Christy Ferioli, State Bar No. 289083
cferioli@publiccounsel.org
Ben Conway, State Bar No. 246410
bconway@publiccounsel.org
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA  90005
(213) 637-3864 direct
(213) 385-9089 fax

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jay F. and Shari L., individually, and A.F., a minor, by and through his guardian ad litem, **Shari L.,**<br><br>    Plaintiffs,<br><br>  v.<br><br>**William S. Hart Union High School District**, a local educational agency,<br><br>    Defendant. | Case No.: 2:16-CV-05117<br><br>Complaint for<br> 1. Violations of the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq.*);<br> 2. Violations of Section 504 of the Rehabilitation Act (29 U.S.C. § 794) and its Regulations; and<br> 3. Attorneys' Fees and Costs (20 U.S.C. § 1415(i)(3)) |

1.      Congress enacted the Education for All Handicapped Children Act—now the Individuals with Disabilities Education Act ("IDEA")—to stop school districts from excluding children with disabilities from a public education because they were difficult to educate. Under IDEA, a district cannot expel a student with disabilities for behavior that is related to his disabilities. Instead, it is required to provide the student an educational program designed to meet his unique needs.

2.      For years, school staff have recognized that Plaintiff A.F.'s disabilities cause him to exhibit impulsive and aggressive behaviors, namely threatening other students. These threats are the reason he was referred for a special education evaluation in 2008. They have been the focus of his special education goals and services. And they have been the primary challenge he faces in accessing his education.

3.      William S. Hart Union High School District ("Hart UHSD") administrators acknowledged that A.F. acts this way because of his mental health condition, going so far as to say that they did not want A.F. at any district school because he had "serious mental issues." They referred to him as a "psychopath" and "sociopath" behind closed doors. They applied these stigmatizing labels to him without making any effort to understand his disabilities or how best to help him.

4.      Hart UHSD never provided A.F. an adequate special education evaluation to determine what his needs were, nor did it provide A.F. an educational program appropriate to meet his needs.

5.      Instead, in spring of 2015, Hart UHSD expelled A.F. for threats. It pushed him out of school in violation of IDEA and his due process rights. It then encouraged the District Attorney's office to prosecute him for these school-based behaviors.

6.      The California Office of Administrative Hearings ("OAH") failed to address Hart UHSD's unlawful actions in this matter because its administrative decision was not careful or thorough, and it made critical errors of law and fact.

7.     Plaintiffs seek a determination that A.F.'s behavior was related to his disabilities, reversal of his expulsion, and placement in an appropriate educational program.

### JURISDICTION AND VENUE

8.     This is a civil action over which this court has original jurisdiction.[1]

9.     This complaint is timely as it was filed within ninety days of Plaintiffs' receipt of the April 18, 2016, final administrative decision.[2] A true and correct copy of that decision is attached as **Exhibit 1**.

10.     Venue is proper because Defendant Hart UHSD is located in Los Angeles County, which is in the Central District of California. In addition, the events at issue took place in Los Angeles County, within the jurisdiction of the Central District.[3]

### PARTIES

11.     Plaintiff A.F. is a minor and citizen of the United States. During the time period at issue in this case, A.F. resided both with his father Jay F. and his mother Shari L. within Los Angeles County and the boundaries of Hart UHSD. A.F. lived with his parents within the boundaries of Hart UHSD except for one to two weeks when he was detained in a Los Angeles County Juvenile Hall.

12.     Plaintiff Jay F., the father of A.F., is a citizen of the United States. During the time period at issue, Mr. F. resided in Los Angeles County.

13.     Plaintiff Shari L., the mother of A.F., is a citizen of the United States. During the time period at issue, Ms. L. resided in Los Angeles County.

14.     Plaintiffs Jay F. and Shari L. are divorced and share decision-making authority regarding A.F.'s education.

---

[1] 28 U.S.C. § 1331; 20 U.S.C. § 1415(i)(2)(A) and (3)(B).
[2] 20 U.S.C. § 1415 (i)(2)(B); Cal. Educ. Code § 56505(k).
[3] 28 U.S.C. § 1391(b).

15.     Defendant William S. Hart Union High School District is a public school district organized and existing under the laws of the State of California. Hart UHSD is located in Los Angeles County. It receives federal funding to provide students an education, including funds to provide special education to students with disabilities. During the time period at issue, Hart UHSD was the local educational agency responsible for providing A.F. an appropriate education.

FACTUAL BACKGROUND

16.     A.F. is a fifteen-year-old boy who was found eligible for special education in the second grade. He is currently enrolled in special education as a student with Emotional Disturbance and Other Health Impairment.

17.     A.F. is eligible for special education due to his diagnosed disabilities of attention deficit hyperactivity disorder ("ADHD") and a mood disorder. He may have other diagnoses that are not yet identified because Hart UHSD has never appropriately evaluated him.

18.     ADHD is a disorder that causes attention deficits, hyperactivity, and impulsivity. Children with impulsive-type ADHD fail to stop and think before acting. They are often rejected and teased by peers.

19.     A.F.'s primary symptom of his ADHD is his lack of impulse control. When an idea comes to his mind, he acts on it without considering the consequences.

20.     Mood disorders are mental illnesses that affect a person's mood. For decades, the term mood disorders captured both bipolar disorders and depressive disorders.[4] Adolescents with mood disorders tend to be disruptive, irritable, and aggressive. Frequently, they make threats to harm themselves or others.

---

[4] The American Psychiatric Association now separates depressive disorders from bipolar disorders though the diagnostic criteria remain largely unchanged.

3
Complaint

21.     A.F.'s mood disorder sometimes presents in his being sad, hopeless, and withdrawn from peers. Other times, A.F.'s mood disorder presents through aggressive behaviors like harming himself and threatening his peers.

22.     As a result of his disabilities, struggles with peer interactions. He lacks the skills necessary to gain attention, engage peers, deal with negative feelings, and resolve conflicts in an appropriate manner.

23.     A.F.'s parents testified, and his school records confirm, that he has faced these challenges since he was in elementary school in Newhall School District, the elementary school feeder district to Hart UHSD.

24.     In second grade during the 2008-2009 school year, Newhall School District evaluated A.F. to determine whether he was eligible for special education as a child with a disability. It conducted this evaluation because his teacher was concerned about his social isolation, poor coping skills, impulsivity, and use of aggression. In class, A.F. was hitting, choking, and threatening to hurt his peers.

25.     Newhall School District's March 2009 evaluation of A.F. confirmed that he had clinically significant thought problems, social problems, attention problems, rule-breaking behavior, aggressive behavior, inattention, and hyperactivity-impulsivity. It also revealed that he was anxious and socially withdrawn.

26.     Newhall School District attributed these problems to disabilities. It found A.F. eligible for special education and developed an Individualized Education Program ("IEP") for him.

27.     When a student is eligible for special education, the school district must create an IEP document that (1) describes the child's present levels of performance, including how the child's disability affects his involvement and progress in the general education curriculum, (2) includes goals designed to address challenges that result from his disability, and (3) provides an educational placement and services necessary for the child to benefit from his education.

28.    The sole goal written in A.F.'s initial IEP was to help him learn appropriate ways to engage his peers instead of threatening them to get their attention. The IEP team created this goal because it agreed that A.F.'s disabilities caused him to make these threats. The IEP team agreed to provide him a full-time instructional aide, school counseling, and a behavior support plan to target his threatening behaviors.

29.    The next year, in 2010, Newhall School District's school psychologist referred A.F. for a mental health assessment. She was concerned because he continued threatening peers, had no friends, and often spent recess alone with his instructional aide.

30.    The Los Angeles County Department of Mental Health evaluated A.F. and found him eligible for mental health services. However, he was only able to receive these services for a few months.

31.    The Department of Mental Health also recommended several new goals. One goal targeted A.F.'s threatening behavior—his "aggression," "acting out," and "[inappropriate] relationships with peers." It proposed this goal because it agreed that A.F.'s disabilities caused this behavior.

32.    Newhall School District adopted these goals in a June 2010 IEP.

33.    In a February 2011 IEP, Newhall School District reaffirmed these goals because A.F. was still threatening peers as a result of his disabilities.

34.    In September 2011, the start of A.F.'s fifth-grade year, Newhall re-evaluated A.F.'s eligibility for special education. This evaluation revealed that A.F. exhibited symptoms of depression—he was sad, hopeless, and withdrawn. It also confirmed that A.F. continued to threaten peers as a result of his disabilities. For example, he would:

- act like a zombie and bite his peers;
- yell "I will kill you in my sleep" at his peers; and
- use a pencil as a gun and pretend to shoot himself.

35.     Later that year, in the spring of 2012, A.F. threatened to rape a female classmate. When confronted by Newhall School District staff, he sobbed and shared that he had a "dark secret" and wanted to kill himself.

36.     A.F. was only ten years old.

37.     During the sixth grade, in the 2012-2013 school year, Newhall School District tried reducing A.F.'s time with his aide to half-time see if it could phase out this support. A.F.'s threatening behaviors intensified. Numerous staff members, parents, and students voiced concerns about A.F.'s threats—they feared for their safety. Newhall School District documented concerns, including:

- A.F. talked about killing things while shooting an invisible gun at students;

- A.F. created a Facebook page in which he listed his occupation as "killing children";

- A.F. messaged several students through social media saying "I know where you live";

- A.F. laughed while telling a classmate, "I'm gonna stalk you."

38.     At A.F.'s March 2013 IEP team meeting, Newhall School District staff drafted another goal to address A.F.'s threatening behavior—his "aggression," "discipline/behavior problems," "negative attention-seeking," and "[in]appropriate interactions." It drafted this goal because it agreed that A.F.'s disabilities caused this behavior.

39.     To help A.F. progress toward this goal, Newhall School District began weekly mental health services, increased A.F.'s time with his instructional aide back to full-time, and continued to implement a behavior intervention plan[5].

40.     Like most Newhall School District students, A.F. transferred into

---

[5] Due to a 2013 change in California law not relevant to this matter, most California schools stopped using the previous California term "behavior support plan" and began to use the federal term "behavior intervention plan."

Hart UHSD for seventh grade. He enrolled at Rancho Pico Junior High. Hart UHSD received A.F.'s records from Newhall School District.

41.     Hart UHSD placed A.F. in a special day class for part of the school day. It did not offer A.F. an aide or any other supplemental service. It also discontinued his behavior intervention plan.

42.     Over the next seven months, A.F.'s threatening behaviors escalated.

43.     In November 2013, A.F. told his teacher that he was depressed and had a knife collection. He told her that the world was "messed up," he did not want to exist, and that good people like his teacher did not belong there.

44.     In December 2013, A.F. stated that he wanted revenge on his ex-girlfriend and would not care if she died. Hart UHSD school staff documented that his "revenge plan" was to get a new girlfriend to make his ex-girlfriend jealous.

45.     During spring of 2014, school staff sent A.F. to the office several times after he cut and scratched himself "so that he [did]n't feel emotional pain."

46.     In May 2014, A.F. told students that he had guns at home, had brought pills and razor blades to school, was a member of a gang, and had shot a person in the stomach. The Assistant Principal conducted a safety search but did not find A.F. to be in possession of any harmful items. None of those statements were true.

47.     Then, on May 20, 2014, school staff sent A.F. to the office after he cut himself with a razorblade and threatened to cut other students. A.F. was talking to a girl. He started to make inappropriate sexual statements towards her, she got upset, and other students tried to intervene. A.F. brandished a razor blade, threatening to cut them and the girl if they did not leave him alone. He then cut himself on the upper arm. He stated that he cut himself because he was upset that all of his friends hated him.

48.     The next day, a school police officer determined that A.F. was "in need of help and support more than being arrested for a crime," so he placed A.F.

on a psychiatric hold at Henry Mayo Hospital. Henry Mayo then transported A.F. to Bakersfield Good Samaritan Hospital for a 72-hour involuntary psychiatric hold. There, a psychiatrist diagnosed A.F. with a mood disorder.

49.     Hart UHSD held a manifestation determination IEP meeting on May 27, 2014, to discuss A.F.'s May 20 behavior. At this meeting, the IEP team unanimously agreed that A.F.'s threats to cut his classmates had been caused by his disabilities. Hart UHSD removed A.F. from most of his classes for the rest of the year but continued A.F.'s counseling during the summer.

50.     At this IEP team meeting, Hart UHSD proposed a different school for A.F.—Sequoia Charter School. Hart UHSD described Sequoia as a smaller school for students with severe emotional issues.

51.     Sequoia is a school where children with disabilities are segregated from their nondisabled peers. It is located several miles away from any other school. Instead of a real school building, it consists of trailers surrounded by an iron fence.

52.     A.F.'s parents visited Sequoia, where they observed that it "looked more like a prison than a school." They spoke to teachers and other parents in the community. Based on those conversations, they believed that Sequoia was "the worst place" they could send A.F.—that it was a negative environment and the last place a kid went before getting "kicked out" of school. A.F.'s parents also believed that no student who went to Sequoia had been able to return to a general education environment.

53.     At A.F.'s next IEP meeting in June 2014, Hart UHSD staff wrote a new behavior goal into his IEP to address his threats—to "use positive social strategies to gain peer attention instead of using negative verbal aggression." Hart UHSD staff drafted this goal because it agreed that A.F.'s disabilities caused this behavior. The IEP team cited the incidents discussed above (e.g., threats, brandishing a razor blade, and engaging in dialogue with peers about weapons and

violence) as examples of the threatening behavior A.F. exhibited because of his disabilities. It also developed a new behavior intervention plan to address A.F.'s threats.

54.    At this meeting, Hart UHSD staff said that A.F. needed a more therapeutically supportive school placement to access an education. Hart UHSD proposed to place A.F. at Sequoia. A.F.'s parents expressed their concerns that this placement was inappropriate. Hart UHSD did not offer A.F. any other placement.

55.    Hart UHSD reconvened this IEP team meeting on August 13, 2014. A.F.'s parents reiterated their concerns that Sequoia was not an appropriate placement for A.F.

56.    A.F.'s parents did not understand that they could reject this placement and keep A.F. in special education. Their understanding was that they had two options—either place A.F. at Sequoia or exit him from special education and enroll him in his home school of Placerita Junior High.

57.    Because they disagreed with Sequoia, A.F.'s parents exited him from special education.

58.    A.F. enrolled in the eighth grade at Placerita in Hart UHSD for the 2014-2015 school year.

59.    In September 2014, A.F.'s parents requested an evaluation and an intervention plan under Section 504 of the Rehabilitation Act—a 504 Plan.

60.    Hart UHSD did not conduct an evaluation but it did draft a 504 Plan.

61.    The 504 Plan listed A.F.'s Emotional Disturbance as one of his disabling conditions. The 504 Plan contained only two accommodations—preferential seating to limit distractions and a "student planner incentive plan" to improve homework completion. It included no accommodations, modifications, or services to address A.F.'s emotional and behavioral needs.

62.    The next month, Hart UHSD removed A.F. from Placerita because of a disciplinary incident.

63.     On October 20, 2014, several students reported that A.F. had been inhaling ("huffing") an air dust can on campus during a break between classes. When confronted, A.F. admitted this and sobbed in front of the Principal, Assistant Principal, and school counselor for over thirty minutes. He shared that he felt isolated and alone all the time and in pain; that nobody understood what he had been going through every day for years as a result of having no friends. He also told them that he had read a book about psychopaths four times and that he related to some of the characters and their feelings.

64.     Hart UHSD's school counselor called the Los Angeles Department of Child and Family Services for assistance with crisis intervention, and A.F.'s mother took him there for same-day counseling.

65.     That single call was the only help Hart UHSD offered A.F. after this incident.

66.     Shortly thereafter, Hart UHSD informed Ms. L. and Mr. F. that A.F. could no longer attend Placerita. It transferred him to La Mesa Junior High School.

67.     Hart UHSD did not conduct a 504 evaluation or convene a team meeting to determine whether this change of placement was appropriate. It just moved him.

68.     A.F. attended La Mesa from November 2014 to January 2015.

69.     On the night of January 20, 2015, A.F. exchanged text messages with his ex-girlfriend. She expressed that she wanted to die. He responded asking if she would die with him if he brought a gun to school.

70.     When her parents learned of these texts, they reported it to Hart UHSD.

71.     A.F. was again taken to Henry Mayo for a threat assessment.

72.     The police again confirmed that A.F. had no access to guns.

73.     Hart UHSD suspended A.F. for five days. It documented that it planned to expel him until the Principal of La Mesa "determined" that he had a

504 Plan.

74.     Hart UHSD held Section 504 manifestation determination meeting on January 26, 2015, to discuss the January 20 threatening text messages. The team unanimously agreed that A.F.'s threats were a manifestation of his disabilities.

75.     Hart UHSD decided to return A.F. to Placerita, and A.F.'s parents requested to re-enroll A.F. in special education.

76.     The next day, January 27, 2015, A.F. returned to Placerita.

77.     That morning, Hart UHSD held an IEP team meeting to re-enroll A.F. in special education.

78.     The same Placerita staff who drafted the inadequate 504 Plan for A.F. attended the IEP team meeting.

79.     Despite knowledge of A.F.'s significant emotional and behavioral challenges, Hart UHSD offered A.F. only minimal services—a daily study skills class and weekly mental health counseling. Hart UHSD acknowledged his need for behavioral support like a behavior intervention plan, but did not draft one.

80.     Instead, Placerita's Principal Ms. Hayes-Rennels required A.F. to sign a behavior contract, and she spent half of the very short IEP meeting reviewing the contract line by line. The contract did nothing more than make A.F. promise to behave. At hearing, Ms. Hayes-Rennels testified that this contract was the last step before an expulsion.

81.     A.F. was excited about the opportunity return to his home school. He was eager to show that he could be "good" and follow the rules.

82.     Yet within hours of this meeting, A.F. broke school rules.

83.     A.F. approached two separate students during the passing period between classes. He said to one "Hey motherfucker, I'm back. This is going to be fun." He said to the other "Aren't you the motherfucker who told on me? We're going to have a lot of fun" while rubbing his hands together with a "creepy smile."

84.     The students interpreted these statements as threats and reported

them to the Assistant Principal, Ms. Thompson.

85. Ms. Thompson suspended A.F. for five days.

86. Then she and Ms. Hayes-Rennels both reached out to Hart UHSD's Director of Student Services to explain that they did not want A.F. on their campus because he had "serious mental issues." They called him a "psychopath" and "sociopath."

87. Hart UHSD held an IEP team meeting to discuss this incident on February 3, 2015.

88. At this meeting, Hart UHSD decided that A.F.'s threats on January 27 were *not* a manifestation of his disabilities.

89. A.F.'s parents testified that they thought the Hart UHSD staff, which consisted of Ms. Hayes-Rennels, Ms. Thompson, and a few other employees of Placerita, had made up their minds before the meeting started. At the meeting, staff did not review or discuss the years of IEPs indicating that A.F.'s previous IEP teams had considered threatening behaviors to be caused by his disabilities. They did not review or discuss the two manifestation determinations that had taken place in the year prior—one of which occurred just one day before the January 27 incident—in which other Hart UHSD staff members unanimously agreed that A.F. made threats due to his disabilities. Nor did they allow A.F.'s parents to provide any input before reaching their determination.

90. The Placerita staff did not document any reason why they did not consider A.F.'s behavior to be a manifestation of his disabilities. They simply noted that A.F. was impulsive, depressed, and exhibited inappropriate feelings under normal circumstances.

91. Despite A.F.'s parents' disagreement with the manifestation determination, Hart UHSD pursued expulsion proceedings against A.F.

92. On March 3, 2015, Hart UHSD notified Ms. L. and Mr. F. that an expulsion hearing would commence March 23, 2015. That date is more than thirty

school days after its January 27 determination that A.F. had made threats. Hart UHSD did not provide a copy of the disciplinary rules it alleged A.F. had violated.

93.     While the expulsion hearing was pending, Hart UHSD removed A.F. from Placerita and placed him in home study.

94.     Hart UHSD excluded A.F. from all schools from January until the end of April 2015.  During this time, Hart UHSD provided A.F. only a few hours of instruction per week and a single mental health counseling session.

95.     Hart UHSD did not provide A.F. with a functional behavioral assessment or behavioral intervention services (like a behavior intervention plan) designed to address his misconduct so that it would not recur.

96.     Left without any support, A.F. continued to try to engage peers by making threats. He threatened Hart UHSD school staff and students on social media. This resulted in A.F. being arrested and taken to Sylmar Juvenile Hall on March 20, 2015. He was released a few days later.

97.     A.F. was appointed a public defender on March 25, 2015, and an education attorney through the Public Defender's office shortly thereafter. The Public Defender's office notified Hart UHSD of this representation on March 31, 2015.

98.     Around this time, Hart UHSD continued A.F.'s expulsion hearing to April 30, 2015. It did not notify A.F.'s attorneys at the Public Defender's office of this hearing.

99.     In April 2015, Hart UHSD conducted what it called an evaluation of A.F. This evaluation should have assessed A.F.'s disabilities by using a variety of assessment tools. It should have been sufficiently comprehensive to identify all of his educational needs, including what services were necessary for him to be involved in the general education curriculum. Hart UHSD should have obtained this evaluation from a psychiatrist or clinical psychologist.

100.    Hart UHSD's school psychologist instead conducted a superficial

evaluation. The only testing she completed was to have A.F. and Mr. F. complete a questionnaire. She did not conduct a clinical interview of A.F. or observe A.F. She did not obtain input from Ms. L. or any teacher who had observed A.F. in a school setting. It does not appear that she reviewed the majority of A.F.'s records.

101.   The evaluation did not note that A.F. had been diagnosed with a mood disorder or describe how his mood disorder impacted his functioning. Nor did it note any of the troubling behaviors he had exhibited at school. Its sole recommendation was to send A.F. to Sequoia.

102.   On April 17, 2015, Hart UHSD held A.F.'s triennial IEP team meeting. At this meeting, Hart UHSD offered an educational placement at Sequoia. Hart UHSD told A.F.'s parents that it would not expel him if they agreed to send him to Sequoia. Based on this representation, A.F.'s parents signed the IEP, agreeing to the placement at Sequoia.

103.   After this meeting, Ms. L. notified the Public Defender's office that A.F.'s expulsion hearing had been canceled.

104.   A.F.'s education attorney through the Public Defender's office attempted to confirm this information by leaving a voicemail for Hart UHSD on April 20, 2015.

105.   That same day, Mr. F. received a call from Placerita notifying him that he had to return A.F.'s books before A.F. could be enrolled at Sequoia.

106.   Mr. F. went to Placerita on the morning of April 21, 2015, to return the books. While there, someone at Placerita told him and A.F. to sign some exit paperwork.

107.   That paperwork turned out to be a stipulated expulsion agreement. Nobody reviewed the terms of this agreement with Mr. F. or A.F. Neither Mr. F. nor A.F. had an opportunity to read this agreement. Neither Mr. F. nor A.F. have any memory of signing this agreement.

108.   Hart UHSD never notified Ms. L. of this agreement.

109.    Hart UHSD never notified A.F.'s Public Defender or his education attorney from the Public Defender's office, Irene Nunez, of this agreement.

110.    Mary Chester, Hart UHSD's Court Liaison, did not return Irene Nunez's April 20 call about the expulsion hearing until April 27. When she did, she stated that the hearing had been canceled because A.F.'s parents accepted Hart UHSD's offer of FAPE at Sequoia. She said nothing about a stipulated expulsion agreement.

111.    Neither A.F.'s parents nor his attorneys from the Public Defender's office knew that Mr. F. had signed a stipulated expulsion agreement, agreeing that A.F. was expelled from Hart UHSD and (purportedly) waiving their right to contest that expulsion. Indeed, it was their understanding that Hart UHSD had withdrawn its expulsion recommendation because the parents agreed to enroll A.F. at Sequoia.

112.    Hart UHSD's Governing Board ratified the stipulated expulsion agreement on May 20, 2015. Hart UHSD set the suspended expulsion to last until the end of the spring 2016 semester. Hart UHSD did not mail a copy of this final expulsion decision to Ms. L, Mr. F., or A.F.'s attorneys from the Public Defender's office. As such, A.F.'s parents and attorneys remained unaware of this agreement until the fall of 2015.

113.    In the meantime, A.F. enrolled in Sequoia and finished the eighth grade there.

114.    In his second week of the ninth grade—on August 25, 2015—Sequoia suspended A.F. for one day after he killed a small lizard on campus. When asked about the incident, A.F. explained that it was no big deal, he did not feel bad about it, and he did it "because I'm a psychopath."

115.    That day, the Sequoia Principal, school psychologist, and school counselor called A.F.'s parents in for a meeting about A.F.'s behavior, its impact on the other students, and their concerns about A.F.'s lack of remorse and empathy.

A.F.'s school counselor expressed (and documented) his concern that Hart UHSD had not yet conducted a comprehensive psychiatric evaluation of A.F.

116.    Hart UHSD did not hold a manifestation determination IEP meeting to determine whether A.F.'s behavior on August 25 was the result of his disabilities or Hart UHSD's failure to implement his IEP. Instead, it refused to allow A.F. to return to Sequoia.

117.    On September 3, 2015, A.F.'s education attorney from the Public Defender's office sent a letter to Hart UHSD on behalf of A.F.'s parents, asking that Hart UHSD provide A.F. with a mental health assessment and hold an IEP to discuss an appropriate educational placement for A.F.

118.    Hart UHSD did neither of these things.

119.    Rather, it responded by sending A.F.'s parents a letter dated September 8, 2015, notifying them that A.F.'s one-day suspension violated his stipulated expulsion agreement and that it was enforcing the expulsion.

120.    This is the first time A.F.'s parents or attorneys learned of the stipulated expulsion agreement.

121.    After A.F.'s education attorney spoke to Hart UHSD staff, she sent Hart UHSD a letter explaining why the stipulated expulsion agreement was unenforceable and asking for A.F. to be reinstated. Hart UHSD refused.

122.    For the first month that A.F. was removed from Sequoia, Hart UHSD provided A.F. no education whatsoever.

123.    Then, in late September 2015, Hart UHSD agreed to provide A.F. temporary home study of five hours a week for a few weeks. After this, Hart UHSD terminated his instructional services.

124.    Hart UHSD did not offer A.F. any educational services again until mid-November 2015, when it agreed to reinstate A.F.'s home study.

125.    From September 2015 to February 2016, Hart UHSD provided A.F.

only about a week's worth of instructional time.[6]

126.   Hart UHSD provided A.F. no mental health counseling after it expelled him.

127.   Hart UHSD did not hold an IEP team meeting for A.F.

128.   Nor did it ever evaluate A.F.[7]

129.   Instead, Hart UHSD encouraged the District Attorney's office to prosecute A.F. for his actions in January, March, and August of 2015. It used these proceedings to advocate for A.F. to be removed from his home and Hart UHSD.

130.   Since the fall of 2013, Hart UHSD has not provided A.F. an appropriate education.

## PROCEDURAL HISTORY

131.   Plaintiffs filed a special education administrative due process complaint with OAH in February 2015.

132.   Plaintiffs pleaded three sets of claims for resolution—one set of expedited claims alleging that Hart UHSD violated IDEA by disciplining A.F. unlawfully, a second set of non-expedited claims alleging that Hart UHSD violated IDEA by failing to provide A.F. an appropriate education, and a third set of claims that were outside OAH's jurisdiction (i.e., claims under Section 504 of the Rehabilitation Act and its regulations) for purposes of administrative

---

[6] Hart UHSD was the district responsible for educating A.F. this entire time, apart from one to two weeks when he was detained in juvenile hall.

[7] As a result, in February 2016, Plaintiffs requested an independent educational evaluation ("IEE"). Hart UHSD agreed in March 2016 to the IEE. However, it proposed one assessor who was a former Hart UHSD employee and another who was employed by another district. It did not respond regarding Plaintiffs' proposed experts until long-after the administrative hearing in this matter. Plaintiffs are now pursuing an IEE at their own expense and intend to seek reimbursement from Hart UHSD.

exhaustion.

133.    OAH bifurcated the expedited IDEA claims from the non-expedited IDEA claims. A.F.'s non-expedited administrative claims under IDEA are still pending.

134.    At Plaintiffs' request, OAH dismissed the non-IDEA claims for lack of jurisdiction in its March 15, 2016, prehearing conference statement.

135.    The administrative hearing regarding Plaintiffs' expedited claims occurred on March 22, 23, 24, 29, and 30 of 2016. The issues to be decided at hearing included the following:

- Whether Hart UHSD violated IDEA when it determined that A.F.'s behavior on January 27, 2015, was not a manifestation of his disabilities or caused by Hart UHSD's failure to implement his IEP;

- Whether Hart UHSD violated IDEA when it removed A.F. from his educational placement at Placerita for several months in the spring of 2015 while it pursued expulsion proceedings against him;

- Whether Hart UHSD violated IDEA when it failed to provide A.F. with a functional behavioral assessment or behavioral intervention services designed to address the January 27 behavioral incident;

- Whether Hart UHSD violated IDEA when it expelled A.F. by affording him less due process than was required for a nondisabled student; and

- Whether Hart UHSD violated IDEA when it expelled A.F. after an August 25, 2015, behavioral incident without first holding a manifestation determination IEP meeting.

136.    OAH issued its decision regarding the expedited claims on April 18, 2016. Plaintiffs prevailed on the fifth issue (i.e., Hart UHSD's failure to convene a manifestation determination IEP meeting regarding the August 2015 incident).

137.    OAH ordered Defendants to convene a manifestation determination

1   IEP meeting. OAH further ordered that Hart UHSD suspend enforcement of A.F.'s

2   expulsion pending the outcome of the manifestation determination.

3       138.    Pursuant to OAH's order, on May 3, 2016, Hart UHSD held a

4   manifestation determination IEP meeting regarding A.F.'s August 25 behavioral

5   incident. Despite the independent psychologist's and parents' opinions that the

6   behavior was a manifestation of A.F.'s disabilities, Hart UHSD held that the

7   behavior was not a manifestation of A.F's disabilities.

8       139.    Plaintiffs will be appealing Hart UHSD's May 3, 2016, manifestation

9   determination through OAH's administrative process.

10

11                          STATUTORY FRAMEWORK

12      140.    Since its enactment in 1975 as the Education for All Handicapped

13  Children Act, IDEA has required school districts to provide a free and appropriate

14  public education to children with disabilities.[8] This education must be designed to

15  meet the children's unique needs and prepare them for further education,

16  employment, and independence.[9] In reauthorizing IDEA in 2004, Congress

17  emphasized the importance of school districts' duty, noting that "[i]mproving

18  educational results for children with disabilities is an essential element of our

19  national policy of ensuring equality of opportunity, full participation, independent

20  living, and economic self-sufficiency for individuals with disabilities."[10]

21      141.    Before these laws were enacted, children with disabilities were

22  routinely removed from school and denied an education because their disabilities

23  made them difficult to educate.[11] To rectify this, IDEA prohibited the

24

25  _____

26  [8] 20 U.S.C. §§ 1400(c)(3) & 1412(a)(1).

[9] 20 U.S.C. § 1400(d)(1)(A).

27  [10] 20 U.S.C. § 1400(c)(1).

[11] 20 U.S.C. § 1400(c)(2).

28

inappropriate removal of children with disabilities from regular school settings.[12] It created special rights for children with disabilities when they face disciplinary removals from school.

142.    Within ten school days of any disciplinary change of placement, the school district must hold a manifestation determination IEP meeting.[13]

143.    That manifestation IEP team must first determine whether the student's misconduct had a direct and substantial relationship to his disability; it must then determine whether the student's misconduct was the result of the district's failure to implement his IEP.[14] In making these determinations, the manifestation IEP team must review **all** relevant information—including the student's file and information provided by the parents.[15]

144.    The purpose of these procedures is to "limit the inappropriate removal of a child with a disability from his or her current placement."[16]

145.    When the misconduct was a manifestation of the student's disability, the district must return the student to the educational placement from which he was removed.[17] The district must also conduct a functional behavior assessment and/or develop a behavior intervention plan.[18]

146.    When the misconduct is not a manifestation, the district must conduct a functional behavior assessment and/or develop a behavior intervention

---

[12] *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179–80 (1982) (discussing the statutory history of what is now IDEA).

[13] 34 C.F.R. § 300.530.

[14] 34 C.F.R. § 300.530(e)(1) (Plaintiffs do not challenge OAH's findings on the second prong of this analysis: whether the student's misconduct was the direct result of the District's failure to implement the IEP).

[15] *Id.*

[16] Due Process Procedures for Parents and Children, 71 Fed. Reg. 46,714 (Aug. 14, 2006).

[17] 34 C.F.R. § 300.530(f)(2).

[18] 34 C.F.R. § 300.530(f)(1).

plan as appropriate to address the behavior so that it does not recur.[19]

147.   It can then further discipline the student. However, the district must discipline the student "in the same manner" as it disciplines children without disabilities.[20] The U.S. Department of Education has explained that these provisions make it "sufficiently clear that disciplinary measures are to be applied to children with disabilities to the extent they are applied to children without disabilities."[21] The Department went on to explain that one purpose of expedited due process is "to ensure that schools *implement* disciplinary policies that provide for a uniform and fair way of disciplining children with disabilities."[22]

148.   No student can be expelled and deprived of his right to a public education unless he is first provided due process.[23] In California, students have a right to meaningful notice of the charges being alleged against them, which must include written notice of the date and time of the expulsion hearing and a copy of the disciplinary rules of the district that relate to the alleged violation.[24] This notice must be provided at least ten days before the date of the expulsion hearing, and the hearing must be set within thirty school days of when the district determines that the violation occurred.[25] When the student is involved in the juvenile delinquency system, the district must notify not only the student of this hearing, but also the student's attorney.[26] When a district fails to provide adequate notice or schedule a timely hearing, it loses its jurisdiction to pursue an

---

[19] 34 C.F.R. § 300.530(d)(1).
[20] 20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(c).
[21] Due Process Procedures for Parents and Children, 71 Fed. Reg. 46,715 (Aug. 14, 2006).
[22] *Id.* (emphasis added).
[23] *See, e.g., Goss v. Lopez*, 419 U.S. 565, 583 (1975).
[24] Cal. Educ. Code §48918 (b).
[25] Cal. Educ. Code §48918(a) and (b).
[26] Cal. Educ. Code §48918.1(a)(1).

expulsion.[27]  Furthermore, even if the district follows all of these mandated procedures, it cannot expel a student unless it makes certain statutorily required findings.[28]

149.   These due process rights cannot be waived unless the district shows—by clear and convincing evidence—that the waiver was voluntary, knowing, and intelligent.[29]

150.   Lastly, an expulsion cannot be enforced beyond the last day of the semester following the semester in which the incident took place.[30]

FIRST CLAIM: HART UHSD VIOLATED IDEA BY FLAUNTING ITS PROCEDURES FOR DISCIPLINARY CHANGES OF PLACEMENT. 20 U.S.C. § 1400 *ET SEQ.*

151.   Plaintiffs incorporate the preceding paragraphs.

152.   Plaintiffs are aggrieved by OAH's final decision in this matter.[31]

153.   Hart UHSD violated IDEA when it (1) determined that A.F.'s behavior on January 27, 2015, was not a manifestation of his disabilities, (2) removed him from his school for three months in the spring of 2015 while it pursued expulsion proceedings against him, (3) failed to provide him timely behavioral intervention services so that he would not continue to exhibit the same problem behaviors, and (4) expelled him by affording him less due process than was required to expel any other, nondisabled student.

154.   OAH erred in upholding those actions.

155.   Although OAH's decision is 24 pages, it is not careful and thorough— it did not consider significant records and testimony, mischaracterized evidence,

---

[27] *Garcia v. Los Angeles County Board of Education*, 123 Cal. App. 3d 807, 812 (1981).
[28] Cal. Educ. Code §§ 48900 & 48915.
[29] *Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377, 1383-84 (C.D. Cal. 1995).
[30] Cal. Educ. Code § 48916.
[31] 20 U.S.C. § 1415(i)(2)(A); Cal. Educ. Code § 56505(k).

1  failed to note contradictory evidence, inappropriately limited the administrative

2  record, and improperly failed to adjudicate one of Plaintiffs' claims under IDEA.

3      156.    Thus, OAH's decision should be given only limited weight during this

4  Court's review.[32]

5      157.    Plaintiffs intend to submit new evidence including an independent

6  educational evaluation in support of its claims.

7          **a.    Hart UHSD violated IDEA by failing to determine that A.F.'s**

8              **January 27, 2015, behaviors were caused by and had substantial**

9              **relationship to his disabilities.**

10     158.    OAH erred when it upheld Hart UHSD's decision that A.F.'s verbal

11  threats on January 27, 2015, were not related to his disabilities.

12     159.    In evaluating this incident, OAH did not consider substantial

13  evidence adduced by Plaintiffs and drew unsupported inferences in Hart UHSD's

14  favor.

15     160.    Additionally, OAH's decision was factually selective to the detriment

16  of an accurate factual record and often ignored contradictory evidence. OAH's

17  decision mischaracterized testimony and evidence solely in Hart UHSD's favor.

18     161.    OAH abused its discretion by requiring expert testimony even when

19  lay testimony was competent to establish facts, thereby setting too high a burden

20  of proof for Plaintiffs on this issue.

21     162.    As one example of these errors, OAH found:

22          Student offered no credible evidence . . . proving that any of

23          Student's past history of behaviors were relevant to Student's

24          threats of retaliation on January 27, 2015. . . Relying only on

25  _____

26  [32] *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) (holding that a federal court must
   give "due weight" to the administrative agency's decision); *Union Sch. Dist. v. Smith*,

27  15 F.3d 1519, 1524 (9th Cir. 1994) (noting that deference to OAH is appropriate

28  where administrative findings are thorough and careful).

Student's past history and Parents' opinions, . . . Student did not provide any credible evidence supporting a finding that the incident on January 27, 2015, was a manifestation of either disability.[33]

Had Plaintiffs merely introduced disciplinary records documenting behaviors, such as suspension reports, OAH's analysis may have been correct.

163.    Yet both Ms. L. and Mr. F. testified about how A.F.'s IEP and 504 teams from 2009 to 2015 repeatedly found that A.F. made threats as a result of his disabilities. Those teams were comprised of trained educators and mental health professionals employed by Hart UHSD and its feeder district, Newhall School District.

164.    Those IEP teams documented their findings in A.F.'s IEPS—in his present levels of performance, goals, behavior intervention plans, and previous manifestation determinations. Those documents were admitted into evidence.

165.    Ms. L. and Mr. F.'s testimony about those IEP team findings was credible because it was supported by the IEP documents drafted by school staff.

166.    Ms. L. and Mr. F.'s testimony and those IEP documents were relevant because from 2009 up to January 26, 2015, the day before the incident in question, school staff consistently agreed that A.F. made threats very similar to the ones he made on January 27, 2015, as a result of his disabilities.

167.    For years, all professionals interpreted almost identical threatening behaviors to be a caused by A.F.'s disabilities. That is, until a group of administrators who did not know A.F.—but did not want him in their school— decided without explanation that they were not. OAH erred when it failed to find that that A.F.'s January 27, 2015, threats were caused by and had substantial relationship to his disabilities.

---

[33] Administrative Decision, p. 14, ¶ 12.

**b. Hart UHSD violated IDEA by removing A.F. from his educational placement for three months.**

168.   OAH erred when it upheld Hart UHSD's unlawful removal of A.F. from his educational placement and its provision of inadequate special education and related services between January and April 2015.

169.   Because OAH did not properly analyze Hart UHSD's manifestation determination as described above, OAH did not find that Hart UHSD unlawfully changed A.F.'s placement due to behavior that was a manifestation of his disability.

170.   A.F.'s misconduct on January 27, 2015, was a manifestation of his disabilities. Hart UHSD should have reinstated him at Placerita on February 3.

171.   However, even if Hart UHSD had been correct that A.F.'s misconduct on January 27 was not a manifestation, it was required to provide educational services that would enable him to participate in the general education curriculum and make progress towards the goals set out in his IEP.

172.   Instead, it provided a few hours of home study each week, a single mental health counseling session, and no behavioral intervention services.

173.   Those services were not sufficient to enable A.F. to participate in the general education curriculum, given that the needs resulting from his disabilities are primarily behavioral and social/emotional. Indeed, just hours before his January 27 threats, A.F.'s IEP team agreed that he "requires counseling services in order to address [his] functional and behavioral needs." It also acknowledged his need for behavior intervention services including a behavior intervention plan, and it agreed to create one.

174.   In evaluating Hart UHSD's disciplinary removal, OAH did not consider substantial evidence adduced by Plaintiffs and drew unsupported inferences in Hart UHSD's favor.

175.   OAH's decision was factually selective to the detriment of an accurate

factual record and often ignored contradictory evidence. OAH's decision mischaracterized testimony and evidence solely in Hart UHSD's favor.

176.   OAH's decision also improperly shifted responsibility for services that IDEA places on UHSD to Ms. L. and Mr. F.

177.   Specifically, OAH determined that Hart UHSD's failure to provide counseling to A.F. was excused.

178.   Hart UHSD's records show that its mental health counselor, Ms. Prado, spent only three minutes attempting to contact A.F.'s parents to schedule counseling sessions for him. When she reached out to A.F.'s teacher, she was immediately able to schedule a session with A.F. She provided that one session. The District's records show that it then unilaterally cancelled his second session, and nobody from Hart UHSD made any attempt to schedule any additional sessions.

179.   Hart UHSD removed A.F. from his school for three months and provided him only a few hours of education per week, one counseling session, and no behavior intervention services. OAH erred when it failed to find that Hart UHSD unlawfully changed A.F.'s placement and provided him inadequate services.

   **c.   Hart UHSD violated IDEA by failing to provide A.F. a functional behavior analysis and develop a behavior intervention plan for him.**

180.   OAH erred when it upheld Hart UHSD's failure to provide A.F. a functional behavior analysis and develop a behavior intervention plan for him.

181.   When a behavior is a manifestation of a child's disabilities, a district must conduct a functional behavior analysis and/or develop a behavior intervention plan. Even if a behavior is not a manifestation of a child's disabilities, a district still must conduct a functional behavior analysis or develop a behavior intervention plan as appropriate to address the behavior so that it does not recur.

182.   In evaluating this issue, OAH did not consider substantial evidence

adduced by Plaintiffs and drew unsupported inferences in Hart UHSD's favor.

183.   OAH's decision was factually selective to the detriment of an accurate factual record and often ignored contradictory evidence. OAH's decision mischaracterized testimony and evidence solely in Hart UHSD's favor.

184.   OAH also distorted the legal standard, thereby setting too high a burden of proof on Plaintiffs on this issue.

185.   As one example of these errors, OAH held that Plaintiffs did not prove a behavioral intervention plan was appropriate because Plaintiffs did not prove A.F. was at risk of making additional threats while on home study. OAH stated that he was not at risk of making threats because he was on house arrest, which limited his use of social media to communicate with peers.

186.   However, testimony and evidence showed that A.F. was at risk of making additional threats to peers while on home study and—in fact—made additional threats while on home study.

187.   A.F. was arrested on March 20, 2015, because he threatened Hart UHSD students and staff on social media. He was not placed on house arrest until after he was arrested.

188.   Hart UHSD knew he was at risk of making threats. From 2009 and on, A.F.'s IEP teams provided him behavior intervention plans to address his threatening behaviors. Indeed, just hours before the January 27 incident, Hart UHSD staff documented A.F.'s need for a behavior intervention plan to address this behavior. It promised to reconvene the meeting to draft one. It never did—leading to A.F.'s involvement in the juvenile justice system.

189.   Hart UHSD unlawfully failed to conduct a functional behavior analysis of A.F. and develop a behavior intervention plan for him. OAH erred in excusing Hart UHSD from these requirements.

### d. Hart UHSD violated IDEA when it expelled A.F. by affording him less due process than was required for any other student.

190.     OAH erred when it held that it did not have jurisdiction to hear this claim and thereby upheld Hart UHSD's unlawful disciplining of A.F.

191.     Under IDEA, a district cannot discipline a student with disabilities differently than it could any other student.

192.     Yet Hart UHSD disciplined A.F. differently that it was allowed to discipline any other student.

193.     Hart UHSD was required to send A.F.'s parents meaningful notice of the charges being alleged against him (including a copy of the disciplinary rules it said he had violated), set a timely hearing, and notify A.F.'s attorney(s) of the proceedings. Even if it was pursuing a stipulated expulsion, Hart UHSD's Governing Board needed to make specific findings to support an expulsion and limit that expulsion to December 2015—the end of the semester following the semester in which A.F. made the threats.

194.     Hart UHSD did not send A.F.'s parents adequate notice of the initial expulsion hearing. It set the initial expulsion hearing beyond the legal timeline. It did not notify his attorneys of the proposed expulsion hearing. Its Governing Board did not make the statutorily required findings before expelling A.F.

195.     A.F.'s parents did not knowingly, intelligently, and voluntarily waive his due process rights. Although A.F.'s father signed a stipulated expulsion agreement, he did so unknowingly, and A.F.'s mother never even saw the agreement. Both parents believed A.F.'s expulsion charges had been dropped because they accepted Hart UHSD's offer of FAPE at Sequoia. There is no clear and convincing evidence to the contrary.  As such, Hart UHSD lacked jurisdiction to pursue an expulsion.

196.     When Hart UHSD expelled A.F., it did so by affording him less due process than it had to provide to any other, nondisabled student. It also expelled

him for longer than it was allowed to expel any other student. In this way, it violated IDEA's mandate that it could only discipline students with disabilities "in the same manner" that it could discipline any other student.

197.   OAH abused its discretion in reframing the issue Plaintiffs pleaded.

198.   OAH should have held that Hart UHSD's actions were unlawful, but it failed to do so because it improperly concluded it had no jurisdiction to consider this issue. Despite acknowledging that it has jurisdiction to hear claims arising under IDEA, OAH refused to hear Plaintiffs' claim that Hart UHSD's disciplining of A.F. violated IDEA.

199.   In its factual findings related to this issue, OAH did not consider substantial evidence adduced by Plaintiffs and drew unsupported inferences in Hart UHSD's favor.

200.   Additionally, OAH's decision was factually selective to the detriment of an accurate factual record and often ignored contradictory evidence. OAH's decision mischaracterized testimony and evidence solely in Hart UHSD's favor

201.   For example, OAH found that A.F.'s father requested the stipulated expulsion agreement and then signed it after Ms. Thompson spent forty-five minutes reviewing the terms of the agreement with him and A.F.

202.   Yet OAH did not consider or even note the extensive evidence to the contrary, including the following:

- Both of A.F.'s parents testified at length that they thought the expulsion charges had been dropped because they accepted Hart UHSD's offer of FAPE at A.F.'s April 17 IEP meeting, that they did not know this agreement even existed until fall 2015, and why they would not have knowingly signed such an agreement.
- There is no documentation that anybody from Hart UHSD ever met with A.F. or his father regarding the stipulated expulsion agreement despite the fact that his records document numerous, less

significant meetings and phone calls.

- Ms. Thompson, who testified at hearing, never stated that she met with or reviewed the terms of the agreement with A.F. and his father.

203.   OAH  further abused its discretion when it prevented Plaintiffs from introducing additional evidence in support of its arguments that Hart UHSD violated A.F.'s due process rights and that A.F.'s parents did not voluntarily, knowingly, and intelligently waive these rights. Specifically, it prevented Plaintiffs from obtaining the following testimony from A.F.'s attorneys from the Public Defender's office:

- Testimony about the date A.F. became the subject of delinquency court proceedings;
- Testimony that the attorneys informed Hart UHSD that they represented A.F., but Hart UHSD never notified them of A.F.'s expulsion proceedings or expulsion;
- Testimony from A.F.'s education attorney that District staff informed her that the expulsion charges had been dropped because A.F.'s parents accepted Hart UHSD's offer of FAPE at Sequoia; and
- Testimony from A.F.'s education attorney corroborating that A.F.'s parents did not learn about the stipulated expulsion agreement until September 2015.

204.   Had OAH considered all the evidence that Plaintiffs introduced and attempted to introduce, it would have found that Hart UHSD violated IDEA when it expelled A.F. by affording him less due process than was required to expel any other student.

205.   OAH erred when it declined to decide this issue and made unsupported findings of fact.

SECOND CLAIM: HART UHSD VIOLATED SECTION 504 OF THE REHABILITATION ACT AND ITS IMPLEMENTING REGULATIONS BY FLAUNTING THEIR PROCEDURES FOR DISCIPLINARY CHANGES OF PLACEMENT AND DENYING HIM A FAPE.

29 U.S.C. § 794; 34 C.F.R. § 104 *ET SEQ.*

206.    Plaintiffs incorporate the preceding paragraphs.

207.    Plaintiffs bring claims under Section 504 because it applies a different standard in evaluating whether a student has received a FAPE, has a different statute of limitations, and affords broader remedies.

208.    Plaintiffs have an implied right of action to enforce Section 504 and its implementing regulations.[34]

209.    Pursuant to Section 504 and its implementing regulations, an individual with a disability cannot, by reason of his disability, "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[35] All public schools and school districts that receive federal funding must comply with these regulations.[36]

210.    Section 504's regulations mandate that districts provide children with disabilities a free appropriate public education ("FAPE").[37] The educational program must be designed to meet the individual needs of the child and follow the procedures set forth in the 504 regulations.[38]

211.    In addition, a district must evaluate a child before it puts the child in a "general or special education" placement or makes a significant change to the

---

[34] *Mark H. v. Lemahieu*, 513 F.3d 922, 935 (9th Cir. 2008), further proceedings *sub nom Mark H. v. Hamamoto*.
[35] 29 U.S.C. § 794(a); 34 C.F.R. § 104.4.
[36] 34 C.F.R. § 104.31.
[37] 34 C.F.R. § 104.33(a).
[38] 34 C.F.R. § 104.33(b).

child's educational placement.[39] The district's evaluation must be administered by appropriate personnel and tailored to individual areas of need.[40] Furthermore, when making placement decisions, districts must draw from a range of sources, document and carefully consider those sources, and ensure that the placement decision is made by a range of people knowledgeable about the child.[41] Finally, a district must place a child in the least restrictive environment, using supplementary services and aides, rather than removing a child with a disability from school.[42]

212.    The Office of Civil Rights interprets Section 504's regulations as requiring districts to conduct a manifestation determination review in connection with disciplinary actions that constitute a significant change of placement.[43]

213.    Hart UHSD is a public school district that receives federal funds.

214.    Hart UHSD discriminated against A.F. on the basis of his disabilities in a number of ways, including the following:

- It removed A.F. from school and ultimately expelled him due to behaviors caused by his disabilities;
- It brought expulsion proceedings against A.F. for a behavioral incident when it would not have expelled a different kid for this same behavior, and it did so because it was scared of A.F.'s disabilities;
- It expelled A.F. by affording him less due process than it was

---

[39] 34 C.F.R. § 104.35(a).
[40] 34 C.F.R. § 104.35(b).
[41] 34 C.F.R. § 104.35(c).
[42] 34 C.F.R. § 100.34.
[43] *See* OCR Staff Memorandum, 16 IDELR 491 (OCR 1988) (interpreting Section 504's regulations to require a district to conduct a manifestation determination review before removing a student with disabilities from school for more than ten days).

required to provide to any other, nondisabled student; and

- It encouraged and coordinated with law enforcement to prosecute A.F. for his disability-related behaviors in an effort to change A.F.'s educational placement and exclude him from district schools.

215.    Hart UHSD did not provide A.F. an evaluation tailored to meet his individual needs. It also changed his educational placement multiple times without first evaluating whether the change in placement was appropriate, including when it expelled him in September 2015 without conducting a manifestation determination review.

216.    Hart UHSD failed to provide A.F. a FAPE as required by Section 504's regulations when it did not provide an educational program designed to meet his individual needs. It denied A.F.'s access to services it knew he needed. Its program that was so inadequate that his disability-related behaviors worsened instead of progressed, leading to A.F. being suspended, transferred, expelled, and entered into the juvenile delinquency system.

217.    Hart UHSD took the aforementioned actions solely by reason of A.F.'s disabilities and/or with deliberate indifference to A.F.'s disabilities.

THIRD CLAIM: UNDER IDEA, PLAINTIFFS ARE ENTITLED TO ATTORNEYS' FEES.
20 U.S.C. § 1415(I)(3).

218.    Plaintiffs incorporate the preceding paragraphs.

219.    Plaintiffs partially prevailed in the proceeding before OAH and are entitled to reimbursement of reasonable attorneys' fees and costs for the administrative proceeding.[44]

220.    Moreover, Plaintiffs should prevail in this proceeding and therefore should recover reasonable attorneys' fees and costs for this proceeding.

[44] 20 U.S.C. § 1415(i)(3)(B).

REQUEST FOR RELIEF

To remedy Hart UHSD's violations, Plaintiffs request the following relief:

1. Reversal of the Administrative Decision as to Plaintiffs' issues 1, 2, 3, and 4 and an order finding the following:

   a. Hart UHSD violated IDEA and Section 504 by failing to determine that A.F.'s behavior on January 27, 2015 was a manifestation of his disabilities;

   b. Hart UHSD violated IDEA and Section 504 when it removed A.F. from his educational placement at Placerita in spring of 2015 and provided him inadequate services;

   c. Hart UHSD violated IDEA and Section 504 when it failed to provide A.F. a functional behavior analysis and develop a behavior intervention plan for him;

   d. Hart UHSD violated IDEA and Section 504 when it expelled A.F. by affording him less due process than was required for any other student;

   e. Hart UHSD violated Section 504 of the Rehabilitation Act and its regulations when it denied him a FAPE and prohibited him from participating in a public educational program.

2. Injunctive relief requiring Hart UHSD cure its violations by:

   a. determining that A.F.'s behavior on January 27, 2015 was a manifestation of his disabilities;

   b. reversing A.F.'s expulsion and remove all references to the expulsion from his educational records;

   c. funding a functional behavioral analysis of A.F. by an independent professional;

   d. providing A.F. compensatory education to remedy its failure to provide A.F. an appropriate educational program;

Complaint

e.  training its staff to comply with the laws discussed in this complaint;

f.  offering A.F. an appropriate educational program going forward; and

g.  reimburse Ms. L. and Mr. F. for the cost of obtaining an independent evaluation of A.F.

3.  An award of reasonable attorneys' fees and costs incurred for the underlying administrative proceeding and this proceeding;

4.  Such additional relief as the Court determines appropriate.

Respectfully Submitted,

July 15, 2016                                    Public Counsel, Attorneys for Plaintiffs

By: Christy Ferioli

Complaint