BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

In the Matter of:

PARENTS ON BEHALF OF STUDENT,

v.

WILLIAM S. HART UNION HIGH
SCHOOL DISTRICT.

OAH Case No.  2016020807

**EXPEDITED DECISION**

On February 19, 2016, Student, by and through his parents, filed a due process hearing request as part of a due process hearing request (complaint) naming William S. Hart Union High School District.  The complaint stated claims that required both an expedited and non-expedited hearing.[1]

Administrative Law Judge Adrienne L. Krikorian heard the expedited issues in this matter in Santa Clarita, California on March 22, 23, 24, 29 and 30, 2015.

Attorneys Christy Ferioli and Ben Conway represented Student.  Mother attended the first day of hearing.  Father attended the third day of hearing.  Student did not attend.

Attorney Daniel Gonzalez represented District.  District's Special Education Director Sharon Amrhein attended the hearing for District on all hearing dates.

The evidentiary portion of the expedited hearing concluded and was submitted for decision on March 30, 2016.  District's spring break occurred from April 4 through April 8, 2016.  The ALJ granted time for the parties to submit written closing arguments at the parties' request.  The record closed on April 4, 2016, after OAH received the parties' closing briefs.

---

[1]  OAH set the expedited and non-expedited claims for separate hearings.  The expedited claims proceeded to hearing with no continuances.  (34 C.F.R. § 300.532(c)(2).)

ISSUES[2]

1)      Did District violate Student's rights under title 20 United States Code section 1415(k)(1)(E) when it determined that Student's behavior on January 27, 2015, was not a) the manifestation of his disabilities or b) caused by District's failure to implement his individualized education program?

2)      Did District violate Student's rights under title 20 United States Code section 1415(k) and title 34 Code of Federal Regulations section 300.530 when it removed Student for disciplinary reasons from his educational placement at Placerita Junior High School for approximately two months in the spring of 2015 while it pursued expulsion proceedings?

3)      Did District violate Student's rights under title 20 United States Code section 1415(k) and title 34 Code of Federal Regulations section 300.530 when it failed to provide him with a functional behavior assessment or behavioral intervention services designed to address the January 27, 2015 behavior violation so that it did not recur?

4)      Did District fail to comply with the provisions of title 20 United States Code section 1415(k) and title 34 Code of Federal Regulations section 300.530 in relation to expulsion proceedings following the January 27, 2015 incident?

5)      Did District fail to comply with the provisions of title 20 United States Code section 1415(k)(1)(E) following an incident on August 25, 2015?

SUMMARY OF DECISION

Student prevailed on Issue 5.  Student engaged in a behavior incident on August 25, 2015, that violated school codes of conduct.  As a result, District suspended him for one day. The suspension triggered a violation of an April 21, 2015 stipulated agreement to suspend expulsion between Student, Father and District.  On September 8, 2015, District notified Parents it had lifted the suspension of the expulsion, resulting in a disciplinary change of placement for more than 10 days.  District never held a manifestation determination meeting after the August 25, 2015 event, and as a result significantly violated procedural requirements in title 20 United States Code section 1415(k)(1)(E).  Student is entitled to a manifestation determination meeting regarding the August 25, 2015 event.

---

[2]  The issues have been rephrased and reorganized for accuracy and clarity.  Because this hearing arises under title 20 United States Code section 1415(k), the ALJ added specific statutory citations for clarity.  Issue 4 was originally identified as Issue 5 when it was introduced at hearing.  The ALJ reversed the order of Issues 4 and 5 in this Decision for chronological consistency.  The ALJ has authority to redefine a party's issues, so long as no substantive changes are made.  (*J.W. v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 442-443.)

Student did not meet his burden on Issues 1 through 3.  District properly determined on February 3, 2015, that Student's threats of retaliation against fellow schoolmates on January 27, 2015, was not a manifestation of Student's disabilities of attention deficit hyperactivity disorder or emotional disturbance.  The incident was also not caused by District's failure to implement his January 27, 2015 IEP, which had been developed a few hours before the incident.  District proceeded to discipline Student in the same manner as it would for non-disabled students.  It changed Student's placement to home study and recommended expulsion.  It provided Student home study services, and offered mental health counseling while Student was on home study.  Student offered no credible evidence that District should have conducted a functional behavioral assessment or developed a behavior intervention plan while on home study.  District complied with all of the procedural requirements under title 20 United States Code section 1415(k)(1) relating to the January 27, 2015 incident.

Issue 4 challenged District's procedures involving expulsion proceedings, including the validity of the suspension of an expulsion agreement relating to the January 27, 2015 incident.  Based upon the findings in Issues 1 through 3, Student's challenge was outside the jurisdiction of OAH.  This Decision dismisses Issue 4.

## FACTUAL FINDINGS

*Jurisdiction*

1.        Student is a 14-year-old boy who resided in District's boundaries at all relevant times.  He was eligible for special education under the categories of emotional disturbance and other health impairment related to attention deficit hyperactivity disorder.  At the time of the expedited hearing, Student resided in a boys' home as a ward of the Los Angeles Superior Court and attended a school under the jurisdiction of the Los Angeles Unified School District.  Parents, who are divorced and share educational rights for Student, continued to reside within District's boundaries.

*Background Prior to January 27, 2015*

2.        Student was found eligible for special education in 2009 under the eligibility category of other health impaired due to ADHD.  Student's school records dating back to at least second grade contain a significant number of incidents of serious behavioral issues that resulted in suspensions and discipline.  Those behaviors included threatening and hitting other students; teasing and aggression toward others; emotional outbursts after engaging in behavior incidents; threatening to rape a female student in the fifth grade; and threats on social networks.

3.        In May 2010, the Los Angeles County Mental Health Department assessed Student due to behavioral and emotional problems interfering with his access to education.

3

The assessor recommended mental health counseling[3] based on his difficulties shouting out, name calling, teasing other students, and other off-task behaviors.  District amended his IEP on June 2, 2010, to include mental health services on an outpatient basis and added emotional disturbance to his IEP as a secondary eligibility.

4.      On May 27 2014, Student's IEP team held a manifestation determination meeting followed by an IEP team meeting.  The incident at issue involved Student bringing two razor blades to school.  He used the blades to cut himself on his upper arm; pulled them out in front of several students during an argument with peers and brandished the blades and swung them toward his peers; made threats to cut his peers; and made inappropriate sexual comments towards a female peer.  Student was hospitalized and placed on a 72-hour hold, where he was diagnosed with a mood disorder and provided with anti-depressant medication.  The manifestation review team acknowledged that Student had extreme perceptions about his peers and events.  The team concluded that the behaviors related to the razor incident were a manifestation of his emotional disturbance.

5.      On June 12, 2014, the IEP team met to discuss Student's placement for the 2014-2015 school year.  The IEP team discussed a recent incident where Student made statements about being "a Neo-Nazi and Satanist" and stated he wanted revenge on his ex-girlfriend for breaking up with him.  Other students shared with school staff that they were frightened of and for Student.  The IEP team concluded his difficulties at school revolved around peer interactions, inappropriate social skills, and self-harm.  He became overwhelmed when he felt others were upset with him.  The types of threats he expressed to his peers during unstructured times were concerning because those students were in his mainstream classes.  The IEP team discussed putting him in a more therapeutic setting at Sequoia Charter High School, in the Special Day Class 6 program (SC6), which was a moderate-severe program for students with social-emotional and behavioral challenges, with ERICS counseling for Student and Parents.  District proposed to place Student at Sequoia because the campus had a small student population, was secured by gates, and serviced children with IEP's.  Parents did not consent to District's offer of a free appropriate public education because they wanted to research placement options, including home schooling.

6.      On August 13, 2014, District held an amendment IEP team meeting to discuss Student's placement for the 2014-2015 school year.  Parents declined all of District's offers of special education placement and services for the 2014-2015 school year.  Parents

---

[3] Educationally related mental health counseling was referred to as AB 3632 services until July 1, 2012, when it was abolished by Assembly Bill 114.  At hearing, District referred to those services as Educationally Related Instructional Counseling Services and it will be referred to throughout this Decision as ERICS.

voluntarily withdrew Student from special education at the August 13, 2014 meeting. District then developed a section 504 plan under the Rehabilitation Act of 1973 for Student, with placement at Placerita.[4]

7.      On October 20, 2014, District disciplined Student for using a controlled substance.  Other students observed him inhaling ("huffing") from an aerosol dust can on campus and reported the incident to school staff.  District suspended Student from Placerita and transferred him with Mother's consent to La Mesa Junior High School.

8.      On January 20, 2015, while at La Mesa, Student threatened through electronic media to bring a gun to school for the purpose of harming himself and another student.  On January 26, 2015, District held a section 504 manifestation determination meeting.  The team concluded Student's threatening behavior was a manifestation of his disability.  The section 504 team suggested that Parents revisit Student's eligibility for special education, and Parents agreed to attend an IEP team meeting.  District suspended Student from school for five days and the section 504 team agreed to transfer him back to Placerita.

*January 27, 2015 Return to Special Education and Disciplinary Incident*

9.      On January 27, 2015, District held an IEP team meeting to consider Student's eligibility for special education.  Parents, Student, and all required District staff attended the meeting.  The meeting lasted approximately one and one half hours.  The IEP team reviewed Student's educational history and records.  The IEP team agreed Student was eligible for special education under the primary category of other health impairment and secondary category of emotional disturbance.  The IEP team agreed to place Student in a general education class through 2015 extended school year at Placerita with special education support through study skills and ERICS counseling for Student and Parents.

10.      The IEP team did not have time to collect relevant data to develop a behavior intervention plan because Student had just returned to school that day as a special education student.  The IEP team agreed to hold a 30-day review meeting to develop a behavior intervention plan, review a proposed ERICS goal, and to consider Student's need for ERICS counseling during extended school year.  However, the IEP team created and reviewed in detail the terms of a behavior contract with Parents and Student, which they signed at the meeting.  The contract required Student to improve his behavior toward peers, including prohibiting: spreading rumors; causing alarm; saying things that scare others; using profanity; harassing or intimidating anyone; bullying; and threatening peers with emotional or physical harm.

---

[4]  A "Section 504 plan" is an educational program created pursuant to the federal antidiscrimination law commonly known as Section 504 of the Rehabilitation Act of 1973. (29 U.S.C. § 794; see 34 C.F.R. § 104.1 et. seq. (2000).)  Generally, the law requires a district to provide program modifications and accommodations to children who have physical or mental impairments that substantially limit a major life activity such as learning.

11.     At the conclusion of the meeting, Student attended scheduled classes at Placerita.  Within a few hours, other students reported that Student had confronted two peers during lunch break and threatened, using profanity, to retaliate against them for "ratting" on him regarding the "huffing" incident in October 2014.  He rubbed his hands together and told the students "well this oughta be fun."  When one of the students responded that he did not "rat" on Student, Student responded "that's OK I'll find out."  Other students reported that Student had previously communicated threats of retaliation against the two boys to other students through electronic media.

12.     Assistant Principal Pam Thompson has a master's of education, a professional clear teaching credential and has worked as the special education program administrator and assistant principal at Placerita Junior High School since 2013.  Ms. Thompson first met Student in the fall of 2014 and saw him on campus daily.  She reviewed and was familiar with his school records.  She attended the January 27, 2015 IEP meeting.  She credibly testified at hearing.

13.     Ms. Thompson investigated the January 27, 2015 incident.  She interviewed Student, Parents and student witnesses.  She collected written incident reports from Student and the students who reported the incident.  Student denied making threats.  He denied to Father that he ever threatened to bring a gun to school.  He claimed he was trying to be reacquainted with his peers.  Other students reported that Student threatened his classmates.  Ms. Thompson interviewed one student who reported the separate electronic threats.  She counseled Student about the incident, after which he described the incident to her exactly as the other Students had reported.  District suspended Student for five days, pending expulsion proceedings.

14.     On February 3, 2015, District held a manifestation review team meeting regarding the January 27, 2015 incident.  Parents attended with Student.  All of the District IEP team members were present, including Special Education Director Sharon Amrhein, and Placerita Principal Jan Hayes-Rennels, School Psychologist Laura Ramirez, Ms. Thompson, Student's special education case manager, his general education teacher, and his school counselor.

15.     Ms. Ramirez has been a licensed educational psychologist since 1995.  She is a board certified professional counselor.  She holds additional certifications, including as a behavior intervention case manager and in crisis prevention.  She has worked in various capacities for District involving special education students since August 2000.  Ms. Ramirez first met Student in September 2014 at the Section 504 meeting.  She reviewed and was familiar with Student's educational history, special education file, and his online records of attendance and disciplinary incidents.  She was aware of the May 2014 manifestation determination.  She attended the January 27, 2015 IEP team meeting, which she facilitated.  She also attended the February 3, 2015 manifestation review meeting, and Student's April 17, 2015 IEP team meeting.  Ms. Ramirez was qualified to assess and render opinions about Student's behaviors.

16.     At the February 3, 2015 manifestation review meeting, the team reviewed the behaviors associated with the January 27, 2015 incident.  They evaluated the behavior in the context of both of Student's disabilities.  Ms. Ramirez completed an "IEP Manifestation Determination Assessment" at the meeting.  She reported the behavior was seeking revenge for an incident that occurred at Placerita in October 2014.  She concluded the function of the behavior was to gain peer approval and avoid peer conflict.  No one at the meeting disagreed with her conclusion.  She also concluded the behavior was not a manifestation of Student's disability.  Her rationale for her conclusions included that, as to Student's ADHD, school documentation reported Student's impulsive behaviors occurred in the classroom; he did not follow teacher directives; he left his seat; and talked out of turn.  In Ms. Ramirez's opinion, these behaviors were not consistent with the January 27, 2015 incident, which occurred during unstructured lunch period.  Referring to a February 2013 triennial psychoeducational assessment, Ms. Ramirez determined his emotional disturbance caused depression and inappropriate feelings under normal circumstances.  She opined that Student's threats of retaliatory harm to other students on January 27, 2015, were not consistent with depression or inappropriate feelings as previously manifested by Student.  She polled each member of the manifestation review team.  Everyone but Father concluded the incident was not a manifestation of either of Student's disabilities.

17.     The IEP team also reviewed Student's January 27, 2015 IEP.  The team concluded that in the few hours after becoming eligible and while Student was at school, the IEP was in effect.  The January 27, 2015 incident did not occur because District failed to implement Student's IEP.

18.     Neither parent had any professional experience in education or school psychology.  At hearing, neither parent had a clear memory of the February 3, 2015 manifestation review.  Father actively participated at the meeting.  Mother attended and let Father do most of the talking.  Father disagreed with District's conclusions.  Mother later concurred with Father, but at hearing did not remember District team members giving any reasons for their conclusion.  Parents felt District staff had predetermined that they wanted Student out of the District.  Parents claimed that the meeting was very short.  Father felt District staff was throwing Student "to the curb."  He believed the meeting was not a team effort and the mood was District against Parents and Student.  Neither parent recalled the team discussing Ms. Ramirez's conclusions on the Manifestation Assessment.  Father did not recall the team discussing Student's behavioral history.  Parents denied they were informed that they could appeal the manifestation determination.  District offered at the February 3, 2015 meeting to enter into an agreement to suspend expulsion under specific terms.  Parents declined.

19.     District placed Student on home school instruction with ERICS counseling pending expulsion proceedings.  Ms. Thompson monitored the home study services.  District offered one hour a day of home study for each day of school.  Ms. Thompson recalled at hearing that teacher Tim LeMaster provided direct instruction five hours a week when Student was available, plus gave him additional homework outside of the classroom.  Student lived alternately between Parents between February 3, 2015 and sometime in March 2015.

The Los Angeles Superior Court put Student on house arrest in March 2015 and ordered him to live full-time with Mother.  Mother worked full-time five days a week.  Father took Student to home study at the public library, but at hearing he did not recall the frequency of Student's home study sessions.  Mother recalled during hearing that Student received home study services one and one half hours twice a week.  However, at hearing Mother appeared confused about the events of February and March 2015, and therefore her testimony regarding the frequency of Student's home study sessions was not credible enough to establish with certainty the frequency of educational services Student received in the spring of 2015.

20.     The Los Angeles Superior Court detained Student briefly for an unspecified amount of time during late March or early April 2015 for making threats on social media.  The court limited his use of social media and cell phones.

21.     ERICS counselor Nicole Prado made three unsuccessful attempts from February 3 through March 3, 2015, to call both parents to schedule ERICS counseling, but could not reach them.  Father denied that he ever received a call or message from Ms. Prado.  Mother claimed she worked during the day and may have received a message from Ms. Prado.  Ms. Prado requested that Ms. Thompson and Ms. Hayes-Rennels intervene to try to schedule counseling sessions.  Student received one counseling session from Ms. Prado on March 16, 2015, which Mr. LeMaster scheduled in collaboration with a home study session.  Student missed the next scheduled session on March 23, 2015.  Parents did not credibly explain at hearing why they did not schedule more counseling sessions.  Student was eventually removed from Ms. Prado's caseload, for reasons she did not know.  Father claimed the month of April was "a bad month" for him and he had little involvement with Student's activities because Student was living with Mother.

22.     Pending Student's expulsion, District offered Student educational services and ERICS from February 3, 2015, until he returned to school on April 27, 2015.

23.     In March 2015, Father contacted Director of Student Services Kathy Hunter and requested that District agree to suspend the expulsion.  He did not want Student to have an expulsion on his record.  He wanted his son to have the opportunity to attend regular high school with a clean record.  Ms. Hunter agreed to Father's request to extend the suspension to June 2016.  After reviewing the general content of the template suspension of expulsion agreement with Father over the phone, she completed it and sent it to Ms. Thompson to review with Father and Student.

*April 17, 2015 IEP and Return to School*

24.     On April 13, 2015, Ms. Hayes-Rennels wrote a letter to the Superior Court informing the court of her fear of Student's freedom.  She opined that Student was a threat to the safety to the school, staff, students and community at large.  She informed the court that she had never had this level of concern about one student's potentially violent behavior in

18 years as a professional educator.  She voiced her concerns to Ms. Hunter, who requested a formal threat assessment by the Los Angeles County Department of Mental Health School Threat Assessment Response Team.

25.    In preparation for Student's triennial assessment, Sequoia School Psychologist Shahzia Shah conducted a psychoeducational assessment of Student in April 2015, documented in a report dated April 16, 2015.  Ms. Shah has a joint master's of science degree in educational counseling and marriage and family therapy.  She is a licensed counselor in marriage and family therapy, and a California and nationally credentialed school psychologist.  She has worked for District as a school psychologist servicing children with special needs since 2011.  Ms. Shah first learned about Student during the 2013-2014 school year.  She attended the June 12, 2014 IEP team meeting and spoke to then school psychologist regarding Student's potential placement in the SC6 program at Sequoia.  Ms. Shah was qualified to offer opinions regarding Student's behaviors at school.

26.    District did not conduct a functional behavioral assessment of Student or develop a behavior intervention plan during spring of 2015.  Ms. Ramirez credibly opined at hearing that a functional behavioral assessment during that time was not appropriate for Student because Student was on home study and had no direct contact with peers in the school setting.

27.    On April 17, 2015, District held an IEP team meeting for Student.  The Governing Board usually approved suspension of expulsion agreements and therefore District decided to hold the IEP team meeting before the next scheduled Governing Board meeting to get Student back to school.  The IEP team, which included Ms. Ramirez, reviewed Ms. Shah's assessment.  Ms. Shah attended telephonically for part of the meeting.  The IEP team changed Student's primary eligibility to emotional disturbance, and made other health impairment his secondary eligibility.  It developed four goals in the areas of social, emotional, and behavior; and a behavior intervention plan.  District offered placement in the SC6 program at Sequoia with access to ERICS counseling.  Parents consented to the IEP and Student began attending Sequoia on April 27, 2015.

*Execution and Approval of Suspension of Expulsion*

28.    Ms. Thompson met with Father and Student on April 21, 2015.  She spent approximately 45 minutes reviewing the three-page Agreement and Stipulation for Suspension and Suspension of Expulsion with Father and Student.  Father and Student signed the Agreement on April 21, 2015.  At the hearing Father did not recall discussing or signing the agreement.  Ms. Thompson immediately returned the signed Agreement to Ms. Hunter, who signed it the same day as the superintendent's designee and set it for approval on the Governing Board's May agenda.

29.    District officially expelled Student effective May 20, 2015, as part of District's Governing Board's approval of the Agreement.  The Agreement went into immediate effect and suspended the expulsion.  The Agreement required Student to follow all school rules and

policies and to not violate any of the provisions of Education Code section 48900 or 48915 to maintain the suspension of the expulsion.  The Agreement also provided if Student violated Education Code section 48900 or any District or school site rules and regulations governing pupil conduct, the District's Governing Board, in its sole discretion, could revoke the suspension of the expulsion.

30.     Student attended the remainder of the 2014-2015 regular school year and 2015 extended school year at Sequoia.  He did not have any reported behavior incidents at school resulting in discipline during that time.

*August 25, 2015 Disciplinary Incident*

31.     Student began the 2015-2016 school year in the SC6 program at Sequoia.  He had no significant reported behavior incidents during the first two weeks of school.

32.     On August 25, 2015, two students reported to staff that, during the lunch break, Student captured a lizard from the side of the building, twisted its neck and broke off its head, and dropped the carcass on the ground in the presence of other students.  He went to the classroom and showed blood on his hand from the lizard to other classmates, who became upset.  He told them he did not feel bad about killing the lizard because he was "a psychopath."  Student also shared the incident with his teacher, showed the dead lizard to another classmate; and told the teacher he was reading "The Anarchist's Cookbook."  School counselor Mr. Christensen and Ms. Shah met with Student after the incident to determine Student's state of mind.  He showed lack of remorse and no empathy.  Both Student and Father claimed another student encouraged Student to kill the lizard.  Parents came to school to discuss the incident and meet with Ms. Shah and Mr. Christensen.  Father expressed frustration that Student had broken the terms of the Agreement.  He told Student he was in violation of probation with the criminal courts, and faced jail time.

33.     District suspended Student from school for one day on August 26, 2015.  District did not hold a manifestation review meeting regarding the August 25, 2015 lizard incident at any time after the incident.  Ms. Shah explained at hearing that she understood how children with emotional disturbance manifested their disability through anxiety and depression.  Children with ADHD had difficulties with focusing, attention, hyperactivity, and impulsivity in the classroom or unstructured settings.  In Ms. Shah's opinion, ripping the head off a lizard was not a manifestation of either disability category.  Father reported to Ms. Shah that Student "does this all the time."  Father denied making the statement, claiming Student loved animals and saw lizards at home all the time.  Student denied to Ms. Shah that he felt bad after the incident; he felt that killing the lizard was like stepping on a bug.  District relied on Ms. Shah's conclusion, and on the assumption that Student had already been expelled and was only at school as a result of the Agreement and did not hold a manifestation determination meeting.

34.     On September 8, 2015, Ms. Hunter informed Parents in writing that Student's one-day suspension was a violation of the Agreement, and he was immediately expelled. The expulsion resulted in a disciplinary change of placement for more than 10 days.

35.     Student did not return to a District school after August 25, 2015.  District agreed to give Student approximately a month of services to allow Parents to find an alternative placement for Student.  District provided Student with home study and access to ERICS counseling between September 2 and October 9, 2015.  District stopped providing home study on October 9, 2015, because it understood that Student was expelled.  However, at Mother's request, District resumed home study and ERICS counseling from mid-November 2015 until February 2016.  Student became a ward of the Los Angeles Superior Court in February 2016.  The Court placed him in a boys' home and school program within the Los Angeles Unified School District.  At the time of hearing, Parents were not certain when Student would return home.

## LEGAL AUTHORITY AND CONCLUSIONS

*Introduction – Legal Framework for Student Discipline under the IDEA[5]*

1.     This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations intended to implement it.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006)[6] et seq.; Ed. Code, § 56000, et seq.; Cal. Code. Regs., tit. 5, § 3000 et seq.)  Under the IDEA and California law, children with disabilities have the right to a FAPE.  (20 U.S.C. § 1400(d); Ed. Code, § 56000.)  A FAPE is defined as appropriate special education, and related services, that are available to the pupil at no cost to the parent or guardian, that meet the state educational standards, and that conform to the pupil's individualized education program.  (20 U.S.C. § 1401(9); Ed. Code, §§ 56031 & 56040; Cal. Code Regs., tit. 5 § 3001, subd. (o).)  A child's unique educational needs are to be broadly construed to include the child's academic, social, health, emotional, communicative, physical and vocational needs.  (*Seattle Sch. Dist. No. 1 v. B.S.* (9th Cir. 1996) 82 F.3d 1493, 1500, citing H.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106.))

2.     Title 20 United States Code section 1415(k) and title 34 Code of Federal Regulations section 300.530 govern the discipline of special education students.  (Ed. Code, § 48915.5.)  A local educational agency may suspend or expel a student receiving special education services from school as provided by federal law.  (20 U.S.C. §1412(a)(1)(A); Ed. Code, § 48915.5, subd. (a.))  If a special education student violates a code of student conduct, school personnel may remove the student from his or her educational placement without

_____

[5]  Unless otherwise indicated, the legal citations in the introduction are incorporated by reference into the analysis of each issue decided below.

[6]  All references to the Code of Federal Regulations are to the 2006 version.

providing services for a period not to exceed 10 days per school year, provided typical children are not provided services during disciplinary removal.  (20 U.S.C. § 1415(k)(1)(B); 34 C.F.R. § 300.530(b)(1) & (d)(3).)

3.      For disciplinary changes in placement greater than 10 consecutive school days (or that are a pattern that amounts to a change of placement), the disciplinary measures applicable to students without disabilities may be applied to a special education student if the conduct resulting in discipline is determined not to have been a manifestation of the special education student's disability.  (20 U.S.C. § 1415(k)(C); 34 C.F.R. §§ 300.530(c) & 300.536(a)(1),(2).)  School personnel may remove a student to an interim alternative educational setting for not more than 45 school days, regardless of whether the student's behavior is determined to be a manifestation of the student's disability, under certain circumstances.  (20 U.S.C. § 1415(k)(1)(G); 34 C.F.R.§ 300.530(g).)

4.      A parent of a special education student may appeal a school district's determination that particular conduct resulting in a disciplinary change of placement was not a manifestation of the child's disability by requesting an expedited due process hearing.  (20 U.S.C. § 1415(k)(H)(3)(A); 34 C.F.R. 300.532(a) & (c).)  The hearing must be conducted within 20 school days of the date an expedited due process hearing request is filed and a decision must be rendered within 10 school days after the hearing ends.  (20 U.S.C. § 1415(k)(H)(4)(B); 34 C.F.R. 300.532(c)(2).)

5.      At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence.  (*Schaffer v. Weast* (2005) 546 U.S. 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)  Here, Student is the filing party and has the burden of proof on all issues.

*Issue 1:  Manifestation Determination – February 3, 2015*

6.      Student contends District erred when it determined Student's conduct on January 27, 2015, was not a manifestation of his disability, based on his extensive past history of behavioral problems associated with his disabilities.  Student also contends that, as a result of District's erroneous determination, District inappropriately expelled him on May 20, 2015.  District contends the February 3, 2015 manifestation review team's decision was correct, and therefore District properly changed Student's placement in the same manner as it would have for students without disabilities, while offering home study and ERICS counseling from February through late April 2015.

LEGAL AUTHORITY

7.      A special education student's placement is that unique combination of facilities, personnel, location or equipment necessary to provide instructional services to him.  (Cal. Code Regs., tit. 5, § 3042(a).)  The removal of a special education student from the

student's placement for more than 10 consecutive school days constitutes a change of placement.  (34 C.F.R. § 300.536(a)(i).)

8.     When a district seeks to change a special education child's educational placement for more than 10 days as a result of a violation of a student code of conduct, the district must convene a meeting to determine whether the child's violation was a manifestation of the child's disability.  (20 U.S.C. § 1415(k); 34 C.F.R. § 300.530.)  This is known as a manifestation determination.  (20 U.S.C. § 1415(k)(1)(E).)  A manifestation determination must be made by the school district, the parent, and relevant members of the IEP team as determined by the parent and the school district.  (20 U.S.C. § 1415(k)(1)(E)(i); 34 C.F.R. § 300.530(e)(1) & (h).)  A manifestation determination must be accomplished within 10 school days of the decision to change the student's placement.  (*Ibid*.)

9.     Conduct is a manifestation of the student's disability:  (i) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (ii) if the conduct in question was the direct result of the local education agency's failure to implement the IEP.  (34 C.F.R. § 300.530(e)(1) & (2).)  The manifestation determination analyzes the child's behavior as demonstrated across settings and across times.  All relevant information in the student's file, including the IEP, any observations of teachers, and any relevant information from the parents must be reviewed to determine if the conduct was caused by, or had a direct and substantial relationship to the student's disability, or was the direct result of the district's failure to implement the student's IEP.  (20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e)(1); Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46540, 46720 (Aug. 14, 2006) (Comments on 2006 Regulations).)

ANALYSIS AND CONCLUSIONS

10.     Student did not meet his burden of proof on Issue 1 as to either of the two prongs of analysis.  First, Student had the burden of establishing that District staff erred when it determined his behaviors on January 27, 2015, were not a manifestation of his disabilities.  Student failed to prove that Student's threats of retaliation against two fellow students because they "ratted him out" in October 2014 was caused by, or had a direct and substantial relationship to, his disabilities of ADHD or emotional disturbance.

11.     Student offered no opinions from a professional therapist or school psychologist qualified to opine as to the validity of District's manifestation determination. Instead, Student first relied on Parents' opinions about Student's January 27, 2015 behavior to support his contention that the threats of retaliation he made against other students before and on January 27, 2015, were the result of his ADHD or emotional disturbance.  Student offered no credible evidence that discredited Ms. Ramirez's credible professional opinions, discussed below, or the findings of the professional and experienced District staff members of the manifestation review team, which included Ms. Amrhein, Ms. Hunter, Ms. Ramirez, Ms. Hayes-Rennels, Ms. Thompson, Student's special education case manager, his general education teacher, and his school counselor.  While Father disagreed with the team's

conclusion at the time of the meeting, and Mother later concurred with Father, neither parent had any professional experience in education or school psychology sufficient to discredit the conclusions of the District's professional staff, who unanimously agreed the behavior was not a manifestation of Student's disabilities.  Parents' opinions about their son's behaviors, and their perception of the motives of District staff, also did not credibly outweigh the professional opinions at hearing of District staff members, in part because neither parent had a clear memory of the February 3, 2015 meeting at the time of hearing.

12.    Second, Student argued in his closing brief that the manifestation review team should have given more weight to Student's past behavioral history.  However, again, Student offered no credible evidence, including testimony from an expert, proving that any of Student's past history of behaviors were relevant to Student's threats of retaliation on January 27, 2015.  Student offered no expert testimony proving that his actions were not preplanned, as Ms. Ramirez opined, but instead were impulsive and related to his ADHD; or that his actions were caused by or had a direct and substantial relationship to his disability of emotional disturbance.  Relying only on Student's past history and Parents' opinions, and without any expert testimony, Student did not provide any credible evidence supporting a finding that the incident on January 27, 2015, was a manifestation of either disability.

13.    On the other hand, the review team consisted of several District staff members who were familiar with Student and his school records.  Ms. Ramirez reviewed his school records including his educational history, special education file, his online records including grades attendance and discipline records.  She was aware that Student had a previous behavior incident determined to be a manifestation of his disability.  She attended the January 27, 2015 IEP team meeting.  At the manifestation review meeting, Ms. Ramirez weighed Student's behaviors on January 27, 2015, utilizing her professional experience working with the disabilities of ADHD and emotional disturbance.  She reviewed Student's May 2014 IEP, which included a manifestation determination.  She reviewed a 2013 psychoeducational report.  She reviewed incident reports for the January 27, 2015 incident.  Ms. Ramirez conducted a manifestation determination assessment at the meeting, and polled each member of the manifestation review team before the team reached its conclusion.  Other members of the manifestation review team, including Ms. Hayes-Rennels and Ms. Thompson, were familiar with Student's behavior history.  Only Father disagreed during Ms. Ramirez's poll.

14.    Student's threatening behavior was pre-planned and not impulsive; Student came to school on January 27, 2015, having already informed other students that he was looking for the students who "ratted him out" in October 2014.  He confronted those students after he returned to school on January 27, and showed no remorse that day or the next when Ms. Thompson interviewed him.  His behavior had no direct and substantial relationship to his ADHD, which manifested itself in the classroom.  Ms. Ramirez was an experienced school psychologist who understood Student's disabilities.  She reviewed Student's educational records, previous psychoeducational assessment reports and prior IEP's.  She

discussed her findings with the manifestation review team.  Based upon her careful investigation of the incident, she credibly opined that Student's emotional disturbance manifested itself in depression and anxiety, and his behaviors on January 27, 2015, had no direct and substantial relationship to his emotional disturbance.

15.     Student argues that the team had already reached a conclusion before the meeting that they did not want Student at school and therefore the manifestation review team predetermined the outcome of the meeting.  Notwithstanding District staff's concerns about safety risks posed by Student, Student did not prove by any credible evidence that staff's safety concerns played any material role in the outcome of the manifestation determination review, including leading to an incorrect outcome.

16.     Finally, Student also did not prove that his behaviors were caused by District's failure to implement his IEP.  His parents voluntarily removed him from special education in August 2014.  Until January 27, 2015, Student was not eligible for special education and he did not have an IEP.  His January 27, 2015 IEP, which was pending a 30-day review to develop a behavior intervention plan, was only in effect for approximately two hours before Student engaged in the threatening behavior.  Student offered no evidence that established his behaviors on January 27, 2015, were caused by District's failure to implement the January 27, 2015 IEP.

17.     In conclusion, Student did not prove that District's conclusions at the February 3, 2015 manifestation determination that Student's behaviors were not a manifestation of his disability or caused by District's failure to implement his IEP were incorrect.

*Issue 2:  Spring 2015 Disciplinary Change of Placement*

18.     Student contends District's disciplinary change of placement after the January 27, 2015 incident violated section 1415(k)(1)(D)(i) during the two months that he was pending expulsion.  Student contends he should have received more educational programing and related services.  He claims he received home study only two days a week. He received only one session of ERICS counseling.  He had no behavior goals in his January 27, 2015 IEP.  District contends it treated Student like any other student without an IEP when it suspended Student pending expulsion.  It offered five hours a week of home study and ERICS counseling, and intended to hold a 30-day review IEP after the January 27, 2015 IEP to develop behavior goals and, if needed, a behavior intervention plan.

LEGAL AUTHORITY

19.     Legal Authorities 7 through 9 are incorporated by reference.

20.     If the manifestation review team determines the conduct is not a manifestation of the student's disability, then the local educational agency may use normal school disciplinary procedures to address the incident in the same way as the procedures would be

applied to non-disabled students, although it may be provided in an interim alternative educational setting. (20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(c); see *Doe v. Maher* (9th Cir, 1986) 793 F.2d 1470, 1480, fn 8, affd., *sub nom.*, *Honig v. Doe* (1988) 484 U.S. 305 [when a child's misbehavior does not result from his disability no justification exists for exempting him from the rules applicable to other children].)

21. A child with a disability who is removed from the child's current placement under title 20 United States Code section 1415(k)(1)(C) shall continue to receive i) educational services so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP; and (ii) as appropriate, a functional behavioral assessment, behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur. (20 U.S.C. § 1415k(1)(D); 34 C.F.R. § 300.530(d).)

ANALYSIS AND CONCLUSIONS

22. Issue 2 involves the time period between February 3, 2015 and April 27, 2015, when Student returned to school, and, as presented by Student in his closing argument, only addresses the educational and related services component of section 1415(k)(1)(D)(i).

23. Student did not meet his burden on Issue 2. First, District properly determined that Student's January 27, 2015 behavior was not a manifestation of his disabilities of ADHD and emotional disturbance. Therefore, District was entitled under the IDEA to use normal school disciplinary procedures to address the incident in the same way as those procedures applied to non-disabled students, including changing Student's placement to home study pending expulsion, which was one of the options available to District.

24. Next, with regard to educational services, District complied with section 1415(k)(1)(D)(i) by continuing to offer and provide Student with an educational program and related services as part of home study. Ms. Thompson credibly testified she monitored the home study and ERICS services. Mr. LeMaster provided five hours a week plus additional homework outside of the classroom at a public library when Student was available. Student lived alternately between Parents between February 3, 2015 and sometime in March 2015, when he lived with Mother full time under court-ordered house arrest. Mother, who worked full time, recalled Student received home study services one and one half hours twice a week. Father, who took Student to his home study sessions, did not recall the frequency of Student's sessions, particularly after Student began living full time with Mother. Parents' recollections about the frequency of home study were inconsistent at hearing. Student offered no expert testimony or other credible evidence proving District should have provided a specific number of hours of educational services to Student under section 1415(k)(1)(D)(i), or that District failed to meet its obligation to provide an educational program for Student while he was pending expulsion in the spring of 2015.

25. District also offered ERICS counseling and attempted to provide it to Student and Parents. Ms. Prado was not successful in scheduling ERICS counseling through Parents

and Student only received one session during the relevant time period, by no fault of District. Student argues Ms. Prado only made three attempts to reach Parents based upon her billing logs to support its contention that District failed its obligation to Student.  The argument was not convincing.  Parents' testimony was vague on this issue; their recollections were not clear or consistent with each other on why they did not respond to Ms. Prado's three recorded attempts to schedule counseling.  Ms. Prado sought intervention from Ms. Thompson and Ms. Hayes-Rennels to try to schedule ERICS counseling.  Ms. Prado provided one session on March 16, 2015, collaborating with Mr. LeMaster, and Student was absent for the next scheduled session on March 23, 2015.  Parents' lack of response and Student's unavailability prevented District from providing additional counseling.  Student did not prove District violated section 1415(k)(1)(D)(i) with regard to counseling services.

26.     Although Student argued that the January 27, 2015 IEP lacked behavior goals, the evidence established that the IEP team agreed to reconvene in 30 days to develop a behavior goal relating to his school behaviors.  Student was removed from school on the same day.  Student did not prove that District violated section 1415(k)(1)(D)(i) by not having a behavior goal in his IEP on January 27, 2015.

27.      In conclusion, Student offered no legal authority or credible evidence proving District failed to meet its obligations under section 1415(k)(1)(D)(i) after it concluded that Student's behaviors were not a manifestation of his disabilities on February 3, 2015, and changed his placement to home study with ERICS pending expulsion.

*Issue 3:  Functional Behavior Assessment and Behavior Intervention Services*

28.     Student contends District should have provided him with a functional behavioral assessment and behavior intervention services during his disciplinary change of placement after the January 27, 2015 incident, pursuant to title 20 United States Code section 1415(k)(1)(D)(i).  District contends it had no obligation to do so.

LEGAL AUTHORITY

29.     Legal Authorities 7 through 9, 20 and 21 are incorporated by reference.

ANALYSIS AND CONCLUSIONS

30.     Student did not meet his burden on Issue 3.  Student offered no expert testimony that a functional behavioral assessment was appropriate for Student under the circumstances following the January 27, 2015 incident.  No one testified on Student's behalf as to whether relevant data could be obtained from a functional behavioral assessment while he was on house arrest and receiving home study or whether the assessment could have resulted in information that would benefit Student at school under those circumstances. Student argued in his closing brief that a functional behavioral assessment might help his social skills or interactions with others, such as his home study teacher, others at the library, or classmates he continued to communicate with electronically.  The arguments were

unsupported by any credible testimony at hearing and were based only on speculation and conjecture. On the other hand, Ms. Ramirez opined that a functional behavioral assessment was not appropriate in the spring of 2015 because Student had no contact with his peers in the school setting while receiving instruction at home. Her professional opinion outweighed Student's speculative arguments.

31.     Similarly, Student offered no expert testimony that, other than ERICS counseling, behavioral intervention services to address the January 27, 2015 threat incident would have helped prevent Student from engaging in the same behavior in the future. He was not in the school setting at that time. He was on house arrest from sometime in March until he returned to school on April 27, 2015. He may have had some level of communication with his peers through electronic means, but he was limited to his use of social media and cell phones by the court, and Student offered no credible evidence that he was at risk for making additional threats to his fellow students while he was on home study and under house arrest.

32.     Student did not prove that District was obligated to conduct a functional behavioral assessment or offer more behavior services to Student under section 1415(k)(1)(D)(ii).

*Issue 4: Applicability of Suspension of Expulsion Agreement to January 27, 2015 Incident*

33.     Student contends the April 17, 2015 Agreement was contrary to the expulsion procedures required under the Education Code and therefore the Agreement and Student's expulsion is void. Student argued in his closing brief that District did not follow proper timelines for the expulsion hearing, rendering the procedures invalid. Student also argued without any supporting legal authority that the Agreement was void because Mother jointly held educational rights and did not sign it. District contends OAH does not have jurisdiction to decide whether District followed proper protocols for Student regarding expulsion because the January 27, 2015 incident was not a manifestation of Student's disabilities and it was entitled to treat him as it treated non-disabled students.

LEGAL AUTHORITY

34.     Parents have the right to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." (20 U.S.C. § 1415(b)(6); Ed. Code, § 56501, subd. (a).) OAH has jurisdiction to hear due process claims arising under the IDEA. (*Wyner v. Manhattan Beach Unified Sch. Dist.* (9th Cir. 2000) 223 F.3d 1026, 1028-1029.) OAH does not have jurisdiction to determine the procedural validity of expulsion proceedings under the Education Code.

ANALYSIS AND CONCLUSIONS

35.     On the first day of hearing, District objected to adding this issue on the basis of jurisdiction.  The ALJ deferred ruling on the objection, allowing the parties to introduce evidence on the issue, and requesting the parties to brief the legal significance of the Agreement as it related to District's obligations relating to discipline under the IDEA associated with the January 2015 incident.

36.     Based on the evidence and argument offered by both parties, OAH has no jurisdiction to determine whether the Agreement was valid or whether District followed proper procedures up to the time the parties executed the Agreement, because the January 27, 2015 incident was not a manifestation of Student's disability.  The Agreement was therefore the product of school disciplinary procedures applicable to all students, which is not part of the IDEA.  Whether or not it was valid is irrelevant to Student's expedited claims.

37.     The only relevant and appropriate legal issue for OAH to determine relating to the existence of the Agreement is whether District's reinstatement of expulsion by lifting the Agreement's suspension of expulsion triggered District's obligation to hold a manifestation determination meeting after the August 27, 2015 incident.  That issue is addressed below in Issue 5.

38.     Issue 4 is outside of OAH's jurisdiction, and is therefore dismissed.

*Issue 5:  Manifestation Determination for August 25, 2015 Incident*

39.     Student contends District failed to meet its obligations under the IDEA when it 1) failed to hold a manifestation determination meeting after the August 25, 2015 lizard incident, and 2) lifted the suspension of Student's expulsion after the incident.  District contends Student was already expelled, and the expulsion was under suspension at the time of the incident.  District argues the August 25, 2015 incident and the one-day suspension as a result of that incident triggered District's right to lift the suspension of expulsion and therefore District had no obligation to hold a manifestation determination review.

LEGAL AUTHORITY

40.     Legal authorities 7 through 9 are incorporated by reference.

41.     The rules for a due process hearing under title 20 United States Code section 1415(k) must be consistent with those of other IDEA hearings, including analysis of procedural defect issues.  (34 C.F.R. § 300.532(c).)  District's failure to convene a manifestation determination meeting impedes a parent's opportunity to participate in a manifestation determination meeting.  This is similar to significantly impeding a parent's

opportunity to participate in the decision-making process at an IEP team meeting regarding the provision of a FAPE to the parent's child, which is a procedural violation that may support a finding that the child was denied a FAPE.  (§ 1415(f)(3)(E)(ii); 34 C.F.R. §§ 300.513(a)(2)(ii).)

42.     In *Board of Education of the Hendrick Hudson Central School District v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*")*,* the Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. (*Rowley, supra*, at pp. 205-06.)  A procedural violation results in a denial of a FAPE if the violation significantly impeded the parent's opportunity to participate in the decision-making process.  This standard applied to manifestation determination meetings.  (*Danny K. ex rel. Luana K. v. Department of Educ., Hawai'i* (D.Hawai'i 2011 Civ. No. 11– 00025 ACK–KSC) 2011 WL 4527387, * 15.)

ANALYSIS AND CONCLUSIONS

43.     Student met his burden of proof on Issue 5.  District should have conducted a formal manifestation review after District lifted the stay of expulsion on September 8, 2015, because lifting the stay of expulsion resulted in a disciplinary change of placement of more than 10 days.  Its failure to do so was a procedural violation of section 1415(k) and deprived Parents the opportunity to participate in a manifestation review determination.

44.     Student was expelled from District on May 20, 2015.  However, assuming the governing board would approve the Agreement and stay the expulsion, District allowed Student to return to school on April 27, 2015, if he complied with school policies and rules of conduct.  District placed Student at Sequoia, educated him with an IEP, and therefore continued to have statutory obligations to Student under the IDEA.

45.     After the August 25, 2015 lizard incident, District officially suspended Student for one day, on August 26, 2015, for violating school policies.  However, presumably based upon its assumption that Student was on a suspended expulsion, District changed his placement to home study on September 2, 2015.  On September 8, 2015, Ms. Hunter notified Parents in writing that the suspension was a violation of the Agreement.  She notified Parents of District's intent to immediately reinstate the May 20, 2015 expulsion by lifting the suspension.

46.     Ms. Hunter's notice to Parents communicated District's intent to initiate a disciplinary change of placement for more than 10 school days in the 2015-2016 school year. However, District never held a manifestation review after the lizard incident.

47.     District asserts that Education Code section 48917(b) requires the governing board to apply criteria for suspending the enforcement of expulsion equally to all students, including special education students.  As a result, District argues Student's status as a special education student did not confer Student "with any additional protections as the result of the use of the stayed expulsion." (*Id.*)  District concludes without providing any persuasive

authority to support its conclusion that the Agreement entitled District to expel Student after one day of suspension without affording Student with the explicit and applicable protections related to discipline under the IDEA. What the Agreement does permit District to do is automatically expel Student if the conduct at issue was not a manifestation of his disability after a manifestation review meeting is held.

48.     District also speculates that, in any case, a manifestation review team "would have found" that the lizard incident was not a manifestation of Student's disabilities. District's position, which relied primarily on Ms. Shah's testimony at hearing, mirrored the opinions of Ms. Hunter and Ms. Hayes-Rennels, and supported Parents' concerns that, from the time District initiated expulsion proceedings in February 2015, District did not want Student to return to any District school.

49.     Education Code section 48917(b) does not expressly state that Student's protections under the IDEA, and in particular section 1415(k), are abrogated because of the stayed expulsion. If one follows District's argument to its logical conclusion, under the facts of this case, District could completely disregard the provisions of the IDEA, obliterate any protections afforded by the IDEA to Student, and nullify Student's April 17, 2015 IEP, resulting unequivocally in an impermissible change of placement. District's argument was not persuasive or supported by any legal authority.

50.     The IDEA protects the rights of children with disabilities who face a disciplinary change of placement, setting out specific procedures District should have followed once it determined in September 2015 that it planned to initiate a disciplinary change of placement for more than 10 days. The fact that Student had previously been expelled on May 20, 2015, is irrelevant because Student was at a District school at the time of the August 25, 2015 incident under an IEP. The Agreement, which was authorized by California law, did not expressly waive Student's rights under the Federal IDEA, nor would any such waiver be consistent with public policy, which gives precedence to Federal law unless state law grants more rights to a special education student. The Agreement simply gave Student another chance to attend school, abide by the terms of the Agreement, and face the consequences if he did not comply. When he returned to school on April 27, 2015, he continued to have a right to all of the protections under the IDEA as a special education student, including as a result of the August 25, 2015 lizard incident.

51.     District was obligated under section 1415(k) to hold a manifestation review meeting within 10 days after Ms. Hunter notified Parents that District intended to initiate a disciplinary change of placement by lifting the suspension of the expulsion. Ms. Shah's informal opinion that Student's behavior on August 25, 2015, was not a manifestation of his emotional disturbance was not sufficient to constitute an appropriate manifestation determination. Student was entitled to have the incident objectively reviewed by the relevant IEP team members, including Parents. By failing to do so, District committed a significant procedural violation of section 1415(k)(1)(E) resulting in a significant denial of Parents' right to meaningfully participate in Student's educational program.

52.     Student proved District violated section 1415(k)(1)(E).  District should have held a proper manifestation determination before it lifted the suspension of expulsion.

REMEDIES

1.     Student prevailed on Issue 5.  As a remedy, Student requested that District pay an independent assessor to conduct a functional behavioral analysis of Student in his current placement;[7] expunge the expulsion and remove from Student's records; and permit Student to return to an educational placement at District when he is released by the Superior Court.

2.     An ALJ may order District to conduct a manifestation determination under section 1415(k) if the ALJ determines District failed to do so.  (20 U.S.C. § 1415(k)(3)(A) & (B)(1); 34 C.F.R. 300.532(a) & (c).)  Section 1415(k)(3) does not limit a hearing officer from awarding other equitable remedy to craft appropriate relief.  (20 U.S.C. § 1415(k)(3); *Parents of Student W. v. Puyallup School Dist. No. 3* (9th Cir. 1994) 31 F.3d 1489, 1497.)

3.     Under the facts of this case, OAH has no jurisdiction to grant Student's request to expunge Student's expulsion arising from the January 27, 2015 incident because District followed expulsion procedures that applied to non-disabled students based on its proper determination that Student's behaviors were not a manifestation of his disabilities.  Student's recourse under these facts as to the validity of the Agreement or in appealing his May 20, 2015 expulsion is not within OAH jurisdiction.  Similarly, Student did not prove that he required a functional behavioral assessment as a result of the January 27, 2015 incident and therefore that requested relief is not appropriate.

4.     However, after allowing Student to return to school on April 27, 2015, District lifted the suspension of the expulsion after the August 25, 2015 incident, and determined that it would invoke a disciplinary change of placement for more than 10 school days in the 2015-2016 school year, while Student was a special education student, without holding a manifestation review.  Student is therefore entitled to and District shall convene a manifestation determination meeting with Student's relevant IEP team members as of August 2015.  As an equitable remedy for District's denial of parental participation, Parents may, at District's expense, bring a psychologist or psychotherapist of Parents' choosing, to the manifestation review, whom District shall permit to actively participate as part of the team in the review process.  In compliance with title 20 United States Code section 1415(k)(1)(E), District shall objectively evaluate considering all available information whether Student's behaviors on August 25, 2015, were the direct result of or significantly related to either

---

[7] Although at the beginning of the hearing the parties alluded to a pending agreement where District would pay for an independent assessment of Student, neither party offered evidence as to the type of assessment District agreed to pay for.  Therefore, this Decision is not intended to abrogate any agreement for an independent assessment between the parties that existed before the Decision was issued.

Student's emotional disturbance or his ADHD; or whether they were the result of District's failure to implement his IEP.

     5.     Student is entitled to reinstatement of the suspension of expulsion until the manifestation review is complete.  If the team determines the August 25, 2015 lizard incident was a manifestation of Student's disability, the suspension of the expulsion shall continue through its term, unless Student returns to school and violates the Agreement before it expires.  Student shall retain his right of appeal of the manifestation determination under section 1415(k)(3).

ORDER

     1.     District's February 3, 2015 decision that Student's conduct on January 27, 2015 was not a manifestation of his disability or caused by District's failure to implement his IEP is affirmed.

     2.     Issue 4 is dismissed for lack of jurisdiction by OAH.

     3.     District shall conduct a manifestation review within 15 school days of the date of this Order to determine whether Student's conduct on August 25, 2015 was a manifestation of his disability or caused by District's failure to implement his IEP.

     4.     District shall, at District's expense, invite a psychologist or psychotherapist of Parents' choosing to attend and participate at the manifestation review.  Parents shall ensure that the psychologist or psychotherapist has access to Student's educational records, including assessments, behavior logs, and IEPs, before the meeting.  District's obligation to fund expenses shall be limited to a maximum of six hours of the professional's time for preparation and meeting attendance, and round trip travel to the meeting, at the professional's normal hourly rate for treating patients.

     5.     District shall reinstate the suspension of expulsion pending the outcome of the manifestation determination.  If the manifestation review team concludes the behavior was a manifestation of Student's disability, or if District fails to hold the manifestation review as ordered in number 3 of this Order, then the suspension of the Agreement shall be reinstated through the end of its term unless Student returns to school and violates the Agreement before its term expires.

PREVAILING PARTY

     Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.  Student was the prevailing party on issue 5.  District prevailed on Issues 1 to 4.

23

RIGHT TO APPEAL

This Decision is the final administrative determination and is binding on all parties. (Ed. Code, § 56505, subd. (h).)  Any party has the right to appeal this Decision to a court of competent jurisdiction within 90 days of receiving it.  (Ed. Code, § 56505, subd. (k).)


DATED:  April 18, 2016


_____/s/_____
ADRIENNE L. KRIKORIAN
Administrative Law Judge
Office of Administrative Hearings