**Ben Conway, State Bar No. 246410**
bconway@publiccounsel.org
**Eliza Finley, State Bar No. 301318**
efinley@publiccounsel.org
**Leah Gasser-Ordaz, State Bar No. 303881**
lgasser-ordaz@publiccounsel.org
**Public Counsel**
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977
(213) 385-9089 fax

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Consolidated matters of**: <br><br> **Jay F.** and **Shari L.**, individually, and **A.F.**, a minor, by and through his guardian ad litem, **Shari L.**, <br>        Plaintiffs, <br><br>        v. <br><br> **William S. Hart Union High School District**, a local educational agency, <br>        Defendant. | Master File Case No: <br>      2:16-cv-05117 TJH (GJSx) <br><br> Consolidated Case Nos.: <br>      2:16-cv-05226 <br>      2:17-cv-00479 <br><br> **DECLARATION OF BARRETT S. LITT IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES** |

## DECLARATION OF BARRETT S. LITT

I, Barrett S. Litt, declare as follows:

1.      I am an attorney duly licensed to practice law in the State of California. This declaration is submitted in support of Plaintiffs' Motion for Fees and Costs. The facts set forth herein are within my personal knowledge or knowledge gained from review of the pertinent documents. If called upon, I could and would testify competently thereto.

**BACKGROUND AND CIVIL RIGHTS/ATTORNEY FEE EXPERTISE**

2.      Since 1984, I have been the principal or senior partner in firms that operate for the specific purpose of developing and maintaining a civil rights and public interest law practice that operates in the private sector on the basis of self-generated fee awards and other recoveries. Since January 1, 2013, I have been a partner in the law firm of Kaye, McLane, Bednarski & Litt (referred to at times as "KMBL").[1] Between September 2010 and December 31, 2012, I was a partner in the law firm of Litt, Estuar, and Kitson, which still operates to some extent as an independent firm to complete certain old cases. From July 2004 to September 2010, I was a partner in the law firm of Litt, Estuar, Harrison, and Kitson. From 1998 to July 2004, I was the principal in the law firm of Litt & Associates, Inc. From September 1, 1991 to May 1, 1997, when my then partner left the law firm to become Deputy General Counsel for Civil Rights at the federal Department of Housing and Urban Development, I was a partner at the firm of Litt & Marquez. For the seven years prior to that, I was a partner in the firm of Litt & Stormer, Inc.

3.      I graduated from the University of California at Berkeley in 1966 and from UCLA School of Law in 1969. For the first approximately ten years of

---

[1] Because this case was handled by Kaye, McLane & Bednarski before I became a partner with the firm, where it is relevant to refer to work at that stage, the designation "KMB" is used.

my practice, I focused primarily in the area of criminal defense at the trial and appellate levels, mostly in federal courts. In that capacity, I handled hundreds of matters, tried many cases ranging from immigration offenses to murders, and handled numerous appeals. Since 1981, I have focused primarily on complex civil litigation in the areas of constitutional law, civil rights law, class action litigation, and complex multi-party litigation.

4. My former firm, Litt & Stormer, received the Pro Bono Firm of the Year Award from Public Counsel in 1987 in recognition of its public interest and civil rights work. Litt & Marquez received an award from the NAACP Legal Defense Fund in July, 1992, as civil rights firm of the year in recognition of its civil rights work. I received an award from UCLA School of Law as its public interest alumnus of the year in 1995 and received a CLAY award for my work in *Goldstein v. City of Long Beach et al*., along with my co-counsel in the case, described in ¶ 12 *infra*.

5. I have both spoken and written on the subject of civil rights training. I published an article entitled "Class Certification in Police/Law Enforcement Cases" in Civil Rights Litigation and Attorney's Fee Annual Handbook, Vol. 18, Ch. 3 (West Publishing 2002) and one for the National Police Accountability Project titled "Select Substantive Issues Regarding Class Action Litigation In The Jail/Prison Setting", National Police Accountability Project, October 2006. I published an article in the Los Angeles Lawyer regarding the use of minimum statutory damages under the Unruh Act, particularly actions brought under Civil Code §52.1, to enhance the prospects for certifying class actions. See "Rights for Wrongs," Los Angeles Lawyer December 2005. In 2010, I published an article in West's Civil Rights Litigation and Attorney's Fee Annual Handbook entitled, "Obtaining Class Attorney's Fees." I am rated "AV" by Martindale-Hubbell. I am, and have been for many years, listed in Super Lawyers Southern California in the fields of civil rights and class actions.

2

6.      My curriculum vitae is attached as Exhibit "A" to this declaration.

7.      I am considered an expert in, among other things, attorneys' fees in civil rights and class action cases. I have frequently trained attorneys regarding obtaining and properly documenting statutory attorneys' fee awards. I have filed declarations on numerous occasions expressing expert opinions on the appropriate standards for awards of attorneys' fees in civil rights cases, which have been accepted by the courts.

8.      In the State Bar proceeding *In re Yagman*, I was qualified as an expert in attorneys' fees under 42 U.S.C. §1988 and testified in person on whether or not Mr. Yagman's fee arrangement in a police shooting case was or was not unconscionable, as the State Bar contended in that case. I also recently testified in a State Bar proceeding as an expert on civil rights practice in the context of police and jail litigation.

9.      In 2007, I testified as an attorneys' fee expert in a civil rights case on behalf of plaintiffs represented by a major law firm in Los Angeles. The case had a confidential settlement, with fees to be arbitrated by a former superior court judge now at JAMS. Because the settlement and arbitration were confidential, I do not feel at liberty to identify the issues, parties, firms or retired judge involved. However, there was a defense fee expert in that case who described me as "a prominent Los Angeles civil rights litigator experienced in fee issues arising from public interest litigation." The arbitrator described my testimony as "credible and reliable", and described me as having "had a wide exposure to fees at a number of major firms in Los Angeles doing complex civil litigation."

10.      I have also on occasion represented other attorneys in their fee litigation seeking statutory attorneys' fees.

11.      I litigate a wide range of civil rights cases, including police and jail abuse, wrongful conviction, housing and employment and other discrimination, and violation of a wide range of constitutional rights. My current emphases are

civil rights class actions and wrongful convictions cases. I am currently lead or co-lead counsel in pending civil rights class actions in the Los Angeles area and in other jurisdictions, including Washington D.C., Maryland and Georgia.

12.     As I mentioned, my full curriculum vitae is attached. To give some sense of my experience, I mention here the largest civil rights cases in which I have been the lead counsel:

> *Williams v. Block*, Case No. CV97-03826 CW (C.D. Cal.) and related cases (a series of cases county jail overdetention and strip search cases, settled for $27 Million and a complete revamp of jail procedure);

> *McClure v. City of Long Beach* (fair housing case against City of Long Beach for preventing six group homes for the handicapped from opening; jury verdict before remittitur of $22.5 Million (exclusive of attorney's fees) rendered 8/04/04; case recently settled for $20 Million);

> *Craft v. County of San Bernardino*, EDCV05-0359 SGL (C.D. Calif.) (reported at 2008 U.S.Dist. LEXIS 27526) (certified class action against the Sheriff of San Bernardino County for blanket strip searches of detainees, arrestees, and persons ordered released from custody; partial summary judgment decided for plaintiffs; $25.5 Million settlement plus injunctive relief in 2008);

> *MIWON v. City of Los Angeles*, Case No.: CV07-3072 AHM (FMMx) (class action on behalf of demonstrators attacked by LAPD in MacArthur Park on May 1, 2007; settled in 2009 for $12.75 Million plus injunctive relief);

> *Bynum v. District of Columbia*, Case No. 02-956 (RCL) (D.D.C.) (certified class action against the District of Columbia for

4

overdetentions and strip searches of persons ordered released from custody, settled for $12 Million in 2006);

➤ *Nozzi v. Housing Authority of the City of Los Angeles*, Case No. CV 07-00380 PA (FFMx) (settlement of estimated $9.25 Million for failing to provide proper mandated notice prior to subsidy reduction to Section 8 Housing Choice Voucher Program holders pending);

➤ *O'Connell v. County of Los Angeles,* Case No. 13-CV-01905 MWF (PJWx)  ($15 Million settlement in wrongful conviction case pending);

➤ *Gamino v. County of Ventura*, Case No. CV02-9785 CBM (Ex) (C.D. Cal.) (settlement for putative class fund of approximately $12 Million for persons arrested on possession of drugs and strip searched);

➤ *Goldstein v. City of Long Beach*, et al., Case No. CV04-9692 AHM (Ex) (C.D. Cal.) (wrongful conviction case against Long Beach Police Department based on violation of *Brady v. Maryland* for man imprisoned for 24 years; $7.95 Million settlement in August 2010);

➤ *Lopez v. Youngblood*, 609 F.Supp.2d 1125 ((E.D. Cal. 2009) (Settlement approved for putative class fund of approximately $7 Million for inmates strip searched after becoming entitled to release, and strip searches in groups);

➤ *Barnes v. District of Columbia*, Case 1:06-cv-00315-RCL 02-956 (RCL) (D.D.C.) (*Bynum* follow-up certified class action against the District of Columbia for overdetentions and strip searches of persons ordered released from custody, settled for $12 Million in 2006).

13.   My qualifications have been noted by various courts or opposing experts. Following are a few examples:

5

a.      Central District Judge Consuelo Marshall, in a recent fee decision in *Rodriguez et al. v. County of Los Angeles et al.*, CV 10-6342-CBM (AJWx) (12/27/2014), found that "Barrett S. Litt, who served predominantly in a consulting role on this case, is considered one of the leading civil rights attorneys in the country" and that the requested rate "of $975 per hour for Attorney Litt is supported by his strong reputation and experience." See also Judge Marshall's comments in *Gamino v. County of Ventura*, Case No. CV02-9785 CBM (Ex) ("Mr. Litt is widely known as one of the foremost civil rights attorneys in California, having a particular expertise in civil rights class actions and other complex multi-party civil rights cases, especially law enforcement class actions").

b.      Kenneth Moscaret, a well-known defense fee auditor, recently stated in a declaration where he addressed my qualifications that I had "an outstanding background and reputation in civil rights/constitutional litigation in Los Angeles", that I was "one of the top litigators in [my] field" and that he believed that my "skill, experience, and reputation in his field are deserving of a premium rate" (although he thought a premium rate was lower than I do).

c.      Magistrate Judge Carla Woehrle, in awarding attorneys' fees in *Williams v. Block*, *supra*, commented that I am "considered one of the outstanding civil rights litigators in California, with special expertise in class actions, [and] the other attorneys involved in this litigation on behalf of the class are highly regarded, experienced and capable civil rights attorneys…."

d.      United States District Judge Stephen Larson, in awarding attorneys' fees in *Craft v. County of San Bernardino*, *supra*, commented that "Plaintiffs' counsel are experienced civil rights litigators who are at the

6

top of their field of expertise – civil rights litigation with special expertise in civil rights class actions."

e.     This Court, in awarding attorneys' fees in *Gamino v. County of Ventura*, Case No. CV02-9785 CBM (Ex), stated, "Mr. Litt is widely known as one of the foremost civil rights attorneys in California, having a particular expertise in civil rights class actions and other complex multi-party civil rights cases, especially law enforcement class actions."

f.     In a recent case in state Court, where I submitted a declaration in support of a fee motion, Judge Gregory W. Alarcon described another attorney and me as "acknowledged experts in attorney fees in class action cases . . . ." *Molina v. Lexmark International Inc.*, LA Super. Ct. No. BC339177, Order Granting Plaintiff's Motion for Attorney's Fees and Costs in the Amount of $5,772,008.07, filed Oct. 28, 2011 at 4.

14.     As my case list demonstrates, I have been involved with, and successful in, a wide range of complex civil rights cases, and have regularly brought fee motions under numerous federal and state fee shifting provisions. I frequently provide fee declarations in support of fee applications by other attorneys in civil rights cases, which have been cited in fee orders in the Central District to support fees that are in line with those that counsel for the Plaintiffs are seeking in this case. See, e.g., *Rauda v. City of Los Angeles*, CV08-3128 CAS (PJW), Fee Order dated 12/20/2010, p.10 ("With respect to the reasonableness of the fees requested, the Court finds that plaintiffs have sufficiently documented the fees requested. It further concludes, and is satisfied based on the declarations of Barrett S. Litt and Carol A. Sobel in support of plaintiffs' motion that the hourly rates requested by plaintiffs are consistent with those in the relevant legal community for individuals having the stature of plaintiffs' counsel."); *Lauderdale v. City of Long Beach*, No. CV 08-979 ABC (JWJx), Fee Order dated 1/11/2010, p.11 ("Barrett S. Litt, another experienced civil rights litigator, also testified that

the rates are in line with the Southern California market, his own experience, and fee awards in similar cases.").

15. I regularly review a variety of material to keep abreast of rates charged and awarded for complex litigation in Southern California. I do this in a variety of ways, including contacting firms to provide (on either a public or confidential basis) current rate information; speaking with other attorneys familiar with complex litigation rates; reviewing court filings and cases regarding attorneys' fees (including both fee applications and fee awards); and obtaining other sources of fee information. I have also reviewed rates reported in Court Express for bankruptcy work by California law firms for the year 2009. My review of selected billing rate information has included, at various times, review of rates from various large law corporate firms. In particular, I have recently collected a wide variety of civil rights awards (either lodestar awards or lodestar crosschecks in civil rights class action fee awards) and class action awards in consumer cases with lodestar crosschecks, the results of which are described further on in this declaration. This has included review of rates sought and awarded to such boutique civil rights firms as my own firm(s); the ACLU; the Disability Rights Legal Center; Disability Rights Advocates; Hadsell, Stormer et al.; the Law Offices of Carol Sobel; Schonbrun, DeSimone et al.; and awards to various individual practitioners. In addition, to the extent I am able, I collect information regarding commercial rates; there are periodically reported decisions addressing fee awards in commercial cases, which I periodically review.

## SOURCE MATERIALS RELIED ON FOR RATE OPINIONS

16. The rate information on which I rely is set forth in full in Exhibit B to this Declaration, which is incorporated by this reference and is broken into three tables, described as follows:

> ➢ Table 1: *Civil Rights Lodestar Awards/Lodestar Crosschecks*. These are taken from reported attorney fee awards, or filed court orders, in

civil rights cases where there was either a direct lodestar award or a lodestar crosscheck against a percentage of the settlement or award fee.

➢ Table 2: *Consumer/Wage & Hour Class Action Lodestar Crosschecks*. This is self-explanatory, and was taken from reported cases.

➢ Table 3: *Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports*. These are a firm's standard rates reported either in a court filing, referred to in a court decision, provided to counsel, or contained in the 2009 Court Express summary of bankruptcy filings referred to previously.

17.    Exhibit B contains three cuts of the same information, each containing three tables, organized and designated as follows: 1) organized by case; 2) organized by years of graduation, most to least; and 3) organized by rates, highest to lowest (based on the adjusted rate for the year 2014, which concept is described below). I draw on this rate information in addressing the reasonableness of the rates requested in the Defendant/Appellee's motion, and include what I consider the most relevant references in the body of this Declaration.

18.    In the charts that I attach as Exhibit B, and incorporate as relevant into the body of this Declaration, I provide the following information:

| Term | Description |
|------|-------------|
| Attorney | The name of the attorney awarded the rate listed or, for the commercial firms, their normal rates (or indicate if the individual identity is unknown) |
| Firm | The firm listed |
| Practice Yrs | The years in practice at the time of the award or, if it could be clearly |

| Term | Description |
|------|-------------|
| | determined from the opinion or other available information, the years in practice when the fee application was made. In parentheses are the years of law school graduation |
| Rate | The rate awarded in the case of awards, or normally charged for commercial firms |
| Year | The year of the award or the year of the fee application if those rates were used. |
| Adjusted Rate | An adjustment to the fee award to compensate for the passage of time, the basis for which is described in ¶¶ 22-27 below. |

19.    The name of the case in which the fee was awarded or, for commercial rates (where applicable) filed for, is noted by the use of a superscript number next to the name of the attorney. At the conclusion of the first set of charts in Exhibit B (and incorporated as relevant if the reference is used in the body of this Declaration), the name and case number, and/or Westlaw cite of the case is listed if the source is from a public filing. If the source is not from a public filing, the non-public source is identified and/or attached. Cases not in Westlaw, documents from a case file, and non-public documents relied upon (with the exception of Court Express) that are referenced by a superscript number are attached with a designated Exhibit Number (which number matches the superscript number).[2] If the case is in Westlaw, it is not attached.

---

[2] So, for example, if the superscript uses the number "81" to designate the case, then the exhibit, if attached, will be Exhibit 81. It will be attached if it is a non-public source or a court order not available on Westlaw.

20.     The years of practice for an attorney are based on either information directly provided by the source or, where it was not so provided, by checking the attorney's website or the California State Bar Member Search. In some cases, the year of admission to the Bar may not be completely reliable because there may be reasons that an attorney's years of admission to the California State Bar are less than the years of practice. For example, an attorney may have practiced in another state before California or may have delayed admission while clerking for a judge or for some other reason. Where the attorney graduated from a California law school, it is likely that s/he graduated the same year as the Bar admission.

21.     With respect to my analysis of commercial rates in Table 3 of Exhibit B, it is well established that civil rights rates were intended by Congress to be comparable to complex commercial litigation such as antitrust. *See, e.g., Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1122-23 (C.D. Cal. 2008) ( "declarations establish that the hourly rates set are similar to those for attorneys of comparable skill and experience at the rates paid for complex federal litigation, which was Congress' intent for civil rights cases. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-576, 106 S.Ct. 2686 (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976, p. 5913, *supra*, (Congress intended civil rights fees to be comparable to that for 'other types of equally complex Federal litigation, such as antitrust cases')")). There is nothing to suggest that the legal work involved in the rates referenced in Table 3 is more complex than a complex civil rights case.

### ADJUSTMENT FACTOR

22.     In this declaration and in the rate charts attached as Exhibit B, I use "Adjusted Rates" to compare the rates requested in this case to the historical rate data that I have presented. The "Adjusted Rate" is an inflation adjustment to show what a prior rate would be equivalent to in 2017 adjusted for the passage of time. The adjustment is based on the mean (numerical average) of the nation-wide

Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor, which is reproduced by Dr. Michael Kavanaugh in his website for the "Updated Laffey Matrix." The "Updated Laffey Matrix" has been cited, and relied on, by courts in D.C.[3]

23.    I used an adjustment factor of 3% per annum. I reached this number by taking the average (mean) annual rate increase of the Legal Services CPI for the ten years June 2008 to May 2018, which came to slightly below 3% (2.96%) per year, and which I rounded to 3%. See http://www.laffeymatrix.com/see.html. That this is a reliable and conservative national figure is confirmed by the fact that the inflation rate calculated for these years was significantly lower than the average inflation factor for the previous ten years which was more than 4.5%, as reflected in the Updated Laffey Matrix.

24.    Further, other information indicates that the 3% inflation factor is likely an understatement of the increase in rates over the past several years in major metropolitan areas. The 3% adjustment is a national figure, and fees in urban large metropolitan areas will likely have risen more rapidly. Thus, for example, the Wall Street Journal reported in April 2013, that, in "the first quarter of 2013, the 50 top-grossing U.S. law firms boosted their partner rates by as much

---

[3] *See Salazar v. Dist. of Columbia*, 123 F. Supp. 2d 8, 13 (D.D.C. 2000); *Smith v. Dist. of Columbia*, 466 F. Supp. 2d 151, 155 (D.D.C. 2006) (the use of the updated *Laffey* Matrix is reasonable and consistent with previous precedent from our Court of Appeals, as well as from this Court in *Salazar*" and is "more accurate in that the calculation was based on increases/decreases in legal services rather than increase/decreases in the entire CPI"); *McDowell v. District of Columbia*, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001) ("Plaintiffs may point to such evidence as an updated version of the Laffey matrix"); *Salazar v. Dist. of Columbia*, 750 F. Supp. 2d 70, 72 (D.D.C. 2011) (affirming use of the adjusted rate based on the national legal services data for monitoring work in the case, and rejecting Defendant's contention that the United States Attorney's matrix should be used instead).

as 5.7%, billing on average between $879 and $882 an hour" and that, in 2012, "legal fees in general rose 4.8% and associate billing rates rose by 7.4%, according to a coming report by TyMetrix Legal Analytics, a unit of Wolters Kluwer, and CEB, a research and advisory-services company. Those numbers are based on legal-spending data from more than 17,000 law firms." See Jennifer Smith, On Sale: the $1,150-Per-Hour-Lawyer, Wall St. J., Apr. 9, 2013, at http://www.wsj.com/articles.  A 2016 article reported an average billing rate increase of 3.2%. See Elizabeth Olson, Higher Fees Increase Law Firm Revenues by 4.1 Percent, N.Y. Times, Aug. 15, 2016, at www.nytimes.com/2016/08/16/business/dealbook/higher-fees-increase-law-firm-revenue-by-4-1-percent.html. And, according to a March 2017 release from Wolters Kluwer's ELM Solutions and CEB, 2016 rates rose 7.3% at the associate level and 3.2% at the partner level. [4]  These figures are considerably higher than the 3% adjustment factor that I have used.

25.    The adjustment factor is important because it is not a valid comparison to take a fee from five years ago for, e.g., a 20 year lawyer and compare it to a fee requested by a 20 year lawyer today because the five-year-old fee does not account for the change in rates in today's legal dollars. Additionally, it is not a valid comparison to take a fee from five years ago for a particular attorney and compare it to a fee requested by that same attorney today, even if the

---

[4] *See also, e.g.*, Hildebrandt Institute, *Top Law Firms Still Tops in Rates, Billable Hours* at 22, January 10, 2013, available at http://hildebrandtblog.com/2013/01/10/top-law-firms-still-tops-in-rates-billable-hours ("A survey from The National Law Journal (NLJ) (registration required) found that median partner rates were up 4.5 percent from 2011 to $517 an hour in 2012, and the median associate rate rose 3.5 percent to $323, with hourly rates ranging from $130 to $1,285 and a median hourly rate of $432. This gibes with the findings of the Major Lindsey & Africa (MLA) "Partner Compensation Survey 2012," which recorded an hourly rate range from $115 to $1,265 and an average partner billing rate of $584 (up from $555 in 2010).")

adjustment factor is applied. This is because the adjusted rate for that particular attorney does not reflect that, in addition to industry-wide increases in rates, the attorney is five years more experienced and should charge a higher rate today than she could with five years fewer experience.

26.     Thus, the adjustment factor is merely a tool to approximate what the current rate for an attorney of the same years of experience would be awarded now, as opposed to when the award was actually made, and it does not account for increased experience or expertise. To give an example, a 2009 lodestar cross-check for me confirmed an $800 rate, which, in the adjusted dollars I have used, is over $1000. Similarly, in that same case, the Court approved a rate of $710 for Carol Sobel, which, in the adjusted dollar calculation I used, amounts to over $885. However, those are simply inflation/rise in rates adjustments, and do not account for increased experience and expertise gained in those intervening years. Thus, it is to be expected that the current rate for attorneys who have received previous awards will be meaningfully above the adjusted rate based on a prior award.

27.     I have spent the time I have explaining the adjustment factor used because, in analyzing the rates, the only way to compare rates from prior years to the current year rates requested by plaintiffs' counsel in this case is to neutralize the effect of inflation and market changes over time.

28.     I have been at times asked why I do not use generic surveys to determine rates. The simple answer is that surveys do not provide the most useful information for the relevant market. I principally rely on actual awarded rates in civil right cases or class action lodestar cross checks in civil rights cases because these are awards in the same market, i.e., the market for Plaintiffs' complex civil rights cases in the major markets in California (Los Angeles and the Bay Area). *See, e.g., Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547 (1984) ("the statute and legislative history establish that 'reasonable fees' under § 1988 are to

be calculated according to the prevailing market rates in the relevant community"); *Trevino v. Gates*, 99 F.3d 911, 925 (9th Cir. 1996) ("the district court should not have relied on the rates paid by the City to private attorneys for defending excessive force cases as a starting point for the reasonable hourly rate....Private attorneys hired by a government entity to defend excessive force cases are not in the same legal market as private plaintiff's attorneys who litigate civil rights cases."). The relevant community here is Plaintiffs' lawyers in complex civil rights cases in Los Angeles (and, because rates in Northern California are comparable, Bay Area civil rights awards as well). Surveys do not reflect that market. Class actions and commercial rates for complex litigation are used as comparators because Congress intended civil rights awards to be comparable. See discussion in ¶ 21.

## RATES AND COSTS REQUESTED

29.     The rates being requested are for the lawyers identified in the table below, which includes their years of practice, are:

| Biller | Position | Yrs Practice (Grad Yr) | Rate |
|---|---|---|---|
| Ben Conway | Supervising Staff Attorney | 11 (2006) | $640 |
| Christy Ferioli | Attorney | 5 (2012) | $490 |
| Eliza Finley | Attorney | 3 (2014) | $450 |
| Leah Gasser-Ordaz | Attorney | 3 (2014) | $400 |

30.     As reflected by Exhibit B, the rates sought in this case are well within the range of the rates charged by attorneys of comparable experience in the Southern California area for complex federal and civil rights work. Below I address the rates sought in this case, and compare them to attorneys of comparable or lesser experience, skill and reputation seeking or charging comparable or lesser rates.

1

**CONWAY RATE**

2

31.     The requested rate for Ben Conway, an attorney with eleven years of

3

experience, is $640 per hour. Mr. Conway is a civil rights attorney with extensive

4

experience who is known throughout California for his expertise in special

5

education cases. Although I have not personally worked on a case with Mr.

6

Conway, I am familiar with his work and am aware of his strong reputation in the

7

special education field. He has litigated numerous education cases in state and

8

federal courts and recently published a law review article on special education

9

litigation.  He also teaches at UCLA School of Law. The $640 hourly rate

10

requested by Mr. Conway is, in my opinion, within the range of reasonable rates

11

for attorneys of comparable reputation, skill, and experience.

12

32.     Below I list other awards or rates for attorneys of comparable or

13

fewer years who have these or similar rates. In doing so, as I mentioned above, I

14

rely on the adjusted rate in order to compare apples to apples. I supply these in the

15

three different tables previously described – civil rights awards, consumer class

16

actions lodestar crosschecks, and commercial rates.

17

Below I list some relevant comparable rates from my Table 1. Table 1

18

shows many lawyers with comparable years of experience receiving comparable

19

rates in adjusted dollars to those requested here. These are all based on

20

documented court awards in civil rights cases, and thus don't reflect commercial

21

rates. For example, Kevin LaHue, a 10 year attorney at the time, received $600

22

three years ago, which comes to $656 in adjusted dollars. Similarly, Katherine

23

Weed from Disability Rights Advocate, a 10 year attorney at the time, received

24

$600 five years ago, which comes to $696 in adjusted dollars.

25

26

27

28

16

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Belinda Escobosa Helzer[1] | ACLU | 11 (2000) | $525 | 2011 | $627 |
| Peter Bibring[1] | ACLU | 09 (2002) | $490 | 2011 | $585 |
| Joseph J. Ybarra[1] | MTO** | 10 (2001) | $550 | 2011 | $657 |
| Jacob A. Kreilkamp[1] | MTO** | 08 (2003) | $505 | 2011 | $603 |
| Jennifer Bezoza[4] | DRA* | 10 (2000) | $570 | 2010 | $701 |
| Roger Heller[4] | DRA* | 09 (2001) | $560 | 2010 | $689 |
| Rebecca Thornton[6] | Law Offices of Carol Sobel | 08 (2001) | $425 | 2009 | $538 |
| Unnamed[10] | Rosen Bien & Galvan | 13 (1997) | $560 | 2010 | $689 |
| Unnamed[10] | Bingham, McCutcheon | 13 (1997) | $655 | 2010 | $806 |
| Shawna Parks[13] | DRA* | 13 (1999) | $665 | 2012 | $771 |
| Katherine Weed[13] | DRA* | 10 (2002) | $600 | 2012 | $696 |
| Jennifer Lee[13] | DRLC*** | 09 (2003) | $550 | 2012 | $638 |
| Matthew Strugar[13] | DRLC*** | 08 (2004) | $525 | 2012 | $609 |
| Shawna Parks[14] | DRLC | 10 (1999) | $525 | 2009 | $665 |
| Sage Reeves[14] | DRLC | 08 (2001) | $475 | 2009 | $602 |
| John Glugoski[19] | Righetti Glugoski | 12 (1997) | $650 | 2012 | $754 |
| Kevin LaHue[34] | Kaye, McLane, Bednarski & Litt | 10 (2004) | $600 | 2014 | $656 |

Because it would consume an undue amount of space to list the cases, rate sources etc. relied upon in the body of this Declaration, I do not list them in the

17

Declaration for any of the tables. Exhibit B contains the full name of each reference used, and the source referred to, by superscript number. (For example, using the reference from Table 1 to Katherine Weed, superscript #13 refers to the Fee award in *Communities Actively Living Independent and Free v. City of Los Angeles*, 2:090cv-00287 CBM-RZ-Doc # 255 (C.D. Cal. 6/10/13) (lodestar award in settlement of ADA injunctive relief class action), the citation to which may be found at page 14 of Exhibit B.)

Below, I list some relevant, comparable rates from my Table 3. (I did not use Table 2 because it does not contain awards for comparable years of experience.) Table 3 shows a wide range of attorneys in commercial cases with 8 to 14 years of experience, with adjusted rates from $676 to over $1000 (again, based on adjusted dollars), substantially higher than those requested here for an attorney with 11 years of experience. As I explained above, Congress intended rates for complex civil rights litigation to be on a par with those for complex commercial litigation.

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Unnamed[11] | Arnold & Porter | 09 (2004) | $625 | 2013 | $703 |
| Victoria Maroulis[81] | Quinn Emanuel | 13 (1999) | $815 | 2012 | $945 |
| Todd Briggs[81] | Quinn Emanuel | 12 (2000) | $735 | 2012 | $852 |
| Melissa Dalziel[81] | Quinn Emanuel | 12 (2000) | $730 | 2012 | $846 |
| Hillary A. Hamilton[82] | Skadden Arps | 10 (2001) | $710 | 2011 | $848 |
| Unnamed[85] | Paul Hastings | 08 (2003) | $620 | 2011 | $740 |
| Unnamed[85] | Paul Hastings | 09 (2002) | $630 | 2011 | $752 |
| Unnamed[85] | Paul Hastings | 12 (1999) | $670 | 2011 | $800 |
| Erik Swanholt[88] | Greenberg Traurig | 11 (1998) | $575 | 2009 | $750 |
| Thomas M. Riordan[90] | O'Melveny &Myers | 14 (1995) | $675 | 2009 | $716 |

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Jorge DeNeve[90] | O'Melveny &Myers | 10 (1998) | $620 | 2009 | $785 |
| Allan Johnson[90] | O'Melveny &Myers | 08 (2001) | $565 | 2009 | $716 |
| Paralegal[90] | O'Melveny &Myers | 12 (1997) | $245 | 2009 | $892 |
| Unnamed[91] | Paul Hastings | 11 (1999) | $670 | 2010 | $824 |
| Unnamed[91] | Paul Hastings | 10 (2000) | $660 | 2010 | $760 |
| Unnamed[92] | White & Case | 08 (2001) | $655 | 2009 | $836 |
| Unnamed[92] | Pachulski, Stang et al. | 14 (1995) | $535 | 2009 | $918 |
| Unnamed[92] | Munger, Tolles & Olson | 12 (1997) | $525 | 2009 | $918 |
| Unnamed[92] | Morrison & Foerster | 09 (2000) | $535 | 2009 | $823 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 12 (1997) | $650 | 2009 | $1,077 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 09 (2000) | $505 | 2009 | $861 |
| Unnamed[92] | Gibson Dunn & Crutcher | 12 (1997) | $635 | 2009 | $773 |
| Daniel Perry[93] | Milbank, Tweed | 14 (2000) | $1135 | 2014 | $1240 |
| Delilah Vinzon[93] | Milbank, Tweed | 12 (2002) | $900 | 2014 | $874 |
| Hannah Cannom[93] | Milbank, Tweed | 08 (2006) | $800 | 2014 | $830 |
| Amy Lalley[94] | Sidley Austin | 14 (1998) | $700 | 2012 | $812 |

### FERIOLI, FINLEY, GASSER-ORDAZ RATES

33.    Next, I turn to attorneys Ferioli (a five year attorney), Finley, and Gasser-Ordaz (both three year attorneys), for whom the requested rates are $490, $450, and $400.  I am not personally familiar with these attorneys nor have they

yet established a reputation for their practice to my knowledge.  As this is common for attorneys with five or fewer years of experience, I still have informed opinions about the reasonableness of their rates.

34.     Although Ms. Gasser-Ordaz and Ms. Finley have practiced law for the same number of years, Ms. Finley's proposed rate is higher. Plaintiffs explain that Ms. Finley has a higher rate because she has three years of general litigation experience, including two years of special education litigation experience, whereas this matter was Ms. Gasser-Ordaz's first special education litigation case. Such differentiation of rates for attorneys with similar length of overall practice is common and appropriate—these rates reflect their respective skill at the time of the litigation rather than just the number of years that they have practiced any law.

35.     Although there are slight differences in years of litigation experience between them, I will provide support for both in the same table excerpts provided below and then will point to the relevant rates from those tables.

36.     Table 1 shows many lawyers with comparable years of experience receiving comparable rates in adjusted dollars to those requested here. Below aer some adjusted rates drawn from that Table (which reflects civil rights awarded or lodestar cross-checked rates). For example, Marina Torres, a three year attorney at MTO, received $385 in 2008, which comes to $460 in adjusted dollars. Stephanie Biederman from Disability Rights Advocate, a three year attorney at the time, received $350 in 2010, which comes to $430 in adjusted dollars.

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Laura D. Smolowe[1] | MTO** | 05 (2006) | $460 | 2011 | $549 |
| Marina A. Torres[1] | MTO** | 03 (2008) | $385 | 2011 | $460 |

20

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Sarala V. Nagala[1] | MTO** | 03 (2008) | $385 | 2011 | $460 |
| Peter Bibring[2] | ACLU | 07 (2002) | $375 | 2009 | $475 |
| Anna Canning[3] | Schoenbrun, de Simon | 06 (2006) | $450 | 2012 | $522 |
| Kevin Knestrick[4] | DRA* | 07 (2003) | $535 | 2010 | $658 |
| Kasey Corbit[4] | DRA* | 06 (2004) | $500 | 2010 | $615 |
| Mary–Lee Kimber[4] | DRA* | 05 (2005) | $475 | 2010 | $584 |
| Stephanie Biedermann[4] | DRA* | 03 (2007) | $350 | 2010 | $430 |
| Becca von Behren[4] | DRA* | 02 (2008) | $265 | 2010 | $326 |
| Sheryl Wu Leung[4] | Skadden Arps | 05 (2005) | $395 | 2010 | $486 |
| Nathaniel Fisher[4] | Skadden Arps | 02 (2008) | $530 | 2010 | $652 |
| Stacey Brown[7] | Litt, Estuar & Kitson | 01 (2006) | $275 | 2007 | $370 |
| Unnamed[10] | Prison Law Office | 01 (2009) | $275 | 2010 | $338 |
| Unnamed[10] | Bingham, McCutcheon | 02 (2008) | $400 | 2010 | $492 |
| Mary-Lee Smith[13] | DRA* | 07 (2005) | $555 | 2012 | $643 |
| Karla Gilbride[13] | DRA* | 05 (2007) | $430 | 2012 | $498 |
| Stephanie Biedermann[13] | DRA* | 05 (2007) | $430 | 2012 | $498 |
| Christine Chuang[13] | DRA* | 05 (2007) | $430 | 2012 | $498 |
| Kara Janssen[13] | DRA* | 02 (2010) | $330 | 2012 | $383 |

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Debra Patkin[13] | DRLC*** | 05 (2007) | $450 | 2012 | $522 |
| Matthew Strugar[14] | DRLC | 05 (2004) | $400 | 2009 | $507 |
| Bethany Woodard[14] | MTO** | 04 (2005) | $395 | 2009 | $500 |
| Kristina Wilson[14] | MTO** | 03 (2006) | $350 | 2009 | $443 |
| Mahogany Jenkins[20] | MoFo | 02 (2004) | $285 | 2006 | $395 |
| Heather McGunigle[22] | DRLC | 04 (2009) | $375 | 2009 | $475 |
| Bambo Obarro[29] | Weill Gotschall | 04 (2010) | $400 | 2014 | $437 |
| Richard D. Lambert[31] | Stonebarger Law | 07 (2007) | $500 | 2014 | $546 |
| Caitlin Weisberg[34] | Kaye, McLane, Bednarski & Litt | 06 (2008) | $500 | 2014 | $546 |

As for commercial rates, below are some comparable rates drawn from Table 3.

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Suzanna Brickman[83] | MoFo | 07 (2006) | $650 | 2013 | $732 |
| Unnamed[84] | Lieff Cabraser | 01 (2011) | $325 | 2012 | $377 |
| Unnamed[84] | Lieff Cabraser | 04 (2008) | $395 | 2012 | $458 |
| Unnamed[84] | Lieff Cabraser | 06 (2006) | $435 | 2012 | $504 |
| Unnamed[85] | Paul Hastings | 01 (2010) | $360 | 2011 | $430 |
| Unnamed[85] | Paul Hastings | 03 (2008) | $450 | 2011 | $537 |
| Unnamed[85] | Paul Hastings | 04 (2007) | $500 | 2011 | $597 |
| Unnamed[85] | Paul Hastings | 05 (2006) | $530 | 2011 | $633 |
| Unnamed[85] | Paul Hastings | 06 (2005) | $565 | 2011 | $675 |

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[85] | Paul Hastings | 07 (2004) | $590 | 2011 | $704 |
| Danielle Katzir[86] | Gibson Dunn | 05 (2004) | $525 | 2009 | $665 |
| Multiple associates[86] | Gibson Dunn | 04 (2005) | $495 | 2009 | $627 |
| Melissa Barshop[86] | Gibson Dunn | 03 (2006) | $470 | 2009 | $595 |
| Multiple associates[86] | Gibson Dunn | 02 (2007) | $400 | 2009 | $507 |
| Multiple associates[86] | Gibson Dunn | 01 (2008) | $345 | 2009 | $437 |
| Sara Brenner[87] | Quinn Emanuel | 02 (2006) | $340 | 2008 | $444 |
| Hirad Dadgostar[88] | Greenberg Traurig | 03 (2006) | $400 | 2008 | $522 |
| Kimberly A. Svendsen[89] | Irell & Manella | 04 (2004) | $410 | 2008 | $535 |
| Dena G. Kaplan[89] | Irell & Manella | 05 (2003) | $475 | 2008 | $620 |
| Katherine J. Galston[89] | Irell & Manella | 05 (2003) | $490 | 2008 | $1,089 |
| Abby Schwartz[90] | O'Melveny &Myers | 03 (2006) | $450 | 2009 | $570 |
| Unnamed[92] | White & Case | 04 (2004) | $600 | 2009 | $830 |
| Unnamed[92] | White & Case | 06 (2003) | $600 | 2009 | $950 |
| Unnamed[92] | Weil, Gotscahl & Manges | 01 (2008) | $355 | 2009 | $633 |
| Unnamed[92] | Weil, Gotscahl & Manges | 03 (2006) | $465 | 2009 | $735 |
| Unnamed[92] | Weil, Gotscahl & Manges | 04 (2005) | $500 | 2009 | $633 |
| Unnamed[92] | Weil, Gotscahl & Manges | 06 (2003) | $580 | 2009 | $678 |
| Unnamed[92] | O'Melveny & | 03 (2006) | $395 | 2009 | $507 |

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| | Myers | | | | |
| Unnamed[92] | Munger, Tolles & Olson | 03 (2006) | $400 | 2009 | $551 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $450 | 2009 | $500 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $435 | 2009 | $665 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2004) | $395 | 2009 | $500 |
| Unnamed[92] | Gibson Dunn & Crutcher | 03 (2006) | $470 | 2009 | $595 |
| Unnamed[92] | Gibson Dunn & Crutcher | 06 (2003) | $570 | 2009 | $665 |
| Unnamed[92] | Davis, Polk & Wardwell | 04 (2005) | $680 | 2009 | $861 |
| Revi-Ruth Enriquez[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $830 |
| Caitlin Hawks[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $811 |
| Katherine Eklund[93] | Milbank, Tweed | 05 (2009) | $550 | 2014 | $601 |
| Alex Doherty[94] | Sidley Austin | 04 (2008) | $520 | 2012 | $603 |
| Alex Doherty[94] | Sidley Austin | 06 (2008) | $700 | 2014 | $541 |
| Lauren McCray[94] | Sidley Austin | 01 (1998) | $340 | 2012 | $929 |
| Lauren McCray[94] | Sidley Austin | 02 (1998) | $495 | 2014 | $437 |
| Bambo Obaro[95] | Weil Gotshal | 04 (2010) | $400 | 2014 | $656 |
| Jessica Mohr[95] | Weil Gotshal | 01 (2013) | $300 | 2014 | $328 |

As the tables above demonstrate, rates of $490, $450, and $400 for Ms. Ferioli, Ms. Finley, and Ms. Gasser-Ordaz are very reasonable, and well within the range of rates previously awarded in civil rights cases or charged in commercial cases. The referenced rates contain many for three to five year attorneys above $500 in adjusted dollars. The rates Plaintiffs seek, all of which are below $500 per hour, are reasonable.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at Pasadena, California on August 16, 2017.

Barrett S. Litt

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**

**Barrett S. Litt**
Kaye, McLane, Bednarski & Litt, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

## Education

1966  B.A. University of California at Berkley
1969  J.D. UCLA School of Law

## Honors and Awards

1987  Pro Bono Firm of the Year Award from Public Counsel (Litt & Stormer)
1992  Civil Rights Firm of the Year Award from the NAACP Legal Defense Fund (Litt & Marquez)
1995  Public Interest Alumnus of the Year Award from UCLA School of Law
2010  California Lawyer Attorney of the Year Award (CLAY)

## Recent Contributions to Professional Publications

"Class Certification in Police/Law Enforcement Cases", *Civil Rights Litigation and Attorney's Fee Annual Handbook*, Vol.18, Ch.3, West Publishing 2002

*"Rights for Wrongs"*, addressing issues under the California Civil Rights statutes, *Los Angeles Lawyer Magazine*, December 2005

"Select Substantive Issues Regarding Class Action Litigation In The Jail/Prison Setting", *National Police Accountability Project,* October 2006

"Obtaining Class Attorney's Fees," *Civil Rights Litigation and Attorney's Fee Annual Handbook*, Vol.26, West Publishing 2010

**Professional**

| | |
|---|---|
| 1/2013 to the present | Kaye, McLane, Bednarski & Litt, LLP |
| 2004 to 2012 | Litt, Estuar & Kitson, LLP |
| 1997 to 2004 | Litt & Associates |
| 1991 to 1997 | Litt & Marquez |
| 1984 to 1991 | Litt & Stormer |

Licensed to practice in:

> State of California
> U.S. District Court, Central District of California
> U.S. District Court, Eastern District of California
> U.S. District Court, Northern District of California
> Ninth Circuit Court of Appeals
> Fourth Circuit Court of Appeals
> Fifth Circuit Court of Appeals
> Eleventh Circuit Court of Appeals
> D.C. Circuit Court of Appeals
> United States Supreme Court

Admitted Pro Haec Vice in:

> U.S. District of Columbia
> U.S. District Court, Northern District of Georgia
> U.S. District Court, District of Maryland

Rated "AV" by Martindale-Hubbell

Listed in *Southern California Super Lawyers* in the fields of civil rights and class actions for the years 2005-present.

Listed in Best Lawyers in America (Los Angeles area) in the field of civil rights.

**Civil Rights Class Actions – Classes Certified and Cases Currently Pending:**

*Nozzi v. Housing Authority of the City of Los Angeles*, CV 07-00380 GW (C.D. Calif.) (pending certified class action against the Housing Authority for violations of due process and federal regulations by failing to provide

proper notice of Section 8 rent increase affecting approximately 10,000 tenants; case dismissed on sj for defendants; reversed by Ninth Circuit; dismissed again; reversed second time in *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Jan. 29, 2016; case pending).and summary judgment on liability ordered entered for Plaintiffs; on remand, (b)(2) and (b)(3) classes certified in *Nozzi v. Hous. Auth. of the City of Los Angeles,* No. CV 07-380 PA (FFMX), 2016 WL 2647677, at *1 (C.D. Cal. May 6, 2016)); preliminary approval for $9.25 Million settlement granted;

*Amador v. Baca,* No.: 10-1649 SVW (RC) (C.D. Calif) (pending certified class action challenging manner of searches of women  inmates in outside bus bay; estimated number of class members is an estimated 175,000 plus; 23 (b)(2) and (b)(3) classes certified; summary judgment on liability granted to Plaintiffs));

*Roy v. Los Angeles County Sheriff's Department,* Case No.: CV 12-9012 RGK (FFMx) (pending class action for injunctive relief and damages;(b)(2) and (b)(3) classes certified in Sept. 2016; summary judgment motions pending);

*Chua et al. v. City of Los Angeles, et al.* Case No.: CV-00237-JAK-GJS(x) (C.D. Calif.) (pending class action for injunctive relief and damages for arrests and related actions regarding Ferguson related protests at 6th & Hope and Beverly & Alvarado; estimated class size is 170; class certification granted);

## Civil Rights Class Actions – Classes Certified and Cases Resolved:

*Williams v. Block*, Case No.: CV-97-03826-CW (Central District of California) and related cases (a series of county jail overdetention and strip search cases, settled for $27 Million and a complete revamp of jail procedures; classes certified in conjunction with settlement);

*Bynum v. District of Columbia*, Case No.: 02-956 (RCL) (D.D.C.)( certified class action against the District of Columbia for overdetentions and blanket strip searches of persons ordered released from custody; final approval of $12,000,000 settlement occurred January 2006 );

*Craft v. County of San Bernardino,* 468 F.Supp.2d 1172 (C.D.Cal. 2006)
(certified class action against the Sheriff of San Bernardino County for
blanket strip searches of detainees, arrestees, and persons ordered released
from custody; partial summary judgment decided for plaintiffs; $25.5
Million settlement approved April 1, 2008);

*MIWON v. City of Los Angeles*, Case No.: CV 07-3072 AHM (C.D. Calif.)
(certified class action against City of Los Angeles and others for use of
police force and related conduct at MacArthur Park on May 1, 2007; final
approval of class settlement for $12,800,000 settlement granted  June 24,
2009, the largest class action protest settlement in the U.S.);

*Barnes v. District of Columbia,* Civil Action No.: 06-315 (RCL) (D.D.C.)
(class action against District of Columbia for continuing to both over-detain
and strip search post-release inmates despite settlement in *Bynum, supra*;
class certification granted; summary judgment granted Plaintiffs on most
claims; case ultimately settled for $6 Million);

*Lopez v. Youngblood*, No.: CV07-00474 LJO (DLBx) (E.D. Calif.) (certified
class action against Kern County, California, for unlawful pre-arraignment
and post-release strip searches and strip searches not conducted in private;
class certification and summary judgment on liability granted;
approximately $7 Million settlement);

*Aichele et al. v. City of Los Angeles, et al.* Case No.: CV 12-10863 DMG
FFM (x) (C.D. Calif.) (certified class action for injunctive relief and
damages for arrests and related actions regarding the shutdown of the use of
the City Hall lawn by Occupy LA; estimated class size is 300-400; class
certified; $2,675,000 settlement);

*Gail Marie Harrington-Wisely, et al. v. State of California, et al*., Superior
Court Case No.: BC 227373 (a case involving searches of visitors to
California prisons utilizing backscatter x-ray methods without reasonable
suspicion; injunctive relief class certified; stipulated injunction entered;
partial reversal on appeal and case returned to Superior Court for
determination of attorney's fees and discrete damages claims; damages class
decertified in light of certain liability determinations on appeal);

*Ofoma v. Biggers*, Case No.: 715400 (Complex Litigation Panel) (Orange
County Superior Court)(family discrimination class action settled in 1996

for damages for the individual plaintiffs and the class of residents, a consent decree and an award of attorney's fees);

*Francis, et al. v. California Department of Corrections, et al*., Case No.: BC302856 (class action against the CDC(R) for the failure to reimburse inmates assigned to the restitution centers in  Los Angeles for their obligations as ordered by the court. Case was successful in bringing about the restructuring of the CDCR's inmate accounting systems, and in the payment of restitution settlement in the amount of $325,000.)

*People of the State of California v. Highland Federal Savings and Loan*, Case No.: CA 718 828 (Los Angeles Superior Court)(class action filed on behalf of the People of the State of California and a class of tenants residing in several slum buildings located in Los Angeles for financing practices encouraging and perpetuating slum conditions, settled for $3.165 million after decision in *People v. Highland*, 14 Cal.App.4th 1692, 19 Cal. Rptr. 555 (1993) established potential liability for lenders);

*Hernandez v. Lee*, No.: BC 084 011 (Los Angeles Superior Court)(a class action on behalf of tenants of numerous buildings for slum conditions settled in 1998 for $1,090,000);

*Mould v. Investments Concept, Inc*., Case No.: CA 001 201 (Los Angeles Superior Court)(race discrimination class action on behalf of a class of applicants and potential housing applicants, settled in 1992 for a total of $850,000 for the class and a comprehensive consent decree regarding the defendants' discriminatory policies and practices);

*California Federation of Daycare Association v. Mission Insurance Co.*, Case No.: CA 000 945 (Los Angeles Superior Court)(class action on behalf of several thousand family daycare providers whose daycare insurance policies were canceled mid-term or were not renewed by Mission Insurance Company, settled in 1980's for reinstatement of policies and attorney's fees; brought at request of Public Counsel).

**Pending Class Actions Where Class certification has not yet been addressed:**

*McKibben v. County of San Bernardino,* Case No.: EDCV 14-2171 - JGB (SPx) (pending class action for injunctive relief and damages for unequal

treatment of Gay, Bisexual and Transgender jail inmates; class certification not yet filed or ruled on);

*Brewster v. City of Los Angeles,* Case No.: EDCV14-2257- JGB (SPx) (class action for injunctive relief and damages for 30 day impounds of cars without a warrant; class certification motion and motion for preliminary injunction pending; case dismissed and currently on appeal);

*M.S. v. County of Ventura*, No. 2:16-CV-03084-BRO-RAO(x) (C.D. Calif.) (recently filed  class action for injunctive relief and damages for failure to provide mental health treatment to criminal defendants held in jail and found incompetent to stand trial until their mental health is restored).

*Coordinated Proceeding, County Inmate Telephone Service Cases*
Case No: JCCP 4897 (Superior Court for the County of Los Angeles (nine pending class action complaints against nine counties coordinated in Los Angeles and consolidated into a single complaint alleging that the telephone charges to jail inmates and inmate callers constitute an unlawful tax under the California Constitution, seeking injunctive relief and damages).

**Multi-party Civil Rights Cases:**

*Hospital and Service Employees Union, SEIU Local 399, AFL-CIO v. City of Los Angeles* (Los Angeles Superior Court) (a settlement in 1993 of $2.35 million against the Los Angeles Police Department for injuries to 148 demonstrators at Century City organized by the Justice for Janitors campaign of SEIU);

*Rainey v. County of Ventura*, Case No.: 96 4492 LGB (C.D. Calif.)(action against County of Ventura for race discrimination on behalf of 12 police officers, settled for damages, structural relief and attorney's fees);

*Lawson v. City of Los Angeles*, Case No.: BC 031 232 (Los Angeles Superior Court)(lawsuit filed in 1991 on behalf of individuals who had been subjected to what plaintiffs alleged were unlawful use of force practices by the Los Angeles Police Department's Canine Unit, settled in 1995 for $3.6 million and comprehensive structural relief);

*Tipton-Whittingham v. City of Los Angeles*, Case No.: CV-94-3240 (TH)(C.D. Cal.)(sex discrimination and harassment suit against the Los

Angeles Police Department, involving over 25 individual officers, as a result of which the Department has already completely revamped its anti-discrimination policies and procedures; damages claims settled for $4.85 Million in 2004 in addition to separate fee award of nearly $2 Million in 2000 for injunctive relief, resulting in decision in *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, in which the California Supreme Court upheld catalyst fees under California law);

*Hampton v. NRG* (racial harassment in employment claim; jury verdict of $1,000,000 for two former employees, plus award of attorney's fees and costs; settled in mid-'90's while on appeal);

*Zuniga v. Los Angeles Housing Authority,* 41 Cal.App.4th 2 (1995) (holding that the Housing Authority could be held responsible for injuries to tenants after the Housing Authority was put on notice that tenants were being victimized on the premises and took no reasonable measures to prevent the injury; case settled for $1,040,000);

*PIN v. HACLA*, Case No.: CV-96-2810 RAP (RNBx)(action against the Housing Authority of the City of Los Angeles on behalf of several hundred present or former tenants for discrimination by failing to provide adequate security for isolated minorities in housing developments, settled in 1998 for $1.3 Million plus a comprehensive structural relief settlement agreement);

*Heidy v. United States Customs Serv.,* 681 F.Supp. 1445 (C.D.Cal. 1988) (injunction against U.S. Customs Service for policies and practices of seizing materials from persons traveling from Nicaragua in violation of the First Amendment);

*Castaneda v. Avol* (Los Angeles Superior Court) (1985) (action on behalf of approximately 350 slum housing residents, settled in 1988 for a comprehensive injunction and $2.5 Million damages, plus a separate award of attorneys' fees).

**Individual Civil Rights Cases: Wrongful Conviction Cases**

*Frank and Nicholas O'Connell v. County of Los Angeles, et al.,* Case No.: 13-01905-MWF (PJWx) (C.D. Cal.) (civil rights cases for police failure to turn over exculpatory information and eyewitness manipulation, resulting in murder conviction; plaintiff spent 27 years in prison before his habeas

petition was granted, and he was not re-tried; suit on behalf of son as well for denial of relationship with father as result of conviction; defendants' qualified immunity appeal rejected in *Carrillo/O'Connell v. County of Los Angeles*);

*Thomas Goldstein v. City of Long Beach et al.*, Case No.: 04-CV-9692 AHM (Ex) (C.D. Cal.) (civil rights cases for police failure to turn over exculpatory information regarding jailhouse informant perjury and eyewitness manipulation, resulting in murder conviction; plaintiff spent 24 years in prison before his habeas petition was granted, and he was not re-tried; brought in mid-way through the case to act as lead counsel; final settlement of $7.95 Million approved by the Court; Ninth Circuit recently reversed dismissal of County/DA's Office, and case against DA settled for additional $900,000);

*Bruce Lisker v. City of Los Angeles,* Case No.: CV 09-9374 AHM (AJW) (C.D. Cal.) (civil rights cases for police fabrication of evidence and failure to turn over exculpatory information, resulting in murder conviction; plaintiff spent 26 years in prison before his habeas petition was granted, and he was not re-tried; 9th Circuit affirmed district court's denial of immunity on 3/20/15; petition for en banc review denied; $7.6 Million settlement).

Consulting counsel in wrongful conviction cases of *Franky Carrillo v. County of Los Angeles*, CV 11-10310-SVW(AGRx) (settled for $10.1 Million), *Obie Anthony v. City of Los Angeles,* CV 12-01332-CBM (AJWx) (settled for $8.3 Million) and *v. County of Los Angeles*,   CV 13-07224-CBM (AJWx) )(settled for $890,000 and reform of DA practices), and *Harold Hall v. City of Los Angeles*, C.D. Cal. No. CV 05-1977 ABC, 9th Cir. No. 10-55770 (appeal from grant of summary judgment to Defendants affirmed).

**Other Individual Civil Rights Cases:**

*McClure v. City of Los Angeles,* No.: CV-92-2776-E (C.D. Cal.)(fair housing and equal protection case against City of Long Beach and its agents for preventing six group homes for Alzheimer's victims from opening; jury verdict of $22.5 Million (reduced on remittitur to $13,826,832) plus approximately $10,000,000 in attorney's fees and costs; settled while on appeal for $20 Million);

*U.S. v. Hovsepian*, 359 F.3d 1144, 1147 (9th Cir. 2004)(en banc) (successful action to naturalize individuals previously convicted of conspiracy to bomb Turkish consulate in Philadelphia), aff'd en banc after remand, 422 F.3d 883 (9/6/05);

*Walker v. City of Lakewood*, 263 F.3d 1005 (9th Cir. 2001) (reversing district court decision dismissing fair housing organization's claim against city for retaliation for supporting tenants suing landlord; case subsequently settled for structural relief, damages and attorneys' fees);

*Tavelman v. City of Huntington Park* (individual employment discrimination case against the City on behalf of a Jewish police officer who had been subjected to a campaign of religious harassment which was settled in mi-'90's for $350,000);

*Ware v. Brotman Medical Center* (Los Angeles Superior Court) (1993 $2.5 million jury verdict against hospital for removal of hospital privileges of black doctor; settled for $1.75 million);

*Mathis v. PG&E* (1991 $2 million verdict against PG&E for barring contract employee from Diablo Canyon Nuclear Power Plant; reversed by the Ninth Circuit);

*Macias v. State of California* (Los Angeles Superior Court) (action against the State of California and others for blinding of young man as a result of exposure to malathion spray, a portion of which was decided in *Macias v. State of California,* 10 Cal.4th 844 (1994));

*Melgar v. Klee* (Los Angeles Superior Court) (1988) ($1.5 million jury verdict against Los Angeles Police Department for police shooting; settled for $1.45 million).

## Selected Civil Rights Decisions (from 1995 forward):

*Aichele v. City of Los Angeles,* 2013 WL 2445195 (C.D. Cal. June 5, 2013)

*Biggs v. Best, Best & Krieger*, 189 F.3d 989 (9th Cir. 1999);

*Bynum v. Dist. of Columbia*, 384 F.Supp.2d 342 (D.D.C. 2005);

*Bynum v. District of Columbia*, 412 F.Supp.2d 73 (D.D.C. 2006);

*Carrillo v. Cty. of Los Angeles,* 798 F.3d 1210 (9th Cir. 2015)

*Craft v. Cnty. of San Bernardino,* EDCV 05-359 -SGL, 2006 WL 4941829
(C.D. Cal. Mar. 23, 2006);

*Craft v. County of San Bernardino,* 468 F.Supp.2d 1172 (C.D.Cal. 2006);

*Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113 (C.D. Cal. 2008);

*Goldstein v. City of Long Beach*, 603 F. Supp. 2d 1242 (C.D. Cal. 2009);

*Goldstein v. City of Long Beach*, CV 04-9692AHM, 2010 WL 3952888
(C.D. Cal. Apr. 9, 2010)

*Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013)

*Haynie v. Superior Court*, 26 Cal.4th 1061 (Cal. S. Ct. 2001);

*Jones v. Murphy*, 256 F.R.D. 519 (D. Md. 2009)

*Jones v. Murphy*, 470 F.Supp.2d 537 (D.Md. 2007);

*Jones v. Murphy*, 567 F. Supp. 2d 787 (D. Md. 2008);

*West v. Murphy*, 771 F.3d 209 (4th Cir. 2014)

*Lisker v. City of Los Angeles*, CV 09-09374 AHM AJWX, 2011 WL
3420665 (C.D. Cal. Aug. 4, 2011);

*Lisker v. City of Los Angeles*, CV 09-09374 AHM AJWX, 2012 WL
3588560 (C.D. Cal. Aug. 20, 2012);

*Lisker v. City of Los Angeles*, 2:09-CV-09374-ODW, 2014 WL 293463
(C.D. Cal. Jan. 27, 2014)

*Lisker v. City of Los Angeles*, 780 F.3d 1237 (9th Cir. 2015)

*Lopez v. Youngblood*, 609 F.Supp.2d 1125 (E.D.Cal. 2009);

*Lopez v. Youngblood*, 2011 WL 10483569 (E.D. Cal. Sept. 2, 2011)

*Macias v. State of California*, 10 Cal.4th 844 (Cal. S. Ct. 1995).

*Mathis v. Pacific Gas and Elec. Co.,* 75 F.3d 498 (9th Cir. 1996);

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 2009 WL 1065072 (C.D. Cal. Mar. 19, 2009)

*Nozzi v. Hous. Auth. of City of Los Angeles*, 425 F. App'x 539, 540 (9th Cir. 2011)

*Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Jan. 29, 2016)

*Powell v. Barrett*, 376 F.Supp.2d 1340 (N.D.Ga. 2005);

*Powell v. Barrett*, 496 F.3d 1288 (11th Cir. 8/23/07)

*Powell v. Barrett,* 541 F.3D 1298 (11th Cir. 2008) (en banc) [overruling a portion of the preceding panel decision; after remand to the panel, remaining issues remanded to the District Court];

*Silva v. Block*, 49 Cal.App.4th 345 (1996);

*Streit v. County of Los Angeles*, 236 F.3d 552 (9th Cir. 2001);

*Tipton-Whittingham v. City of Los Angeles*, 316 F.3d 1058 (9th Cir. 2003);

*Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604 (2004);

*U.S. v. Hovsepian*, 359 F.3d 1144 (9th Cir. 2004) (en banc);

*U.S. v. Hovsepian*, 422 F.3d 883 (9th Cir. 2005) (en banc);

*Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2001);

*Zuniga v. Housing Authority*, 41 Cal.App.4th 82 (1995);

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit B**

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

I.      **TABLE OF REPORTED ATTORNEYS' FEES – ORGANIZED BY CASE [SUPERSCRIPT REFERENCES FOUND AT CONCLUSION OF THIS SECTION BEGINNING ON PG. 16]**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Hector O. Villagra[1] | ACLU | 17 (1994) | $600 | 2011 | $703.71 |
| Belinda Escobosa Helzer[1] | ACLU | 11 (2000) | $525 | 2011 | $615.74 |
| Peter Bibring[1] | ACLU | 09 (2002) | $490 | 2011 | $574.69 |
| Paralegal[1] | ACLU | | $200 | 2011 | $234.57 |
| Joseph J. Ybarra[1] | MTO** | 10 (2001) | $550 | 2011 | $645.06 |
| Jacob A. Kreilkamp[1] | MTO** | 08 (2003) | $505 | 2011 | $592.29 |
| Laura D. Smolowe[1] | MTO** | 05 (2006) | $460 | 2011 | $539.51 |
| Marina A. Torres[1] | MTO** | 03 (2008) | $385 | 2011 | $451.54 |
| Sarala V. Nagala[1] | MTO** | 03 (2008) | $385 | 2011 | $451.54 |
| Paralegal[1] | MTO** | | $210 | 2011 | $246.30 |
| ALS[1] | MTO** | | $250 | 2011 | $293.21 |
| Carol Sobel[2] | Law Ofc Carol Sobel | 31 (1978) | $710 | 2009 | $887.55 |
| Mark Rosenbaum[2] | ACLU | 35 (1974) | $740 | 2009 | $925.06 |
| Peter Eliasberg[2] | ACLU | 15 (1994) | $525 | 2009 | $656.29 |
| Peter Bibring[2] | ACLU | 07 (2002) | $375 | 2009 | $468.78 |
| James de Simone[3] | Schoenbrun, de Simon | 27 (1985) | $695 | 2012 | $789.54 |
| Michael Seplow[3] | Schoenbrun, de Simon | 22 (1990) | $630 | 2012 | $715.70 |

1

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Anna Canning[3] | Schoenbrun, de Simon | 06 (2006) | $450 | 2012 | $511.22 |
| Law student interns[3] | Schoenbrun, de Simon | | $200 | 2012 | $227.21 |
| Sid Wolinsky[4] | DRA* | 49 (1961) | $835 | 2010 | $1,011.05 |
| Laurence Paradis[4] | DRA* | 26 (1985) | $730 | 2010 | $883.92 |
| Melissa Kasnitz[4] | DRA* | 18 (1992) | $650 | 2010 | $787.05 |
| Jennifer Bezoza[4] | DRA* | 10 (2000) | $570 | 2010 | $690.18 |
| Roger Heller[4] | DRA* | 09 (2001) | $560 | 2010 | $678.07 |
| Kevin Knestrick[4] | DRA* | 07 (2003) | $535 | 2010 | $647.80 |
| Kasey Corbit[4] | DRA* | 06 (2004) | $500 | 2010 | $605.42 |
| Mary–Lee Kimber[4] | DRA* | 05 (2005) | $475 | 2010 | $575.15 |
| Stephanie Biedermann[4] | DRA* | 03 (2007) | $350 | 2010 | $423.80 |
| Becca von Behren[4] | DRA* | 02 (2008) | $265 | 2010 | $320.87 |
| Senior paralegals[4] | DRA* | | $265 | 2010 | $320.87 |
| Paralegals[4] | DRA* | | $225 | 2010 | $272.44 |
| Summer associates[4] | DRA* | | $245 | 2010 | $296.66 |
| Law clerks[4] | DRA* | | $175 | 2010 | $211.90 |
| Case clerks[4] | DRA* | | $165 | 2010 | $199.79 |
| Daniel B. Kohrman[4] | AFL***** | 26 (1984) | $740 | 2010 | $896.02 |
| Julie Nepveu[4] | AFL***** | 19 (1991) | $660 | 2010 | $799.16 |
| Jose R. Allen[4] | Skadden Arps | 34 (1976) | $930 | 2010 | $1,126.08 |
| Sheryl Wu Leung[4] | Skadden Arps | 05 (2005) | $395 | 2010 | $478.28 |
| Nathaniel Fisher[4] | Skadden Arps | 02 (2008) | $530 | 2010 | $641.75 |
| Legal assistant[4] | Skadden Arps | | $285 | 2010 | $345.09 |

2

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Technology manager[4] | Skadden Arps | | $320 | 2010 | $387.47 |
| Ben Schonbrun[5] | Schonbrun, de Simone | 25 (1985) | $650 | 2010 | $762.35 |
| Michael Seplow[5] | Schonbrun, de Simone | 20 (1990) | $590 | 2010 | $691.98 |
| John Raphling[5] | Schonbrun, de Simone | 17 (1993) | $525 | 2010 | $615.74 |
| Barrett S. Litt[6] | Litt, Estuar & Kitson | 40 (1969) | $800 | 2009 | $1,000.06 |
| Carol A. Sobel[6] | Law Offices of Carol Sobel | 31 (1978) | $710 | 2009 | $887.55 |
| Rebecca Thornton[6] | Law Offices of Carol Sobel | 08 (2001) | $425 | 2009 | $531.28 |
| Paul L. Hoffman[6] | Schonbrun, de Simone | 33 (1976) | $750 | 2009 | $937.56 |
| Barrett S. Litt[7] | Litt, Estuar & Kitson | 38 (1969) | $725 | 2007 | $965.98 |
| Paul Estuar[7] | Litt, Estuar & Kitson | 14 (1993) | $485 | 2007 | $646.21 |
| Stacey Brown[7] | Litt, Estuar & Kitson | 01 (2006) | $275 | 2007 | $366.41 |
| Senior Paralegals[7] | Litt, Estuar & Kitson | | $225 | 2007 | $299.79 |
| Barrett S. Litt[8] | Litt, Estuar & Kitson | 43 (1969) | $850 | 2012 | $965.63 |
| Robert M. Kitson[8] | Litt, Estuar & Kitson | 17 (1995) | $625 | 2012 | $710.02 |
| Bryan M. Miller[8] | Litt, Estuar & Kitson | 18 (1994) | $625 | 2012 | $710.02 |
| Sr. paralegal[8] | Litt, Estuar & Kitson | | $250 | 2012 | $284.01 |
| Law student interns[8] | Litt, Estuar & Kitson | | $225 | 2012 | $255.61 |
| Dan Stormer[8] | HSKRR**** | 38 (1974) | $825 | 2012 | $937.23 |
| Michael Bien[9] | Rosen Bien Galvan & Grunfeld | 28 (2008) | $640 | 2008 | $825.97 |
| Unnamed[10] | Prison Law Office | 01 (2009) | $275 | 2010 | $354.91 |
| Unnamed[10] | Prison Law Office | 32 (1978) | $700 | 2010 | $903.40 |
| Unnamed[10] | Rosen Bien & Galvan | 48 (1962) | $800 | 2010 | $1,032.46 |
| Unnamed[10] | Rosen Bien & Galvan | 13 (1997) | $560 | 2010 | $722.72 |
| Sr. paralegal[10] | Rosen Bien & Galvan | | $240 | 2010 | $309.74 |

3

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Unnamed[10] | Bingham, McCutcheon | 32 (1978) | $700 | 2010 | $903.40 |
| Unnamed[10] | Bingham, McCutcheon | 02 (2008) | $400 | 2010 | $516.23 |
| Unnamed[10] | Bingham, McCutcheon | 13 (1997) | $655 | 2010 | $845.33 |
| John Houston Scott[11] | Scott Law Firm | 37 (1976) | $725 | 2013 | $797.78 |
| Thomas P. Greerty[11] | Law Offices of Thomas P. Greerty | 34 (1979) | $725 | 2013 | $797.78 |
| Amitai Schwartz[11] | Law Offices of Amitai Schwartz | 40 (1973) | $725 | 2013 | $797.78 |
| Moira Duvernay[11] | Law Offices of Amitai Schwartz | 09 (2004) | $450 | 2013 | $495.17 |
| Sanford J. Rosen[12] | Rosen Bien & Galvan | 46 (1962) | $700 | 2008 | $903.40 |
| Sid Wolinsky[13] | DRA* | 51 (1961) | $860 | 2012 | $976.99 |
| Shawna Parks[13] | DRA* | 13 (1999) | $665 | 2012 | $755.46 |
| Mary-Lee Smith[13] | DRA* | 07 (2005) | $555 | 2012 | $630.50 |
| Karla Gilbride[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Larry Paradis[13] | DRA* | 27 (1985) | $800 | 2012 | $908.83 |
| Ron Elsberry[13] | DRA* | 25 (1987) | $725 | 2012 | $823.63 |
| Katherine Weed[13] | DRA* | 10 (2002) | $600 | 2012 | $681.62 |
| Stephanie Biedermann[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Christine Chuang[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Kara Janssen[13] | DRA* | 02 (2010) | $330 | 2012 | $374.89 |
| Paralegal | DRA* | | $240 | 2012 | $284.01 |
| Summer Associates[13] | DRA* | | $250 | 2012 | $272.65 |
| Michelle Uzeta[13] | DRLC*** | 20 (1992) | $700 | 2012 | $795.22 |
| Debra Patkin[13] | DRLC*** | 05 (2007) | $450 | 2012 | $511.22 |
| Jennifer Lee[13] | DRLC*** | 09 (2003) | $550 | 2012 | $624.82 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Matthew Strugar[13] | DRLC*** | 08 (2004) | $525 | 2012 | $596.42 |
| Law Clerk[13] | DRLC*** | | $230 | 2012 | $261.29 |
| Litigation Assist[13] | DRLC*** | | $230 | 2012 | $261.29 |
| Shawna Parks[14] | DRLC | 10 (1999) | $525 | 2009 | $656.29 |
| Sage Reeves[14] | DRLC | 08 (2001) | $475 | 2009 | $593.79 |
| Matthew Strugar[14] | DRLC | 05 (2004) | $400 | 2009 | $500.03 |
| Bethany Woodard[14] | MTO** | 04 (2005) | $395 | 2009 | $493.78 |
| Kristina Wilson[14] | MTO** | 03 (2006) | $350 | 2009 | $437.53 |
| Robert Dell Angelo[14] | MTO** | 17 (1992) | $550 | 2009 | $687.54 |
| Law Clerks[14] | MTO** | | $220 | 2009 | $275.02 |
| Barrett S. Litt[15] | Litt, Estuar & Kitson | 39 (1969) | $750 | 2008 | $967.93 |
| Earnest Bell[15] | Law Offices of Earnest Bell | 20 (1988) | $600 | 2008 | $774.35 |
| Sr. Paralegal[15] | Litt, Estuar & Kitson | | $235 | 2008 | $303.29 |
| Dale Galipo[16] | Law Ofc of Dale Galipo | 28 (1984) | $700 | 2012 | $795.22 |
| Humberto Guizar[16] | | 26 (1986) | $500 | 2012 | $568.02 |
| Matthew McNicholas[17] | McNicholas & McNicholas | 15 (1997) | $700 | 2012 | $795.22 |
| Douglas D. Winter[17] | McNicholas & McNicholas | 22 (1990) | $600 | 2012 | $681.62 |
| Catherine Schmidt[17] | McNicholas & McNicholas | 11 (2001) | $500 | 2012 | $568.02 |
| Bill Lann Lee[18] | Lewis, Feinberg, Lee, Renaker, & Jackson | 38 (1974) | $825 | 2012 | $937.23 |
| Matthew Righetti[19] | Righetti Glugoski | 27 (1985) | $750 | 2012 | $852.03 |
| John Glugoski[19] | Righetti Glugoski | 12 (1997) | $650 | 2012 | $738.42 |
| Angela Padilla[20] | MoFo | 15 (1991) | $600 | 2006 | $825.34 |

5

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Mahogany Jenkins[20] | MoFo | 02 (2004) | $285 | 2006 | $392.03 |
| Robert Rubin[20] | LCCR | 28 (1978) | $625 | 2006 | $859.73 |
| Paralegal[20] | MoFo | | $175 | 2006 | $240.72 |
| Carol Sobel[21] | Law Office of Carol Sobel | 32 (1978) | $725 | 2010 | $850.31 |
| Rebecca Thornton[21] | Law Office of Carol Sobel | 09 (2001) | $450 | 2010 | $527.78 |
| Heather McGunigle[22] | DRLC | 04 (2009) | $375 | 2009 | $468.78 |
| Todd Burns[23] | Law Office of Todd Burns | 18 (1996) | $650 | 2014 | $692.80 |
| Scott A. Brooks[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 19 (1992) | $650 | 2011 | $762.35 |
| Paul R. Fine[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 39 (1972) | $850 | 2011 | $996.92 |
| Craig Momita[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 18 (1993) | $400 | 2011 | $469.14 |
| Stephen Glick[24] | Law Offices of Stephen Glick | 37 (1974) | $800 | 2011 | $938.27 |
| Ian Herzog[24] | Law Office of Ian Herzog | 44 (1967) | $1,000 | 2011 | $1,172.84 |
| Susan Abitanta[24] | Law Office of Ian Herzog | 28 (1983) | $600 | 2011 | $703.71 |
| Rebecca Grey[25] | | 16 (1998) | $650 | 2014 | $692.80 |
| Dale Galipo[26] | Law Ofc Dale Galipo | 23 (1989) | $675 | 2013 | $719.45 |
| Michael Haddad[27] | Haddad & Sherwin | 23 91991) | $725 | 2014 | $772.74 |
| Julia Sherwin[27] | Haddad & Sherwin | 19 (1995) | $695 | 2014 | $740.77 |
| Richard Pearl[27] | | 44 (1970) | $750 | 2014 | $799.39 |
| Genevieve Guertin[27] | Haddad & Sherwin | 05 (2009) | $400 | 2014 | $426.34 |
| Gina Altomare[27] | Haddad & Sherwin | 04 (2010) | $350 | 2014 | $373.05 |
| Thomas Kennedy | Haddad & Sherwin | 02 (2012) | $325 | 2014 | $346.40 |

6

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Helm[27] | | | | | |
| Paralegals (not senior)[27] | Haddad & Sherwin | | $200 | 2014 | $213.17 |
| Jim DeSimone[28] | Schonbrun, de Simone | 28 (1985) | $725 | 2013 | $797.78 |
| Michael Seplow[28] | Schonbrun, de Simone | 23 (1990) | $660 | 2013 | $726.25 |
| Douglas Ingraham[28] | Schonbrun, de Simone | 15 (1998) | $575 | 2013 | $632.72 |
| Chritopher Cox[29] | Weill Gotschall | 23 (1991) | $850 | 2014 | $905.97 |
| Bambo Obarro[29] | Weill Gotschall | 04 (2010) | $400 | 2014 | $426.34 |
| Ronald K. Tellis[30] | Baron & Budd | 18 (1996) | $775 | 2014 | $826.03 |
| Timothy G. Blood[30] | Blood Hurst and O'Reardon | 24 (1990) | $695 | 2014 | $740.77 |
| Gene J. Stonebarger[31] | Stonebarger Law, APC | 14 (2000) | $650 | 2014 | $692.80 |
| Richard D. Lambert[31] | Stonebarger Law | 07 (2007) | $500 | 2014 | $532.92 |
| Dale Galipo[32] | Law Ofc Dale Galipo | 30 (1984) | $800 | 2014 | $852.68 |
| Dale Galipo[33] | Law Ofc Dale Galipo | 30 (1984) | $800 | 2014 | $825.92 |
| Barrett S. Litt[34] | Kaye, McLane, Bednarski & Litt | 45 (1969 | $975 | 2014 | $1,039.20 |
| Ronald O. Kaye[34] | Kaye, McLane, Bednarski & Litt | 26 (1988) | $775 | 2014 | $826.03 |
| David M. McLane[34] | Kaye, McLane, Bednarski & Litt | 28 (1988) | $775 | 2014 | $826.03 |
| Kevin LaHue[34] | Kaye, McLane, Bednarski & Litt | 10 (2004) | $600 | 2014 | $639.51 |
| Caitlin Weisberg[34] | Kaye, McLane, Bednarski & Litt | 06 (2008) | $500 | 2014 | $532.92 |
| Julia White[34] [Sr. Paralegal] | Kaye, McLane, Bednarski & Litt | | $295 | 2014 | $314.43 |
| Heath White[34] [High Tech Paralegal] | Kaye, McLane, Bednarski & Litt | | $235 | 2014 | $250.47 |
| Jose R. Allen[35] | Skadden, Arps | 31 (1985) | $1150 | 2016 | $1,150 |

7

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Guy Wallace[35] | Schneider Wallace | 23 (1993) | $750 | 2016 | $750 |
| David Borgen[35] | Goldstein Borgen Dardarian | 35 (1981 | $795 | 2016 | $795 |
| Linda Dardarian[35] | Goldstein Borgen Dardarian | 29 (1987) | $775 | 2016 | $775 |
| Shawna Parks[35] | Law Ofc Shawna Parks | 17 (1999) | $695 | 2016 | $695 |
| Brian Dunn[36] | Cochran Firm | 21 (1995) | $795 | 2016 | $795 |

| Table 2: Consumer/Wage & Hour Class Action Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Guy Wallace[51] | Schneider Wallace | 17 (1993) | $650 | 2010 | $787.05 |
| Josh Konecky[51] | Schneider Wallace | 14 (1996) | $625 | 2010 | $756.78 |
| Jonathan E. Gertler[52] | Chavez & Gertler | 31 (1983) | $725 | 2013 | $797.78 |
| Dan L. Gildor[52] | Chavez & Gertler | 12 (2002) | $550 | 2013 | $605.21 |
| Patrick N. Keegan[53] | Keegan & Baker LLP | 20 (1993) | $695 | 2013 | $764.77 |
| Todd Schneider[54] | Schneider Wallace | 29 (1982) | $675 | 2011 | $791.67 |
| Eric Gibbs[55] | Girard Gibbs | 15 (1995) | $675 | 2010 | $817.32 |
| Dylan Hughes[55] | Girard Gibbs | 10 (2000) | $545 | 2010 | $659.91 |
| Eric Gibbs[56] | Girard Gibbs | 15 (1995) | $675 | 2010 | $817.32 |
| Dylan Hughes[56] | Girard Gibbs | 10 (2000) | $545 | 2010 | $787.05 |
| Jonathan Selbin[57] | Lieff Cabraser | 16 [1993] | $600 | 2009 | $750.04 |
| Shawn Khorrami[58] | Khorrami Boucher Sumner Sanguinetti, LLP | 19 (1995) | $650 | 2014 | $692.80 |

8

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 2: Consumer/Wage & Hour Class Action Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Launa Adolph[58] | Khorrami Boucher Sumner Sanguinetti, LLP | 11 (2003) | $495 | 2014 | $527.60 |

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports |
|---|

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|---|---|---|---|---|---|
| Unnamed[11] | Arnold & Porter | 39 (1974) | $910 | 2013 | $1,001.35 |
| Unnamed[11] | Arnold & Porter | 09 (2004) | $625 | 2013 | $687.74 |
| Unnamed[11] | Quinn Emanuel | | $821 | 2013 | $903.41 |
| Unnamed[11] | Quinn Emanuel | | $448 | 2013 | $492.97 |
| Unnamed[11] | Quinn Emanuel | 20 | $700 | 2013 | $770.27 |
| Diane Hutnyan[81] | Quinn Emanuel | 15 (1997) | $790 | 2012 | $897.47 |
| Victoria Maroulis[81] | Quinn Emanuel | 13 (1999) | $815 | 2012 | $925.87 |
| Todd Briggs[81] | Quinn Emanuel | 12 (2000) | $735 | 2012 | $834.99 |
| Marc Becker[81] | Quinn Emanuel | 24 (1988) | $1035 | 2012 | $1,175.80 |
| Melissa Dalziel[81] | Quinn Emanuel | 12 (2000) | $730 | 2012 | $829.31 |
| Thomas J. Nolan[82] | Skadden Arps | 40 (1971) | $1095 | 2011 | $1,284.26 |
| Jason D. Russell[82] | Skadden Arps | 18 (1993) | $1030 | 2011 | $1,208.03 |
| Hillary A. Hamilton[82] | Skadden Arps | 10 (2001) | $710 | 2011 | $832.72 |
| Legal Assistant[82] | Skadden Arps | | $295 | 2011 | $345.99 |
| Arturo Gonzalez[83] | MoFo | 28 (1985) | $950 | 2013 | $1,045.36 |

9

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|---|---|---|---|---|---|
| Suzanna Brickman[83] | MoFo | 07 (2006) | $650 | 2013 | $715.25 |
| Unnamed[84] | Lieff Cabraser | 01 (2011) | $325 | 2012 | $369.21 |
| Unnamed[84] | Lieff Cabraser | 04 (2008) | $395 | 2012 | $448.73 |
| Unnamed[84] | Lieff Cabraser | 06 (2006) | $435 | 2012 | $494.18 |
| Unnamed[84] | Lieff Cabraser | 11 (2001) | $525 | 2012 | $596.42 |
| Unnamed[84] | Lieff Cabraser | 14 (1998) | $585 | 2012 | $664.58 |
| Unnamed[84] | Lieff Cabraser | 17 (1995) | $650 | 2012 | $738.42 |
| Unnamed[84] | Lieff Cabraser | 21 (1991) | $700 | 2012 | $795.22 |
| Unnamed[84] | Lieff Cabraser | 24 (1988) | $775 | 2012 | $880.43 |
| Unnamed[84] | Lieff Cabraser | 29 (1983) | $775 | 2012 | $880.43 |
| Unnamed[84] | Lieff Cabraser | 34 (1978) | $800 | 2012 | $908.83 |
| Unnamed[84] | Lieff Cabraser | 38 (1974) | $900 | 2012 | $1,022.43 |
| Unnamed[84] | Lieff Cabraser | 42 (1970) | $900 | 2012 | $1,022.43 |
| Unnamed[85] | Paul Hastings | 01 (2010) | $360 | 2011 | $422.22 |
| Unnamed[85] | Paul Hastings | 03 (2008) | $450 | 2011 | $527.78 |
| Unnamed[85] | Paul Hastings | 04 (2007) | $500 | 2011 | $586.42 |
| Unnamed[85] | Paul Hastings | 05 (2006) | $530 | 2011 | $621.61 |
| Unnamed[85] | Paul Hastings | 06 (2005) | $565 | 2011 | $662.66 |
| Unnamed[85] | Paul Hastings | 07 (2004) | $590 | 2011 | $691.98 |
| Unnamed[85] | Paul Hastings | 08 (2003) | $620 | 2011 | $727.16 |
| Unnamed[85] | Paul Hastings | 09 (2002) | $630 | 2011 | $738.89 |
| Unnamed[85] | Paul Hastings | 12 (1999) | $670 | 2011 | $785.80 |
| Unnamed[85] | Paul Hastings | 15 (1996) | $725 | 2011 | $850.31 |
| Unnamed[85] | Paul Hastings | 17 (1994) | $725 | 2011 | $850.31 |
| Unnamed[85] | Paul Hastings | 23 (1998) | $850 | 2011 | $996.92 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|---|---|---|---|---|---|
| Unnamed[85] | Paul Hastings | 33 (1978) | $940 | 2011 | $1,102.47 |
| Wayne Barsky[86] | Gibson Dunn | 26 (1983) | $905 | 2009 | $1,131.32 |
| Marcellus McRae[86] | Gibson Dunn | 21 (1988) | $785 | 2009 | $981.31 |
| Daniel Kolkey[86] | Gibson Dunn | 32 (1977) | $840 | 2009 | $1,050.06 |
| Danielle Katzir[86] | Gibson Dunn | 05 (2004) | $525 | 2009 | $656.29 |
| Multiple associates[86] | Gibson Dunn | 04 (2005) | $495 | 2009 | $618.79 |
| Melissa Barshop[86] | Gibson Dunn | 03 (2006) | $470 | 2009 | $587.54 |
| Multiple associates[86] | Gibson Dunn | 02 (2007) | $400 | 2009 | $500.03 |
| Multiple associates[86] | Gibson Dunn | 01 (2008) | $345 | 2009 | $431.28 |
| Paralegal[86] | Gibson Dunn | | $300 | 2009 | $375.02 |
| Paralegal[86] | Gibson Dunn | | $295 | 2009 | $368.77 |
| Paralegal[86] | Gibson Dunn | | $315 | 2009 | $393.77 |
| Danielle Gilmore[87] | Quinn Emanuel | 15 (1993) | $685 | 2008 | $884.05 |
| Sara Brenner[87] | Quinn Emanuel | 02 (2006) | $340 | 2008 | $438.80 |
| Paralegal[87] | Quinn Emanuel | | $235 | 2008 | $303.29 |
| Mark D. Kemple[88] | Greenberg Traurig | 20 (1989) | $675 | 2009 | $871.14 |
| Erik Swanholt[88] | Greenberg Traurig | 11 (1998) | $575 | 2009 | $742.08 |
| Hirad Dadgostar[88] | Greenberg Traurig | 03 (2006) | $400 | 2008 | $516.23 |
| Brian J. Hennigan[89] | Irell & Manella | 25 (1983) | $775 | 2008 | $1,000.20 |
| Michal H. Strub[89] | Irell & Manella | 18 (1990) | $670 | 2008 | $864.69 |
| Kimberly A. Svendsen[89] | Irell & Manella | 04 (2004) | $410 | 2008 | $529.14 |
| Dena G. Kaplan[89] | Irell & Manella | 05 (2003) | $475 | 2008 | $613.02 |
| Katherine J. Galston[89] | Irell & Manella | 05 (2003) | $490 | 2008 | $1,075.06 |
| Paralegal[89] | Irell & Manella | | $220 | 2008 | $962.56 |

11

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|------|------|------------------------|------|------|---------------|
| Gordon Kirscher[90] | O'Melveny &Myers | 38 (1971) | $860 | 2009 | $1,075.06 |
| Alejandro Mayorkas[90] | O'Melveny &Myers | 23 (1986) | $770 | 2009 | $962.56 |
| Thomas M. Riordan[90] | O'Melveny &Myers | 14 (1995) | $675 | 2009 | $843.80 |
| Jorge DeNeve[90] | O'Melveny &Myers | 10 (1998) | $620 | 2009 | $775.05 |
| Allan Johnson[90] | O'Melveny &Myers | 08 (2001) | $565 | 2009 | $706.29 |
| Abby Schwartz[90] | O'Melveny &Myers | 03 (2006) | $450 | 2009 | $562.53 |
| Paralegal[90] | O'Melveny &Myers | 17 (2004) | $310 | 2009 | $387.52 |
| Paralegal[90] | O'Melveny &Myers | 05 (2004) | $225 | 2009 | $281.27 |
| Paralegal[90] | O'Melveny &Myers | 12 (1997) | $245 | 2009 | $306.27 |
| Unnamed[91] | Paul Hastings | 36 (1974) | $940 | 2010 | $1,138.19 |
| Unnamed[91] | Paul Hastings | 16 (1994) | $725 | 2010 | $877.86 |
| Unnamed[91] | Paul Hastings | 11 (1999) | $670 | 2010 | $811.27 |
| Unnamed[91] | Paul Hastings | 10 (2000) | $660 | 2010 | $799.16 |
| Sr. Paralegal[91] | Paul Hastings | | $330 | 2010 | $399.58 |
| Unnamed[92] | White & Case | 04 (2004) | $600 | 2009 | $750.04 |
| Unnamed[92] | White & Case | 06 (2003) | $600 | 2009 | $750.04 |
| Unnamed[92] | White & Case | 08 (2001) | $655 | 2009 | $818.80 |
| Unnamed[92] | White & Case | 24 (1985) | $750 | 2009 | $937.56 |
| Unnamed[92] | Weil, Gotscahl & Manges | 01 (2008) | $355 | 2009 | $443.78 |
| Unnamed[92] | Weil, Gotscahl & Manges | 03 (2006) | $465 | 2009 | $581.28 |
| Unnamed[92] | Weil, Gotscahl & Manges | 04 (2005) | $500 | 2009 | $625.04 |
| Unnamed[92] | Weil, Gotscahl & Manges | 06 (2003) | $580 | 2009 | $725.04 |
| Unnamed[92] | Weil, Gotscahl & Manges | 23 (1986) | $799 | 2009 | $998.81 |
| Unnamed[92] | Pachulski, Stang et al. | 14 (1995) | $535 | 2009 | $668.79 |
| Unnamed[92] | Pachulski, Stang et al. | 20 (1989) | $645 | 2009 | $806.30 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|---|---|---|---|---|---|
| Unnamed[92] | Pachulski, Stang et al. | 22 (1987) | $725 | 2009 | $906.30 |
| Unnamed[92] | Pachulski, Stang et al. | 24 (1985) | $675 | 2009 | $843.80 |
| Unnamed[92] | Pachulski, Stang et al. | 27 (1982) | $750 | 2009 | $937.56 |
| Unnamed[92] | Pachulski, Stang et al. | 32 (1977) | $650 | 2009 | $812.55 |
| Unnamed[92] | O'Melveny & Myers | 03 (2006) | $395 | 2009 | $493.78 |
| Unnamed[92] | O'Melveny & Myers | 34 (1975) | $860 | 2009 | $1,075.06 |
| Unnamed[92] | Munger, Tolles & Olson | 03 (2006) | $400 | 2009 | $500.03 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $450 | 2009 | $562.53 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $435 | 2009 | $543.78 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2004) | $395 | 2009 | $493.78 |
| Unnamed[92] | Munger, Tolles & Olson | 12 (1997) | $525 | 2009 | $656.29 |
| Unnamed[92] | Munger, Tolles & Olson | 21 (1988) | $600 | 2009 | $750.04 |
| Unnamed[92] | Munger, Tolles & Olson | 22 (1987) | $725 | 2009 | $906.30 |
| Unnamed[92] | Munger, Tolles & Olson | 25 (1984) | $550 | 2009 | $687.54 |
| Unnamed[92] | Munger, Tolles & Olson | 39 (1970) | $625 | 2009 | $781.30 |
| Unnamed[92] | Morrison & Foerster | 24 (1985) | $750 | 2009 | $937.56 |
| Unnamed[92] | Morrison & Foerster | 09 (2000) | $535 | 2009 | $668.79 |
| Unnamed[92] | Morrison & Foerster | 17 (1992) | $650 | 2009 | $812.55 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 12 (1997) | $650 | 2009 | $812.55 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 18 (1991) | $590 | 2009 | $737.54 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 19 (1990) | $850 | 2009 | $1,062.56 |
| Unnamed[92] | Hennigan, Bennett & | 09 (2000) | $505 | 2009 | $631.29 |

13

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|------|------|------------------------|------|------|---------------|
| | Dorman | | | | |
| Unnamed[92] | Hennigan, Bennett & Dorman | 30 (1979) | $760 | 2009 | $950.06 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 31 (1978) | $680 | 2009 | $850.05 |
| Unnamed[92] | Gibson Dunn & Crutcher | 03 (2006) | $470 | 2009 | $587.54 |
| Unnamed[92] | Gibson Dunn & Crutcher | 06 (2003) | $570 | 2009 | $712.54 |
| Unnamed[92] | Gibson Dunn & Crutcher | 12 (1997) | $635 | 2009 | $793.80 |
| Unnamed[92] | Gibson Dunn & Crutcher | 15 (1994) | $525 | 2009 | $656.29 |
| Unnamed[92] | Gibson Dunn & Crutcher | 18 (1991) | $610 | 2009 | $762.55 |
| Unnamed[92] | Gibson Dunn & Crutcher | 25 (1974) | $790 | 2009 | $987.56 |
| Unnamed[92] | Davis, Polk & Wardwell | 04 (2005) | $680 | 2009 | $850.05 |
| Unnamed[92] | Davis, Polk & Wardwell | 19 (1990) | $955 | 2009 | $1,193.82 |
| Unnamed[92] | Davis, Polk & Wardwell | 23 (1986) | $960 | 2009 | $1,200.07 |
| Daniel Perry[93] | Milbank, Tweed | 14 (2000) | $1135 | 2014 | $1,209.74 |
| Delilah Vinzon[93] | Milbank, Tweed | 12 (2002) | $900 | 2014 | $959.26 |
| Hannah Cannom[93] | Milbank, Tweed | 08 (2006) | $800 | 2014 | $810.05 |
| Revi-Ruth Enriquez[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $852.68 |
| Caitlin Hawks[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $810.05 |
| Katherine Eklund[93] | Milbank, Tweed | 05 (2009) | $550 | 2014 | $586.22 |
| Amy Lalley[94] | Sidley Austin | 14 (1998) | $700 | 2012 | $795.22 |
| Amy Lalley[94] | Sidley Austin | 16 (1998) | $825 | 2014 | $937.23 |
| Alex Doherty[94] | Sidley Austin | 04 (2008) | $520 | 2012 | $590.74 |
| Alex Doherty[94] | Sidley Austin | 06 (2008) | $700 | 2014 | $746.09 |
| Lauren McCray[94] | Sidley Austin | 01 (1998) | $340 | 2012 | $386.25 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|------|------|------------------------|------|------|---------------|
| Lauren McCray[94] | Sidley Austin | 02 (1998) | $495 | 2014 | $527.60 |
| Christopher Cox[95] | Weil Gotshal | 23 (1991) | $850 | 2014 | $905.97 |
| Bambo Obaro[95] | Weil Gotshal | 04 (2010) | $400 | 2014 | $426.34 |
| Jessica Mohr[95] | Weil Gotshal | 01 (2013) | $300 | 2014 | $319.75 |
| Glenn Peterson[96] | Millstone Peterson & Watts | 18 (1996) | $600 | 2014 | $639.51 |

\*DRA stands for Disability Rights Advocates
\*\*MTO stands for Munger, Tolles & Olson
\*\*\*DRLC stands for Disability Rights Legal Center
\*\*\*\*HSKRR stands for Hadsell, Stormer, Keeny, Richardson & Renick
\*\*\*\*\*AFL stands for AARP Foundation Litigation

**CIVIL RIGHTS LODESTAR AWARD SOURCES**

[1] – *Vasquez v. Rackauckas*, SACV 09-1090 VBF, 2011 WL 1791091 (C.D. Cal. May 10, 2011) *aff'd in part, rev'd in part and remanded,* 734 F.3d 1025 (9th Cir. 2013) (lodestar award in civil rights injunctive relief class action regarding modification of state gang injunctions) (remand did not affect fee award)

[2] – *Fitzgerald v. City of Los Angeles*, CV 03-01876DDP(RZX), 2009 WL 960825 (C.D. Cal. Apr. 7, 2009) (lodestar award in civil rights Skid Row litigation)

[3] – *Charlebois v. Angels Baseball LP*, SACV 10-0853 DOC ANX, 2012 WL 2449849 (C.D. Cal. May 30, 2012) (lodestar award in settlement of ADA case)

[4] – *Californians for Disability Rights v. California Dep't of Transp.,* C 06-05125 SBA MEJ, 2010 WL 8746910 (N.D. Cal. Dec. 13, 2010) *report and recommendation adopted sub nom. Californians for Disability Rights, Inc. v. California Dep't of Transp.,* C 06-5125 SBA, 2011 WL 8180376 (N.D. Cal. Feb. 2, 2011) (lodestar award in settlement of ADA case)

15

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

[5] – *Rauda v. City of Los Angeles,* CV08-3128-CAS PJW, 2010 WL 5375958 (C.D. Cal. Dec. 20, 2010) (lodestar award in civil rights police misconduct case)

[6] – *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles,* CV 07-3072 AHM FMMX, 2009 WL 9100391 (C.D. Cal. June 24, 2009) ) (lodestar cross-check in protest excessive force civil rights class action)

[7] – *Craft v. Cnty. Of San Bernardino,* 624 F. Supp. 2d 1113, 1122-23 (C.D. Cal. 2008) (lodestar cross-check in jail civil rights class action)

[8] – *Pierce v. Cnty. Of Orange,* 905 F. Supp. 2d 1017, 1035-39, 1049  (C.D. Cal. 2012) (lodestar award in jail ADA class action)

[9] – *L.H. v. Schwarzenegger,* 645 F. Supp. 2d 888, 893-96 (E.D. Cal. 2009) (lodestar award in settlement of prison injunctive relief class action)

[10] – *Armstrong v. Brown,* 805 F. Supp. 2d 918, 920-21 (N.D. Cal. 2011)) (lodestar award in prison class action for monitoring work)

[11] – *A.D. v. State of California Highway Patrol,* C 07-5483 SI, 2013 WL 6199577 (N.D. Cal. Nov. 27, 2013) (civil rights lodestar award for police killing) [Arnold & Porter and Quinn Emmanuel rates were described in opinion as support for awarded rates, and are contained in the commercial rates table with the attorney as )"Unnamed"]

[12] – *Prison Legal News v. Schwarzenegger,* 608 F.3d 446, 455 (9th Cir. 2010), *upholding award in Prison Legal News v. Schwarzenegger,* 561 F. Supp. 2d 1095, 1106 (N.D. Cal. 2008) (post –settlement lodestar award in prisoner First Amendment injunctive relief case)

[13] – *Communities Actively Living Independent and Free v. City of Los Angeles,* 2:090cv-00287 CBM-RZ-Doc # 255 (C.D. Cal. 6/10/13) (lodestar award in settlement of ADA injunctive relief class action) [ATTACHED AS EXHIBIT 13]

[14] – *Lauderdale v. City of Long Beach,* CV 08-979 ABC (JWJx) (C.D.Cal. 1/11/10) (lodestar award after settlement of ADA injunctive relief class action against jail) [ATTACHED AS EXHIBIT 14]

[15] – *Gamino v. County of Ventura,* CV 02-9785-CBM (Ex), Doc # 185 (C.D.Cal. 2/5/09) (lodestar cross-check in jail civil rights class action) [ATTACHED AS EXHIBIT 15]

[16] – *P.C. v. City of Los Angeles,* 2:090cv-06495-PLA Doc # 77  (C.D. Cal. 9/4/12) (lodestar award in civil rights suit against police for excessive force resulting in death) [ATTACHED AS EXHIBIT 16]

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

[17] – *Avila v. LAPD*, No. CV 11-01326 sjo (FMOX) (C.D.Cal. 8/2/12) (lodestar award for retaliatory termination for testifying for FLSA plaintiff) [ATTACHED AS EXHIBIT 17]

[18] – *Vallabhapurapu v. Burger King Corp*., Case No. C11-00667 WHA (JSC) (N.D.Cal. 10/26/2012) (lodestar award with multiplier of 1.29 in ADA accessibility class action; opinion refers to rates used to calculate the lodestar of up to $825; Lee Dec dated 8/27/2012 sets forth the rates used to calculate the lodestar, including a rate of $825 for him) [ATTACHED AS EXHIBIT 18]

[19] – *Rutti v. Lojack Corp., Inc.*, SACV 06-350 DOC JCX, 2012 WL 3151077 (C.D. Cal. July 31, 2012) (FLSA lodestar crosscheck)

[20] – Fee award in *Comite De Jornaleros De Redondo Beach v. City of Redondo Beach*, CV 04-9396 CBMJTLX, 2006 WL 4081215 (C.D. Cal. Dec. 12, 2006) rev'd, 607 F.3d 1178 (9th Cir. 2010) on reh'g en banc, 657 F.3d 936 (9th Cir. 2011) and aff'd, 657 F.3d 936 (9th Cir. 2011) (civil rights case successfully challenging day laborer ordinance on First Amendment grounds)

[21] – Fee award in *Long Beach Area Peace Network v. City of Long Beach,* No. CV 04-08510 JSO (SSx) (C.D.Calif.) (Doc # 64) (civil rights case successfully challenging parade ordinance on First Amendment grounds) (rates based on personal knowledge from fee declaration filed by Mr. Litt in the case) [ATTACHED AS EXHIBIT 21]

[22] – 2/22/10 Fee Order in *Riverside County Dept. of Mental Health v. A.S*., No. CV 08-00511 ABC  (C.D.Calif.) (IDEA fee award) (2009 used because it is clear from the timing of the order that 2009 rates were used)

[23] – Fee order in *Dugan v. County of Los Angeles*, 2:11-cv-08145-CAS-SHx (C.D.Cal. 3/3/14) (4th Amendment, malicious prosecution § 1983 action; background as criminal defense lawyer; no evidence of prior experience litigating civil rights cases, but knowledge of 4th Amendment law and trial experience should be reflected in the rate) [**ATTACHED AS EXHIBIT 23**]

[24] – Fee order in *Heyen v. Safeway Inc.*, B243610, 2014 WL 2154676 (Cal. Ct. App. May 23, 2014) upheld (individual wage and hour case after denial of class certification, with damages award of approximately $26,000; full hourly rate awarded to determine lodestar, then reduced due to limited success because received only 25% of overtime sought; fee award was in 2012, based on 2011 rates [since fee application was filed in 2011]).

[25] – Lodestar fee award in *Echague v. Metro. Life Ins*. Co., No. 12-CV-00640-WHO, 2014 WL 4746115, at *2 (N.D. Cal. Sept. 24, 2014) – ERISA case.

17

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

[26] – Fee award in *Contreras v. City of Los Angeles*, 2:11-CV-1480-SVW-SH, 2013 WL 1296763 (C.D. Cal. Mar. 28, 2013) – individual police case

[27] – Fee order in *Dixon v. City of Oakland*, No. C-12-05207 DMR, 2014 WL 6951260, at *8 (N.D. Cal. Dec. 8, 2014) – individual police case (1.1 multiplier awarded under Civil Code § 52.1).

[28] – Fee order in *Xue Lu v. United States*, No. CV 01-01758 CBM EX, 2014 WL 2468826, at *5 (C.D. Cal. May 23, 2014) – EAJA market rate award (available due to government's bad faith).

[29] – Fee order in *Xu v. Yamanaka*, No. 13-CV-3240 YGR, 2014 WL 3840105 (N.D. Cal. Aug. 1, 2014); award was for successful Anti-SLAPP motion; defendants voluntarily reduced rate sought by 10%

[30] – Fee order in *Aarons v. BMW of N. Am., LLC*, No. CV 11-7667 PSG CWX, 2014 WL 4090564 (C.D. Cal. Apr. 29, 2014) objections overruled, No. CV 11-7667 PSG CWX, 2014 WL 4090512 (C.D. Cal. June 20, 2014) – consumer class action in which award was court determined lodestar, not percentage of fund.

[31] – Fee order in *Morey v. Louis Vuitton N. Am., Inc., No. 11CV1517 WQH BLM,* 2014 WL 109194, at *10 (S.D. Cal. Jan. 9, 2014) – consumer class action in which award was court determined lodestar, not percentage of fund; 1.51 multiplier..

[32] – Fee order in *Sanchez v. County of San Bernardino*, 10-09384 MMM (Opx) [3/1/14] – individual police case [**ATTACHED AS EXHIBIT 32**]

[33] – Fee order in *Howard v. County of Riverside,* EDCV 12-00700 VAP (Opx) [8/27/14] – individual police case [**ATTACHED AS EXHIBIT 33**].

[34] – Fee order in *Rodriguez v. Cty. of Los Angeles*, 96 F. Supp. 3d 1012 (C.D. Cal. 2014)  [12/29/2014] – multi-plaintiff prisoners for guard brutality; award primarily under California state law for Civil Code 52.1 claim, with part of award on exclusively federal claims under PLRA; multiplier of two for state fee award .

[35] – Fee Order in *Willits v. City of Los Angeles*, CV 10-5782 CBM (RZx) (8/25/16)  –  class action injunctive relief case under ADA, RA [**ATTACHED AS EXHIBIT 35**].

[36] – *Woods v. Fagan*, CV 14-8374-VAP (SPx)  (C.D. Cal.) (9/21/16 Fee Order) [**ATTACHED AS EXHIBIT 36**].

OF THE 36 CIVIL RIGHTS CASES, 25 ARE FROM THE CENTRAL DISTRICT, 8 FROM THE NORTHERN DISTRICT, 1 FROM THE EASTERN DISTRICT, 1 FROM THE SOUTHERN DISTRICT AND 1 FROM LOS

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

ANGELES COUNTY SUPERIOR COURT. AT LEAST THE CENTRAL AND NORTHERN DISTRICT RATES ARE COMPARABLE, AND MANY FIRMS PRACTICE IN BOTH. (FOR THIS PURPOSE, ERISA AND ANTI-SLAPP ARE INCLUDED]

### CLASS ACTION LODESTAR CROSS CHECK SOURCES

[51] – *Wren v. RGIS Inventory Specialists,* C-06-05778 JCS, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) *supplemented,* C-06-05778 JCS, 2011 WL 1838562 (N.D. Cal. May 13, 2011)

[52]– *Bolton v. U.S. Nursing Corp*., C 12-4466 LB, 2013 WL 5700403 (N.D. Cal. Oct. 18, 2013)

[53]– *Johansson-Dohrmann v. Cbr Sys., Inc.,* 12-CV-1115-MMA BGS, 2013 WL 3864341 (S.D. Cal. July 24, 2013)

[54]– *Thieriot v. Celtic Ins. Co.,* C-10-04462-LB, 2011 WL 1522385 (N.D. Cal. Apr. 21, 2011)

[55]– *Browne v. Am. Honda Motor Co., Inc.,* CV 09-06750 MMM DTBX, 2010 WL 9499073 (C.D. Cal. Oct. 5, 2010)

[56]– *Parkinson v. Hyundai Motor Am.,* 796 F. Supp. 2d 1160, 1164-66,  1170-73 (C.D. Cal. 2010)

[57]– *Pelletz v. Weyerhaeuser Co.,* 592 F. Supp. 2d 1322, 1326-27 (W.D. Wash. 2009)

[58] – *Gonzalez v. S. Wine & Spirits of Am. Inc*., No. 2:11-CV-05849-ODW, 2014 WL 1630674, at *2 (C.D. Cal. Apr. 24, 2014))

[58] – *G. F. v. Contra Costa Cty.*, 2015 WL 7571789, at *13 (N.D. Cal. Nov. 25, 2015)

### COMMERCIAL LITIGATION SOURCES

[81] – *Apple, Inc. v. Samsung Electronics Co., Ltd*., C 11-1846 LHK PSG, 2012 WL 5451411 (N.D. Cal. Nov. 7, 2012)). The rates listed reflect what Quinn Emmanuel indicated were its standard rates for the attorneys being billed; the court award was lower as follows: Marc Becker - $800; Diane Hutnyan - $700; Victoria Maroulis - $700; Todd Briggs - $700; Melissa Dalziel - $681. Because Mr. Becker is based in London he was marked  for whether he was designated as a SuperLawyer.

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

[82] – Skadden Arps bill Bill to MGA Entertainment Inc. in *Mattel v. MGA Entertainment*, Case No. 04 CV 09049-DOC (C.D.Cal.), filed 7/11/1, Doc 10684-50; rates accepted without objection and ordered in Doc. 10703 (8/4/11) [ATTACHED AS EXHIBIT 82]

[83] – Declaration of Arturo Gonzalez in *Bullis Charter School v. Los Altos School District et al*. , Case No. 109 CV144569 (Santa Clara Sup. Ct., filed 10/19/13).  Although *Bullis* is arguably a public interest case, we are presenting this as a reflection of Mr. Gonzalez's and Ms. Brickman's normal rates, which is what Mr. Gonzalez explains in his declaration. [ATTACHED AS EXHIBIT 83]

[84] – The Lieff Cabraser rates were provided in a 3/21/2012 email from firm partner as their standard rates for 2012; Lieff Cabraser is a contingent fee firm specializing in class actions.

[85] – Email from ACLU to Barry Litt of 7/26/11 with Paul Hastings rate information provided to ACLU by former Paul Hastings associate.

[86] – 4/9/09 Gibson Dunn partner Wayne Barsky Declaration in *Rogel v. Development Agency of City of Lynwood*, Case No. BS106592 (reflecting Gibson Dunn standard rates) [ATTACHED AS EXHIBIT 86]

[87] – 11/27/08 Dec. of Quinn Emmanuel partner Danielle Gilmore in *Monrovia Nursing Co. v. Rosedale*, Case No. BC 351140  (LA Sup. Ct.) (reflecting Gibson Dunn standard rates) [ATTACHED AS EXHIBIT 87]

[88] – 10/16/09 Fee Order for Greenberg Taurig attorneys in *Santa Fe Pointe, L.P. v. Greystone Servicing Corp.*, C-07-5454 MMC, 2009 WL 3353449 (N.D. Cal. 10/16/09) (reflecting rates billed to client)

[89] – 11/21/08 Dec. of O'Irell & Manella partner Brian Hennigan in *Monrovia Nursery Co.  v. Rosedale*, No. BC351140 (Los Angeles Superior Court) (reflecting customary rates, which were billed to client in the case) (rates rounded down to the closest $5)[ATTACHED AS EXHIBIT 89]

[90] – 1/09/09 Bankruptcy Fee Application in *In re Three A's Holdings, L.L.C.*, No CV-04-07131- SVW (D. Del.) [bankruptcy fee application; only adversarial (litigation) rates relied on]

[91] – 11/17/10 Declaration of James Gillian in support of fee application in *La Asociacion De Trabajadores De Lake Forest v. City of Lake Forest*, CA 9 Case #09-55215 (Dkt. # 43-7) [ATTACHED AS EXHIBIT 91]

[92] – Selected rates compiled from 2009 Westlaw Court Express

[93] – Milbank Tweed rates being sought for DRLC co-counsel in *LAUSD v. Michael Garcia*, Case No. 10-55879 (9th Cir.); listed in email from DRLC counsel Anna Rivera on 2/24/14 [not yet in other tables as of 2/24]

[94] – Sidley Austin rates listed in Declaration of Amy Lalley for fee motion in Jones v. Upland Housing Authority,

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

NO.: EDCV 12-2074 VAP (Opx) (Dkt. # 46 2/24/14) [**ATTACHED AS EXHIBIT 94**]
[95] – Fee award in anti-SLAPP motion in *Xu v. Yamanaka*, 2014 WL 3840105 (N.D. Cal. Aug. 1, 2014)
[96] – *Altavion, Inc. v. Konica Minolta Sys. Lab. Inc*., 226 Cal. App. 4th 26, 71, 171 Cal. Rptr. 3d 714, 750 (2014), review denied (Aug. 20, 2014) [Trade secrets litigation; lodestar award]

## II.     RATES FROM SECTION I ORGANIZED BY YEARS OF PRACTICE

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Sid Wolinsky[13] | DRA* | 51 (1961) | $860 | 2012 | $976.99 |
| Sid Wolinsky[4] | DRA* | 49 (1961) | $835 | 2010 | $1,011.05 |
| Unnamed[10] | Rosen Bien & Galvan | 48 (1962) | $800 | 2010 | $1,032.46 |
| Sanford J. Rosen[12] | Rosen Bien & Galvan | 46 (1962) | $700 | 2008 | $903.40 |
| Barrett S. Litt[34] | Kaye, McLane, Bednarski & Litt | 45 (1969 | $975 | 2014 | $1,039.20 |
| Richard Pearl[27] | | 44 (1970) | $750 | 2014 | $799.39 |
| Ian Herzog[24] | Law Office of Ian Herzog | 44 (1967) | $1,000 | 2011 | $1,172.84 |
| Barrett S. Litt[8] | Litt, Estuar & Kitson | 43 (1969) | $850 | 2012 | $965.63 |
| Amitai Schwartz[11] | Law Offices of Amitai Schwartz | 40 (1973) | $725 | 2013 | $797.78 |
| Barrett S. Litt[6] | Litt, Estuar & Kitson | 40 (1969) | $800 | 2009 | $1,000.06 |
| Paul R. Fine[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 39 (1972) | $850 | 2011 | $996.92 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Barrett S. Litt[15] | Litt, Estuar & Kitson | 39 (1969) | $750 | 2008 | $967.93 |
| Dan Stormer[8] | HSKRR**** | 38 (1974) | $825 | 2012 | $937.23 |
| Bill Lann Lee[18] | Lewis, Feinberg, Lee, Renaker, & Jackson | 38 (1974) | $825 | 2012 | $937.23 |
| Barrett S. Litt[7] | Litt, Estuar & Kitson | 38 (1969) | $725 | 2007 | $965.98 |
| John Houston Scott[11] | Scott Law Firm | 37 (1976) | $725 | 2013 | $797.78 |
| Stephen Glick[24] | Law Offices of Stephen Glick | 37 (1974) | $800 | 2011 | $938.27 |
| David Borgen[35] | Goldstein Borgen Dardarian | 35 (1981 | $795 | 2016 | $795 |
| Mark Rosenbaum[2] | ACLU | 35 (1974) | $740 | 2009 | $925.06 |
| Thomas P. Greerty[11] | Law Offices of Thomas P. Greerty | 34 (1979) | $725 | 2013 | $797.78 |
| Jose R. Allen[4] | Skadden Arps | 34 (1976) | $930 | 2010 | $1,126.08 |
| Paul L. Hoffman[6] | Schonbrun, de Simone | 33 (1976) | $750 | 2009 | $937.56 |
| Unnamed[10] | Prison Law Office | 32 (1978) | $700 | 2010 | $903.40 |
| Unnamed[10] | Bingham, McCutcheon | 32 (1978) | $700 | 2010 | $903.40 |
| Carol Sobel[21] | Law Office of Carol Sobel | 32 (1978) | $725 | 2010 | $850.31 |
| Jose R. Allen[35] | Skadden, Arps | 31 (1985) | $1150 | 2016 | $1,150 |
| Carol Sobel[2] | Law Ofc Carol Sobel | 31 (1978) | $710 | 2009 | $887.55 |
| Carol A. Sobel[6] | Law Offices of Carol Sobel | 31 (1978) | $710 | 2009 | $887.55 |
| Dale Galipo[32] | Law Ofc Dale Galipo | 30 (1984) | $800 | 2014 | $852.68 |
| Dale Galipo[33] | Law Ofc Dale Galipo | 30 (1984) | $800 | 2014 | $825.92 |
| Linda Dardarian[35] | Goldstein Borgen Dardarian | 29 (1987) | $775 | 2016 | $775 |
| Michael Bien[9] | Rosen Bien Galvan & Grunfeld | 28 (2008) | $640 | 2008 | $825.97 |
| David M. McLane[34] | Kaye, McLane, Bednarski & Litt | 28 (1988) | $775 | 2014 | $826.03 |
| Jim DeSimone[28] | Schonbrun, de Simone | 28 (1985) | $725 | 2013 | $797.78 |

22

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Dale Galipo[16] | Law Ofc of Dale Galipo | 28 (1984) | $700 | 2012 | $795.22 |
| Susan Abitanta[24] | Law Office of Ian Herzog | 28 (1983) | $600 | 2011 | $703.71 |
| Robert Rubin[20] | LCCR | 28 (1978) | $625 | 2006 | $859.73 |
| Larry Paradis[13] | DRA* | 27 (1985) | $800 | 2012 | $908.83 |
| Matthew Righetti[19] | Righetti Glugoski | 27 (1985) | $750 | 2012 | $852.03 |
| James de Simone[3] | Schoenbrun, de Simon | 27 (1985) | $695 | 2012 | $789.54 |
| Ronald O. Kaye[34] | Kaye, McLane, Bednarski & Litt | 26 (1988) | $775 | 2014 | $826.03 |
| Humberto Guizar[16] |  | 26 (1986) | $500 | 2012 | $568.02 |
| Laurence Paradis[4] | DRA* | 26 (1985) | $730 | 2010 | $883.92 |
| Daniel B. Kohrman[4] | AFL***** | 26 (1984) | $740 | 2010 | $896.02 |
| Ron Elsberry[13] | DRA* | 25 (1987) | $725 | 2012 | $823.63 |
| Ben Schonbrun[5] | Schonbrun, de Simone | 25 (1985) | $650 | 2010 | $762.35 |
| Timothy G. Blood[30] | Blood Hurst and O'Reardon | 24 (1990) | $695 | 2014 | $740.77 |
| Michael Haddad[27] | Haddad & Sherwin | 23 91991) | $725 | 2014 | $772.74 |
| Guy Wallace[35] | Schneider Wallace | 23 (1993) | $750 | 2016 | $750 |
| Chritopher Cox[29] | Weill Gotshall | 23 (1991) | $850 | 2014 | $905.97 |
| Michael Seplow[28] | Schonbrun, de Simone | 23 (1990) | $660 | 2013 | $726.25 |
| Dale Galipo[26] | Law Ofc Dale Galipo | 23 (1989) | $675 | 2013 | $719.45 |
| Michael Seplow[3] | Schoenbrun, de Simon | 22 (1990) | $630 | 2012 | $715.70 |
| Douglas D. Winter[17] | McNicholas & McNicholas | 22 (1990) | $600 | 2012 | $681.62 |
| Brian Dunn[36] | Cochran Firm | 21 (1995) | $795 | 2016 | $795 |
| Michelle Uzeta[13] | DRLC*** | 20 (1992) | $700 | 2012 | $795.22 |
| Michael Seplow[5] | Schonbrun, de Simone | 20 (1990) | $590 | 2010 | $691.98 |
| Earnest Bell[15] | Law Offices of Earnest Bell | 20 (1988) | $600 | 2008 | $774.35 |

23

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Julia Sherwin[27] | Haddad & Sherwin | 19 (1995) | $695 | 2014 | $740.77 |
| Scott A. Brooks[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 19 (1992) | $650 | 2011 | $762.35 |
| Julie Nepveu[4] | AFL***** | 19 (1991) | $660 | 2010 | $799.16 |
| Ronald K. Tellis[30] | Baron & Budd | 18 (1996) | $775 | 2014 | $826.03 |
| Todd Burns[23] | Law Office of Todd Burns | 18 (1996) | $650 | 2014 | $692.80 |
| Bryan M. Miller[8] | Litt, Estuar & Kitson | 18 (1994) | $625 | 2012 | $710.02 |
| Craig Momita[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 18 (1993) | $400 | 2011 | $469.14 |
| Melissa Kasnitz[4] | DRA* | 18 (1992) | $650 | 2010 | $787.05 |
| Shawna Parks[35] | Law Ofc Shawna Parks | 17 (1999) | $695 | 2016 | $695 |
| Robert M. Kitson[8] | Litt, Estuar & Kitson | 17 (1995) | $625 | 2012 | $710.02 |
| Hector O. Villagra[1] | ACLU | 17 (1994) | $600 | 2011 | $703.71 |
| John Raphling[5] | Schonbrun, de Simone | 17 (1993) | $525 | 2010 | $615.74 |
| Robert Dell Angelo[14] | MTO** | 17 (1992) | $550 | 2009 | $687.54 |
| Rebecca Grey[25] | | 16 (1998) | $650 | 2014 | $692.80 |
| Douglas Ingraham[28] | Schonbrun, de Simone | 15 (1998) | $575 | 2013 | $632.72 |
| Matthew McNicholas[17] | McNicholas & McNicholas | 15 (1997) | $700 | 2012 | $795.22 |
| Peter Eliasberg[2] | ACLU | 15 (1994) | $525 | 2009 | $656.29 |
| Angela Padilla[20] | MoFo | 15 (1991) | $600 | 2006 | $825.34 |
| Gene J. Stonebarger[31] | Stonebarger Law, APC | 14 (2000) | $650 | 2014 | $692.80 |
| Paul Estuar[7] | Litt, Estuar & Kitson | 14 (1993) | $485 | 2007 | $646.21 |
| Shawna Parks[13] | DRA* | 13 (1999) | $665 | 2012 | $755.46 |

24

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Unnamed[10] | Bingham, McCutcheon | 13 (1997) | $655 | 2010 | $845.33 |
| Unnamed[10] | Rosen Bien & Galvan | 13 (1997) | $560 | 2010 | $722.72 |
| John Glugoski[19] | Righetti Glugoski | 12 (1997) | $650 | 2012 | $738.42 |
| Catherine Schmidt[17] | McNicholas & McNicholas | 11 (2001) | $500 | 2012 | $568.02 |
| Belinda Escobosa Helzer[1] | ACLU | 11 (2000) | $525 | 2011 | $615.74 |
| Kevin LaHue[34] | Kaye, McLane, Bednarski & Litt | 10 (2004) | $600 | 2014 | $639.51 |
| Katherine Weed[13] | DRA* | 10 (2002) | $600 | 2012 | $681.62 |
| Joseph J. Ybarra[1] | MTO** | 10 (2001) | $550 | 2011 | $645.06 |
| Jennifer Bezoza[4] | DRA* | 10 (2000) | $570 | 2010 | $690.18 |
| Shawna Parks[14] | DRLC | 10 (1999) | $525 | 2009 | $656.29 |
| Moira Duvernay[11] | Law Offices of Amitai Schwartz | 09 (2004) | $450 | 2013 | $495.17 |
| Jennifer Lee[13] | DRLC*** | 09 (2003) | $550 | 2012 | $624.82 |
| Peter Bibring[1] | ACLU | 09 (2002) | $490 | 2011 | $574.69 |
| Roger Heller[4] | DRA* | 09 (2001) | $560 | 2010 | $678.07 |
| Rebecca Thornton[21] | Law Office of Carol Sobel | 09 (2001) | $450 | 2010 | $527.78 |
| Matthew Strugar[13] | DRLC*** | 08 (2004) | $525 | 2012 | $596.42 |
| Jacob A. Kreilkamp[1] | MTO** | 08 (2003) | $505 | 2011 | $592.29 |
| Sage Reeves[14] | DRLC | 08 (2001) | $475 | 2009 | $593.79 |
| Rebecca Thornton[6] | Law Offices of Carol Sobel | 08 (2001) | $425 | 2009 | $531.28 |
| Richard D. Lambert[31] | Stonebarger Law | 07 (2007) | $500 | 2014 | $532.92 |
| Mary-Lee Smith[13] | DRA* | 07 (2005) | $555 | 2012 | $630.50 |
| Kevin Knestrick[4] | DRA* | 07 (2003) | $535 | 2010 | $647.80 |
| Peter Bibring[2] | ACLU | 07 (2002) | $375 | 2009 | $468.78 |

25

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Caitlin Weisberg[34] | Kaye, McLane, Bednarski & Litt | 06 (2008) | $500 | 2014 | $532.92 |
| Anna Canning[3] | Schoenbrun, de Simon | 06 (2006) | $450 | 2012 | $511.22 |
| Kasey Corbit[4] | DRA* | 06 (2004) | $500 | 2010 | $605.42 |
| Genevieve Guertin[27] | Haddad & Sherwin | 05 (2009) | $400 | 2014 | $426.34 |
| Debra Patkin[13] | DRLC*** | 05 (2007) | $450 | 2012 | $511.22 |
| Karla Gilbride[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Stephanie Biedermann[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Christine Chuang[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Laura D. Smolowe[1] | MTO** | 05 (2006) | $460 | 2011 | $539.51 |
| Mary–Lee Kimber[4] | DRA* | 05 (2005) | $475 | 2010 | $575.15 |
| Sheryl Wu Leung[4] | Skadden Arps | 05 (2005) | $395 | 2010 | $478.28 |
| Matthew Strugar[14] | DRLC | 05 (2004) | $400 | 2009 | $500.03 |
| Bambo Obarro[29] | Weill Gotschall | 04 (2010) | $400 | 2014 | $426.34 |
| Gina Altomare[27] | Haddad & Sherwin | 04 (2010) | $350 | 2014 | $373.05 |
| Heather McGunigle[22] | DRLC | 04 (2009) | $375 | 2009 | $468.78 |
| Bethany Woodard[14] | MTO** | 04 (2005) | $395 | 2009 | $493.78 |
| Marina A. Torres[1] | MTO** | 03 (2008) | $385 | 2011 | $451.54 |
| Sarala V. Nagala[1] | MTO** | 03 (2008) | $385 | 2011 | $451.54 |
| Stephanie Biedermann[4] | DRA* | 03 (2007) | $350 | 2010 | $423.80 |
| Kristina Wilson[14] | MTO** | 03 (2006) | $350 | 2009 | $437.53 |
| Thomas Kennedy Helm[27] | Haddad & Sherwin | 02 (2012) | $325 | 2014 | $346.40 |

26

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|------|------|------------------------|------|------|---------------|
| **Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks** | | | | | |
| Kara Janssen[13] | DRA* | 02 (2010) | $330 | 2012 | $374.89 |
| Nathaniel Fisher[4] | Skadden Arps | 02 (2008) | $530 | 2010 | $641.75 |
| Unnamed[10] | Bingham, McCutcheon | 02 (2008) | $400 | 2010 | $516.23 |
| Becca von Behren[4] | DRA* | 02 (2008) | $265 | 2010 | $320.87 |
| Mahogany Jenkins[20] | MoFo | 02 (2004) | $285 | 2006 | $392.03 |
| Unnamed[10] | Prison Law Office | 01 (2009) | $275 | 2010 | $354.91 |
| Stacey Brown[7] | Litt, Estuar & Kitson | 01 (2006) | $275 | 2007 | $366.41 |
| Technology manager[4] | Skadden Arps | | $320 | 2010 | $387.47 |
| Legal assistant[4] | Skadden Arps | | $285 | 2010 | $345.09 |
| Senior paralegals[4] | DRA* | | $265 | 2010 | $320.87 |
| Julia White[34] [Sr. Paralegal] | Kaye, McLane, Bednarski & Litt | | $295 | 2014 | $314.43 |
| Sr. paralegal[10] | Rosen Bien & Galvan | | $240 | 2010 | $309.74 |
| Sr. Paralegal[15] | Litt, Estuar & Kitson | | $235 | 2008 | $303.29 |
| Senior Paralegals[7] | Litt, Estuar & Kitson | | $225 | 2007 | $299.79 |
| Summer associates[4] | DRA* | | $245 | 2010 | $296.66 |
| ALS[1] | MTO** | | $250 | 2011 | $293.21 |
| Sr. paralegal[8] | Litt, Estuar & Kitson | | $250 | 2012 | $284.01 |
| Paralegal | DRA* | | $240 | 2012 | $284.01 |
| Law Clerks[14] | MTO** | | $220 | 2009 | $275.02 |
| Summer Associates[13] | DRA* | | $250 | 2012 | $272.65 |
| Paralegals[4] | DRA* | | $225 | 2010 | $272.44 |
| Law Clerk[13] | DRLC*** | | $230 | 2012 | $261.29 |
| Litigation Assist[13] | DRLC*** | | $230 | 2012 | $261.29 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Law student interns[8] | Litt, Estuar & Kitson | | $225 | 2012 | $255.61 |
| Heath White[34] [High Tech Paralegal] | Kaye, McLane, Bednarski & Litt | | $235 | 2014 | $250.47 |
| Paralegal[1] | MTO** | | $210 | 2011 | $246.30 |
| Paralegal[20] | MoFo | | $175 | 2006 | $240.72 |
| Paralegal[1] | ACLU | | $200 | 2011 | $234.57 |
| Law student interns[3] | Schoenbrun, de Simon | | $200 | 2012 | $227.21 |
| Paralegals (not senior)[27] | Haddad & Sherwin | | $200 | 2014 | $213.17 |
| Law clerks[4] | DRA* | | $175 | 2010 | $211.90 |
| Case clerks[4] | DRA* | | $165 | 2010 | $199.79 |

| Table 2: Consumer/Wage & Hour Class Action Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Jonathan E. Gertler[52] | Chavez & Gertler | 31 (1983) | $725 | 2013 | $797.78 |
| Todd Schneider[54] | Schneider Wallace | 29 (1982) | $675 | 2011 | $791.67 |
| Patrick N. Keegan[53] | Keegan & Baker LLP | 20 (1993) | $695 | 2013 | $764.77 |
| Shawn Khorrami[58] | Khorrami Boucher Sumner Sanguinetti, LLP | 19 (1995) | $650 | 2014 | $692.80 |
| Guy Wallace[51] | Schneider Wallace | 17 (1993) | $650 | 2010 | $787.05 |
| Jonathan Selbin[57] | Lieff Cabraser | 16 [1993] | $600 | 2009 | $750.04 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 2: Consumer/Wage & Hour Class Action Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Eric Gibbs[55] | Girard Gibbs | 15 (1995) | $675 | 2010 | $817.32 |
| Eric Gibbs[56] | Girard Gibbs | 15 (1995) | $675 | 2010 | $817.32 |
| Josh Konecky[51] | Schneider Wallace | 14 (1996) | $625 | 2010 | $756.78 |
| Dan L. Gildor[52] | Chavez & Gertler | 12 (2002) | $550 | 2013 | $605.21 |
| Launa Adolph[58] | Khorrami Boucher Sumner Sanguinetti, LLP | 11 (2003) | $495 | 2014 | $527.60 |
| Dylan Hughes[56] | Girard Gibbs | 10 (2000) | $545 | 2010 | $787.05 |
| Dylan Hughes[55] | Girard Gibbs | 10 (2000) | $545 | 2010 | $659.91 |

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[84] | Lieff Cabraser | 42 (1970) | $900 | 2012 | $1,022.43 |
| Thomas J. Nolan[82] | Skadden Arps | 40 (1971) | $1095 | 2011 | $1,284.26 |
| Unnamed[11] | Arnold & Porter | 39 (1974) | $910 | 2013 | $1,001.35 |
| Unnamed[92] | Munger, Tolles & Olson | 39 (1970) | $625 | 2009 | $781.30 |
| Unnamed[84] | Lieff Cabraser | 38 (1974) | $900 | 2012 | $1,022.43 |
| Gordon Kirscher[90] | O'Melveny &Myers | 38 (1971) | $860 | 2009 | $1,075.06 |
| Unnamed[91] | Paul Hastings | 36 (1974) | $940 | 2010 | $1,138.19 |
| Unnamed[84] | Lieff Cabraser | 34 (1978) | $800 | 2012 | $908.83 |
| Unnamed[92] | O'Melveny & Myers | 34 (1975) | $860 | 2009 | $1,075.06 |

29

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[85] | Paul Hastings | 33 (1978) | $940 | 2011 | $1,102.47 |
| Daniel Kolkey[86] | Gibson Dunn | 32 (1977) | $840 | 2009 | $1,050.06 |
| Unnamed[92] | Pachulski, Stang et al. | 32 (1977) | $650 | 2009 | $812.55 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 31 (1978) | $680 | 2009 | $850.05 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 30 (1979) | $760 | 2009 | $950.06 |
| Unnamed[84] | Lieff Cabraser | 29 (1983) | $775 | 2012 | $880.43 |
| Arturo Gonzalez[83] | MoFo | 28 (1985) | $950 | 2013 | $1,045.36 |
| Unnamed[92] | Pachulski, Stang et al. | 27 (1982) | $750 | 2009 | $937.56 |
| Wayne Barsky[86] | Gibson Dunn | 26 (1983) | $905 | 2009 | $1,131.32 |
| Unnamed[92] | Munger, Tolles & Olson | 25 (1984) | $550 | 2009 | $687.54 |
| Brian J. Hennigan[89] | Irell & Manella | 25 (1983) | $775 | 2008 | $1,000.20 |
| Unnamed[92] | Gibson Dunn & Crutcher | 25 (1974) | $790 | 2009 | $987.56 |
| Marc Becker[81] | Quinn Emanuel | 24 (1988) | $1035 | 2012 | $1,175.80 |
| Unnamed[84] | Lieff Cabraser | 24 (1988) | $775 | 2012 | $880.43 |
| Unnamed[92] | White & Case | 24 (1985) | $750 | 2009 | $937.56 |
| Unnamed[92] | Morrison & Foerster | 24 (1985) | $750 | 2009 | $937.56 |
| Unnamed[92] | Pachulski, Stang et al. | 24 (1985) | $675 | 2009 | $843.80 |
| Unnamed[85] | Paul Hastings | 23 (1998) | $850 | 2011 | $996.92 |
| Christopher Cox[95] | Weil Gotshal | 23 (1991) | $850 | 2014 | $905.97 |
| Unnamed[92] | Davis, Polk & Wardwell | 23 (1986) | $960 | 2009 | $1,200.07 |
| Unnamed[92] | Weil, Gotscahl & Manges | 23 (1986) | $799 | 2009 | $998.81 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Alejandro Mayorkas[90] | O'Melveny &Myers | 23 (1986) | $770 | 2009 | $962.56 |
| Unnamed[92] | Pachulski, Stang et al. | 22 (1987) | $725 | 2009 | $906.30 |
| Unnamed[92] | Munger, Tolles & Olson | 22 (1987) | $725 | 2009 | $906.30 |
| Unnamed[84] | Lieff Cabraser | 21 (1991) | $700 | 2012 | $795.22 |
| Marcellus McRae[86] | Gibson Dunn | 21 (1988) | $785 | 2009 | $981.31 |
| Unnamed[92] | Munger, Tolles & Olson | 21 (1988) | $600 | 2009 | $750.04 |
| Mark D. Kemple[88] | Greenberg Traurig | 20 (1989) | $675 | 2009 | $871.14 |
| Unnamed[92] | Pachulski, Stang et al. | 20 (1989) | $645 | 2009 | $806.30 |
| Unnamed[11] | Quinn Emanuel | 20 | $700 | 2013 | $770.27 |
| Unnamed[92] | Davis, Polk & Wardwell | 19 (1990) | $955 | 2009 | $1,193.82 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 19 (1990) | $850 | 2009 | $1,062.56 |
| Glenn Peterson[96] | Millstone Peterson & Watts | 18 (1996) | $600 | 2014 | $639.51 |
| Jason D. Russell[82] | Skadden Arps | 18 (1993) | $1030 | 2011 | $1,208.03 |
| Unnamed[92] | Gibson Dunn & Crutcher | 18 (1991) | $610 | 2009 | $762.55 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 18 (1991) | $590 | 2009 | $737.54 |
| Michal H. Strub[89] | Irell & Manella | 18 (1990) | $670 | 2008 | $864.69 |
| Paralegal[90] | O'Melveny &Myers | 17 (2004) | $310 | 2009 | $387.52 |
| Unnamed[84] | Lieff Cabraser | 17 (1995) | $650 | 2012 | $738.42 |
| Unnamed[85] | Paul Hastings | 17 (1994) | $725 | 2011 | $850.31 |
| Unnamed[92] | Morrison & Foerster | 17 (1992) | $650 | 2009 | $812.55 |

31

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Amy Lalley[94] | Sidley Austin | 16 (1998) | $825 | 2014 | $937.23 |
| Unnamed[91] | Paul Hastings | 16 (1994) | $725 | 2010 | $877.86 |
| Diane Hutnyan[81] | Quinn Emanuel | 15 (1997) | $790 | 2012 | $897.47 |
| Unnamed[85] | Paul Hastings | 15 (1996) | $725 | 2011 | $850.31 |
| Unnamed[92] | Gibson Dunn & Crutcher | 15 (1994) | $525 | 2009 | $656.29 |
| Danielle Gilmore[87] | Quinn Emanuel | 15 (1993) | $685 | 2008 | $884.05 |
| Daniel Perry[93] | Milbank, Tweed | 14 (2000) | $1135 | 2014 | $1,209.74 |
| Amy Lalley[94] | Sidley Austin | 14 (1998) | $700 | 2012 | $795.22 |
| Unnamed[84] | Lieff Cabraser | 14 (1998) | $585 | 2012 | $664.58 |
| Thomas M. Riordan[90] | O'Melveny &Myers | 14 (1995) | $675 | 2009 | $843.80 |
| Unnamed[92] | Pachulski, Stang et al. | 14 (1995) | $535 | 2009 | $668.79 |
| Victoria Maroulis[81] | Quinn Emanuel | 13 (1999) | $815 | 2012 | $925.87 |
| Delilah Vinzon[93] | Milbank, Tweed | 12 (2002) | $900 | 2014 | $959.26 |
| Todd Briggs[81] | Quinn Emanuel | 12 (2000) | $735 | 2012 | $834.99 |
| Melissa Dalziel[81] | Quinn Emanuel | 12 (2000) | $730 | 2012 | $829.31 |
| Unnamed[85] | Paul Hastings | 12 (1999) | $670 | 2011 | $785.80 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 12 (1997) | $650 | 2009 | $812.55 |
| Unnamed[92] | Gibson Dunn & Crutcher | 12 (1997) | $635 | 2009 | $793.80 |
| Unnamed[92] | Munger, Tolles & Olson | 12 (1997) | $525 | 2009 | $656.29 |
| Unnamed[84] | Lieff Cabraser | 11 (2001) | $525 | 2012 | $596.42 |
| Unnamed[91] | Paul Hastings | 11 (1999) | $670 | 2010 | $811.27 |
| Erik Swanholt[88] | Greenberg Traurig | 11 (1998) | $575 | 2009 | $742.08 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Hillary A. Hamilton[82] | Skadden Arps | 10 (2001) | $710 | 2011 | $832.72 |
| Unnamed[91] | Paul Hastings | 10 (2000) | $660 | 2010 | $799.16 |
| Jorge DeNeve[90] | O'Melveny &Myers | 10 (1998) | $620 | 2009 | $775.05 |
| Unnamed[11] | Arnold & Porter | 09 (2004) | $625 | 2013 | $687.74 |
| Unnamed[85] | Paul Hastings | 09 (2002) | $630 | 2011 | $738.89 |
| Unnamed[92] | Morrison & Foerster | 09 (2000) | $535 | 2009 | $668.79 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 09 (2000) | $505 | 2009 | $631.29 |
| Hannah Cannom[93] | Milbank, Tweed | 08 (2006) | $800 | 2014 | $810.05 |
| Unnamed[85] | Paul Hastings | 08 (2003) | $620 | 2011 | $727.16 |
| Unnamed[92] | White & Case | 08 (2001) | $655 | 2009 | $818.80 |
| Allan Johnson[90] | O'Melveny &Myers | 08 (2001) | $565 | 2009 | $706.29 |
| Suzanna Brickman[83] | MoFo | 07 (2006) | $650 | 2013 | $715.25 |
| Unnamed[85] | Paul Hastings | 07 (2004) | $590 | 2011 | $691.98 |
| Revi-Ruth Enriquez[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $852.68 |
| Caitlin Hawks[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $810.05 |
| Alex Doherty[94] | Sidley Austin | 06 (2008) | $700 | 2014 | $746.09 |
| Unnamed[84] | Lieff Cabraser | 06 (2006) | $435 | 2012 | $494.18 |
| Unnamed[85] | Paul Hastings | 06 (2005) | $565 | 2011 | $662.66 |
| Unnamed[92] | White & Case | 06 (2003) | $600 | 2009 | $750.04 |
| Unnamed[92] | Weil, Gotscahl & Manges | 06 (2003) | $580 | 2009 | $725.04 |
| Unnamed[92] | Gibson Dunn & Crutcher | 06 (2003) | $570 | 2009 | $712.54 |
| Katherine Eklund[93] | Milbank, Tweed | 05 (2009) | $550 | 2014 | $586.22 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[85] | Paul Hastings | 05 (2006) | $530 | 2011 | $621.61 |
| Danielle Katzir[86] | Gibson Dunn | 05 (2004) | $525 | 2009 | $656.29 |
| Paralegal[90] | O'Melveny &Myers | 05 (2004) | $225 | 2009 | $281.27 |
| Katherine J. Galston[89] | Irell & Manella | 05 (2003) | $490 | 2008 | $1,075.06 |
| Dena G. Kaplan[89] | Irell & Manella | 05 (2003) | $475 | 2008 | $613.02 |
| Bambo Obaro[95] | Weil Gotshal | 04 (2010) | $400 | 2014 | $426.34 |
| Alex Doherty[94] | Sidley Austin | 04 (2008) | $520 | 2012 | $590.74 |
| Unnamed[84] | Lieff Cabraser | 04 (2008) | $395 | 2012 | $448.73 |
| Unnamed[85] | Paul Hastings | 04 (2007) | $500 | 2011 | $586.42 |
| Unnamed[92] | Davis, Polk & Wardwell | 04 (2005) | $680 | 2009 | $850.05 |
| Unnamed[92] | Weil, Gotscahl & Manges | 04 (2005) | $500 | 2009 | $625.04 |
| Multiple associates[86] | Gibson Dunn | 04 (2005) | $495 | 2009 | $618.79 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $450 | 2009 | $562.53 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $435 | 2009 | $543.78 |
| Unnamed[92] | White & Case | 04 (2004) | $600 | 2009 | $750.04 |
| Kimberly A. Svendsen[89] | Irell & Manella | 04 (2004) | $410 | 2008 | $529.14 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2004) | $395 | 2009 | $493.78 |
| Unnamed[85] | Paul Hastings | 03 (2008) | $450 | 2011 | $527.78 |
| Melissa Barshop[86] | Gibson Dunn | 03 (2006) | $470 | 2009 | $587.54 |
| Unnamed[92] | Gibson Dunn & Crutcher | 03 (2006) | $470 | 2009 | $587.54 |
| Unnamed[92] | Weil, Gotscahl & Manges | 03 (2006) | $465 | 2009 | $581.28 |
| Abby Schwartz[90] | O'Melveny &Myers | 03 (2006) | $450 | 2009 | $562.53 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Hirad Dadgostar[88] | Greenberg Traurig | 03 (2006) | $400 | 2008 | $516.23 |
| Unnamed[92] | Munger, Tolles & Olson | 03 (2006) | $400 | 2009 | $500.03 |
| Unnamed[92] | O'Melveny & Myers | 03 (2006) | $395 | 2009 | $493.78 |
| Multiple associates[86] | Gibson Dunn | 02 (2007) | $400 | 2009 | $500.03 |
| Sara Brenner[87] | Quinn Emanuel | 02 (2006) | $340 | 2008 | $438.80 |
| Lauren McCray[94] | Sidley Austin | 02 (1998) | $495 | 2014 | $527.60 |
| Unnamed[84] | Lieff Cabraser | 01 (2011) | $325 | 2012 | $369.21 |
| Jessica Mohr[95] | Weil Gotshal | 01 (2013) | $300 | 2014 | $319.75 |
| Unnamed[85] | Paul Hastings | 01 (2010) | $360 | 2011 | $422.22 |
| Unnamed[92] | Weil, Gotscahl & Manges | 01 (2008) | $355 | 2009 | $443.78 |
| Multiple associates[86] | Gibson Dunn | 01 (2008) | $345 | 2009 | $431.28 |
| Lauren McCray[94] | Sidley Austin | 01 (1998) | $340 | 2012 | $386.25 |
| Paralegal[89] | Irell & Manella | | $220 | 2008 | $962.56 |
| Unnamed[11] | Quinn Emanuel | | $821 | 2013 | $903.41 |
| Unnamed[11] | Quinn Emanuel | | $448 | 2013 | $492.97 |
| Sr. Paralegal[91] | Paul Hastings | | $330 | 2010 | $399.58 |
| Paralegal[86] | Gibson Dunn | | $315 | 2009 | $393.77 |
| Paralegal[86] | Gibson Dunn | | $300 | 2009 | $375.02 |
| Paralegal[86] | Gibson Dunn | | $295 | 2009 | $368.77 |
| Legal Assistant[82] | Skadden Arps | | $295 | 2011 | $345.99 |
| Paralegal[87] | Quinn Emanuel | | $235 | 2008 | $303.29 |

35

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

## III.     RATES FROM SECTION I ORGANIZED FROM HIGH TO LOW

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Ian Herzog[24] | Law Office of Ian Herzog | 44 (1967) | $1,000 | 2011 | $1,172.84 |
| Jose R. Allen[35] | Skadden, Arps | 31 (1985) | $1150 | 2016 | $1,150 |
| Jose R. Allen[4] | Skadden Arps | 34 (1976) | $930 | 2010 | $1,126.08 |
| Barrett S. Litt[34] | Kaye, McLane, Bednarski & Litt | 45 (1969) | $975 | 2014 | $1,039.20 |
| Unnamed[10] | Rosen Bien & Galvan | 48 (1962) | $800 | 2010 | $1,032.46 |
| Sid Wolinsky[4] | DRA* | 49 (1961) | $835 | 2010 | $1,011.05 |
| Barrett S. Litt[6] | Litt, Estuar & Kitson | 40 (1969) | $800 | 2009 | $1,000.06 |
| Paul R. Fine[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 39 (1972) | $850 | 2011 | $996.92 |
| Sid Wolinsky[13] | DRA* | 51 (1961) | $860 | 2012 | $976.99 |
| Barrett S. Litt[15] | Litt, Estuar & Kitson | 39 (1969) | $750 | 2008 | $967.93 |
| Barrett S. Litt[7] | Litt, Estuar & Kitson | 38 (1969) | $725 | 2007 | $965.98 |
| Barrett S. Litt[8] | Litt, Estuar & Kitson | 43 (1969) | $850 | 2012 | $965.63 |
| Stephen Glick[24] | Law Offices of Stephen Glick | 37 (1974) | $800 | 2011 | $938.27 |
| Paul L. Hoffman[6] | Schonbrun, de Simone | 33 (1976) | $750 | 2009 | $937.56 |
| Dan Stormer[8] | HSKRR**** | 38 (1974) | $825 | 2012 | $937.23 |
| Bill Lann Lee[18] | Lewis, Feinberg, Lee, Renaker, & Jackson | 38 (1974) | $825 | 2012 | $937.23 |
| Mark Rosenbaum[2] | ACLU | 35 (1974) | $740 | 2009 | $925.06 |
| Larry Paradis[13] | DRA* | 27 (1985) | $800 | 2012 | $908.83 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Chritopher Cox[29] | Weill Gotschall | 23 (1991) | $850 | 2014 | $905.97 |
| Sanford J. Rosen[12] | Rosen Bien & Galvan | 46 (1962) | $700 | 2008 | $903.40 |
| Unnamed[10] | Prison Law Office | 32 (1978) | $700 | 2010 | $903.40 |
| Unnamed[10] | Bingham, McCutcheon | 32 (1978) | $700 | 2010 | $903.40 |
| Daniel B. Kohrman[4] | AFL***** | 26 (1984) | $740 | 2010 | $896.02 |
| Carol Sobel[2] | Law Ofc Carol Sobel | 31 (1978) | $710 | 2009 | $887.55 |
| Carol A. Sobel[6] | Law Offices of Carol Sobel | 31 (1978) | $710 | 2009 | $887.55 |
| Laurence Paradis[4] | DRA* | 26 (1985) | $730 | 2010 | $883.92 |
| Robert Rubin[20] | LCCR | 28 (1978) | $625 | 2006 | $859.73 |
| Dale Galipo[32] | Law Ofc Dale Galipo | 30 (1984) | $800 | 2014 | $852.68 |
| Matthew Righetti[19] | Righetti Glugoski | 27 (1985) | $750 | 2012 | $852.03 |
| Carol Sobel[21] | Law Office of Carol Sobel | 32 (1978) | $725 | 2010 | $850.31 |
| Unnamed[10] | Bingham, McCutcheon | 13 (1997) | $655 | 2010 | $845.33 |
| David M. McLane[34] | Kaye, McLane, Bednarski & Litt | 28 (1988) | $775 | 2014 | $826.03 |
| Ronald O. Kaye[34] | Kaye, McLane, Bednarski & Litt | 26 (1988) | $775 | 2014 | $826.03 |
| Ronald K. Tellis[30] | Baron & Budd | 18 (1996) | $775 | 2014 | $826.03 |
| Michael Bien[9] | Rosen Bien Galvan & Grunfeld | 28 (2008) | $640 | 2008 | $825.97 |
| Dale Galipo[33] | Law Ofc Dale Galipo | 30 (1984) | $800 | 2014 | $825.92 |
| Angela Padilla[20] | MoFo | 15 (1991) | $600 | 2006 | $825.34 |
| Ron Elsberry[13] | DRA* | 25 (1987) | $725 | 2012 | $823.63 |
| Richard Pearl[27] |  | 44 (1970) | $750 | 2014 | $799.39 |
| Julie Nepveu[4] | AFL***** | 19 (1991) | $660 | 2010 | $799.16 |
| Amitai Schwartz[11] | Law Offices of Amitai Schwartz | 40 (1973) | $725 | 2013 | $797.78 |
| John Houston Scott[11] | Scott Law Firm | 37 (1976) | $725 | 2013 | $797.78 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Thomas P. Greerty[11] | Law Offices of Thomas P. Greerty | 34 (1979) | $725 | 2013 | $797.78 |
| Jim DeSimone[28] | Schonbrun, de Simone | 28 (1985) | $725 | 2013 | $797.78 |
| Dale Galipo[16] | Law Ofc of Dale Galipo | 28 (1984) | $700 | 2012 | $795.22 |
| Michelle Uzeta[13] | DRLC*** | 20 (1992) | $700 | 2012 | $795.22 |
| Matthew McNicholas[17] | McNicholas & McNicholas | 15 (1997) | $700 | 2012 | $795.22 |
| David Borgen[35] | Goldstein Borgen Dardarian | 35 (1981 | $795 | 2016 | $795 |
| Brian Dunn[36] | Cochran Firm | 21 (1995) | $795 | 2016 | $795 |
| James de Simone[3] | Schoenbrun, de Simon | 27 (1985) | $695 | 2012 | $789.54 |
| Melissa Kasnitz[4] | DRA* | 18 (1992) | $650 | 2010 | $787.05 |
| Linda Dardarian[35] | Goldstein Borgen Dardarian | 29 (1987) | $775 | 2016 | $775 |
| Earnest Bell[15] | Law Offices of Earnest Bell | 20 (1988) | $600 | 2008 | $774.35 |
| Michael Haddad[27] | Haddad & Sherwin | 23 91991) | $725 | 2014 | $772.74 |
| Ben Schonbrun[5] | Schonbrun, de Simone | 25 (1985) | $650 | 2010 | $762.35 |
| Scott A. Brooks[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 19 (1992) | $650 | 2011 | $762.35 |
| Shawna Parks[13] | DRA* | 13 (1999) | $665 | 2012 | $755.46 |
| Guy Wallace[35] | Schneider Wallace | 23 (1993) | $750 | 2016 | $750 |
| Timothy G. Blood[30] | Blood Hurst and O'Reardon | 24 (1990) | $695 | 2014 | $740.77 |
| Julia Sherwin[27] | Haddad & Sherwin | 19 (1995) | $695 | 2014 | $740.77 |
| John Glugoski[19] | Righetti Glugoski | 12 (1997) | $650 | 2012 | $738.42 |
| Michael Seplow[28] | Schonbrun, de Simone | 23 (1990) | $660 | 2013 | $726.25 |
| Unnamed[10] | Rosen Bien & Galvan | 13 (1997) | $560 | 2010 | $722.72 |
| Dale Galipo[26] | Law Ofc Dale Galipo | 23 (1989) | $675 | 2013 | $719.45 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Michael Seplow[3] | Schoenbrun, de Simon | 22 (1990) | $630 | 2012 | $715.70 |
| Bryan M. Miller[8] | Litt, Estuar & Kitson | 18 (1994) | $625 | 2012 | $710.02 |
| Robert M. Kitson[8] | Litt, Estuar & Kitson | 17 (1995) | $625 | 2012 | $710.02 |
| Susan Abitanta[24] | Law Office of Ian Herzog | 28 (1983) | $600 | 2011 | $703.71 |
| Hector O. Villagra[1] | ACLU | 17 (1994) | $600 | 2011 | $703.71 |
| Shawna Parks[35] | Law Ofc Shawna Parks | 17 (1999) | $695 | 2016 | $695 |
| Todd Burns[23] | Law Office of Todd Burns | 18 (1996) | $650 | 2014 | $692.80 |
| Rebecca Grey[25] | | 16 (1998) | $650 | 2014 | $692.80 |
| Gene J. Stonebarger[31] | Stonebarger Law, APC | 14 (2000) | $650 | 2014 | $692.80 |
| Michael Seplow[5] | Schonbrun, de Simone | 20 (1990) | $590 | 2010 | $691.98 |
| Jennifer Bezoza[4] | DRA* | 10 (2000) | $570 | 2010 | $690.18 |
| Robert Dell Angelo[14] | MTO** | 17 (1992) | $550 | 2009 | $687.54 |
| Douglas D. Winter[17] | McNicholas & McNicholas | 22 (1990) | $600 | 2012 | $681.62 |
| Katherine Weed[13] | DRA* | 10 (2002) | $600 | 2012 | $681.62 |
| Roger Heller[4] | DRA* | 09 (2001) | $560 | 2010 | $678.07 |
| Peter Eliasberg[2] | ACLU | 15 (1994) | $525 | 2009 | $656.29 |
| Shawna Parks[14] | DRLC | 10 (1999) | $525 | 2009 | $656.29 |
| Kevin Knestrick[4] | DRA* | 07 (2003) | $535 | 2010 | $647.80 |
| Paul Estuar[7] | Litt, Estuar & Kitson | 14 (1993) | $485 | 2007 | $646.21 |
| Joseph J. Ybarra[1] | MTO** | 10 (2001) | $550 | 2011 | $645.06 |
| Nathaniel Fisher[4] | Skadden Arps | 02 (2008) | $530 | 2010 | $641.75 |
| Kevin LaHue[34] | Kaye, McLane, Bednarski & Litt | 10 (2004) | $600 | 2014 | $639.51 |
| Douglas Ingraham[28] | Schonbrun, de Simone | 15 (1998) | $575 | 2013 | $632.72 |
| Mary-Lee Smith[13] | DRA* | 07 (2005) | $555 | 2012 | $630.50 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|------|------|------------------------|------|------|---------------|
| **Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks** | | | | | |
| Jennifer Lee[13] | DRLC*** | 09 (2003) | $550 | 2012 | $624.82 |
| John Raphling[5] | Schonbrun, de Simone | 17 (1993) | $525 | 2010 | $615.74 |
| Belinda Escobosa Helzer[1] | ACLU | 11 (2000) | $525 | 2011 | $615.74 |
| Kasey Corbit[4] | DRA* | 06 (2004) | $500 | 2010 | $605.42 |
| Matthew Strugar[13] | DRLC*** | 08 (2004) | $525 | 2012 | $596.42 |
| Sage Reeves[14] | DRLC | 08 (2001) | $475 | 2009 | $593.79 |
| Jacob A. Kreilkamp[1] | MTO** | 08 (2003) | $505 | 2011 | $592.29 |
| Mary–Lee Kimber[4] | DRA* | 05 (2005) | $475 | 2010 | $575.15 |
| Peter Bibring[1] | ACLU | 09 (2002) | $490 | 2011 | $574.69 |
| Humberto Guizar[16] | | 26 (1986) | $500 | 2012 | $568.02 |
| Catherine Schmidt[17] | McNicholas & McNicholas | 11 (2001) | $500 | 2012 | $568.02 |
| Laura D. Smolowe[1] | MTO** | 05 (2006) | $460 | 2011 | $539.51 |
| Richard D. Lambert[31] | Stonebarger Law | 07 (2007) | $500 | 2014 | $532.92 |
| Caitlin Weisberg[34] | Kaye, McLane, Bednarski & Litt | 06 (2008) | $500 | 2014 | $532.92 |
| Rebecca Thornton[6] | Law Offices of Carol Sobel | 08 (2001) | $425 | 2009 | $531.28 |
| Rebecca Thornton[21] | Law Office of Carol Sobel | 09 (2001) | $450 | 2010 | $527.78 |
| Unnamed[10] | Bingham, McCutcheon | 02 (2008) | $400 | 2010 | $516.23 |
| Anna Canning[3] | Schoenbrun, de Simon | 06 (2006) | $450 | 2012 | $511.22 |
| Debra Patkin[13] | DRLC*** | 05 (2007) | $450 | 2012 | $511.22 |
| Matthew Strugar[14] | DRLC | 05 (2004) | $400 | 2009 | $500.03 |
| Moira Duvernay[11] | Law Offices of Amitai Schwartz | 09 (2004) | $450 | 2013 | $495.17 |
| Bethany Woodard[14] | MTO** | 04 (2005) | $395 | 2009 | $493.78 |
| Karla Gilbride[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |

40

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Stephanie Biedermann[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Christine Chuang[13] | DRA* | 05 (2007) | $430 | 2012 | $488.50 |
| Sheryl Wu Leung[4] | Skadden Arps | 05 (2005) | $395 | 2010 | $478.28 |
| Craig Momita[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 18 (1993) | $400 | 2011 | $469.14 |
| Peter Bibring[2] | ACLU | 07 (2002) | $375 | 2009 | $468.78 |
| Heather McGunigle[22] | DRLC | 04 (2009) | $375 | 2009 | $468.78 |
| Marina A. Torres[1] | MTO** | 03 (2008) | $385 | 2011 | $451.54 |
| Sarala V. Nagala[1] | MTO** | 03 (2008) | $385 | 2011 | $451.54 |
| Kristina Wilson[14] | MTO** | 03 (2006) | $350 | 2009 | $437.53 |
| Genevieve Guertin[27] | Haddad & Sherwin | 05 (2009) | $400 | 2014 | $426.34 |
| Bambo Obarro[29] | Weill Gotschall | 04 (2010) | $400 | 2014 | $426.34 |
| Stephanie Biedermann[4] | DRA* | 03 (2007) | $350 | 2010 | $423.80 |
| Mahogany Jenkins[20] | MoFo | 02 (2004) | $285 | 2006 | $392.03 |
| Technology manager[4] | Skadden Arps | | $320 | 2010 | $387.47 |
| Kara Janssen[13] | DRA* | 02 (2010) | $330 | 2012 | $374.89 |
| Gina Altomare[27] | Haddad & Sherwin | 04 (2010) | $350 | 2014 | $373.05 |
| Stacey Brown[7] | Litt, Estuar & Kitson | 01 (2006) | $275 | 2007 | $366.41 |
| Unnamed[10] | Prison Law Office | 01 (2009) | $275 | 2010 | $354.91 |
| Thomas Kennedy Helm[27] | Haddad & Sherwin | 02 (2012) | $325 | 2014 | $346.40 |
| Legal assistant[4] | Skadden Arps | | $285 | 2010 | $345.09 |

41

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Becca von Behren[4] | DRA* | 02 (2008) | $265 | 2010 | $320.87 |
| Senior paralegals[4] | DRA* | | $265 | 2010 | $320.87 |
| Julia White[34] [Sr. Paralegal] | Kaye, McLane, Bednarski & Litt | | $295 | 2014 | $314.43 |
| Sr. paralegal[10] | Rosen Bien & Galvan | | $240 | 2010 | $309.74 |
| Sr. Paralegal[15] | Litt, Estuar & Kitson | | $235 | 2008 | $303.29 |
| Senior Paralegals[7] | Litt, Estuar & Kitson | | $225 | 2007 | $299.79 |
| Summer associates[4] | DRA* | | $245 | 2010 | $296.66 |
| ALS[1] | MTO** | | $250 | 2011 | $293.21 |
| Sr. paralegal[8] | Litt, Estuar & Kitson | | $250 | 2012 | $284.01 |
| Paralegal | DRA* | | $240 | 2012 | $284.01 |
| Law Clerks[14] | MTO** | | $220 | 2009 | $275.02 |
| Summer Associates[13] | DRA* | | $250 | 2012 | $272.65 |
| Paralegals[4] | DRA* | | $225 | 2010 | $272.44 |
| Law Clerk[13] | DRLC*** | | $230 | 2012 | $261.29 |
| Litigation Assist[13] | DRLC*** | | $230 | 2012 | $261.29 |
| Law student interns[8] | Litt, Estuar & Kitson | | $225 | 2012 | $255.61 |
| Heath White[34] [High Tech Paralegal] | Kaye, McLane, Bednarski & Litt | | $235 | 2014 | $250.47 |
| Paralegal[1] | MTO** | | $210 | 2011 | $246.30 |
| Paralegal[20] | MoFo | | $175 | 2006 | $240.72 |
| Paralegal[1] | ACLU | | $200 | 2011 | $234.57 |
| Law student interns[3] | Schoenbrun, de Simon | | $200 | 2012 | $227.21 |
| Paralegals (not | Haddad & Sherwin | | $200 | 2014 | $213.17 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| senior)[27] | | | | | |
| Law clerks[4] | DRA* | | $175 | 2010 | $211.90 |
| Case clerks[4] | DRA* | | $165 | 2010 | $199.79 |

| Table 2: Consumer/Wage & Hour Class Action Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Eric Gibbs[55] | Girard Gibbs | 15 (1995) | $675 | 2010 | $817.32 |
| Eric Gibbs[56] | Girard Gibbs | 15 (1995) | $675 | 2010 | $817.32 |
| Jonathan E. Gertler[52] | Chavez & Gertler | 31 (1983) | $725 | 2013 | $797.78 |
| Todd Schneider[54] | Schneider Wallace | 29 (1982) | $675 | 2011 | $791.67 |
| Guy Wallace[51] | Schneider Wallace | 17 (1993) | $650 | 2010 | $787.05 |
| Dylan Hughes[56] | Girard Gibbs | 10 (2000) | $545 | 2010 | $787.05 |
| Patrick N. Keegan[53] | Keegan & Baker LLP | 20 (1993) | $695 | 2013 | $764.77 |
| Josh Konecky[51] | Schneider Wallace | 14 (1996) | $625 | 2010 | $756.78 |
| Jonathan Selbin[57] | Lieff Cabraser | 16 [1993] | $600 | 2009 | $750.04 |
| Shawn Khorrami[58] | Khorrami Boucher Sumner Sanguinetti, LLP | 19 (1995) | $650 | 2014 | $692.80 |
| Dylan Hughes[55] | Girard Gibbs | 10 (2000) | $545 | 2010 | $659.91 |
| Dan L. Gildor[52] | Chavez & Gertler | 12 (2002) | $550 | 2013 | $605.21 |
| Launa Adolph[58] | Khorrami Boucher Sumner Sanguinetti, LLP | 11 (2003) | $495 | 2014 | $527.60 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Thomas J. Nolan[82] | Skadden Arps | 40 (1971) | $1095 | 2011 | $1,284.26 |
| Daniel Perry[93] | Milbank, Tweed | 14 (2000) | $1135 | 2014 | $1,209.74 |
| Jason D. Russell[82] | Skadden Arps | 18 (1993) | $1030 | 2011 | $1,208.03 |
| Unnamed[92] | Davis, Polk & Wardwell | 23 (1986) | $960 | 2009 | $1,200.07 |
| Unnamed[92] | Davis, Polk & Wardwell | 19 (1990) | $955 | 2009 | $1,193.82 |
| Marc Becker[81] | Quinn Emanuel | 24 (1988) | $1035 | 2012 | $1,175.80 |
| Unnamed[91] | Paul Hastings | 36 (1974) | $940 | 2010 | $1,138.19 |
| Wayne Barsky[86] | Gibson Dunn | 26 (1983) | $905 | 2009 | $1,131.32 |
| Unnamed[85] | Paul Hastings | 33 (1978) | $940 | 2011 | $1,102.47 |
| Gordon Kirscher[90] | O'Melveny &Myers | 38 (1971) | $860 | 2009 | $1,075.06 |
| Unnamed[92] | O'Melveny & Myers | 34 (1975) | $860 | 2009 | $1,075.06 |
| Katherine J. Galston[89] | Irell & Manella | 05 (2003) | $490 | 2008 | $1,075.06 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 19 (1990) | $850 | 2009 | $1,062.56 |
| Daniel Kolkey[86] | Gibson Dunn | 32 (1977) | $840 | 2009 | $1,050.06 |
| Arturo Gonzalez[83] | MoFo | 28 (1985) | $950 | 2013 | $1,045.36 |
| Unnamed[84] | Lieff Cabraser | 42 (1970) | $900 | 2012 | $1,022.43 |
| Unnamed[84] | Lieff Cabraser | 38 (1974) | $900 | 2012 | $1,022.43 |
| Unnamed[11] | Arnold & Porter | 39 (1974) | $910 | 2013 | $1,001.35 |
| Brian J. Hennigan[89] | Irell & Manella | 25 (1983) | $775 | 2008 | $1,000.20 |

44

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS
ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[92] | Weil, Gotscahl & Manges | 23 (1986) | $799 | 2009 | $998.81 |
| Unnamed[85] | Paul Hastings | 23 (1998) | $850 | 2011 | $996.92 |
| Unnamed[92] | Gibson Dunn & Crutcher | 25 (1974) | $790 | 2009 | $987.56 |
| Marcellus McRae[86] | Gibson Dunn | 21 (1988) | $785 | 2009 | $981.31 |
| Alejandro Mayorkas[90] | O'Melveny &Myers | 23 (1986) | $770 | 2009 | $962.56 |
| Paralegal[89] | Irell & Manella | | $220 | 2008 | $962.56 |
| Delilah Vinzon[93] | Milbank, Tweed | 12 (2002) | $900 | 2014 | $959.26 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 30 (1979) | $760 | 2009 | $950.06 |
| Unnamed[92] | Pachulski, Stang et al. | 27 (1982) | $750 | 2009 | $937.56 |
| Unnamed[92] | White & Case | 24 (1985) | $750 | 2009 | $937.56 |
| Unnamed[92] | Morrison & Foerster | 24 (1985) | $750 | 2009 | $937.56 |
| Amy Lalley[94] | Sidley Austin | 16 (1998) | $825 | 2014 | $937.23 |
| Victoria Maroulis[81] | Quinn Emanuel | 13 (1999) | $815 | 2012 | $925.87 |
| Unnamed[84] | Lieff Cabraser | 34 (1978) | $800 | 2012 | $908.83 |
| Unnamed[92] | Pachulski, Stang et al. | 22 (1987) | $725 | 2009 | $906.30 |
| Unnamed[92] | Munger, Tolles & Olson | 22 (1987) | $725 | 2009 | $906.30 |
| Christopher Cox[95] | Weil Gotshal | 23 (1991) | $850 | 2014 | $905.97 |
| Unnamed[11] | Quinn Emanuel | | $821 | 2013 | $903.41 |
| Diane Hutnyan[81] | Quinn Emanuel | 15 (1997) | $790 | 2012 | $897.47 |
| Danielle Gilmore[87] | Quinn Emanuel | 15 (1993) | $685 | 2008 | $884.05 |
| Unnamed[84] | Lieff Cabraser | 29 (1983) | $775 | 2012 | $880.43 |
| Unnamed[84] | Lieff Cabraser | 24 (1988) | $775 | 2012 | $880.43 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[91] | Paul Hastings | 16 (1994) | $725 | 2010 | $877.86 |
| Mark D. Kemple[88] | Greenberg Traurig | 20 (1989) | $675 | 2009 | $871.14 |
| Michal H. Strub[89] | Irell & Manella | 18 (1990) | $670 | 2008 | $864.69 |
| Revi-Ruth Enriquez[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $852.68 |
| Unnamed[85] | Paul Hastings | 17 (1994) | $725 | 2011 | $850.31 |
| Unnamed[85] | Paul Hastings | 15 (1996) | $725 | 2011 | $850.31 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 31 (1978) | $680 | 2009 | $850.05 |
| Unnamed[92] | Davis, Polk & Wardwell | 04 (2005) | $680 | 2009 | $850.05 |
| Unnamed[92] | Pachulski, Stang et al. | 24 (1985) | $675 | 2009 | $843.80 |
| Thomas M. Riordan[90] | O'Melveny &Myers | 14 (1995) | $675 | 2009 | $843.80 |
| Todd Briggs[81] | Quinn Emanuel | 12 (2000) | $735 | 2012 | $834.99 |
| Hillary A. Hamilton[82] | Skadden Arps | 10 (2001) | $710 | 2011 | $832.72 |
| Melissa Dalziel[81] | Quinn Emanuel | 12 (2000) | $730 | 2012 | $829.31 |
| Unnamed[92] | White & Case | 08 (2001) | $655 | 2009 | $818.80 |
| Unnamed[92] | Pachulski, Stang et al. | 32 (1977) | $650 | 2009 | $812.55 |
| Unnamed[92] | Morrison & Foerster | 17 (1992) | $650 | 2009 | $812.55 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 12 (1997) | $650 | 2009 | $812.55 |
| Unnamed[91] | Paul Hastings | 11 (1999) | $670 | 2010 | $811.07 |
| Hannah Cannom[93] | Milbank, Tweed | 08 (2006) | $800 | 2014 | $810.05 |
| Caitlin Hawks[93] | Milbank, Tweed | 06 (2008) | $760 | 2014 | $810.05 |
| Unnamed[92] | Pachulski, Stang et al. | 20 (1989) | $645 | 2009 | $806.30 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Unnamed[91] | Paul Hastings | 10 (2000) | $660 | 2010 | $799.16 |
| Unnamed[84] | Lieff Cabraser | 21 (1991) | $700 | 2012 | $795.22 |
| Amy Lalley[94] | Sidley Austin | 14 (1998) | $700 | 2012 | $795.22 |
| Unnamed[92] | Gibson Dunn & Crutcher | 12 (1997) | $635 | 2009 | $793.80 |
| Unnamed[85] | Paul Hastings | 12 (1999) | $670 | 2011 | $785.80 |
| Unnamed[92] | Munger, Tolles & Olson | 39 (1970) | $625 | 2009 | $781.30 |
| Jorge DeNeve[90] | O'Melveny &Myers | 10 (1998) | $620 | 2009 | $775.05 |
| Unnamed[11] | Quinn Emanuel | 20 | $700 | 2013 | $770.27 |
| Unnamed[92] | Gibson Dunn & Crutcher | 18 (1991) | $610 | 2009 | $762.55 |
| Unnamed[92] | Munger, Tolles & Olson | 21 (1988) | $600 | 2009 | $750.04 |
| Unnamed[92] | White & Case | 06 (2003) | $600 | 2009 | $750.04 |
| Unnamed[92] | White & Case | 04 (2004) | $600 | 2009 | $750.04 |
| Alex Doherty[94] | Sidley Austin | 06 (2008) | $700 | 2014 | $746.09 |
| Erik Swanholt[88] | Greenberg Traurig | 11 (1998) | $575 | 2009 | $742.08 |
| Unnamed[85] | Paul Hastings | 09 (2002) | $630 | 2011 | $738.89 |
| Unnamed[84] | Lieff Cabraser | 17 (1995) | $650 | 2012 | $738.42 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 18 (1991) | $590 | 2009 | $737.54 |
| Unnamed[85] | Paul Hastings | 08 (2003) | $620 | 2011 | $727.16 |
| Unnamed[92] | Weil, Gotscahl & Manges | 06 (2003) | $580 | 2009 | $725.04 |
| Suzanna Brickman[83] | MoFo | 07 (2006) | $650 | 2013 | $715.25 |
| Unnamed[92] | Gibson Dunn & Crutcher | 06 (2003) | $570 | 2009 | $712.54 |
| Allan Johnson[90] | O'Melveny &Myers | 08 (2001) | $565 | 2009 | $706.29 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[85] | Paul Hastings | 07 (2004) | $590 | 2011 | $691.98 |
| Unnamed[11] | Arnold & Porter | 09 (2004) | $625 | 2013 | $687.74 |
| Unnamed[92] | Munger, Tolles & Olson | 25 (1984) | $550 | 2009 | $687.54 |
| Unnamed[92] | Pachulski, Stang et al. | 14 (1995) | $535 | 2009 | $668.79 |
| Unnamed[92] | Morrison & Foerster | 09 (2000) | $535 | 2009 | $668.79 |
| Unnamed[84] | Lieff Cabraser | 14 (1998) | $585 | 2012 | $664.58 |
| Unnamed[85] | Paul Hastings | 06 (2005) | $565 | 2011 | $662.66 |
| Unnamed[92] | Gibson Dunn & Crutcher | 15 (1994) | $525 | 2009 | $656.29 |
| Unnamed[92] | Munger, Tolles & Olson | 12 (1997) | $525 | 2009 | $656.29 |
| Danielle Katzir[86] | Gibson Dunn | 05 (2004) | $525 | 2009 | $656.29 |
| Glenn Peterson[96] | Millstone Peterson & Watts | 18 (1996) | $600 | 2014 | $639.51 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 09 (2000) | $505 | 2009 | $631.29 |
| Unnamed[92] | Weil, Gotscahl & Manges | 04 (2005) | $500 | 2009 | $625.04 |
| Unnamed[85] | Paul Hastings | 05 (2006) | $530 | 2011 | $621.61 |
| Multiple associates[86] | Gibson Dunn | 04 (2005) | $495 | 2009 | $618.79 |
| Dena G. Kaplan[89] | Irell & Manella | 05 (2003) | $475 | 2008 | $613.02 |
| Unnamed[84] | Lieff Cabraser | 11 (2001) | $525 | 2012 | $596.42 |
| Alex Doherty[94] | Sidley Austin | 04 (2008) | $520 | 2012 | $590.74 |
| Melissa Barshop[86] | Gibson Dunn | 03 (2006) | $470 | 2009 | $587.54 |
| Unnamed[92] | Gibson Dunn & Crutcher | 03 (2006) | $470 | 2009 | $587.54 |
| Unnamed[85] | Paul Hastings | 04 (2007) | $500 | 2011 | $586.42 |
| Katherine Eklund[93] | Milbank, Tweed | 05 (2009) | $550 | 2014 | $586.22 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Unnamed[92] | Weil, Gotscahl & Manges | 03 (2006) | $465 | 2009 | $581.28 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $450 | 2009 | $562.53 |
| Abby Schwartz[90] | O'Melveny &Myers | 03 (2006) | $450 | 2009 | $562.53 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2005) | $435 | 2009 | $543.78 |
| Kimberly A. Svendsen[89] | Irell & Manella | 04 (2004) | $410 | 2008 | $529.14 |
| Unnamed[85] | Paul Hastings | 03 (2008) | $450 | 2011 | $527.78 |
| Lauren McCray[94] | Sidley Austin | 02 (1998) | $495 | 2014 | $527.60 |
| Hirad Dadgostar[88] | Greenberg Traurig | 03 (2006) | $400 | 2008 | $516.23 |
| Unnamed[92] | Munger, Tolles & Olson | 03 (2006) | $400 | 2009 | $500.03 |
| Multiple associates[86] | Gibson Dunn | 02 (2007) | $400 | 2009 | $500.03 |
| Unnamed[84] | Lieff Cabraser | 06 (2006) | $435 | 2012 | $494.18 |
| Unnamed[92] | Munger, Tolles & Olson | 04 (2004) | $395 | 2009 | $493.78 |
| Unnamed[92] | O'Melveny & Myers | 03 (2006) | $395 | 2009 | $493.78 |
| Unnamed[11] | Quinn Emanuel | | $448 | 2013 | $492.97 |
| Unnamed[84] | Lieff Cabraser | 04 (2008) | $395 | 2012 | $448.73 |
| Unnamed[92] | Weil, Gotscahl & Manges | 01 (2008) | $355 | 2009 | $443.78 |
| Sara Brenner[87] | Quinn Emanuel | 02 (2006) | $340 | 2008 | $438.80 |
| Multiple associates[86] | Gibson Dunn | 01 (2008) | $345 | 2009 | $431.28 |
| Bambo Obaro[95] | Weil Gotshal | 04 (2010) | $400 | 2014 | $426.34 |
| Unnamed[85] | Paul Hastings | 01 (2010) | $360 | 2011 | $422.22 |
| Sr. Paralegal[91] | Paul Hastings | | $330 | 2010 | $399.58 |
| Paralegal[86] | Gibson Dunn | | $315 | 2009 | $393.77 |

**RATE TABLES: TABLE 1 – CIVIL RIGHTS LITIGATION AWARDS; TABLE 2 – CONSUMER CLASS ACTION AWARDS; TABLE 3 – COMMERCIAL LITIGATION AWARDS AND RATES**

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| **Atty** | **Firm** | **Practice Yrs [Grad Yr]** | **Rate** | **Year** | **Adjusted Rate** |
| Paralegal[90] | O'Melveny &Myers | 17 (2004) | $310 | 2009 | $387.52 |
| Lauren McCray[94] | Sidley Austin | 01 (1998) | $340 | 2012 | $386.25 |
| Paralegal[86] | Gibson Dunn | | $300 | 2009 | $375.02 |
| Unnamed[84] | Lieff Cabraser | 01 (2011) | $325 | 2012 | $369.21 |
| Paralegal[86] | Gibson Dunn | | $295 | 2009 | $368.77 |
| Legal Assistant[82] | Skadden Arps | | $295 | 2011 | $345.99 |
| Jessica Mohr[95] | Weil Gotshal | 01 (2013) | $300 | 2014 | $319.75 |
| Paralegal[90] | O'Melveny &Myers | 12 (1997) | $245 | 2009 | $306.27 |
| Paralegal[87] | Quinn Emanuel | | $235 | 2008 | $303.29 |
| Paralegal[90] | O'Melveny &Myers | 05 (2004) | $225 | 2009 | $281.27 |

50

1

**Exhibit C**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   DARRELL K. MOORE (SBN 136845)
    dmoore@icls.org
2   INLAND COUNTIES LEGAL SERVICES
    10565 Civic Center Drive, Suite 200
3   Rancho Cucamonga, CA  91730
    Telephone: (951) 248-4724
4   Fax: (909) 980-4871

5   RICHARD A. ROTHSCHILD (SBN 67356)
    rrothschild@wclp.org
6   NAVNEET K. GREWAL (SBN 251930)
    ngrewal@wclp.org
7   STEPHANIE E. HAFFNER (SBN 194192)
    shaffner@wclp.org
8   WESTERN CENTER ON LAW AND POVERTY
    3701 Wilshire Boulevard, Suite 208
9   Los Angeles, CA 90010
    Telephone: (213) 487-7211
10  Fax: (213) 487-0242

11  Attorneys for Plaintiffs
    REBECCA JONES and BRENT PALMER
12

13              UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15
16  REBECCA JONES and                ) CASE NO.:  EDCV 12-2074 VAP
    BRENT PALMER,                    ) (OPx)
                                     )
17         Plaintiffs,               ) *Assigned for all purposes to the*
                                     ) *Honorable Virginia A. Phillips*
18         v.                        )
                                     ) **DECLARATION OF AMY**
19  UPLAND HOUSING AUTHORITY;        ) **LALLY IN SUPPORT OF**
    DON SWIFT, Executive Director of the ) **PLAINTIFFS' MOTION FOR**
20  HOUSING AUTHORITY OF THE         ) **ATTORNEYS' FEES**
    CITY OF UPLAND in his official   )
21  capacity,                        )
                                     )
22         Defendants.               )
    ─────────────────────────────────)
23
24
25
26
27
28

ACTIVE 43044573v.2

────────────────────────────────────────────────
DECL. OF AMY LALLY IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
Case No. EDCV 12-2074

List of counsel for Plaintiffs continued from caption page:

AMY P. LALLY, SBN 198555
alally@sidley.com
ALEX DOHERTY, SBN 261552
adoherty@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

DECL. OF AMY LALLY IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
Case No. EDCV 12-2074

## DECLARATION OF AMY LALLY

I, Amy Lally, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a partner at the law firm of Sidley Austin LLP, co-counsel for Plaintiffs Rebecca Jones and Brent Palmer in this action.  I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify competently hereto.

2.     I graduated from Georgetown University Law Center in 1998.  In my sixteen years as a litigator, I have litigated a wide variety of civil matters, with a focus on complex commercial litigation and class actions.  I have substantial experience, in particular, with Proposition 65 litigation and consumer litigation involving false advertising, marketing and privacy litigation under California's Unfair Business Practices Act, Consumers Legal Remedies Act, and Song Beverly Credit Card Act.

3.     Based on my experience litigating consumer class actions under various California and federal statutes, it is my opinion that the issues raised in this action – in particular, those relating to due process and the federal regulations governing the Section 8 housing program – are at least as complex as the issues I litigate for corporate clients on a daily basis.

4.     I have contemporaneously recorded my time spent litigating this action on behalf of Plaintiffs.  Attached hereto as **Exhibit A** is a true and correct summary of my time records for this action.

5.     As detailed in Exhibit A, my primary responsibilities included supervising the work of the two Sidley Austin associates assigned to this case, Alex Doherty and Lauren McCray, and participating in strategy discussions with Sidley Austin's co-counsel, *i.e.*, the Western Center on Law and Poverty and Inland Counties Legal Services.

6.     Attached hereto as **Exhibit B** is a true and correct summary of the expenses incurred by Sidley Austin LLP in the course of litigating this action on Plaintiffs' behalf.

ACTIVE 43044573v.2

7.      Sidley Austin LLP has represented Plaintiffs in this action on a *pro bono* basis.  My standard billing rate in 2012 was $700 an hour.  My current billing rate is $825 an hour.  Alex Doherty's standard billing rate in 2012 was $520 an hour.  Mr. Doherty's current billing rate is $700 an hour.  Lauren McCray's standard billing rate in 2012 was $340 an hour.  Ms. McCray's current billing rate is $495 an hour.  The standard 2012 billing rates for Mr. Doherty, Ms. McCray, and me were actually charged to fee-paying clients in 2012 for our respective work.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 24, 2014, in Los Angeles, California.


AMY LALLY



FILED
CLERK, U.S. DISTRICT COURT

SEP 21, 2016

CENTRAL DISTRICT OF CALIFORNIA
BY: ___BH___ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Trevor Woods et al., <br><br>          **Plaintiffs,** <br><br>     v. <br><br> John B. Fagan et al., <br><br>          **Defendants.** | CV 14-8374-VAP (SPx) <br><br> **ORDER GRANTING MOTION FOR ATTORNEYS' FEES [DOC. NO. 158]** |

On July 7, 2016, following a jury trial, this Court entered a Judgment in favor of Plaintiffs Trevor Woods and Tyra Woodson and against Defendants John Fagan and Daniel Martinez. (Doc. No. 154.) On August 3, 2016, Plaintiff filed a Motion for Attorneys' Fees. (Doc. No. 158.) On September 19, 2016, the court held a hearing and the parties submitted on their papers. After considering the papers filed in support of, and in opposition to, the Motion, the Court GRANTS the Motion.

## I. BACKGROUND

On November 19, 2013, Defendants Fagan and Martinez, both of whom are Long Beach Police Department ("LBPD") officers, shot and killed Tyler Woods following a foot pursuit. Woods' parents, Plaintiffs Trevor Woods and Tyra Woodson, filed a complaint under 42 U.S.C. § 1983 alleging Defendants' actions violated their Fourteenth Amendment liberty interest in the companionship and society of their son.

The issues of liability and damages were tried to a jury, which returned a special verdict in favor of Plaintiffs on their claims.  The parties stipulated to an amount of $10,000.00 in punitive damages if the jury found liability for them.  (Doc. No. 154.) The jury returned a special verdict awarding Plaintiffs a total of $1,050,000.00 in compensatory damages (Doc. No. 145).

On July 7, 2016, this Court entered a judgment in Plaintiffs' favor in the sums of $1,050,000.00 in compensatory damages and $10,000.00 in punitive damages. (Doc. No. 154.)

On August 3, 2016, Plaintiff filed a Motion for Attorneys' Fees pursuant to 42 U.S.C. § 1988.  (Doc. No. 158.)  On August 22, 2016, Defendants filed an Opposition.  (Doc. No. 165.)  On August 29, 2016, Plaintiff filed a Reply.  (Doc. No. 170.)

## II.   LEGAL STANDARD

Fees in § 1983 cases are governed by 42 U.S.C. § 1988, which provides:

In any action or proceeding to enforce a provision of section [] . . . 1983 . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . .  42 U.S.C. § 1988(b).

"The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quotation marks omitted).  The analysis of attorney's fees is twofold.  The Court first must determine whether or not the party seeking fees is the prevailing

party.  Fischer v. SJB-P.D., Inc., 214 F.3d 1115 (9th Cir. 2000); Chabner v. United of Omaha Life Ins. Co., 1999 WL 33227443 (N.D. Cal. 1999).  A plaintiff is the prevailing party when the "resolution of the dispute . . . changes the legal relationship between itself and the defendant."  Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792 (1989).  In other words, "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  Farrar v. Hobby, 506 U.S. 103, 109 (1992) (internal citation omitted).

## III.  DISCUSSION

Plaintiffs were the prevailing party at trial.  The jury found that Defendants violated Plaintiffs' constitutional rights and awarded them $1,050,000.00 in compensatory damages, and the parties stipulated to $10,000.00 in punitive damages.  Defendants agree Plaintiffs are entitled to reasonable attorneys' fees, but object to the sum sought, $365,275.15, as unreasonable and excessively high.  (Opp. at 1-2.)  Defendants' argument is unpersuasive.

"In determining a reasonable attorney's fee, the district court's first step is to calculate a 'lodestar' by multiplying the number of hours it finds the prevailing party expended on the litigation by a reasonable hourly rate." McGrath v. County of Nevada, 67 F.3d 248, 252 (9th Cir. 1995) (citing Hensley, 461 U.S. at 433). The Court then decides whether to increase or decrease the lodestar amount by evaluating the factors enunciated in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975), cert. denied, 425 U.S. 951 (1976).

The Kerr factors are: time and labor required; the novelty and difficulty of the questions involved; the skill needed to perform the legal service properly; the preclusion of other employment by the attorney due to acceptance of the case; the customary fee, whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of the attorney; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases. Id.

Plaintiffs' counsel, Mr. Brian Dunn, seeks $180,404.40 in fees based on an hourly rate of $790 per hour and a total of 228.36 hours; Mr. John Fattahi seeks $119,952.00 based on an hourly rate of $630.00 per hour and a total of 190.40 hours; and Ms. Megan Gyongyos seeks $64,918.75 based on an hourly rate of $425.00 and a total of 152.75 hours. (Mot. at 21.) Plaintiffs' counsel are not seeking an increase from those lodestar amounts based on the Kerr factors.

Case 2:16-cv-05147-TJH-GJS Document 68-7 Filed 09/16/17 Page 99 of 445 Page ID
#:1512
Case 2:14-cv-09574-VAP-SPJS Document 180-7 Filed 09/28/16/17 Page 9 of 20 Page ID #:2147

### 1. Reasonable Hourly Rate

"The hourly rate for successful civil rights attorneys is to be calculated by considering certain factors, including the novelty and difficulty of the issues, the skill required to try the case, whether or not the fee is contingent, the experience held by counsel and fee awards in similar cases." <u>Moreno v. City of Sacramento</u>, 534 F.3d 1106, 1114 (9th Cir. 2008). In addition, the court is guided by "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." <u>Trevino v. Gates</u>, 99 F.3d 911, 925 (9th Cir. 1996).

In support of their requested hourly rates, Mr. Dunn, Mr. Fattahi, and Ms. Gyongyos submitted declarations detailing their skills and experience as civil rights attorneys and past fee awards they have received. (See generally Dunn Decl., Fattahi Decl., Gyongyos Decl.) Mr. Dunn, who served as lead counsel for Plaintiffs, specializes in police misconduct civil rights litigation. (Dunn Decl. ¶ 6.) He has been counsel on numerous civil rights cases for over 20 years in which he has obtained substantial verdicts and settlements. (Dunn Decl. ¶¶ 6-8.) Mr. Fattahi has ten years of experience with federal civil rights litigation and has practiced police excessive force litigation almost exclusively for the past seven years. (Fattahi Decl. ¶ 5.) Mr. Fattahi collaborated with Mr. Dunn on nearly all aspects of the trial, including researching applicable law and marshaling evidence, participating in the jury selection, and examining three civilian and six hostile witnesses. (Fattahi Decl. ¶ 3.) Ms. Gyongyos, Mr. Dunn's associate, has more than three years of experience litigating police misconduct cases and had primary responsibility of the day-to-day management of this case since April 2014. (Gyongyos Decl. ¶¶ 3, 5.) Her involvement included drafting Plaintiffs' complaint, propounding written discovery, and preparing numerous pretrial and trial documents. (Gyongyos Decl. ¶ 3.)

Considering the prevailing rate in the community for similar work performed by attorneys of comparable skill, experience, and reputation, the Court finds a reasonable hourly rate for Mr. Dunn is $750 per hour, for Mr. Fattahi is $550 per hour, and for Ms. Gyongyos is $375 per hour.

The Court notes that Plaintiffs' counsel "served the public interest by vindicating important constitutional rights." McCown v. City of Fontana, 565 F.3d 1097, 1105 (9th Cir. 2008) (citing City of Riverside v. Rivera, 477 U.S. 561, 572

(1986)).  Their representation of Plaintiffs was not without risk given, for example, that both Plaintiffs were incarcerated at the time of the trial.  Moreover, the hourly rates listed above are in line with the market rates of similarly experienced attorneys in the community (see generally Galipo Decl., Sobel Decl.), and the attorneys in this case are not requesting a fee multiplier.

## 2. Reasonable Hours

The Court has reviewed each and every billing entry in Plaintiffs' fee request, and eliminated the fees requested by Plaintiff for (1) tasks on which excessive time was spent, (2) unnecessary, excessive, or duplicative entries, (3) time charged for clerical or secretarial tasks. The descriptions in the billing entries submitted were satisfactorily detailed, and the Court did not find many instances needing reduction. After reviewing the billing entries, the Court reduced Mr. Dunn's hours by 4.5 hours, Mr. Fattahi's hours by 6.4 hours, and Ms. Gyongyos's hours by 7.48 hours.

Plaintiffs' counsel bears the burden of establishing entitlement to an attorney's fee award and "documenting the appropriate hours expended and hourly rates." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). The Court maintains discretion to reduce the number of hours requested where an attorney's block billing makes it difficult to identify whether the hours were reasonably expended. See Welch v. Metro. Life Ins. Co., 480 F.3d 942, 948 (9th Cir. 2007) ("We do not quarrel with the district court's authority to reduce hours that are billed in block format. The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked."); R.S., et al, SACV11-536 AG (RNBx) at 28 (reducing an attorney's "trial preparation" hours by 20 percent based on block billing).

The trial court, due to its familiarity with the case, is in the best position to evaluate the reasonableness of the hours requested. Moreno, 534 F.3d 1106, 1116 (9th Cir. 2008). Here, the Court has reduced the hours of Plaintiffs' counsel where the hours were excessive, duplicative, or charged for clerical or secretarial tasks. For example, the Court deducted 6.2 hours from Mr. Fattahi's multiple logs of "Review

documents and depositions, prepare for trial" because the logs did not identify discrete tasks and the time spent appeared excessive. The Court also deducted the 5.0 hours Ms. Gyongyos logged for assisting in the preparation of Exhibit Binders because that is a clerical task.

In conclusion, the Court sees no reason to depart from the lodestar amount, and the "presumptively reasonable" lodestar amounts for Plaintiffs' counsel are as follows. See Jordan v. Multnomah Cnty., 815 F.2d 1258, 1262 (9th Cir. 1987).

| Attorney/ Paralegal | Hourly Rate | Hours | Lodestar |
|---|---|---|---|
| Dunn | $750 | 223.86 | $167,895.00 |
| Fattahi | $550 | 184.00 | $101,200.00 |
| Gyongyos | $375 | 145.27 | $54,476.25 |
| **Total** | | | **$323,571.25** |

### 3. Reasonable Out-of-Pocket Expenses

Defendants have not objected to Mr. Fattahi's request for out-of-pocket litigation expenses totaling $810.15. In light of the documentation attached to Mr. Fattahi's declaration, the Court views those expenses as reasonable and awards him $810.15 for reasonable out-of-pocket expenses in addition to the attorney's fees noted above.

## IV.   CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' Motion for Attorneys' Fees, and awards fees in the amount of $323,571.25.

**IT IS SO ORDERED.**

Dated:   9/21/16

Virginia A. Phillips
Chief United States District Judge

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18

| | |
|---|---|
| MARK WILLITS, JUDY GRIFFIN, BRENT PILGREEN, and COMMUNITIES ACTIVELY LIVING INDEPENDENT & FREE ("CALIF"), on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, a public entity,<br><br>     Defendant. | Case No.:  CV 10-5782 CBM (RZx)<br><br>**ORDER GRANTING MOTION FOR ATTORNEYS' FEES AND COSTS** |

19
20

The matter before the Court is Plaintiffs' unopposed Motion For Attorneys'

21

Fees and Costs brought pursuant to Fed. Rule of Civ. Proc. 23(h) (the "Motion").

22

(Dkt. No. 380.)

23

## I.    PROCEDURAL AND FACTUAL OVERVIEW

24

On August 4, 2010, Plaintiffs Mark Willits, Judy Griffin, Brent Pilgreen,

25

and Communities Actively Living Independent and Free ("CALIF") (collectively,

26

"Named Plaintiffs") filed a class action lawsuit on behalf of persons with mobility

27

disabilities against the City of Los Angeles (the "City") and various individual

28

defendants based on the alleged inaccessibility of the City's sidewalks and other

1

"pedestrian rights of way." The Complaint asserted two federal claims under the American with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act" or "Section 504"), and four state law claims.

**A.    State Court Actions**

In December 2006, Saundra Carter and nine other individuals filed a class action complaint in state court against the City alleging disability discrimination in connection with the City's sidewalks. (Los Angeles Superior Court Case No. BC363305.)  In December 2007, Nicole Fahmie commenced a class action against the City in state court based on, among other things, lack of ramps or cutouts on the City's curbs. (Los Angeles Superior Court Case No. BC381773.) *Carter* and *Fahmie* (collectively, "*Carter/Fahmie*") were consolidated on January 27, 2011 under Case No. BC363305.[1]

Victor Pineda, Anatoli Ilyashov, and CALIF commenced a state court class action against the City and various individual defendants in December 2008 on behalf of persons with mobility disabilities who have been denied access to pedestrian rights of way in the City. (Los Angeles Superior Court Case No. BC403327, hereinafter "*Pineda*".)

**B.    Procedural History**

On December 10, 2010, the Court denied defendants' motion to stay proceedings pending *Pineda*, but dismissed the state law claims without prejudice "to be pursued in state court."[2] (Dkt. No. 57.)  The Named Plaintiffs commenced a state court action against the City following this Court's dismissal of their state

---

[1] A settlement was reached in 2011 in *Carter/Fahmie*. Although the Named Plaintiffs objected to the *Carter/Fahmie* class action settlement, the settlement was approved by the Superior Court in 2012. The Named Plaintiffs appealed the Superior Court's approval of the *Carter/Fahmie* settlement, and the California Court of Appeal reversed the Superior Court order certifying the settlement class and approving the settlement based on due process grounds. *Carter v. City of Los Angeles*, 224 Cal. App. 4th 808 (Cal. Ct. App. 2014).

[2] The Court also dismissed the individual defendants on that date. (Dkt. No. 57.)

law claims.  (Case No. BC457403, hereinafter "*Griffin*").[3]

The Court granted Plaintiffs' motion for class certification for injunctive and declaratory relief only on January 3, 2011, and appointed Schneider Wallace Cottrell Konecky Wotkyns LLP ("SWCKW"), Disability Rights Legal Center ("DRLC"), Goldstein, Borgen, Dardarian & Ho ("GBDH"), and the Legal Aid Society – Employment Law Center ("LAS-ELC") as Class Counsel.  (Dkt. Nos. 59, 177.)

Defendants filed a motion for judgment on the pleadings based on the purported res judicata effect of the State Court Actions, which was denied as premature by this Court on August 10, 2012.   (Dkt. No. 150.)

The Court granted preliminary and final approval of the parties' class action settlement agreement in this case (the "Settlement Agreement").

Plaintiffs' instant Motion seeks $13,300,000 in attorneys' fees and $1,700,000 in costs expended in connection with this litigation and the State Court Actions.[4]

## II.   STATEMENT OF THE LAW

Federal Rule of Civil Procedure Rule 23(h) provides that "[i]n a certified class action, the court may award attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).

In "civil rights and other injunctive relief class actions, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement or any percentage thereof."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  In determining the amount of a reasonable fee, the Court first determines "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Jankey*, 537 F.3d at 1132 (citing *Hensley*

---

[3] *Carter/Fahmie*, *Pineda*, and *Griffin* shall be collectively referred to herein as the "State Court Actions."

[4] Currently pending before the Clerk is Plaintiffs' application to tax costs.  (Dkt. No. 377.)

*v. Eckerhart,* 461 U.S. 424, 433-34 (1983)).  "The hours expended and the rate should be supported by adequate documentation and other evidence."  *Hanlon*, 150 F.3d at 1029.  The Court then "exclude[s] from th[e] initial fee calculation hours that were not reasonably expended," such as hours that are "excessive, redundant, or otherwise unnecessary."  *Jankey*, 537 F.3d at 1132 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433-34 (1983)).  The Court, however, must provide a "comprehensible" explanation for any fee reductions.  *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 486 (9th Cir. 2015), *cert. denied sub nom. San Diego Unified Sch. Dist. v. T.B.*, 136 S. Ct. 1679 (2016).

## III.   DISCUSSION

### A.   Prevailing Party

The Court finds Plaintiffs are entitled to reasonable fees and costs as a prevailing party under the ADA and Section 504.  *See* 42 U.S.C. § 12205; 29 U.S.C. § 794a(b); *Jankey v. Poop Deck*, 537 F.3d 1122, 1130 (9th Cir. 2008); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010).[5]

### B.   Lodestar

#### a.   Hourly Rates

The Court finds, based on the evidence submitted, that the following hourly rates are reasonable:[6]

---

[5] The Court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismissed those claims without prejudice.  Accordingly, Plaintiffs are not entitled to fees and costs as a prevailing party under state law, and are not entitled to a state-law multiplier of the lodestar.  *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1112 (9th Cir.), *cert. denied sub nom. City of Los Angeles, Cal. v. Chaudhry*, 135 S. Ct. 295 (2014); *Mangold v. Cal. Pub. Utilities Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995); *City of San Jose v. San Jose Police Officers' Ass'n*, 2013 WL 4806453, at *3 (N.D. Cal. Sept. 9, 2013); *Yates v. Union Square*, 2008 WL 346418, at *4 (N.D. Cal. Feb. 7, 2008).

[6] *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008).

| Name | Title | Hourly Rate |
|---|---|---|
| Guy Wallace | Attorney | $750 |
| Mark Johnson | Attorney | $700 |
| Andrew Lee | Attorney | $525 |
| Jennifer Uhrowczik | Attorney | $450 |
| Kiran Prasad | Attorney | $450 |
| Michelle Nguyen | Attorney | $300 |
| Katharine White | Attorney | $300 |
| Amanda Riley | Attorney | $300 |
| Chris Springer | Paralegal/Law Clerk | $235 |
| Charles Greenlee | Paralegal/Law Clerk | $200 |
| Scott Gordon | Paralegal/Law Clerk | $200 |
| Sam Marks | Paralegal/Law Clerk | $200 |
| David A. Borgen | Attorney | $795 |
| Linda Dardarian | Attorney | $775 |
| Andrew Lee | Attorney | $550 |
| Jason Tarricone | Attorney | $525 |
| Katrina Eiland | Attorney | $400 |
| Nancy Hanna | Attorney | $375 |
| Raymond Wendell | Attorney | $325 |
| Scott G. Grimes | Paralegal/Law Clerk | $250 |
| Elizabeth Kramer | Paralegal/Law Clerk | $250 |
| Damon Valdez | Paralegal/Law Clerk | $225 |
| Wendy E. Whitt | Paralegal/Law Clerk | $225 |
| Charlotte Nguyen | Paralegal/Law Clerk | $195 |
| Stuart Kirkpatrick | Paralegal/Law Clerk | $195 |
| Jinny Kim | Attorney | $644 |
| Rachael Langston | Attorney | $473 |
| Alexis Alvarez | Attorney | $385 |
| Mary Broughton | Paralegal/Law Clerk | $165 |

| Michael Hsueh | Paralegal/Law Clerk | $110 |
|---|---|---|
| Shawna Parks | Attorney | $695 |
| Ronald Elsberry | Attorney | $680 |
| Surisa E. Rivers | Attorney | $550 |
| Trevor Finneman | Attorney | $375 |
| Law Clerk | Law Clerk | $230 |
| Shawna L Parks | Attorney | $695 |
| José R. Allen, Esq. | Attorney | $1,115.60 |

**b.    Hours Worked**

Based on the evidence submitted, the Court finds the following hours were reasonably expended:

| Willits | | | |
|---|---|---|---|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 2,902.5 | $2,176,875.00 |
| Mark Johnson | $700 | 1,922.4 | $1,345,680 |
| Andrew Lee | $525 | 1,034.7 | $543,217.50 |
| Jennifer Uhrowczik | $450 | 331.4 | $149,130.00 |
| Kiran Prasad | $450 | 272.2 | $122,490.00 |
| Michelle Nguyen | $300 | 101.3 | $30,390.00 |
| Katharine White | $300 | 76.0 | $22,800.00 |
| Amanda Riley | $300 | 217.7 | $65,310.00 |
| Chris Springer | $235 | 277.5 | $65,212.50 |
| Charles Greenlee | $200 | 534.1 | $106,820.00 |

| | | | |
|---|---|---|---|
| Scott Gordon | $200 | 100.1 | $20,020.00 |
| Sam Marks | $200 | 1,026.7 | $205,340.00 |
| David A. Borgen | $795 | 113.8 | $90,471.00 |
| Linda Dardarian | $775 | 1,276.1 | $988,977.50 |
| Andrew Lee | $550 | 576.3 | $316,965.00 |
| Jason Tarricone | $525 | 278.0 | $145,950.00 |
| Katrina Eiland | $400 | 207.3 | $82,920.00 |
| Nancy Hanna | $375 | 44.4 | $16,650.00 |
| Raymond Wendell | $325 | 133.7 | $43,452.50 |
| Scott G. Grimes | $250 | 372.2 | $93,050.00 |
| Elizabeth Kramer | $250 | 63.3 | $15,825.00 |
| Damon Valdez | $225 | 946.4 | $212,940.00 |
| Wendy E. Whitt | $225 | 329.3 | $74,092.50 |
| Charlotte Nguyen | $195 | 100.3 | $19,588.50 |
| Stuart Kirkpatrick | $195 | 178.5 | $34,807.50 |
| Jinny Kim | $644 | 859.4 | $553,453.60 |
| Rachael Langston | $473 | 180.2 | $85,234.60 |
| Alexis Alvarez | $385 | 28.6 | $11,011.00 |

| | | | |
|---|---|---|---|
| Mary Broughton | $165 | 567.9 | $93,703.50 |
| Michael Hsueh | $110 | 77.4 | $8,514.00 |
| Shawna Parks (DRLC)[7] | $695 | 101.9 | $70,820.50 |
| Ronald Elsberry | $680 | 63.7 | $43,316.00 |
| Surisa E. Rivers | $550 | 810.6 | $445,830.00 |
| Trevor Finneman | $375 | 112.9 | $42,337.50 |
| Unnamed Law Clerk | $230 | 149.3 | $34,339.00 |
| Shawna L Parks | $695 | 15.2 | $10,564.00 |
| José R. Allen, Esq. | $1,115.60 | 560.2 | $624,962.12 |
| **TOTAL** | | | **$9,013,060.32** |

| Carter/Fahmie | | | |
|---|---|---|---|
| Name | Hourly Rate | Hours | Lodestar |
| Guy Wallace | $750 | 499.7 | $374,775.00 |
| Mark Johnson | $700 | 141.2 | $98,840.00 |
| Andrew Lee | $525 | 1.7 | $892.50 |
| Charles Greenlee | $200 | 11.6 | $2,320.00 |

---

[7] Shawna Parks was the Legal Director / Director of Litigation at DRLC until her departure in 2012. The fees sought for Park's time spent during her employment with DRLC is designated under "Shawna Parks (DRLC)," and the fees sought for Park's time spent in connection with her own law practice is designated under "Shawna L Parks."

| Sam Marks | $200 | 4.4 | $880.00 |
|-----------|------|-----|---------|
| **TOTAL** | | | **$477,707.50** |

| *Pineda* | | | |
|----------|-----------|-------|---------|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 188.2 | $141,150.00 |
| Mark Johnson | $700 | 142.9 | $100,030.00 |
| Andrew Lee | $525 | 67.4 | $35,385.00 |
| Kiran Prasad | $450 | 13.5 | $6,075.00 |
| Shawna Parks (DRLC) | $695 | 121.6 | $84,512.00 |
| Sage Reeves | $625 | 236.9 | $148,062.50 |
| Surisa E. Rivers | $550 | 67.2 | $36,960.00 |
| Debra J. Patkin | $450 | 410.2 | $184,587.75 |
| Unnamed Law Clerk | $230 | 108.5 | $24,955.00 |
| **TOTAL** | | | **$761,717.25** |

| *Griffin* | | | |
|-----------|-----------|-------|---------|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 0.8 | $600.00 |
| Mark Johnson | $700 | 6.5 | $4,550.00 |
| Shawna Parks (DRLC) | $695 | 2.0 | $1,390.00 |
| Surisa E. | $550 | 18.6 | $10,230.00 |

| Rivers | | | |
|---|---|---|---|
| Trevor Finneman | $375 | 1.4 | $490.00 |
| **TOTAL** | | | **$17,260.00** |

The Court also finds, based on the evidence submitted, that the above-listed hours expended by non-appointed class counsel Shawna Parks and Jose Allen, and hours expended in connection with the State Court Actions, benefitted the class in this case. *See* F.R.C.P. 23(h) 2003 Advisory Committee Notes; *Wininger v. SI Mgmt. L.P.,* 301 F.3d 1115, 1121 (9th Cir. 2002).

Accordingly, the Court awards $10,269,745.07 in reasonable attorneys' fees to Plaintiffs' counsel.

**C.     Costs**

Plaintiffs seek $1,631,511.98 in costs as follows:  (1) SWCKW: $1,079,353.37; (2) GBDH:  $231,937.31; (3) LAS-ELC:  $276,257.48; (4) DRLC: $43,918.94; and (5) Parks:  $44.88.

**(1)     <u>SWCKW</u>**

Plaintiffs seek a total of $1,079,353.37 in costs expended by SWCKW as follows:[8]

| **CATEGORY** | **AMOUNT REQUESTED** |
|---|---|
| Copying/Scanning (external) | $94,122.20 |
| Copying (internal) | $86,565.00 |
| Document Management | $393,837.20 |
| Experts | $324,429.95 |
| Filing/Service Fees | $23,702.74 |
| Legal Research | $34,395.54 |

---

[8] The amount of costs sought on behalf of SWCKW is based on the amounts set forth in the declarations of Eugenia Gueorguieva.

| Mediation | $58,929.50 |
| Messenger | $1,853.90 |
| Overnight Mail | $2,169.79 |
| Telephonic Court Appearance | $473.00 |
| Travel and Transportation | $52,953.09 |
| Depositions (video services) | $4,472.50 |
| Postage | $509.96 |
| System Access Fees | $939.00 |
| **TOTAL** | **$1,079,353.37** |

Copying (internal). SWCKW seeks $86,565.00 in internal copying costs. The evidence demonstrates SWCKW made 290,629 internal copies for this action and 11,222 in connection with the State Court Actions, at a cost of $0.20 per page, totaling $60,370.20. Accordingly, the Court awards $60,370.20 in costs expended by SWCKW for internal copying.

Travel and Transportation. SWCKW seeks $52,953.09 in travel and transportation costs. SWCKW submits evidence verifying $51,791.49 in travel and transportation costs were expended by SWCKW. SWCKW declares that it cannot locate receipts confirming $9 and $409.80 in travel expenses purportedly expended on December 15, 2012 and January 11, 2013, respectively, and therefore do not seek reimbursement for those costs. SWCKW fails to submit evidence that $742.80 was actually expended for airfare on March 16, 2012.[9] Accordingly, the Court decreases travel and transportation costs by $1,161.60, and awards

---

[9] SWCKW submits evidence that the $742.80 travel cost sought "is consistent with airfares charged by Southwest Airlines for other events that took place in Los Angeles during the above-captioned litigation," but fails to submit evidence of the actual cost for the March 16, 2012 airfare requested. *See Vectren Commc'ns Servs. v. City of Alameda*, 2014 WL 3612754, at *7 (N.D. Cal. July 22, 2014); *Butler v. Homeservices Lending LLC*, 2014 WL 5460447, at *9 (S.D. Cal. Oct. 27, 2014).

1   $51,791.49 for travel and transportation costs expended by SWCKW.

2   Other Categories.  The evidence submitted demonstrates that the amount of

3   the costs sought for the remaining categories were reasonably expended by

4   SWCKW.  Accordingly, the Court awards the following amounts for costs

5   reasonably expended by SWCKW:  (1) Copying/Scanning (external):  $94,122.20;

6   (2) Document Management:  $393,837.20; (3) Experts:  $324,429.95; (4)

7   Filing/Service Fees:  $23,702.74; (5) Legal Research:  $34,395.54; (6) Mediation:

8   $58,929.50; (7) Messenger:  $1,853.90; (8) Overnight Mail:  $2,169.79; (9)

9   Telephonic Court Appearance:  $473.00; (10) Depositions (video services):

10  $4,472.50; (11) Postage:  $509.96; and (12) System Access Fees:  $939.00.

11  The Court therefore awards $1,051,996.97 in costs reasonably expended by

12  SWCKW.[10]

13  **(2)    GBDH**

14  Plaintiffs seek $231,937.31 in costs expended by GBDH in this action as

15  follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| Court Reporters/Transcripts | $10,267.05 |
| Special masters/Mediators/Arbitrators | $7,816.12 |
| Copying Costs - In-house | $10,664.80 |
| Depositions | $3,100.00 |
| Experts | $157,804.65 |
| Overnight Mail | $180.06 |
| Copying and Scanning - outside agency | $1,023.12 |

[10] Plaintiffs seek costs expended by SWCKW in this action and in connection with the State Court Actions.  The Court finds, based on the evidence submitted, that costs which were reasonably expended by SWCKW in connection with the State Court Actions benefitted the class in this litigation.

| Filing/Service Fees | $7,360.90 |
| Class Notice: | $990.00 |
| Postage/USPS | $64.04 |
| Legal Research | $19,812.27 |
| Telephone/Conference Calls | $45.33 |
| Travel and Transportation | $10,362.35 |
| Travel – Lodging | $2,446.62 |
| **TOTAL** | **$231,937.31** |

Taxable Costs. Plaintiffs seek $18,083.17 in taxable costs expended by GBDH (i.e., $10,267.05 (court reporters/transcripts), and $7,816.12 (Special masters/Mediators/Arbitrators). Accordingly, the Court decreases GBDH's costs by $18,083.17.[11] *See* Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54; Local Rule 54.

Other Categories. The evidence submitted demonstrates that the amount of costs sought for the remaining categories were reasonably expended by GBDH in this action. Accordingly, the Court awards the following amounts for costs reasonably expended by GBDH in this action: (1) Copying Costs - In-house: $10,664.80; (2) Depositions: $3,100.00; (3) Expert Fees: $157,804.65; (4) Overnight Mail: $180.06; (5) Copying and Scanning - outside agency: $1,023.12; (6) Filing Service Fees: $7,360.90; (7) Class Notice: $990.00; (8) Postage USPS: $64.04; (9) Legal Research: $19,812.27; (10) Telephone/Conference Calls: $45.33; (11) Travel and Transportation: $10,362.35; and (12) Travel – Lodging: $2,446.62.

The Court therefore awards $213,854.14 in costs reasonably expended by GBDH.

---

[11] To the extent not already including in Plaintiff's pending application to the Clerk to tax costs (Dkt. No. 377), Plaintiffs are directed to apply for all taxable costs with the Clerk pursuant to Rule 54.

**(3)**   **LAS-ELC**

Plaintiffs seek $276,257.48 in costs expended by LAS-ELC in this action as follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| clerk's fees | $230.00 |
| depositions | $539.70 |
| reproducing exhibits to deposition | $9.99 |
| Special Master | $27,697.87 |
| copying (in house) | $6,721.40 |
| copying/scanning (outside) | $28,189.65 |
| document management and hosting | $16,290.04 |
| Experts | $167,325.98 |
| legal research | $245.10 |
| mediation | $21,462.98 |
| messenger | $134.29 |
| overnight mail | $69.37 |
| travel and transportation | $5,418.33 |
| long distance phone charges | $119.78 |
| photo reproduction | $20.92 |
| temporary staffing | $872.08 |
| investigator fees | $910.00 |
| **TOTAL** | **$276,257.48** |

<u>Taxable Costs</u>.  Plaintiffs seek $28,477.56 in taxable costs expended by LAS-ELC (i.e., $230 (clerk's fees), $539.70 (depositions), $9.99 (reproducing exhibits to deposition), and $27,697.87 (Special Master fees)).  Accordingly, the Court decreases LAS-ELC's costs by $28,477.56.  *See* Fed. R. Civ. P. 23(h); Fed.

14

R. Civ. P. 54; Local Rule 54.

<u>Long Distance Phone Charges</u>.  Plaintiffs originally requested $119.78 in long distance phone charges purportedly expended by LAS-ELC.  LAS-ELC, however, declares that it was unable to locate evidence supporting any of the long distance phone charges, and therefore will not be seeking reimbursement of those costs.  Accordingly, the Court does not award LAS-ELC any amount for long distance phone charges.

<u>Other Categories</u>.  The evidence submitted demonstrates that the amount of costs sought for the remaining categories were reasonably expended by LAS-ELC in this action.  Accordingly, the Court awards the following amounts for costs reasonably expended by LAS-ELC:  (1) copying (in house):  $6,721.40; (2) copying/scanning (outside):  $28,189.65; (3) document management and hosting:  $16,290.04; (4) expert fees:  $167,325.98; (5) legal research:  $245.10; (6) mediation fees:  $21,462.98; (7) messenger:  $134.29; (8) overnight mail:  $69.37; (9) travel and transportation:  $5,418.33; (10) photo reproduction charges:  $20.92; (11) temporary staffing:  $872.08; and (12) investigator fees:  $910.00.

The Court therefore awards $247,660.14 in costs reasonably expended by LAS-ELC.

**(4)** **DRLC**

Plaintiffs seek $40,908.94 in costs expended by DRLC as follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| Clerks' fees | $1,891.45 |
| Depositions | $10,135.95 |
| Interpreter's and Translator Fees | $2,067.50 |
| Fees for Service of Process | $1,028.00 |
| Reporter's Transcripts | $789.00 |

| | |
|---|---|
| Reproduction of Documents - Chambers Copies | $1,736.40 |
| Other Costs - Photographs | $6,075.00 |
| Copying and Scanning - outside agency | $4,050.09 |
| Copying Costs - In-house | $833.98 |
| Filing/Service Fees | $87.40 |
| Experts | $10,821.12 |
| Messenger | $99.00 |
| Overnight Mail | $261.13 |
| Travel and Transportation | $2,891.86 |
| Postage | $45.76 |
| System Access Fees | $580.30 |
| Translation of Documents | $145.00 |
| Official Court Reporter | $380.00 |
| **TOTAL** | **$43,918.94** |

Taxable Costs.  Plaintiffs seek $23,723.30 in taxable costs expended by DRLC (i.e., $1,891.45 (clerks fees), $10,135.95 (Depositions), $2,067.50 (Interpreter's and Translator Fees), $1,028.00 (Fees for Service of Process), $789.00 (Reporter's Transcripts), $1,736.40 (Reproduction of Documents - Chambers Copies), and $6,075.00 (Other Costs - Photographs)).  Accordingly, the Court decreases DRLC's costs by $23,723.30.  *See* Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54; Local Rule 54.

Other Categories.  The evidence submitted demonstrates that the entire amount of costs sought for the remaining categories were reasonably expended by DRLC in this action.  Accordingly, the Court awards the following amounts for costs reasonably expended by DRLC:  (1) Copying and Scanning - outside agency: $4,050.09; (2) Copying Costs - In-house: $833.98; (3) Filing/Service Fees:  $87.40; (4) Expert Fees: $10,821.12; (5) Messenger: $99.00; (6) Overnight

16

Mail: $261.13; (7) Travel and Transportation: $2,891.86; (8) Postage: $45.76; (9) System Access Fee: $580.30; (10) Translation of Documents: $145.00; and (11) Official Court Reporter: $380.00.[12]

The Court therefore awards $20,195.64 in costs reasonably expended by DRLC.

**(5)** __Parks__

Plaintiffs seek $44.88 in costs expended by Parks. The evidence submitted demonstrates the $44.88 in costs were reasonably expended and benefitted the class. The Court therefore awards $44.88 in costs reasonably expended Parks.

# IV.   CONCLUSION

Accordingly, the Court **GRANTS** the Motion, and awards $10,269,745.07 in attorneys' fees and $1,533,751.77 in costs to Plaintiffs.

**IT IS SO ORDERED.**

DATED:  August 25, 2016.

_____
Honorable Consuelo B. Marshall
United States District Judge

CC:FISCAL

---

[12] Plaintiffs seek costs expended by DRLC in this action and in connection with the State Court Actions. The Court finds, based on the evidence submitted, that costs which were reasonably expended by DRLC in connection with the State Court Actions benefitted the class in this litigation.

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

COMMUNITIES ACTIVELY
LIVING INDEPENDENT AND
FREE, a nonprofit corporation, and
AUDREY HARTHORN, an
individual, on behalf
of themselves and ALL OTHERS
SIMILARLY SITUATED

    Plaintiffs,

   vs.


CITY OF LOS ANGELES, a
public entity, and COUNTY OF
LOS ANGELES, a public entity,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 09-0287 CBM (RZx)

CLASS ACTION

ORDER GRANTING PLAINTIFFS'
APPLICATION FOR REASONABLE
ATTORNEYS' FEES AND COSTS

  Before the court is Plaintiffs' Application for Reasonable Attorneys' Fees and Costs. [Docket No. 234.] Plaintiffs have applied to the Court for an order approving attorneys' fees and reimbursement of litigation costs to Class Counsel in the amount of $1,225,000, and up to $75,000 in attorneys' fees and costs for

monitoring the Settlement Agreement ("Agreement"). Defendant County of Los Angeles does not oppose the motion, and these are the amounts contained in the proposed class settlement agreement between the Plaintiffs and the County. Having read the papers submitted and carefully considered the arguments and relevant legal authority, and good cause appearing, the Court GRANTS Plaintiffs' Motion for Reasonable Attorneys' Fees and Costs and finds and rules as follows:

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.     The Court finds that Plaintiffs have submitted sufficient evidence supporting their claim for reasonable attorneys' fees and costs, and hereby approves the settlement of attorneys' fees and costs in the amount of $1,225,000 for work performed on this matter, as stated in Section VII of the Agreement. The Court also approves the availability of fees and costs for monitoring the Agreement after Final Approval, in an amount up to $75,000, as stated in Section VI.G of the Agreement.

2.     The Court finds that Plaintiffs have provided sufficient evidence, including time records detailing the tasks performed on this matter and declarations from practitioners in the field, supporting the reasonableness of their 2012 requested hourly rates. The Court finds that the requested hourly rates correspond to the prevailing market rate in the relevant community, considering the experience, skill, and reputation of the attorneys in question.

3.     Class counsel stated that no other litigation in the country has sought to determine the nature and extent of a municipality's obligation to include persons with disabilities in its emergency preparedness and planning efforts. Therefore, counsel had to conduct considerable research, familiarize themselves with the fact intensive literature on the subject of emergency planning, and explore untested legal theories. The active litigation included extensive, voluminous discovery, numerous depositions, and thousands of pages of

documents.  The negotiations were thorough, involving many teleconferences, in-person meetings, and conferences and mediation sessions before two judges.  Additionally, after a joint request to stay the litigation, the Court approved a process where Plaintiffs and the Defendant County would coordinate to draft a "Persons with Disabilities and Access and Functional Needs Annex," ("Annex") for which the experts conferred and resolved many issues, and any disputes were referred to counsel.  Resolving the issues involved many settlement conferences on the phone and in person, and multiple proposals and drafts by both parties.  After the Annex was sent out for public comment in late 2011, the U.S. Department of Justice detailed its concerns, after which a second draft was developed and Defendant County of Los Angeles developed a work plan.  Negotiations continued for five months regarding the scope of the Annex and workplan.  Parties then attended two mediation sessions in February and July 2012 and were able to resolve all outstanding substantive issues.  After the July mediation session, parties continued to work together to finalize the Agreement and other matters, including attorneys' fees and costs.  The proposed settlement was approved by the Los Angeles County Board of Supervisors on October 15, 2012.

4.     The Court finds that Class Counsel was efficient in allocating work.  Counsel states that only four attorneys performed the majority of the work required, that discrete tasks were given to other attorneys as needed, and that a small group of attorneys litigated the entire case.  Counsel also states that Attorneys Wolinsky, Smith, and Gilbride from Disability Rights Advocates ("DRA"), and Attorney Parks from Disability Rights Legal Center ("DRLC"), did a majority of the work.

5.     In support of the hourly rates quoted by lead attorneys in this case, Attorney Wolinsky is a graduate of Yale Law School in 1961 and has been

practicing law and trying cases for over 50 years. He has been the lead and trial attorney in well over 150 class action and high-impact cases, and has tried and argued cases before the California and New York Federal Courts, the California and Hawaii Supreme Courts, and many other appellate courts. He is the Director of Litigation at DRA and is considered one of the foremost experts nationally on civil rights and disability law, and is requesting an hourly rate of $860. Attorney Parks is a 1999 graduate of University of California at Berkeley, Boalt Hall, and is nationally recognized as a leading disability rights attorney and has been co-director of litigation at DRA since April 2012. From 2005 to March 2012, she was at the DRLC, where she was a litigation attorney, and later the legal director from 2009 to 2012, and is requesting an hourly rate of $665. Attorney Smith is managing attorney at DRA, and graduated from U.C. Berkeley, Boalt Hall Law School in 2005. She received the 2013 California Lawyer Magazine Attorney of the Year Award in the area of Disability Law for her work on this litigation and the 2010 California Lawyer Attorney of the Year Award in the area of Disability Law for her work on the above referenced Caltrans case, and is requesting an hourly rate of $555. Attorney Gilbride is a 2007 graduate of Georgetown Law School and worked on this case as part of DRA. Attorney Gilbride served as a law clerk to Judge Ronald Gould on the U.S. Court of Appeals for the Ninth Circuit in Seattle. She conducted much of the written discovery and took and defended several depositions. She was also responsible for all expert discovery, and is knowledgeable in the requirements for emergency preparedness under the law, and is requesting an hourly rate of $430.

6. In support of the hourly rates quoted by other attorneys in this case, Attorney Uzeta is a 1992 graduate of University of California at Davis, King Hall School of Law, with a Certification in Public Interest Law. She has practiced exclusively in the area of civil rights law, in particular disability rights, since

1993.  From February 1995 to August 2008, she worked as an attorney at Disability Rights California ("DRC"), the largest disability rights organization in the nation, where she represented individuals and classes with disabilities in federal and state litigation.  From August 2008 to December 2010, she was employed as the Litigation Director of the Southern California Housing Rights Center, a Los Angeles based nonprofit whose mission is to combat housing discrimination, where she engaged mostly in disability discrimination cases, and is requesting an hourly rate of $700.  Attorney Paradis is the Executive Director and Co-Director of Litigation at DRA.  He graduated from Harvard Law School in 1985 and has extensive experience with disability rights litigation, and has received several awards for his work on precedent setting disability rights cases, including the California Lawyer Magazine Attorney of the Year Award in 2003 and 2011 and the Trial Lawyer of the Year Award from the San Francisco Trial Lawyers Association.  Mr. Paradis assisted with advising the litigation team on settlement strategy and potential experts, and is requesting an hourly rate of $800. Attorney Elsberry is a 1987 graduate of University of California, Hastings College of Law. He was a Managing Attorney at DRA from 2009 to 2012, and is currently a Senior Staff Attorney at DRLC. He assisted with certain tasks relating to class certification, and is requesting an hourly rate of $725.  Attorney Weed is a 2002 graduate of the University of Michigan Law School.  She was involved in the preliminary investigation and review of the voluminous public records, and is requesting an hourly rate of $600.  Attorney Biedermann is a 2007 graduate of Yale Law School and was an Arthur Liman Fellow at DRA from 2007 to 2009. She assisted with the review of many public records and drafting the complaint, and is requesting an hourly rate of $430.  Attorney Chuang is a 2007 graduate of University of Pennsylvania Law School and has been a Staff Attorney at DRA since 2011.  Previously, she was a Litigation Associate at Latham & Watkins LLP.

She primarily worked on finalizing the settlement agreement, providing notice to the class, and drafting the motions for preliminary and final approval, as well as the motion for reasonable attorneys' fees and costs, and is requesting an hourly rate of $430.  Attorney Janssen is currently a Staff Attorney at DRA and graduated from New York University School of Law in 2010.  She assisted with discrete tasks relating to the negotiation of the County's Work Plan and draft Annex, and is requesting an hourly rate of $330.  Attorneys Patkin, Lee, and Strugar worked on the case in their capacity as attorneys at DRLC.  Former DRLC staff attorney Patkin is a 2007 graduate of UCLA School of Law, and is requesting an hourly rate of $450.  Former DRLC staff attorney Strugar is a 2004 graduate of USC Gould School of Law, and is requesting an hourly rate of $525.  Former DRLC staff attorney Lee is a 2003 graduate of Loyola Law School, and is requesting an hourly rate of $550.  The Fee Experts cited by Attorneys indicate that the hourly rates requested by all of these attorneys is reasonable.

7.  The Court finds that the rate of $240 for DRA's paralegals and $250 for its summer associates is reasonable.  DRA's paralegals are college graduates that have worked under attorney supervision for over a year.  DRA's summer associates generally have two full years of law school experience before working at DRA for their second-year summer.  The Court further finds that the hourly rate of $230 for DRLC's law clerks and litigation assistants is reasonable.

8.  The Court hereby approves the following 2012 hourly rates and hours expended:

| DRA | Rate | Hours | Fees |
|---|---|---|---|
| Sid Wolinsky | $860.00 | 700.00 | $602,000.00 |
| Shawna Parks | $665.00 | 81.40 | $54,131.00 |
| Mary-Lee Smith | $555.00 | 139.50 | $77,422.50 |
| Karla Gilbride | $430.00 | 494.40 | $212,592.00 |

| DRA | Rate | Hours | Fees |
|---|---|---|---|
| Larry Paradis | $800.00 | 15.80 | $12,640.00 |
| Ron Elsberry | $725.00 | 18.30 | $13,267.50 |
| Katherine Weed | $600.00 | 20.50 | $12,300.00 |
| Stephanie Biedermann | $430.00 | 184.00 | $79,120.00 |
| Christine Chuang | $430.00 | 125.00 | $53,750.00 |
| Kara Janssen | $330.00 | 36.40 | $12,012.00 |
| Summer Associates | $250.00 | 26.70 | $6,675.00 |
| Paralegals | $240.00 | 260.90 | $62,616.00 |

| DRLC | Rate | Hours | Fees |
|---|---|---|---|
| Michelle Uzeta | $700.00 | 35.50 | $24,850.00 |
| Shawna Parks | $665.00 | 285.60 | $189,924.00 |
| Debra Patkin | $450.00 | 143.50 | $64,575.00 |
| Jennifer Lee | $550.00 | 16.00 | $8,800.00 |
| Matthew Strugar | $525.00 | 20.20 | $10,605.00 |
| Law Clerk | $230.00 | 122.90 | $28,267.00 |
| Steve Cueller (Litigation Assist.) | $230.00 | 4.70 | $1,081.00 |

9.    The Court finds that the hourly rates and hours expended are reasonable under established Ninth Circuit law. *See Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (citing the lodestar figure and the requirement to consider factors outlined in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir. 1975)).[1]

---

[1] The requested Attorneys' Fees and Costs stem from negotiations between Class Counsel and the County of Los Angeles, and are much lower than the fees calculated under the lodestar method. The calculated fees, without any multiplier, are $1,526,628.00 and the costs expended are $47,903.05, for a total of $1,574,531.05, which is $349,531.05 greater than the amount negotiated by the Settlement. Since this case involved injunctive and declaratory relief, the Fee award will not result in an "inequity" between Counsel and Class Members. *See In re HP Inkjet Printer Litig.*, 11-16097, --- F.3d ----, 2013 WL 1986396, *1, *5 (9th Cir. May 15, 2013) (reasoning that "coupon" settlements may create inequity where Class Counsel request fees and

10.    The Court further finds that Counsel has submitted sufficient evidence of the time and effort undertaken by Class Counsel in prosecuting and settling the claims, and that this time and effort was reasonable and necessary in light of the needs of the litigation.

In accordance with the terms of the Agreement, the County of Los Angeles shall pay attorneys' fees and reimbursement of litigation costs to Class Counsel in the amount of $1,225,000 within ninety (90) days of this Order (September 9, 2013) and up to $75,000 for monitoring the Agreement within six (6) years of this Order.

**IT IS SO ORDERED.**

DATED: June 10, 2013

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

_____

costs).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| CESSY LAUDERDALE, CORNELIO VERA, and BERTHA DAVIS, individually and on behalf of the class of similarly situated individuals, | ) ) ) ) ) | CASE NO.: CV 08-979 ABC (JWJx) ORDER RE: ATTORNEY FEES AND COSTS |
|---|---|---|

Plaintiffs,

v.

CITY OF LONG BEACH, a public entity, LONG BEACH POLICE DEPARTMENT, a public entity,

Defendants.

Plaintiffs Cessy Lauderdale, Cornelio Vera, and Bertha Davis, on their behalf and on behalf of similarly situated individuals, filed a motion on November 23, 2009, for reasonable attorney's fees and costs following the parties' settlement of this class action lawsuit. Defendants City of Long Beach and the Long Beach Police Department (the "City") opposed on December 14, 2009 and Plaintiffs replied on December 22, 2009. The Court found this matter appropriate for resolution without oral argument and vacated the January 11, 2010 hearing date. Fed. R. Civ. P. 78; Local Rule 7-15. Upon

consideration of the parties' papers and the case file, the Court
rules as follows.

**I.  BACKGROUND**

On February 13, 2008, Plaintiffs filed this class action lawsuit
against the City, alleging that the City had violated the rights of
people who are deaf or hard of hearing who have interacted, currently
interact, or will interact with the Long Beach Police Department
("LBPD"), by failing to take appropriate steps to effectively
communicate with these individuals.  The Complaint sought declaratory
and injunctive relief compelling the City to ensure effective
communication with individuals who are deaf or hard of hearing through
the provision of auxiliary aids and services and proper training of
LBPD officers on how to effectively communicate during official
interactions.

The Complaint and the motion for preliminary approval of the
class action settlement set forth the underlying facts in this matter,
and the Court need not summarize them here.

The parties ultimately entered a Settlement Agreement resolving
Plaintiffs' claims under Title II of the Americans with Disabilities
Act ("ADA"), Section 504 of the Rehabilitation Act, the Unruh Civil
Rights Act (Cal. Civ. Code §§ 51 et seq.), and the Blind and Other
Physically Disabled Persons Act (Cal. Civ. Code §§ 54 et seq.).  The
Agreement provides that, among other relief: (1) the LBPD will take
appropriate steps to ensure effective communication with the class
through the provision of auxiliary aids and services; (2) the LBPD
will implement and follow a policy entitled "Communication with People
who are Deaf or Hard of Hearing"; (3) the LBPD will make available
Video Relay Service/Video Interpreting equipment at the main LBPD

Case 2:16-cv-05117-JHL-GJS Document 88-7 Filed 03/16/17 Page 132 of 445 Page ID
#:1545
Case 2:08-cv-00379-ABC-JW Document 67 Filed 07/17/2010 Page 3 of 38

station within one year after final approval of the agreement for a
minimum one-year period; and (4) the LBPD will train personnel on the
Settlement Agreement and policy.  In the Agreement, the City conceded
that Plaintiffs were prevailing parties for the purpose of attorney's
fees.  The parties agreed that Plaintiffs would apply to the Court for
a determination of the amount of fees.

Although the parties ultimately reached a settlement, Plaintiffs
portray the negotiations as unnecessarily drawn out by the City, while
the City claims the negotiations were protracted by Plaintiffs,
especially because the City knew that prolonging the matter could
expose it to more in fees.  In reality, the negotiations fell
somewhere in the middle.

Before Plaintiffs filed suit, they sent a tort claims letter to
the City in early 2007, which the City rejected.  (Parks Decl. ¶ 20.)
Plaintiffs sent another detailed letter to the City in January 2008,
which was again rejected by the City.  (Id. ¶ 20, Exs. H, I.)
Plaintiffs then filed suit in February 2008.

The Court suggested settlement of the case at a June 16, 2008,
conference with the parties and the first step to that settlement was
to negotiate the policy that the City would eventually adopt.  The
City began the process with the first of three attorneys, Principle
Deputy City Attorney Belinda Mayes.  (Parks Decl. ¶ 21; Fudge Decl. ¶
4.)  But Ms. Mayes left the City Attorney's Office in October 2008 and
this matter was reassigned to Principal Deputy City Attorney Monte
Machit, who met with Plaintiffs' counsel on December 15, 2008.  Machit
informed Plaintiffs' counsel that the matter would be transferred
again to Deputy City Attorney Randall C. Fudge, who worked on the
matter from that time to the present.  (Parks Decl. ¶ 22; Fudge Decl.

1    ¶ 8.)  Plaintiffs claim that, during these transitional periods,

2    progress on settlement slowed.

3         Nevertheless, progress was made on the policy by January 2009

4    (which the LBPD began implementing), so the parties turned their

5    attention to the Settlement Agreement itself, setting up a series of

6    four meetings at the City Attorney's office in Long Beach.  (Parks

7    Decl. ¶ 23.)  The preliminary drafts of the agreement exceeded twenty

8    pages and the City objected to several terms, as did Plaintiffs, so "a

9    significant amount of time was expended in re-drafting portions of the

10   Settlement Agreement."  (Fudge Decl. ¶ 8; Parks Decl. ¶ 24, Ex. L

11   (letter from Attorney Fudge noting that the negotiations were "a

12   laborious process involving multiple revisions of a 20-some page

13   agreement.").  Nevertheless, the parties eventually agreed on most of

14   the issues.  (Fudge Decl. ¶ 9.)  The remaining issues were submitted

15   to a five-hour mediation on June 4, 2009, and an agreement on

16   injunctive and declaratory relief was reached in principle and the

17   amount of damages settled on.  (Parks Decl. ¶ 25.)  From October 2008

18   through July 2009, the parties exchanged at least ten drafts of the

19   proposed Settlement Agreement.  (Parks Decl. ¶ 27.)

20        But a final agreement was not immediately forthcoming.  Each side

21   claims that the other sought to change, amend, or renegotiate some of

22   the terms agreed to after the mediation, including aspects of the

23   policy the LBPD had already implemented.  (Compare Parks Decl. ¶ 26

24   ("Although Plaintiffs' counsel believed they had an agreement in

25   principle on the few remaining issues regarding injunctive and

26   declaratory relief at the parties' mediation, Defendants' counsel

27   sought to renegotiate a number of issues that were previously

28   negotiated and agreed upon by the parties.") with Fudge Decl. ¶ 10

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 03/16/17 Page 134 of 445 Page ID
#:1547
Case 2:08-cv-00779-ABC-JWJ Document 67 Filed 07/17/2010 Page 5 of 39

("Subsequently, in or about July 2009, Plaintiffs sought to amend the Policy by adding terms to the Policy contained in the Settlement Agreement.").) After much negotiation, the parties finally agreed that the City would issue a supplemental Training Bulletin to LBPD personnel. (Fudge Decl. ¶ 11.)

During the course of negotiations up to February 2009, the parties did not engage in discovery, other than a public records request by Plaintiffs before filing the Complaint. (Parks Decl. ¶ 28.) With discovery cut-off and class certification deadlines looming and no settlement reached, however, Plaintiffs moved forward with some discovery, which they hoped would reveal the extent of the LBPD's policies, procedures, and training, and, as a result, nudge the case closer to settlement. (Parks Decl. ¶ 29.) They served on the LBPD three sets of requests for production, two sets of requests for admissions and interrogatories, and served on the City two sets of requests for production, requests for admissions and interrogatories, and Plaintiffs deposed representatives from the LBPD and the City. (Parks Decl. ¶ 29.) The parties also exchanged correspondence in setting the deposition dates, which were moved several times. (Parks Decl. ¶ 30.) Ultimately, because deadlines were still approaching, Plaintiffs drafted a class certification brief and supporting declarations, although those documents were never filed with the Court. (Parks Decl. ¶ 31.)

Having executed the Settlement Agreement and presented it to the Court for approval, Plaintiffs now seek attorney's fees and costs for the work performed. Plaintiffs claim reasonable fees in the amount of $429,282.50 as calculated under the lodestar method, multiplied by 1.5 to reflect the inherent risk in the case and the results achieved, for

a total of $643,923.75.  They also seek $10,378.95 in costs and
$51,024.50 for the hours expended on the fees motion.  The City, on
the other hand, claims that Plaintiffs are entitled to no more than
$167,340 in attorney's fees and $7,439.79 in costs, but does not
dispute that Plaintiffs are entitled to $51,024.50 for the fees
motions.

**II.  DISCUSSION**

Plaintiffs' counsel, the Disability Rights Legal Center (the
"DRLC") and the private law firm of Munger, Tolles & Olsen LLP
("MTO"), seek fees and costs under several statutes as the prevailing
parties: the ADA, 42 U.S.C. § 12205; the Rehabilitation Act, 29 U.S.C.
§ 794a(b); the California Disabled Persons Act, Cal. Civ. Code § 55;
and Cal. Civ. Code § 1021.5.  The lodestar fees they seek (not
including fees for the fees motion and costs) are as follows:

//

//

//

//

//

//

//

//

//

//

//

//

//

//

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 03/16/17 Page 136 of 445 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 07/17/2010 Page 7 of 89
#:1549

| Attorney | Year of Graduation | Rate | Hours | Amount |
|---|---|---|---|---|
| **DRLC** | | | | |
| Shawna L. Parks | 1999 | $525 | 99.00 | $51,975.00 |
| Sage Reeves | 2001 | $475 | 263.40 | $125,115.00 |
| Tiffany Green | 2005 | $375 | 225.40 | $84,525.00 |
| Matthew Strugar | 2004 | $400 | 9.60 | $3,840.00 |
| Law Clerks | | $165 | 81.80 | $13,497.00 |
| **Subtotal DRLC** | | | 679.20 | $278,952.00 |
| **MTO** | | | | |
| Kristina Wilson | 2006 | $350 | 263.60 | $92,260.00 |
| Bethany Woodard | 2005 | $395 | 118.70 | $46,886.50 |
| Robert Dell Angelo | 1992 | $550 | 9.90 | $5,445.00 |
| Law Clerks/Support Staff | | $65 to $220 | 30.60 | $5,739.00 |
| **Subtotal MTO** | | | 422.80 | $150,330.50 |
| **Total Lodestar** | | | 1102.00 | $429,282.50 |
| **with 1.5 Multiplier** | | | | $643,923.75 |

Generally, a prevailing party "'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Barrios v. Cal. Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir. 2002) (quoting and applying standards from Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S. Ct. 1933, 1937, 76 L. Ed. 2d 40 (1983) to ADA claim); see also Armstrong v. Davis, 318 F.3d 965, 970-71 (9th Cir. 2003) (applying standard to ADA and Rehabilitation Act claims); Molski v. Arciero Wine Group, 164 Cal. App. 4th 786, 790, 79 Cal. Rptr. 3d 574, 577-78 (Ct. App. 2008) (interpreting Cal. Civ.

Case 2:16-cv-05117-JLS-JPR Document 88-7 Filed 03/16/17 Page 137 of 445 Page ID
#:1550
Case 2:08-cv-00575-ABC-JWJ Document 67 Filed 07/17/2010 Page 8 of 39

Code § 55). The City agreed in the Settlement Agreement that
Plaintiffs were "prevailing parties" here, which is consistent with
controlling authority. See Barrios, 277 F.3d at 1134 ("Under
applicable Ninth Circuit law, a plaintiff 'prevails' when he or she
enters into a legally enforceable settlement agreement against the
defendant[.]"); see also Estrada v. FedEx Ground Package Sys., Inc.,
154 Cal. App. 4th 1, 16–17, 64 Cal. Rptr. 3d 327, 340–41 (Ct. App.
2007) (finding that disability class action obtaining awards for 209
drivers satisfied the "significant benefit," "public interest," and
"large class of persons" requirements of section 1021.5).

Once a party is considered "prevailing," the Court must determine
the reasonable amount of fees by calculating the "lodestar," which is
the number of hours reasonably spent multiplied by a reasonable hourly
rate. Hensley, 461 U.S. at 433, 103 S. Ct. at 1939; Moreno v. City of
Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008); Camacho v. Bridgeport
Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008). The lodestar amount is
also the touchstone for reasonable fees under California law. See
Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553, 579, 21 Cal. Rptr.
3d 331, 157 (2004). The lodestar is presumed to provide reasonable
fees, but "the district court may, if circumstances warrant, adjust
the lodestar amount to account for other factors which are not
subsumed within it." Camacho, 523 F.3d at 978 (quoting Ferland v.
Conrad Credit Corp., 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)). To
make adjustments following calculation of the lodestar, the Court
considers the following factors:

> (1) the time and labor required, (2) the novelty
> and difficulty of the questions involved, (3) the
> skill requisite to perform the legal service
> properly, (4) the preclusion of other employment
> by the attorney due to acceptance of the case, (5)

Case 2:16-cv-05117-JHL-GJS  JDocument 88-7  Filed 03/16/17  Page 138 of 445  Page ID
Case 2:08-cv-00375-ABC-JW    Document 67  Filed 07/17/2010  Page 9 of 88
#:1551

```
              the customary fee, (6) whether the fee is fixed or
              contingent, (7) time limitations imposed by the
              client or the circumstances, (8) the amount
              involved and the results obtained, (9) the
              experience, reputation, and ability of the
              attorneys, (10) the "undesirability" of the case,
              (11) the nature and length of the professional
              relationship with the client, and (12) awards in
              similar cases.
```

Morales v. City of San Rafael, 96 F.3d 359, 363–64 & n.8 (9th Cir.

1996) (quoting Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th

Cir. 1975)), amended by 108 F.3d 981, 981 (9th Cir. 1997).  The Court

must explain how it reached the ultimate amount of fees awarded,

although that explanation can vary somewhat in its level of detail

depending on the magnitude of the variation from the amount requested

and the amount awarded.  See Moreno, 534 F.3d at 1111 (noting that

"the district court can impose a small reduction, no greater than 10

percent – a 'haircut' – based on its exercise of discretion and

without a more specific explanation.").

**A.  Lodestar Amount**

Before applying any multiplier requested by Plaintiffs (which the

Court will discuss below), Plaintiffs claim a lodestar of $429,282.50.

(See Parks Reply Decl., Ex. A.)

**1.  Reasonable Hourly Rates**

Reasonable hourly rates are based upon the "prevailing market

rates in the relevant community, regardless of whether plaintiff is

represented by private or nonprofit counsel."  Blum v. Stenson, 465

U.S. 886, 895, 104 S. Ct. 1541, 1547, 79 L. Ed. 2d 891 (1984).  The

relevant community is the "forum in which the district court sits."

Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997).  And the

prevailing rate is the "'rate prevailing in the community for similar

work performed by attorneys of comparable skill, experience, and

reputation.'" Id. at 502 (citation omitted). "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990).

Plaintiffs seek fees based upon the following prevailing rates in this District:

- $375/hour for Tiffany Green of DRLC, a 2005 graduate of University of California, Los Angeles School of Law;

- $475/hour for Sage Reeves of DRLC, a 2001 graduate of University of California, Davis School of Law;

- $525/hour for Shawna L. Parks of DRLC, a 1999 graduate of Boalt Hall School of Law at the University of California, Berkeley;

- $400/hour for Matthew D. Strugar of DRLC, a 2004 graduate of University of Southern California School of Law;

- $395/hour for Bethany Woodard of MTO, a 2005 graduate of University of Southern California School of Law;

- $350/hour for Kristina Wilson of MTO, a 2006 graduate of Northwestern University School of Law;

- $550/hour for Robert Dell Angelo, a partner of MTO and a 1992 graduate of University of California, Los Angeles School of Law; and

- $165/hour and $220/hour for law clerks at DRLC and MTO, respectively.

Plaintiffs have presented ample evidence that the rates they seek are reasonable in the Central District. Laurence W. Paradis, an experienced civil rights litigator and the Executive Director and Co-Director of Litigation of Disability Rights Advocates in Berkeley, California, testified that he is familiar with the DRLC and its attorneys and opined that the rates sought are consistent with market rates for attorneys with similar experience in the Southern California

market, and are consistent with the rates charged by his organization. (Paradis Decl. ¶¶ 6-12.)  Barrett S. Litt, another experienced civil rights litigator, also testified that the rates are in line with the Southern California market, his own experience, and fee awards in similar cases.  (Litt Decl. ¶¶ 26-31.)  Three other experienced civil rights litigators also submitted declarations all attesting that the rates Plaintiffs charge are consistent with market rates in Southern California.  (See Stormer Decl. ¶¶ 8-13; Mann Decl. ¶¶ 15-19; Harris Decl. ¶¶ 12-16.)

Indeed, two large law firms in the Los Angeles area – O'Melveny & Myers and Gibson, Dunn & Crutcher – charge similar rates for attorneys with equivalent experience.  In 2008, O'Melveny & Myers charged $450 per hour for a 2005 graduate (as compared to the $395 per hour for MTO's Bethany Woodard, also a 2005 graduate) and charged $675 per hour for a 1994 partner (as compared to $550 per hour for MTO partner Robert Dell Angelo, a 1992 graduate).  (Litt Decl. ¶ 21.)  In a case in which Gibson, Dunn & Crutcher partnered with the Los Angeles public interest law firm of Public Counsel, that firm charged $525 per hour for a 2004 graduate and $495 per hour for 2005 graduates.  (Litt Decl. ¶ 23.)  Finally, Mr. Paradis testified that his organization charges $375 per hour for its 2005 graduates and $420 per hour for its 2004 graduates.  (Paradis Decl., Ex. A.)[1]

Once the prevailing party provides evidence of the prevailing

---

[1]Although Mr. Paradis's organization is located in San Francisco, he opined that rates there and in Southern California are similar. The City offered no contradictory evidence.  See Bouman v. Block, 940 F.2d 1211, 1236 (9th Cir. 1991) (accepting testimony of litigator and expert on attorney's fees that market rates in San Francisco and California are similar).

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 141 of 445 Page ID
#:1554
Case 2:08-cv-00974-ABC-JWJ Document 67 Filed 04/11/2010 Page 12 of 36

market rates, "'[t]he party opposing the fee application has the

burden of rebuttal that requires submission of evidence to the

district court challenging the accuracy and reasonableness of the . .

. facts asserted by the prevailing party in the submitted

affidavits.'" <u>Camacho</u>, 523 F.3d at 980 (citation omitted; ellipsis in

original). To carry this burden, the City offers the testimony of

Andre Jardini, a legal auditor who provided an audit report on

Plaintiffs' fee request, to show that Plaintiffs' counsel's rates are

inflated.[2] He explained:

> Based on an Incisive Legal Intelligence
> publication entitled "The Survey of Law Firm
> Economics 2009 Edition", the average hourly
> billing rate for an attorney with 8 to 10 years of
> experience is $272. The lower quartile is $212
> and the upper quartile $325. The average hourly
> rate for attorneys with five years experience like
> Matthew D. Strugar is $231 an hour and attorneys
> with two to three years experience like Tiffany
> Green average $186 hourly rate.

(Jardini Decl. ¶ 35.) The Court does not find Mr. Jardini's position

persuasive. He does not include copies of the survey he cites and he

_____

[2]Plaintiffs filed objections to the report of Andre E. Jardini in
support of the City's opposition to the motion for attorney's fees.
Plaintiffs claim he is not qualified as an "expert" under Federal Rule
of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509
U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Generally, under
Rule 702, the Court acts as a gatekeeper before expert evidence goes
to a jury, but "[t]here is less need for the gatekeeper to keep the
gate when the gatekeeper is keeping the gate only for himself."
<u>United States v. Brown</u>, 415 F.3d 1257, 1269 (11th Cir. 2005). "Thus,
where the factfinder and the gatekeeper are the same, the court does
not err in admitting the evidence subject to the ability later to
exclude it or disregard it if it turns out not to meet the standard of
reliability established by Rule 702." <u>In re Salem</u>, 465 F.3d 767, 777
(7th Cir. 2006). Plaintiffs mostly disagree with the substance of Mr.
Jardini's conclusions, which the Court addresses <u>infra</u> as they are
relevant to the Court's rulings. To the extent that any part of his
testimony does not meet the standard of Rule 702, the Court has not
considered it. The Court overrules Plaintiffs' other objections.

Case 2:16-cv-05147-TJH-GJS Document 88-7 Filed 08/16/17 Page 142 of 445 Page ID
#:1555
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 04/11/2010 Page 13 of 36

1  does not explain the methodology the authors of the survey might have

2  used to arrive at the "average" billing rate.  The survey could very

3  well have included rates that encompassed all types of lawyers from

4  solo practitioners to partners at the largest law firms and could have

5  covered the entire country.  That, of course, runs contrary to the

6  requirement that reasonable rates be set at the "'rate prevailing in

7  the community for similar work performed by attorneys of comparable

8  skill, experience, and reputation.'"  See Barjon, 132 F.3d at 500,

9  502.

10     Mr. Jardini proposes a "blended rate" of $300 per hour, but again

11  he does not explain how he reached this blended rate, which does not

12  even seem to correlate with the survey he cited.  (Jardini Decl. ¶

13  36.)  Nor does he cite any legal authority for using a blended hourly

14  rate, which may not reflect a reasonable rate.  Cf. S.E.C. v. Goren,

15  272 F. Supp. 2d 202, 208 (E.D.N.Y. 2003) (rejecting use of blended

16  hourly rate because it "risks under- and over-compensating [attorneys]

17  for their efforts.").  The Court finds this evidence insufficient to

18  rebut Plaintiffs' proposed rates and concludes that those rates are

19  reasonable.

20          2.  Reasonable Hours Expended

21     Plaintiffs' counsel spent a total of 1,102 hours litigating this

22  case (not including hours spent on the fees motion), which Plaintiffs

23  claim is reasonable.  (Parks Reply Decl., Ex. A.)[3]  Plaintiffs'

24  counsel arrived at that number after making discrete deductions from

25  their hours equal to twenty percent.  (Parks Decl. ¶ 33, Ex. A.)

26

27       [3]This number reflects Plaintiffs' subtraction of 4.2 hours from
   their initial total (3.7 from the hours spent by Tiffany Green and .5
   hours spent by Sage Reeves) based on conceded billing errors.  (Parks
28  Reply Decl. ¶ 5.)

Further, eighty percent of the hours expended were spent by attorneys at the associate level (and thus had lower billing rates) and that number increases to ninety percent once support staff and law clerks are included. (Parks Decl. ¶ 32, Ex. A.)

### a. Reduction for MTO's Involvement

First, the City argues that all the work done by the MTO attorneys was duplicative and unnecessary, so the 446.70 hours billed by the MTO attorneys should be excluded entirely from the reasonable hours spent on the litigation. (Jardini Decl. ¶¶ 26–32, 49.) Generally, billed time that includes unnecessary duplication of effort should be excluded from the lodestar. See Herrington v. County of Sonoma, 883 F.2d 739, 747 (9th Cir. 1989). Indeed, "courts ought to examine with skepticism claims that several lawyers were needed to perform a task, and should deny compensation for such needless duplication as when three lawyers appear for a hearing when one would do." Democratic Party of Wash. State v. Reed, 388 F.3d 1281, 1286 (9th Cir. 2004) (internal citations omitted). Nevertheless, "[c]ommon experience indicates that lawyers often hire other lawyers to help them with specific issues in the case." Bouman, 940 F.2d at 1236. Of course, there is some degree of duplication that is necessary in any case, so "the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." Moreno, 534 F.3d at 1112.

Here, MTO's participation was not unnecessarily duplicative. MTO brought its highly regarded civil litigation practice to the case, relying on its years of experience litigating complex cases to help bring the case to a favorable settlement. Likewise, the DRLC is

14

nationally recognized as an expert in the field of disability law and undoubtedly assisted MTO attorneys on understanding the substantive aspects of disability law, which may have reduced, not increased, the number of hours MTO attorneys would have otherwise had to spend to research and understand disability law. As one DRLC attorney explained, Plaintiffs' counsel employed a "team approach at settlement meetings, leveraging the DRLC's expertise in the subject matter with the litigation skills and resources brought to bear by MTO." (Parks Reply Decl. ¶ 10.)

Mr. Jardini opines that "MTO has used this matter as a training ground for its younger associates to gain experience while providing pro bono work" (Jardini Decl. ¶ 26), but he points to nothing to suggest that the attorneys from MTO lacked competence to participate in the case or that the DRLC attorneys engaged in any sort of "training," apart from the normal supervision one would expect from experts in the substantive law at issue. In fact, were the City right, Plaintiffs could never have staffed the case appropriately no matter what they did: on the one hand, the City complains that higher-billing attorneys spent too much time on the case (Jardini Decl. ¶ 36 (claiming case was staffed in a "top heavy fashion")), but on the other hand the City criticizes the use of lower-billing MTO attorneys for alleged "training" purposes (Jardini Decl. ¶ 26). Whatever the City believes should have been the proper staffing of the case, "the district court may not set the fee based on speculation as to how other firms would have staffed the case." Moreno, 534 F.3d at 1114. Thus, the Court finds that a total elimination of the 446.70 hours spent by MTO attorneys on the case is unwarranted.

Although MTO's presence was not unnecessarily duplicative as a

general matter, Mr. Jardini points to three specific instances where utilizing multiple attorneys from both firms may have led to some duplicative work.[4]  First, Mr. Jardini indicates that unidentified entries from January 23, 2008 to March 14, 2008 of MTO's billing records[5] indicate that Kristina Wilson spent 16.45 hours drafting the complaint.  (Jardini Decl. ¶ 28.)  Similarly, unidentified entries from February 4, 2008 to February 13, 2008, indicate that several DRLC attorneys also spent approximately 13.3 hours reviewing and revising the complaint.  (<u>Id.</u>)  The Court does find the 29.75 hours spent on the complaint were likely duplicative.  The DRLC has brought two similar deaf and hard-of-hearing class action cases before this court (Parks Decl. ¶ 9), so they probably could have used at least some part of those prior complaints to save time drafting the complaint in this case.  Yet, a relatively junior MTO attorney (Kristina Wilson, a 2006 graduate) spent 12.4 hours from January 23, 2008 to February 4, 2008, before DRLC attorneys seem to have reviewed any part of the draft complaint.  Then another relatively junior DRLC attorney (Tiffany Green, a 2005 graduate) spent two hours reviewing and revising the complaint before she sent it to a more experienced DRLC attorney, Shawna Parks.  And even after that, counsel spent an additional 11.3 hours reviewing and revising the complaint.

_____

[4]Mr. Jardini includes these three specific instances in his declaration.  He also created a chart of billing entries that he suggests demonstrates other possible duplicate billing entries.  He has not set out the information in a useful way, however, because the Court cannot tell from his list whether the two firms actually performed duplicate work.

[5]A further problem with Mr. Jardini's chart is that he does not identify the discrete billing entries he adds together to reach his cumulative totals.  Neither Plaintiffs nor the Court has any way to verify the accuracy of each cumulative entry without that information.

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 146 of 445 Page ID
#:1559
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 04/11/2010 Page 17 of 38

As noted above, the DRLC brings its expertise in disability law
to this case – and specifically its experience litigating deaf and
hard-of-hearing class actions against municipalities – yet it
apparently did not immediately lend that support to the complaint-
drafting process, which likely prolonged the entire drafting process.
Thus, the Court finds that the 12.4 hours spent by junior MTO
associate Kristina Wilson before the DRLC attorneys reviewed the draft
complaint was duplicative and unnecessary, as was the two hours DRLC
junior attorney Tiffany Green spent before sending it to a more senior
DRLC attorney. Although the Court is not entirely convinced that all
of the remaining 15.35 hours spent by the two firms were still
necessary, the City provides no basis to reduce that number further
and the Court will not do so.

Second, Mr. Jardini identifies instances where multiple attorneys
attended court appearances and depositions, which the City claims were
overstaffed. As a general matter, "in an important class action
litigation such as this, the participation of more than one attorney
does not constitute an unnecessary duplication of effort." Probe v.
State Teacher's Retirement Sys., 780 F.2d 776, 785 (9th Cir. 1986).
Indeed, having multiple attorneys attend depositions, meetings and
settlement conferences allowed counsel to contribute creative
solutions, reduced the need for inter-office communications after
meetings, and ameliorated disagreements over what actually went on at
meetings. (Parks Reply Decl. ¶ 12.)

However, one DRLC attorney billed 5.9 hours and two MTO attorneys
billed a total of eight hours for attending a deposition on April 27,
2009. (Jardini Decl. ¶ 29.) First, the Court has reviewed the actual
billing records and they do not appear to correlate to Mr. Jardini's

Case 2:16-cv-05147-TJH-GJS   Document 88-7   Filed 08/16/17   Page 147 of 445   Page ID
#:1560
Case 2:08-cv-00974-ABC-JWJ   Document 67   Filed 04/11/2010   Page 18 of 36

entries.  The entry for the DRLC attorney on that date reflects 6.10

hours billed for attending the deposition, not 5.9, and the entries

for the MTO attorneys on that date reflect 6.5 and 3.7 hours billed,

for a total of 10.2 hours, not eight hours.[6]  Based on the numbers

contained in the actual billing records, the Court finds duplicative

the 3.7 hours spent by MTO associate Kristina Wilson, when an MTO

associate with similar seniority (Bethany Woodard, a 2005 graduate)

billed 6.5 hours for the deposition and DRLC attorney Sage Reeves (a

2001 graduate) billed 6.1 hours for the deposition.  Having one senior

attorney and one more junior attorney attend the deposition was

plenty; the third junior attorney was excessive.

The Court, however, does not find that having two DRLC attorneys

and one MTO attorney attend the mediation in this case was

duplicative.  Both Sage Reeves (again, a 2001 graduate) and Shawna

Parks (a 2000 graduate) from DRLC attended the June 4, 2009,

mediation, billing a total of 12.6 hours for the time preparing and

attending.  Kristina Wilson also billed 8.8 hours for preparing for

and attending the mediation.[7]  First, participation of more than one

attorney at a mediation does not automatically constitute an

unnecessary duplication of effort.  See Kim v. Fujikawa, 871 F.2d

1427, 1435 n.9 (9th Cir. 1989).  Second, the mediation was far more

important in this case than the deposition discussed above.  Unlike

the deposition, the mediation sat at the very crossroads of the

---

[6]The Court also notes that the MTO attorneys spent a total of
17.7 hours preparing for and attending the deposition, but subtracted
7.5 hours from that to arrive at 10.2 hours actually billed.

[7]Again, Mr. Jardini's calculation of eight hours for Ms. Wilson's
hours billed was inaccurate based on the billing records.

Case 2:16-cv-05172-TJH-GJS  Document 88-7  Filed 08/16/17  Page 148 of 445  Page ID
#:1561
Case 2:08-cv-00970-ABC-JWJ  Document 67  Filed 04/11/2010  Page 19 of 36

resolution of this case.  The parties had agreed to some terms of a

settlement, but needed a neutral to finalize it.  The Court hesitates

to second-guess the choice of two senior DRLC attorneys to attend with

the assistance of a junior MTO associate, since an agreement may not

have been reached if both senior DRLC counsel had not brought to bear

their expertise and experience.  The Court will not subtract hours on

this basis.

b.  <u>Specific Reductions for DRLC Hours</u>

The City also seeks to reduce DRLC's hours based on improper

billing for overhead, conducting excessive interoffice communication,

and for committing errors within its bills.

Mr. Jardini identifies 27.05 hours he claims were improperly

spent on "overhead," including "calendaring, scheduling and confirming

meetings, issues regarding retainer agreements, and electronic

filing."  (Jardini Decl. ¶ 37.)  In some circumstances, "attorneys'

fees for administrative and secretarial tasks . . should be considered

general overhead to run a law office," and already compensated in the

reasonable hourly fee, <u>Eklund v. City of Seattle</u>, No. C06-1815Z, 2009

WL 2019119, at *4 (W.D. Wash. July 2, 2009) (citing <u>Keith v. Volpe</u>,

644 F. Supp. 1312, 1316 (C.D. Cal. 1986)), but only if that is the

billing custom in the relevant market, <u>see</u> <u>Trustees of Constr. Indus.</u>

<u>& Laborers Health & Welf. Trust v. Redland Ins. Co.</u>, 460 F.3d 1253,

1257 (9th Cir. 2006).  The City has provided no evidence that this is

the practice in the Central District.  Thus, the Court cannot subtract

these hours on that basis.

It is clear, however, that "[i]t is simply not reasonable for a

lawyer to bill, at her regular hourly rate, for tasks that a non-

attorney employed by her could perform at a much lower cost." <u>Davis</u>

19

<i>v. City & County of San Francisco</i>, 976 F.2d 1536, 1543 (9th Cir. 1992), <i>vacated in part on other ground by</i> 984 F.2d 345, 345 (9th Cir. 1993); <i>see also</i> <u>Redlands Ins. Co.</u>, 460 F.3d at 1257. The Court has reviewed the entries for the hours claimed to be "overhead" or administrative and finds that most of them, while not models of billing clarity, arguably require the skills of an attorney to be performed. For example, on June 14, 2007, Tiffany Green spent three-tenths of an hour responding to an email from a law clerk "re questions about Long Beach Case . . . and Section 1983 COA," which certainly entails attorney-level work. Similarly, on December 18, 2008, Sage Reeves billed one-tenth of an hour in a telephone conference with the City's counsel Randall Fudge "re scheduling," which also could require an attorney's experience, especially if the scheduling issue was disputed. On September 21, 2009, Sage Reeves billed two-tenths of an hour for "Legal research re filing with Court re need for settlement conference/extension," which again, is obviously attorney-level work. And several entries reflect work performed by Tiffany Green on retainer agreements, which also entails attorney skill.

Not every entry identified needed an attorney to perform it, however. For example, on July 2, 2007, Tiffany Green spent one-tenth of an hour emailing "Cessy Lauderdale – re videophone," which the Court suspects was intended to set up videoconferencing and required no attorney-level skill. On January 25, 2008, Tiffany Green billed .05 of an hour with the entry "Gave to SAC to be mailed off with a check for 20.00," which certainly could have been done by a non-attorney. Similarly, several times Ms. Green simply forwarded electronic notices sent by the Clerk's office when a document is

1    electronically docketed, yet she charged one-tenth of an hour each

2    time.  On June 3, 2009, Sage Reeves spent .2 of an hour drafting an

3    "email to clients re mediation location and directions," which appears

4    to entail nothing but logistics.  And in September and October of

5    2009, an unidentified attorney by the initials of "M.D." (who the

6    court presumes is Matthew D. Strugar, who bills at $400 per hour)

7    spent half an hour "preparing" to mail declarations and cover letters

8    to the named Plaintiffs, spent .6 of an hour compiling and assembling

9    exhibits for the declaration of Barrett Litt, and spent .9 of an hour

10   compiling documents for the fee motion and settlement approval, none

11   of which required an attorney's skill, and especially not one at $400

12   an hour.

13        Rather than chronicle every improper entry here, the Court has

14   reviewed the entries Mr. Jardini identified as "overhead" and deducts

15   3.65 hours spent on clerical and administrative work that were

16   improperly billed at attorney rates.[8]

17        Next, the City claims that the DRLC attorneys spent an excessive

18   73.5 hours conferring among themselves and an excessive 56.6 hours

19   conferring with MTO attorneys.  Mr. Jardini proposes – without legal

20   authority or factual support – that the 73.5 hours be reduced by half

21   to 36.75 and the 56.6 hours be eliminated entirely.[9]  The Court will

22

23        [8]The Court notes that, on June 10, 2008, a law clerk billed 6.3
     hours for "Discovery matter: indexed defendant's initial disclosures."
24   That task could have reasonably required the expertise of a law clerk
     or paralegal, especially if some sort of summary or analysis of the
25   documents was required.  Thus, it was compensable at the law clerk
     rate of $165 per hour.
26
          [9]On the hours spent conferring with MTO attorneys, the Court only
27   presumes Mr. Jardini proposes eliminating the hours entirely, based on
     the summary chart included in his declaration (Jardini Decl. ¶ 49)
28                                                          (continued...)

Case 2:16-cv-05147-TJH-GJS Document 88-7 Filed 08/16/17 Page 151 of 445 Page ID
#:1564
Case 2:08-cv-00974-ABC-JWJ Document 67 Filed 04/11/2010 Page 22 of 36

1  not do so.

2      There is nothing inherently wrong with conferencing with co-
3  counsel in a case; in fact, "conferences between attorneys to discuss
4  strategy and prepare for oral argument are an essential part of
5  effective litigation." McKenzie v. Kennickell, 645 F. Supp. 437, 450
6  (D.D.C. 1986) ("Such supervision is necessary to avoid wasteful or
7  disorganized efforts by inexperienced lawyers keeping fee claims
8  within reasonable bounds."); see also Berberena v. Coler, 753 F.2d
9  629, 632-33 (7th Cir. 1985) (finding compensable the hours attorneys
10  "spent mostly in consultation, negotiation, and on the telephone,"
11  which "were of key importance to obtaining the consent decree" in the
12  case). Conferences are especially important in cases like this one,
13  where more junior attorneys took the laboring oar while more senior
14  attorneys supervised, because "meetings between junior and senior
15  lawyers to discuss the progress of research and review completed
16  assignments are reasonable and appropriate means to secure proper
17  supervision and efficient staffing of large class actions cases such
18  as this." McKenzie, 645 F. Supp. at 450.

19      Moreover, the total number of hours the City complains were
20  excessively spent on consultation – 130.1 – amounts to just under
21  twelve percent of the total 1102 hours spent. Given that the parties
22  conducted only limited discovery, no motion work, and the case settled
23  before going to trial, it is unremarkable that conferences accounted
24  for this proportion of time. The City provides no cogent reason why

25

26

───────────────

27      [9](...continued)
because his actual testimony in this section of his declaration is
28  unintelligible (Jardini Decl. ¶¶ 43-44).

22

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 152 of 445 Page ID
#:1565
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 04/11/2010 Page 23 of 36

1    this amount of conferencing was excessive, and the Court finds none.[10]

2    See Prison Legal News v. Schwarzenegger, 561 F. Supp. 2d 1095, 1104

3    (N.D. Cal. 2008) (rejecting request to reduce fees by eight percent

4    for excessive conferences because "Defendants have provided no

5    evidence or argument that any conference was excessive or

6    duplicative.").

7         Next, the City points out several entries it claims are the

8    result of duplicative billing errors and requests a reduction of 10.3

9    hours.  The DRLC attorneys conceded that 3.7 hours were billed by

10   Tiffany Green in error and half an hour was billed by Sage Reeves in

11   error (and those deductions are already reflected in the 1102 hours

12   sought by Plaintiffs).  They argue that the other entries were correct

13   for a simple reason: the same attorney can work on the same task at

14   two separate times in a single day.  Indeed, all the remaining

15   "errors" that Mr. Jardini points out appear to fall within that

16   category, and, in some instances, even reflect different amounts of

17   time spent on the same task.  The Court finds Plantiffs' explanation

18   reasonable and will not deduct the remaining 6.1 hours from the total

19   hours spent.

20        Finally, the City argues that the DRLC spent an excessive number

21   of hours drafting the settlement agreement in this case, which Mr.

22   Jardini calculates at 46.4 hours.  Mr. Jardini instead suggests that

23   the proper number should be twenty-four hours because the settlement

24   in this case was similar to the settlement agreement in a similar case

25   litigated before this Court.  See Valenzuela v. County of Los Angeles,

26   _____

27        [10]Even the City's own expert, Mr. Jardini, opined in another case
     that conferences among co-counsel are not unreasonable, but beneficial
28   to a case.  (Parks Reply Decl., Ex. E at 7-8.)

                                    23

Case 2:16-cv-05173-TJH-GJS  Document 88-7  Filed 08/16/17  Page 153 of 445  Page ID
#:1566
Case 2:08-cv-00979-ABC-JWJ  Document 67  Filed 04/11/2010  Page 24 of 36

No. CV 02-902 ABC (JWJx).

The Court rejects the request for several reasons.  First, Mr.
Jardini provides no explanation of how he arrived at the 46.4 hours,
so the Court cannot tell whether that number accurately reflects only
hours spent on drafting, or included hours spent on any other tasks
related to the settlement agreement, such as research, conferences,
consultation with clients, etc., and these tasks were obviously unique
to this case.  Second, while Mr. Jardini suggests that the hours were
excessive because the DRLC attorneys could have simply copied portions
of the settlement agreement in Valenzuela, Plaintiffs submit a
detailed declaration from DRLC attorney Shawna Parks explaining that
the negotiations over the contents of the settlement agreement here
reflected "the needs of this case, including operational aspects of
the LBPD, the specific problems encountered by people who are deaf or
hard of hearing and who have interacted with the LBPD, and advances in
technology since the Valenzuela settlement."  (Parks Reply Decl. ¶ 6.)
The Court has reviewed the two agreements and notes that the
settlement agreement here was not simply a carbon copy of the
settlement in Valenzuela and it is unsurprising that the parties spent
a substantial amount of time finalizing it.  (Parks Reply Decl. ¶¶
7-9.)  Thus, the Court declines to subtract any hours for this work.

                    c.   Total Hours Deducted

The Court concludes that Plaintiffs reasonably spent 1080.25
hours on the case, which reflects the following deductions from
Plaintiffs' proposed 1102 hours:

- • - 12.4 hours spent by MTO associate Kristina Wilson on
    drafting the complaint;

- • - 3.7 hours spent by MTO associate Kristina Wilson to
    prepare for and attend the April 27, 2009, deposition;

- •   - 2 hours spent by DRLC attorney Tiffany Green on the complaint; and

- •   - 3.65 hours spent as clerical and administrative work, 1.45 of which was billed by Tiffany Green, .2 billed by Sage Reeves, and two of which were billed by attorney Matthew D. Strugar.

    4.   <u>Total Lodestar Amount</u>

Based on the above analysis, the Court calculates the lodestar amount as $421,458.75, which is broken down as follows:

| Attorney | Year of Graduation | Rate | Hours | Fees | Notes |
|---|---|---|---|---|---|
| **DRLC** | | | | | |
| Shawna L. Parks | 1999 | $525 | 99.00 | $51,975.00 | |
| Sage Reeves | 2001 | $475 | 263.20 | $125,020.00 | Reflects .2 hour reduction |
| Tiffany Green | 2005 | $375 | 221.95 | $83,231.25 | Reflects 3.45 hour reduction |
| Matthew Strugar | 2004 | $400 | 7.60 | $3,040.00 | Reflects 2 hour reduction |
| Law Clerks | | $165 | 81.80 | $13,497.00 | |
| **Subtotal DRLC** | | | 673.55 | $276,763.25 | |
| **MTO** | | | | | |
| Kristina Wilson | 2006 | $350 | 247.50 | $86,625.00 | Reflects 16.1 hour reduction |
| Bethany Woodard | 2005 | $395 | 118.70 | $46,886.50 | |
| Robert Dell Angelo | 1992 | $550 | 9.90 | $5,445.00 | |
| Law Clerks/Support Staff | | $65 to $220 | 30.60 | $5,739.00 | |
| **Subtotal MTO** | | | 406.70 | $144,695.50 | |
| | | | | | |
| **Total Lodestar** | | | 1080.25 | $421,458.75 | |

**B.   Use of a Multiplier**

Plaintiffs seek to apply a multiplier of 1.5 to the lodestar amount under California law "to account for the contingent risk of the litigation and the extraordinary results achieved." Even though a multiplier is not available under federal fee-shifting statutes based

upon the contingency nature of a case, the Ninth Circuit has held that
when a plaintiff is entitled to fees for both federal and California
state claims, a federal court may apply a contingency multiplier under
California law. See Mangold v. Cal. Pub. Util. Comm'n, 67 F.3d 1470,
1478–79 (9th Cir. 1995).[11]  To determine whether a multiplier is
appropriate, the Court considers factors similar to those considered
under federal law, such as "the novelty and difficulty of the issues
presented, the quality of counsel's services, the time limitations
imposed by the litigation, the amount at stake, and the result
obtained by counsel." City of Oakland v. Oakland Raiders, 203 Cal.
App. 3d 78, 83, 249 Cal. Rptr. 606, 609 (Ct. App. 1988).

While this case involves important issues and Plaintiffs obtained
substantial relief, Plaintiffs are not entitled to a multiplier.  The
case was not particularly difficult, given that the parties never
needed to litigate applicable legal standards and the city all but
conceded liability at the outset of the lawsuit.  Likewise, the DRLC
has reached settlements in at least two other similar cases against
municipalities.  (Parks Decl. ¶ 9.)  Furthermore, the lion's share of
the work in this case was spent on negotiating a settlement agreement.
Negotiations began early in the case and enabled the parties to avoid

---

[11]Even under federal fee-shifting statutes, the Court may adjust
the lodestar in light of additional considerations, including the
results obtained. Hensley, 461 U.S. at 434.  However, a "strong
presumption" exists that the lodestar figure represents a "reasonable
fee" and should be enhanced only in "rare and exceptional cases."
Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478
U.S. 546, 565 (1986).  To overcome the strong presumption that the
basic fee is reasonable, the fee applicant bears the burden of coming
forward with "specific evidence" that the lodestar amount is
unreasonably low. See Van Gerwen v. Guarantee Mut. Life Co., 214 F.3d
1041, 1045 (9th Cir. 2000) (citing Delaware Valley, 478 U.S. at 565).
This showing must be based on factors not already subsumed in the
lodestar calculation. Id.

Case 2:16-cv-05143-TJH-GJS   Document 88-7   Filed 08/16/17   Page 156 of 445   Page ID
#:1569
Case 2:08-cv-00974-ABC-JWJ   Document 67   Filed 04/11/2010   Page 27 of 36

motion work and most discovery.  Counsel was certainly well-equipped
to bring the case to a favorable resolution for Plaintiffs and the
class, but the reasonable hourly rates to which Plaintiffs' attorneys
are entitled more than adequately account for the quality of counsel's
representation.  See Morales, 96 F.3d at 363-64 (noting that the Court
may adjust lodestar figure "on the basis of the Kerr factors that are
not already subsumed in the initial lodestar calculation.").  The
Court also appreciates that Plaintiffs' counsel may have had to forego
some other clients to pursue this case, but once again that fact is
adequately reflected in the lodestar amount.  See id.

Plaintiffs cite Beasley v. Wells Fargo Bank, 235 Cal. App. 3d
1407, 1419, 1 Cal. Rptr. 2d 459, 466 (Ct. App. 1991), overruled on
other grounds by Olson v. Auto. Club of S. Cal., 42 Cal. 4th 1142,
1151, 74 Cal. Rptr. 3d 81, 87 (2008), to argue that the purpose of
using a contingency risk multiplier "is to compensate for the risk of
loss generally in contingency cases as a class," (emphasis in
original), and such a risk is present in disability class action cases
(Parks Decl. ¶¶ 34-37; Stormer Decl. ¶ 15).  Yet, the DRLC has brought
several cases involving deaf or hard-of-hearing individuals against
public entities and those cases have settled, suggesting the risks in
these specific types of cases are not so high that a multiplier is
necessary to assure class action plaintiffs obtain representation.[12]

The Court has already calculated the lodestar amount at over
$400,000, more than twice the amount of fees to which the DRLC agreed
in the Valenzuela case.  The Court recognizes that the settlement here

---

[12]The Court notes as well that the lodestar amount of fees,
including any enhancement, assessed against the City would fall on the
taxpayers.  See Serrano v. Priest, 20 Cal. 3d 25, 49, 141 Cal. Rptr.
315, 328 (1977).

Case 2:16-cv-05117-TJH-GJS  Document 88-7  Filed 08/16/17  Page 157 of 445  Page ID
#:1570
Case 2:08-cv-00979-ABC-JWJ  Document 67  Filed 01/11/2010  Page 28 of 36

1  was harder-fought than the one in <u>Valenzuela</u> and some of the issues

2  raised in this case were different from those in <u>Valenzuela</u>, but those

3  differences are adequately reflected in the lodestar.  Applying a

4  multiplier on top of that is unwarranted.

5  **C.   Reasonable Costs**

6      Plaintiffs also seek reimbursement for costs expended in the

7  litigation in the amounts of $2,367.25 to the DRLC and $8,011.70 to

8  MTO.  (Parks Decl., Ex. A.)  The City does not dispute that Plaintiffs

9  are entitled to costs generally.  <u>See</u> 42 U.S.C. § 12205; Cal. Code

10  Civ. Proc. § 1032(b).  Nor does the City dispute that the DLRC should

11  recover the full $2,367.25 it seeks.  Thus, the Court awards the DRLC

12  its full $2,367.25 in costs.

13      The City does dispute the amount sought by MTO, however.[13]  Mr.

14  Jardini identifies two possible duplicate entries on the costs billing

15  records submitted by MTO: (1) a duplicate charge of $30 for a filing

16  fee on June 25, 2008; and (2) a duplicate charge on March 10, 2009,

17  for a court reporter for a deposition to occur on April 27, 2009.  As

18  to the first charge, it appears that the entries were not for "filing

19  fees," but each was for a "Certified Case Records Request" to the

20  Superior Court.  It is possible that these two entries are not

21  duplicates, but two separate requests.  But Plaintiffs were unable to

22  respond to the City's argument because they belatedly filed a notice

23  of errata and supplemental submission to which the City appropriately

24  responded after briefing had otherwise concluded.  Therefore, the

25

26      [13]In their initial request, Plaintiffs omitted the itemized list
of costs for MTO.  Following the City's filing of its opposition,
27  Plaintiffs recognized the error and filed an errata including the
missing information.  The City then filed a supplemental declaration
28  from Mr. Jardini analyzing the costs.

Court accepts the City's explanation and subtracts $30 from MTO's costs.

MTO's costs billing records also include a duplicate charge for a court reporter at a deposition on April 27, 2009. MTO's records reflect that Kristina Wilson paid $1,143.22 to Barkley Court Reporters on March 10, 2009, in advance of a deposition scheduled on April 27, 2009. A second entry on July 23, 2009, reflects that MTO attorney Bethany Woodard also paid $1,143.22 to Barkley Court Reporters for a deposition on April 27, 2009. Both entries share the same invoice number of 368523 and nothing in the entries indicates that they were intended to be separate payments. Again, because Plaintiffs' notice of errata and the City's response came after the close of briefing and Plaintiffs provided no explanation of the duplication, the Court can only conclude that these entries were in fact duplicative. Thus, the Court subtracts $1,143.22 from MTO's costs and awards a total of $6,838.48 in costs expended by MTO.[14]

//

//

//

//

//

//

//

---

[14]Mr. Jardini also renews his opinion that MTO's involvement in the case was unnecessary and duplicative, and therefore subtracts costs from MTO's costs billing records to arrive at a total of $5,072.54. For the reasons discussed supra, the Court rejects his position that MTO attorneys were entirely unnecessary to the case and declines to subtract any costs on that basis.

1    //

2    //

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.  Fees for the Fees Motion

Plaintiffs also seek fees for the time spent on the fees motion:

| Attorney | Year of Graduation | Rate | Hours | Fees |
|---|---|---|---|---|
| **DRLC** | | | | |
| Shawna L. Parks | 1999 | $525 | 35.10 | $18,427.50 |
| Matthew Strugar | 2004 | $400 | 21.50 | $8,600.00 |
| **Subtotal DRLC** | | | 56.60 | $27,027.50 |
| **MTO** | | | | |
| Kristina Wilson | 2006 | $350 | 23.80 | $8,330.00 |
| Bethany Woodard | 2005 | $395 | 36.60 | $14,457.00 |
| Robert Dell Angelo | 1992 | $550 | 2.20 | $1,210.00 |
| **Subtotal MTO** | | | 62.60 | $23,997.00 |
| | | | | |
| **Total Requested** | | | 119.2 | $51,024.50 |

The City does not dispute that Plaintiffs may recover fees for work done in litigating attorney's fees.  See, e.g., Thompson v. Gomez, 45 F.3d 1365, 1366 (9th Cir. 1995).  The City also does not dispute the amount presented by Plaintiffs of $27,027.50 for DRLC attorneys and $23,997.00 for MTO attorneys, for a total of $51,024.50.

The Court nevertheless feels compelled to reduce the amount of fees incurred on the fees motion by 10% for time spent on a frivolous dispute over the date of the hearing on this motion.  The Court may, in its discretion, shave up to 10% off the fees sought without reviewing and commenting on billing records entry-by-entry.  See In re Smith, 586 F.3d 1169, 1174 (9th Cir. 2009); Moreno, 534 F.3d at 1112. That includes deducting excessive hours spent on a fees motion.  See Anderson v. Dir., Office of Workers Compensation Programs, 91 F.3d 1322, 1325 (9th Cir. 1996).

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 161 of 445 Page ID
#:1574
Case 2:08-cv-00974-ABC-JWJ Document 67 Filed 04/11/2010 Page 32 of 36

1    Plaintiffs originally filed this motion on November 23, 2009 and
2    noticed the hearing for December 14, 2009.  On December 1, 2009, the
3    parties filed a stipulation with the Court purporting to move that
4    hearing date.  The stipulation did not clearly indicate which party
5    drafted it (the document contained the City's counsel's caption, but
6    the docket indicates that Plaintiffs' counsel filed it), but it was so
7    deficient that the Court not only denied it, but made clear its
8    displeasure with the parties' failures.  (Docket No. 55.)  The Court
9    did, however, grant the parties the opportunity to refile it properly.
10    That should have been the end of the matter.  But apparently the
11    parties could no longer agree on the new hearing date, due in no small
12    part to the Plaintiffs' obstinance.  (See Docket No. 56.)  To protect
13    its interests in opposing the fees motion, on December 4, 2009, the
14    City filed an ex parte application to set the new hearing date.  In
15    response, Plaintiffs' counsel filed a notice of non-opposition.  They
16    claimed the City acted prematurely in filing the ex parte application,
17    but the City was right to act promptly, as the Court had already
18    pointed out that the City missed the previous deadline to file its
19    opposition to the fees motion, which could have resulted in forfeiture
20    of any chance to oppose.  (See Docket No. 55.)  Plaintiffs never
21    provided a good explanation as to why they had not simply worked with
22    the City's counsel to file a new stipulation.  The Court finds that
23    the work spent on this motion practice – which the Court calculates at
24    approximately 10% of the total work done on the fees motion – was
25    unnecessary and unreasonable.
26    Moreover, even if the motion work were not unnecessary, the hours
27    spent on it were grossly excessive.  The Court need not – and will not
28    – chronicle every excessive hour, but a few entries are worth noting.

For example, on December 7, 2009, the date the non-opposition to the ex parte application was filed, MTO associate Kristina Wilson spent 2.6 hours, for a total cost of $910, drafting the "notice of non-opposition to defendant's ex parte application to continue hearing dates; revise and file notice of non-opposition to defendants' ex parte motion to continue hearing dates." On the same date, MTO attorney Bethany Woodard also spent some part of one hour, at a cost of $395, conferencing regarding the non-opposition, as well as revising a draft of it. And then DRLC attorney Shawna Parks spent .4 hours, at a cost of $210, "receiv[ing] and review[ing] draft non-opp to briefing schedule on fees motion, edits to same." The Court can conceive of no justification for spending four hours at a total cost of over $1,500 on a document that should have been one line (maybe two if Plaintiffs felt compelled to explain their position) indicating Plaintiffs did not oppose the City's request.

Similarly, MTO attorneys spent 3.6 hours on December 4, 2009, at a cost of $1,350, conferencing with each other and with opposing counsel, and researching the law on ex parte applications. Again, the Court can identify no reason why MTO associates spent nearly four hours discussing and researching the ex parte application that asked for relief that Plaintiffs had previously agreed to.

The Court has reviewed the billing records for the motion work and concludes that a 10% reduction from Plaintiffs' requested fees on the fees motion is warranted, for a total reasonable award of $45,922.05. Of that, $24,324.75 goes to MTO and $21,597.30 goes to

Case 2:16-cv-05147-TJH-GJS Document 88-7 Filed 08/16/17 Page 163 of 445 Page ID
#:1576
Case 2:08-cv-00974-ABC-JWJ Document 67 Filed 04/11/2010 Page 34 of 35

1 the DRLC, which is proportionate to each firm's share of the original

2 total fee amount requested.[15]

3 **III. CONCLUSION**

4     Based on the above analysis, the Court finds that Plaintiffs are

5 the prevailing parties entitled to reasonable attorney's fees and

6 costs.  The Court further finds that Plaintiffs' counsel's hourly

7 rates are reasonable and, after taking the deductions from the total

8 hours as noted above, finds the hours spent were reasonable.  The

9 Court denies Plaintiffs' request to apply a multiplier.  The Court

10 also awards reasonable costs to Plaintiffs, except those deducted

11 above, and awards Plaintiffs the fees spent in connection with the

12 fees motion with a 10% reduction.  Thus, the Court AWARDS Plaintiffs

13 the reasonable fees and costs in the amount of $476,586.53, which

14 breaks down as follows:

| DRLC Lodestar Fees | $276,763.25 | | MTO Lodestar Fees | $144,695.50 |
|---|---|---|---|---|
| DRLC Fees on Fees | $21,597.30 | | MTO Fees on Fees | $24,324.75 |
| DRLC Costs | $2,367.25 | | MTO Costs | $6,838.48 |
| | | | | |
| DRLC Total | $300,727.80 | | MTO Total | $175,858.73 |
| | | | | |
| Total Award | $476,586.53 | | | |

20     //

21     //

22     //

23     //

24     //

---

27     [15]In other words, MTO's share of the original $51,024.50 was
$27,027.50, or 53%, and the DRLC's share was $23,024.50, or 47%.  The
Court has used those same proportions to determine the reduced award
28 for each firm.

Case 2:16-cv-05147-TJH-GJS  Document 88-7   Filed 08/16/17   Page 164 of 445   Page ID
#:1577
Case 2:08-cv-00970-ABC-JWO   Document 67   Filed 01/11/2010   Page 35 of 36

1    Plaintiffs are ordered to lodge with the Court **within 10 days of**

2    **the date of this Order** a proposed order that reflects the Court's

3    ruling.[16]

4    **IT IS SO ORDERED.**

5

6    DATED: January 11, 2010    _____

7                              AUDREY B. COLLINS
                              UNITED STATES DISTRICT CHIEF JUDGE

---

[16]In conjunction with this Order, the Court has also signed the
proposed Order granting preliminary approval of the class action
settlement and class certification.  The parties should treat this
Order as triggering paragraphs 9 and 10 of that Order for issuing
class notice, for filing any counsel objections, and for calculating
the hearing date on the final approval of the settlement,
notwithstanding the Court's request here that Plaintiffs file a
conforming proposed order on the attorney's fees and costs award.

1

2

3

4

5

6

7

8    UNITED STATES DISTRICT COURT

9    FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  JUAN GAMINO, individually and as | CASE NO. CV-02-9785 CBM (Ex) |
| 12  class representative; KATHY | |
| CONLEY, individually and as class | **ORDER AWARDING CLASS** |
| 13  representative; ED FERREL, | **COUNSEL ATTORNEYS' FEES** |
| 14  individually and as class representative, | **AND COSTS** |
| 15                Plaintiffs, | |
| 16 | |
| 17          v. | |
| 18  COUNTY OF VENTURA; | |
| 19  VENTURA COUNTY SHERIFF BOB | |
| BROOKS, individually and in his | |
| 20  capacity as Sheriff of Ventura County; | |
| 21  DOES 1-10, | |
| 22                Defendants. | |
| 23 | |

24       The matter before the Court is Plaintiffs' Motion for Attorneys' Fees (the

25   "Motion"). Upon consideration of the papers and arguments presented, the Court

26   GRANTS Plaintiffs' Motion.

27

28

1

## BACKGROUND

2

3

4

5

6

7

8

This case is a class action on behalf of new arrestees booked into in the Ventura County Jail charged with violations of California Health and Safety ("H&S") Code §11550, who were strip searched pursuant to the then policy of the Ventura County Jail to do so without individualized suspicion. The case was settled on terms enumerated in the Preliminary Approval Order and documents attached thereto, and those terms will not be repeated here.

9

10

11

12

13

14

15

16

The custom and practice that was the basis of this lawsuit was ceased as a result of the litigation in the related action, *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir. 2006) (hereafter *Way*) and this case. *Way* was an individual plaintiff case, also before this Court. *Gamino* was filed separately after *Way*, as a class action. After favorable decisions in this Court and the Ninth Circuit, granting summary judgment to plaintiff *Way* on liability, *Way* was settled for a total of $575,000. Of that amount, $500,000 was for fees and costs, and the remainder was for the plaintiff.

17

18

19

20

21

22

This case subsequently settled, after extensive mediation efforts. The Court approved the settlement at a hearing held on February 2, 2009. [Doc. No. 182.] Under the settlement, defendants would pay sums to class representatives, and various sums to class members who file claims, and would pay for the cost of class administration. In addition, defendants would pay $1,400,000 in attorneys' fees and costs, subject to the approval of this Court.

23

24

25

26

Plaintiffs filed a motion for attorneys' fees seeking the $1,400,000 award agreed to, based on both a class fund theory and a lodestar with a multiplier theory. For the reasons stated below, the Court awards Plaintiffs' counsel $1,400,000 in attorneys' fees and costs.

27

28

2

## LEGAL STANDARD

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007. To calculate an award of reasonable attorney's fees, courts use the lodestar formulation set forth in *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), which instructs the court to take the number of hours reasonably expended on the litigation and multiply it by a reasonable hourly rate. In determining the "lodestar figure," courts must consider the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

## DISCUSSION

### A.    The Time and Labor Expended By Counsel

Counsel efforts in litigating this case were substantial. The work performed included: 1) extensive investigation of the underlying circumstances, including speaking with scores of class members; 2) preparation of the complaint; 3) the Rule 26 conference and report; 4) three requests for production of documents; 5) extensive analysis of documents produced; 6) three set of interrogatories; 7) 12 depositions; 8) three discovery motions; 9) a motion to compel Sheriff Brooks' deposition; 10) three summary judgment motions; 11) two published appeals in *Way* (one remanding because appealed order was not final for purposes of appeal, and the second upholding this Court's grant of summary judgment to Plaintiff

3

1   Way); 12) preparation and mailing of first class notice (pre-settlement); 13)

2   handling of hundreds of class members' calls after mailing of first class notice; 14)

3   retention of data consultants and extensive analysis of computerized jail data; 15)

4   list of charges qualifying as charges of violence, weapons or drugs for purposes of

5   the different levels of class claims; 16) three days of unsuccessful mediation efforts

6   with Ret. Magistrate Judge Edward Infante (including multiple mediation

7   sessions); 17) four mediation sessions with Magistrate Judge Charles Eick;

8   18) preparation of a 14-page mediation letter in anticipation of mediation with

9   Ret. United States District Judge Raul Ramirez; 19) two days of mediation sessions

10  with Judge Ramirez; 20) and negotiation and preparation of settlement documents,

11  including settlement agreement, preliminary and final approval orders, class notice

12  and claim forms.

13

14      In summary, the time and efforts expended by Class Counsel were extensive

15  and involved all that occurs in a case that is being prepared for trial.

16      **B.   The Novelty and Difficulty of the Issues and Counsel's Skill**

17      The issues involved in this case involve complex issues of constitutional law

18  in an area where considerable deference is given to jail officials, as the Ninth

19  Circuit recognized in the partial summary decision in this case. *See Way v. County

20  of Ventura, supra,* 445 F.3d at 1161 (9th Cir.2006) ("We recognize the difficulty of

21  operating a detention facility safely, the seriousness of the risk of smuggled

22  weapons and contraband, and the deference we owe jail officials' exercise of

23  judgment in adopting and executing policies necessary to maintain institutional

24  security."); *see also Craft v. County of San Bernardino*, 468 F.Supp.2d 1172,

25  1176 (C.D.Cal. 2006) (quoting *Way*).

26      The *Way* case, which provided the legal foundation for the settlement here

27  (as the parties stipulated that the outcome of *Way* would govern liability here),

28  involved difficult questions of constitutional law. A good snapshot of the state of

4

1   the law at the time is contained in *Way v. County of Ventura,* 445 F.3d 1157, 1159

2   (9th Cir.2006), where the Court provided the following summary:

> Way brought this civil rights action ... alleging that they violated her
> civil rights under the Fourth and Fourteenth Amendments by
> subjecting her to a body cavity search following her arrest. The parties
> both filed motions for summary judgment. The district court held that
> the search violated *Way*'s constitutional rights because individualized
> suspicion is required for arrestees who are not admitted to the general
> jail population. It denied qualified immunity to Brooks and Hanson on
> the basis of *Giles v. Ackerman,* 746 F.2d 614, 616-17 (9th Cir.1984)
> (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la
> Vina,* 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc); *Kennedy v.
> Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1990) (as
> amended), *implied overruling on other grounds recognized by Act
> Up!/Portland v. Bagley,* 971 F.2d 298, 301 (9th Cir.1992); and *Fuller
> v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991), holding that a
> reasonable officer reviewing Ventura's policy and the established law
> would have recognized that the Sheriff Department's policy was
> unconstitutional because it did not further any legitimate penological
> interests. That ruling is the subject of this appeal.

13   What was distinct about this case and the *Way* case was that it involved strip

14   searches of arrestees charged with a drug offense. The Ninth Circuit had ruled long

15   before that the involvement of drugs supplied reasonable suspicion for a strip

16   search. *See, e.g., Thompson v. City of Los Angeles,* 885 F.2d 1439, 1447 (9th Cir.

17   1989) (reasonable suspicion may be supplied by the nature of the charge).

18   Thus, the plaintiff in *Way* had to prevail on the argument that being under

19   the influence of drugs was fundamentally different in kind from possession or

20   trafficking in drugs and did not provide reasonable suspicion for a strip search.

21   Plaintiff succeeded in that contention, paving the way for the current settlement.

22
23   *See Way*, 445 F.3d at 1162 ("We cannot see how the charge of being under the

24   influence of a drug necessarily poses a threat of concealing (and thereby using or

25   trafficking) additional drugs in jail during the limited time between booking and

26   bail, or booking and placement in the general population. If not, it was

27   unreasonable to assume that *Way* harbored drugs in some cavity or other.").

28   Plaintiff ultimately prevailed before the Ninth Circuit, which acknowledged it had

     never directly addressed the issue in deciding that the Sheriff was entitled to

5

1    qualified immunity. *Id.* ("we had never previously addressed the constitutionality

2    of a body cavity search policy premised on the nature of this or any other drug

3    offense. More importantly, we had held that the nature of the offense alone may

4    provide reasonable suspicion [citation omitted], and twice pointed to charges

5    involving drugs, contraband and violence as the kind of offense that might give

6    rise to reasonable suspicion.").

7         In addition, properly handling the data in cases of this type requires a high

8    degree of sophistication. In cases like this, proper use of the data is the factual key

9    to the case (along with establishing the policies or customs being challenged,

10   which occurred during the *Way* case). It is through the data that members of the

11   class are identified. This is usually a sophisticated process, requiring counsel

12   familiar with both the facts of the case and how to use the data. Jail data is not

13   configured to straightforwardly answer the questions for which answers are needed

14   to determine class composition. Code has to be written to take all of those factors

15   into account. Then the analysis has to be discussed between Plaintiffs and

16   Defendants, in order to work out agreement on the data issues. All of this occurred

17   here.

18

19        There are relatively few attorneys qualified to handle the data issues in a

20   case such as this to the maximum degree of effectiveness. When Mr. Barrett Litt

21   came into the case, Plaintiffs had not yet undertaken an independent data analysis.

22   After Mr. Litt's entry, data consultants he had used previously analyzed all the

23   data. As a result, the class list changed. In addition, an entire group of individuals

24   were identified for whom no determination could be made based on the available

25   data as to whether they were strip searched. This is because, for the earlier part of

26   the class period, the data only captured the lead charge, but there may have been a

27   secondary §11550 charge on the basis of which the arrestee was strip searched.

28

6

1    The solution to this problem was developed through the use of the Possible Class

2    Member mailing.

3        **C.    The Risks Of Non-Payment Assumed By Counsel and Preclusion**
         **of Other Employment**
4

5        Plaintiffs' counsel faced a substantial risk of non-payment, in part because

6    counsel took this case on a contingency fee basis. Obviously, the County had the

7    resources to pay a judgment. However, the risk lay in establishing that the

8    County's policies were illegal. As discussed previously, strip search litigation in

9    general is inherently risky because of the deference given jail officials, and because

10   there is a split in circuits developing. Seeking large amounts of money from

11   government entities always carries risks of politics entering into the equation.

12       Declarations filed in support of Plaintiffs' motion for attorneys' fees from

13   experienced class and civil rights lawyers noted several particular difficulties in

14   litigation of this kind, including 1) particular challenges and expertise exist to

15   establish a policy or custom under *Monell v. Dept. Soc. Serv.,* 436 U.S. 658, 690

16   (1978); 2) great deference is given to jails in addressing security issues; 3) the law

17   often differs from circuit to circuit; and 4) there is a greater risk than normal that

18   the whole legal landscape could change by virtue of a change in the law,

19   particularly if the Supreme Court addresses the issue (which it has not done in the

20   area of strip searches of pre-trial detainees since *Bell v. Wolfish,* 441 U.S. 520

21   (1979), almost 30 years ago. The Court agrees that all of these reflect risks for

22   Plaintiffs' counsel in pursuing litigation of this type.

23       Class counsel, particularly Mr. Earnest Bell, declined substantial other work

24   to pursue this case. These two cases combined (*Way* and *Gamino*) spanned many

25   years when the outcome was uncertain. Over 2000 hours were devoted to the

26   combined *Way* and *Gamino* cases.

27

28

7

#### D. The Result Obtained For The Class

This case was hard fought. The *Way* case, in which the key merits issues were fought out, went through extensive briefing in this Court and the Ninth Circuit. The Plaintiffs were individuals of little means. All the work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered only after Plaintiff won the *Way* case. Even then it required over a year of settlement efforts, and the addition of Mr. Litt to Plaintiffs' attorney team, to reach a settlement.

The financial terms of the settlement are very favorable to class members. Those not charged with crimes of violence or involving other drug charges receive $2300 for a first offense and $700 for a second offense. This is considerably higher than the average recovery in other strip search class actions. (*See* B. Litt Dec. at ¶ 35, [Doc. No. 176], filed concurrently with Plaintiffs' Motion.) While this is partly explained by the scale of the other cases compared to this one, the fact remains that class members are receiving very favorable payments. In addition, even those charged with other drug charges or crimes of violence are participating in the settlement, even though the law in this Circuit is that such charges provide reasonable suspicion to strip search pre-arraignment arrestees. All of this is due exclusively to Class Counsel's efforts.

Nor can the results in this case be judged solely by the monetary component of the settlement. As a result of the combined *Way* and *Gamino* litigation, the County long ago ceased all of the strip search practices addressed in this settlement. That is a major accomplishment, particularly in light of the standing limitations imposed on such cases. Thus, as a result of Class Counsel's efforts, tens of thousands of future inmates have been spared the "embarrassing and humiliating experience", and "extensive intrusion on personal privacy", that a strip

8

1    search, "regardless of how professionally and courteously conducted", necessarily

2    entails. *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

3
### E.    Experience, Reputation and Ability of Class Counsel

4
    Class Counsel are highly experience litigators in the fields of civil rights and

5
    class actions. Mr. Litt is widely known as one of the foremost civil rights attorneys

6
    in California, having a particular expertise in civil rights class actions and other

7
    complex multi-party civil rights cases, especially law enforcement class actions.

8
    He has both spoken and published on the issue of strip search and law enforcement

9
    class actions at some length, and is counsel in several other pending class actions,

10
    both in California, and in other parts of the country (Washington, D.C., Baltimore

11
    and Atlanta). In addition, he has several $1 Million plus civil rights trial verdicts,

12
    including a $22.5 Million verdict against the City of Long Beach, which is the

13
    largest Fair Housing verdict on record. He has settled three strip search class

14
    actions for eight figure sums, aside from this one. (*See* Dec. of B. Litt at ¶¶ 1-12,

15
    and his curriculum vitae attached as Exhibit 1.)

16

17    Mr. Bell is an experienced civil rights litigator, who has practiced primarily

18    in Ventura County, and has been the most prominent plaintiffs' police abuse

19    attorney in Ventura County for many years. He litigated the *Way* case through the

20    Ninth Circuit and settlement. In addition, Mr. Bell litigated the first part of the

21    *Gamino* case and brought in Mr. Litt when he determined that the settlement

22    process would be aided by a civil rights lawyer experienced in class actions.

23
### F.    The Reaction Of The Class

24
    The reaction of the class was very favorable. There were no objections to

25
    the settlement. There were only five opt-outs (which is approximately 1/10 of 1%).

26
    Over 1000 Claim Forms were timely filed.

27

28

9

## G.    $1,400,000 Is A Reasonable Fee In This Case

In this case, Plaintiffs' counsel seek an award of $1.4 Million, in addition to the $500,000 received in the *Way* case. This encompasses both fees and costs. (Costs are relatively modest, totaling under $15,000, which includes all the specialized data work performed by consultants retained by Plaintiffs.) The table below reflects the lodestar calculation for Plaintiffs' counsel's work in this case.

| Attorney | Hourly Rate | Hours | Total |
|---|---|---|---|
| Earnest Bell | $600 | 1,602.50 | $961,500.00 |
| Barrett S. Litt | $750 | 187 | $140,250.00 |
| Charla Gray | $275 | 5.3 | $1,457.50 |
| Julia White | $235 | 37 | $8,695.00 |
| **Total** | | | **$1,111,902.50** |

The rates used here are reasonable. Mr. Bell and Mr. Litt have been attorneys since 1988 and 1970, respectively. (Dec. of B. Litt at ¶ 3; Dec. of E. Bell at ¶ 2, attached as Exhibit 2 to Dec. of B. Litt.) Combined, they have 60 years' litigation experience. Mr. Bell, an attorney with 21 years' experience, is the leading plaintiffs' police practices civil rights attorney in Ventura County. (Dec. of E. Bell at ¶¶ 2, 5.) Over the last several years, police misconduct cases have comprised about 90% of his practice. (*Id*. at ¶ 5.) Mr. Litt has 38 years' experience and for the last 25-30 years has focused his practice on complex civil litigation in the areas of constitutional law, civil rights law, class action litigation and complex multi-party litigation. (Dec. of B. Litt at ¶ 3.) In the area of class actions against jails for violation of civil rights involving strip searches, specifically, Mr. Litt is considered one of the leading plaintiffs' lawyers in the country. (*Id*. at ¶ 8.) The rates used by Mr. Bell and Mr. Litt are comparable to Los Angeles market rates for complex litigation. (*See id*. at ¶¶ 10-21; Dec. of E. Bell at ¶ 11.)

In addition, numerous declarations have been filed that were submitted in *Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. April 01, 2008),

10

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 175 of 445   Page ID
#:1588
Case 2:02-cv-09785-CBM-E   Document 185   Filed 02/05/2009   Page 11 of 14

establishing the reasonableness of these rates, and those declarations are a year out of date. Mr. Litt also submitted a declaration establishing that his then current rates have frequently been awarded by courts, and that the rates here reflect his firm's current rates.

In *Craft*, District Judge Stephen Larson, using 2007 rates, found that "rates ranging from a high of $725 per hour for Mr. Litt to a low of $275 for 2006 graduates, as well as law clerk rates of $200 per hour and paralegal rates from a low of $110 to a high of $225 per hour" were "supported by numerous declarations… establish[ing] that the hourly rates set are similar to those for attorneys of comparable skill and experience at the rates paid for complex federal litigation" and that "the rates sought are reasonable and reflect the market for attorneys of comparable skill, experience and expertise in complex federal litigation." *Craft*, 2008 WL 916965 at 9. Judge Larson also noted that it "was Congress' intent for civil rights cases [to use the standard of complex litigation in setting civil rights fee rates]. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-576 (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976, p. 5913, *supra*, (Congress intended civil rights fees to be comparable to that for 'other types of equally complex Federal litigation, such as antitrust cases')." *Id.*

Plaintiffs anticipate that the lodestar will increase by approximately $100,000 plus in the course of the remaining work on the case, including work between now and the settlement and work over the ensuing period through the final distribution of the funds. (The post-settlement work is expected to be somewhat extensive due to the process of deciding issues such as which possible class members are in fact class members, lien issues and the like). Thus, the total lodestar is approximately $1.2 Million. The total fee award, including the $500,000 awarded in *Way*, is $1.9 Million, which would result in a multiplier of approximately 1.6 ($1.2M x 1.6 = $1.9M).

11

1    This is a modest multiplier. Many class action cases have authorized far

2    higher multipliers. *See, e.g., Craft v. County of San Bernardino*, 2008 WL 916965

3    (C.D.Cal. 2008) (multiplier of 5.2 in strip search class action); *In re Charter*

4    *Communications, Inc., Securities Litigation*, 2005 WL 4045741, 18 (E.D.Mo.

5    2005) (multiplier of 5.61); *In re Rite Aid Corp. Sec. Litig,* 362 FSupp.2d 587

6    (E.D.Pa. 2005) (multiplier of 6.96); *Di Giacomo v. Plains All Am. Pipeline,* Nos.

7    H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at 31, 2001 WL 3463337 at

8    10 (S.D.Tex. Dec. 18, 2001) (multiplier of 5.3); *Roberts v. Texaco, Inc.,* 979

9    F.Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5, plus fund set aside for post-

10   settlement work); *Bynum v. District of Columbia,* 412 F. Supp. 2d 73 (D.D.C.

11   2006) (multiplier of 2 in strip search class action); *Kuhnlein v. Department of*

12   *Revenue,* 662 So.2d 309, 315 (Fla. 1995) (class fund award of 10% of

13   $188,100,000, resulting in multiplier of approximately 15, reduced by Fla.

14   Supreme Court to multiplier of 5 times lodestar, because lodestar was proper

15   method under Florida law). See also cases cited in the Appendix in *Vizcaino v.*

16   *Microsoft Corp.,* 290 F3d 1043 (9th Cir. 2002) (containing several cases with

17   multipliers of three and higher).

18       In this case, Plaintiffs' counsel obtained a relatively expeditious and

19   "excellent result" in a "complex and risky case". *See Stop & Shop,* 2005 WL

20   1213926 (E.D.Pa.), *supra.* The *Way/Gamino* case, when initially filed in *Way,* was

21   a very risky case. The size of the recovery for class members is substantial. The

22   "skill and experience brought to bear by counsel throughout the year[s] they spent

23   actively litigating this case, and the economy with which they were able to achieve

24   such a noteworthy settlement" all speak to a substantial fee award. Further, "the

25   award is justified by the high caliber of Plaintiffs' counsels' work in this case." *Stop*

26   *& Shop, supra.*

27

28

12

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 177 of 445   Page ID
#:1590
Case 2:02-cv-09785-CBM-E    Document 185    Filed 02/05/2009    Page 13 of 14

### H. Awarding Fees and Costs Requested Advances the Purposes of Class Actions in the Context of This Settlement

Because of the structure of the settlement agreement, the $1,400,000 allocated to fees and costs is separate from the individual class members' recovery, *i.e.,* class members will not receive more if a lower fee is awarded. An important purpose of the class action device is that defendants should not benefit from their wrongdoing, and should be deterred from doing so by being vulnerable to class actions to remedy their wrongful conduct. *See, e.g.,* Richard A. Posner, *Economic Analysis of Law* 626-27 (5th ed. 1998) ("the most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit-not that he pays them to his victims").

Through the deterrence prism, the defendants would receive an unjustified windfall if the requested fees were not granted in full. In addition, it is important to provide appropriate incentives for attorneys to undertake the risk of class litigation. To the extent they are not properly awarded when they are successful, that undermines the deterrent purpose of the class action mechanism. As recent commentators have observed, if the economic interests of the class and counsel are misaligned, class counsel lose the incentive to maximize the benefit to the class because they do not participate, or do not fully participate, in the benefit of a larger recovery. *See, e.g.,* Myriam Gilles, *Exploding The Class Action Agency Costs Myth: The Social Utility Of Entrepreneurial Lawyers*, University of Pennsylvania Law Review, 155 U. Pa. L. Rev. 103 (November 2006).

### CONCLUSION

Based on the foregoing, the Court GRANTS Plaintiffs' Motion for Attorneys' Fees. Defendants are ordered to pay Class Counsel attorneys' fees and

13

Case 2:16-cv-05117-TJH-GJS  Document 88-7  Filed 08/16/17  Page 178 of 445  Page ID
#:1591
Case 2:02-cv-09785-CBM-E    Document 185      Filed 02/05/2009      Page 14 of 14

1   costs in the amount of $1,400,000 pursuant to Paragraph ¶ 26 of the parties'

2   Settlement Agreement [Doc. No. 171].

3

4        IT IS SO ORDERED.

5

6   DATED:   February 5, 2009          By _____

7                                         CONSUELO B. MARSHALL
                                          UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

## United States Court of Appeals for the Ninth Circuit

**Notice of Docket Activity**

The following transaction was entered on 02/10/2009 at 2:23:58 PM PST and filed on 02/06/2009

**Case Name:**     COUNTY OF LOS ANGELES v. USDC-CAC
**Case Number:**   09-70361

**Docket Text:**
Received notification from District Court re: payment of docket fee. Amount Paid: USD 450.00 Date paid: 02/06/2009. (JFF)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | | |
|---|---|---|
| P.C., etc., et al., | ) | No. CV 07-3413-PLA |
| Plaintiffs, | ) | **consolidated with** |
| v. | ) | |
| CITY OF LOS ANGELES, et al., | ) | |
| Defendants. | ) | |
| | ) | |
| S.G.P., etc., et al., | ) | No. CV 07-6495-PLA |
| Plaintiffs, | ) | |
| v. | ) | |
| CITY OF LOS ANGELES, et al., | ) | |
| Defendants. | ) | |
| | ) | |
| P.C., etc., et al., | ) | No. CV 09-842-PLA |
| Plaintiffs, | ) | **ORDER RE MOTIONS FOR ATTORNEYS FEES AND COSTS** |
| v. | ) | |
| CITY OF LOS ANGELES, et al., | ) | |
| Defendants. | ) | |

On March 15, 2012, following a jury trial, a verdict in this civil rights action was returned in favor of plaintiffs and against six of the original ten named defendants.[1]  The jury concluded that two defendants had used excessive force or failed to intervene in the use of excessive force against decedent, and that the excessive force was a substantial factor in his death; that six defendants (including the aforementioned two defendants) unreasonably denied medical care to decedent while he was in their custody and were negligent toward decedent; and that punitive damages against three of those six defendants were justified.  On March 19, 2012, following a damages phase, the jury awarded damages of $870,000 to decedent's estate, $1,500,000 to plaintiff P.C., $400,000 to plaintiff S.G.P., $400,000 to plaintiff E.E., and punitive damages against defendant Meneses ($20,000), defendant Silva ($10,000) and defendant Arellano ($15,000). Plaintiffs have now filed two Motions for Attorneys Fees in which they seek: (1) attorneys fees pursuant to Fed.R.Civ.P. 54(d) and 42 U.S.C. § 1988 in the sum of $791,883.50, as well as costs, as to attorneys Dale Galipo, Humberto Guizar, Hilary Rau, and John Fattahi (the "First Motion"); and (2) attorneys fees in the sum of $49,282.50 as to attorney James P. Segall-Gutierrez (the "Second Motion").  Defendants have filed oppositions to both Motions, and Replies were filed to both the First Motion and the Second Motion.  The Court has reviewed the documents submitted by the parties in connection with the Motions, and has considered the arguments presented by counsel at the hearing on September 12, 2012.

There is no dispute that plaintiffs are considered the prevailing parties in this action under § 1988.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); see Defendants' Opposition to First Motion, at 4 ("plaintiffs are the prevailing party for purpose of awarding *reasonable* attorneys' fees and costs with respect to Officers Meneses, Silva, Flores, Chavez, Arellano and Vargas") (emphasis in original).  "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances.  Accordingly, a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"  Hensley, 461 U.S. at 429 (citations omitted).  The applicant bears the burden of showing

---

[1]     One defendant was dismissed at the start of trial, and the jury did not find liability as to three defendants.

an entitlement to an award and of documenting the hours expended and hourly rates (id. at 437); the opposing party then "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." Gates v. Gomez, 60 F.3d 525, 534-35 (9th Cir. 1995). The question in these Motions is whether the requested amounts are reasonable under the statute. Plaintiffs contend that they are entitled to the requested fees, based on the nature of the case, the experience of counsel, the work involved, and the outcome of the trial. Defendants disagree, arguing that counsels' billing statements are too vague, counsel billed for improper activities and duplicative tasks, counsel seeks excessive amounts for an excessive number of attorneys, and the hourly rates sought are excessive.

The Court examines the "lodestar" in determining whether the requested fees are reasonable. The lodestar is obtained, first, by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. Hensley, 461 U.S. at 433-34. Those hours that were not reasonably expended (such as when a case is overstaffed, or based on varying skills of the lawyers involved, or that are excessive or redundant) should be excluded. Id. A reasonable hourly rate under § 1988 is determined "according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." Blum v. Stenson, 465 U.S. 886, 895 (1984).

The factors that may be considered in reaching a lodestar value and possible adjustment are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Hensley, 461 U.S. at 430 n.3.

Here, plaintiffs seek an award of fees of $791,883.50 in the First Motion based on the work of four attorneys. They assert that as of the filing of the First Motion, Mr. Galipo had spent 780.4

1   hours working on this case, and that a reasonable hourly rate is $700; that Mr. Guizar worked

2   358.5 hours, at a reasonable hourly rate of $500; that Hilary L. Rau worked 89.1 hours, at a

3   reasonable hourly rate of $285; and that John C. Fattahi worked 102.4 hours, at a reasonable

4   hourly rate of $400.  In the Second Motion, attorney James P. Segall-Gutierrez represents that he

5   worked 141 hours, at a reasonable hourly rate of $350, for a total of $49,350.[2]  In support of these

6   numbers, plaintiffs have submitted declarations from each attorney setting forth his or her legal

7   experience, including in civil rights litigation, and their time records from this case.  As for Mr.

8   Galipo and Mr. Guizar, civil rights litigation is their area of expertise.  Mr. Galipo and Mr. Guizar

9   have also submitted declarations from attorneys not associated with this case setting forth their

10  opinions as to the skills of these two lawyers, the prevailing hourly rates for attorneys with similar

11  experience and skills, and the reasonableness of the hourly amounts sought by Mr. Galipo and

12  Mr. Guizar.[3]  Plaintiffs seek an additional $4,845 (17 hours of work by Ms. Rau at $285 per hour)

13  for time spent drafting their Reply to the First Motion, and for work performed opposing

14  defendants' Motion for New Trial.

15         In opposition, defendants argue that plaintiffs' counsel's billing statements are too vague,

16  and that counsel billed for improper activities, duplicative tasks, excessive amounts and attorneys,

17  and at excessive rates.  In particular, counsel contends that Mr. Galipo rarely appeared in Court

18  prior to the final pretrial conferences, and when he did appear he represented that he was not

19  familiar with the case at that point; and that when Mr. Guizar would appear on behalf of plaintiff

20  E.E., he "rarely had any idea as to how to move the case forward."  Defendants assert that this

21  was a "relatively straight forward case of excessive force," that the amount sought in the Motions

22  is "extraordinary," and that four of the original officers accused in this action were either dismissed

23  or not found liable by the jury.  Examining each of the four attorneys in the First Motion,

24  ────────────────

25       [2]    While Mr. Segall-Gutierrez indicates that he worked a total of 141 hours at a rate of $350
26  per hour (which works out to $49,350) (Second Motion, at 6), he seeks a slightly lower recovery
    of $49,282.50.  Second Motion, at 6, 8.

27       [3]    One of the declarations attached to Mr. Guizar's declaration indicates Mr. Guizar is seeking a
28  fee based on $600 per hour (not the $500 per hour rate actually being sought), and that the $600
    per hour amount is reasonable.  See Guizar Declaration, Ex. D.

defendants contend among other things that courts have been reluctant to award a rate as high as that sought by Mr. Galipo even to attorneys with comparable experience; that he was playing catch-up as the trial progressed; that it is "unbelievable" he passed up taking on other cases while handling this matter given his busy schedule; that he and other counsel relied on defendants' exhibits as they were better organized; and that he was never available to discuss the case with opposing counsel.  As for Mr. Guizar, defense counsel argues that his assertions concerning the number of successful jury trials he has handled are unsupported; that his contribution to this trial was minimal, he did not take part in any hearings regarding legal issues, and he did not ask meaningful questions even when he did appear at depositions; and that he was ill-informed about the status of the case, and in essence acted as an assistant to Mr. Galipo.  Defendants next argue that Mr. Fattahi's billing rate at his former firm has no correlation to the type of work he did on this case.[4]  Although defendants agree that he did most of the work on this case prior to trial, he is a third year attorney with minimal police litigation experience, and his duties -- including outlining issues for Mr. Galipo for depositions -- were comparable to those of a paralegal.  Finally, Ms. Rau had only a year of experience as an attorney when this case went to trial, and she was only minimally involved.

Defendants further argue that although three separate lawsuits were involved in this consolidated action, they all involved the same allegations and officers arising from the same incident.  Defendants were able to handle the case with one attorney alone; multiple attorneys were not necessary for plaintiffs.  Similarly, multiple attorneys attended conferences, depositions, and hearings, often doing the same work.  For example, Mr. Guizar attended depositions where he asked only a few questions, which were all objectionable, and billed for all of his time in trial even though he played only a minor role.

Defendants in the First Motion also present a challenge to the number of hours spent on specific billing entries for Mr. Galipo and Mr. Guizar, and more general challenges as to the other

---

[4]    Attached to Mr. Fattahi's declaration is a declaration from a partner at the firm where Mr. Fattahi was an associate prior to going to work for Mr. Galipo.  Mr. Fattahi's billing rate for paying clients in business litigation matters was $365 per hour.

Case 2:07-cv-05463-PLA-JS Document 88-7 Filed 09/16/17 Page 185 of 445 Page ID
#:1598
Case 2:07-cv-05463-PLA-JS Document 77 Filed 09/14/12 Page 6 of 12 Page ID #:260
#:1598

two counsel.  Citing specific examples (Opposition to First Motion, at 9-12), defense counsel contends in part that Mr. Galipo and Mr. Guizar are padding their hours; that fees should not be allowed for time spent by multiple attorneys attending the same hearings and depositions or for reviewing a case with another attorney involved in the same matter; that Mr. Guizar is guilty of "truly excessive billing," and his fee request is unreasonable given that his time was essentially spent "occupying a chair in court;" and that counsel is asking for compensation for deposition time above and beyond the length of the actual deposition.  Next, counsel points out that Mr. Fattahi billed for many of the same items for which Mr. Galipo billed, including depositions, the review of reports and documents, and attending court conferences.  He also prepared and reviewed documents even though Mr. Galipo and Mr. Guizar billed for the same items, and billed at an attorney rate for correspondence that could have been handled by a law clerk.  Finally, Ms. Rau's contribution to the case was minimal, and her hours were duplicative, excessive and unnecessary.

Accordingly, defendants believe the hourly rate for each attorney in the First Motion should be reduced, that a reasonable number of hours is 200 hours for Mr. Galipo, 75 hours for Mr. Guizar, 51.2 hours for Mr. Fattahi, and no hours for Ms. Rau.  They also seek a downward adjustment of the lodestar amount by 40% based on the fact that plaintiffs did not prevail as to four of the original ten defendants.

As to Mr. Segall-Gutierrez, defendants argue that he was only marginally involved in this case "until he abandoned it completely;" he did not appear at trial or at most depositions, did not generate pleadings or participate in negotiations, and did not discuss the case with opposing counsel.  Defendants further contend that he was not permitted to appear to represent plaintiff E.E. in court; never discussed settlement with defense counsel (although he asserts that "plaintiffs' counsel" made efforts to settle the case); spent no time in trial; completely misrepresented a prior matter he claims to have settled for $25.5 million (and in fact abandoned his clients in that case, who received only a small portion of the over-all settlement, and that he had nothing to do with the settlement); misrepresented the nature of another case he settled; had nothing to do with the ultimate verdict in this action; and had minimal participation at most at the five depositions at which he appeared.  Defendant thus contends that Mr. Segall-Gutierrez should not be awarded any fees.

As to the hours he claims, defendants argue that the time he spent reviewing pleadings and work generated by other attorneys involved nothing generated by him, and his skill and experience lent nothing to this case. Defendants list several examples of entries that, they submit, show that Mr. Segall-Gutierrez "is attempting to piggy-back his bill on the work of Mr. Galipo, and dip his hand into the treasury of the City of Los Angeles for legal work that he had nothing to do with." Opposition to Second Motion, at 9-11.

After considering the pleadings of the parties and declarations filed in support of their positions, and the oral argument of counsel, the Court accepts the rates of the four attorneys in the First Motion as falling within the prevailing market rate. Here, plaintiffs have submitted evidence that the rates sought by Mr. Galipo and Mr. Guizar are appropriate for attorneys of comparable skill, experience, and reputation. The rates established in the case L.H. v. Schwarzenegger, 645 F.Supp.2d 888, 894 (E.D. Cal. 2009), for San Francisco are appropriate to utilize as reflective of the market rates in a large California city. The Court notes that those rates are now a few years old, but the rates sought here are still within those set forth in L.H. See First Motion, at 6. When added to the declarations of outside attorneys attesting to the propriety of the requested rates, the Court will not deviate from those amounts as to Mr. Galipo and Mr. Guizar. As to Mr. Fattahi, however, the Court observes that at the time he started working on this case, he had only a few months experience in the area of civil rights litigation, and had less than two years of such experience when he ceased his work on this case. His **current** billing rate at his own firm, after six years as an attorney and three years specializing in civil rights litigation, is $400 per hour. The Court thus finds it appropriate to cut his requested rate by 20%, to $320 per hour. As for Ms. Rau, she only had months as a practicing attorney when she began her work on this case, and no experience in the area of civil rights litigation. The Court will also cut her requested rate by 20%, to $228 per hour.

Having reviewed all of the time entries of all counsel, the Court rejects defendants' assertions that Mr. Galipo's judgment as to the time he needed to prepare for what turned out to be a very successful trial for plaintiffs should be questioned. Aside from citing the numbers of hours sought for various tasks, the Court has not been presented with any sound rationale to

1  question his or Mr. Guizar's under oath declarations.  Defense counsel's opinion as to Mr. Guizar's

2  legal abilities, or the significance of his questions at depositions or his performance at trial, do not

3  undercut his sworn statements.  The fact that Mr. Galipo conducted the bulk of the trial does not

4  mean that Mr. Guizar should not be entitled to his time preparing for and being at the trial.  He

5  represented different plaintiffs; his presence was proper and necessary.  He also conducted some

6  witness examinations and cross-examinations, and gave a closing argument.  There was little

7  repetition between the questions and arguments of Mr. Galipo and Mr. Guizar, which reflects time

8  they spent coordinating their trial presentations.  Defense counsel has not convinced the Court

9  that the hours spent by these counsel on the various tasks "are well beyond what a reasonable

10 attorney would claim."  Further, many hours are claimed based on time spent by counsel reviewing

11 depositions, statements and reports, and meeting with experts and preparing for expert testimony.

12 The Court observed at trial that much of plaintiffs' case was based on a careful review and

13 understanding of prior statements made by defendants, both immediately following the incident

14 and at deposition.  This review necessarily required many hours to compare, contrast, index and

15 reference those statements.  The Court also observed the importance of expert testimony at trial,

16 and the need for a thorough comprehension and understandable presentation of expert opinions.

17 The requested hours are not excessive.

18      Nor does the Court believe that reduction is needed when more than one attorney appeared

19 at a deposition, or at a court hearing.  First, at a minimum, one attorney for plaintiffs E.E. and

20 S.G.P. and one attorney for plaintiff P.C. were entitled to attend and be compensated for such

21 proceedings.  Next, even if one plaintiff had multiple attorneys at a proceeding, this is not per se

22 duplicative.  "Duplicative hours are those where the presence of more than one attorney does not

23 provide benefit to the client."  Oberfelder v. City of Petaluma, 2002 WL 472308, *7 (N.D. Cal. Jan.

24 29, 2002) (citation omitted).  As in Oberfelder, this Court does not find the presence of multiple

25 attorneys at depositions, hearings or trial to be unreasonable or atypical, especially as multiple

26 clients were being represented.  Indeed, it is far more effective to judge a deponent's demeanor

27 based on an attorney's actual in-person perception; the ability to effectively discuss case strategy

28 and division of labor may well depend on multiple view points presented by multiple attorneys.

See, e.g., Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008) (recognizing that some duplication is necessary when litigation extends over years, and that it would be "the highly atypical civil rights case where plaintiff's lawyer engages in churning;" "the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case"). The Court is also not persuaded that plaintiffs should not be able to recover for time beyond the hours actually spent at a deposition. Time preparing for and traveling to and from the deposition is also recoverable. So may counsel be awarded fees for time spent conferring with co-counsel.

However, the Court cannot conclude that Mr. Guizar's time spent writing letters to the mayor and other public figures, or preparing for a press conference, "contributed directly and substantially" to plaintiffs' litigation goals. See Gilbrook v. City of Westminster, 177 F.3d 839, 877 (9th Cir. 1999).[5] The Court will reduce the number of hours by 8 for letters to "Carillo on behalf of family," to the Mayor, for the family "regarding citizen compt [sic]", to the Police Commissioners, and to Senator Romero, and by 2 hours for time Mr. Guizar spent preparing for a press conference.

Defendants offer no persuasive reasons to reduce Mr. Fattahi's hours based on duplication of efforts. The fact that a team of lawyers prepared the case for plaintiffs does not mean that they should not be able to bill hours for talking to each other, or for an associate to prepare the attorney who will actually litigate the case. Finally, Ms. Rau took over for Mr. Fattahi when he left Mr. Galipo's office in July, 2011. The bulk of her time spent reviewing and updating documents is not unreasonable.

The Court rejects defendants' suggestion that the lodestar be reduced by 40% based on the percent of defendants as to whom no liability was established. The overall relief obtained by plaintiffs was substantial; the issues as to each defendant were substantially similar; and the hours attributable to the four non-liable defendants that were not also necessary for the other defendants

---

[5]    Defendants object to, among other entries, 30 hours of time spent by Mr. Guizar writing letters to the mayor, police commissioner, and others, and 2 hours of time preparing for a press conference.

is insignificant.  Nevertheless, the Court will reduce the overall number of hours being sought by all counsel in the First Motion by 10% to account for this factor, as well as to account for the relatively straight-forward nature of the litigation (i.e., little in the way of novel or complicated legal issues), the lack of substantiation that counsel was precluded from accepting other cases as a result of handling this matter, and some duplication of efforts based on changes in counsel during the course of this litigation.

As to Mr. Segall-Gutierrez, however, the analysis is quite different.  In his declaration, he asserts that he worked on this case for approximately four years.  He states in his Reply brief that he acted in the role of a "co-counsel" for plaintiff E.E., presumably with Mr. Guizar.  Reply to Second Motion, at 3.  His time records indicate that he first became involved in this action in August, 2007, was working regularly on the action until February 2010, but then had little involvement until February, 2012, an almost two-year gap.  His activities after that time were limited to only a few hours, mostly involving the preparation of a declaration of his client.  He was not involved in the trial of the case.  While Mr. Segall-Gutierrez argues that his accomplishments as a civil rights attorney are attested to by his declaration and "the supporting declarations" (Second Motion, at 6), he submits no such supporting declarations.[6]  His own declaration is filled with inconsistencies and/or errors.  For example, he indicates that he attended law school until 1999, but has managed his own law firm since 1995.  Segall-Gutierrez Declaration, at ¶¶ 7, 8.  In his Reply brief, however, he indicates that he has been an attorney since 2005.  He does not detail when he made the "natural transition" to civil rights litigation (id., at ¶ 8).  While he may have settled two federal civil rights cases with the City of Los Angeles (and defendants offer strong evidence that he may be over-stating, if not misrepresenting, his involvement in those actions), he does not assert that he has **tried** any federal civil rights cases, or that he has tried any civil rights cases at all.  Id., at ¶¶ 9, 10.  One of his two "accomplishments" in civil rights cases "in the last eighteen months," i.e., prior to the signing of the declaration on May 9, 2012, occurred well over **three years** prior.  Id., at ¶ 11.  While he indicates that he specializes in police misconduct

---

[6]    The Second Motion, concerning Mr. Segall-Gutierrez, appears to be a "copy-and-paste" job of the First Motion, as to which there were supporting declarations.

1  civil rights litigation (id., at ¶ 12), his declaration does not support that assertion.  As to the time

2  he spent on this case, his time sheets include entries amounting to many, many hours for his

3  "review" of documents prepared by others, but his contribution to those documents, or the

4  necessity for him to review those documents to advance this litigation, goes unaddressed.  His

5  assertion that "the difficulty of this case and the skill, experience and ability necessary to prevail

6  on this case" (id., at ¶ 14) warrants a fee of $350 per hour to him is not supported by anything

7  contained in the Second Motion.  Indeed, at the time he began work on this case, he had been an

8  attorney for only two years.  In the Reply to the Second Motion, Mr. Segall-Gutierrez does little to

9  counter or even address the specific claims raised by defendants in their Opposition, other than

10  to argue that he has been an attorney since December 2005, has worked on "several" civil rights

11  cases, and that he worked 141 hours on this case and did not abandon his client.  There is no

12  evidence before the Court -- from co-counsel, from plaintiffs, or even from Mr. Segall-Gutierrez

13  himself -- that the actual work done by Mr. Segall-Gutierrez contributed in any way to the final

14  results in this case or provided a benefit to his client that was not being provided by Mr. Guizar.

15  While he asserts that he "did not assume representation of Plaintiff; he was a co-counsel" (Reply

16  to Second Motion, at 3), what he actually did as co-counsel that added to the advancement of the

17  case is left largely to the imagination.  The Court concludes that his contribution to this matter was

18  minimal at best, and therefore reduces his number of hours to 60, at an hourly rate of $200.  The

19  10% reduction discussed above is also appropriate as to Mr. Segall-Gutierrez' fees.

20      In sum, taking into account the 10% across-the-board adjustment to the number of hours,

21  the deduction of 10 hours from Mr. Guizar, and the adjustment in the hourly rates of Mr. Fattahi

22  and Ms. Rau, the Court awards attorneys fees based on the First Motion as follows: (1) Mr. Galipo

23  -- 702.4 hours at $700 per hour ($491,680); (2) Mr. Guizar -- 313.7 hours at $500 per hour

24  ($156,850); (3) Mr. Fattahi -- 92.2 hours at $320 per hour ($29,504); and (4) Ms. Rau -- 80.2 hours

25  at $228 per hour ($18,285.60), **for an award on the First Motion of $696,319.60**.  An additional

26  award of **$3,876** is appropriate for the time spent opposing defendants' Motion for New Trial, and

27  preparing the Reply to the First Motion (17 hours by Ms. Rau at $228 per hour).  The court

28  concludes that the **total award on the First Motion** (**$700,195.60**) does not amount to a windfall

to the attorneys involved.  While the Court is not required to consider proportionality of fees to determine if the amount sought is reasonable, the Court notes that plaintiffs seek $791,883.50 based on a total jury award of over $3.2 million, or only about 25% of the amount awarded.  The amount the Court is actually awarding is even less, about 22% of the amount awarded by the jury. As for the Second Motion, the Court awards attorneys fees to Mr. Segall-Gutierrez in the amount of **$10,800**, based on 60 hours at $200 per hour, with a 10% adjustment.[7]

**IT IS SO ORDERED**.

DATED: September 14, 2012

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[7]     Counsel for plaintiffs should advise the Clerk's Office that defendants' Motion for Judgment as a Matter of Law or, in the alternative, Motion for a New Trial has been denied, so that a determination on the previously-submitted Bills of Costs can be made.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

===========================================================================

CASE NO.: **CV 11-01326 SJO (FMOx)**        DATE: **August 2, 2012**

TITLE:      **Leonard Avila v. Los Angeles Police Department, et al.**

===========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                               Not Present
Courtroom Clerk                                Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**            **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                    Not Present

===========================================================================
**PROCEEDINGS (in chambers): ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND LIQUIDATED DAMAGES** [Docket No.
170]

This matter is before the Court on Plaintiff Leonard Avila's ("Plaintiff") Motion for Attorneys' Fees
and Liquidated Damages ("Motion"), filed May 3, 2012. Defendants Los Angeles Police
Department ("LAPD"), City of Los Angeles, and Commander Stuart Maislin (collectively,
"Defendants") filed an Opposition ("Opposition") on May 14, 2012, to which Plaintiff submitted a
Reply ("Reply") on May 21, 2012. On May 14, 2012, Defendants filed a Request for Judicial
Notice ("RJN") to which Plaintiff filed no objection. Therefore, the Request for Judicial notice is
GRANTED. The Court found the matter suitable for disposition without oral argument and vacated
the hearing set for June 4, 2012. *See* Fed. R. Civ. P. 78(b). For the following reasons, Plaintiff's
Motion is GRANTED IN PART and DENIED IN PART.

I.      FACTUAL AND PROCEDURAL BACKGROUND

The instant action was brought under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C.
§ 215(a)(3). Plaintiff is a former police officer employed by Defendant LAPD, and was terminated
after he testified in the trial of a coworker regarding FLSA violations in his department. (Mot. 1,
May 3, 2012, ECF No. 170.) On April 4, 2012, a unanimous jury determined that Plaintiff's
termination was retaliatory, in violation of § 215(a)(3) of the FLSA. (Mot. 1.) Remedies are set
forth in 29 U.S.C. § 216(b): "The court in such action shall, in addition to any judgment awarded
to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs
of the action." 29 U.S.C. § 216(b). Plaintiff also seeks liquidated damages in the amount of his
jury award of $50,000. (Mot. 11.) Section 216(b) authorizes liquidated damages to plaintiffs
prevailing on § 215(a)(3) claims:

> Any employer who violates the provisions of section 215(a)(3) of this
> title shall be liable for such legal or equitable relief as may be
> appropriate to effectuate the purposes of section 215(a)(3) of this title,

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-01326 SJO (FMOx)</u>     **DATE:** <u>August 2, 2012</u>

including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).

Plaintiff's Motion seeks a total of $748,522.50 in attorneys' fees, and liquidated damages of $50,000. (Mot. 14.) Defendants filed an Opposition, arguing that Plaintiff's calculations are inaccurate and that the attorneys' fees requested are excessive and unreasonable. (*See generally* Opp'n, May 14, 2012, ECF No.186.) Defendants also argue that Plaintiff is not entitled to liquidated damages. (Opp'n 15-19.) Plaintiff's Reply argues that his request is reasonable and that there is no basis for reducing the requested attorneys' fees. (*See generally* Reply, May 21, 2012, ECF No. 194.) Plaintiff also argues that liquidated damages are mandatory because Defendants do not have a "good faith" defense. (Reply 5.)

II.    DISCUSSION

A.    Plaintiff's Request for Attorney's Fees

Section 216(b) authorizes the payment of attorneys' fees by a defendant when a plaintiff is successful in bringing a FLSA claim. 29 U.S.C. § 216(b). The Court holds that Plaintiff is thus entitled to such a recovery and now determines the appropriate amount. The district court uses the lodestar method to determine the appropriate amount of attorneys' fees. *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993). Courts calculate the lodestar figure by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate for the region and for the experience of the attorney. *City of Riverside v. Rivera*, 477 U.S. 561, 568-69 (1986); *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009).

Plaintiffs have used the lodestar method to reach a total of $748,522.50 in attorneys' fees. (Mot. 4-5.) The Motion asserts that lead attorney Matthew McNicholas's services are billed at $850 per hour. (Mot. 5.) Plaintiff claims that Mr. McNicholas worked over 500 hours on Plaintiff's case. (Mot. 5.) For Douglas Winter, Plaintiff requests 284 hours at $600 per hour. (Mot. 5.) Catherine Schmidt's 126.25 hours are billed at $550 per hour. (Mot. 5.) For Alyssa Schabloski's 42 hours, Plaintiff requests $450 per hour. (Mot. 5.) Cameron Fredman's 107.50 hours are billed at $350 per hour. (Mot. 5.) Finally, the services of paralegal Dawn McGuire are billed at $150 per hour, for 33.75 hours. (Mot. 5.) In addition to the attorneys at McNicholas & McNicholas, LLP ("McNicholas & McNicholas"), Plaintiff also retained the services of an additional attorney, Stuart Esner, to address the issue of exhaustion of judicial remedies. (Mot. 5.) For his 68.4 hours of work, Mr. Esner requests $400 per hour. (Mot. 6.) Defendants contest Plaintiff's calculations, for various reasons including both the hourly rates and number of hours applied in calculating the lodestar number. (*See generally* Opp'n.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 11-01326 SJO (FMOx)</u>     **DATE:** <u>August 2, 2012</u>

      1.    <u>Reasonable Hourly Rate</u>

A reasonable hourly rate is based on the market rates of the region and the experience of the lawyer. *See Rivera*, 477 U.S. at 568-69; *McCown*, 565 F.3d at 1102. Defendants do not contest the hourly billing rates charged by Mr. Fredman and Ms. McGuire of $350 and $150 per hour, respectively. (Opp'n 10; Decl. of Mark K. Kitabayashi in Supp. of Opp'n ("Kitabayashi Decl.") ¶ 11, May 14, 2012, ECF No. 186-2.) Defendants also do not dispute the hourly rate of $400 charged by independent attorney, Stuart Esner. (Mot. 6; Kitabayashi Decl. ¶ 11.)

For Plaintiff's lead counsel, Mr. McNicholas, Plaintiff requests $850 per hour in attorneys' fees. (Mot. 5.) However, Defendants argue that this rate should be reduced to $600, the amount Mr. McNicholas was awarded in a related case, *Romney v. Bratton*, Case No. CV 09-3048-VPF (PLAx) (C.D. Cal. Dec. 1, 2011).[1] (Opp'n 10-11.) Defendants also note that Mr. McNicholas's request of $850 per hour far exceeds rates charged in the ninth decile by partners practicing in California. (Kitabayashi Decl. ¶ 10(a), Ex. A.) However, the data consulted by Defendants reports the average hourly rates for the entire state of California. (*See generally* Kitabayashi Decl. Ex. A.) This number is the average of all regions in California, including those with significantly lower costs of living than Los Angeles, where McNicholas & McNicholas practices. Thus, it is unreasonable to decrease Mr. McNichlas's rate simply because it exceeds rates charged in the ninth decile in California as a whole. However, the Court finds that Plaintiff's request for $850 per hour is excessive.

Plaintiff argues that this increased rate is supported by the rates he received in two recent cases. (Decl. of Matthew S. McNicholas in Supp. of Mot. ("McNicholas Decl.") ¶ 15, May 3, 2012, ECF No. 171.) In 2011, Plaintiff was retained at an hourly rate of $850 to negotiate a separation package. (McNicholas Decl. ¶ 15.) Plaintiff was also awarded an hourly rate of $800 in a recent case. (McNicholas Decl. ¶ 15.) The Court declines to award Plaintiff an hourly rate of $850 based upon these two outliers. As noted by Mr. McNicholas, his typically awarded rate is $650 per hour. (McNicholas Decl. 4-5.) In the most similar case to the present case, *Romney*, Mr. McNicholas claims he was awarded an hourly rate of $650. (McNicholas Decl. ¶ 15.) However, the Court recognizes that the experience of the attorney is relevant to calculating his appropriate hourly rate. In *Romney*, Mr. McNicholas succeeded in gaining his client a nearly $4 million jury verdict. (McNicholas Decl. ¶ 6.) It is reasonable for Mr. McNicholas to request a higher rate after winning

---

[1] It is unclear whether Mr. McNicholas was awarded $600 or $650 per hour. Plaintiff's Reply states he was awarded $600/hour for his work in *Romney*. (Reply 4.) However, Mr. McNicholas states in his declaration that he was awarded $650/hour. (Decl. of Matthew S. McNicholas in Supp. of Mot. ("McNicholas Decl.") ¶ 15, May 3, 2012, ECF No. 171.)

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 11-01326 SJO (FMOx)</u>          DATE: <u>August 2, 2012</u>

a significant award in a closely related case.  Therefore, the Court finds an hourly rate of **$700/hour** to be a reasonable rate for Plaintiff's lead counsel, Mr. McNicholas.

Defendants argue that the rates requested by Plaintiff's attorneys Mr. Winter, Ms. Schmidt, and Ms. Schabloski should be reduced.  (Opp'n 10; Kitabayashi Decl. 5.)  Mr. McNicholas has attested to the skill and expertise of these attorneys, rates charged in other cases, and their work product at McNicholas & McNicholas.  (McNicholas Decl. ¶¶ 17-21.)  Defendants make the unsupported assumption that because the rate charged by Mr. McNicholas exceeds what they believe to be a reasonable rate by 30%, the rates charged by the remaining attorneys should also be decreased by 30%.  (Kitabayashi Decl. ¶ 10.)  Defendants provide no other support for their argument that the rates charged by these attorney should be decreased other than noting once again that the rates charged by Plaintiff's attorneys exceed the rates charged in the ninth decile in California. (Kitabayashi Decl. ¶ 10.)  However, as noted above, the rates indicated in Defendants' chart represent the average of rates charged by attorneys in all of California. (Kitabayashi Decl. Ex. A 3-4.)  These rates are not indicative of a reasonable rate in Los Angeles.[2]  Without further evidence that the rates charged by Mr. Winter, Ms. Schmidt, and Ms. Schabloski are unreasonable, the Court  grants the rates requested in Plaintiff's Motion.  The Court awards Mr. Winter an hourly rate of **$600/hour**, Ms. Schmidt an hourly rate of **$550/hour**, and Ms. Schabloski an hourly rate of **$450/hour**.

>    2. <u>Reasonable Number of Hours</u>

In the Ninth Circuit:

> [t]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked.  The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged . . . .

*Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (citation omitted).  Plaintiff has submitted a declaration with an attached record of all time expended by his attorneys on the

---

[2] Defendants' argument that Mr. Winter's rate should be reduced because it exceeds rates charged in the ninth decile by partners in California also fails because this argument does not take into account Mr. Winter's experience.  (Kitabayashi Decl. ¶ 10(b).)  According to Defendants' own chart, a partner in the ninth decile with 22 years of experience (Kitabayashi Decl. ¶ 11; McNicholas Decl. ¶ 17) bills at $665/hr.  (Kitabayashi Decl. Ex. A, at 4).  Therefore, Defendants' argument is not a basis for reducing Mr. Winter's requested rate of $600/hr.

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 11-01326 SJO (FMOx)</u>        DATE: <u>August 2, 2012</u>

matter, in fifteen minute increments. (*See generally* McNicholas Decl. Ex. 1.) The record includes not only the amount of time expended, but how the time was spent. (McNicholas Decl. Ex. 1.)

Defendants advance several theories as to why the number of hours used to calculate Plaintiff's lodestar should be reduced. (*See generally* Opp'n.) The Court will consider each of Defendants' theories individually.

### a.    Administrative and Clerical Work

Defendants argue that the number of hours worked by Plaintiff's attorneys should be reduced for all hours spent on administrative or clerical work. (Opp'n 12.) In support of their argument that that all hours spent on administrative and clerical work should be reduced by 100%, Defendants cite *Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009). (Opp'n 12; Decl. of Gerald G. Knapton in Supp. of Opp'n ("Knapton Decl.") ¶¶ 25-27, May 14, 2012, ECF No. 186-3; Knapton Decl. Ex. 3A.) *Nadarajah* states that clerical tasks, such as tracking a package and assembling documents, billed by a **paralegal** should be subsumed in the firm's overhead rather than billed at the paralegal's rates. 569 F.3d at 921. Of the billing entries identified as clerical work by Defendants, the Court finds that only the printing of exhibits by McNicholas & McNicholas's paralegal on November 30,2011 and the 10.5 hours billed by "YB" at McNicholas & McNicholas constitute clerical work. (Knapton Decl. Ex. 3A.) The Court thus grants Defendants' request as to these hours and reduces the hours billed by paralegal McGuire by **1 hour**, and the hours billed by "YB" by **10.5 hours**.[3]

### b.    Duplicative Work

Defendants argue that Plaintiff's requested attorneys' fees should be substantially reduced for duplicative work. (Opp'n 12.) Alleged duplicative billings include: work repeated by various lawyers; internal conferences; responses to errors made by Plaintiff's attorneys; attendance at multiple attorneys at conferences and hearings; work done by Stuart Esner; and hours that attorneys spent consulting with each other. (Knapton Decl. ¶¶ 38-44.)

---

[3] It is unclear to the Court whether Plaintiff intended to bill the hours clocked by "YB". YB's 10.5 hours are not included in Plaintiff's breakdown of hours and hourly billing rates. (McNicholas Decl. 8; Mot. 5.) Yet, when the sum of hours billed by the attorneys at McNicholas & McNicholas is calculated, a total of $722,900 is reached. This is $262.50 short of the supposed $723,162.50 requested by Plaintiff for work by McNicholas & McNicholas alone (McNicholas Decl. 9; Mot. 5), exactly the amount the records show billed by YB (*see generally* McNicholas Decl. Ex. 1; Knapton Decl. Ex. 3A). Regardless of whether Plaintiff intended to request reimbursement for the work billed by YB, the Court determines that the $262.50 is inappropriate and will not include these fees in the award.

**CASE NO.:** <u>CV 11-01326 SJO (FMOx)</u>     **DATE:** <u>August 2, 2012</u>

In support of their argument that internal conferences should not be billed, Defendants point only to memoranda issued by the Committee on Mandatory Fee Arbitration, created in 1998 and 2003, which specifically state that the memos have not been adopted by the State Bar and are intended to assist arbitrators in detecting bill padding.  (State Bar of Cal. Comm. on Mandatory Fee Arbitration, Arbitration Advisory 98-03, Determination of a "Reasonable" Fee (June 23, 1998); State Bar of Cal. Comm. on Mandatory Fee Arbitration, Arbitration Advisory 03-01, Detecting Attorney Bill Padding (January 29, 2003); Knapton Decl. ¶ 38.)  While the Court finds some of the techniques persuasive, the Court will not grant such broad, unspecific cuts without further evidence of duplicative work.  Defendants argue that time spent by attorneys consulting one another should be eliminated as duplicative work.  The Court declines to reduce Plaintiff's requested attorneys' fees for such a reason, because it is often necessary for attorneys working on a single project to meet and confer about the case in order to provide the best assistance possible.

Defendants also argue that hours spent by the attorneys at McNicholas & McNicholas working on Plaintiff's Opposition to Defendants' Motion for Summary Judgment are duplicative because another attorney, Stuart Esner, was retained to work on the Opposition.  (Knapton Decl. ¶ 41.)  However, Mr. Esner was retained solely to address the issue of exhaustion of judicial remedies.  (Mot. 5.)  Defendants have provided no argument to suggest that, because Mr. Esner was retained to address an issue, any work done by the attorneys at McNicholas & McNicholas themselves is necessarily duplicative.  Thus, the Court declines to reduce the number of billable hours pursuant to this theory.

The Court agrees with Defendants that time spent on work that ultimately failed due to mistake and oversight of Plaintiff's attorneys is not compensable.  (Knapton Decl. ¶ 39.)  Therefore, for Plaintiff's attorneys' failure to timely file his motions in limine, the Court will deduct **11 hours** of the time billed by Mr. Winter and **1.75 hours** of the time billed by Mr. McNicholas.  The Court will also deduct time spent by Plaintiff's attorneys on the preparation of an expert whom they failed to timely designate as an expert.  The Court deducts **5 hours** of the time billed by Mr. Fredman, **12.75 hours** of the time billed by Mr. Winter, and **5.25** of the hours billed by Mr. McNicholas.  The Court declines to deduct billable hours for counsels' failure to file a Writ regarding the Board of Rights findings.

     c. <u>Excessive Time Billed</u>

Defendants argue that the hours billed by Plaintiff's attorneys should be reduced because counsel billed excessive hours to complete certain tasks that should have been completed more efficiently.  (Knapton Decl. ¶¶ 45-49.)  Defendants also note that because Plaintiff's counsel bills in minimum increments of 0.25 hours, shorts tasks such as checking an email are over-billed.  (Knapton Decl. ¶ 48.)  For the billings that Defendants have identified as excessive, they request a 40% reduction.  (Knapton Decl. ¶ 49.)  "[D]uplicative work, however, is not a justification for cutting a fee, unless the lawyer does *unnecessarily* duplicative work."  *Mendez v. County of San Bernardino*, 540 F.3d

Case 2:10-cv-05410-SJO-FMO Document 89-3 Filed 08/16/17 Page 7 of 12 Page ID
Case 2:11-cv-01326-SJO-FMO Document 89-3 Filed 08/16/13 Page 7 of 12 Page ID
#:3755

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 11-01326 SJO (FMOx)</u>       **DATE:**  <u>August 2, 2012</u>

1109, 1129 (9th Cir. 2008) (internal quotation marks omitted).  Therefore, in order to achieve their requested reduction, Defendants must clearly demonstrate that Plaintiff's attorneys engaged in work that was unnecessarily time consuming.

The Court agrees that billing 15 minutes for reviewing a single email is excessive and grants Defendants' request as to those records.  The Court deducts **.5 hours** of the time billed by Ms. Schmidt and **.5 hours** of the time billed by Mr. McNicholas.

Defendants make the unsupported assumption that Plaintiff's counsel billed an excessive amount of time for the completion of certain tasks that do not require such time.  (Knapton Decl. ¶ 47.) They have pointed to several entries that supposedly fall within this group, yet have failed to note exactly which tasks they believe took excessive time, how much time the tasks took, or what a reasonable amount of time would be.  (*See generally* Knapton Decl. Ex. 3E.)  Based upon a review of Plaintiff's counsels' billing records, there do not appear to be any tasks that were grossly over-billed.  (*See generally* Knapton Decl. Ex. 2.; McNicholas Decl. Ex. 1.)  The taking of depositions, preparation of an opposition to summary judgment, and preparation for trial are tasks that are generally time consuming, and the Court sees nothing that necessitates a reduction of 40% as to those tasks.

> d.    <u>Block Billing</u>

Defendants request that the Court reduce Plaintiff's attorneys' fees by 30% overall to account for numerous records that were block billed.  (Knapton Decl. ¶¶ 50-55.)  Block billing is the practice of grouping several tasks into a single time recording.  *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007).  Courts frown upon block billing because it impedes the court's ability to determine whether billed hours are reasonable and tends to inflate legal fees.  *Mendez*, 540 F.3d at 1128-29.  Defendants argue that a total of 274.5 hours have been block billed and should therefore be reduced by 30%.  (Knapton Decl. ¶ 54.)  The Court disagrees that such a reduction is necessary and finds that Plaintiff's attorneys have not impermissibly block billed hours.  The entries are sufficiently clear and discrete for the Court to assess what the attorneys were working on and whether they expended an unreasonable amount of time.  (*See generally* McNicholas Decl. Ex. 1; Knapton Decl. Ex. 3B.)

The Court also notes that the vast majority of the entries alleged by Defendants  to be block billing are in reality broken-down explanations of each part of a single task.  (*See generally* Knapton Decl. Ex. 3B.)  For example, one entry criticized by Defendants states: "Review CPF's research re defense argument; read and review related cases." (Knapton Decl. Ex. 3B 1.)  While initially appearing to include several tasks, this entry in fact simply provides an explanation of various parts of a single task: the review of CPF's research.  Most of the entries pointed to by Defendants are of the same nature: detailed breakdowns of individual tasks into discrete parts.  Because the Court finds that Plaintiff's attorneys' billing records sufficiently articulate each task, the Court denies Defendants' request to reduce the 274.5 hours by 30%.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

**CASE NO.:** <u>CV 11-01326 SJO (FMOx)</u>          **DATE:** <u>August 2, 2012</u>

     e.    <u>Vague Billing Descriptions</u>

Defendants argue that several hours billed should be reduced by 30% because the billing descriptions are vague. (Knapton Decl. ¶¶ 56-58.) Records that are not sufficiently detailed prevent the Court from determining whether the hours billed are reasonable and can result in the billing of excessive hours. *In re Donovan*, 877 F.2d 982, 995 (D.C. Cir. 1989). The Court concludes that the majority of the hours pointed to by Defendants are sufficiently detailed to allow the Court to determine the reasonableness. However, Mr. McNicholas has billed several hours on tasks simply described as "trial preparation" or "work on trial documents". (*See generally* McNicholas Decl. Ex. 1; Knapton Decl. Ex. 3C 2.) From these limited descriptions, it is entirely unclear what Mr. McNicholas was working on and whether it required the several hours that he billed. The Court finds that 34.5 of the hours billed by Mr. McNicholas are impermissibly vague. The Court will apply the 30% deduction requested by Defendants because this is sufficient to capture the potential inflation of hours attributable to the vague records. (Knapton Decl. ¶ 58.) Thus, the Court deducts **10.35 hours** of the time billed by Mr. McNicholas.

     f.    <u>Rounded Off Billing Entries</u>

Defendants argue that the Court should reduce Plaintiff's requested attorneys' fees by 10% to account for their unsupported assumption that Plaintiff's attorneys engage in a routine practice of rounding off their entries to the nearest hour. (Opp'n 12; Knapton Decl. ¶¶ 59-61.) Defendants point to several entries that they assume were rounded up, and the support for their argument is simply noting that many billing entries are even numbers. (Knapton Decl. ¶ 60.) Defendants also fail to point to case law supporting their argument that attorney time must be billed in six minute increments, and that such alleged roundings are a proper basis for adjusting the calculation of a lodestar. Thus, the Court declines to reduce Plaintiff's request based on Defedants' allegations of improper rounding.

    3.    <u>Post-Lodestar Calculation Adjustments</u>

The district court may adjust a fee upward or downward after calculating the lodestar to account for special circumstances. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

     a.    <u>Plaintiff's Limited Success</u>

Courts recognize that a party may be the prevailing party, yet have only succeeded on a fraction of its claims. *Id.* at 434. To account for such situations, courts may award the full amount of attorneys' fees or grant additional reductions. *Id.*; *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999). Relevant to this inquiry is the similarity between the successful and unsuccessful claims, because "work on an unsuccessful claim cannot be deemed to have been

| CASE NO.: <u>CV 11-01326 SJO (FMOx)</u> | DATE: <u>August 2, 2012</u> |
| --- | --- |

expended in pursuit of the ultimate result achieved." *Hensley*, 461 U.S. at 435 (internal quotation marks omitted).

In this case, Plaintiff prevailed on only his FLSA retaliation claim, losing his due process and state law claims. (Reply 2.) Defendants argue that Plaintiff's successful and unsuccessful claims are substantially unrelated and that Plaintiff's fees should thus be reduced by 80 to 90%. (Opp'n 7-8.) The Court disagrees. The claims are based upon the same core set of facts and generally related legal theories. *See Hensley*, 461 U.S. at 435. The majority of the hours spent on the most time-consuming tasks, such as discovery and trial, would have been necessary regardless of whether Plaintiff had pursued his failed claims. However, the Court recognizes that some effort was expended on the failed claims that did not contribute to Plaintiff's successful claims and therefore grants Defendants a **10% reduction** in the overall amount of fees incurred.

Defendants also argue that an overall reduction is necessary regardless of the relatedness of the claims because Plaintiff's relief is substantially less than what he initially sought. (Opp'n 13.) The Court recognizes that in relation to the multitude of claims brought and Plaintiff's counsels' success in the *Romney* trial, Plaintiff's actual success in this case was limited. The Court believes that the 10% reduction is sufficient to adjust the award for deductions necessary to account for partial success in spite of the relatedness of the claims. *See Hensley*, 461 U.S. at 436 (holding that reductions in attorneys' fees may be necessary even if all claims were interrelated to account for partial success of the plaintiff).

b. Similarity to *Romney* Case

Defendants argue that Plaintiff's attorneys' fees award should be substantially reduced to account for the fact that Plaintiff's attorneys also litigated the *Romney* case. (Opp'n 8-9.) Defendants argue that Plaintiff's counsels' experience with the *Romney* case resulted in "nothing novel or difficult about Plaintiff's case" that would require such a substantial amount of the attorneys' time and effort. (Opp'n 9.) Plaintiff disagrees, arguing that there were some significant differences "including the judicial exhaustion issue, Maislin's changed testimony, [and] Avila's resignation." (Reply 3.) While there were many similarities between the instant case and *Romney*, the Court agrees with Plaintiff that there were several differences necessitating the expenditure of additional time and resources. Thus, the Court declines to reduce Plaintiff's request for fees because Mr. McNicholas litigated the *Romney* case.

B. Plaintiff's Request for Liquidated Damages

Plaintiff argues that he is entitled to an amount of liquidated damages equal to the amount of lost wages awarded by the jury. (Mot. 11-13.) He argues that the language of 29 U.S.C. § 216(b) requires the Court to award such damages when a violation of the FLSA has been found. (Mot. 12.) Defendants disagree with Plaintiff's interpretation of the statute, arguing that liquidated damages are discretionary when defendants are found to have engaged in retaliatory conduct,

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 11-01326 SJO (FMOx)</u>          DATE: <u>August 2, 2012</u>

rather than wage violations. (Opp'n 15-17.) In support, Defendants point to *Braswell v. City of El Dorado*, 187 F.3d 954 (8th Cir. 1999), and *Blanton v. City of Murfreesboro*, 856 F.2d 731 (6th Cir. 1988), both of which held that an award of liquidated damages in a FLSA retaliation claim is discretionary. (Opp'n 16.) Similarly, in the related *Romney* case, also concerning FLSA retaliation, the court declined to award liquidated damages. (RJN Ex. 4, Ex. 5, May 14, 2012, ECF No. 187-1.) Defendants further argue that the Court should exercise its discretion by not awarding the liquidated damages because an award in this case would not work to advance the purposes of the FLSA. (Opp'n 17.)

Finally, Defendants argue that even if the Court finds that an award would further the purposes of the FLSA, liquidated damages should not be granted because Defendants have a "good faith" defense. (Opp'n 18-19.) Section 260 states that if an employer demonstrates that the violation was committed in good faith, then the court may exercise its discretion and decline to award liquidated damages. 29 U.S.C. § 260. The Court finds that Defendants have not established that they had "reasonable grounds for believing that [their] act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C. § 260. The Court disagrees with Defendants' argument that because the jury declined to find Defendants liable on Plaintiff's due process and state law claims, Defendants necessarily have a good faith defense. (Opp'n 18-19; Kitabayashi Decl. ¶ 15.)

In the related *Romney* case, liquidated damages were denied not because Defendants had a good faith defense, but because the court found that Plaintiff's award of over $100,000 in past economic damages was sufficient to effectuate the purposes of the FLSA. (RJN Ex. 4 3.) However, the Court believes that in this case, an award of liquidated damages would help advance the goals of the FLSA. In *Romney*, the plaintiff received a nearly $4 million verdict, while here, Plaintiff received only $50,000. (McNicholas Decl. ¶ 6; Opp'n 1.) The Court finds that the additional $50,000 in liquidated damages would work to compensate Plaintiff for a delay in payment of wages owed and also provide an incentive for future employees to report wage and hour violations by their employers. *Hultgren v. Cnty. of Lancaster*, 913 F.2d 498, 508-09 (8th Cir. 1990) ("Section 216's provision for liquidated damages is intended in part to compensate employees for the delay in payment of wages owed under the FLSA; it is a penalty or a punishment."); (RJN Ex. 4 3.) Thus, the Court awards Plaintiff liquidated damages in the amount of his damages award: $50,000.

   C.   <u>Final Calculations</u>

Plaintiff's initial Motion includes a request for: (1) 503.75 hours for Matthew McNicholas; (2) 284 hours for Douglas Winter; (3) 126.25 hours for Catherine Schmidt; (4) 42 hours for Alyssa Schabloski; (5) 107.5 hours for Cameron Fredman; (6) 33.75 hours for Dawn McGuire; and (7) 68.4 hours for Stuart Esner. (Mot. 5.) The Court declines to allow Plaintiff to collect for the hours billed by "YB".

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

**CASE NO.:** <u>CV 11-01326 SJO (FMOx)</u>    **DATE:** <u>August 2, 2012</u>

The Court holds that the attorneys' hours will be billed accordingly: (1) $700/hr for Mr. McNicholas; (2) $600/hr for Mr. Winter; (3) $550/hr for Ms. Schmidt; (4) $450/hr for Ms. Schabloski; (5) $350/hr for Mr. Fredman; (6) $150/hr for Ms. McGuire; and (7) $400/hr for Mr. Esner.

The hours billed by Mr. McNicholas are reduced by 17.85 hours, bringing his total billable hours to 485.9 hours. Thus, Mr. McNicholas's fees total $340,130.

The hours billed by Mr. Winter are reduced by 23.75 hours, bringing his total billable hours to 260.25. Thus, Mr. Winter's fees total $156,150.

Ms. Schmidt's billable hours are reduced by only .5 hours, bringing her total billable hours to 125.75. Therefore, $69,162.50 is the total for her services.

Mr. Fredman's hours total 102.5, after a reduction of 5 hours. Thus, Plaintiff may recover $35,875 for the services of Mr. Fredman.

The Court will deduct 1 hour of pay from the total amount billed by Ms. McGuire. Thus, Plaintiff may recover $2,812.50 for the services of Ms. McGuire.[4]

For the services of Ms. Schabloski[5] and Mr. Esner,[6] the Court grants Plaintiff the full amount requested: $14,287.50 and $25,360 respectively. (Mot. 5-6.) This brings the preliminary total to $643,877.50. Applying a 10% reduction to account for Plaintiff's limited success, the Court **AWARDS** Plaintiff **$579,400 in attorneys' fees**.

The Court also **GRANTS** Plaintiff **$50,000 in liquidated damages**.

///

///

///

---

[4] Ms. McGuire billed 14 hours at no charge. (McNicholas Decl. Ex. 1.) Thus, the fee award for Ms. McGuire is based on an initial request of 19.75 hours billed at the hourly rate.

[5] Ms. Schabloski's billed 10.25 hours at no charge. (McNicholas Decl. Ex. 1.) Thus, the fee award is based on an initial request of 31.75 hours billed at the hourly rate.

[6] Mr. Esner did not charge for 5 hours at trial. (Esner Decl. 2.) Thus, the fee award is based on an initial request of 63.4 hours billed at the hourly rate.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 11-01326 SJO (FMOx)**          **DATE:  August 2, 2012**

III.    RULING

For the foregoing reasons, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**.
Plaintiff shall recover attorneys' fees in the amount of **$579,400** and liquidated damages in the
amount of **$50,000**.  The Judgment is hereby amended accordingly.

IT IS SO ORDERED.

cc: fiscal

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 09/18/17 Page 204 of 445 Page ID
#:1617
Case 2:12-cv-03113-WCO-JCF Document 28-1 Filed 07/10/13 Page 12 of 55 Page ID
#:537

United States District Court
For the Northern District of California

1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT
8
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11                                              No. C 11-00667 WHA
   VALLABHAPURAPU, et al.,
12                                              **ORDER GRANTING MOTION FOR**
              Plaintiffs,                       **FINAL APPROVAL OF CLASS**
13                                              **SETTLEMENT; MOTION FOR AN**
      v.                                        **AWARD OF ATTORNEY'S FEES**
14                                              **AND COSTS**
   BURGER KING CORPORATION,
15
              Defendant
16
   _____/
17

18                          **INTRODUCTION**

19          This is an ADA disability-access class action alleging barriers to access on behalf of

20   mobility-impaired customers of restaurants in California leased by defendant Burger King

21   Corporation.  The parties have filed a joint motion for final approval of the settlement.  Class

22   counsel also requests attorney's fees and litigation costs and expenses.  For the reasons explained

23   below, final approval of the proposed settlement is **GRANTED**.  Plaintiffs' motion for attorney's

24   fees and costs is **GRANTED**.

25                            **STATEMENT**

26          This action is the second part of a class action originally asserted against Burger King

27   Corporation.  Plaintiffs alleged that restaurants that Burger King Corporation leases to its

28   franchisees in California violated the Americans with Disabilities Act, the Unruh Civil Rights

     Act, and the California Disabled Persons Act.  Plaintiffs alleged that Burger King violated state

EXHIBIT D                                                                      000104

Case 2:16-cv-05117-TJH-SS  Document 89-7  Filed 08/18/17  Page 205 of 445  Page ID
#:1000
Case 3:11-cv-01131-WHA  Document 117  Filed 09/23/11  Page 2 of 5  Page ID
#:1000

and federal regulations by pursuing discriminatory policies or practices that resulted in unlawful architectural or design barriers which denied customers who use wheelchairs or scooters access to services at these Burger King restaurants.

In the first part of the litigation, *Castaneda v. Burger King Corporation*, No. 08-04262 WHA, ten classes were certified as to ten of the alleged non-compliant restaurants. The parties reached a class settlement, final approval of which was granted by this Court in July 2010.

Plaintiffs then filed this action in February 2011 against Burger King. The complaint in this action brings the same claims and asserts class action allegations as to the remaining 86 restaurants not included in the *Castaneda* settlement. Plaintiffs reached a settlement agreement with Burger King regarding the remaining 86 restaurants in this action.

The proposed class action settlement provides for significant injunctive relief and damages. Specifically, the injunctive relief includes all of the measures agreed to in *Castaneda*, including the elimination of all accessibility barriers and the use of mandatory checklists with specific accessibility items for remodeling, alterations, repairs, and maintenance. An additional remedial measure not included in the *Castaneda* settlement is that Burger King will include in its manual to its franchisees the recommendation that franchisees check the force required to open all public exterior and restroom doors twice per month to ensure that they do not require more than five pounds of pressure to open. The proposed settlement provides for a cash payment of $19,000,000 to satisfy and settle all claims for damages, as well as any attorney's fees and costs awarded (Settlement Agreement ¶ 9.1.1). The settlement agreement provides that it "does not in any way affect the rights, obligations, or restaurants at issue in the *Castaneda* Settlement" (*id.* at ¶ 1.5). Of the 86 restaurants originally at issue, the injunctive relief applies to the 77 Burger King restaurants that are still in business and are leased by Burger King to franchisees in California.

After reviewing the proposed class settlement and revising the proposed notice forms, the Court directed plaintiffs to give notice to class members so that a fairness hearing could be held. A "short-form notice" was approved, which was required to be posted for 30 calendar days at each of the restaurants covered by the class certification order. A "long-form notice" was also

2

United States District Court
For the Northern District of California

1  approved, which was to be sent out to existing damage claimants and to northern California

2  disability rights groups.  A fairness hearing was held on October 25, 2012 and addressed (1)

3  whether the proposed settlement should be approved, and (2) the amount of fees and costs to be

4  awarded to class counsel from the settlement fund.

5      The deadline for class members to object or opt out of the settlement was September 17,

6  2012.  Class members can opt in to receive monetary damages by November 15.  Each damages

7  claimant is required to complete a claim form documenting his or her eligible visits to one of the

8  86 restaurants where he or she encountered a barrier to access.  As in *Castaneda*, the proposed

9  settlement provides that monetary awards to each damages claimant will be distributed pro rata

10  based on the total number of visits by each damages claimant, with a maximum number of six

11  visits for which each claimant may obtain recovery.  Class members who do not opt in to receive

12  damages claims do not release their rights to pursue such damages claims separately.

13      Plaintiffs also move for a combined $4,823,082.58 in attorney's fees and litigation costs

14  and expenses, consisting of reimbursement of $230,776.77 in litigation costs and expenses, and

15  $4,592,305.81 in attorney's fees.  To provide class members with an opportunity to review and

16  comment on the application for an award of attorney's fees and costs, class counsel posted the

17  application on their website three weeks prior to the September 17 object/opt-out deadline (Lah

18  Decl. ¶ 7).

19                                    **ANALYSIS**

20      This order first explains why the pending settlement is fair, reasonable and adequate

21  under FRCP 23(e) and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (setting

22  forth the factors to be considered when evaluating class action settlements).  Next, this order

23  discusses why the awarded attorney's fees are reasonable.

24      **1.    THE SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE.**

25      Having considered the terms of the settlement agreement, proposed plan of distribution,

26  and adequacy of notice to class members, and having considered the motion for final approval

27  of the settlement agreement, the declarations submitted therewith, oral argument by counsel,

28  and all other documents of record in this matter, this order holds that the settlement agreement

3

United States District Court
For the Northern District of California

1    is in the best interests of the class and is fair, reasonable, and adequate under the factors set forth

2    in *Hanlon*.

3         No objections to the settlement have been filed or received by counsel or the claims

4    administrator.  One class member opted out (Keough Decl. ¶¶ 14–15).  Class counsel attempted

5    to contact the individual several times and confirmed that she was not interested in participating

6    in the settlement (Lah Decl. ¶ 6).  The settlement agreement provides for injunctive relief,

7    including the elimination of alleged accessibility barriers, the use of mandatory checklists with

8    specific accessibility items for remodeling, alterations, repairs and maintenance, and the

9    monitoring of compliance.  Burger King will also include in its manual a guideline that

10   franchisees should check to ensure the appropriate force is required to open public exterior and

11   restroom doors.  The settlement agreement provides for the Court to retain jurisdiction to enforce

12   the terms of settlement until October 26, 2016, four years after the settlement agreement has

13   been finalized.

14        The settlement also provides for a cash payment of $19,000,000 to the settlement class.

15   Monetary awards to each claimant in the settlement class will be distributed pro rata based on the

16   total number of visits by each damages claimant to one of the 86 restaurants where he or she

17   encountered a barrier, with a maximum number of six visits for which each damages claimant

18   can obtain recovery.  Each of these damage claimants must complete a claim form documenting

19   his or her eligible visits.  Payment for the costs of notifying and administering the settlement up

20   to $100,000 shall be paid by class counsel's awarded attorney's fees, while costs above those

21   amounts shall come from the settlement fund.

22        The class administrator reported that, as of October 11, 620 individuals had submitted

23   claim forms to recover damages.  The class administrator estimated that, assuming a net

24   settlement fund of $14,250,000, the average award value is $22,983.87 per processed claim,

25   $1,253.62 per store visit based on a raw store visit count, and $4,968.61 per store visit based on

26   an adjusted store visit count (limiting the number of eligible visits per claimant to six visits)

27   (Keough Decl. ¶ 16).  The parties state that, if the numbers reported by the claims administrator

28   do not change significantly, the average recovery per claimant will be 50 percent above the

4

EXHIBIT D                                                              000107

United States District Court
For the Northern District of California

1    average recovery in *Castaneda* (Br. 12–13).  At the final fairness hearing, class counsel stated

2    that as of October 22, 677 individuals have submitted claim forms to recover damages.

3         Accordingly, final approval of the settlement and plan of allocation is hereby **GRANTED**.

4    **2.    ATTORNEY'S FEES AND COSTS.**

5         Despite the settlement agreement and defendant's acquiescence to the attorney's fees

6    sought, a court must still ensure that the attorney's fees and costs awarded are "fair, reasonable,

7    and adequate."  *See Staton v. Boeing, Co.*, 327 F. 3d 938, 963–64 (9th Cir. 2003).  Common fund

8    fees, as we have here, are consistent with the "American Rule" (*i.e.,* that each party pays for its

9    own litigation expenses), and "a litigant or lawyer who recovers from the common fund for the

10   benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from

11   the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

12        District courts in this circuit may use two different approaches to gauge the

13   reasonableness of a requested fee award under the traditional common-fund approach.  The first

14   is the lodestar method, whereby a reasonable number of hours is multiplied by a reasonable

15   hourly rate.  The lodestar may include a risk multiplier to enhance the fees under certain

16   circumstances, in which a court considers "the quality of the representation, the benefit obtained

17   for the class, the complexity and novelty of the issues presented, and the risk of nonpayment."

18   *Hanlon*, 150 F.3d at 1026.  Our court of appeals, however, also allows a calculation based upon a

19   percentage of the common fund.  *See Staton*, 327 F.3d at 967–68.  The benchmark percentage is

20   25 percent.  *See Hanlon*, 150 F.3d 1011, 1026.  Here, the requested $4,592,305.81 in attorney's

21   fees equals approximately 25 percent of the settlement fund, after costs.

22        In *Castaneda*, class counsel reduced their lodestar by $1,106,625.35, representing over

23   4,500 hours for work attributable to the 86 restaurants covered by the current settlement

24   (*Castaneda* Dkt. No. 346 ¶ 41; Fox Decl. ¶ 39).  After *Castaneda*, class counsel spent an

25   additional 5,568.53 hours on the current settlement, after exercising billing judgment and

26   deleting 557.6 hours (Lee Decl., Exh. B).  In total, class counsel claim to have expended over ten

27   thousand hours in this six-year action (*ibid.*).  After applying what they assert are reasonable

28

5

**United States District Court**

For the Northern District of California

1   rates to those hours (ranging from $335 to $825 for the attorneys, and from $225 to $275 for

2   paralegals and other staff), counsel calculate a lodestar of $3,546,721.60 (Br. 12).

3          Counsel request that this order enhance the total fee award by applying a multiplier of

4   1.29, which this order finds warranted given "the quality of the representation, the benefit

5   obtained for the class, the complexity and novelty of the issues presented, and the risk of

6   nonpayment" in this action. *Hanlon*, 150 F.3d at 1029. The determinative factor, however, is

7   the benefit to the class. Even after the requested attorney's fees and costs are deducted, the

8   monetary damages of over $14 million — which, according to plaintiffs, is the largest total

9   recovery amount ever obtained in a disability access case — is only part of the relief obtained for

10  class members. As noted above, the settlement also provides for considerable measures of

11  injunctive relief at the restaurants at issue to eliminate accessibility barriers. Because the

12  deadline for claims is November 15, 2012, the average monetary recovery per damages claimant

13  is yet unknown; however, the $14 million net settlement fund, by itself, is very good. Based on

14  the current number of processed claims, class counsel estimates that the average recovery per

15  claimant will be nearly 50 percent above the average recovery in *Castaneda* (Br. 12–13).

16  Accordingly, the benefits provided to the class warrant the requested fee award. Class counsel's

17  request for $4,592,305.81 in attorney's fees is fair, reasonable, and adequate.

18         Plaintiffs' counsel seek $230,776.77 in litigation costs and expenses. This order finds

19  that the costs and expenses, as detailed by class counsel, are reasonable. Additionally, plaintiffs'

20  counsel have not included in this amount the $100,000 in claims administration costs that they

21  have agreed to pay out of their recovered attorney's fees. For the reasons stated above, the

22  request for attorney's fees and reimbursement of litigation costs and expenses is **GRANTED**.

### CONCLUSION

23

24         Accordingly, it is hereby ordered as follows:

25         1. The Court hereby finds that the settlement is fair, reasonable, and adequate as to

26  the class, plaintiffs, and defendants, that it is the product of good faith, arms-length negotiations

27  between the parties, and that the settlement is consistent with public policy and fully complies

28  with all applicable provisions of law. The breadth of the release to be imposed on the absent

EXHIBIT D                                                    000109

United States District Court
For the Northern District of California

1  class members is sufficiently narrow.  Absent class members who have not opted in to pursue

2  damages claims release only non-monetary claims relating to the accessibility of the restaurants

3  covered by the settlement based on conduct preceding final approval of the settlement

4  agreement.  They do not release any claims for monetary damages.  The final settlement is

5  therefore approved.

6       2.  The notice given to class members and potential damages claimants was the best

7  notice practicable under the circumstances, was valid, gave due and sufficient notice to all class

8  members, and complied fully with the Federal Rules of Civil Procedure, due process, and all

9  other applicable laws.  A long-form notice was mailed to all known damages claimants described

10  in the proposed settlement.  A short-form notice was posted for a period of 30 calendar days in

11  all Burger King restaurants covered by the settlement, which provided information for obtaining

12  the long-form notice and opt-in/opt-out form.  The short-form notice was also mailed to northern

13  California disability rights groups.  The long-form and short-form notices provided information

14  regarding the manner in which class members could object to or participate in the settlement and

15  the manner in which class members could opt out of the class.  A full and fair opportunity was

16  afforded to class members to participate in the proceedings to determine whether the proposed

17  settlement should be given final approval.  Accordingly, this order holds that all class members

18  who did not exclude themselves from the settlement by filing a timely request for exclusion are

19  bound by this settlement order and judgment.

20       3. The Court retains continuing jurisdiction over the class action, named plaintiffs,

21  the class, and defendant for four years (until October 26, 2016) from the date of entry of this

22  order in order to supervise the implementation, enforcement, construction and interpretation of

23  the revised settlement agreement and this order.

24       4. The Court hereby awards to plaintiffs' counsel attorney's fees of $4,592,305.81 and

25  $230,776.77 in litigation costs and expenses, to be paid from the settlement fund.  Plaintiffs'

26  counsel shall be awarded the $230,776.77 as well as 50 percent of the attorney's fees now; the

27  remaining 50 percent may be recovered only after counsel certifies that the fund is completely

28

7

United States District Court
For the Northern District of California

1  wound up.  If problems do arise and if management of this fund so necessitates, any shortfall in

2  funds to pay class members may be deducted from the unpaid attorney's fees.

3       5. Damages claimants who have already opted in or intend to opt in to receive monetary

4  damages have until November 15, 2012, to complete, sign, and submit their claim forms for

5  shares of the damages fund.  Eligibility for payments from the net settlement fund shall be

6  determined based on the procedure set forth in section nine of the settlement agreement.

7

8       **IT IS SO ORDERED.**

9

10  Dated:  October 26, 2012.

                                   WILLIAM ALSUP
11                                     UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT D                                                     000111

Case 2:16-cv-05017-TJH-SS Document 88-7 Filed 08/16/17 Page 212 of 445 Page ID
Case 2:04-cv-08510-SJO-SS Document 64 Filed 07/02/10 Page 1 of 8 Page ID
#:1625

1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   LONG BEACH AREA PEACE          )      NO. CV 04-08510 SJO (SSx)
     NETWORK, et al.,               )
12                                  )
                  Plaintiffs,       )      **ORDER GRANTING PLAINTIFFS' MOTION**
13                                  )      **FOR AWARD OF ATTORNEYS' FEES AND**
              v.                    )      **COSTS AGAINST DEFENDANT**
14                                  )      [Docket No. 56]
     CITY OF LONG BEACH,            )
15                                  )
                  Defendant.        )
16   _____ )

17          This matter is before the Court on Plaintiffs Long Beach Area Peace Network and

18   Diana Mann's (collectively, "Plaintiffs") Motion for Award of Attorneys' Fees and Costs, filed

19   April 15, 2010. Defendant City of Long Beach ("Defendant") filed an Opposition to which Plaintiffs

20   replied. The Court found this matter suitable for disposition without oral argument and vacated

21   the hearing set for May 24, 2010. *See* Fed. R. Civ. P. 78(b). Because of the following reasons,

22   Plaintiffs' Motion is GRANTED.

23   I.     BACKGROUND

24          Defendant adopted an ordinance, codified in §§ 5.60 *et seq.*, of the Long Beach Municipal

25   Code ("LBMC"), that established a permit scheme for parades and assemblies held in the

26   City of Long Beach (the "Ordinance"). Plaintiffs filed a "facial challenge" to the Ordinance,

27   seeking: (1) declaratory and injunctive relief; (2) compensatory damages; and (3) attorneys' fees.

28   On November 15, 2004, the Court permanently enjoined Defendant from enforcing the Ordinance

Case 2:16-cv-05417-TJH-GJS Document 88-7 Filed 08/16/17 Page 213 of 445 Page ID
Case 2:04-cv-08310-SJO-SS Document 64 Filed 07/02/10 Page 2 of 8 Page ID
#:1626

1  on the grounds that the Ordinance constituted an unconstitutional restraint on speech and

2  assembly.  Defendant subsequently appealed the Court's Order to the Ninth Circuit.

3         In *Long Beach Area Peace Network v. City of Long Beach,* 574 F.3d 1011 (9th Cir. 2009),

4  the Ninth Circuit affirmed in part and reversed in part, and remanded the issue of whether the four

5  unconstitutional provisions could be severed.  Defendant filed a petition for rehearing *en banc*,

6  which was denied.  Defendant then petitioned for a Writ of Certiorari with the United States

7  Supreme Court, which was also denied.

8         On March 15, 2010, the Court heard argument on whether the unconstitutional provisions

9  of the Ordinance were severable and concluded on April 1, 2010, that the provisions were not

10  severable and thus the entire Ordinance was invalid.  (Docket ("Dkt.") No. 43.)  Plaintiffs now

11  move for attorneys' fees and costs.  (*See generally* Pls.' Mot. for an Order Awarding Attorneys'

12  Fees and Costs Pursuant to 42 U.S.C. § 1983 and California Code of Civil Procedure § 1021.5

13  ("Pls.' Mot.").)

14  II.    DISCUSSION

15         A.    Attorneys' Fees

16         42 U.S.C. § 1988 states that "[i]n any action or proceeding to enforce a provision of [section

17  1983] . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney[s']

18  fee as part of the costs . . . ."  42 U.S.C.  § 1988.  In determining the amount of attorneys' fees to

19  be awarded, the court must first determine the lodestar figure, which is calculated by multiplying

20  the number of hours reasonably expended on the litigation by a reasonable hourly rate.  *See*

21  *Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983).  The lodestar figure is presumptively

22  reasonable.  *See Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988).  Hours are not

23  reasonably expended if they are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461

24  U.S. at 434.  The reasonable hourly rate is the rate "prevailing in the community for similar work

25  performed by attorneys of reasonably comparable skill, experience, and reputation."  *Blum*

26  *v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  Once calculated, the court may then adjust the

27  lodestar amount up or down based on a number of factors, including:

28

Case 2:16-cv-05017-TJH-GJS Document 88-7 Filed 08/16/17 Page 214 of 445 Page ID
Case 2:04-cv-08310-SJO-SS Document 64 Filed 07/02/10 Page 3 of 8 Page ID
#:1627

1        (1) [t]he time and labor required; (2) [t]he novelty and difficulty of the

2        questions; (3) [t]he skill requisite to perform the legal services

3        properly; (4) [t]he preclusion of other employment due to acceptance

4        of the case; (5) [t]he customary fee; (6) [t]he contingent or fixed nature

5        of the fee; (7) [t]he limitations imposed by the client or the case; (8)

6        the amount involved and the results obtained; (9) [t]he experience,

7        reputation, and ability of the attorneys; (10) [t]he undesirability of the

8        case; (11) [t]he nature of the professional relationship with the client;

9        and (12) [a]wards in similar cases.

10  *Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 622 (9th Cir. 1993). In seeking attorneys' fees under this

11  method, "the fee applicant has the burden of producing satisfactory evidence, in addition to the

12  affidavits of its counsel, that the requested rates are in line with those prevailing in the community

13  for similar services . . . and that the claimed number of hours is reasonable . . . ." *Id.* at 622-23.

14        Plaintiffs allege that they are entitled to attorneys' fees and costs as prevailing parties under

15  42 U.S.C. § 1983. (Pls.' Mot. 2:13-16.)

16        1.   Reasonableness of Hourly Rate

17        As established in *Blum v. Stenson*, the reasonableness of an hourly rate is "calculated

18  according to the prevailing market rates in the relevant community, regardless of whether plaintiff

19  is represented by private or nonprofit counsel . . . . [T]he rates should be in line with those

20  prevailing in the community for similar services by lawyers of reasonably comparable skill,

21  experience, and reputation." *Blum*, 465 U.S. at 896 n.11. Plaintiffs have submitted affidavits and

22  cases in support of the reasonableness of the hourly rate charged by Plaintiffs' attorneys. (Pls.'

23  Mot., Ex. 3-8; Pls.' Mot., Decl. of Barrett Litt in Support of Plaintiffs' Motion for an Order Awarding

24  Attorneys' Fees and Costs.) Accordingly, the rates are presumed to be reasonable unless

25  Defendant can show that the rates are not in line with those prevailing in the community. *See*

26  *Blum*, 465 U.S. at 896 n.11.

27        Defendant has not presented sufficient evidence to refute the figures provided by Plaintiffs,

28  instead relying on references to the United States Attorney's Office ("USAO") *Laffey* Matrix and

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 215 of 445 Page ID
Case 2:04-cv-08310-SJO-SS Document 64 Filed 07/02/10 Page 4 of 58
#:1628

1    the Altman Weil Survey of Law Firm Economics.[1] (*See generally* Mem. of P. & A. in Opp'n to Pls.'

2    Mot. for Attorneys' Fees ("Def.'s Opp'n").) However, neither alternative is representative of the

3    "prevailing market rates in the relevant community" of Los Angeles. *Blum*, 465 U.S. at 896 n.11.

4    Since neither the *Laffey* Matrix nor the Altman Weil Survey are applicable, Defendant has failed

5    to rebut the presumption of reasonableness of Plaintiffs' claimed rates. *See id.*

6          After review of the evidence presented by the parties in support of fees, the Court finds that

7    the requested rates are reasonable for each of the attorneys, clerks, and paralegals.

8                  2.    <u>Reasonableness of Claimed Number of Hours</u>

9          Hours are not reasonably expended if they are "excessive, redundant, or otherwise

10    unnecessary." *Hensley*, 461 U.S. at 434. Moreover, the "fee applicant bears the burden of

11    documenting the appropriate hours expended in the litigation and must submit evidence in support

12    of these hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992). Once the fee

13    applicant has met that burden, the opposing party "has a burden of rebuttal that requires

14    submission of evidence to the district court challenging the accuracy and reasonableness of the

15    hours charged." *Id.* at 1397-98.

16          Plaintiffs have submitted a sufficiently detailed breakdown of time spent on various levels

17    of the litigation. (Pls.' Mot. 6:3-25.) Plaintiffs allege that they have exercised billing judgment by

18    excluding the time spent preparing briefs in Small Claims Court and for issues that were ultimately

19    unsuccessful. *See Hensley*, 461 U.S. at 434; Pls.' Mot. 5:10-20. In total, Plaintiffs contend that

20    they have already eliminated 46 hours from Ms. Thornton's time and 41 hours from Ms. Sobel's

21    hours. (Pls.' Mot. 5:10-20.)

22          However, Defendant argues that the hours billed are still unreasonable and must be

23    reduced. The Court will address each of Defendant's arguments separately.

24

25

26

27         [1] The USAO *Laffey* Matrix is a publication based on District of Columbia averages of hourly rates charged by attorneys, whereas the Altman Weil Survey is a national average of hourly rates charged by attorneys in the United States. The Court notes that Defendant failed to provide the

28    *Laffey* Matrix, as well as the pertinent portions of the Altman Weil Survey.

Case 2:16-cv-05017-JJS-GSS Document 88-7 Filed 08/16/17 Page 216 of 445 Page ID
Case 2:04-cv-08310-SJO-SS Document 84 Filed 07/02/10 Page 5 of 8 Page ID
#:1629

1          a.     Ms. Sobel's Use of an Associate

2          Defendant wishes to exclude all of Ms. Thornton's involvement in the appellate process

3   when calculating attorneys' fees.  (Opp'n to Appellees' Application for Attorneys' Fees attached

4   as Ex. 1 to Def.'s Opp'n ("Ex. 1").)  However, Defendant's request implies that Defendant would

5   have preferred Ms. Sobel to conduct the same basic research and drafting tasks done by

6   Ms. Thornton, but at more than three times the billing rate.  (Pls.' Reply to the Opp'n to Attorneys'

7   Fees and Costs ("Pls.' Reply") 6:13-24.)  Had Ms. Sobel completed all of the work done by

8   Ms. Thornton, Plaintiffs' fees would be even higher.  Accordingly, the Court finds that Plaintiffs' use

9   of an associate was neither excessive nor unwarranted.

10          b.     Ninth Circuit Appeal

11          Defendant alleges that Ms. Sobel's general experience in First Amendment law and her

12   involvement as lead attorney in *Santa Monica Food Not Bombs v. Santa Monica*, 450 F.3d 1022

13   (9th Cir. 2006), necessarily resulted in duplicitous research. (Def.'s Opp'n 2:24-25.) However, the

14   Court finds that any duplicitous work was done out of necessity, especially given the fact that

15   litigation occurred over several years.  (Pls.' Reply 2:9-10.)

16          Defendant also contends that a reduction in attorneys' fees is warranted because Plaintiffs

17   were only successful on four out of nine issues.  (Ex. 1.)  This is irrelevant because Plaintiffs were

18   ultimately successful in invalidating the entire Ordinance.   (*See generally* Pls.' Reply.)

19   Accordingly, the Court finds this argument is without merit.

20          Alternatively, Defendant contends that Plaintiffs' failure to follow Ninth Circuit Rule 28-2.6[2]

21   resulted in unnecessary supplemental briefing in the present case because the "matters could

22   have potentially been consolidated and the necessity and expense of supplemental briefing could

23   have been avoided." (Ex. 1.)  There is no evidence that the Ninth Circuit would have consolidated

24   the matters.  Accordingly, the Court finds that this argument lacks merit.  After reviewing the

25   evidence presented by both parties, the Court finds no reduction in attorneys' fees is necessary

26

27          [2] Ninth Circuit Rule 28-2.6 states in pertinent part: "[e]ach party shall identify in a statement
. . . any known related case pending in [the Ninth Circuit] . . . .  Cases are deemed related if they

28   . . . raise the same or closely related issues . . . ."  Fed. R. App. P. 28-2.6.

Case 2:16-cv-05017-JJT-JFM Document 88-7 Filed 08/16/17 Page 217 of 445
Case 2:04-cv-08310-SJO-SS Document 94 Filed 07/02/10 Page 6 of 8 Page ID
#:1630

for the appellate process.  Accordingly, Plaintiffs are awarded $119,082.50 in attorneys' fees for work done during the appeals process.

### c.    United States Supreme Court Briefing

Defendant alleges that spending 141.1 hours on Plaintiffs' Brief in opposition to Defendant's Petition for Writ of Certiorari is excessive because Plaintiffs merely quoted and paraphrased liberally from the Ninth Circuit opinion and provided little independent legal analysis. (Def.'s Opp'n 4.) However, Plaintiffs allege that it had to research numerous new cases and issues. (Pls.' Reply 6:25-28.) Furthermore, Plaintiffs argue that 19 months passed between the time Plaintiffs filed their Opposition to the petition for rehearing *en banc* in May 2008 to the time they filed their Response to the Petition for Certiorari in December 2009.  (Pls.' Reply 7:22-24.)  Thus, although the work may have been duplicitous, given the time lapse between actions, the Court finds that any duplication was necessary.  The Court finds that no reduction in attorneys' fees is necessary.  Accordingly, the Court finds the sum of $71,322.50 to be appropriate, and thus awards such an amount for matters related to the Petition for Certiorari.

### d.    District Court Proceedings

Defendant alleges that Plaintiffs are not entitled to collect attorneys' fees for the original district court proceedings because they failed to file a timely application for attorneys' fees pursuant to Federal Rule of Civil Procedure ("Rule") 54(d)(2)(B)(i).[3]  *See* Fed. R. Civ. P. 54(d)(2)(B)(i). However, Local Rule 54-12 permits the filing of a motion for attorneys' fees fourteen days after any final order is issued. *See* Local Rule 54-12.[4]  Plaintiffs contend that the term "final order" means after the time for filing an appeal has expired "such that there is no longer any possibility that the district court's judgment is open to attack."  *Al-Harbi v. Immigration and Naturalization Serv.*, 284 F.3d 1080, 1082 (9th Cir. 2002).  The Court issued its Order denying

---

[3]  Rule 54(d)(2)(B)(i) states that a motion for attorneys' fees must "be filed no later than 14 days after the entry of judgment[.]" Fed. R. Civ. P. 54(d)(2)(B)(i).

[4]  Local Rule 54-12 states that "[a]ny motion or application for attorneys' fees shall be served and filed within fourteen (14) days after the entry or judgment or other final order, unless otherwise ordered by the Court."

Case 2:16-cv-05017-TJH-GJS Document 88-7 Filed 08/16/17 Page 218 of 445 Page ID
Case 2:04-cv-08310-SJO-SS Document 64 Filed 07/07/10 Page 7 of 8 Page ID
#:1631

1   severability on April 1, 2010, and the instant Motion for attorneys' fees was filed on April 14, 2010.

2   (*See* Dkt. No. 55; Dkt. No. 56.)  Since the instant Motion was filed within 14 days from the final

3   Order denying severability, Plaintiffs are not precluded from seeking attorneys' fees for the original

4   district court proceedings.  Accordingly, Plaintiffs are awarded $67,405.00 for work done for the

5   original district court proceedings.

6                   e.      Severability and Post-Appellate Proceedings

7           Defendant alleges that Ms. Sobel's involvement in *Long Beach Lesbian & Gay Pride, Inc.*

8   *v. City of Long Beach*, 17 Cal. Rptr. 2d 861 (Cal. App. 1993), a case dealing with a prior version

9   of the same city ordinance as the instant case, necessarily means that some hours expended

10  working on the severability hearings in the instant case are duplicitous.  (Def.'s Opp'n 5:3-12.)

11  *Long Beach Lesbian & Gay Pride, Inc.* was decided in 1993, almost two decades ago and a whole

12  decade before the commencement of the instant litigation.  Over such a long period of time, laws

13  may change and work product may become stale.  *See Moreno v. City of Sacramento*, 534 F.3d

14  1006, 1112 (9th Cir. 2008).  At a bare minimum, an attorney "needs to get up to speed with the

15  research previously performed." *Id*.  Thus, the Court finds Defendant's argument without merit.

16  Accordingly, the Court finds the sum of $19,690.00 to be a reasonable sum of attorneys' fees for

17  the severability hearing and post-appeal proceedings.

18                  f.      Work on the Motion for Attorneys' Fees and Costs

19          Defendant argues that the hours billed for the instant Motion are excessive because

20  Plaintiffs only had to include a minor amount of additional information and thus much of the work

21  was duplicative.  (Def.'s Opp'n 5:20-24.)  Plaintiffs initially sought 17.9 hours, but request an

22  additional 18.4 hours for time spent on the Reply.  Plaintiffs are not required to travel to, appear

23  at, or prepare for a hearing regarding this matter.  Accordingly, Plaintiffs' request for fees for 4.5

24  hours of time for such matters is denied.  As such, total hours billable for work done regarding the

25  instant Motion is 31.8 hours at $725 per hour for a total of $23,055.

26          B.      Costs

27          The Court is unable to locate the Bill of Costs that Plaintiffs allegedly transferred from the

28  Ninth Circuit, as it is not attached as Exhibit 15 to the Declaration of Ms. Sobel as Plaintiffs claim.

1   (Decl. of Carol A. Sobel in Support of Mot. for an Order Awarding Attorneys' Fees and Costs ¶ 20.)

2   The only enumerated costs that can be found are in Ms. Sobel's Supplemental Declaration

3   attached to Plaintiffs' Reply.   (Pls.' Reply, Supplemental Decl. of Carol A. Sobel ¶ 12.)

4   Accordingly, Plaintiffs are awarded $190.68 for out-of-pocket costs.  (Pls.' Reply, Supplemental

5   Decl. of Carol A. Sobel ¶ 12.)

6   III.    RULING

7       For the foregoing reasons, Plaintiffs' Motion for an Order Awarding Attorneys' Fees and

8   Costs is GRANTED.  Accordingly, the Court awards Plaintiffs attorneys' fees and costs in the

9   amount of $300,745.68.

10

11      IT IS SO ORDERED.

12  Dated: July 2, 2010.

13

14      _____

15                  S. JAMES OTERO
                UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:16-cv-05147-TJH-GJS   Document 80-7   Filed 08/16/17   Page 220 of 445   Page ID
#:1633
Case 5:08-cv-00511-SGL-RC   Document 80-7   Filed 02/22/10   Page 1 of 6   Page ID
#:1633

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | ED CV 08-00503 ABC (RCx) | Date | February 22, 2010 |
|---|---|---|---|
| | ED CV 08-00511 ABC (RCx) | | |
| | ED CV 08-00512 ABC (RCx) | | |
| Title | <u>Riverside County Department of Mental Health v. A.S., et al.</u> | | |

| Present: The Honorable | Audrey B. Collins, Chief Judge | |
|---|---|---|
| Angela Bridges | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**   ORDER GRANTING MOTION FOR ATTORNEYS' FEES AND DENYING WITHOUT PREJUDICE MOTION FOR COSTS (In Chambers)

Pending before the Court is the motion for attorneys' fees and costs filed by Defendants and Consolidated Plaintiffs A.S. and Monica Valentine ("Defendants"). Mot. (Docket # 103).[1] Plaintiff Riverside County Department of Mental Health ("RCDMH") filed an opposition and Defendants filed a reply. Opp'n (Docket # 113); Reply (Docket # 116). The Court finds the matter appropriate for resolution without oral argument. Local Rule 7-15.[2] Having considered the materials submitted by the parties and the case file, and for the reasons indicated below, the Court **GRANTS** in part and **DENIES** in part the Motion.

## I.      BACKGROUND

This is a case brought under the federal Individuals with Disabilities Education Act ("IDEA"), in which the Court affirmed the ALJ ruling that Plaintiff and Riverside Unified School District (the "District") were required to place A.S. at the National Deaf Academy. See Order Affirming Administrative Law Judge's Decision (Docket # 109).[3] Defendants filed a motion to recover attorneys'

---

[1]  Unless otherwise noted, all references to the docket refer to the docket for Case No. ED CV 08-0503 ABC (RCx).

[2]  The hearing previously set for the motion was vacated pending reassignment. December 10, 2009 Minute Order (Docket # 120). This case was previously assigned to Judge Larson, but was transferred to Chief Judge Collins.

[3]  Judge Larson's order provides an extensive discussion of the background of the case, which the Court will not repeat here.

Case 2:16-cv-05147-TJH-GJS   Document 80-7   Filed 08/16/17   Page 221 of 445   Page ID
Case 5:08-cv-00511-SGL-RC   Document 89-7   Filed 02/22/10   Page 2 of 6   Page ID
#:1634

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | ED CV 08-00503 ABC (RCx) <br> ED CV 08-00511 ABC (RCx) <br> ED CV 08-00512 ABC (RCx) | Date | February 22, 2010 |
|---|---|---|---|

| Title | Riverside County Department of Mental Health v. A.S., et al. |
|---|---|

fees and costs. That motion seeks to recover for work performed by attorneys with the Disability Rights Legal Center ("DRLC") and Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel") in the amount of $41,685.25 for work performed during the due process proceeding, $54,793.75 for work performed during the consolidated federal appeal, and $16,597.50 for work performed in connection with this fees motion. See, e.g., McGunigle Decl. Ex. G; McGunigle Reply Decl. Ex. A. Defendants also seek to recover certain costs incurred during those proceedings. See McGunigle Decl. Ex. G; McGunigle Reply Decl. Ex. A.

## II.     REQUEST FOR ATTORNEYS' FEES

Litigants in the United States generally pay their own attorneys' fees, regardless of the outcome of a case, although Congress may provide otherwise by statute. Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008). The IDEA provides that the Court "may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i).[4] In calculating an award of reasonable attorneys' fees in IDEA cases, courts use the familiar lodestar calculation set forth in Hensley v. Eckerhart, 461 U.S. 424 (1983). See Aguirre v. Los Angeles Unified School Dist., 461 F.3d 1114, 1121 (9th Cir. 2006). The lodestar consists of multiplying the number of hours reasonably expended on the matter by a reasonable hourly rate. Camacho, 523 F.3d at 978. Once the lodestar is calculated, it is presumed to be reasonable. Id. But the Court may adjust it based on the evaluation of additional factors not subsumed in the lodestar calculation. Id.

The RCDMH makes three arguments in challenging Defendants' proposed lodestar. First, it argues that the hourly rate sought by Heather McGunigle is excessive. Second, it argues that all work performed by Quinn Emanuel following issuance of the administrative decision was unnecessary. Third, it argues that the proposed lodestar should be reduced to reflect Defendants' settlement with the district. The Court will address each argument in turn. For the reasons discussed below, the Court finds that none of the RCDMH's arguments have merit and that Defendants may recover for all fees sought.

### A.     HOURLY RATE FOR HEATHER MCGUNIGLE

Reasonable hourly rates are based upon the "prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." Blum v. Stenson, 465 U.S. 886, 895 (1984). The relevant community is the "forum in which the district court sits." Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997). And the prevailing rate is the "'rate prevailing in the

---

[4]  "A prevailing party is one who succeeds on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." Weissburg v. Lancaster School Dist., 591 F.3d 1255, 1258 (9th Cir. 2010) (quoting Van Duyn v. Baker School Dist. 5J, 502 F.3d 811, 825 (9th Cir. 2007)) (internal alterations and quotations omitted). The RCDMH does not dispute that Defendants are the prevailing parties in this matter.

Case 2:16-cv-05041-SJO-GJS   Document 80-7   Filed 08/16/17   Page 222 of 445   Page ID
#:1635
Case 5:08-cv-00511-SGL-RC   Document 80-7   Filed 02/22/10   Page 3 of 6   Page ID #:96

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | ED CV 08-00503 ABC (RCx) | Date | February 22, 2010 |
| | ED CV 08-00511 ABC (RCx) | | |
| | ED CV 08-00512 ABC (RCx) | | |

| Title | Riverside County Department of Mental Health v. A.S., et al. |
| | |

community for similar work performed by attorneys of comparable skill, experience, and reputation.'"
Id. at 502 (quoting Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210-11 (9th Cir. 1986)).
"Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community,
and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are
satisfactory evidence of the prevailing market rate." United Steelworkers of Am. v. Phelps Dodge
Corp., 896 F.2d 403, 407 (9th Cir. 1990).

The RCDMH quibbles only with the rate sought for Heather McGunigle, who is a 2005 law
school graduate claiming a rate of $375 per hour.[5] This Court recently approved that rate for another
2005 law school graduate working for the DRLC in this district based on evidence that is the same or
very similar to that presented here. See Lauderdale v. City of Long Beach, Case No. CV 08-979 ABC
(JWJx), Order Re: Attorney Fees and Costs at 10-11 (C.D. Cal. January 11, 2010) (awarding rate of
$375 per hour to DRLC attorney who graduated law school in 2005 based on, inter alia, declarations
from Laurence Paradis and Barrett Litt). For the same reasons articulated in Lauderdale, the Court finds
the rate claimed by Ms. McGunigle to be in accordance with the prevailing rate in the community for
similar work performed by attorneys of similar skill and experience.[6]

### B.   WORK PERFORMED BY QUINN EMANUEL FOLLOWING ISSUANCE OF
###       THE ADMINISTRATIVE DECISION

The RCDMH argues that all work done by Quinn Emanuel after the issuance of the
administrative decision was unnecessary, so roughly 43 hours billed by Quinn Emanuel should be
excluded entirely from the lodestar. Opp'n at 7-10; see also McGunigle Decl. Ex. G (documenting 85.4
hours billed by Kristelia Garcia, half of which it seeks to recover for from the RCDMH). Hours not
"reasonably expended" are excluded from the lodestar. Hensley, 461 U.S. at 434. "By and large, the
court should defer to the winning lawyer's professional judgment as to how much time he was required
to spend on the case; after all, he won, and might not have, had he been more of a slacker." Moreno v.

---

[5] Ms. McGunigle graduated from law school in December 2004. The DRLC appears to treat her
as a 2005 graduate for billing purposes, however. See Mot. at 20, n.5 ("she is effectively a 2005 law
school graduate").

[6] The RCDMH presented countervailing evidence in the form of an order awarding fees for Ms.
McGunigle's services at a rate of $255 per hour for work performed in 2007. See Pulido v. Rialto
Unified School Dist., Case No. ED CV 07-0506 VAP (JCRx) (C.D. Cal. May 11, 2008) (Craig Decl. Ex.
B); see also Parks Decl. at ¶ 7. Rates awarded to the particular attorney in another case can be probative
of her reasonable hourly rate. See Cruz ex rel. Cruz v. Alhambra School Dist., 601 F. Supp. 2d 1183,
1194 (C.D. Cal. 2009). In this case, however, the Court has before it substantial evidence as to the 2009
rate for attorneys of Ms. McGunigle's experience and expertise. The Court finds that evidence more
persuasive than an order setting Ms. McGunigle's rate for work performed in 2007.

Case 2:16-cv-05041-TJH-GJS   Document 80-7   Filed 08/16/17   Page 223 of 445   Page ID
#:1636
Case 5:08-cv-00511-SGL-RC   Document 80-7   Filed 02/22/10   Page 4 of 6   Page ID #:91

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | ED CV 08-00503 ABC (RCx) | Date | February 22, 2010 |
|---|---|---|---|
| | ED CV 08-00511 ABC (RCx) | | |
| | ED CV 08-00512 ABC (RCx) | | |

| Title | Riverside County Department of Mental Health v. A.S., et al. |
|---|---|

City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008).

      Here, Quinn Emanuel's hours were not unnecessary.  Indeed, the RCDMH does not point to specific entries of unnecessary work performed by Quinn Emanuel.  Instead, the RCDMH argues generally that the DRLC staff had sufficient federal civil litigation experience to adequately represent Defendants following the entry of the administrative decision.  See Opp'n at 8-9.  The RCDMH does not dispute any Quinn Emanuel fees incurred during the due process proceedings. Opp'n at 9 n.2.  Thus, the RCDMH's argument appears to boil down to its belief that the case could have been staffed more efficiently by not having Quinn Emanuel attorneys continue working on the case beyond that point.  Such speculation does not warrant a reduction in fees.  See Moreno, 534 F.3d at 1114 ("the district court may not set the fee based on speculation as to how other firms would have staffed the case").

## C.      HOURS SPENT LITIGATION AGAINST THE DISTRICT

      The RCDMH next argues that Defendants' proposed lodestar should be reduced to account for their settlement with the District.  See Opp'n at 10-11.  More particularly, the RCDMH requests that the total hours be halved.  See Opp'n at 12.  As their moving papers make clear, however, Defendants have already done precisely that:

> [B]ecause [Defendants] have settled their case with Riverside Unified School District, I deducted in their entirety, all time entries on both Quinn Emanuel's and DRLC's billing statements that are exclusively attributable to Riverside Unified School District, and not to RCDMH. . . .

> After making those deductions, I reduced the remaining totals by 50 percent, again, to account for [Defendants'] settlement with Riverside Unified School District.  Some of the entries that were divided by half were exclusively attributable to RCDMH, and therefore this approach actually underestimates RDCHH's [sic] liability for fees.  However, I made those deductions for ease of calculation and to account for any remaining arguable inefficiencies.

McGunigle Decl. at ¶¶ 25-26.[7]  Accordingly, the RCDMH's point is moot.

## D.      CONCLUSION ON FEES

---

    [7]  In light of this clear explanation of Defendants' deductions made to reflect their settlement with the District, the Court is puzzled by the RCDMH's assertion that it "is unaware of any attempt by Defendants to offset the amount requested from RCDMH by the amounts received from the District." Opp'n at 10.

Case 2:16-cv-05141-TJH-GJS   Document 80-7   Filed 08/16/17   Page 224 of 445   Page ID
#:1637
Case 5:08-cv-00511-SGL-RC   Document 20-7   Filed 02/22/10   Page 5 of 6   Page ID #:98

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | ED CV 08-00503 ABC (RCx)<br>ED CV 08-00511 ABC (RCx)<br>ED CV 08-00512 ABC (RCx) | Date | February 22, 2010 |
|---|---|---|---|
| Title | Riverside County Department of Mental Health v. A.S., et al. | | |

As noted above, the lodestar is presumptively reasonable. Camacho, 523 F.3d at 978. The Court has considered the additional factors that could militate in favor of adjusting the lodestar, and finds that none of them warrant any adjustment. Accordingly, the Court concludes that Defendants are entitled to recover attorneys' fees in the amount of their proposed lodestar: $113,076.50.

## III.   REQUEST FOR COSTS

The RCDMH lastly argues that Defendants are not entitled to recover the $2,627.79 in costs sought, asserting that the IDEA does not allow prevailing parties to recover costs. Opp'n at 11. The IDEA allows for the recovery of "reasonable attorneys' fees as part of the costs" to the parents of "a child with a disability" who is the "prevailing party." 20 U.S.C. § 1415(i)(3)(B)(i).[8] The Supreme Court has provided guidance on the interpretation of this provision:

> [Section] 1415(i)(3)(B) does not say that a court may award "costs" to prevailing parents; rather, it says that a court may award reasonable attorney's fees "as part of the costs" to prevailing parents. This language adds reasonable attorney's fees incurred by prevailing parents to the list of costs that prevailing parents are otherwise entitled to recover. This list of otherwise recoverable costs is obviously the list set out in 28 U.S.C. § 1920, the general statute governing the taxation of costs in federal court.

Arlington Cent. School Dist. Bd. of Edu. v. Murphy, 548 U.S. 291, 297-98 (2006); see also id. at 301 ("the term 'costs' in 20 U.S.C. § 1415(i)(3)(B), like the term in Rule 54(d), is defined by the categories of expenses enumerated in 28 U.S.C. § 1920"). Thus, Defendants are entitled to recover costs, but only to the extent allowed under Section 1920.

Unfortunately, neither party analyzes whether the costs claimed here are actually recoverable under Section 1920.[9] Accordingly, to the extent Defendants would like to continue seeking costs, they must file a bill of costs with the Court Clerk within 10 days and attach this order. See Local Rule 54.

## IV.   CONCLUSION

---

[8] The basis for Defendants' cost request appears to be Section 1415(i)(3)(B). See Mot. at 1; see also Reply at 8 (citing Section 1415(g)(3)(B) in an apparent typographical error).

[9] The Court expresses no opinion regarding whether the costs listed by Defendants in their moving papers are recoverable.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | ED CV 08-00503 ABC (RCx)<br>ED CV 08-00511 ABC (RCx)<br>ED CV 08-00512 ABC (RCx) | Date | February 22, 2010 |
|---|---|---|---|
| Title | Riverside County Department of Mental Health v. A.S., et al. | | |

For the foregoing reasons, Defendants' request for attorneys' fees is **GRANTED** in the amount of $113,076.50, and Defendants' request for costs is **DENIED** without prejudice to filing a bill of costs with the Court Clerk.

**IT IS SO ORDERED.**

                                                                    _____ : _____

                                        Initials of Preparer    AB

Paula Pearlman      (State Bar No. 109038)
paula.pearlman@lls.edu
Shawna L. Parks      (State Bar No. 208301)
shawna.parks@lls.edu
**DISABILITY RIGHTS LEGAL CENTER**
919 Albany Street
Los Angeles, CA 90015
Tel: (213) 736-1031 / Fax: (213) 736-1428

Heather D. McGunigle      (State Bar No. 237174)
heather.mcgunigle@lls.edu
**DISABILITY RIGHTS LEGAL CENTER**
320 East D Street
Ontario, CA 91764
Tel: (909) 460-2034 / Fax: (909) 460-2094

Attorneys for Defendants and Consolidated Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF MENTAL HEALTH,<br><br>        PLAINTIFF(S)<br><br>   vs.<br><br>A.S., an individual; and MONICA VALENTINE, an individual,<br><br>        DEFENDANT(S) | Consolidated Case Nos. ED CV 08-00503 SGL (Rx); ED CV 08-0511 SGL (RCx)<br><br>**NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES PURSUANT TO 20 U.S.C. § 1415; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Declarations of HEATHER MCGUNIGLE, SHAWNA L. PARKS, AARON B. CRAIG, LAURENCE W. PARADIS, BARRETT S. LITT, PAUL VANDOREN; [Proposed] Order filed concurrently herewith]<br><br>Date:   August 10, 2009<br>Time:   10:00<br>Place:   Courtroom 1<br><br><br>HON. STEPHEN G. LARSON |

DEFENDANT/CONSOLIDATED PLAINTIFF MONICA VALENTINE MOTION FOR AWARD OF ATTORNEYS' FEES

**CONSOLIDATED CASES:**

MONICA VALENTINE,

             Plaintiff,

    v.

RIVERSIDE UNIFIED SCHOOL
DISTRICT, a public entity;
RIVERSIDE COUNTY
DEPARTMENT OF MENTAL
HEALTH, and DOES 1-10, inclusive,

             Defendants.

DEFENDANT/CONSOLIDATED PLAINTIFF MONICA VALENTINE MOTION FOR AWARD OF
ATTORNEYS' FEES

# **TABLE OF CONTENTS**

I. Introduction……….…………………………………………… 2

   1. Plaintiff is the Prevailing Party………………………………... 4

   2. The Result of this Case Serves the Public Interest…………… 4

   3. Plaintiff's Counsels' Hours were Reasonably Expended and Well Documented; Plaintiff's Counsels' Rates are Based on Prevailing Market Rates…………………………………… 4

   4. Plaintiff's Counsel Displayed Exceptional Skill and Expertise…………………………………………………... 4

II. Requested Fees and Costs…………………………………… 5

III. Factual Background…………………………………………… 5

IV. History of Litigation………………………………………… 7

   A. Underlying Due Process Proceeding………………………... 7

   B. Federal Court Proceeding…………………………………… 9

      1. Federal Court Appeal of Due Process Decision……….. 9

V. Legal Standard………………………………………………… 10

VI. Plaintiff is the Prevailing Party Under Both State and Federal Law and is Entitled to Attorneys' Fees and Costs……………….. 12

VII. The Amount Sought by Plaintiff Is Reasonable…………………. 14

   a. The Number Of Hours Claimed Is Reasonable and Well-Documented……………………………………………… 14

      i. Plaintiff's Counsel Pursued This Case Efficiently And The Hours Claimed Are Reasonable……………… 14

      ii. Plaintiff's Counsel Has Provided Detailed Documentation Of Fees………………………………… 17

   b. The Hourly Rates Claimed Are Reasonable and

Comparable to Other Local Attorneys' Rates......................... 18

     i.  Heather McGunigle.................................................. 20

    ii.  Shawna Parks........................................................... 20

   iii.  Maronel Barajas...................................................... 21

   iv.  Kristelia Garcia........................................................ 22

    v.  Aaron Craig............................................................ 22

c.  In the Exercise of Billing Judgment, Plaintiff's Counsel

Has Discounted its Lodestar total.................................. 22

VIII.  This Fee Award Should Include Fees for Time Spent in

Federal Court................................................................. 23

IX.    Conclusion.................................................................... 24

# **TABLE OF AUTHORITIES**

**Cases**

*Barlow-Gresham Union High Sch. Dist. No. 2 v. Mitchell,* 940 F.2d 1280, 1286 (9th Cir. 1991)...................................................................................10

*Barrios v. California Interscholastic Federation*, 277 F.3d 1128, 1134 (9th Cir. 2002) ...........................................................................................12

*Bd.Ed.The Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 189 (1982)...................................................................12

*Bernardi v. Yeutter*, 951 F.2d 971, 975 (9th Cir. 1991) .........................................23

*Blum v. Stenson,* 465 U.S. 886, 895 (1984) .................................................... 10, 18

*Bouman v. Block*, 940 F.2d 1211, 1236 (9th Cir. 1991) .........................................16

*Caudle v. Bristol Optical Co., Inc.,* 224 F.3d 1014, 1028 (9th Cir. 2000)..............10

*Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768-69 (7th Cir. 1982), *cert. denied,* 461 U.S. 956, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983)............................19

*City of Riverside v. Rivera*, 477 U.S. 561, 581 (1986) .........................................14

*Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir. 1986) ..........................23

*County of San Diego v. Calif. Special Education Hearing Office*, 93 F.3d 1458,1468 (9th Cir. 1996)...................................................................13

*Davis v. City and Ct. of San Francisco*, 976 F.2d 1536, 1544 (9th Cir. 1992) .......16

*Dennis v. Change,* 611 F.2d 1302, 1306 n.12 (9th Cir. 1980)……………….. 10,18

*Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983) .......................................... 10, 14

*Johnson v. University College*, 706 F.2d 1205, 1208 (11th Cir. 1983)...................16

*Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 69-70 (9th Cir. 1975)...................11

*Louisville Black Officers Org., Inc. v. Louisville,* 700 F.2d 268, 278 (6th Cir. 1983) ...............................................................................................19

*M.L. v. Federal Way School District*, 394 F.3d 634 (9th Cir. 2005)......................13

*Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir. 1983)................................................19

*McDonald v. Armontrout*, 860 F.2d 1456, 1459-60 (8th Cir. 1988) .......................19

*National Wildlife Federation v. Hanson,* 859 F.2d 313, 317-18 (4th Cir. 1988) ....19

*Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489, 1498 (9th Cir. 1994) ...................................................................................................................13

*Park, ex rel. Park v. Anaheim Union High School Dist.*, 464 F.3d 1025, 1035-36 (9th Cir. 2006) ...................................................................................................12

*Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 564 (1986) .........................................................................................................14

*Perkins v. Mobile Housing Board*, 847 F.2d 735 (11th Cir. 1988) .........................16

*Perkins v. Mobile Housing Board*, 847 F.2d 735, 738 (11th Cir. 1988) .................18

*PLCM Group, Inc. v. Drexler,* 22 Cal. 4th 1084, 1095 (2000)................................10

*Polk v. New York State Dept. of Correctional Servs.*, 722 F.2d 23, 25 (2nd Cir. 1983) ...................................................................................................................19

*Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.,* 374 F.3d 857, 864-65 (9th Cir. 2004)................................................................................................12

*Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989) .............................................................................................................................12

*U.S. v. City and County of San Francisco*, 748 F.Supp. 1416, 1421 (N.D. Cal. 1990) ...................................................................................................................16

*Union School District v. Smith*, 15 F.3d 1519 (9th Cir. 1994) ...............................13

*Ustrak v. Fairman,* 851 F.2d 983, 988 (7th Cir. 1988)...........................................10

**Statutes**

20 U.S.C. § 1415(i)(3)(B) ................................................................................. 1, 10

20 U.S.C. §1400(d)(1) ............................................................................................12

California Welfare and Institutes Code section 11460(c)(2) & (3) ..........................6

**Other Authorities**

Daniel Golden, "Schools Beat back Demands for Special Ed Services." Wall Street
Journal, July 24, 2007 ............................................................................16

**Regulations**

California Code of Regulations section 60100(h) ....................................................6

Case 5:16-cv-05117-ABC-RJS Document 08-7 Filed 08/16/17 Page 233 of 445 Page ID
#:1646
Case 5:08-cv-00508-ABC-RJS Document 108-7 Filed 07/17/09 Page 3 of 31 Page ID #:726

**TO PLAINTIFF / CONSOLIDATED DEFENDANT AND ITS
ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on August 10, 2009 at 10:00 a.m., or at
such other date and time as may be ordered by the Court, in Courtroom 1 of the
above-captioned Court, located at 3470 Twelfth Street, Riverside, California
92501, Defendant/Consolidated Plaintiff[1] Monica Valentine will and hereby do
move for an order granting Defendant's Motion for Attorneys' Fees.

This motion is made following a number of conferences of counsel pursuant
to U.S. District Court, Central District Local Rule 7-3. There have been numerous
occasions when the parties discussed attorneys' fees, including but not limited to
June 26, 2008 and May 22, 2009.

As the prevailing party Plaintiff Monica Valentine respectfully requests
reasonable fees and costs in the amount of $104,852.60. Of that total, $42,557.50 is
for work in the due process proceeding, $56,445.10 is for work at the federal court
level, and $5,850.00 is for work on the instant motion (this final figure will be
updated on reply). This motion, made pursuant to 20 U.S.C. § 1415(i)(3)(B), is
based upon the accompanying Memorandum of Points and Authorities, the
concurrently filed Declarations of Heather McGunigle, Shawna L. Parks, Aaron B.
Craig, Laurence W. Paradis, Barrett. S. Litt, and Paul VanDoren, the pleadings and
papers on file in this action, such matters of which the Court may take judicial
notice, and other such evidence and argument as may be presented at the hearing.

DATED: July 17, 2009                    Respectfully submitted,

                                        DISABILITY RIGHTS LEGAL CENTER

                                        By: __/s/ Heather McGunigle_____
                                            Heather McGunigle
                                            Attorneys for Defendants
                                            /Consolidated Plaintiffs

---

[1] For the purpose of this Motion, Defendant / Consolidated Plaintiff Monica Valentine will be
referred to as "Plaintiffs."

Case 2:16-cv-05117-ABC-RJS Document 08-7 Filed 08/10/17 Page 234 of 445 Page ID
Case 5:09-cv-00503-ABC-RJS Document 03 Filed 07/17/09 Page 5 of 4 Page ID #:27
#:1647

### I.  **Introduction**

The case of first impression underlying this motion was about whether Student A.S., a special education eligible student with multiple disabilities, including deafness and an emotional disturbance, was entitled to receive a free and appropriate education ("FAPE"). The Individuals with Disabilities Education Act ("IDEA") mandates that all students identified as eligible for special education and related services receive a FAPE. In the underlying administrative special education hearing, all parties agreed that the National Deaf Academy was the only available placement in the country that constituted a FAPE for A.S. because it was the only place that could address the unique intersection of his communication and mental health needs.

Nevertheless, the Riverside Unified School District ("District") and Riverside County Department of Mental Health ("RCDMH") refused to place A.S. at the National Deaf Academy because they contended that state law prevented them from doing so.

The Office of Administrative Hearings held that the National Deaf Academy was the only appropriate placement available to A.S., holding that even if certain provisions of state law prohibited the District and RCDMH from placing A.S. there, the IDEA and California Education Codes trumped those prohibitory provisions. The Administrative Law Judge thus found that A.S. was not provided a FAPE, and ordered compensatory education to remedy this violation, in the form of placement at the National Deaf Academy.

Despite this, the District and RCDMH filed a Motion for Reconsideration with the Office of Administrative Hearings, essentially disputing that the Administrative Law Judge had characterized the award as compensatory education. After the Administrative Law Judge denied their Motion for Reconsideration, the District and RCDMH filed the instant case, seeking reversal of the Administrative Judge's Order to place A.S. at the only facility able to provide him with a FAPE –

the National Deaf Academy. The Court affirmed the Administrative Judge's Order on July 6, 2009.

A.S.'s victory at the administrative due process proceeding and in the federal appeal in this matter dramatically altered his educational landscape. As a result of the ruling by the Administrative Law Judge, A.S. was able to attend the National Deaf Academy, the only placement that would address both his communication and mental health needs. Further, the remarkable outcome in this case may have the precedential effect of deterring RCDMH and other county mental health departments from denying students with disabilities appropriate placements when they require placement at a facility that is run on a for-profit basis in order to receive a FAPE.

The consequences of litigating this case were significant not only for children with disabilities, but also for Plaintiff's counsel, Disability Rights Legal Center ("DRLC") and Quinn Emanuel. DRLC is a non-profit organization that specializes in representing people with disabilities. In addition to representing low-income parents of children with disabilities, DRLC engages in extensive public service work that is not fee-generating, such as its Options Counseling Program, which provides free resources and referrals to low-income callers with disabilities, and self-advocacy trainings, including special education trainings to low-income parents of children with disabilities so that they can better advocate for their children's needs. Declaration of Heather McGunigle ("McGunigle Decl.") ¶ 2-3. Quinn Emanuel is a large private litigation firm that co-counsels with the DRLC in due process hearings in order to leverage DRLC's resources and assist DRLC in representing a greater number of low-income clients. Declaration of Aaron B. Craig ¶ 4; Declaration of Shawna L. Parks ¶ 8; McGunigle Decl. ¶ 19.

In successfully litigating this action, Plaintiff's counsel had to expend substantial time and resources demanded by this important case. As the prevailing

party, Plaintiff Monica Valentine is entitled under applicable law to recover their full reasonable attorneys' fees and costs because, as set forth in detail below:

**(1) Plaintiff is the Prevailing Party.**

The Administrative Law Judge determined that Monica Valentine and A.S. prevailed on the sole issue heard. The order below has now been affirmed by this Court.

**(2) The Result of this Case Serves the Public Interest.**

As a result of this case and the cases which will rely and build upon it, the Riverside Department of Mental Health will be deterred from refusing to place students at a FAPE, even if the only available placement is at a for-profit institution.

**(3) Plaintiff's Counsels' Hours were Reasonably Expended and Well Documented; Plaintiff's Counsels' Rates are Based on Prevailing Market Rates.**

Plaintiff's counsel kept detailed records of all hours expended. These records, supported by sworn declarations, constitute conclusive evidence of the time expended. The time expended addressed, *inter alia*, the legal and factual issues involved, the importance of the issue presented. Counsels' rates charged in the instant matter are comparable to prevailing market rates in the legal community as supported by the sworn declarations submitted with this motion.

**(4) Plaintiff's Counsel Displayed Exceptional Skill and Expertise.**

Based upon the trial experience of Quinn Emanuel and DRLC's experience and expertise in disability and special education law, Plaintiff's attorneys remained focused on the primary issue in this case and litigated the case effectively and efficiently. Plaintiff's success was directly related to counsels' careful preparation, underlying research, and diligence.

As a result, Plaintiff is entitled to the full measure of attorneys' fees and costs requested.

**II.     Requested Fees and Costs**

Plaintiff now moves for an award of reasonable fees and costs. The total amounts incurred by Plaintiff up through July 16, 2009 are as follows:

**Due Process Work[2]**

1.    Lodestar Fees:    $41,685.25

2.    Costs:              $932.25

3.    Total:              $42,557.50

**Fees for Time Spent in Federal Court on Plaintiff's Appeal of the Administrative Law Judge Decision and Related Proceedings**

1.    Lodestar Fees:    $54,793.75

2.    Costs:              $1,651.35

3.    Total:              $56,445.10

**Fees for Time Spend on the Instant Motion**

i.     Lodestar Fees:    $5,850.00

ii.    Costs:              $0.00

iii.   Total:              $5,850.00

**III.    Factual Background**

At the time of the underlying administrative hearing, A.S. was seventeen years old. His family is low-income. He is deaf and his only effective mode of communication is American Sign Language. He also has a serious emotional disturbance and a long history of social and behavioral problems and has had numerous psychiatric hospitalizations. In addition, A.S. has been assessed as having borderline cognitive ability, and also has impaired vision. Throughout his educational career, A.S. has experienced multiple failed placements, because he requires a highly specialized program that can meet both his mental health and

---

[2] These numbers are the fees sought after substantial discounts for purposes of billing judgment and to reflect the fact that Plaintiffs have settled with the District and thus do not seek fees against the District in this motion. *See infra* Section VII for further explanation of Plaintiffs' calculations.

communication needs. During this time, A.S. has been hospitalized as a result of his mental health conditions, including being placed on several 72-hour psychiatric holds. Decision, Supp. A.R. p. 782-784, ¶¶ 5 and 16. Stipulated Facts, Supp. A.R. p. 733, ¶¶ 8 and 10.

DRLC attorney Heather McGunigle has been advocating for A.S. since 2005, assisting his family in the struggle to find him an appropriate placement. McGunigle Decl. ¶ 5. After A.S. moved to the District in 2007, the parties made a number of attempts at an educational placement. However, none of these were successful given his very unique needs. In October of 2007, the Individualized Education Plan team met and recommended placement at a residential program. Despite investigation of a variety of programs, RCDMH "exhausted all leads for placement of [A.S.] in a non-profit, in-state or out-of-state residential treatment center." Decision, Supp. A.R. p. 783 ¶14; Stipulated Facts Supp. A.R. p. 737 at ¶¶ 24-26.

Separately from the District and Department of Mental Health, A.S. (through his parent and counsel) located the National Deaf Academy, which could accommodate both his mental health condition, cognitive abilities and also had a staff that was fluent in American Sign Language. All parties "agree[d] that the [National Deaf Academy] is an appropriate placement which would provide Student a FAPE." Decision, Supp. A.R. p. 783-784, ¶ 15; Stipulated Facts, Supp. A.R. p. 733 ¶ 9, *Id.* at 737, ¶ 25.

However, the District and RCDMH took the position that they could not place A.S. at the National Deaf Academy because it is operated by a for-profit entity. More specifically, they took the position that California law, specifically the California Code of Regulations section 60100(h) and California Welfare and Institutes Code section 11460(c)(2) & (3) prohibited them from placing student at a for-profit entity. As a result, A.S. filed for due process.

IV. **History of Litigation**

### A. Underlying Due Process Proceeding

On September 25, 2007, A.S. filed his First Amended Request for Due Process Hearing based on his need for a therapeutic residential placement that could meet both his communication and mental health needs. *See* First Amended Request for Due Process Hearing, Supp. A.R. p. 675. On December 31, 2007, the Parties submitted their joint Stipulated Statement of Facts and Evidence, Supp. A.R. p. 731; their Joint Stipulation of Issue to be Decided, Supp. A.R. p. 722; and their Closing Arguments, Supp. A.R. p. 743.

In the underlying proceeding, no disagreement existed among the parties as to what constituted a FAPE. All parties agreed that the National Deaf Academy was the only placement able to afford Student a FAPE. The issue presented for resolution was whether the District and RCDMH could place A.S. at a for-profit institution, when no other appropriate residential placement is available to provide him a FAPE. Decision, Supp. A.R. p. 891.

The matter was decided based upon the documents submitted, and no hearing was held. *See* Decision, Supp. A.R. p. 780. The Administrative Law Judge took judicial notice of the Stipulated Facts. Decision, Supp. A.R. p. 781, fn. 1. On January 15, 2008, she issued her Decision in favor of Student, ordering District and RCDMH to place A.S. at the National Deaf Academy, a for-profit residential placement. Decision, Supp. A.R. p. 788. The Administrative Law Judge held, *inter alia*, that assuming the District and Department of Mental Health's interpretation was correct (that certain state regulations and codes prevent placement at a for-profit institution) that this runs counter to both the California Education Code as it relates to special education and the mandates of the IDEA. Decision, Supp. A.R. p. 786-788, ¶¶ 9-17. The Administrative Law Judge thus concluded that regardless of whether the District and Department of Mental Health properly interpreted the state regulations and Welfare and Institutions Code, that:

1      [A.S.] has ultimately been denied a FAPE since May 23, 2007,

2      when he was terminated from attending [the Riverside School

3      for the Deaf]... Student's need for therapeutic residential

4      placement with ASL services continues. As a result of this

5      denial of FAPE, Student is entitled to compensatory education...

6 Decision, Supp. A.R. p. 788, ¶ 17. Thus, the Administrative Law Judge ordered

7 "[t]he District has denied Student a free appropriate public education as of May 23,

8 2007. The District and [RCDMH] are to provide Student with compensatory

9 education consisting of immediate placement at the National Deaf Academy...."

10 Decision, Supp. A.R. p. 788.

11    On January 28, 2008, District submitted its Motion for Reconsideration of

12 Decision and Order. RCDMH filed a joinder in District's Motion on January 31,

13 2008. Supp. A.R. p. 791-806. They objected to the fact that the Administrative

14 Law Judge characterized the relief she provided as compensatory education. The

15 agencies' objections were based on the fact that the parties had not identified

16 "compensatory education" as an issue for the Administrative Law Judge to resolve,

17 and because A.S. waived claims for compensatory education for the time period of

18 April 20, 2007 through October 9, 2007. However, A.S. never disputed the waiver.

19 Indeed in A.S.'s Response in Opposition to District and RCDMH's Motion for

20 Reconsideration, he expressly stated that he does not dispute the existence of a

21 waiver, but contended that he was entitled to placement as a matter of FAPE.[3]

22 Order Denying Motion for Reconsideration, Supp. A.R. p. 819, ¶ 6; Student's

23 Response in Opposition to Motion for Reconsideration, Supp. A.R. p. 811, fn. 1.

24 On February 20, 2008, the Administrative Law Judge issued her Order Denying

25 Motion for Reconsideration, and reasserted her order of equitable compensatory

26 relief in the form of placement at National Deaf Academy. Order Denying Motion

27

28 [3] In any event, any waiver did not cover the entire period at issue in the proceeding and thus could not have affected the ultimate outcome.

for Reconsideration, Supp. A.R. p. 820.

**B. Federal Court Proceeding**

**1. Federal Court Appeal of Due Process Decision**

District and RCDMH filed cases appealing the underlying due process decision. At the same time Ms. Valentine and A.S. filed a case to recover attorneys' fees for prevailing in the underlying due process proceeding. In the time between the due process decision and the appeal in this matter, A.S. left the National Deaf Academy. Thus, the practical effect of the due process decision was complete. However, the outcome of the appeal would determine Defendants' entitlement to attorneys' fees. It could also set a precedent regarding legal obligations of the entities involved in situations such as these where the needs of the student are very unique, and the services available to meet those needs are very limited. However, aside from precedential value, the only remaining relief at issue in the case was attorneys' fees. The District's and RCDMH's appeals, however, presented novel issues of first impression. Therefore, the issues required extensive briefing by Plaintiff at the federal appeal stage.

On May 14, 2009, representatives of all of the parties attended a Mandatory Settlement Conference in front of Magistrate Judge Rosalyn M. Chapman. The District and Plaintiff settled their claims against each other at this Conference. After the Mandatory Settlement Conference RCDMH moved to Disqualify Magistrate Judge Chapman and Plaintiff filed an Opposition to this Motion and prepared for the hearing on July 6, 2009. Plaintiff also responded to RCDMH's ex parte Application for Continuance of the Mandatory Settlement Conference and submitted a Joint Stipulation to Seal Documents Regarding Mandatory Settlement Conference. At the July 6 hearing on the motion for disqualification the Court indicated that it would affirm the Administrative Law Judge's order, and that issue thus was moot. See July 6, 2009 Minute Order (Docket No. 101).

**V. <u>Legal Standard</u>**

The Individuals with Disabilities Education Improvement Act (the "IDEIA") entitles A.S. through his mother, as the prevailing party, to recoup his attorneys' fees incurred in vindicating his right to a free and appropriate public education. 20 U.S.C. § 1415(i)(3)(B). Moreover, he is entitled to recover the attorneys' fees incurred to enforce the right to reimbursement of the fees from the underlying action, commonly known as "fees on fees." *See Barlow-Gresham Union High Sch. Dist. No. 2 v. Mitchell,* 940 F.2d 1280, 1286 (9th Cir. 1991).

As with all claims for attorneys' fees, the starting point in a court's analysis of an IDEIA attorneys' fees award is the calculation of a presumptively reasonable "lodestar" amount, where the court multiplies the number of reasonable hours expended on the case by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983); *Caudle v. Bristol Optical Co., Inc.,* 224 F.3d 1014, 1028 (9th Cir. 2000); *cf. PLCM Group, Inc. v. Drexler,* 22 Cal. 4th 1084, 1095 (2000) (California state calculation of attorneys' fees award using the lodestar amount).

These fees are to be calculated at the prevailing private market rates. Only this is considered a "fully compensatory fee" that encourages the vindication of constitutional and statutory rights. *See Hensley,* 461 U.S. at 435; *Ustrak v. Fairman,* 851 F.2d 983, 988 (7th Cir. 1988); *see generally Blum v. Stenson,* 465 U.S. 886, 895 (1984) (legislative history of civil rights statutes requires that hourly rates for public interest attorneys equal prevailing private market rates). The "award of fees to legal aid offices and other groups furnishing *Pro bono publico* representation promotes the enforcement of the underlying statutes as much as an award to privately retained counsel." *Dennis v. Change,* 611 F.2d 1302, 1306 n.12 (9th Cir. 1980); *see also* Declaration of Barrett S. Litt ("Litt Decl.") ¶¶ 15-16.

Adjustments to this presumptively reasonable amount may then be made based upon the factors set forth in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67,

69-70 (9th Cir. 1975), *cert denied,* 425 U.S. 951 (1976), to the extent that those factors are not reflected in the lodestar calculation. *See Caudle,* 224 F.3d at 1028-29. The *Kerr* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Kerr,* 526 F.2d at 69-70.

As will be explained below, both the rates charged and the hours spent by Plaintiff's attorneys are reasonable, and the Court need go no further than this lodestar amount to award the full fees incurred in this action. However, should the Court do so, application of the abovementioned factors to the circumstances of the case demonstrate that the amount requested by Plaintiff is reasonable. For instance, Quinn Emanuel and the DRLC attorneys involved in this action have dedicated over 450 hours over the last two years vindicating A.S.'s rights, with the Quinn Emanuel attorneys doing so at the expense of more lucrative work. DRLC is widely recognized as an expert in the field of disability rights and special education, and known for bringing important and cutting edge cases in these fields. Parks Decl. ¶ 3. Furthermore, there are very few lawyers in Southern California and the Inland Empire, in particular, who are available or willing to undertake such matters. Declaration of Paul VanDoren ¶¶ 4, 9. Finally, Plaintiff obtained an excellent result at the administrative hearing, which was upheld on appeal.

## VI.  **Plaintiff is the Prevailing Party Under Both State and Federal Law**

**and is Entitled to Attorneys' Fees and Costs**

Plaintiff was the prevailing party in the underlying action filed. Plaintiff meets all conceivable standards to be a prevailing party with entitlement to attorneys' fees pursuant to IDEA. IDEA was created "to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction of each child." *Bd.Ed.The Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 189 (1982).

IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living..." 20 U.S.C. §1400(d)(1). IDEA, its implementing regulations and California law set forth specific and comprehensive requirements to ensure that this occurs.

A party is "prevailing" when it can "point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989). "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits plaintiff." *Barrios v. California Interscholastic Federation*, 277 F.3d 1128, 1134 (9th Cir. 2002) (internal quotations and citations omitted); *see also Texas State Teachers Ass'n*, 489 U.S. at 792-93 (stating that touchstone is the "material alteration of the legal relationship of the parties."); *Park, ex rel. Park v. Anaheim Union High School Dist.*, 464 F.3d 1025, 1035-36 (9th Cir. 2006); and *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.*, 374 F.3d 857, 864-65 (9th Cir. 2004) (alteration of legal relationship is relevant inquiry).

Importantly, the Ninth Circuit has held that "a material alteration of the legal

relationship occurs [when] the plaintiff becomes entitled to enforce a judgment...In these situations, the legal relationship is altered because the plaintiff can force the defendant to do something he otherwise would not have to do." *Barrios*, 277 F.3d at 1134 (emphasis added). So long as "a party... 'succeed[s] on any significant issue in the litigation which achieves some of the benefit the parties sought in brining suit.'" He is the prevailing party for purposes of attorneys' fees. *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489, 1498 (9th Cir. 1994) (alteration in original) (emphasis added) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1988)).

In the underlying matter here, Plaintiff prevailed on the sole issue heard, and were awarded one hundred percent of the relief sought. The Administrative Law Judge explicitly found that "[t]he Student prevailed on the sole issue heard and decided." Decision, Supp. A.R. at 788. The relief altered the parties' legal relationship and Plaintiff was consequently able to force Defendants to provide placement at the National Deaf Academy. This order is now affirmed on appeal.

Courts have held that a victory on the issue of educational placement, denial of FAPE, or procedural violations of IDEA is each sufficient to entitle plaintiff to fees. *See*, e.g., *M.L. v. Federal Way School District*, 394 F.3d 634 (9th Cir. 2005) (finding failure to include regular education teacher on IEP team a significant violation of IDEA procedures) on remand 401 F.Supp.2d 1158, 1163 (student was prevailing party and entitled to fees based on result); *County of San Diego v. Calif. Special Education Hearing Office*, 93 F.3d 1458,1468 (9th Cir. 1996) (entitlement to fees when student prevailed on issue of residential placement); *Union School District v. Smith*, 15 F.3d 1519 (9th Cir. 1994) (entitlement to fees when district failed to make a formal offer and parents ordered reimbursed for placement).

The underlying case specifically involved the issue of placement, and the Administrative Law Judge found that A.S. had been denied a FAPE. For all of the reasons stated above, Plaintiff is entitled to recover full attorneys' fees and costs as

mandated by both federal and state statutes and binding precedent.

## VII. **The Amount Sought by Plaintiff Is Reasonable.**

The starting point for computation of attorneys' fees in civil rights cases is the "lodestar" arrived at by multiplying the number of hours reasonably expended by the reasonable hourly rates. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The "resulting product is presumed to be the reasonable fee to which counsel is entitled." *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 564 (1986) (internal quotations omitted). Where, as here, Plaintiff obtained substantial results, the "attorney should recover a fully compensatory fee . . . encompass[ing] all hours reasonably expended on the litigation . . . ." *Hensley v. Eckerhart*, 461 U.S. at 435. Under federal law a "fully compensatory fee" is one that encourages the vindication of constitutional and statutory rights through recovery of all costs and time spent on the case, calculated at private market rates. It must ensure that attorneys are paid for all the time they devote to the litigation. It is not limited by the number of causes of actions on which relief is awarded, or the amount of damages recovered. *See City of Riverside v. Rivera*, 477 U.S. 561, 581 (1986). Thus, once the Plaintiff has been determined to be the prevailing party, they are entitled to all reasonable time spent.

Plaintiff's counsels' lodestar is reasonable because: (a) detailed, contemporaneous records show that counsel expended all hours on negotiation or litigation tasks necessary to attaining relief and (b) counsels' billing rates are comparable to those of attorneys with similar expertise and experience.

### a. The Number Of Hours Claimed Is Reasonable and Well-Documented

#### i. Plaintiff's Counsel Pursued This Case Efficiently And The Hours Claimed Are Reasonable.

The time spent on this case was necessary and reasonable. This case was pursued as efficiently as possible in light of RCDMH's position on settlement and

1   unwillingness to give properly place Student at the National Deaf Academy.

2   Because, as the hearing decision shows, this case involved complicated legal

3   issues, including conflicts of laws, it required extensive briefing in order to be

4   decided both by the Administrative Law Judge and the District Court. McGunigle

5   Decl. ¶¶ 9-10.

6   In the underlying proceeding, all parties agreed that the National Deaf

7   Academy was the only placement able to afford Student a FAPE. The issue

8   presented for resolution was whether the District and RCDMH could place A.S. at

9   a for-profit institution, when no other appropriate residential placement is available

10  to provide him a FAPE. Decision, Supp. A.R. p. 891.

11  The Matter was decided based upon the documents submitted, and no

12  hearing was held. See Decision, Supp. A.R. p. 780. The Administrative Law Judge

13  took judicial notice of the Stipulated Facts. Decision, Supp. A.R. p. 781, fn. 1. On

14  January 15, 2008, she issued her Decision in favor of Student, ordering District and

15  RCDMH to place A.S. at the National Deaf Academy, a for-profit residential

16  placement. Decision, Supp. A.R. p. 788.

17  Plaintiff's counsel used appropriate staffing in the prosecution of this case.

18  While DRLC and Quinn Emanuel both represented client, Counsel's work was

19  efficient, not duplicative. For example, in the underlying proceeding, Ms.

20  McGunigle was the lead DRLC attorney on the case, while minimal time was spent

21  by other DRLC attorneys during the due process phase. In addition, only one

22  Quinn Emanuel attorney was assigned to the due process case at any given time.

23  Mr. Craig worked on the case at its inception with Ms. McGunigle. Only when Mr.

24  Craig had to stop working on the case due to prior obligations did Ms. Garcia

25  become involved. McGunigle Decl. ¶ 21; Parks Decl. ¶ 9；Craig Decl. ¶ 5.

26  Similarly, Plaintiff's counsel used appropriate staffing in the consolidated

27  federal appeals. For example, again, the majority of DRLC's time is billed by

28  Heather McGunigle, with litigation Director Shawna L. Parks acting as lead

counsel and supervisor. McGunigle Decl. ¶   ; Parks Decl. ¶ 10. Additionally, as in the due process case, only one attorney from Quinn Emanuel was assigned to the consolidated federal appeals at any given time. McGunigle Decl. ¶   ; Parks Decl. ¶ 10.

Federal cases have recognized that "lawyers often hire other lawyers to help them with specific issues in the case." *Bouman v. Block*, 940 F.2d 1211, 1236 (9th Cir. 1991). The Court will deny fees because they are duplicative "only if the attorneys are unreasonably doing the same work." *Johnson v. University College*, 706 F.2d 1205, 1208 (11th Cir. 1983); *see also, U.S. v. City and County of San Francisco*, 748 F.Supp. 1416, 1421 (N.D. Cal. 1990), aff'd in relevant part sub nom *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1544 (9th Cir. 1992).

In order to justify a reduction in the lodestar based upon excessive time, Defendants must show that "the time claimed if obviously and convincingly excessive." *Perkins v. Mobile Housing Board*, 847 F.2d 735 (11th Cir. 1988). Based upon Plaintiff's counsel's experience with Defendants prior to the hearing, it was apparent that the due process case would be hard fought. This in combination with the current low success rate of parents in California due process hearings, and the complexity of issue involved, led DRLC to procure co-counsel in order to protect the interests of our client.[4]

The law firm of Quinn Emanuel has extensive trial expertise, while DRLC has extensive experience and subject matter expertise in the area of disability rights and special education. This partnership allowed counsel to provide effective representation on a procedural and substantive level. The billing records show that the partnership was not duplicative, but rather an efficient division of labor and

---

[4] In California, parents prevail at the due process hearings less then ten percent of the time. *See* Daniel Golden, "Schools Beat back Demands for Special Ed Services." Wall Street Journal, July 24, 2007 (noting that in 2005-2006, parents won only 11 of 119 due process decisions that year). Thus, Defendant's victory at the administrative level is truly significant.

leveraging of resources. See McGunigle Decl. ¶ 19, Exhibits E-H; Craig Decl., Exh. A.

The public interest/private firm partnership of Quinn Emanuel and DRLC has previously been found to utilize reasonable billing rates and to expend reasonable hours on matters on which the two firms collaborate. *Pulido v. Rialto Unified School District* involved an award of attorneys' fees to DRLC and Quinn Emanuel after the two firms prevailed at a due process hearing before the state agency. *See* Order entered May 11, 2008, C.D. Cal. Case No. EDCV 07-0506 VAP (attached as Exhibit B to the Craig Declaration). The court in *Pulido* specifically found that both firms efficiently used their time to prepare for the hearing as well as in bringing an action for attorneys' fees. The court in *Pulido* also held that it was reasonable to have multiple attorneys, from both DRLC and Quinn Emanuel, represent the plaintiff in the due process hearing. *See* Craig Decl., Exh. B at 15-16 (specifically rejecting contention that only a sole attorney should have attended the administrative hearing).

In that case, the student sought a total of $99,283.37 in fees and costs for both the underlying due process action and the fees suit in the district court. The court awarded $85,905.50 in fees. These numbers only slightly lower than those at issue here because, among other reasons, Quinn Emanuel was retained on the eve of the hearing before the administrative hearing. Additionally, unlike the present action, the school district in *Pulido* did not needlessly expand the litigation by filing a merits appeal.

### ii. Plaintiff's Counsel Has Provided Detailed Documentation Of Fees.

Plaintiff's counsel has provided detailed documentation of fees. See Exhibits E-H of McGunigle Decl.; Craig Decl., Exhibit A. The time records of Plaintiff's counsel are more than accurate to meet the documentation requirements set forth

by the Supreme Court and the Ninth Circuit. *See Hensley v. Eckerhart*, 461 U.S. at 437 n.12, ("Plaintiff's counsel, or course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures."); and *Dennis v. Chang*, 611 F.2d 1302, 1309 (9th Cir. 1980) (finding chronological and detailed time records with no dates sufficient). Plaintiff's counsels' records exceed this standard in that they provide detailed descriptions of the work conducted. See Exhibits E-H of McGunigle Decl.; Craig Decl., Exhibit A. Additionally, the declarations and supporting documentation submitted herewith constitute evidence of exactly the type that courts have relied on in numerous fees decisions. *See, e.g., Perkins v. Mobile Housing Board*, 847 F.2d 735, 738 (11th Cir. 1988) ("[S]worn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case...").

### b. The Hourly Rates Claimed Are Reasonable and Comparable to Other Local Attorneys' Rates

The United States Supreme Court has clearly held that fee awards to public interest attorneys who do not charge their clients (such as Defendant's counsel) must be based on the prevailing billing rates of attorneys in private practice with similar skills and experience. *See Blum v. Stenson*, 465 U.S. 886, 895 (1984) (legislative history of civil rights statutes requires that hourly rates for public interest attorneys equal prevailing private market rates).

Plaintiff's counsel request compensation for the work in this case at their regular hourly rates. McGunigle Decl. ¶ 29; Craig Decl. ¶ 8. These rates are reasonable as measured by the rates charged by attorneys of comparable experience and skill in Southern California.

As the itemized bill shows, counsels' rates are in line with those of attorneys with similar experience and length of practice. As an initial matter, the majority of the hours sought from the due process proceeding and the consolidated federal

1  appeals are submitted by Heather McGunigle at an hourly rate of $375.00. This
2  rate is well within the going rate in the community.

3      Plaintiff has provided representative declarations of attorneys which
4  establish that rates for Plaintiff's counsel are within the prevailing hourly rates. *See*
5  Declarations of Barrett S. Litt and Laurence W. Paradis. In addition, DRLC's
6  earlier rates have been approved on . *See*, *e.g. Pulido v. Rialto Unified School*
7  *District*. Attorneys in Southern California do not alter their rates depending on in
8  which division of the Central District their case resides, and have had their
9  standard rates charged for work performed in Los Angeles approved in the Eastern
10 Division of the Central District. *See* Litt Decl. ¶ Thus, rates charged in the
11 Southern California area are the applicable market rates.

12     Even if the Inland Empire were to have a different or lower rate structure
13 than other parts of Southern California, such a rate structure is not appropriate in
14 this matter. Rates, other than those of the forum, may be employed if local counsel
15 was unavailable, either because they are unwilling or unable to perform because
16 they lack the degree of experience, expertise, or specialization required to handle
17 properly the case. *See, e.g., McDonald v. Armontrout*, 860 F.2d 1456, 1459-60 (8th
18 Cir. 1988); *Polk v. New York State Dept. of Correctional Servs.*, 722 F.2d 23, 25
19 (2nd Cir. 1983); *Louisville Black Officers Org., Inc. v. Louisville,* 700 F.2d 268,
20 278 (6th Cir. 1983); *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768-69 (7th Cir.
21 1982), *cert. denied,*461 U.S. 956, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983); *see*
22 *also National Wildlife Federation v. Hanson,* 859 F.2d 313, 317-18 (4th Cir.
23 1988); *Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir. 1983).

24     Here, there are few or no practitioners willing to represent low-income
25 children in special education proceedings in the Inland Empire. Van Doren Decl.¶
26 ¶ 4, 9. Thus, Plaintiff's counsel is entitled to fees for the effective representation
27 counsel provided to Plaintiff even if those fees are normally charged in the Los
28 Angeles community.

As set forth below and in the supporting declarations submitted herewith, Plaintiff's counsel's rates are reasonable and well-justified.

### i. Heather McGunigle

Ms. McGunigle is the Director of the DRLC's Inland Empire Program. Her rate is $375 per hour. Ms. McGunigle has been substantially involved in this case at all phases. McGunigle Decl. ¶¶ 11-12.

Ms. McGunigle is a 2004[5] graduate of Loyola Law School. Prior to joining the DRLC, Ms. McGunigle participated in externships in DRLC's Civil Rights Litigation Program and Education Advocacy project. In addition, she externed at the Inner City Law Center, the Legal Aid Foundation of Los Angeles' Eviction Defense Center, the Equal Employment Opportunity Commission, and the Barrister's Pro Bono Domestic Violence Project. She is a 2005 recipient of Loyola Law School's Post Graduate Public Interest Fellowship.. Ms. McGunigle has represented numerous children in special education matters in both Riverside and San Bernardino County. McGunigle Decl. ¶ 11, Exh. A.

Upon joining DRLC, Ms. McGunigle opened DRLC's Inland Empire satellite office, where she has participated in impact litigation and special education advocacy. Ms. McGunigle is an adjunct Professor of Law at University of La Verne, College of Law, where she teaches disability rights law. Ms. McGunigle also conducts special education trainings for parents in the Inland Empire, and developed a services Matrix in conjunction with the Inland Empire Health Plan to clarify interagency responsibilities to children with disabilities. McGunigle Decl. at Exh. A.

### ii. Shawna Parks

Shawna Parks is the Director of the Civil Rights Litigation Program at the Disability Rights Legal Center. Her rate is $525 per hour. As the DRLC's director

---

[5] Ms. McGunigle graduated from Law School in December 2004. Therefore, she is effectively a 2005 law school graduate.

Case 2:16-cv-05417-TJH-RCJS Document 88-7 Filed 07/16/17 Page 253 of 445 Page ID #:26
Case 5:03-cv-00503-ABC-RCJ Document 108-7 Filed 07/07/09 Page 28 of 39 Page ID #:26
#:1666

of litigation, Ms. Parks transitioned on to this case when it reached the federal level. Parks Decl. 10.¶

Ms. Parks has worked extensively on high-impact cases affecting the rights of people with disabilities. These include cases regarding the rights of children with disabilities in the foster care and juvenile justice systems, the rights of people with disabilities in the criminal justice system, as well as a wide variety of cases addressing physical and communication access at private and public entities. Parks Decl. ¶ 3.

Ms. Parks is a 1999 graduate of Boalt Hall School of Law at U.C. Berkeley where she was a Notes & Comments Editor of the *California Law Review* and a member of the Task Force on Public Interest Law.  Upon graduation from law school, Ms. Parks was a Fulbright Fellow in Budapest, Hungary, where she focused on the implementation of Hungary's disability rights legislation. Prior to joining DRLC Ms. Parks was an Equal Justice Works / Cotchett-Furth Fellow and Staff Attorney at Disability Rights Advocates in Oakland, California, and an associate at the civil rights law firm of Schonbrun DeSimone Seplow Harris & Hoffman, where she focused on cases addressing race and gender discrimination. Parks Decl. ¶¶ 2, 5, Exh. A.

Ms. Parks is an Adjunct Professor at Loyola Law School where she teaches Disability Rights and Special Education Law, supervises the DRLC's litigation externship program, and teaches the accompany disability rights and litigation seminar. Parks Decl. ¶ 6.

Ms. Parks supervised this case once it was in federal court on appeal. Ms. Parks' resume is attached to her declaration as Exhibit A, filed concurrently herewith.

### iii.  Maronel Barajas

Ms. Barajas is a 2003 graduate of Columbia Law School. Her current billing rate is $224 per hour. She is the former Director of DRLC's Education Advocacy

Project. Ms. Barajas was involved in this case at the due process level, and transitioned off of the case when it reached the federal level. McGunigle Decl. ¶ 14. Ms. Barajas' resume is attached as Exhibit B of the Declaration of Heather McGunigle.

### iv. Kristelia Garcia

Kristelia Garcia is a 2003 graduate of Yale Law School, and former associate at Quinn Emanuel. Her most recent billing rate was $550 per hour. Ms. Garcia was actively involved in this case at both the due process and federal levels. Craig Decl. ¶ 6. Ms. Garcia is now the Director of Business Development at Myspace Music. Her professional information is attached to the Declaration of Heather McGunigle as Exhibit D. See also McGunigle Decl., ¶ 22.

### v. Aaron Craig

Aaron Craig is a 1999 graduate of Yale Law School, and an of counsel at Quinn Emanuel. He has extensive litigation experience, and is an expert on intellectual property litigation, representing multinational corporations. Mr. Craig has also participated in significant antitrust and cost accounting litigation. Mr. Craig has practiced before the International Trade Commission in Washington D.C., in addition to federal and state courts throughout California. Craig Decl. Mr. Craig's current billing rate is $590 per hour. Mr. Craig's professional information is attached to the Declaration of Heather McGunigle as Exhibit C, filed concurrently herewith. See also McGunigle Decl., ¶¶ 19-21.

### c. In the Exercise of Billing Judgment, Plaintiff's Counsel Has Discounted its Lodestar Total

In the exercise of billing judgment and to take account of any duplication or inefficiencies, DRLC has substantially reduced its total hours. Plaintiff's counsel has deleted the time of DRLC attorneys Zaheva Stevens and Anna Rivera, both of whom worked on the case. Likewise, Quinn Emanuel has deleted the time of Timothy Alger and Rory S. Miller, each of whom spent time on the case. Plaintiff

1  deducted this time to account for any inefficiency or duplication in staffing.

2  McGunigle Decl. ¶ 24; Parks Decl. ¶ 11.

3    Further, because Plaintiff has settled with the District, Plaintiff has deducted

4  all time in their billing that is exclusively attributable to District. See McGunigle

5  Decl ¶ 25; See, also Exhibit E of McGunigle Decl. and Exhibit A of Craig Decl. [6]

6  After all of the above mentioned deductions, Plaintiff's counsel then divided the

7  total bill in half to account for their settlement with the District.

8    This approach actually underestimates RCDMH's liability for fees in this

9  matter. Some of the entries that were divided in half are related attributable only to

10  RCDMH and not the District. However, for ease of calculation, and to account for

11  any remaining inefficiencies, Plaintiff has opted to simply divide all remaining

12  hours in half. McGunigle Decl. ¶ 26; Exhibits F-G to McGunigle Decl.

13    Plaintiff's original bill totaled $224,768.28. Plaintiff's counsel has

14  discounted its lodestar total by more than 50 percent, to a total of $104,852.60.

15  Table summaries detailing this reduction are attached to Declaration of Heather

16  McGunigle as Exhibits F and G.

17  **VIII.**  **This Fee Award Should Include Fees for Time Spent in Federal**

18     **Court.**

19    Plaintiff is entitled to recover her fees and costs incurred in litigating the fee

20  issue. *See Bernardi v. Yeutter*, 951 F.2d 971, 975 (9th Cir. 1991) (holding that

21  denial of fees-on-fees issue is reversible error); *see also Clark v. City of Los*

22  *Angeles*, 803 F.2d 987, 992 (9th Cir. 1986). Plaintiff has been required to file a

23  separate action in federal court to recover her attorneys' fees, and has been

24  required to, among other things, appear for a Mandatory Settlement Conference, in

25  addition to filing this motion. Through July 16. 2009, Plaintiff's counsel have

26  generated fees of $5,850.00 while preparing this motion. Counsel has submitted

27

28  ---
[6] Deducted entries on the billing records are represented by a black horizontal line to the right of each deducted entry. See Exh. E of McGunigle Decl. and Exh. A of Craig Decl.

Case 2:16-cv-05417-TJH-RGS Document 88-7 Filed 07/06/17 Page 256 of 445 Page ID
#:1669
Case 5:08-cv-00563-ABC-RGS Document 108-7 Filed 07/17/09 Page 25 of 39 Page ID #:129

billing records for this work performed at the federal court level. McGunigle Decl.

Exhibit H his amount will be updated on Reply to include final work to prepare

this motion as well as work through the Reply.

## IX. <u>Conclusion</u>

DRLC charges no fees to its clients, and has brought many landmark

disability rights cases as well as cases, such as the one at issue here, addressing the

critical needs of low-income children with disabilities. These precedent-setting

cases, and the many other actions undertaken by DRLC, are risky, lengthy, and

expensive enterprises. It is essential that DRLC be fully compensated where, as

here, Plaintiff has prevailed in an important civil right and is entitled to recover

attorneys' fees and costs as a matter of law.

For the foregoing reasons, Plaintiff respectfully requests that this Court find

that the fees charged and the hours spent ensuring A.S's right to a free and

appropriate public education, which were denied by the RCDMH and only secured

following years of litigation before the state administrative agency and this Court,

are reasonable, and award $104,852.60 in attorneys' fees.

Respectfully submitted,

Dated: July 17, 2009          DISABILITY RIGHTS LEGAL CENTER
                                   Paula. D. Pearlman
                                   Shawna L. Parks
                                   Heather McGunigle

                                   /s/  Heather McGunigle
                                   By: Heather McGunigle

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| CATHERINE JEANG | N/A | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|

**Proceedings:** **(In Chambers:)** PLAINTIFF'S MOTION FOR ATTORNEY FEES (Dkt. #234, filed Jan. 7, 2014)

## I. INTRODUCTION AND BACKGROUND

Plaintiff Troy Dugan filed this action on September 30, 2011. Dkt. #1. Plaintiff filed the operative first amended complaint ("FAC") on December 12, 2011. Dkt. #9. The FAC asserted claims for violations of constitutional rights under 42 U.S.C. § 1983 against defendants Los Angeles County, the Los Angeles County Sheriff's Department ("LACS"), Los Angeles County Sheriff's Deputies Christopher Nance, and Brett Binder, Sergeant John Stanley, and other personnel employed by the Los Angeles County Sheriff's Department. Id.

Following a stipulated dismissal of several defendants, the case was tried to a jury in July and August 2013 against Deputy Brett Binder ("Binder"), former LACS Deputy Christopher Nance ("Nance"), and LACS Sergeant John Stanley ("Stanley"). Plaintiff asserted claims for excessive force and unlawful arrest under 42 U.S.C. § 1983 against defendants Nance and Binder, and asserted a claim for malicious prosecution under 42 U.S.C. § 1983 against all three defendants. Dkt. #200. The jury returned a special verdict in favor of plaintiff, and awarded $850,000 in compensatory damages. Id. In a separate punitive damages phase of the trial, the jury awarded $50,000 against each defendant. Dkt. #215. By order dated December 16, 2013, the Court denied defendants' motions for judgment as a matter of law and for a new trial. Dkt. #229.

Plaintiff filed a motion for attorney's fees on January 7, 2014. Dkt. #234. Defendants filed an opposition on January 28, 2014, dkt. #239, and plaintiff replied on February 4, 2014, dkt. #242. Plaintiff requests fees for the work of attorneys Todd Burns

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|----------|----------------------|------|---------------|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

and Gabriel Cohan, as well as non-taxable costs. The Court held a hearing on February 24, 2014, and thereafter took the matter under submission. After considering the parties' arguments, the Court finds and concludes as follows.

## II.    LEGAL STANDARD

42 U.S.C. § 1988 provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). "The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances. Accordingly, a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (internal quotations and citations omitted). In applying the "special circumstances" exception, the Court focuses on two factors: (1) whether allowing attorneys' fees would further the purpose of the statute and (2) whether the balance of equities favors or disfavors the denial of fees. Gilbert v. City of Westminster, 177 F.3d 839, 870 (9th Cir. 1999).

Where fee awards are appropriate and available, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. "The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party and submitted affidavits." Gates v. Gomez, F.3d 525, 534–35 (9th Cir. 1995).

The Court has an independent duty to determine whether the hours and hourly rates submitted by the fee applicant are "reasonable," and to reach its own "lodestar" value, which is "the number of hours reasonably expended . . . multiplied by a reasonable hourly rate." Hensley, 461 U. S. at 433. In Hensley, the Supreme Court set forth twelve factors that may be considered in determining both the lodestar value and a potential adjustment.[1]

---

[1] The twelve factors identified are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service properly; (4) whether accepting the case precluded the attorney from taking other work; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|----------|------------------------|------|---------------|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

Id. at 430. The lodestar amount is "presumptively the reasonable fee amount," and should be adjusted upward or downward by a multiplier in "rare" or "exceptional" cases only. Van Gerwen v. Guarantee Mut. Life Co., 214 F.3d 1041, 1045 (9th Cir. 2000).[2]

## III. DISCUSSION

### A. Reasonable Hourly Rate

In determining a reasonable hourly rate, a court should look to the prevailing market rates in the relevant legal community. Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551 (2010). By multiplying this rate by the number of hours expended on the litigation, the fee award will "roughly approximate[] the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." Id. In determining a reasonable hourly rate, a district court should consider "the experience, skill, and reputation of the attorney requesting fees." Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986); see also Moreno v. City of Sacramento, 534 F.3d 1106, 1114 (9th Cir. 2008) (factors to consider include the novelty and difficulty of the issues, the experience of counsel, and fee awards in similar cases). In addition, "contingency cannot be used to justify a fee enhancement or an inflated hourly rate" above the prevailing market rate for paying clients. Welch v. Metro. Life Ins. Co., 480 F.3d 942, 947 (9th Cir. 2007) (citations omitted).

### 1. Reasonable Hourly Rate for Todd Burns

Plaintiff's counsel requests that Burns be compensated at an hourly rate of $650. Mot. Att'y Fees at 6. In support of this request, plaintiff's counsel supplies declarations from himself, Carol Sobel, Michael Marrinan, and Steven Hubacheck. Id., Exs. A, D-E;

---

the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Hensley, 461 U.S. at 430 n.3.

[2] The parties do not argue in favor of a lodestar multiplier, nor does the Court find that one is appropriate in this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

dkt. #235. Burns states that he graduated from the University of Virginia School of Law in 1996, and thereafter clerked for Judge James B. Loken on the Eighth Circuit Court of Appeals. Burns Decl. ¶¶ 7-8. After clerking, he worked for one year at the firm of Wilson Sonsini Goodrich & Rosati in Palo Alto, California. Id. ¶ 9. He worked at the Federal Defenders of San Diego ("FDSDI") from 1998 to 2011, serving as lead or sole counsel on "over a thousand" felony cases. Id. ¶ 10.[3] He also held supervisory positions at FDSDI. Id. Burns left FDSDI in 2011 because he wished to expand his practice to include civil rights litigation. Id. ¶ 11. Burns has tried "approximately [40]" criminal cases in federal court, id. ¶ 13, and has served as lead or sole counsel in "over 50" appeals in the Ninth Circuit Court of Appeals, id. ¶ 14. Burns estimates that he has litigated Fourth Amendment-related issues in the federal courts in "over 150" cases. Id. ¶ 17.

Sobel is a former Senior Staff Counsel at the American Civil Liberties Union, and has maintained a private civil rights practice since 1997. Sobel Decl. ¶ 2. She has twice been qualified as an expert to testify at trial as to issues in non-profit legal practice, id. ¶ 4, and prepared "numerous" motions for attorney's fees while employed by the ACLU, id. ¶ 7. Sobel is of the opinion that the rate sought by Burns is "well within the range of reasonable market rates for attorneys of comparable skill, experience, and reputation." Id. ¶ 9. Sobel's opinion is grounded "in large part" on fee awards in other cases in the Central District of California, including Communities Actively Living v. City of Los Angeles, 09-cv-00287-CBM-RZx (C.D. Cal. June 10, 2013), dkt. #255, in which Judge Marshall awarded fees at an hourly rate of $665 to a 1999 law graduate. Id. ¶ 10.

Michael Marrinan graduated from law school in 1979, and began his career at FDSDI. Marrinan Decl. ¶¶ 2-3. He entered private practice in San Diego in 1985, and his practice since then has focused on "criminal defense and civil litigation involving police misconduct and civil rights." Id. ¶ 4. He has tried "over 100" cases, and has handled "more than 200" civil rights cases. Id. ¶ 5. Marrinan states that he has known Burns since 2007, and he believes Burns to be a "highly skilled trial lawyer who has a wealth of experience litigating Constitutional issues, including in the Fourth Amendment context." Id. ¶ 10. He is of the opinion that $650 reflects the prevailing market rate for attorneys of comparable skill and experience to Burns. Id.

---

[3] FDSDI is the "equivalent of a public defender['s] office." Marrinan Decl. ¶¶ 2-3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|----------|----------------------|------|---------------|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

Steven Hubacheck is of counsel at the firm of Robbins Geller Rudman & Dowd LLP in San Diego. Hubacheck Decl. ¶ 1. He graduated from law school in 1987, and began working at FDSDI in 1989. Id. ¶ 5. During his time at FDSDI, he served as lead counsel in "hundreds of district court cases and appeals," and tried "approximately thirty" cases. Id. He has argued "over [100] appeals," including three in the United States Supreme Court. Id. ¶ 6. Hubacheck states that he supervised Burns during his time at FDSDI, and "worked closely with him on several cases." Id. ¶ 9. Hubacheck is of the opinion that Burns is the best trial lawyer to have worked at FDSDI in the last thirty years, and that he is highly regarded among the members of the federal criminal defense bar in San Diego. Id. ¶¶ 10, 12.

Defendants respond that Burns has not established that $650 is a reasonable hourly rate because he does not provide evidence of prior experience litigating civil rights cases. Opp. Mot. Att'y Fees at 2-3. Defendants provide a declaration from Robert Bruning, a partner at the law firm of Cooper & Bruning, LLP in Pasadena, California. Bruning graduated from law school in 1977, and specializes in serving as an expert witness in litigation matters involving fee disputes. Bruning Decl. ¶ 2. He has experience with business litigation, including tort and contractual disputes. Id. ¶ 3. Bruning is of the opinion that $650 is not a reasonable hourly rate due to Burns' lack of experience as a civil rights attorney. Id. ¶¶ 14-15. Bruning also states that Burns' "guaranteed" hourly rates for federal appellate work in the Ninth Circuit and Criminal Justice Act ("CJA") panel work would have been approximately $185 and $125, respectively. Id. ¶ 16. Based on his research, Bruning is of the opinion that "the rates which fee paying clients would actually pay to reasonable competent attorneys" in the Los Angeles area fall between $275 and $475 per hour. Id. ¶¶ 26-27. Bruning therefore opines that $375 is a reasonable hourly rate for Burns. Id. ¶ 27.

After reviewing the declarations submitted by the parties, the Court finds that $650 is a reasonable hourly rate for Burns. The Court reaches this conclusion because, while Burns was an inexperienced civil rights attorney at the time that this case was litigated, see Burns Decl. ¶ 11, he was an experienced trial lawyer and was familiar with Fourth Amendment doctrine, Burns Decl. ¶ 17, which was the area of law governing plaintiff's claims for excessive force and unlawful arrest. It is therefore appropriate that Burns should be compensated at an hourly rate that reflects his Fourth Amendment knowledge and trial experience. $650 properly reflects these considerations because it is consistent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

with awards to experienced trial lawyers.[4]  See Contreras v. City of Los Angeles, 2013 WL 1296763, at *3 (C.D. Cal. Mar. 28, 2013) (setting hourly rate of $675 for experienced civil rights attorney who tried case in 2012); Allen v. City of Los Angeles, et al., 10-cv-4695-CAS-RCx, dkt. #133, at 29 (C.D. Cal. Nov. 19, 2012) (setting hourly rate of $575 for experienced trial lawyer with unsubstantiated civil rights experience); Perrin v. Goodrich, 2012 WL 1698296, at *6 (C.D. Cal. May 24, 2012) (setting hourly rate of $500 for experienced civil rights attorney who tried case in 2011); Vasquez v. Rackauckas, 2011 WL 3320482, at *2 (C.D. Cal. July 29, 2011) (setting hourly rate of $600 for ACLU attorney who graduated from law school in 1994); Rauda v. City of Los Angeles, 2010 WL 5375958, at *6 (C.D. Cal. Dec. 20, 2010) (setting hourly rates of $650, $590, and $525, respectively for three attorneys who tried case in 2010).

The Court is unpersuaded by the Bruning Declaration's discussion of hourly rates because it applies an incorrect legal standard—focusing on the "rates which fee paying clients would actually pay to reasonabl[y] competent attorneys to handle such a matter in the general Los Angeles area"—rather than taking into account the actual "experience, skill, and reputation of the attorney requesting fees."  Compare Bruning Decl. ¶ 26 with Chalmers, 796 F.2d at 1210.  Moreover, the cases relied on by Bruning are older cases that do not reflect current market rates.  See Bruning Decl. ¶ 24.  The Court is more persuaded by the most recent cases decided in this District.

2.      Reasonable Hourly Rate for Gabriel Cohan

According to plaintiff's counsel, Cohan performed work on this case suitable for an attorney and also other work appropriately charged as paralegal work.  Cohan seeks compensation at the hourly rate of $390 for the work that he performed as an attorney, and $190 for the work that he performed as a paralegal.  The Court addresses each hourly rate in turn.

Cohan requests that he be compensated at an hourly rate of $390 for work that he performed as counsel.  Mot. Att'y Fees at 7-8.  In support of this request, Cohan provides

---

[4] This conclusion is bolstered by the fact that, as stated above, Sobel believes this rate to be reasonable based on her examination of fee awards in similar cases in this district.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

his own declaration, the Sobel Declaration, and declarations from Paul Hoffman, Shereen Charlick, and Todd Burns. Mot. Att'y Fees at 7-8, Exs. A, G-H; dkt. #235. Cohan graduated from the California Western School of Law in 2008, and was hired as a trial attorney for FDSDI immediately after graduating from law school. Cohan Decl. ¶¶ 7, 10. Cohan left the FDSDI in 2011 to assist his father with his law practice and also because Burns invited him to become Burns' law partner. Id. ¶ 11. Prior to attending law school, Cohan worked as a paralegal and a contractor for several years, assisting CJA counsel and FDSDI counsel, including Burns. Id. ¶¶ 8-9. Burns states that Cohan was well regarded as an attorney at the FDSDI. Burns Decl. ¶ 28. Cohan's supervisor at FDSDI, Chief Trial Attorney Shereen Charlick, states that Cohan is an "extraordinarily conscientious attorney" who, at FDSDI, "performed legal work with skills and ability beyond his number of years of experience" since graduating from law school. Charlick ¶ 4.

Sobel states that 2007 and 2008 law school graduates have been awarded fees at hourly rates ranging from $385 to $450, and on that basis opines that $390 is a reasonable hourly rate for Cohan. Sobel Decl. ¶¶ 11-15. Paul Hoffman, a partner in the firm of Schonbrun DeSimone Seplow Harris & Hoffman LLP, states that the firm's "standard rate" for a 2008 law school graduate is between $400 and $450 dollars. Hoffman Decl. ¶¶ 3-4. Hoffman states that he periodically reviews prevailing hourly rates in the legal community, and believes that his firm's hourly rate structure is consistent with the "general level of hourly rates charged for general civil litigation by comparable firms practicing in Los Angeles." Id. ¶ 6. Defendants do not provide evidence or argument that specifically responds to Cohan's hourly rate request, other than Bruning's opinion that $275 would be a reasonable hourly rate for Cohan based on Bruning's "survey and research." Bruning Decl. ¶ 27. In light of the fact that the rate requested for Cohan's work as an attorney is within the range identified by the Sobel declaration, and is slightly below the rate set forth in the Hoffman declaration, the Court finds that $390 is a reasonable hourly rate for Cohan.

Plaintiff's counsel also seek fees for the paralegal work performed by Cohan at an hourly rate of $190. Mot. Att'y Fees at 8. In support of this request, plaintiff's counsel cite the Sobel Declaration, which cites recent awards of paralegal fees at hourly rates ranging from $170 to $250. Sobel Decl. ¶ 16. Bruning asserts that $150 is an appropriate hourly rate for this paralegal work, but does not appear to provide any support for his assertion. See Bruning Decl. ¶ 27. Based on the cases cited in the Sobel

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

Declaration, and in light of the lack of contradictory evidence in the Bruning Declaration, the Court finds that $190 is a reasonably hourly rate for Cohan's paralegal work. See, e.g., Vasquez, 2011 WL 3320482, at *2 (awarding fees to ACLU paralegals at rates of $165 to $200 per hour).

### B.    Reasonable Hours

Plaintiff's counsel contend that Burns reasonably expended 796.3 hours on this case, and that Cohan reasonably spent 698.1 hours on this case as an attorney, and 41.7 hours as a paralegal. Mot. Att'y Fees at 6-8; Burns Decl.; Cohan Decl. The Court finds that these hours are reasonable as a general matter, based on the fact that this case was sharply contested and involved substantial motion practice as to discovery matters, pre-trial motions, and post-trial motions. E.g., Burns Decl. ¶¶ 19-23.

Defendants do not challenge the reasonableness of the hours expended as a whole, but instead challenge specific blocks of hours. The Court addresses each of these challenges in turn.

### 1.    Hours Expended During Travel to and from San Diego

Defendants argue that plaintiff's counsel should not be awarded fees for time spent traveling to and from San Diego, where plaintiff's counsel's office is located, because plaintiff has made no showing that Los Angeles-based counsel was unavailable. Opp. Mot. Att'y Fees at 4-5 (citing Fantasy v. Fogerty, 1995 WL 261504, at *6 (N.D. Cal. May 2, 1995)). According to defendants, plaintiff's counsel expended 152.8 hours traveling to and from San Diego, which increased plaintiff's counsel's total fee request by $49,820.00, when calculated at the rates proposed by Bruning. Bruning Decl. ¶ 29; Ex. G. Plaintiff's counsel respond that plaintiff lives in Moreno Valley, Riverside, and that plaintiff should be provided some leeway in choosing his counsel. Reply Mot. Att'y Fees at 17. Additionally, plaintiff's counsel argue that substantial travel time would have been billed even if their offices were located in Los Angeles County due to the size of the county and pervasive traffic. Id.

While the Court agrees that billing for a certain portion of travel time is permissible, see, e.g., Doran v. Del Taco, Inc., 2005 WL 3560648, at *1-2 (C.D. Cal. June 9, 2005); Cotton v. City of Eureka, 889 F. Supp. 2d 1154, 1177 (N.D. Cal. 2012),

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

the Court finds that plaintiff's counsel should not be permitted to bill all hours spent traveling to and from San Diego because plaintiff has not made a showing that local counsel was unavailable to handle this case. See Fantasy, 1995 WL 261504, at *6 (citing Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992)). Rather, plaintiff's counsel should be permitted to bill travel time that would have been expended if their offices were based within the Central District of California. According to the Bruning Declaration, Burns expended 78 hours on travel, and Cohan expended 74.8 hours on travel. Bruning Decl., Ex. G. These hours are comprised primarily of entries of between two and three hours expended for travel from San Diego to Los Angeles in order to appear in court, conduct investigation, or participate in other proceedings. Id. The Court finds that these hours should be reduced by 50 percent in order to account for the extra time spent traveling from San Diego, as opposed to Orange County, Los Angeles County, or Riverside County. A further reduction is not warranted in light of the fact that counsel could easily have spent one hour or more traveling each direction from a location within the Central District of California to the Courthouse located on Spring Street in downtown Los Angeles, or to other locations in Los Angeles County. Accordingly, the Court finds that the hours expended on travel should be reduced by 39 with respect to Burns, and 37.4 with respect to Cohan.

2.     Clerical Tasks

Defendants contend that plaintiff's counsel unreasonably expended 28.6 hours on "clerical tasks," which, according to Bruning, are not a permissible component of a fee request. Bruning Decl. ¶ 30, Ex. H. Plaintiff's counsel respond that some of these entries reflect paralegal tasks performed by Cohan, and others reflect trial preparation tasks. Reply Mot. Att'y Fees at 19 (citing Cohan Reply Decl. ¶ 4). After reviewing the entries identified by Bruning, the Court concludes that the hours billed by Cohan for paralegal work should be reduced by 2.7 hours to account for "purely clerical or secretarial tasks" that he performed. See Davis v. City and County of San Francisco, 976 F.2d 1536, 1543 (9th Cir. 1992), vacated in part on other grounds, 984 F.2d 345. Additionally, 0.1 hours should be deducted from the time billed by Cohan for time billed as an attorney for "mail[ing] copy of complaint and related case initiation filings to client." Bruning Decl., Ex. H, at 1. These hours are not a permissible component of a fee request because they were expended on the mailing, filing, serving, and photocopying of documents. See Bruning Decl., Ex. H; Davis, 976 F.2d at 1543 (describing "filing of pleadings" as a clerical task that should not be included in hours reasonably expended in a lodestar

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

calculation). The other hours identified by Bruning appear to have been reasonably expended by Cohan performing paralegal tasks or trial preparation tasks. See Bruning Decl., Ex. H; Cohan Reply Decl. ¶ 4; Missouri v. Jenkins, 491 U.S. 274, 288 (1989) (approving of awarding paralegal fees under 42 U.S.C. § 1988).

       3.    Vague Entries

Defendants argue that entries totaling 16.05 hours are too vague to form the basis for a fee award. Bruning Decl. ¶ 31, Ex. I. The Court has reviewed these entries. While some of them are not exceedingly clear, they are nonetheless sufficiently specific in order to determine the "general subject matter of [plaintiff's counsel's] time expenditures." See Davis, 976 F.2d at 1542. The Court therefore declines to exclude these hours from the lodestar calculation.

**C.    Non-Taxable Costs**

In addition to taxable costs recoverable under 28 U.S.C. § 1920, which are addressed in plaintiff's separate application to the Clerk of Court, a prevailing party may recover "out-of-pocket expenses that would normally be charged to a fee paying client." See Dang v. Cross, 422 F.3d 800, 814 (9th Cir. 2005). Defendants object to several items included in plaintiff's counsel's fee request as non-taxable costs. The Court addresses each item in turn.

       1.    Expert Witness Fees

Defendants object to fees totaling $5,930.66 arising from plaintiff's retention of police practices expert Roger Clark. Opp. Mot. Att'y Fees at 6-7. Plaintiff's counsel do not object to cutting this amount from their fee request. Reply Mot. Att'y Fees at 23. The Court therefore reduces the total fee request by $5,930.66.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

    2.    Hotel, Mileage, and Meal Expenses

    Defendants object to $5,800.22 in hotel charges, $2,689.39 in mileage expenses, and $591.16 in meal expenses on the grounds that such expenses would not have been incurred if plaintiff had hired local counsel. Opp. Mot. Att'y Fees at 7-8; Bruning Decl. ¶ 32, Ex. J. According to the Bruning Declaration's itemized list of hotel charges, the $5,800.22 figure consists of approximately 19 individual charges, ranging in size from $79.91 for hotel room expenses from "trial prep meetings with client" to $906.28 for a hotel room during the second through fifth trial days. Id. Ex. J. The nightly rate for each hotel room appears to have been less than $200 for all of these hotel charges. The Court declines to reduce the hotel charges because the nightly rate appears reasonable, and the expenses were incurred during trial, depositions, or settlement conferences.[5] Even if plaintiff's counsel had offices in Los Angeles, it would have been reasonable for them to arrange to stay in a hotel near the courthouse during trial or multi-day depositions. Moreover, the expense of staying in a hotel is partially offset by the travel time that was saved, and therefore not included in the lodestar calculation. The Court similarly declines to reduce the amount requested for meal expenses because such expenses would have likely been incurred regardless of whether plaintiff's counsel was based in Los Angeles. However, the Court will reduce mileage expenses by 50%, or $1,344.70, to comport with the corresponding 50% reduction in hours expended on travel.

    3.    Miscellaneous Expenses

    Defendants object to $335.34 spent on court attire for plaintiff. Opp. Mot. Att'y Fees at 8. Plaintiff's counsel does not object to eliminating this expense. Reply Mot. Att'y Fees at 22-23. The Court will therefore reduce the total fee request by $335.34.

---

    [5] At oral argument, the Court inquired about a $652.17 hotel expense that was incurred on March 20, 2013, and is described as "Hotel rooms expense re settlement conf." Bruning Decl. Ex. J. Plaintiff's counsel represented that this expense was incurred because plaintiff's counsel arrived in Los Angeles the night before the settlement conference and stayed in a hotel. The Court concludes that this expense is reasonable because, even if plaintiff's counsel lived in Los Angeles, they could have reasonably decided to spend the previous night in a hotel in light of the overall size of the Los Angeles metropolitan area and the resulting lengthy travel times.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

Defendants also object to $43.94 for the purchase of a camping chair. Opp. Mot. Att'y Fees at 8. The Court finds that the $43.94 paid for the purchase of a camping chair is not a reasonable expense because, even if used at trial, it was not necessary to prosecute the case.

### D.    Fees on Fees

Plaintiff's counsel state that Cohan expended 11.6 hours and Burns expended 39.8 preparing the present motion, and also incurred $90.82 in additional expenses. Reply Mot. Att'y Fees at 24-25, Exs. B-D. At oral argument, defense counsel objected to the inclusion of .8 hours that appeared to have been expended by Cohan on the preparation of the appeal in this matter. Plaintiff's counsel agreed that, to the extent that the billing records reflect that this time was expended in preparing the appeal, it should not be included in the instant fee request. The Court has examined the billing records provided in support of plaintiff's counsel's fees on fees request, and concludes that defense counsel is correct that 0.8 hours was expended by Cohan in preparing the appeal, and not the instant fee request. See Reply Mot. Att'y Fees, Ex. C. Accordingly, the Court reduces Cohan's total hours by 0.8. Defense counsel also objected at oral argument to 0.9 hours that appeared to have been expended by Cohan in preparing the bill of taxable costs. The Court finds that this time is properly included in this fee request because it appears to be the practice of courts in this circuit to permit recovery of such fees. E.g., Quesnoy v. Or. Dep't of Corrections, 2012 WL 1155832, at *4 (D. Or. April 6, 2012).

Accordingly, the hours expended in preparing this motion appear to be reasonable (with the exception of the aforementioned 0.8 hours), and the Court will therefore include 10.8 hours for Cohan, 39.8 hours for Burns, and $90.82 in expenses in calculating the total fee award. See, e.g., Thompson v. Gomez, 45 F.3d 1365, 1366 (9th Cir. 1995) (noting that fees recoverable under 42 U.S.C. § 1988 include "fees incurred while pursuing merits fees").

## IV.    CONCLUSION

In accordance with the foregoing, plaintiff's motion for attorney fees is GRANTED IN PART and DENIED IN PART. Plaintiff is awarded a total of **$803,237.37**, which is comprised of **$787,371.00** in fees, and **$15,866.37** in non-taxable costs.

Case 2:16-cv-09517-TJH-GJS Document 88-7 Filed 08/16/17 Page 269 of 445 Page ID
Case 2:11-cv-08145-CAS-SHx Document 258 Filed 03/03/14 Page 13 of 13 Page ID #:3253
#:1682

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-08145-CAS-SHx | Date | March 3, 2014 |
|---|---|---|---|
| Title | TROY J. DUGAN V. COUNTY OF LOS ANGELES, ET AL. | | |

This award consists of the following amounts:

Merits Fees

| Cohan (as attorney) | 660.6 hours x $390=$257,634 |
| Cohan (as paralegal) | 39 hours     x $190=$7,410 |
| Burns | 757.3 hours x $650=$492,245 |

Merits Expenses

$15,775.55

Fees on Fees

| Cohan (as attorney) | 10.8 hours  x $390=$4,212 |
| Burns | 39.8 hours  x $650=$25,870 |

Expenses Incurred for Fees Motion

$90.82

IT IS SO ORDERED.

|   | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | IM | | |

**EX. 87**

ORIGINAL

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
George R. Hedges (Bar No. 081873)
2 | georgehedges@quinnemanuel.com
Danielle L. Gilmore (Bar No. 171457)
3 | daniellegilmore@quinnemanuel.com
Sara Brenner (Bar No. 247559)
4 | sarabrenner@quinnemanuel.com
865 South Figueroa Street, 10th Floor
5 | Los Angeles, California 90017-2543
Telephone:     (213) 443-3000
6 | Facsimile:     (213) 443-3100

7 | Attorneys for Plaintiffs in Intervention

**FILED**
LOS ANGELES SUPERIOR COURT

NOV 21 2008

JOHN A. CLARKE, CLERK

BY AMBER LA FLEUR-CLAYTON, DEPUTY

8

9 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 | COUNTY OF LOS ANGELES

11 | MONROVIA NURSERY COMPANY, a
California corporation,
12
Plaintiff,
13
vs.
14
HARRY E. ROSEDALE, JR., an individual;
15 | RICHARD VANLANDINGHAM, an
individual; and DOES 1 through 10, inclusive,
16
Defendants.
17

18 | WILLIAM BRUCE USREY, MILES R.
ROSEDALE, LANCE H. ROSEDALE,
19 | SUSAN KAY BRIERLY, JOANNE M.
HUMMER (acting individually and as trustee
20 | of certain testamentary trusts),

21 | Plaintiffs in Intervention.

CASE NO. BC351140
(Consolidated with Case No. BC 354657)

DECLARATION OF DANIELLE L.
GILMORE IN SUPPORT OF MOTION OF
PLAINTIFFS IN INTERVENTION FOR
ATTORNEYS' FEES

Date:      December 18, 2008
Time:     8:30 a.m.
Dept.:     53

Assigned to Hon. John P. Shook

Filing Date:          April 21, 2006
Trial Date:           December 18, 2006

22

23

24

25

26

27

28

11189/2703718.1

Case No. BC351140

DECLARATION OF DANIELLE L. GILMORE IN SUPPORT ATTORNEYS' FEE MOTION

1  ## DECLARATION OF DANIELLE L. GILMORE

2  I, Danielle L. Gilmore, declare as follows:

3  1.     I am a member of the bar of the State of California and a partner of Quinn

4  Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel"), attorneys for Plaintiffs in

5  Intervention. I make this declaration of personal, firsthand knowledge, and if called and sworn as

6  a witness, I could and would testify competently thereto.

7  2.     Attached as Exhibit A is a true and correct copy of California's Second

8  Appellate District decision in this matter, *Monrovia Nursery Co. Inc. v. Rosedale* (Sept. 24, 2008,

9  B197739, B199444) [nonpub. opn.].

10  3.     Attached as Exhibit B is a true and correct copy of this Court's order, dated

11  February 28, 2007, granting attorneys' fees to the Plaintiff and to Plaintiffs in Intervention.

12  4.     Attached as Exhibit C is a chart of all Quinn Emanuel attorneys and

13  paralegals who have billed time from December 2006 to October 2008 in regard to tasks related to

14  the attorneys' fees motions and appeal in this case, including the number of hours billed and the

15  billable rates of each timekeeper. The total amount of billable dollars during that timeframe is

16  $199,589.75. $9,732.50 has been deducted from that total for work unrelated to the attorneys' fees

17  motions and appeal in this case, leading to a total amount of attorneys' fees sought of $189,857.25

18  5.     Attached as Exhibit D is a true and correct copy of monthly invoices

19  submitted by Quinn Emanuel for its work in connection with Plaintiffs in Intervention's motion for

20  attorney fees and the appeal in this action. The records are redacted in some places to protect

21  attorney-client privileged information or attorney work product information. Further, circled

22  entries are entries that have been removed from the billable total as they were not related to the

23  attorneys fee motions or the appeal in this action.

24  6.     Attached as Exhibit E is a true and correct copy of The National Law

25  Journal's most recent "Firm by Firm Sampling of Billing Rates Nationwide," dated December 10,

26  2007.

27

28

11189/2703718.1

-2-

Case No. BC351140

1          7.    Attached as Exhibit F is a true and correct copy of the Court EXPRESS

2   Legal Billing Report, which shows rates identified in fee applications for California lawyers from

3   2008.

4          I declare under penalty of perjury under the laws of the State of California that the

5   foregoing is true and correct.

6          Executed on November 20, 2008, at Los Angeles, California.

7

8          Danielle L. Gilmore

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MONROVIA V. ROSEDALE
LOS ANGELES SUPERIOR COURT
CASE NO. BC351140

LIST OF QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP TIMEKEEPERS
ON BEHALF OF PLAINTIFFS IN INTERVENTION RELATING TO THE MOTION FOR
ATTORNEYS FEES IN THIS CASE AND ITS APPEAL
FROM DECEMBER, 2006 TO OCTOBER, 2008*

| TIMEKEEPER | TITLE | RATE | HOURS | TOTAL |
|---|---|---|---|---|
| George R. Hedges | Partner | $760 | 21.5 | $16,340.00 |
| George R. Hedges | Partner | $725 | 71.2 | $51,620.00 |
| Danielle L. Gilmore | Partner | $685 | 63.55 | $43,531.75 |
| Bethany Henderson | Associate | $360 | 46.5 | $16,740.00 |
| Katherine Bonnici | Associate | $320 | 44.7 | $14,304.00 |
| Sara Brenner | Associate | $340 | 98.3 | $33,422.00 |
| Sara Brenner | Associate | $310 | 11.3 | $3,503.00 |
| Andrea Manka | Associate | $330 | 19.4 | $6,402.00 |
| Carol O'Connor | Paralegal | $235 | 11.6 | $2,726.00 |
| Carol O'Connor | Paralegal | $215 | 5.9 | $1,268.50 |
| | | | | |
| TOTAL HOURS & FEES | | | 393.95 | $189,857.25 |

\*       NOTE: The total billing during this timeframe is $199,589.75. $9,732.50 has been deducted from the total billing for work unrelated to the motion for attorneys' fees and the appeal in this case, leading to a total of $189,857.25. Those hours deducted are circled in the invoices provided by Plaintiffs in Intervention in Exhibit D attached herewith.

**EXHIBIT C**

1

**PROOF OF SERVICE**

2       I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa

3   Street, 10th Floor, Los Angeles, California 90017-2543.

4       On November 21, 2008, I served true copies of the following document(s) described as **DECLARATION OF DANIELLE L. GILMORE IN SUPPORT OF MOTION OF**

5   **PLAINTIFFS IN INTERVENTION FOR ATTORNEYS' FEES** the parties in this action as follows:

6

7

8

9

Brian J. Hennigan, Esq.
Michael H. Strub, Jr., Esq.
Dena G. Kaplan, Esq.
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277-1010
Fax: (310) 203-7199

10

11

Scott B. Garner, Esq.
HOWREY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614
Tel: (949) 721-6900
Fax: (949) 721-6910

12

**Attorneys for Plaintiffs Monrovia Nursery Company**

13

**Attorneys for Defendants Harry E. Rosedale, Jr. and Richard Vanlandingham**

14

15   **BY FEDEX:** I deposited such document(s) in a box or other facility regularly maintained by

16   FedEx, or delivered such document(s) to a courier or driver authorized by FedEx to receive documents, in sealed envelope(s) or package(s) designated by FedEx with delivery fees paid or

17   provided for, addressed to the person(s) being served.

18       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

19

20       Executed on November 21, 2008, at Los Angeles, California.

21

22       Laura Valenzuela

23

24

25

26

27

28



1   ARTURO J. GONZALEZ (BAR NO. 121490)
    (AGonzalez@mofo.com)
2   MIRIAM A. VOGEL (BAR NO. 67822)
    (MVogel@mofo.com)
3   SUZANNA P. BRICKMAN (BAR NO. 250891)
    (SBrickman@mofo.com)
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California 94105-2482
    Telephone:   415.268.7000
6   Facsimile:    415.268.7522

7   Attorneys for Petitioner
    BULLIS CHARTER SCHOOL
8

**(ENDORSED)**
**F I L E D**
OCT 1 8 2013
DAVID H. YAMASAKI
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ DEPUTY

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              FOR THE COUNTY OF SANTA CLARA

11

12   BULLIS CHARTER SCHOOL,            **CASE NO. 109CV144569**

13           Petitioner,         **SUPPLEMENTAL**
                              **DECLARATION OF ARTURO J.**
14       v.                     **GONZÁLEZ IN SUPPORT OF**
                              **BULLIS CHARTER SCHOOL'S**
15   LOS ALTOS SCHOOL DISTRICT; BOARD OF   **MOTION FOR ATTORNEYS'**
    TRUSTEES OF THE LOS ALTOS SCHOOL    **FEES**
16   DISTRICT; and TIM JUSTUS, in his capacity as
    District Superintendent,            Date:  December 12, 2013
17                                 Time:  9:00 a.m.
           Respondents.       Dept:  5
18
                                 The Honorable Carol Overton
19
                                 Petition Filed:  June 10, 2009
20

21

22

23

24

25

26

27

28

COPY

I, Arturo J. González, declare as follows:

1.       I am Co-Chair of the Litigation Department at Morrison & Foerster LLP, counsel for Petitioner Bullis Charter School in this action. I am licensed to practice law in the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit, and all state and federal courts in California. I have personal knowledge of the facts stated herein and could testify competently to them if called upon to do so.

2.       This declaration supplements my declaration filed on August 10, 2012 (Dkt. No. 190). Like this declaration, my August 10, 2012 declaration was filed in support of Bullis' Motion for Attorneys' Fees under section 1021.5 of the Code of Civil Procedure (Dkt. No. 189). Although the motion – and Bullis' supporting memorandum – was filed over a year ago, the parties have not yet completing briefing. This updates my August 10, 2012 declaration, and, as discussed below, attaches legal bills since August 2012 for our work responding to the District's substantial discovery that the District claims was necessary to respond to Bullis' motion for legal fees. Together with this declaration, we are filing an amended notice of our motion as well as a supplemental Declaration of Jed Wallace (Mr. Wallace also filed a declaration on August 10, 2012 (Dkt No. 191)). Because our memorandum of points and authorities (Dkt. No. 190) has not changed, we rely on our August 10, 2012 filing.[1]

3.       Bullis Charter School ("Bullis") retained Morrison & Foerster in 2008, when it was sued (as real party in interest) by the Los Altos School District (the "District") regarding its County-approved admissions policy. Bullis prevailed. I have represented Bullis since, and began work as lead counsel on this engagement in early 2009.

## LEGAL EXPERIENCE

4.       In evaluating a fee request, one of the things courts consider is the experience and background of the lawyers who did the work. I am a trial lawyer. I graduated from Harvard Law School in 1985, began working as an associate at Morrison & Foerster in September of 1985, and

---

[1] We note that the citations to the González Declaration in Bullis' memorandum refer to my original, August 10, 2012, declaration.

1

1   became a partner in 1992. I am an Associate with the American Board of Trial Advocates, an

2   organization that requires the equivalent of 20 civil jury trials for consideration. I have

3   successfully defended three trials where my client was a defendant sued in each case for more

4   than $1 billion. I have also obtained four verdicts for plaintiffs that were each in excess of $10

5   million. I have tried cases in a variety of complex substantive areas, including seven civil rights

6   cases to verdict and cases involving trade secrets, the Lanham Act, copyright, fraud, contract

7   disputes, unfair business practices, legal and medical malpractice, race and sex discrimination, tax

8   matters, and criminal law.

9       5.      I have worked on many matters affecting the public interest and public education

10   throughout my career, including *Butt v. State of California* (1992) 4 Cal.4th 668, one of

11   California's most important public school decisions, which I argued in the California Supreme

12   Court. That case held that a premature closure of public schools would violate a child's

13   fundamental right to a public education. I served as lead counsel for plaintiffs, representing

14   public school parents and their children who resided in the district.

15      6.      I also have significant appellate experience. I have argued cases before the

16   California Supreme Court, the First, Third, and Sixth District California Courts of Appeal, and

17   the Ninth Circuit.

18      7.      I have received a number of awards and acknowledgements for my legal work. In

19   2009, I was recognized by the *National Law Journal's* "Winning" Special Report as one of the

20   top 10 trial lawyers in the United States. From 2010-2013, I was selected as one of the country's

21   top trial lawyers by *Legal 500 US*, which described me as "incredibly impressive on his feet" and

22   "a great leader." From 2006-2012, I was named by the *California Daily Journal* as one of

23   California's Top 100 leading lawyers, and was recommended as a leading lawyer by *Best*

24   *Lawyers in America* in 2011 and 2012. In 2008, I was selected by *The National Law Journal*

25   among the "50 Most Influential Minority Lawyers in America," by *Hispanic Business* as one of

26   the 100 most influential Latinos in the United States, and by *Lawdragon* as one of the 500

27   Leading Lawyers in America. In 2003, the *American Lawyer* magazine selected me as one of the

28   nation's top 45 lawyers under the age of 45, and in 1995, the *National Law Journal* selected me

2

1    as one of the nation's top 40 lawyers under the age of 40. In addition, in 1991, *California Law*

2    *Business* selected me as one of the top 20 young lawyers in California. I have also been named as

3    a leading litigation attorney in California by *Chambers USA*.

4        8.    I have served as Co-Chair of Morrison & Foerster's Litigation Department since

5    2010; prior to assuming that role, I served as Chair of the firm's Trial Practice Group. In these

6    roles, and during the course of my 28-year legal career, I have been active in teaching other

7    lawyers. I have chaired panel presentations on behalf of the Practicing Law Institute ("PLI") and

8    have served on more than twenty panels for the California Continuing Education of the Bar

9    ("CEB") in different substantive areas. This past August, I was Chairperson for a new PLI

10    Program on trial skills entitled "California Trial Advocacy." I moderated one of the panels,

11    entitled "Preparing Your Case for Trial." I have served on six panels on The Effective Delivery

12    of Opening Statements and Closing Arguments (and was moderator for two of those panels), and

13    have also served on panels regarding preparing cases for trial, motion practice, recent

14    developments in the law, expert witnesses, courtroom technology, and discovery issues. I have

15    also made a presentation on professional malpractice, and have taught lawyers the effective way

16    to take depositions. I have lectured to over 3,000 lawyers throughout California. In addition, I

17    have made a presentation to lawyers in Puerto Rico on trial preparation, including the effective

18    use of videotaped depositions at trial.

19        9.    I am also active in bar activities. In 2010, I served as the President of the Bar

20    Association of San Francisco.

21        10.    I have received awards for my legal work from a number of organizations,

22    including the Alameda County Board of Education, which awarded me with a Public Education

23    Service Award for representing the public high school students of California in a challenge to the

24    High School Exit Exam. I have also received commendations from the California State Senate

25    and the California State Assembly. I have been honored by the League of United Latin-American

26    Cities, the Mexican-American Political Association, La Raza Centro Legal, and the San

27    Francisco, East Bay, and Fresno La Raza Lawyers' Associations. Numerous public interest

28    organizations have recognized me for my work affecting the public interest.

3

**THIS LITIGATION**

11.　　In early 2009, Bullis engaged Morrison & Foerster to analyze the legality of the District's facilities offer and methodology.  Prior to filing this lawsuit, we conducted an extensive analysis of the District's facilities offer, informed the District of all of the ways in which it was deficient, and asked the District to correct those deficiencies.  We hoped that through open dialogue and negotiation, we could avoid litigation.  But the District refused to address the issues Bullis identified.  We had no choice but to file a lawsuit, which we did in June 2009.

12.　　This case has been vigorously litigated for over four years.  It was not an easy case to win.  The District has hired multiple law firms to fight Bullis, including the international law firm of Reed Smith.  In addition, multiple parties have filed multiple amici briefs that we have had to address, both in the appellate and trial courts.

**THE DISTRICT'S INACCURATE MEASUREMENTS**

13.　　From the beginning of this engagement, and throughout the litigation, Bullis' job was particularly difficult due to the numerous steps that the District took that made it difficult to compare the facilities at comparison group schools and those offered to Bullis.  For example:

- The District knowingly used – and filed with the Court – old site plans that overstated the amount of space offered to Bullis.  Attached as **Exhibit A** to my original (August 10, 2012) declaration is a true and correct copy of a declaration (with relevant exhibits only) detailing the District's filing of a declaration from their architect that contained inaccurate measurements of Bullis.  Exhibit A was filed on October 26, 2009, in support of Bullis' petition.  (See Dkt. No. 77.)  Even though the District admitted that the map was wrong, and although the Court of Appeal noted the District's use of the erroneous map and figures, the District continued to use the same outdated map.  (See Supplemental Declaration of Andrea Eyring In Support of Bullis' Motion to Compel Compliance, Dkt. No. 180, ¶¶ 10-11; *Bullis Charter School v. Los Altos School District* (2011) 200 Cal.App.4th 1022, 1057, fn. 24 (*Bullis*).)

4

- The District failed to identify which physical space on each campus it considered in its Proposition 39 analysis, despite Bullis' pre-litigation requests that the District explain the discrepancy between the total site size of each campus and the amount of space reported in the District's Proposition 39 analysis.  Instead of identifying which space it did and did not count, the District forced Bullis to painstakingly walk the District's Assistant Superintendent Randy Kenyon through numerous numbered photographs of each school in deposition to determine what the District did and did not count.  (*Bullis, supra*, 200 Cal.App. 4th at p. 1045.)

- The District mis-reported actual size of numerous facilities at the comparison group schools, by using "standard room sizes."  These were measurements that were not tied to actual (or even average) size of the real facilities.  Despite Bullis' multiple requests, the District refused to explain to Bullis how it arrived at its "standard" measurements.  Instead, to confirm whether "standard" measurements were accurate, Bullis had to take its own measurements of comparison group schools and conduct detailed analysis of voluminous site maps.  It found that the "standard" measurements were wrong.  Only then did Mr. Kenyon admit, in deposition, that standard room sizes were invented by the District.  (*Bullis, supra*, 200 Cal.App. 4th at pp. 1060-1061.)

- The District counted space at Bullis underneath buildings as "blacktop play space" while also counting the buildings as indoor space, and changed its view of what counted as "blacktop" or "turf" at comparison group schools to make them appear smaller.  (*Bullis, supra*, 200 Cal.App. 4th at pp. 1044-1046.)

- The District used inconsistent and shrinking measurements to represent certain areas at comparison group schools, despite the fact that there had been no changes to the configurations or sizes of the comparison group schools.  (*Bullis, supra*, 200 Cal.App. 4th at p. 1046.)

5

sf-3341220

- The District failed to accurately report (and in some cases, failed to even measure) site size. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1050-1052.)  Bullis had to engage various individuals – including an aerial photographer, engineer, and architect/designer – to obtain measurements that the District refused to provide.

- The District failed to report the amount of space per student at comparison group schools. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1050, 1055.)  Bullis had to reverse engineer these calculations.

- The District failed to specify the sharing arrangements that would restrict Bullis' use of the facilities offered, and counted restricted use space as if it had been offered on a 100% basis. (*Bullis, supra*, 200 Cal.App. 4th at p. 1059.)

- The District withheld building and site plans from Bullis, despite multiple requests (including requests before litigation began), forcing us to go to the Division of State Architect to obtain these plans.  This took us, and DSA, significant time and effort.  When the District finally allowed us to inspect site plans, months later (and well into litigation), they first directed us to old building and site plans that were clearly irrelevant.  Only after considerable pressure did the District drive us to a completely different location where the relevant documents were stored.

14.     In order to demonstrate and explain the District's improper methodology and allocation, we had to spend significant amounts of time reverse engineering and cross-checking the District's process:

- We reviewed volumes of historical documents, including, among others, all documents related to each Proposition 39 offer since Bullis' inception, District budget reports for accurate total site size measurements, demographer's reports, District Board minutes, and documents submitted by the District to Facilities Planning Division of the Department of Education.

6

- We noticed and took the deposition of various District administrators and agents, including Mr. Kenyon (to find the truth about what he did and did not consider in his Proposition 39 analysis and accurate site measurements, among other things) and the District's architect, Lawrence Schadt (to determine whether accurate maps were used to take measurements and what he was instructed to exclude from his measurements).

- We engaged various subject matter experts to, among other things, take aerial photographs, create Auto-CAD files, and determine site size measurements.

15.     Despite these difficulties, Bullis' efforts have resulted in a published opinion that will benefit charter school students throughout the state. (See Declaration of J. Wallace ("Wallace Dec."), filed on August 10, 2012 (see Dkt. No 191); see also Supplemental Declaration of J. Wallace ("Supp. Wallace Dec."), filed concurrently herewith.)

### MY CUSTOMARY HOURLY RATE

16.     One of the factors that courts consider in determining a reasonable hourly rate is the customary rate that is charged by the attorney. In 2009, my customary billing rate was $750 per hour. In 2010, my customary billing rate was $795. In 2011, my customary billing rate was $835. My 2012 customary billing rate was $875. Early in 2012, I tried a case in the Southern District of New York where I billed the client $875 an hour for my time. My current customary billing rate is $950.

17.     Bullis received a 5% discount off of all of our hourly rates from the beginning of this engagement through the end of 2012. The District's tactics (further discussed below) have caused me significant concern about the cost of this litigation. In an effort to stem those costs, I have followed a strict "push work down" to associates policy (also discussed below). I have also increased the discount that the firm has given the client on this engagement. For example, in late 2012, the associate discount increased to 10%, and in January 2013, this discount was applied to all timekeepers (including me). In March 2013, we increased the Bullis discount to 15% for associates and legal assistants.

7

18.     In 2009, my hourly rate to Bullis was $712.50, in 2010 - $755.25, in 2011 - $793.25, in 2012, - $831.25, and in 2013, it is $855.

**TRIAL COURT PREPARATION AND PROCEEDINGS**

19.     Preparing to file this case, and briefing in preparation for the hearing on Bullis' petition, was extremely difficult and time-intensive.  That was due, in large part, to the District's failure to properly account for all space at its schools, overstating the amount of space it had allocated to Bullis, and constantly changing factual assertions and legal arguments.  Repeatedly during the course of this litigation, the District's factual and legal positions have changed.  For example, the District has frequently changed its measurements of the comparison group campuses.  At one point, the District filed a declaration from its architect with this Court that the District's lawyers knew contained false statements.  We discussed this in detail in the Opening Brief in the Court of Appeal.  The relevant pages of that discussion are attached as **Exhibit B** to my original (August 10, 2012) declaration.

20.     As a result, we have had to reverse engineer almost all of the District's Proposition 39 analysis, and upon discovery of numerous and significant errors, take extensive measurements of each comparison group school – indoor and outdoor space, as well as overall site size – and the space allocated to Bullis.  Approximately 14 depositions were taken of parties and non-parties, though Bullis only took 5.

21.     The Court of Appeal commented on many of these discrepancies in its opinion.  For example, the Court noted that "large amounts (*over 50 percent*) of exterior square footage were not included in the District's calculations." (*Bullis, supra,* 200 Cal.App.4th at p. 1044, emphasis in original.)  The Court also noted that Randy Kenyon, the District's Assistant Superintendent, had failed to count picnic tables, walkways, lunch areas, childcare areas, playgrounds, blacktop, and other space at the comparison group schools.  (*Id.* at p. 1045.)  The Court also noted that Kenyon instructed the architect to only measure certain specified areas and "not anything else." (*Id.* at p. 1046, fn. 15.)  Significantly, the Court noted that there was "evidence in the record—e.g., failure to consider large amounts of comparison group school space, disregarding site size component, and changing established methods of performing the

8

1    reasonable equivalence analysis—from which such a finding [of bad faith] could be made." (*Id.*

2    at p. 1063, fn. 35.)

3        22.     In addition, the legal arguments made in the District's Petition for Review conflict

4    with other legal positions advocated by the District in this Court. Here are just a few notable

5    examples from the briefing before this Court pertaining to the Proposed Judgment:

6      **Site Size.** Bullis' proposed judgment stated that "[t]he District shall provide Bullis with a

7       site and facilities that are reasonably equivalent to the 10-acre minimum sites enjoyed by

8       comparison schools." (Amended Proposed Judgment at 1.)  The District objected to this

9       language on the ground that "[t]he court of appeal decision does not require provision of a

10      specific size site." (Respondents' Objections at 4:6, Dkt. No. 111.)  But in the Supreme

11      Court and Court of Appeal the District argued repeatedly that:

12          [Under the Court of Appeal's opinion,] a district ***must*** . . . provide a
13          school site of equal size [to the charter school]. (Pet. for Review at
           15, italics added.)

14          [T]he Opinion transforms site size into an overriding consideration,
15          requiring a district to provide a site of equal size [to the charter
           school] to those of the comparison school sites. (Pet. for Review at
16          30.)

17          [T]he Court [of Appeal] hails site size as an overriding
           consideration. (Pet. for Rehearing at 50.)

18          [The Court of Appeal opinion] elevat[es] . . . 'school site size' to
19          the primary consideration in the analysis. (Req. for Depublication
           at 6.)

20          [T]he Opinion elevates site size to *the* overriding factor. (Reply In
           Support of Pet. for Review at 14.)
21

22      **Allocation of Facilities.** Bullis' proposed judgment also stated that "the District shall

23       consider total site size and account for (and allocate reasonably equivalent building and

24       outdoor space to Bullis for) *all* building and outdoor space on any and all comparison

25       school sites." (Amended Proposed Judgment at 1.)  The District objected on the ground

26       that "[t]he court of appeal decision says nothing about what the District needs to allocate –

27       it only opines as to what the District needs to consider." (Respondents' Objections at 5,

28       10.)  Compare this to the District's arguments in prior briefs:

9

Arturo J. González Suppl. Decl. In Support of Motion for Attorneys' Fees

sf-3341220

1    [Under the Court of Appeal's Opinion,] a district *must . . . allocate*
     'equal' space to the charter school.  (Pet. for Review at 15, italics
2    added.)

3    [U]nder the Opinion, a district *must . . . allocate* each and every
     category of non-teaching space to a charter school."  (Pet. for
4    Review at 22-23, italics added.)

5    [A] district *must* count every facility at every comparison school
     and *provide* each facility to the charter school.  (Reply In Support
6    of Pet. for Review at 13, italics added.)

7    [T]he Opinion indicates that [the] district *must . . . provide*
     additional space or access, to *another* multi-purpose room to meet
8    the 'reasonably equivalent requirement.  (Pet. for Review at 32,
     italics added.)

9
     The [Court of Appeal] Opinion . . . finds that a school district must
10   include [in its facilities offer] before- and after-school childcare
     facilities if comparison schools also include such facilities.  (Pet.
11   for Rehearing at 49; see also Pet. for Review at 33 [same]; Reply In
     Support of Pet. for Review at 16 [same].)
12

13   **Consideration of All Space.**  Bullis' proposed judgment stated that "[t]he District shall,

14   in its reasonable equivalency analysis, disclose and utilize the actual size of building and

15   outdoor space at comparison schools."  (Amended Proposed Judgment at 1.)  The District

16   objected because"[t]he court of appeal does not dictate how the District shall document its

17   consideration, . . . . Mathematical precision is not required; a fair representation of space

18   may be given in a number of ways."  (Respondents' Objections at 6.)  Likewise, the

19   District objected to measuring all outdoor space, on the ground that "[t]he court of appeal

20   decision does not order the District . . . to measure everything."  (*Id.* at 7.)  The District

21   also objected to proposed language requiring the District to provide accurate

22   measurements of the outdoor and building space offered to Bullis, because "[t]he court of

23   appeal decision . . . does not mandate measuring every single space."  (*Id.* at 8.)

24   Again, the District sang a different song in the Supreme Court and Court of Appeal:

25       [T]he Opinion . . . requires a district to measure *all square feet of
         space* which is not considered 'teaching station space' or
26       'specialized classroom space.'  (Reply In Support of Pet. for
         Review at 12, italics added.)

27

28

10

[T]he [Court of Appeal] Opinion . . . requires *calculations and articulation* of every square inch of space, usable or not.  (Pet. for Rehearing at 35, italics added.)

One of the [Court of Appeal] Opinion's *primary holdings requires* school districts to include every square foot of a parcel on which a school sits in its consideration of a facilities request.  (Pet. for Rehearing at 42, italics added.)

[E]very patch of dirt, hillside, space occupied by a cell phone tower or space otherwise essentially unusable to students and staff must be considered in the analysis.  (Pet. for Rehearing at 42.)

[A] district must . . . meticulously measure *all* space at each comparison school site, . . . [and] identify every category of space at every comparison school site. (Pet. for Review at 15-16.)

The Opinion . . . concludes a district must count every category of facility at every school site.  (Pet. for Review at 29; see also Request for Depublication at 6 [same]; Reply In Support of Pet. for Review at 13 [same].)

[T]he Opinion imposes a requirement of 'arithmetical precision.' (Reply In Support of Pet. for Review at 11.)

23.     When we appeared before this Court to argue regarding the Proposed Judgment, the District's lawyers from Reed Smith told this Court (without a clear explanation) to disregard the District's objections to the Proposed Judgment.  Specifically, Ray Cardoza told this Court that that "[y]ou can consider the objections withdrawn."  (A true and correct excerpt from the transcript of this hearing is attached as **Exhibit C** (see 3:10-11) to my original (August 10, 2012) declaration.)  However, by that point, I had personally spent a significant amount of time digesting and responding to that brief.  At no point prior to Mr. Cardozo making this statement in open court had I been given notice that the District was going to "withdraw" their written objections to the Proposed Judgment.

## DELEGATING WORK TO ASSOCIATES AND CLIENTS

24.     In order to more efficiently handle this matter, I delegated significant responsibilities to the associate working on this case, including covering nearly all of the depositions, drafting all of the written discovery and submissions to the Court, interviewing witnesses, and handling conferences and negotiations with opposing counsel.

11

Arturo J. González Suppl. Decl. In Support of Motion for Attorneys' Fees

sf-3341220

25.     Suzanna Brickman has been the associate who has assumed primary responsibility for the day-to-day tasks on this case since its inception. Ms. Brickman is a 2006 graduate from Stanford Law School. Prior to associating with Morrison & Foerster, Ms. Brickman completed a one-year fellowship in education law at The Johns Hopkins University. Ms. Brickman has been working with Bullis since 2008, and has worked on this engagement since its inception in 2009. She drafted the petition and most of the briefs, and drafted most of the written discovery and took or defended many of the depositions. In 2009, Ms. Brickman's customary billing rate was $400; in 2010, it was $480; in 2011, it was $570; in 2012, it was $620; and it is currently $650. Despite these customary rates, Morrison & Foerster reduced Ms. Brickman's hourly rate as follows: $380 in 2009, $456 in 2010, $541.50 in 2011, $589 in 2012 (in late 2012 this was reduced to $558), and $552.50 in 2013. As discussed above, these rates reflect a 5-15% discount.

26.     In addition to Ms. Brickman, associate Maggie Mayo assisted with this case in April through September 2009. At the time, Ms. Mayo was a first year associate (she is a 2008 graduate of the University of California, Berkeley, School of Law) and billed at a customary rate of $295 (Bullis was billed $280.25 for her time). Moreover, several summer associates have conducted legal research and analysis on this matter since 2009 (including research related to this motion and the currently pending motion to compel compliance); most of this work has not been billed to the client.

27.     To further improve efficiency and reduce the number of hours billed by Morrison & Foerster, Bullis Board and committee members have volunteered many hours to case strategy and fact development, as well as negotiations with the District, since the beginning of this litigation. For example, Andrea Eyring, a six-year Bullis Board member who holds a bachelor and master degree in electrical engineering from Brigham Young University, spent many hours on this litigation. Ms. Eyring took extensive measurements of all relevant District campuses – including indoor space, outdoor space, and overall site size. Ms. Eyring also reverse engineered numerous District facilities offers in order to show the District's inconsistent and inaccurate measurements, overstatement of Bullis' measurements, understatement of comparison schools'

12

sf-3341220

1   measurements, and the otherwise obfuscated discrepancy between Bullis' facilities and those of

2   the comparison group schools.

3       28.   Francis La Poll, another Bullis Board member, has also volunteered many hours to

4   this litigation in order to reduce Bullis' fees. Mr. La Poll graduated from Stanford Law School,

5   served as a Ninth Circuit clerk, and is currently an AV-rated lawyer in private practice. Mr. La

6   Poll served as a two-term Mayor of the City of Los Altos. Mr. La Poll was particularly helpful in

7   mediation, where we were able to reach a settlement in principle with the District's negotiating

8   committee.

9       29.   I also delegated significant tasks to my law school classmate, David Spector, who

10  has volunteered many hours to this matter. Mr. Spector is a cum laude graduate of Harvard Law

11  School. He has played an integral role in, among other things, analyzing the District's

12  Proposition 39 methodology, formulating legal strategy, and revising briefs. His work saved

13  Bullis thousands of dollars; without Mr. Spector's assistance, I would have spent considerably

14  more time on this matter.

15      30.   Several other Bullis Board and committee members have dedicated substantial

16  amounts of time to this litigation. Had I not been able to delegate fact development (among other

17  tasks) to them, both Ms. Brickman and I would have had to spend considerably more time on this

18  engagement. Because Ms. Brickman is also responsible for other matters, I would have likely

19  had to put another associate on this case. This would have increased legal fees, especially given

20  the complex facts of this case and the time it takes to getting up to speed. Moreover, I believe we

21  would have had to retain at least two experts to conduct the work that our clients were delegated.

22      31.   I took other measures to ensure that this matter was handled efficiently. For

23  example, Bullis limited the number of depositions it took, and sought expedited briefing on

24  multiple occasions. We also assigned organizational and filings tasks that would ordinarily have

25  been completed by legal assistants to experienced legal secretaries and did not bill for that work.

26  **APPELLATE COURT PREPARATION AND PROCEEDINGS**

27      32.   On appeal, I asked retired Justice Miriam Vogel, who is a Senior Of Counsel at

28  Morrison & Foerster, to assist with briefing. Justice Vogel, a graduate of Whittier Law School,

13

1    spent eighteen years as a Justice on the California Court of Appeal, Second Appellate District,

2    Division One, and five years as a judge on the Los Angeles Superior Court.  Justice Vogel is a

3    member of the California Academy of Appellate Lawyers and serves on the Ninth Circuit

4    Advisory Board.  Although Justice Vogel's customary rate was $765 in 2010, $800 in 2011, and

5    $850 in 2012, her hourly rate to Bullis was $726.75, $760, and $807.50, respectively.

6    Ms. Brickman also played a large role in preparing the appellate court filings, as did the Bullis

7    volunteers.  Again, for the sake of efficiency, I delegated most of the work regarding the appeal to

8    others.

9         33.    Even after the Court of Appeal issued its opinion, we operated with as much

10   efficiency as possible in the face of a concerted effort by the District to set aside the opinion.  The

11   District filed three post-appeal briefs:  a Petition for Rehearing, Petition for Review, and Reply in

12   Support of Petition for Review.  In addition, the District filed a Request for Depublication.

13   Moreover, the California School Boards Association submitted an amicus letter in support of the

14   District's Petition for Review.  We successfully opposed the District's efforts to overturn the

15   Court of Appeal's opinion.

16                    **POST-APPEAL TRIAL COURT PREPARATION AND PROCEEDINGS**

17        34.    When this was case was remanded to the trial court following remittitur, we took

18   various steps to expedite post-appeal matters and resolution of the litigation.  Bullis appeared ex

19   parte 6 court days after remittitur issued and asked the Court to move forward status conference,

20   sign a proposed judgment, and expedite any briefing on the form of judgment.  The parties are

21   continuing to litigate whether the District has complied with the Court's order and writ – that

22   motion is currently on appeal.

23        35.    In addition, when Bullis filed this fees motion in August 2012, the District served

24   substantial discovery requests– seeking from Bullis documents and information including:  all

25   admission applications Bullis received from 2008-present; Bullis' special education expenses; the

26   occupations of all Bullis parents from 2009 to the present; the average annual income of parents

27   who send their children to Bullis; the net worth of parents who send their children to Bullis;

28   Bullis' recruiting and enrollment materials since 2004; the investment strategy and earnings of the

                                                    14

1  independent and non-party Bullis-Purissima Elementary School Foundation; the Los Altos Hills

2  City Counsel's pursuit of a school site; Bullis' legal committee; a group of volunteer parents who

3  looked for a site for Bullis nearly a decade ago; and Bullis' agreements with non-party vendors;

4  and legal bills from other litigation.

5       36.    Since the summer of 2012, the District has served six sets of document requests

6  (84 requests) and five sets of interrogatories (87 interrogatories).  Bullis has responded to each,

7  and has produced nearly a thousand pages of documents.  In addition, we have engaged in

8  countless hours of meet and confer communications and correspondence.

9       37.    In addition to the aforementioned written discovery, the District also took two

10  depositions and served five third party subpoenas, resulting in the production of over 3,200 pages.

11  **SETTLEMENT OF LEGAL FEES AND MEDIATION**

12       38.    We have made several attempts to avoid further litigation and settle the issue of

13  legal fees.  First, I sent the District a letter in early 2012, offering to settle legal fees for an

14  amount substantially less than the fees actually incurred in the course of this litigation.  The

15  District did not respond to the offer.

16       39.    Then, in February 2012, Bullis invited the District to mediation with the intent to

17  reach a long-term solution regarding facilities and to settle outstanding litigation issues, including

18  legal fees.  We attended numerous mediation sessions with the District.  The public details of the

19  mediation with retired Justice Richard J. McAdams are discussed in the Declaration of Ken

20  Moore, filed in support of Bullis' Motion for Compliance.  (Dkt. No. 139.)  Although the parties

21  reached a tentative agreement that included Bullis' waiver of legal fees, the District subsequently

22  refused to adopt the agreed upon deal terms.  (See Exhibits P and Q to the Declaration of Ken

23  Moore in Support of Bullis' Motion for Compliance, Dkt. No. 139.)

24  **IMPACT OF THIS CASE**

25       40.    As discussed in the memorandum of points and authorities and Declaration of Jed

26  Wallace (Dkt. Nos. 189, 191) and the Supplemental Declaration of Jed Wallace, filed

27  concurrently herewith, the Court of Appeal's published opinion reaches far beyond just the

28

1  parties and provides critical analysis that will guide school districts and charter schools across the

2  state.

3         41.     In addition, the impact of this case is evident in light of the publicity it has

4  received since the Court of Appeal issued its opinion.  For example, the lawsuit was the subject of

5  legal alerts on various education-related websites, including the websites of the Charter School

6  Development Center (http://www.chartercenter.org/resources, *last visited* Aug. 9, 2012),

7  California Charter Schools Association ("CCSA") (Wallace Dec. Ex. A at 1-18), Financial Crisis

8  & Management Team Assistance (www.fcmat.org/2012/01/20 and www.fcmat.org/2012/01/24,

9  *last visited* Aug. 9, 2012), and the law firm of Middleton, Young, and Minney

10  (http://www.mymcharterlaw.com/pdf/Bullis_v_%20Los_Altos_School_District_legal_alert_1028

11  11_%28PCM%20final%29.pdf, *last visited* Aug. 9, 2012).  As the CCSA noted, this case

12  represents "[a]n important victory for Prop. 39 statewide . . . . This action by the Court lets stand

13  the published decision for use throughout the state."  (Wallace Dec. Ex. A at 7.)

14         42.     Attached as **Exhibit D** to my original (August 10, 2012) declaration are excerpts

15  from the District's post-appeal briefs in the Court of Appeal and Supreme Court.  We have

16  highlighted some of the portions of these briefs in which the District concedes that this case is one

17  that affects broad public interests, and one that will have a significant practical impact on school

18  districts.

19         43.     Attached as **Exhibit E** to my original (August 10, 2012) declaration is a

20  presentation given by Sue Ann S. Evans of Dannis Woliver Kelley, the law firm that represented

21  the District from the inception of this litigation through the appeal (Ms. Evans was counsel of

22  record until late February 2012, when her firm was substituted by Reed Smith).[2]  In the

23  presentation (which was given on March 29, 2012 at the Small School Districts' Association

24  Annual Conference), the District's own lawyer acknowledged the broad impact of this case.  (Ex.

25  E at 38 [among other things, noting that under *Bullis* "[a] district must include all square footage

26  _____

27       [2] We found this presentation on the Small School Districts' Association's website (*last visited* Aug. 9, 2012).

28

1    of comparison school sites when determining the facilities offered" and that the Court of Appeal

2    "[i]n measuring the facilities a district may not count the entire square footage of a facility if the

3    charter school is sharing that facility with a district-operated school"].)

4        44.    In addition, the appellate court's decision in *Bullis* is agendized as a "hot topic" to

5    be discussed at the California Council of School Attorneys 2012 Fall Workshop. A true and

6    correct copy of the webpage describing the 2012 Fall Workshop is attached as **Exhibit F** to my

7    original (August 10, 2012) declaration. "The California Council of School Attorneys (CCSA) is .

8    . . comprised of attorneys who represent school districts in California. . . . It is affiliated with the

9    California School Boards Association." (See

10   www.csba.org/LegislationAndLegal/Legal/CaliforniaCouncilOfSchoolAttorneys.aspx, *last visited*

11   Aug. 7, 2012.) This is the same organization that submitted an amicus letter to the Supreme

12   Court in support of the District's Petition for Review, and has now filed an application to appear

13   as amicus curiae in the trial court.

14       45.    Based on my associate's research, I understand that the Court of Appeal's opinion

15   has been subsequently cited in several cases and legal briefs, and is cited in numerous secondary

16   source materials regarding education, mandamus, standard of review, mootness, and agency

17   discretion. Moreover, the lawsuit has also been the subject of press coverage from various news

18   sources, including those outside the immediate Los Altos vicinity. The case was recently cited in

19   a Howard Law Journal Note and Comment calling for a legislative and judicial remedy for

20   inadequate school facilities.

21                       **HOURS WORKED ON THIS ENGAGEMENT**

22       46.    Attached as **Exhibit G** to my original (August 10, 2012) declaration is a copy of

23   the hourly billings submitted to Bullis from the beginning of this litigation through July 2012 (the

24   last billing submitted before Bullis filed its fees motion). In my professional judgment, all of the

25   time included in Exhibit G was reasonably necessary to litigate this case successfully on behalf of

26   Bullis.[3]

27         [3] We have redacted a few entries that disclose privileged information or that concern

28   issues for which we are not seeking fees.

sf-3341220

1      47.     Attached hereto as **Exhibit G-2** is a copy of the hourly billings submitted to Bullis

2    from August 2012 (when Bullis filed its fees motion) through the present.  These bills have been

3    redacted to exclude work on matters for which we are not currently seeking fees (e.g. appellate

4    work).  In addition, where a particular entry shows that a timekeeper worked on multiple issues,

5    including matters related to this fees motion, we redacted the *entire* entry and are not seeking

6    such fees at this time.  Thus, by way of example, in August 2012, Bullis was billed $176,912.50;

7    however, we are only seeking $11,290.76.  Likewise, in October 2012, Bullis was billed

8    $76,758.75, but we are only seeking $1,674 of that amount.  And in April 2013, Bullis was billed

9    $133,931.25; we are only seeking $23,641.66.  In total, Bullis is seeking $182,252.74 for this

10   firm's work from August 2012 through the end of September 2013.

11      48.     In order to further reduce costs, we delegated a significant amount of discovery to

12   our co-counsel at Procopio, Cory, Hargreaves & Savitch LLP.  The billings reflecting work co-

13   counsel did relating to fees' motion discovery are attached to the Declaration of John Lemmo,

14   submitted concurrently herewith.

15               **COMPARABLE RATES IN THE SAN FRANCISCO BAY AREA**

16      49.     I am a former member of Morrison & Foerster's Board of Directors and participate

17   in weekly meetings of the Firm's Executive and Management Committees.  I am generally

18   familiar with the hourly rates charged by comparable law firms in San Francisco, Oakland, and

19   Silicon Valley.  Our Firm studies rates charged by comparable law firms to ensure that our rates

20   are competitive.  I have also reviewed fee petitions filed by other law firms and have reviewed

21   cases awarding legal fees in other cases.  The rates that we are seeking in this fee petition are

22   consistent with what comparable attorneys charge in the Bay Area.

23

24

25

26

27

28

18

Arturo J. González Suppl. Decl. In Support of Motion for Attorneys' Fees

sf-3341220

## FEES SOUGHT

50.     When we sought fees in August 2012, in addition to the 5% discount Bullis was given, we sought to recover only 95% of the fees it paid to Morrison & Foerster.  Accordingly, the District was asked to pay for only 90% of the work done by Bullis' lawyers.  As discussed above, the fees we have added since our filing reflect a discount of up to 15%.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18th day of October at San Francisco, California.

Arturo J. González

19

sf-3341220

1  GIBSON, DUNN & CRUTCHER LLP
   Wayne Barsky (SBN 116731)
2  Marcellus A. McRae (SBN 140308)
   Meghan Blanco (SBN 238171)
3  Michael Anthony Brown (SBN 243848)
   Carol A. Fabrizio (SBN 258187)
4  Kristy S. Grant (SBN 260016)
   333 South Grand Avenue
5  Los Angeles, California 90071-3197
   Tel: (213) 229-7000  Fax: (213) 229-6604
6  wbarsky@gibsondunn.com
   mmcrae@gibsondunn.com
7  mblanco@gibsondunn.com
   tbrown@gibsondunn.com
8
   Attorneys for PLAINTIFFS Esperanza Rogel,
9  Gerardo Espinoza, Oscar Leon, Marcos Martinez,
   Jaime Torres, and California ACORN, Los
10 Angeles Chapter

11 Additional counsel listed on following page.

**FILED**
LOS ANGELES SUPERIOR COURT

APR 09 2009

JOHN A. CLARKE, CLERK

BY JALON TAYLOR, DEPUTY

12             SUPERIOR COURT OF THE STATE OF CALIFORNIA

13

14             COUNTY OF LOS ANGELES – CENTRAL DISTRICT

15 ESPERANZA ROGEL, *et al.*,              ) Case No. BS106592
                                          )
16             PLAINTIFFS,                 ) **DECLARATION OF WAYNE BARSKY IN**
                                          ) **SUPPORT OF PLAINTIFFS' MOTION FOR**
17        v.                               ) **ORDER AWARDING ATTORNEYS' FEES**
                                          )
18 REDEVELOPMENT AGENCY OF THE CITY        )
   OF LYNWOOD,                             ) Hearing Date:  May 1, 2009
19                                         ) Hearing Time:  9:00 a.m.
                                          ) Hearing Place:  Dept: 20
20             Defendant.                  ) Judge: Hon. Kevin C. Brazile
                                          )
21                                         )
                                          ) (Filed Concurrently: Plaintiffs' Motion for
22                                         ) Award of Attorneys Fees; Memorandum of
                                          ) Points and Authorities in Support thereof;
23                                         ) Supporting Declarations of Wayne Barsky,
                                          ) Marcellus McRae, Meghan Blanco, Michael A.
24                                         ) Brown, Kristy S. Grant, Carol A. Fabrizio,
                                          ) Rebecca F. Thornton, Carol A. Sobel, Theresa
25                                         ) Traber, Shashi Hanuman, Michael Rawson,
                                          ) Deborah Collins, Craig Castellanet, Karen R.
26                                         ) Growdon, and Cynthia Merrill)
                                          )
27                                         )
                                          ) Complaint Filed: December 21, 2006
28

Gibson, Dunn &
Crutcher LLP
          DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
                     FOR ORDER AWARDING ATTORNEYS' FEES

1

2   LAW OFFICE OF REBECCA F. THORNTON
Rebecca F. Thornton (SBN 231128)
3   429 Santa Monica Boulevard, Suite 550
Santa Monica, California 90401
4   Tel: (310) 393-3055  Fax: (866) 499-5162
rebecca@humanrightsesq.com

5

6   PUBLIC COUNSEL
Pam Schmidt (SBN 128950)
Shashi Hanuman (SBN 198522)
7   610 South Ardmore Avenue
Los Angeles, California 90005
8   Tel: (213) 385-2977  Fax: (213) 385-9089
shanuman@publiccounsel.org
9

10  CALIFORNIA AFFORDABLE HOUSING
LAW PROJECT, PUBLIC INTEREST LAW PROJECT
11  Michael F. Rawson (SBN 95868)
Craig Castellanet (SBN 176054)
12  449 15th Street, Suite 301
Oakland, California 94612
13  Tel: (510) 891-9794  Fax: (510) 891-9727
ccastellanet@pilpca.org
14

15  O'MELVENY & MYERS LLP
Karen R. Growdon (SBN 82240)
16  Cynthia A. Merrill (SBN 254571)
400 South Hope Street
17  Los Angeles, California 90071-2899
Tel: (213) 430-6000  Fax: (213) 430-6407
18  kgrowdon@OMM.com
cmerrill@OMM.com
19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

## DECLARATION OF WAYNE BARSKY

I, Wayne Barsky, declare:

1.      I am an attorney, duly licensed to practice law before all courts in the State of California, and I am a partner of the law firm Gibson, Dunn & Crutcher LLP, counsel for Plaintiffs Esperanza Rogel, Gerardo Espinoza, Oscar Leon, Marcos Martinez, and Jaime Torres, and California ACORN, Los Angeles Chapter (collectively "Plaintiffs") in the above-captioned matter. I make this declaration in support of Plaintiffs' Motion for Order Awarding Attorneys' Fees ("Motion"). If called as a witness in the above-reference matter, I could and would testify competently to the following facts, which I know to be true based on my personal knowledge, or which I believe and understand to be true based on my leadership role in this case, my review of documents, and my communications with my colleagues and co-counsel.

### Qualifications of Declarant

2.      I have supervised this case since it came to our firm in September 2008. I am currently serving as the firm's National Co-Chairman of Intellectual Property Practice Group. I received my law degree from the University of California at Berkeley, Boalt Hall School of Law in 1983, and my Bachelor of Arts from the State University of New York at Binghamton in 1979. I am admitted to practice in California, the District of Columbia and Missouri, and have extensive trial and appellate experience in federal and state court. I frequently lecture at PLI and other professional conferences, have chaired the National Intellectual Property Institute for the Corporate Counsel Institute, and am on the Planning Committee of the USC Intellectual Property Institute. My practice consists almost entirely of complex intellectual property litigation, particularly patent litigation in the federal courts and the U.S. International Trade Commission.

3.      I am extensively involved in community and *pro bono* affairs, currently serving as a member of the Executive Committee and Board of Directors of Public Counsel Law Center, the nation's largest *pro bono* law office, where I am also the immediate past Chairman. I have served as a member of the Board of Governors of the Association of Business Trial Lawyers, and as a Judge *Pro Tempore* in the Los Angeles Superior Court system. I received a California State Bar Commendation for my community service and *pro bono* activities some years ago.

Gibson, Dunn &
Crutcher LLP

1

4.     In 2006, I was selected as one of the top 500 trial lawyers in the United States by
*LawDragon* Magazine, and in 2009 by the *Los Angeles Daily Journal* and *San Francisco Recorder* as
one of the leading intellectual property lawyers in California. I have been named a "Super Lawyer"
for each of *Los Angeles* magazine's 2004 through 2009 surveys, have been named in multiple editions
of *Who's Who in American Law*, am "Highly Recommended" as an intellectual property specialist in
*Global Counsel 3000*, and am profiled as one of the state's top IP specialists in all recent editions of
*Chambers USA* and *Legal 500*.

## Overview of Gibson Dunn's Involvement in Plaintiffs' Litigation

5.     I was contacted sometime in September by Public Counsel and asked whether my firm
would be able to step into a complex *pro bono* case that was headed for trial on a very quick
schedule. My understanding was that, although O'Melveny & Myers was originally lead counsel, for
a variety of reasons they were unable to continue in that role. After determining that there were at
least two senior litigation associates—including Meghan Blanco and Michael Anthony ("Tony")
Brown—who were in a position to devote substantially all of their time to completing discovery and
getting the case ready for trial, I advised Public Counsel that we would take the case. I also advised
Public Counsel that I would lead the trial, but that due to a very significant trial that I had beginning
in late September in Washington, D.C., I would need to recruit another trial partner to oversee the
case for the month that I was expected to be in Washington, D.C. My partner Marcellus McRae
volunteered for that role. Gibson Dunn led Plaintiffs' litigation efforts from September 2008 to the
present. I was the head of this team, but Mr. McRae was charged with the day-to-day responsibility
while I was in trial or otherwise out-of-pocket. My initial role, before I left for D.C., was to develop
our case strategy with co-counsel when we were first retained, allocate responsibilities among the
team members, identify evidentiary and legal issues we needed to resolve, and determine the state of
discovery and the needs for additional discovery. After I returned from D.C. and my calendar began
freeing up, in December, I continued with this same oversight role, but began to be more hands-on in
terms of plotting case strategy, assessing the state of the evidentiary record, getting the team prepared
for trial, and later, together with Craig Castellanet of Public Interest Law Project, negotiated the

1   terms of the Settlement Agreement with opposing counsel. I also closely reviewed our billing

2   records on this case, and supervised the drafting of this Motion.

3       6.      As I said above, Mr. McRae managed the case on a day-to-day basis. He served as the

4   main point of contact for opposing counsel, stayed in near-constant contact with our terrific associate

5   team, developed an extremely effective pre-trial strategy, deposed the Agency's "person most

6   knowledgeable," argued a number of motions and applications, and initiated the parties' negotiations

7   for settlement. Mr. McRae and I conferred regularly about the case, either by email or phone or both,

8   including (to a lesser extent) during the period of time when I was in trial in D.C.

9       7.      Mr. Brown and Ms Blanco performed the vast majority of team's daily work, and were

10  essentially full-time on the case (and often more than full-time). The efficiently divided the causes of

11  action between them. Mr. Brown drafted discovery concerning the Agency's relocation plans,

12  development of inclusionary and replacement dwelling units, and compliance with affordability

13  covenants. Mr. Brown deposed the Agency's Housing Manager and Project Manager, researched and

14  drafted most of Plaintiffs filings, including discovery motions, Plaintiffs' opposition to the Agency's

15  Motion for Reconsideration, stipulations and *ex parte* applications, expert disclosures, and Plaintiffs'

16  Mandatory Settlement Conference Statement. He also served as the point-person for consulting with

17  Plaintiffs' affordable housing experts. Ms. Blanco was primarily responsible for assessing the need

18  for, and drafting, discovery concerning the Agency's obligations to deposit set-aside funds and

19  expend excess surplus. She deposed the Agency's "person most qualified" concerning the Agency's

20  finances, served as Gibson Dunn's point person for consulting with the Plaintiffs' financial expert,

21  supervised Gibson Dunn's review of the vast quantity of documents obtained via discovery and public

22  records requests, and played an integral part in drafting the Parties' final settlement agreement. The

23  tremendous demands of this litigation, described more fully below, caused Mr. Brown and

24  Ms. Blanco to spend more than 90% of their client chargeable hours from October 2008 to February

25  2009 on this case alone.

26      8.      Gibson Dunn associates Carol Fabrizio and Kristy Grant also contributed substantial

27  time to Plaintiffs' action. Ms. Grant conducted legal research on a number of issues, performed

28  extensive document review, maintained the litigation team's case calendar, and drafted, issued, and

3

1  monitored Plaintiffs' third-party subpoenas. Ms. Fabrizio drafted requests for production and

2  requests for admissions, performed extensive document review, audited discovery received,

3  researched requirements of a PMK deponent, and assisted, reviewed, and summarized depositions.

4  She also helped to prepare for trial by creating exhibit and witness lists, drafting Notices to Appear at

5  Trial, and researching the applicability of Sections 998 and 1021.5 of the Code of Civil Procedure.

6  Other associates, including Melissa Barshop, Sam Kim, Sonam Makker, Bobbie Andelson, and

7  Brooke Myers, assisted the above-listed six attorneys in their tasks, by helping to research legal

8  issues, review transcripts, and perform document review.

9              **The Complexity of this Action and the Agency's Litigation Conduct**

10             **Required Very Long Hours from Plaintiffs' Counsel**

11       9.      When Gibson Dunn joined the litigation team, trial was just months away, the Agency

12  had just made its first meaningful production of documents, and substantial discovery remained to be

13  accomplished in a very short time.

14       10.     Both legally and factually, this case was extremely complex, and I say that as someone

15  who spends most of his time wrestling with the patent laws and technology as diverse as

16  semiconductors and the human genome. To litigate this case, our team had to familiarize itself with

17  the complex and highly specialized area of public law governing redevelopment agencies in a short

18  amount of time. This forced us to dive head-first into the complex system of statutory provisions in

19  the Government and Health & Safety Codes and the regulations that implement those provisions, a

20  task that was quite challenging even with the assistance of co-counsel specializing in this area.

21       11.     In addition to the case's legal complexity, five factors contributed to the long hours our

22  attorneys spent litigating this case.

23          a.      First was the broad range, and thus the enormous quantity, of potentially

24          relevant evidence including: (i) emails, letters, and internal memoranda, (ii) Agency

25          ordinances, resolutions, agendas, and staff reports; (iii) general Agency documents, such as

26          implementation plans, relocation plans, and redevelopment plans, consulting services

27          agreements and other contracts with third party consultants; (iv) housing project-specific

28          documents, including Requests for Proposals, pro formas, Disposition and Development

Gibson, Dunn &
Crutcher LLP

4

1  Agreements ("DDAs"), purchase and sale agreements, grant deeds, deeds of trust, promissory

2  notes, subordination agreements, closing documents, and other documents related to real

3  property transfers. (v) financial records, such as ledgers, bank statements, audited financial

4  transaction reports filed with the California State Controller, and Los Angeles County tax

5  bills. In its Motion for Reconsideration, the Agency estimated that, over the course of this

6  litigation, it had produced as many as 25,000 pages of documents. This figures does not

7  include, of course, (i) documents Plaintiffs' counsel were permitted to inspect both at the

8  Agency's offices and at an off-site storage facility between December 23, 2008, and January

9  3, 2009; or (ii) documents obtained through public records requests, including thousands of

10 building permits and over 14 years of Agency housing and County tax information. My

11 colleagues Ms. Blanco and Mr. Brown have informed me that, over the course of this

12 litigation, they reviewed and analyzed as many as 100,000 pages of potentially relevant

13 documents.

14         b.      Second, the nature of the evidence needed to make out Plaintiffs' case was

15 itself complex and required an analysis of a number of highly technical records, including:

16 (i) Agency ordinances and the real property transfer documents noted above, (ii) financial

17 records; and (iii) dense, often highly technical contracts between the Agency and developers

18 and third party redevelopment consultants.

19         c.      Third, Plaintiffs' First Amended Verified Petition and Complaint

20 ("Complaint") implicated Agency actions going back to 1994 and, in the Third through Sixth

21 Causes of Action, alleged violations that were cumulative in nature. Consequently, assessing

22 the evidence of those violations entailed pain-staking comparison of records from year to year

23 for as many as 14 years. For example, Plaintiffs' Fifth Cause of Action, alleging the unlawful

24 failure to expend excess surplus, required Gibson Dunn's attorneys, in consultation with our

25 financial expert, to cross-reference and aggregate financial data for several Agency funds

26 contained in records spanning over a decade.

27         d.      Fourth, the Agency's records were incomplete and in disarray. Throughout

28 discovery, the Agency repeatedly claimed it could not locate records that any properly

1  functioning redevelopment agency should have been able to produce in a timely fashion, e.g.,

2  lists of Agency-funded housing projects, budgets and general ledgers, bank account

3  statements, and complete audit reports. Indeed, Both Ernie Nishii, the Agency's Housing

4  Manager, and Lorry Hempe, the Agency's current Assistant City Manager and designated

5  "person most qualified" on affordable housing issues, testified that the Agency's records were

6  so disorganized that it would be difficult for the Agency to determine even how man

7  redevelopment projects it had been involved in; and, given the state of the records, perhaps

8  impossible to reconstruct the Agency's current inclusionary housing, replacement housing,

9  and LMIHF-related obligations. Relevant excerpts from true and correct copies of the

10  certified transcripts of Ernie Nishii's and Lorry Hempe's depositions are attached to this

11  declaration as **Exhibit A** (Nishii Dep. 41:17-21, 43:1-5; Hempe Dep., Vol. 1, 148:7-151:14).

12  As a result of the Agency's appalling record-keeping, Plaintiffs' counsel, including attorneys

13  from Gibson Dunn, had in some cases to create from scratch records the Agency should have

14  been maintaining in the course of its operations.

15    e.  Fifth, the Agency officers and staff members deposed, including the Agency's

16  designated "persons most qualified," lacked sufficient knowledge to answer certain basic

17  questions about Agency's redevelopment activities or finances. For example, Roger Haley,

18  the Agency's Executive Director, and both designated "persons most qualified"—Lorry

19  Hempe, Assistant City Manager, who testified about redevelopment activities; and Christy

20  Valencia, Deputy Director of Finance, who testified about the Agency's finances—were

21  unable to verify whether the Agency had a separate and segregated LMIHF as required by

22  law. Mr. Haley testified that he did not know whether the Agency maintained a separate bank

23  account for the LMIHF but that Lorry Hempe would know. Ms. Hempe testified that she

24  simply assumed set aside funds were being properly deposited into an LMIHF by the City's

25  Finance Department. Ms. Valencia testified that the Agency maintained a LMIHF but could

26  not readily explain where those funds were maintained or how the Agency accounted for

27  them. Relevant excerpts from true and correct copies of the certified deposition transcripts of

28  Roger Haley, Lorry Hempe, and Christy Valencia are attached to this declaration as

1        **Exhibit B** (Haley Dep. 88:13-92:3; Hempe Dep. Vol **II**, 443:22-445:25; Valencia Dep.

2       149:17-153:6).  Similarly, Ms. Hempe testified that she did not know—and because of the

3       disarray of the Agency's records, could not create an accurate list of—the number of

4       properties purchased with, or the number of housing projects assisted by, funds from the

5       LMIHF.  Relevant excerpts from a true and correct copy of the certified transcript of

6       Ms. Hempe's deposition are attached to this declaration as **Exhibit C** (Hempe Dep., Vol. 1,

7       145:24-147:20).  As a result, Plaintiffs' counsel had to depose all but two of the Agency's

8       officers and staff, including the Agency's "person most qualified" for three full, though

9       somewhat fruitless, days, in an effort to obtain answers to such questions.  Some of these

10      depositions may have been avoided had the Agency's designated "persons most qualified"—

11      who, as the attached excerpts from Lorry Hempe's deposition transcript illustrate, repeatedly

12      professed ignorance about basic facts concerning Agency projects and finances—had been

13      better prepared for their depositions.

14           12.     The difficulty of assessing the evidence in this case was matched only by the difficulty

15     of obtaining it.  Remarkably, the Agency did not provide a single timely response to any of Plaintiffs'

16     numerous discovery requests.  Responses that it did provide were invariably inadequate, requiring

17     Plaintiffs to move for further responses—as was the case with, for example, Plaintiffs' Motion for

18     Issue and Evidence Sanctions, which involved, among other discovery responses, the Agency's

19     nonresponsive and evasive Second Supplemental and Amended Responses to the Form Interrogatory

20     No. 17.1 (served with Plaintiffs' First Set of Requests for Admissions) and was granted by the Court

21     on December 23, 2008 ("December 23 Order").  Where Plaintiffs' requests for production of

22     documents ("RFPs") were involved, the Agency never adequately responded at all.  For example, the

23     documents produced by the Agency in response to Plaintiffs' First Set of RFPs came in at least five

24     stages: (i) five Disposition and Development Agreements  in February 2008; (ii) a box of documents

25     in July 2008; (iii) six boxes on September 9, 2008; (iv) one more box of documents in November

26     2008, after the Court on October 24 granted Plaintiffs Plaintiffs' Motion For Order Compelling

27     Production of Documents (First Set); and (v) various individual documents emailed by the Agency's

28     counsel to Plaintiffs' counsel over the next few weeks.  Throughout this litigation, the Agency

1    repeatedly claimed to be in the process of locating additional responsive documents and reserving the

2    right to produce them at a later date. Indeed, the Agency's repeated assertion in its Second

3    Supplemental and Amended Response to Interrogatory No. 17.1 that it "continues to search for

4    [responsive documents] that may exist and reserves the right to produce them when they are located"

5    was something of a motif in this case. A true and correct copy of these discovery responses is

6    attached to this declaration as **Exhibit D.** In the end, the Agency's efforts to produce documents

7    responsive to Plaintiffs First Set of RFPs was so inadequate the Court issued evidence sanctions

8    against the Agency on December 23, prohibiting the Agency from admitting into evidence for any

9    purpose in this litigation responsive documents not produced by December 31.

10       13.     The Agency's chronic failure to provide timely or satisfactory discovery responses

11    required Gibson Dunn's attorneys to engage in extensive law and motion practice. Discovery

12    motions like the ones filed in this case by Plaintiffs' counsel are extremely time-consuming. They

13    require the moving party's attorney (i) to ascertain the inadequacies of the responses at issue, (ii) to

14    participate in meet-and-confer sessions, (iii) to draft the moving papers as well as the extremely fact-

15    intensive supporting declarations, separate statements, and—where, as here, time is of the essence—

16    additional *ex parte* papers for orders shortening time; and, finally, (iv) to argue the motions. Gibson

17    Dunn attorneys working on this case dedicated a substantial amount of their hours to such law and

18    motion practice. From September 2008 to February 2009, Plaintiffs' counsel filed no fewer than six

19    discovery-related motions. Notably, the Court granted five of these discovery motions, two on

20    October 24, 2008, and the remaining three on December 23, 2008. The Court did not hear the sixth

21    motion, filed in January 2009, because it was taken off calendar pending the Agency's approval of a

22    tentative settlement agreement negotiated between the Parties' counsel.

23       14.     Shortly after the New Year, this case reached a critical turning point. As previously

24    mentioned, on December 23, 2008, the Court granted three Gibson Dunn-drafted discovery motions,

25    ordering (i) that the matters covered by Plaintiffs' First Set of RFAs, Plaintiff Jaime Torres's First Set

26    of RFAs, and Plaintiff Esperanza Rogel's First Set of RFAs be deemed admitted for all purposes in

27    the litigation; (ii) that the Agency was prohibited from introducing into evidence any document

28    responsive to Plaintiffs' First Set of RFPs after December 31, 2008; and (iii) imposing monetary

8

1    sanctions on the Agency.  The issues sanctions alone went a long way toward establishing liability on

2    all of Plaintiffs' causes of action.  Then, on January 2, 2009, the Agency served its Response to

3    Plaintiff Oscar Leon's First Set of Requests for Admissions ("Leon RFAs"), admitting each matter

4    covered by that discovery request.  Together, the matters deemed admitted by the Court's December

5    23 Order with the Leon admissions essentially established liability on each of the affordable housing

6    causes of action in Plaintiffs' Complaint, as illustrated by the following chart:

| Cause of Action | Matters Established |
|---|---|
| Second<br><br>(Relocation Assistance) | The Agency has never provided relocation assistance to persons displaced from dwelling units within its jurisdiction. (Torres RFA No. 5.) |
| Third<br><br>(Inclusionary Housing Obligations) | The Agency has failed to properly determine both the number of housing units that actually have been, and the number that should have been, produced to meet its inclusionary housing obligations. (Leon RFA Nos. 1-2.)<br><br>The Agency has no evidence that, since January 1, 1994, it has satisfied any of its inclusionary housing obligations relating to any redevelopment projects. (Leon RFA No. 16.)<br><br>Since January 1, 1994, the Agency has failed to ensure that the appropriate percentage of dwelling units developed or substantially rehabilitated within its jurisdiction was made available at an affordable housing cost to, and occupied by, persons and families of low or moderate income. (Leon RFA Nos. 3-4.) |
| Fourth<br><br>(Replacement Housing Obligations) | Since January 1, 1994, the Agency has not produced the appropriate number of replacement dwelling units it was obligated to produce. (Leon RFA Nos. 5-6.)<br><br>The Agency has no evidence that, from January 1, 1994, through September 13, 2006, it satisfied any of its replacement housing obligations. (Leon RFA No. 17.)\<br><br>The Agency has produced no replacement dwelling units since September 14, 2006.  (Torres RFA No. 9.) |

9

Gibson, Dunn &
Crutcher LLP

| Cause of Action | Matters Established |
|---|---|
| Fifth<br><br>(LMIHF Deposit Obligations) | For each year since January 1, 1994, the Agency has failed to deposit at least 20% of the gross tax increment or tax allocation bond proceeds into the LMIHF. (Leon RFA Nos. 8-9) |
| Sixth<br><br>(LMIHF Expenditure Obligations) | Since January 1, 1994, the Agency has not made an annual determination that LMIHF revenues spent on planning and general administrative costs were necessary for the production, improvement, or preservation of low- and moderate-income housing. (Leon RFA Nos. 12-13.) |
| | From FY 1995-1996 to FY 2007-2008 the Agency did not comply with its obligation to spend excess surplus. (Espinoza RFA Nos. 15-28.) |
| | From FY 2001-2002 to FY 2006-2007, the Agency accumulated an aggregate excess surplus of at least $20,214,957. (Pls.' First Set RFA No. 9-14.) |
| | The Agency has not recorded any affordability covenants for housing units developed with the assistance of LMIHF revenues or for housing units it counts toward its inclusionary or replacement housing obligations. (Pls. First Set RFA No. 32-33; Torres RFA No. 11.) |
| | The Agency has not monitored affordability covenants or had them monitored by others. (Pls.' First Set RFA No. 34-35; Torres RFA Nos. 12-13.) |
| Seventh & Eighth<br><br>(Nondiscrimination/Fair Housing Obligations) | Since January 1, 1994, the Agency's redevelopment activities have had discriminatory, adverse, and disproportionate impact on racial and ethnic minorities, persons with disabilities, and families with children, and further discriminate against the development of housing reserved for occupancy by lower-income households. (Leon RFA No. 26) |

Many of these matters actually admitted or deemed admitted were identical to the findings of the California State Department of Housing and Community Development ("HCD"), which audited the Agency in 2006. True and correct copies of the Leon RFAs, the Agency's responses to the Leon RFAs, and of HCD's final audit letter, dated November 14, 2006, re attached to this declaration as **Exhibits E, F, and G**, respectively.

10

15.     Even after HCD's findings and so many of Plaintiffs' key allegations against the Agency had been established, the Agency refused to engage in any serious settlement discussions until the eve of trial.  To encourage the Agency to come to the table, Mr. McRae on January 9 requested a Mandatory Settlement Conference for January 23.  A week later, on January 16, the Agency served Plaintiffs with a Motion for Reconsideration of the Court's December 23 Order.  Despite the implication of this motion, Plaintiffs' counsel served the Agency with their MSC Statement long in advance of the MSC date.  The Agency, however, did not send Plaintiffs' counsel its MSC Statement until 11:34 p.m. the night before the conference.  A true and correct copy of the email containing the Agency's MSC statement, sent by Bruce Gridley of Kane, Ballmer & Berkman, is attached hereto as **Exhibit H.**  Then, when the Parties agreed to move settlement discussions from the Court to Gibson Dunn's offices nearby, the Agency's counsel showed up more than an hour late, and the Parties did not reach a settlement that day.

16.     Plaintiffs' counsel had no choice but to vigorously prepare for trial while continuing its efforts to resolve the case by settlement.  For the attorneys at Gibson Dunn, this entailed: (a) inspecting and analyzing thousands of pages of Agency documents never produced during discovery; (b) assembling evidence matrices for each cause of action; (c) consulting with and preparing experts for trial; (d) drafting still further motions for relief from discovery abuses; (e) drafting and issuing third party business records subpoenas on Agency consultants and reviewing the documents produced in response; and (f) drafting and issuing notices to appear and trial subpoenas.  Mr. McRae supervised this trial preparation on a daily basis.

17.     Even so, Plaintiffs' counsel did not give up on the possibility of a settlement.  Mr. McRae continued to keep the issue of settlement alive through almost daily correspondence with opposing counsel.  Mr. McRae even succeeded in getting the Agency to agree to private mediation, which the Parties scheduled for February 11.  Under Mr. McRae's supervision, Ms. Blanco and Mr. Castellanet drafted a final settlement offer incorporating many of the concrete issues Mr. McRae had discussed with opposing counsel.  Plaintiffs delivered this letter to the Agency on February 12.  Though the Agency was finally engaging in settlement discussions, there was little basis for

11

1    confidence that a comprehensive agreement would be reached, and thus, with less than two weeks

2    until trial, Mr. McRae turned his full attention to trial preparation.

3        18.    At this point, I became Plaintiffs' main point of contact for negotiations with the

4    Agency. Discussions got hung up on the issue of attorneys' fees. Through numerous telephone calls

5    and emails with opposing counsel, I successfully hammered out the main sticking point by proposing

6    certain language to include in the proposed Settlement Agreement. During these discussions with

7    opposing counsel, I also negotiated certain remaining terms and concretized others that had remained

8    ambiguous. After this extensive negotiation, the Parties reached a final Settlement Agreement in

9    mid-February, which the Agency approved on February 17, 2009. Gibson Dunn attorneys then

10   incorporated the approved agreement into a Stipulation and Proposed Interlocutory Judgment. But

11   because proceedings were ongoing, the agreement was recast as a Stipulation and Proposed Order,

12   which the Court signed and entered on March 23, 2009. A true and correct copy of the Court's March

13   23 Order, incorporating the Parties' Settlement Agreement, is attached to this declaration as

14   **Exhibit I.**

15       19.    The Settlement Agreement, incorporated into the March 23 Order, is essentially a

16   consent judgment and permanent injunction. By imposing the following specific, concrete

17   obligations on the Agency, the March 23 Order provides Plaintiffs with virtually all of the relief they

18   requested in their Complaint:

19           a.    Paragraphs 2 and 3 require that the Agency develop at least 42 inclusionary

20       dwelling units and 41 replacement dwelling units.

21           b.    Paragraph 7 requires that the Agency record affordability covenants on all

22       newly developed inclusionary and replacement dwelling units, as well as all dwelling units

23       the Agency has ever counted toward the satisfaction of its inclusionary and replacement

24       housing obligations.

25           c.    Paragraph 8 requires that the Agency establish, fund, administer and use in

26       accordance with applicable law a separate and segregated LMIHF.

27

28

Gibson, Dunn &
Crutcher LLP

**DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES**

d.      Paragraph 9 requires that the Agency replenish the LMIHF with at least $312,000 in revenues owed as a result of the Agency's improper calculation of its set-aside funds.

e.      Paragraph 10 requires that the Agency deposit $250,000 into the LMIHF to replace improperly expended funds.

f.      Paragraphs 11 and 12 provide for the final and mutually binding determination by a redevelopment specialist of the amount of excess surplus and any related interest and penalties for which the Agency may be liable.

g.      Paragraphs 14 through 16 provide for the full payment of all relocations assistance owed to persons displaced by Agency activities, including the named Plaintiffs.

h.      In addition to substantive affordable housing obligations imposed on the Agency, Paragraphs 11 and 12 the Settlement Agreement call for a Redevelopment Specialist to determine (i) all amounts of all inappropriate expenses from the LMIHF, and (ii) all amounts of excess surplus from FY 1996-1997 to FY 2007-2008, as well as any related interest and penalties for which the Agency may be liable. Plaintiffs' financial expert, David Nolte of Fulcrum Financial Inquiry LLP, estimated the Agency's excess surplus penalties alone at no less than $4.4 million. A true and correct copy of Mr. Nolte's draft expert report, containing this estimate on page 2, is attached to this declaration as **Exhibit J.**

### Calculation of Gibson Dunn's Lodestar

20.      Gibson Dunn attorneys are required to keep accurate, daily time records recording the amount of time spent on their daily activities and the general substance of their work. I supervised the billing in this case, and have reviewed every single time entry by anyone who recorded time to this matter. Moreover, I have discussed these time entries in detail with Ms. Blanco and Mr. Brown, and have satisfied myself that the time for which we are seeking attorney's fees was reasonably and necessarily spent to prosecute this action. A true and correct copy of the itemized time records for this matter are attached hereto as **Exhibit K.** These records have been modified to reflect certain time entries for which we are *not* pursuing fees. I also discovered, during the course of my review,

1    certain time entries that were mis-entered into our computer system, and which should have been

2    charged to other clients; these time entries were removed entirely from the attached billing records.

3        21.    As of March 18, 2009, Gibson Dunn incurred $1,304,645.50 in legal fees and

4    $38,810.34 in costs and out-of-pocket expenses in connection with its prosecution of Plaintiffs'

5    action. At my direction, however, we have excluded from our lodestar figure numerous attorney

6    (and non-attorney) hours and costs incurred in an effort to seek recovery only for non-duplicative and

7    particularly relevant work. Toward that end, we have: (a) deducted *all* time, regardless of task, of

8    attorneys who worked less than 10 total hours on the case; (b) deducted numerous hours for drafts of

9    discovery that were not ultimately used; (c) reduced or eliminated attorneys' time entries for

10   depositions and hearings where more than one attorney was present; (d) reduced *all* time charge for

11   reviewing and summarizing deposition transcripts; and, (e) reduced time charged for an attorney's

12   general background work when the time invested in activities were disproportionate to the time spent

13   substantively working on the case.

14       22.    As noted in Plaintiffs' Motion for Award of Attorneys Fees, I calculated the Fees

15   Charged using the firm's actual 2009 rates. The following charts detail the 2009 rates of each Gibson

16   Dunn attorney who worked on this matter, the total charges actually incurred by those attorneys on

17   this matter through March 17, 2009, and the total amount the firm has included in its lodestar figure.

*Total Attorney Fees Actually Incurred & Charged*

| Attorney | 2009 Rate | Total Hours Worked | Total Fees Incurred | Total Hours Billed | Total Fees Charged |
|---|---|---|---|---|---|
| Wayne M. Barsky Partner, JD 1983 | $905 | 76.75 | $69,458.75 | 75.15 | $68,010.75 |
| Marcellus A. McRae Partner, JD 1988 | $785 | 339.90 | $266,821.50 | 338.7 | $265,879.50 |
| Daniel M. Kolkey Partner, JD 1977 | $840 | 0.3 | $252 | 0.3 | $0 |
| Danielle A. Katzir Associate, JD 2004 | $525 | 0.4 | $210 | 0 | $0 |
| Michael Anthony Brown | $495 | 746.9 | $369,715.50 | 738.77 | $365,691.15 |

14

**DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER AWARDING ATTORNEYS' FEES**

| Attorney | 2009 Rate | Total Hours Worked | Total Fees Incurred | Total Hours Billed | Total Fees Charged |
|---|---|---|---|---|---|
| Associate, JD 2005 | | | | | |
| Meghan Blanco Associate, JD 2005 | $495 | 766.00 | $379,170.00 | 747.36 | $369,943.20 |
| Samy L. Sadighi Associate, JD 2005 | $495 | 5.7 | $2,821.50 | 0 | $0 |
| Melissa L. Barshop Associate, JD 2006 | $470 | 46.20 | $21,714.00 | 46.20 | $21,714.00 |
| Lora A. Cicconi Associate, JD 2007 | $400 | 0.3 | $120 | 0 | $0 |
| Kristy S. Grant Associate, JD 2008 | $345 | 183.30 | $63,238.50 | 173.58 | $59,885.10 |
| Carol A. Fabrizio Associate, JD 2008 | $345 | 184.20 | $63,659.00 | 168.70 | $58,201.50 |
| Sonam Makker Associate, JD 2008 | $345 | 50.80 | $17,526.00 | 21.95 | $7,572.75 |
| Brooke L. Myers Associate, JD 2008 | $345 | 27.70 | $9,556.50 | 27.70 | $9,556.50 |
| Bobbie J. Andelson Associate, JD 2008 | $345 | 71.20 | $24,564 | 23.00 | $7,935.00 |
| Carrie A. Ligozio Associate, JD 2008 | $345 | 7.5 | $2,587.50 | 0 | $0 |
| Sam K. Kim Associate, JD 2008 | $345 | 33.20 | $11,454.00 | 3.28 | $1,131.60 |
| Hane L. Kim Associate, JD 2008 | $345 | 5.15 | $1,776.75 | 0 | $0 |
| **Total through 3/17/09** | | 2,545.5 | $1,304,645.50 | 2,364.69 | $1,235,521.05 |

23.    The following chart details the 2009 rates of each Gibson Dunn paralegal who worked on this matter, the total charges actually incurred by those paralegals on this matter through

15

Gibson, Dunn & Crutcher LLP

1  March 17, 2009, and the total amount the firm has included in its lodestar figure.

2  I believe the hourly rates for Gibson Dunn's paralegals and litigation support staff are reasonable and

3  similar to those of paralegals and litigation technical support staff doing similar work at comparable

4  law firms in Los Angeles. Attached hereto as **Exhibit L** is a true and correct copy of an article

5  entitled "Paralegal Pay: Top Managers Earn $102,000 Plus Bonuses," which appeared in the July

6  2007 issue of *Law Firm Management*. The article states that the national median hourly rate for

7  paralegal work in mid-2007 was $160.

8
9  *Total Paralegal Fees Actually Incurred & Charged*

| Staff | Rate | Total Hours Worked | Total Fees Incurred | Total Hours Billed | Total Fees Charged |
|---|---|---|---|---|---|
| Lolita C. Gadberry Paralegal | $300 | 80.75 | $24,225.00 | 80.75 | $24,225.00 |
| Louie S. Hopkins Paralegal | $295 | 0.2 | $59.00 | 0 | $0 |
| Deborah D. Hoxie Paralegal | $315 | 11 | $3,465.00 | 11 | $3,465.00 |
| Brian W. Jensen Paralegal | $180.00 | 8.5 | $1,530.00 | 0 | $0 |
| S. A. Leonard Paralegal | $290.00 | 30.5 | $8,845.00 | 30.5 | $8,845.00 |
| J. M. Mendith Paralegal | $165.00 | 3.7 | $610.00 | 0 | $0 |
| S. A. Bock Litigation Database Manager | $295.00 | 4.8 | $1,416.00 | 0 | $0 |
| D. J. Barber, Practice Systems Analyst | $295.00 | 12.75 | $3,761.25 | 12.75 | $3,761.25 |
| C. H. Jones Support Staff | $160.00 | 3.4 | $544.00 | 0 | $0 |
| **Total through 3/17/09** | | **155.60** | **$42,455.00** | **135** | **$40,296.00** |

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

24.     The following charts detail Gibson Dunn's total costs incurred for the litigation of Plaintiffs' action through March 17, 2009.

*Total Expenses Actually Incurred & Charged*

| Expense | Cost | Charged |
|---|---|---|
| Court Fees | $40.00 | $40.00 |
| Document Retrieval Service | $139.50 | $139.50 |
| Document Search and Retrieval | $467.66 | $467.66 |
| Freight and Shipping | $18.66 | $0 |
| In House Duplication | $9,280.17 | $0 |
| Meals | $402.10 | $0 |
| Messenger and Courier Expense | $896.56 | $896.56 |
| On-Line Research (Lexis) | $11,362.93 | $11,362.93 |
| On-Line Research (Westlaw) | $5,826.19 | $5,826.19 |
| On-Line Research Nexis-Main | $1,679.71 | $1,679.71 |
| Outside Duplication and Binding | $1,008.31 | $1,008.31 |
| Outside Process Server | $6,060.84 | $6,060.84 |
| Outside Services/Consultants | $514.41 | $514.41 |
| Reference Materials | $25.00 | $0 |
| Specialized Research / Filing Fees | $324.18 | $324.18 |
| Telephone Charges | $1,276.81 | $0 |
| Transcripts / Digesting | $10.460.30 | $10.460.30 |
| Travel – Parking | $16.00 | $16.00 |
| Travel – Taxi / Miles | $13.75 | $13.75 |
| **Total** | **$49,813.08** | **$38,810.34** |

Gibson, Dunn & Crutcher LLP

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

1    Our practice is to process these expenses contemporaneously and enter them into a computerized

2    accounting system maintained by Gibson Dunn's accounting department, and I understand that this

3    practice was followed in connection with this case. I have reviewed the expenses with Mr. McRae,

4    Ms. Blanco, and Mr. Brown to satisfy myself of their accuracy, appropriateness, and fairness.

5    Expenses related to the fee demand served on the Agency and preparation of Plaintiffs' Motion have

6    *not* been included at this time. All of the listed expenses are of the type Gibson Dunn customarily

7    bills to its clients. Furthermore, all of the listed expenses were reasonably necessary to the

8    prosecution of Plaintiffs' claims. For example, copying of documents was necessary to create a

9    database of Agency documents that Gibson Dunn shared with co-counsel via a secure FTP website

10   and to provide attorneys with sufficient time to review and analyze them, and online use of the Lexis

11   and Westlaw databases was necessary to conduct the background legal research supporting the

12   numerous motions, *ex parte* applications, discovery requests, and other court filings prepared by

13   Gibson Dunn's attorneys.

14                                **Prevailing Billing Rates**

15          25.    I am generally familiar with the hourly rates charged by general practice firms in Los

16   Angeles, and am specifically familiar with the hourly rates of firms such as O'Melveny & Myers,

17   Latham & Watkins, and Irell & Manella, which both we and the legal community consider to be

18   among our peer firms. In particular, I am generally familiar with the hourly rates charged by such

19   firms for attorneys of comparable skill, reputation and experience, and our hourly rates are consistent

20   with the rate structures of such firms. The hourly billing rates charged by Gibson Dunn's attorneys

21   on this case are also consistent with the rates charged by other national and international law firms

22   with offices in Los Angeles for attorneys of comparable skill, reputation and experience, as shown by

23   an article entitled "A Nationwide Sampling of Law Firm Office Billing Rates," which appeared in the

24   December 8, 2008, issue of *The National Law Journal.* This article, a true and correct copy of which

25   is attached as **Exhibit M**, lists the 2008 billing rates for the following national and international firms

26   with offices in Los Angeles:

27          a.     Manatt Phelps & Phillips's rates ranged from $290 to $505 for associates and

28                 from $490 to $850 for partners.

1    b.    Reed Smith's rates ranged from $235 to $580 for associates and from $375 to
2    $900 for partners.

3    c.    Sheppard, Mullin, Richter & Hampton's rates ranged from $275 to $455 for
4    associates and from $475 to $795 for partners.

5    d.    Hogan and Hartson's rates ranged from $150 to $550 for associates and from
6    $375 to $900 for partners.

7    e.    Hughes Hubbard & Reed's rates ranged from $270 to $600 for associates and
8    from $625 to $875 for partners.

9    f.    Steptoe and Johnson's ranged from $210 to $685 for associates and from $350
10   to $895 for partners.

11   g.    White & Case ranged from $160 to $920 for associates and from $550 to
12   $1,260 for partners.

13   I declare under penalty of perjury under the laws of the State of California that the foregoing
14   is true and correct.

15   April 9, 2009                                    
16                                                    Wayne Barsky

17

18

19

20

21

22

23

24

25

26

27

28

19

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

**EX. 82**

Case 2:16-cv-05117-TJH-GJS  Document 88-7  Filed 08/16/17  Page 318 of 445  Page ID
#:1731
Case 2:04-cv-09049-DOC-RNB  Document 10703  Filed 08/04/11  Page 1 of 48  Page ID
#:326050

○

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., et al. ) | CASE NO. CV 04-9049 DOC (RNBx) |
| Plaintiffs, ) | |
| ) | **O R D E R** GRANTING IN PART |
| v. ) | **AND DENYING IN PART MGA** |
| ) | **ENTERTAINMENT, INC., MGA** |
| MGA ENTERTAINMENT, INC., et al. ) | **ENTERTAINMENT (HK) LTD.,** |
| ) | **MGAE DE MEXICO S.R.L. DE CV,** |
| Defendants. ) | **AND ISAAC LARIAN'S** |
| _____ ) | **APPLICATION FOR AN AWARD** |
| ) | **OF ATTORNEYS' FEES AND** |
| AND CONSOLIDATED ACTIONS ) | **COSTS** |
| ) | |
| _____ ) | |

Before the Court is MGA Entertainment, Inc., MGA Entertainment (HK) Limited,

MGAE de Mexico S.R.L. de CV, and Isaac Larian (collectively "MGA")'s Application for

Attorneys' Fees and Costs Under Section 505 of the Copyright Act. The Court referred the

Application to the Special Master for Discovery. *See* Fed. R. Civ. P. 53(a)(C). Mattel did not

initially object to the Special Master's appointment, but states that it "did not consent to the

[Special] Master's evaluation of MGA's fee applications." Because any interest in convenience

must yield to Mattel's right to a judicial determination, the Court STRIKES the Special Master's

Report and Recommendation.

Case 2:16-cv-05117-TJH-GJS  Document 88-7  Filed 08/16/17  Page 319 of 445  Page ID
#:1732
Case 2:04-cv-09049-DOC-RNB  Document 10203  Filed 08/04/11  Page 2 of 18  Page ID
#:326051

## I.    Introduction

Section 505 of the Copyright Act provides that "[i]n any action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof." 17 U.S.C. § 505. "[T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." *Id.* The statute's use of the word "may" makes clear that a prevailing party is not always entitled to recover its costs. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023 (1994).

The court's exercise of discretion under Section 505 is guided by a single equitable inquiry: did the successful prosecution or defense "further the purposes of the Copyright Act[?]" *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 559 (9th Cir. 1996); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1120 (9th Cir. 2007). Factors relevant to that inquiry may include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986).[1] These factors are not exclusive, *id.*, or mandatory, *Fogerty*, 94 F.3d at 558, and must always yield to the purposes of the Copyright Act, *Fogerty*, 510 U.S. at 534 n. 19. "Faithfulness to the purposes of the Copyright Act [] is the pivotal criterion." *Fogerty*, 94 F.3d at 558.

## II.    Discussion

Unlike many other statutes, the Copyright Act limits the rights it confers, and prevents other jurisdictions from enlarging those rights. 17 U.S.C. § 301. Thus, "the policies served by the Copyright Act are more complex, more measured, than simply maximizing the number of meritorious suits for copyright infringement." *Fogerty*, 510 U.S. at 526. By restricting the rights of copyright holders, the Act ensures that "private motivation [] ultimately serve[s] the cause of promoting broad public availability of literature, music, and the other arts." *See id.* at 526-27 (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040 (1975)). "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the

---

[1] Mattel is not an impecunious litigant. *See Mattel, Inc. v. Greiner & Hauser GmbH*, 354 F.3d 857, 859 (9th Cir. 2003).

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 320 of 445   Page ID
#:17633
Case 2:04-cv-09049-DOC-RNB   Document 10705   Filed 08/04/11   Page 3 of 46   Page ID
#:326652

1   Progress of Science and useful Arts.'" *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340,

2   361, 111 S.Ct. 1282 (1991).  This purpose is satisfied when the public can "build freely upon the

3   ideas and information" in the public domain.  *Id.* at 349-50.

**A.  Recovery of Fees**

5        In this case, Mattel claimed that it owned valid copyrights in the concept sketches and

6   sculpts for the "Bratz" line of dolls and that every generation of "Bratz" dolls released by MGA

7   infringed those copyrights.  The breadth of Mattel's infringement claim corresponded with its

8   request for "more than $1 billion dollars in copyright damages" and an "injunction prohibiting

9   MGA from producing or marketing virtually every Bratz female fashion doll, as well as any

10  future dolls substantially similar to Mattel's copyrighted Bratz works." *Mattel, Inc. v. MGA*

11  *Entm't, Inc.*, 616 F.3d 904, 910 (9th Cir. 2010).  This request for relief was predicated on

12  Mattel's mistaken expectation that it owned the "ideas" in the copyrighted works; and the mere

13  specter of that relief may have clouded MGA's business prospects, bolstered Mattel's status, and

14  changed the landscape of the fashion doll industry.  *Cf. Ideal Steel Supply Corp. v. Anza*, ___

15  F.3d ___, 2011 WL 2557618, at *19 (2d Cir. June 28, 2011) ("In light of (i) the broad scope of

16  RICO (and what might constitute proceeds from a RICO 'predicate act'), and (ii) the specter of

17  paying treble damages, the mere threat of such a suit would chill competition.").

18       The Ninth Circuit held that only a small minority of Mattel's claim "might" be

19  reasonable. *Mattel*, 616 F.3d at 917.  This Court agreed on remand, finding "no indicia of

20  sufficient disagreement" that all but six Bratz dolls did not infringe the concept sketches and

21  sculpts. *Mattel, Inc. v. MGA Entm't, Inc.*, ___ F. Supp. 2d ___, 2011 (C.D. Cal. Jan. 5, 2011).

22  Regardless of Mattel's disputed claim to ownership of the concepts sketches and sculpts, these

23  rulings, prompted by MGA, prevented Mattel from stifling the dissemination of "fashion dolls

24  with a bratty look or attitude," *Mattel*, 616 F.3d at 916, and encouraged the widespread

25  "production of original . . . artistic . . . expression for the good of the public." *Fantasy*, 94 F.3d

26  at 557 (quoting *Fogerty*, 510 U.S. at 524).[2]

27  _____

28       [2] Contrary to Mattel's argument, its copyright claim affected more than just "which
    company would provide Bratz to the public."  Mattel's request for an injunction, as well

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 321 of 445   Page ID
#:16734
Case 2:04-cv-09049-DOC-RNB   Document 10705   Filed 08/04/11   Page 4 of 18   Page ID
#:326053

1      There are compelling equitable reasons to award MGA its attorneys' fees. MGA secured

2  the public's interest in a robust market for trendy fashion dolls populated by multiple toy

3  companies, not just Mattel or even MGA. *Cf. Fogerty*, 94 F.3d at 556 ("Fogerty's vindication of

4  his copyright in "The Old Man Down the Road" secured the public's access to an original work

5  of authorship and paved the way for future original compositions-by Fogerty and others-in the

6  same distinctive "Swamp Rock" style and genre."); *see also Mattel*, 616 F.3d at 917 ("Mattel

7  can't claim a monopoly over fashion dolls with a bratty look or attitude, or dolls sporting trendy

8  clothing-these are all unprotectable ideas."). A fee award accounts for this lawsuit's detrimental

9  impact on MGA's sales, as well as the economic benefit Mattel may have obtained by distracting

10  its primary competitor with litigation. *Cf. Fogerty*, 94 F.3d at 556 ("Further, the district court

11  found that a fee award was appropriate to help restore to Fogerty some of the lost value of the

12  copyright he was forced to defend."). MGA's successful defense also nudged copyright law in

13  the direction of "free expression" by appealing to basic principles about the unprotectability of

14  ideas, instead of relying on "technical defense[s], such as the statute of limitations, laches, or the

15  copyright registration requirements." *Id.* MGA's contribution to the state of the law in the field

16  of copyright in a case of this magnitude and notoriety cannot be understated; its failure to

17  vigorously defend against Mattel's claims could have ushered in a new era of copyright litigation

18  aimed not at promoting expression but at stifling the "competition" upon which America thrives.

19  *Mattel*, 616 F.3d at 918; *cf. Fogerty*, 94 F.3d at 556 ("Finally, the benefit conferred by Fogerty's

20  successful defense was not slight or insubstantial relative to the costs of litigation.").

21      Mattel argues that MGA's successful defense could not have furthered the purposes of

22  copyright law because Mattel's underlying claim was reasonable. This argument is factually and

23  legally incomplete. In many cases involving reasonable claims, a successful defense is no more

24  effective than a successful prosecution at furthering the purposes of copyright law, and a fee

25  award to the defendant is therefore inappropriate. *See Lotus Dev. Corp. v Borland Int'l, Inc.,*

26

---

27  as the legal reasoning offered in support of that request, attempted to justify a restriction

28  on *every other prospective doll designer* from producing "fashion dolls with a bratty look
or attitude, or dolls sporting trendy clothing." *Mattel*, 616 F.3d at 916.

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 322 of 445 Page ID
#:16734
Case 2:04-cv-09049-DOC-RNB Document 10705 Filed 08/04/11 Page 5 of 18 Page ID
#:326054

1  140 F.3d 70, 75 (1st Cir. 1998); *Matthew Bender & Co. v. W. Publ'g Co.*, 240 F.3d 116, 122 (2d

2  Cir. 2001); *see also Harris Custom Builders Inc. v. Hoffmeyer*, 140 F.3d 728, 730-31 (7th Cir.

3  1998). But that is a rule of thumb, not rule of law, and Mattel's insistence that objective

4  unreasonableness is a prerequisite to the recovery of costs under Section 505 defies clear

5  authority to the contrary.

6       Indeed, Justice Thomas wrote separately in *Fogerty* to express concern about the

7  disparate treatment of prevailing parties seeking attorneys' fees under identically worded

8  statutes. Justice Thomas' concurrence recognized that unreasonableness is not a prerequisite to

9  the recovery of attorneys' fees in a copyright case:

10       Under the Title VII provision, a prevailing plaintiff 'ordinarily is to be awarded

11       attorney's fees in all but special circumstances,' whereas a prevailing defendant is

12       to be awarded fees only 'upon a finding that plaintiff's action was frivolous,

13       unreasonable, or without foundation.' *By contrast*, under the Court's decision

14       today, prevailing plaintiffs and defendants in the copyright context 'are to be

15       treated alike,' and 'attorney's fees are to be awarded to prevailing parties only as a

16       matter of the court's discretion.'

17  *Fogerty*, 510 U.S. at 536 (emphasis added) (Thomas, J., concurring in judgment).

18       In any event, Mattel's claim – that the reproduction of the look of a "girl with too much

19  makeup on" must be remedied by a billion dollars in damages and injunctive relief – is far less

20  reasonable than the claim in *Fogerty*, which reached the jury in its entirety. 94 F.3d at 556.[3] By

21  and large, the protected features of subsequent generation "Bratz" dolls "are nothing like" the

22  concept sketches and sculpts to which Mattel claimed ownership. *Mattel*, 616 F.3d at 917.

23  Differences in the "fashions and hairstyles" are plainly evident and Mattel never argued that any

24  such similarities existed. Instead, Mattel claimed that the *types* and *placement* of features

25   

26       [3] The Ninth Circuit awarded defendant his fees and costs on appeal, even though
plaintiff's appeal raised close and difficult legal issues. *See Fogerty*, 94 F.3d at 561.

27  There was no discussion of reasonableness; the court considered it sufficient that "it
served the purposes of the Copyright Act for [defendant] to defend an appeal so that the

28  district court's fee award would not be taken away from him." *Id.*

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 323 of 445   Page ID
#:17636
Case 2:04-cv-09049-DOC-RNB   Document 10705   Filed 08/04/11   Page 6 of 18   Page ID
#:326035

1    depicted in the concept sketches and sculpts were protectable merely because they made the

2    dolls "look younger." *Mattel*, 2011 WL 1114250, at \*16. But it is well-established that

3    copyright protection does not extend to ideas, especially not ubiquitous ideas like young and

4    fashionable females. *Id.*; *see also Mattel*, 616 F.3d at 917. Mattel had been reminded of this

5    black letter law in prior litigation. *See, e.g., Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d

6    133, 136 (2d Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain

7    type of doll face. That idea belongs not to Mattel but to the public domain.").

8        Mattel argues that its claim could not have been unreasonable because the prior district

9    court judge entered its requested injunctive relief. Far from demonstrating the reasonableness of

10    its copyright claim, the fact that Mattel convinced a judicial officer to commit legal error

11    underscores the value of MGA's persistent defense in furthering the purposes of copyright law.

12    Judges occasionally make mistakes, and sometimes, as in this case, those mistakes are

13    unreasonable. *See Mattel*, 616 F.3d at 917 ("It might have been reasonable to hold that *some* of

14    the Bratz dolls were substantially similar to Bryant's sketches, especially those in the first

15    generation. But we fail to see how the district court could have found the vast majority of Bratz

16    dolls . . . substantially similar[.]"). MGA's successful defense prevented that error from

17    affecting the outcome of this lawsuit and setting poor precedent in the field of copyright.

18        Mattel also argues that its copyright claim did not offend the policies served by copyright

19    law because some evidence supported its ultimately unsuccessful assertion of ownership over the

20    concept sketches and sculpts. But ownership of the copyrighted work is only one element of a

21    successful copyright claim, and it is often uncontested. *See Feist Publ'ns, Inc. v. Rural Tele.*

22    *Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282 (1991); *see, e.g., Fogerty*, 94 F.3d at 556. Even if

23    a plaintiff's assertion of ownership to a valid copyright is reasonable or even uncontested, the

24    claim may still aspire to stifle works that "build freely upon the ideas and information" in the

25    public domain, and a successful defense may further the purposes of the Act. *Id.*; *Feist*, 499

26    U.S. at 349-50. The danger of over-aggressive copyright prosecution that concerned the

27    Supreme Court in *Fogerty* was exemplified not by Mattel's assertion of ownership over the

28    copyrighted works but by its pursuit of grossly overbroad monetary and injunctive relief.

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 324 of 445   Page ID
#:326056
Case 2:04-cv-09049-DOC-RNB   Document 10705   Filed 08/04/11   Page 7 of 48   Page ID
#:316356

1      Mattel finally argues that its good faith cannot be questioned because its motivation in

2  filing suit is the subject of a separate action presently pending before this Court and in which

3  Mattel has filed a jury demand.[4]  Though *Lieb* discussed "motivation" as a relevant factor, "a

4  finding of bad faith, frivolous or vexatious conduct is no longer required," *Fogerty*, 94 F.3d at

5  960, and the Court fails to see its applicability here.  Had Mattel advanced a meritorious

6  copyright claim, the presence of a nefarious motivation (excepting a purpose to "harass, cause

7  unnecessary delay, or needlessly increase the cost of litigation," *see* Fed. R. Civ. P. 11) might not

8  have entitled MGA to a fee award.  *Lotus Dev. Corp.*, 140 F.3d at 75 ("Arguably, there is

9  nothing inherently improper about bringing a claim that is well-founded in law and fact against

10 one's competitors, even when legal action, if successful, will inflict severe economic

11 consequences upon them.").  Similarly, the Copyright Act's interest in creative freedom is no

12 more vindicated by a successful defense against an unreasonable claim brought by a mischievous

13 plaintiff as it is by a successful defense against an unreasonable claim brought by a clean-hearted

14 plaintiff. *See Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47, 51-52 (S.D.N.Y.

15 1994) (citing *Diamond Star Bldg. Corp. v. Freed*, 30 F.3d 503 (4th Cir. 1994)).  Mattel's claim

16 posed a serious threat to the public's access to free and competitive expression; the possibility

17 that Mattel ignored decades-old principles about the unprotectability of ideas in good faith is not

18 an excuse and does not diminish the benefits society will reap as a result of MGA's successful

19 defense.

20      **B.      Calculation of Attorneys' Fees and Costs**

21           1.    Invoices

22      MGA has filed its attorney invoices in support of its Application and, pursuant to this

23

24

25      [4] In support of its argument that Mattel acted in bad faith, MGA asks the Court to
26 consider the conduct of Mattel's attorneys.  However, the Court's duty is to do "justice
   between the parties," *see Elder v. Holloway*, 984 F.2d 991, 998 (9th Cir. 1993) (Kozinski,
27 J., dissenting from denial of petition for rehearing), not the attorneys.  Mattel's attorneys
   may represent the company in litigation, but the Court's Orders affect Mattel, and the
28 company should not have to account for its lawyers' independent conduct.

1   Court's order, submitted unredacted versions of those invoices for review *in camera*.[5] Mattel

2   has moved to compel the production of those unredacted invoices pursuant to the rule that

3   invoices submitted in support of a request for attorneys' fees "should be redacted *only* to the

4   extent absolutely necessary to protect information covered by the attorney-client privilege or the

5   work-product doctrine." *U.S. v. $1,379,879.09 Seized From Bank of America*, 374 Fed. Appx.

6   709, at **1 (9th Cir. Mar. 19, 2010) (emphasis in original) (citing *MGIC Indem. Corp. v.*

7   *Weisman*, 803 F.2d 500, 505 (9th Cir. 1986)); *see also Reynolds v. Beneficial Nat. Bank*, 288

8   F.3d 277, 286 (7th Cir. 2002). Mattel's position is legally sound; this Court has recognized that

9   the submission of *in camera* information or argument circumvents the adversarial process.[6] *See*

10  Hearing Tr., dated December 20, 2010, Vol. I-B, at 21:8-17. But that concern has been partially

11  alleviated here, because MGA has served Mattel with redacted copies of its attorney invoices

12  that (1) identify the number of hours each attorney dedicated to the case on a monthly basis; and

13  (2) categorize attorney hours between time spent on MGA's affirmative claims and time spent

14  on MGA's defense against Mattel's claims. Further detail could be necessary for Mattel to

15  assess the reasonableness of the fees charged, but Mattel has expressly waived any objection to

16  the "rates" charged by MGA's attorneys or the allocation of time on "particular tasks." Hearing

---

19   [5] Contrary to Mattel's argument, MGA did not waive the attorney-client privilege
or work product doctrine.

20   [6] Despite the Court's admonition, the parties have requested a number of *in
camera* proceedings over the course of this lawsuit and, particularly, during discovery.

21   For instance, Mattel demanded that its in-house counsel be examined *in camera* about his

22   factual investigation prior to the filing of this lawsuit prior to testifying about that subject
in connection with MGA's statute of limitations defense. Mattel also requested that its

23   outside counsel and in-house counsel be subject to *in camera* examination before being

24   exposed to the adversarial process in connection with MGA's claim that Mattel concealed
evidence about its market research tactics – conduct that ultimately resulted in a finding

25   of liability against Mattel. MGA likewise requested that its outside and in-house counsel

26   be subject to *in camera* examination in connection with Mattel's claims that the
company's communications with its lawyers about the withholding of an email chain

27   were made in furtherance of a crime or a fraud as well as Mattel's claim that MGA
suborned perjury.

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 326 of 445   Page ID
#:1739
Case 2:04-cv-09049-DOC-RNB   Document 10705   Filed 08/04/11   Page 9 of 18   Page ID
#:326058

1 | Tr., dated May 25, 2011, Vol. IV, at 41-42.[7]

2 |         Mattel argues that it needs to review MGA's unredacted invoices in order to object to the

3 | "apportionment" of fees between MGA's defense against Mattel's claim for copyright

4 | infringement and MGA's defense against Mattel's other claims.  But information relevant to

5 | apportionment, including legal strategy and the results of witness interviews, is covered by the

6 | attorney-client privilege and work product doctrine.  *Weisman*, 803 F.2d at 505; *Federal Savings*

7 | *and Loan Ins. Corp. v. Ferm*, 909 F.2d 372 (9th Cir. 1990) (noting that *in camera* review of

8 | attorney invoices was necessary to protect "the confidentiality of Ferm's communications with

9 | her counsel and her counsel's mental impressions concerning litigation strategy"); *In Re Grand*

10 | *Jury Witness*, 695 F.2d 359 (9th Cir. 1982) ("[C]orrespondence between attorney and client

11 | which reveals the client's motivation for creation of the relationship or possible litigation

12 | strategy ought to be protected.  Similarly, bills, ledgers, statements, time records and the like

13 | which also reveal the nature of the services provided, such as researching particular areas of law,

14 | also should fall within the privilege.").  Mattel already has information about MGA's monthly

15 | bills and its attorneys' allocation of time between affirmative and defensive claims.  The risk of

16 | disclosing specific information about seven years of MGA's legal strategy is particularly

17 | concerning in this case, since both parties are involved in several lawsuits, including a lawsuit

18 | against each other in this Court.  If the parties were no longer engaged in litigation or if Mattel

19 | agreed to some reciprocal production of its own attorney invoices, the Court might have lent

20 | greater credence to Mattel's claimed due process concern.  But granting this demand for

21 | additional transparency, despite the absence of any objection to the hourly rates and time

22 | allocation by MGA's attorneys, gives Mattel a one-way view into the litigation strategy of a

23 |

--------------------------------------------

24 |         [7] Mattel has opposed the production of its own billing records by noting its lack of
objection to the reasonableness of MGA's fees.  Had Mattel so objected, its own billing

25 | records may have been relevant.  *See* M. Derfner & A. Wolf, Court-Awarded Attorney

26 | Fees ¶ 16.02[8][a] at 16-46 (2010 ed.) ("[T]he vehemence or tenacity of the opposition
justifies an increase in the amount of time an attorney must necessarily – and therefore

27 | reasonably – spend in countering the opposition and winning the suit.  Similarly, the skill
of an opposing counsel may justify the expenditure of a greater amount of time in

28 | litigation than would ordinarily be reasonable.").

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 327 of 445   Page ID
#:15740
Case 2:04-cv-09049-DOC-RNB   Document 10703   Filed 08/04/11   Page 10 of 16   Page ID
#:326059

1    party that it continues to battle with in other cases.

2                              2.    Relatedness

3         MGA is entitled to recover the fees it incurred in defending against claims that

4    "involve[d] a common core of facts or [were] based on related legal theories." *The Traditional*

5    *Cat Ass'n v. Gilbreath*, 340 F.3d 829, 833 (9th Cir. 2003); *see also Thomas v. City of Tacoma*,

6    410 F.3d 644, 649 (9th Cir. 2005).  That test has been imported from the federal civil rights

7    context, in which a prevailing plaintiff is entitled to recover its reasonable attorney's fees.

8    *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933 (1983).  In *Hensley*, the Supreme Court

9    noted that the calculation of "reasonable attorney's fees" involves (1) multiplying the number of

10   hours "reasonably expended on the litigation" with a reasonable hourly rate; (2) the

11   interrelatedness of the claims; (3) the extent of the plaintiff's success; and (4) other equitable

12   factors, including those identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714,

13   717-19 (5th Cir. 1974).  461 U.S. at 434-37.  On the other hand, fees incurred defending against

14   unrelated claims are not recoverable because time spent on the prosecution of those claims

15   cannot "be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *Id.*

16        Contrary to Mattel's argument, the Supreme Court's recent decision in *Fox v. Vice* does

17   not undermine *Hensley*.  In *Fox*, a successful civil rights defendant applied for its reasonable

18   attorneys' fees contending, as a § 1988 defendant must, that the plaintiff's claim was

19   "frivolous."[8]  The plaintiff responded that frivolousness requires that *every* claim be frivolous,

20   but the Court disagreed, citing *Hensley* for the proposition that "a court may reimburse a

21   defendant for costs under § 1988 even if a plaintiff's suit is not wholly frivolous."  131 S.Ct.

22   _____

23        [8] Unlike copyright law's "evenhanded" approach that evaluates attorney's fee
     applications brought by prevailing plaintiffs and defendants under the same test, *Fogerty*,
24   510 U.S. at 534, § 1988 plaintiffs and defendants are treated differently in light of the
     statute's obvious interest in vindicating civil rights.  Section 1988 plaintiffs need only
25   demonstrate that they prevailed, *i.e.*, that "succeed on any significant issue in litigation
     which achieves some of the benefit the parties sought in bringing suit," *Hensley*, 461 U.S.
26   at 433 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1st Cir. 1978), but
     defendants must demonstrate that the action was "frivolous, unreasonable, or without
27   foundation." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694
     (1978).
28

1   2205, 2214 (2011). If "a plaintiff [] prevail[s] on one contention in a suit while also asserting an

2   unrelated frivolous claim[,] a court could probably award fees to *both* parties." *Id.* (emphasis

3   added) (citing *Hensley*, 461 U.S. at 435 n. 10). However, the Court held, just as the statute's

4   interest in deterring frivolous claims entitles a defendant to recover fees incurred defending

5   against such claims, it also limits recovery to amounts the defendant "would not have paid but

6   for the frivolous claims." 131 S.Ct. at 2215. If the defendant would have incurred those fees

7   anyway, "he has suffered no incremental harm from the frivolous claim" and "has never

8   shouldered the burden that Congress, in enacting § 1988, wanted to relieve." *Id.*

9       Mattel reads *Fox*'s second holding to require that "fees incurred for defense of related

10  claims that would have been incurred by MGA in the absence of the copyright claim are not

11  recoverable" because "frivolousness and objective unreasonableness [are] factors the Court

12  should consider in awarding fees under the Copyright Act" and in the context of federal civil

13  rights claims, fees incurred for non-frivolous related claims are not recoverable. Docket 10644

14  at ¶ 15. This syllogism misreads the controlling standard for the recovery of fees by copyright

15  defendants, flips *Fox*'s reasoning on its head, promotes absurd outcomes, and, even if correct,

16  does not undermine MGA's entitlement to its fees. "Reasonableness" may affect defendants'

17  recovery of fees in both the federal civil rights and copyright contexts, but for different reasons.

18      An interest in compensation drives fee awards to civil rights defendants. *Fox*, 131 S.Ct.

19  at 2215 ("[T]he relevant purpose of § 1988 is to relieve defendants of the burdens associated

20  with fending off frivolous litigation."). Federal civil rights statutes, like the one considered in

21  *Fox*, are mechanisms to safeguard and expand liberties and promote broad compliance with the

22  law. *See Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412,

23  418-19 (1978) (citing *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401-02, 88 S.Ct. 964

24  (1968)). Plaintiffs that bring civil rights claims therefore resemble "private attorneys general,"

25  helping vindicate "polic[ies] that Congress considered of the highest priority." *Id.* Both because

26  plaintiffs' successful prosecutions of federal civil rights claims serve an important public

27  benefit, and because "violat[ions] of federal [civil rights] law" must be vigorously deterred, a

28  prevailing civil rights plaintiff "should ordinarily recover an attorney's fee unless special

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 329 of 445   Page ID
#:35742
Case 2:04-cv-09049-DOC-RNB   Document 10703   Filed 08/04/11   Page 12 of 16   Page ID
#:326061

1    circumstances would render such an award unjust." *Newman*, 390 U.S. at 417 (Title II); *see also*

2    *Christianburg*, 434 U.S. at 417 (Title VII); *Fox*, 131 S.Ct. at 2213.  Since successful civil rights

3    defendants rarely vindicate the same "important public benefits" and civil rights plaintiffs can

4    hardly be considered "violator[s] of federal law," civil rights defendants do not enjoy the same

5    presumption in favor of fee recovery. *Christianburg*, 434 U.S. at 418-19.  Instead, defendants'

6    entitlement to fees rests on "different equitable considerations," namely the interest in preserving

7    the integrity of the "adversary judicial process" that must "ultimately effectuat[e]" Congress'

8    policies, *id.* at 419, and compensating defendants for "shoulder[ing] the burden" of defeating the

9    "frivolous [or] unreasonable" claims that undermine that process. *Fox*, 131 S.Ct. at 2215; *see*

10   *also Christianburg*, 434 U.S. at 420-21 (discussing legislative history).  Of course, no burden

11   has been "shouldered" and no compensation is necessary if the defendant would have incurred

12   its fees anyway, *Fox*, 131 S.Ct. at 2215.

13          Fee awards to copyright defendants serve a purpose loftier than mere compensation:

14   rewarding a successful defense that "enrich[es] the general public through access to creative

15   works." *Fogerty*, 510 U.S. at 527.  The rationales that underlie copyright law favor limitation.

16   Defendants play an important role in "demarcat[ing]" the "boundaries of copyright law" by

17   raising defenses predicated upon public access to creative works and the novel expression of

18   ideas. *Id.*  Defendants should accordingly be "encouraged to litigate [meritorious copyright

19   defenses] to the same extent that plaintiffs are encouraged to litigate meritorious claims of

20   infringement." *Id.*  Unlike the narrow compensatory principles that limit recovery to civil rights

21   defendants in cases involving frivolous claims, *see Fox*, 131 S.Ct. at 2215, society's interest in

22   the assertion of meritorious defenses against *both* reasonable and unreasonable copyright claims

23   is best achieved through the award of all fees incurred in connection with the claim and related

24   "claims [that] involve a common core of facts or . . . legal theories." *Hensley*, 461 U.S. at 435.

25   That is the standard that has been applied to civil rights plaintiffs, *see Fox*, 131 S.Ct. at 2214,

26   copyright plaintiffs, *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999) (applying

27   *Hensley*'s relatedness standard to contract fee provision), and copyright defendants, *see*

28   *Twentieth Century Fox Film Corp. v. Entm't Distributing*, 429 F.3d 869, 884 (9th Cir. 2005).

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 330 of 445   Page ID
#:32662
Case 2:04-cv-09049-DOC-RNB   Document 10703   Filed 08/04/11   Page 13 of 16   Page ID
#:326082

1    Indeed, Mattel concedes that *Fox* does not affect copyright plaintiffs' entitlement to fees

2    incurred in prosecuting "related claims." Reading *Fox* to nevertheless preclude copyright

3    defendants from recovering fees spent defending against related claims runs afoul of the rule that

4    courts should apply the same standards in awarding fees to copyright plaintiffs and copyright

5    defendants. *See Fogerty*, 510 U.S. at 527.

6         In any event, *Fox* acknowledged that "the 'but-for' standard . . . may in some cases allow

7    compensation to a defendant for attorney work relating to both frivolous and non-frivolous

8    claims." 131 S.Ct. at 2216. If the "frivolous" claim implicated greater "monetary exposure" or

9    "involved a specialized area that reasonably caused [defendant] to hire more expensive counsel,"

10   a court could find that the "costs would not have been incurred in the absence of the frivolous

11   allegation." *Id.* Such is the case here. Mattel sought expansive legal and equitable relief

12   through its claim for copyright infringement. The parties' attorneys dedicated significant

13   resources to that claim as a result, recognizing its potential to enrich Mattel and destroy MGA.

14        Though the Court, for reasons discussed below, still attempts to apportion fees to the

15   extent practicable, *Fox* does not compel a denial of fees. The specter of billion dollar relief

16   spurred the vast majority of MGA's legal expenditures and motivated the parties' commitment to

17   litigate the remaining claims. The Court accordingly awards MGA the reasonable attorneys'

18   fees it incurred in defending against the copyright claim and all related claims.

19                        3.    Pre-Filing Costs

20        MGA is also entitled to recover a modest amount of the fees incurred after the filing of

21   Mattel's lawsuit but before the filing of Mattel's copyright infringement counterclaim.

22   Prevailing plaintiffs are permitted to recover fees incurred for essential pre-filing activity, *see*

23   *Webb v. Bd. of Educ. of Dyer County, Tenn.*, 471 U.S. 234, 243, 105 S.Ct. 1923, and

24   evenhandedness demands that defendants similarly recover fees incurred in the preparation of

25   their defense against an imminent claim. *See Fogerty*, 510 U.S. at 527. Mattel sought discovery

26   relevant to its copyright infringement claim before formally moving for leave to assert that claim

27   in an amended pleading. In response to Mattel's requests, MGA performed extensive factual

28   investigation, retrieved physical evidence, researched the law on copyrights, and prepared

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 331 of 445 Page ID
#:15744
Case 2:04-cv-09049-DOC-RNB Document 10703 Filed 08/04/11 Page 14 of 16 Page ID
#:326063

1   witnesses to respond to Mattel's questions about substantial similarity and access during

2   depositions. It is equitable to reimburse MGA for some of this work not just because MGA's

3   early efforts may have directly contributed to its eventual success, but also because Mattel did

4   not limit its discovery requests prior to the formal filing of its claim for copyright infringement.

5                           4.    Discussion

6          All but four of Mattel's claims arose out of the reproduction of the Bratz concept sketches

7   and sculpts. *See* Fourth Amended Answer and Counterclaims ¶¶ 124(f) (first counterclaim); 129

8   (second counterclaim); 146 (fourth counterclaim); 154 (fifth counterclaim); 161-62 (sixth

9   counterclaim); 168 (seventh counterclaim); 176 (eighth counterclaim); 181 (ninth counterclaim);

10  187 (tenth counterclaim); 194 (eleventh counterclaim); 203 (twelfth counterclaim); 240

11  (seventeenth claim); *see also* Memo. in Support of Mot. to Confirm Pendency [Docket 7801] at

12  2:7-9 (arguing that "Mattel's Bratz-related trade secret claim . . . has long been at issue."):

13  Mattel's thirteenth, fourteenth, fifteenth, and sixteenth counterclaims, which did not survive

14  MGA's motion to dismiss, concerned conduct unrelated to Mattel's copyright infringement

15  counterclaim and the Court accordingly excludes from the attorneys' fees award amounts

16  incurred in defense of those allegations.

17         Some of these claims also encompassed other conduct, including the alleged

18  misappropriation of Mattel documents using other Mattel employees (a claim the jury rejected).

19  MGA argues that it is entitled to recover the fees it incurred defending against these allegations

20  because the claims are related – an argument that hews to the legal rule while betraying its

21  origins. *Hensley*'s rule ensures that courts do not become bogged down in a "second major

22  litigation" about the "determination of fees." *Fox*, 131 S.Ct. at 2216 (quoting *Hensley*, 461 U.S.

23  at 437). If two claims "involve a common core of facts" or a single "legal theory" supports a

24  claim to relief arising out of two sets of facts, then one would expect "[m]uch of counsel's time

25  will be devoted generally to the litigation as a whole, making it difficult to divide the hours

26  expended on a claim-by-claim basis" or, in the case of a single claim, on an allegation-by-

27  allegation basis. *Hensley*, 461 U.S. at 435. For instance, MGA's attorneys spent thousands of

28  hours performing routine tasks in connection with the filing of dispositive motions, and

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 332 of 445   Page ID
Case 2:04-cv-09049-DOC-RNB   Document 10703   Filed 08/04/11   Page 15 of 16   Page ID
#:326064

1   allocating out time spent on allegations concerning the Bratz works represents a futile and

2   wasteful use of judicial resources, especially since counsel's diligence was more likely

3   motivated by an attempt to defeat Mattel's Bratz-related allegations, and not Mattel's claim that

4   a few employees downloaded company documents. *Fox*, 131 S.Ct. at 2216.

5         The Court has nevertheless attempted to exclude attorneys' fees and costs incurred

6   investigating these other allegations of wrongdoing. The Supreme Court has recognized that

7   "rough justice" is sufficient in the context of fee awards, but justice is still required. Though

8   MGA's billing records are voluminous, the attorneys hired after December 2007 specifically

9   identified the tasks they performed, and thereby enabled the Court to easily separate out time

10   spent on unrelated tasks. Based on these records, the Court estimates that MGA incurred $24

11   million in fees for the factual or legal investigation of allegations that did not overlap with the

12   alleged reproduction of the Bratz concept sketches and sculpts, and excludes that amount from

13   the total fee award. Mattel does not dispute that the total sum incurred by MGA in defense of

14   Mattel's claims totals $129,688,073. *See* Declaration of Stephen Schultz In Support of MGA's

15   Motion for Attorneys' Fees ¶ 17. Deducting $24 million in fees unrelated to the copyright claim

16   results in a total fee award of $105,688,073.

17                          5.    Other Costs

18         MGA also claims to have incurred approximately $40 million in costs over the life of this

19   litigation. That amount must also be reduced, so as to exclude costs unrelated to the copyright

20   claim, including costs for outside investigators ($87,807), approximately $7000 in costs for

21   deposition recording services, branding research ($509,806), and a study performed in

22   connection with MGA's affirmative claims ($128,800). Recoverable costs do, of course, include

23   the modest fees paid to Mr. Glenn Vilppu for his copyright specific expert opinion and other

24   general trial costs incurred over the life of this litigation. Subject to these deductions, MGA's

25   recoverable costs amount to $31,667,104.

26   **III.   Disposition**

27         A fee award is appropriate if a successful defense furthers the purposes of the Copyright

28   Act. Mattel asserted a copyright claim that was stunning in scope and unreasonable in the relief

Case 2:16-cv-05117-TJH-GJS   Document 88-7   Filed 08/16/17   Page 333 of 445   Page ID
#:3746
Case 2:04-cv-09049-DOC-RNB   Document 10703   Filed 08/04/11   Page 16 of 16   Page ID
#:326065

1   it requested.  The claim imperiled free expression, competition, and the only serious competitor

2   Mattel had faced in the fashion doll market in nearly 50 years.  MGA's successful defense

3   ensured that well-resourced plaintiffs cannot bend the law to suit their pecuniary interests.  For

4   these reasons, and pursuant to 17 U.S.C. § 505, the Court awards MGA $105,688,073.00 in

5   attorneys' fees and $31,677,104.00 in costs.[9]

6

7

8   IT IS SO ORDERED.

9   DATED: August 4, 2011

10

11                                          _David O. Carter_

12                                          DAVID O. CARTER
                                           United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24          [9] MGA's *ex parte* Application to Compel Production of Evidence in Connection
     with the Hearing on Motions for Attorneys' Fees [Docket 10574] is DENIED.  Mattel's
25   Motion to Compel MGA Entertainment, Inc. and Mr. Machado to Produce Attorney
     Billing Records [Docket 10676] is DENIED.  Mattel's Motion to Compel the Production
26   of the Declaration of Stephen Schultz [Docket 10634] is STRICKEN AS MOOT, in light
     of MGA's withdrawal of its request to submit that Declaration to the Court, *see* Docket
27   10682.  Mattel's Motion to Compel Production of, or Strike, Cost Materials and
     Additional Cost Invoices [Docket 10672] is DENIED.
28

1   IRELL & MANELLA LLP
    Brian J. Hennigan (86955)
2   Michael H. Strub, Jr. (153828)
    Kimberly A. Svendsen (235785)
3   1800 Avenue of the Stars, Suite 900
    Los Angeles, California 90067-4276
4   Telephone:   (310) 277-1010
    Facsimile:    (310) 203-7199
5
    Attorneys for Plaintiff
6   MONROVIA NURSERY COMPANY

**FILED**
LOS ANGELES SUPERIOR COURT

NOV 2 1 2008

JOHN A. CLARKE, CLERK

7

8   SUPERIOR COURT OF THE STATE OF CALIFORNIA
    BY SHAUNYA WESLEY, DEPUTY

9   FOR THE COUNTY OF LOS ANGELES

10

11  MONROVIA NURSERY COMPANY, a        )   Case No. BC351140
    California corporation,            )   (Consolidated with Case No. BC 354657)
12                                     )
                                       )
        Plaintiff,                     )   **DECLARATION OF BRIAN J.**
13                                     )   **HENNIGAN IN SUPPORT OF**
                                       )   **PLAINTIFF MONROVIA NURSERY**
14      vs.                            )   **COMPANY'S MOTION FOR AWARD OF**
                                       )   **ATTORNEYS' FEES**
15  HARRY E. ROSEDALE, JR., an individual; )
    RICHARD VANLANDINGHAM, an          )
16  individual; and DOES 1 through 10, inclusive, )  [Notice of Motion and Motion of Plaintiff
                                       )   Monrovia Nursery Company for Award of
17      Defendants.                    )   Attorneys' Fees; Memorandum of Points and
                                       )   Authorities; and Memorandum of Costs filed
18  _____      )   concurrently herewith]
                                       )
    WILLIAM BRUCE USREY; MILES R.      )
19  ROSEDALE; LANCE H. ROSEDALE;       )   DATE:       December 18, 2008
    SUSAN KAY BRIERLY; JOANNE M.       )   TIME:       8:30 a.m.
20  HUMMER (acting individually and as trustee )  DEPT.:   53
    of certain testamentary trusts),   )   JUDGE:      Hon. John P. Shook
21                                     )
        Plaintiffs in Intervention.    )
22                                     )   DATE ACTION FILED:   April 21, 2006
    _____      )

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1973648                 DECLARATION OF BRIAN J. HENNIGAN

## DECLARATION OF BRIAN J. HENNIGAN

I, Brian J. Hennigan, declare as follows:

1.      I am a partner at the law firm of Irell & Manella LLP ("Irell & Manella"), counsel of record for plaintiff Monrovia Nursery Company ("Monrovia") in the above-captioned action. I am a member in good standing of the State Bar of California. I submit this Declaration in support of Monrovia's motion for attorneys' fees. Except where stated, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      I am a member of Irell & Manella's litigation workgroup, where I have worked since 1990. From 1983 to 1989, I worked as an Assistant United States Attorney ("AUSA") in the Criminal Division for the Central District of California (Los Angeles). As an AUSA, I served as the Deputy Chief for the Government Fraud and Public Corruption Section in the United States Attorney's Office in Los Angeles. I received the Special Achievement Award from the Department of Justice, as well as awards from other investigative agencies. In 1999, I was recognized by the *Los Angeles Business Journal* as one of the top 50 trial attorneys in Los Angeles. In January 2007, I was named one of the top 100 Los Angeles lawyers in *Los Angeles Magazine*. I have served as the President of the Federal Bar Association in Los Angeles (2004-2005) and the co-chairman of the American Bar Association, White Collar Crime Section (2004-2006). I also have served as an attorney delegate to the Ninth Circuit Judicial Conference.

3.      In my post-Judgment representation of Monrovia, I was assisted by Michael H. Strub, Jr., who is of counsel to the firm, and six attorneys associated with the firm: Kimberly A. Svendsen, Dena G. Kaplan, Michael F. Bacchus, Katharine J. Galston, Aarti Khanolkar Wilson, and Elizabeth Madjlessi. I was also assisted by Michelle M. Williams, a paralegal. Although a number of additional persons at I&M performed work on this matter, they are not included in this fee request because Monrovia is not seeking to recover their fees.

4.      Michael H. Strub, Jr. is a member of Irell & Manella's litigation workgroup. I am informed and believe that he is a 1990 high honors graduate of the University of Texas School of Law (Order of the Coif), and from 1990 until 1991, he clerked from the Honorable Homer

1  Thornberry (United States Court of Appeals for the Fifth Circuit) in Austin, Texas.  From 1991 to
2  1997, Mr. Strub was an associate at Shearman & Sterling's Los Angeles office, then an associate
3  in Shearman & Sterling's Washington, D.C. office from August 1997 until August 1999, and
4  thereafter joined Irell & Manella.  Mr. Strub's practice has included a variety of commercial
5  litigation and transactional matters – from a disputed lease for a Boeing 747 jet aircraft to a
6  dispute over profit participation in the "Judge Judy" television show – and he has represented
7  clients in a variety of jurisdictions, both in and out of California.

8       5.     Kimberly A. Svendsen is a former associate in Irell & Manella's litigation
9  workgroup.  I am informed and believe that she graduated from the University of California, Los
10  Angeles School of Law in 2004 (Order of the Coif) and clerked for the Honorable Stephen V.
11  Wilson in the Central District of California.  While at Irell & Manella Ms. Svendsen worked on
12  cases involving contract and business torts, entertainment law, and white-collar crime, many of
13  them on behalf of national companies.

14       6.     Dena G. Kaplan is a former associate in Irell & Manella's litigation workgroup.  I
15  am informed and believe that she graduated from the University of Pennsylvania Law School cum
16  laude in 2003, and clerked for the Honorable Edward Rafeedie in the Central District of
17  California.  While at Irell & Manella Ms. Kaplan worked on cases involving general business
18  litigation, and was named a Rising Star in California Lawyer magazine.

19       7.     Katharine J. Galston is a former associate in Irell & Manella's litigation workgroup.
20  I am informed and believe that she graduated cum laude from NYU School of Law in 2003.  After
21  earning her law degree, Ms. Galston served as a law clerk to the Honorable Reena Raggi (United
22  States Court of Appeals for the Second Circuit).  While at Irell & Manella, Ms. Galston
23  specialized in appellate litigation matters, and worked on a variety of commercial and
24  entertainment litigation cases.

25       8.     Michael F. Bacchus is a former associate in Irell & Manella's litigation workgroup.
26  I am informed and believe that he graduated from the University of Pennsylvania Law School in
27  2003 (Order of the Coif), and then worked as an associate at Patterson, Belknap, Webb & Tyler in
28  New York City.  Mr. Bacchus clerked for the Honorable Diana Gribbon Motz (United States

1973648             DECLARATION OF BRIAN J. HENNIGAN

1  Court of Appeals for the Fourth Circuit), and then he joined Irell & Manella as an associate,

2  working on civil litigation cases, including international licensing disputes and land use matters.

3       9.       Aarti Khanolkar Wilson is an associate in Irell & Manella's litigation workgroup. I

4  am informed and believe that Ms. Wilson is a 2007 graduate of Yale Law School. At Irell &

5  Manella, Ms. Wilson has worked on cases involving appellate litigation and general commercial

6  litigation involving contractual disputes and fraud.

7       10.      Elizabeth Madjlessi is an associate in Irell & Manella's litigation workgroup. I am

8  informed and believe that Ms. Madjlessi graduated cum laude from NYU School of Law in 2007.

9  At Irell & Manella Ms. Madjlessi has worked on cases involving intellectual property and

10  complex contractual disputes.

11       11.      Michelle M. Williams is a former paralegal in Irell & Manella's litigation support

12  staff. I am informed and believe that Ms. Williams graduated from Highline Community College

13  in Washington, receiving her degree in Legal Assistant Studies, and worked as a legal secretary

14  and paralegal prior to joining Irell & Manella. From 1999 to 2008 Ms. Williams worked on a

15  variety of cases at Irell & Manella, including assisting on large intellectual property matters,

16  managing discovery, and aiding with motion practice, trial preparation and support.

17       12.      Attached as Exhibit A to this Declaration is a detailed billing report documenting

18  the time spent by Irell & Manella attorneys in our representation of Monrovia before this Court.

19  On the report, "HENN" is my abbreviation, "MHST" is the abbreviation for Mr. Strub, "KSVE" is

20  for Ms. Svendsen, "DGRE" is the abbreviation for Ms. Kaplan, "KGAL" is the abbreviation for

21  Ms. Galston, "BACC" is the abbreviation for Mr. Bacchus, "KHAN" is the abbreviation for Ms.

22  Wilson, "MADJ" is the abbreviation for Ms. Madjlessi, and "4OBC" is the abbreviation for Ms.

23  Williams. Certain of the time entries in Exhibit A have been redacted on the basis of the attorney-

24  client privilege, the attorney work-product doctrine, or both, or for work for which Monrovia is

25  not seeking to recover its fees in this motion. In addition, a ten percent deduction was made from

26  the remainder to account for any duplicative work. The detailed billing report set forth as Exhibit

27  A was prepared in the manner described in the following paragraphs.

28

1     13.     Irell & Manella uses a computerized system of time billing in which attorneys and

2 other timekeepers, or their assistants, enter their time into the system. Each time entry includes

3 the name of the client and matter, the number of hours spent, and a description of the work done.

4 In order to keep accurate records, timekeepers at Irell & Manella are instructed to enter their time

5 into the computer each day while their recollection of the work performed is still fresh in their

6 minds. The system is set up to send automatic prompting messages via email to any timekeeper

7 who fails to promptly enter his or her time into the system.

8     14.     In order to determine the fees incurred in connection with our representation of

9 Monrovia in this action, we first took the step of asking our accounting department to print out a

10 detailed time and expense report for the relevant client-matter number.

11     15.     As a next step, we reviewed the description line of each time entry in order to

12 determine whether the time was expended on matters directly related to our representation of

13 Monrovia in this lawsuit. We redacted certain material on grounds of privilege or for work for

14 which Monrovia is not requesting its attorneys' fees in this motion.

15     16.     The billing rates charged to Monrovia in this matter are the customary rates

16 charged by Irell & Manella, and reflect the market value of the type of legal service and

17 experience sought by sophisticated clients in major metropolitan areas like Los Angeles. It is my

18 belief that in the Los Angeles legal community, law firms having experience and reputation

19 similar to those of Irell & Manella charge rates that are comparable to Irell & Manella's rates.

20     17.     Monrovia seeks to recover fees of the following primary Irell & Manella

21 timekeepers at the following average billing rates:

22             Brian J. Hennigan (partner) – 72.5 hours at $776.93 per hour;

23             Michael H. Strub (of counsel) – 83.5 hours at $671.29 per hour;

24             Kimberly A. Svendsen (associate) – 104.75 hours at $410 per hour;

25             Dena G. Kaplan (associate) – 24.25 hours at $475 per hour;

26             Michael F. Bacchus (associate) – 18.5 hours at $475 per hour;

27             Katharine J. Galston (associate) –69 hours at $492.19 per hour;

28             Aarti Khanolkar Wilson (associate) – 25.25 hours at $325 per hour;

- 4 -

1    Elizabeth Madjlessi (associate) – 51.75 hours at $355 per hour;

2    Michelle M. Williams (paralegal) – 14.75 hours at $222.54 per hour.

3    18.    After calculating the total number of hours at the appropriate respective rate we
4    reduced the total by ten percent to account for any duplicative work that may have occurred in the
5    post-judgment phase.

6    19.    Attached hereto as Exhibit B is a true and correct copy of the Court EXPRESS
7    Legal Billing Report, Volume 10, Number 2 August 2008.

8    20.    Attached hereto as Exhibit C is a true and correct copy of excerpts from The
9    National Law Journal's 2007 sampling of nationwide law firm billing rates, dated December 10,
10   2007.

11   21.    On February 8, 2007 the trial court in this action ordered Defendants to pay
12   Monrovia's fees in the amount of $767,931.25, the fees of plaintiffs in intervention in the amount
13   of $494,972.00, and costs in the amount of $25,132.88. Attached hereto as Exhibit D is a true and
14   correct copy of the Court's order.

15   22.    On September 24, 2008 the California Court of Appeal affirmed the trial court's
16   finding that the attorneys' fees requested in this case were reasonable. Attached hereto as Exhibit
17   E is a true and correct copy of the Court of Appeal's decision granting the fees.

18   23.    In 2005, in an unrelated matter, I submitted a fee and cost bill with regard to my
19   representation of a client in civil dispute related to a contract claim before Judge William Fahey of
20   the Los Angeles Superior Court. After briefing and hearing on the matter, Judge Fahey ordered
21   full payment on the bill. Attached hereto as Exhibit F is a true and correct copy of Judge Fahey's
22   May 20, 2005 Order granting my clients the full amount of attorneys' fees and costs they sought
23   after prevailing in an action involving a contract that contained an attorneys' fee provision.

24

25

26

27

28

1973648

1    24.    Attached hereto as Exhibit G is a true and correct copy of the California Court of

2 Appeal's September 5, 2006 opinion affirming Judge Fahey's award of attorneys' fees to my

3 clients.

4    Executed on November 21, 2008, at Los Angeles, California.

5    I declare under penalty of perjury under the laws of the United States of America that the

6 foregoing is true and correct.

7

8    _____
     Brian J. Hennigan

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF DELAWARE

CERTIFIED: AS A TRUE COPY: ATTEST:
DAVID D. BIRD, CLERK
U.S. BANKRUPTCY COURT
BY: Matthew J. Clonis Deputy Clerk 1/8/09
85 pgs

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **THREE A'S HOLDINGS, L.L.C., a** | : | **Case No. 06-10886 (BLS)** |
| **Delaware limited liability company,** | : | |
| ***et al.,***[1] | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | Objection Deadline: December 20, 2006 |
| | : | |
| | : | |

| | |
|---|---|
| Name of Applicant: | O'Melveny & Myers LLP |
| Authorized to Provide Professional Services to: | The above-captioned debtors and debtors-in-possession |
| Date of Retention: | September 14, 2006 (*nunc pro tunc* to the date of commencement of these chapter 11 cases) |
| Period for which compensation and reimbursement are sought: | October 1, 2006 through October 31, 2006 |
| Amount of Compensation sought as actual, reasonable, and necessary: | $308,928.40 (80% of $386,160.50) |
| Amount of Expense Reimbursement sought as actual, reasonable and necessary: | $6,349.08 |

This is a(n): __X__ Monthly _____ Interim _____ Final Application

The total time expended for fee application preparation is approximately 12 hours.[2]

Prior Applications Filed:        Two

---

[1] The Debtors are the following entities: Three A's Holdings, L.L.C., Jeremy's Holdings, LLC, Tower Direct LLC, 33rd Street Records, Incorporated, Pipernick Corp., M T S, Incorporated (d/b/a Tower Records), Columbus & Bay, Inc. and R.T. Records, Incorporated.

[2] This time was expended by attorneys and paraprofessionals, and compensation for this time will be calculated and requested as part of the next monthly fee application

LA3:1125300 1



Case 2:16-cv-05117-JLL-GWS Document 88-2 Filed 08/16/17 Page 343 of 445 PageID
Case 2:04-cv-01771-SWR Document 345-2 Filed 01/09/2009 Page 3 of 28
#:1756

This is a(n):   <u>X</u> monthly     ___ interim     ___ final application

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| David Krinsky | Partner in the Transactions Department. Joined firm in 1994. Member of the CA State Bar since 1973. | 950 | 15.8 | $15,010.00 |
| Robert Rizzi | Partner in the Transactions Department. Joined firm in 1994. Member of the CA State Bar since 1978. | 950 | 3.5 | $3,325.00 |
| Ben Logan | Partner in the Restructuring and Finance Department. Joined firm in 1976. Member of the CA State Bar since 1976. | 860 | 170.9 | $142,681.65 |
| Gordon Krischer | Partner in the Adversarial Department. Joined firm in 1971. Member of the CA State Bar since 1972 and NY State Bar since 1991. | 860 | 1.3 | $1,118.00 |
| Kathryn Sanders | Partner in the Transactions Department. Joined firm in 1985. Member of the CA State Bar since 1985 | 820 | 0.7 | $574.00 |
| Suzzanne Uhland | Partner in the Restructuring and Finance Department. Joined firm in 1988. Member of the CA State Bar since 1988. | 820 | 190.4 | $151,489.62 |
| Alejandro Mayorkas | Partner in the Adversarial Department. Joined firm in 2001. Member of the CA State Bar since 1986. | 770 | 12.2 | $9,394.00 |
| Shannon Lowry Nagle | Partner in the Transactions Department. Joined firm in 2007. Member of the NY State Bar since 2007. Member of VA State Bar since 1991. Member of NC State Bar since 1993. Member of State GA Bar since 1996. | 710 | 68.8 | $48,848.00 |
| Gary Tell | Partner in the Transactions Department. Joined firm in 1999. Member of the DC Bar since 1993. | 700 | 0.5 | $350.00 |

Exhibit A
11

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| Thomas M. Riordan | Partner in the Adversarial Department. Joined firm in 1995. Member of the CA State Bar since 1995. | 675 | 31.0 | $20,925.00 |
| C. Brophy Christensen | Partner in the Transactions Department. Joined firm in 1997. Member of the CA State Bar since 1997. | 675 | 3.4 | $2,295.00 |
| Jorge DeNeve | Counsel in the Adversarial Department. Rejoined firm in 2007. Member of the CA State Bar since 1998. | 620 | 31.2 | $19,344.00 |
| Summer Conley | Counsel in the Transactions Department. Joined firm in 1997. Member of the CA State Bar since 1997. | 600 | 1.7 | $1,020.00 |
| Victoria Newmark | Counsel in the Restructuring and Finance Department. Joined firm in 1995. Member of the CA State Bar since 1995. | 595 | 0.2 | $119.00 |
| Christopher Campbell | Counsel in the Tax Department. Joined firm in 1999. Member of the CA State Bar since 1999. | 590 | 59.7 | $35,223.00 |
| Allan Johnson | Counsel in the Adversarial Department. Joined firm in 2002. Member of the CA State Bar since 2001. | 565 | 49.0 | $27,685.00 |
| Natausha Wilson | Counsel in the Transactions Department. Joined the firm in 2007. Member of the NY and NJ State Bars since 2002 and the CA State Bar since 2003. | 565 | 121.7 | $68,760.50 |
| Arthur (Schan) Duff | Counsel in the Adversarial Department. Joined firm in 2004. Member of the DC Bar since 2003. | 540 | 8.8 | $4,752.00 |
| Justin Laubach | Counsel in the Transactions Department. Joined firm in 2003. Member of the CA State Bar since 2002. | 540 | 54.9 | $29,646.00 |
| Emily Culler | Associate in the Restructuring and Finance Department. Joined firm in 2002. Member of the CA State Bar since 2002. | 540 | 1.9 | $1,026.00 |

LA3:1148107.1
RLF1-3300247-1

3

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 345 of 445 Page ID
#:1758
Case 2:04-cv-07131-SVW-RC Document 734-2 Filed 01/09/2009 Page 5 of 23

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| Laine Mervis | Associate in the Transactions Department. Joined firm in 2007. Member of the CA State Bar since 2003. | 520 | 8.6 | $4,472.00 |
| Andrew Parlen | Associate in the Transactions Department. Joined firm in 2007. Member of the CA State Bar since 2004. | 520 | 297.8 | $151,222.48 |
| Scott Sugino | Associate in the Transactions Department. Joined firm in 2006. Member of the IL State Bar since 2003 and member of the CA State Bar since 2004. | 520 | 2.0 | $1,040.00 |
| Joshua Weisser | Associate in the Transactions Department. Joined the firm in 2007. Member of the NY State Bar since 2006. | 490 | 2.2 | $1,078.00 |
| Jennifer Halvas | Associate in the Transactions Department. Joined firm in 2004. Member of the CA State Bar since 2004. | 480 | 2.1 | $1,008.00 |
| Mike Symons | Associate in the Transactions Department. Joined firm in 2004. Member of the CA State Bar since 2004. | 480 | 28.1 | $13,488.00 |
| Nima Amini | Associate in the Transactions Department. Joined firm in 2006. Member of the CA, MN and DC Bars since 2005, 2006 and 2007, respectively. | 450 | 9.3 | $4,185.00 |
| Abby Schwartz | Associate in the Adversarial Department. Joined firm in 2006. Member of the CA State Bar since 2007. | 450 | 4.8 | $2,160.00 |
| Ana Acevedo | Associate in the Transactions Department. Joined firm in 2006. Not currently a member of the CA State Bar. | 395 | 108.0 | $42,660.00 |
| Danielle Oakley | Associate in the Adversarial Department. Joined firm in 2006. Member of the CA State Bar since 2006. | 395 | 58.2 | $22,337.25 |

Case 2:16-cv-05117-JLS-GJS Document 88-3 Filed 08/16/17 Page 346 of 445 Page ID
#:1759
Case 2:04-cv-09171-SVW-RC Document 346-2 Filed 01/09/2009 Page 6 of 23

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| Adrian Pollner | Associate in the Adversarial Department. Joined firm in 2006. Member of the CA State Bar since 2006. | 395 | 25.0 | $9,875.00 |
| Michael Scheppele | Associate in the Transactions Department. Joined firm in 2006. Member of the CA State Bar since 2006. | 395 | 0.2 | $79.00 |
| Angela Wang | Associate in the Transactions Department. Joined firm in 2006. Member of the NY State Bar since 2007. | 395 | 151.5 | $59,842.50 |
| Melanie McLaughlin | Associate in the Transactions Department. Joined the firm in 2007. Member of the NY State Bar since 2008. | 365 | 0.6 | $219.00 |
| Ryan Austin | Associate in the Transactions Department. Joined the firm in 2007. Member of the CA Bar since 2007. | 330 | 24.9 | $8,217.00 |
| Timothy P. Caballero | Associate in the Adversarial Department. Joined firm in 2007. Member of the CA State Bar since 2007. | 330 | 2.4 | $792.00 |
| Lynn Talab | Adversarial Paralegal since 1992. | 310 | 64.8 | $20,088.00 |
| Gregory Trotter | Transactions Paralegal since 1989. | 310 | 0.5 | $155.00 |
| Timothy Sheehan | Adversarial Paralegal since 2004. | 225 | 1.9 | $427.50 |
| Michael Donovan | Litigation Support Specialist since 2005. | 260 | 66.3 | $17,238.00 |
| James McCarthy | Adversarial Paralegal since 1997. | 245 | 17.0 | $4,165.00 |
| Debra Fisher | Librarian since 1980. | 225 | 0.7 | $157.50 |
| Denise Lieu | Practice Support Analyst since 2006. | 220 | 0.6 | $132.00 |
| Catherine Mirhady | Litigation Support Specialist since 2007. | 220 | 41.5 | $9,130.00 |
| Karen Nguyen | Litigation Support Specialist since 2004. | 220 | 2.2 | $484.00 |
| Ryan Lopez | Litigation Support Specialist since 2007. | 220 | 0.4 | $88.00 |

Exhibit A
14

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| Stella Kim | Transactions Project Assistant since 2007. | 190 | 4.4 | $836.00 |
| Brian Osimiri | Transactions Project Assistant since 2006. | 190 | 15.6 | $2,964.00 |
| Elizabeth Ene | Litigation Support Specialist since 2007. | 110 | 16.1 | $1,771.00 |
| TOTAL | | | 1785.3 | $963,897.00 |

Case 2:16-cv-05117-JLL-SWR  Document 88-7  Filed 08/16/17  Page 348 of 445 Page ID
Case 2:04-cv-05117-JLL-SWR  Document 7345-2  Filed 01/09/2009  Page 8 of 28  Page ID
#:1761

## COMPENSATION BY PROJECT CATEGORY

| Fee Summary - April 1, 2008 through April 30, 2008 | | |
|---|---|---|
| Matter | Hours | Fees |
| Case Administration (071) | 27.2 | $20,361.00 |
| Non-Working Travel (072) | 37.1 | $13,216.00 |
| Asset Analysis/Recovery (073) | 0.1 | $82.00 |
| Asset Disposition (074) | 34.4 | $17,105.50 |
| Relief from Stay Proceedings (075) | 13.2 | $7,690.50 |
| Meetings/Communications with Creditors (076) | 0.6 | $186.00 |
| Fee/Employment Objections (077) | 115.7 | $64,309.50 |
| Assumption/Rejection of Leases and Contracts (080) | 92.8 | $53,073.00 |
| Claims Administration and Objections (081) | 64.7 | $41,715.00 |
| Plan & Disclosure Statement (082) | 933.2 | $514,465.00 |
| General Litigation/Litigation Claims (083) | 67.4 | $32,370.50 |
| Reclamation Claims (086) | 1.0 | $520.00 |
| Fee/Employment Applications (087) | 88.2 | $36,609.00 |
| Employee Matters (Benefits, Pensions) (089) | 5.6 | $2,925.00 |
| Corporate and Securities Matters (090) | 24.3 | $17,015.00 |
| Tax Issues (091) | 36.0 | $23,495.00 |
| Government Investigations (093) | 141.8 | $52,603.50 |
| Warehouse Lenders (094) | 16.5 | $14,190.00 |
| Deferred Compensation Plan Litigation (095) | 21.1 | $12,605.50 |
| Access Lending (096) | 42.5 | $26,801.00 |
| WARN Litigation (097) | 21.4 | $12,206.00 |
| Examiner Issues (098) | 0.5 | $353.00 |
| Total | 1,785.3 | $963,897.00 |

LA3:1148107.1
RLF1-3300247-1

Exhibit A
16

## EXPENSE SUMMARY

| Expense Summary – April 1, 2008 through April 30, 2008 | |
|---|---|
| **Expense** | **Amount** |
| Copying (Equitrac – Internal) (E101E) | $521.20 |
| Lasertrak Printing (E101L) | $571.10 |
| Specialty Photocopying (E101SP) | $110.50 |
| Outside Printing/Reproduction (Photocopying) (E102A) | $3,048.45 |
| Outside Printing/Reproduction (Microfilming) (E102A1) | $890.55 |
| Outgoing Faxes (E104) | $10.00 |
| Telephone (Accounts Payable) (E105A) | $163.40 |
| Premiere Global Service Conference Call (E105P) | $16.93 |
| Online Research / Lexis-Nexis (E106L) | $625.14 |
| Online Research / Miscellaneous (E106M) | $344.48 |
| Online Research / Westlaw (E106W) | $525.47 |
| Delivery Services/Messengers (E107) | $2,053.61 |
| Local Travel (Taxi) (E109TX) | $70.47 |
| Expense Report Other - Includes Out of Town Travel (E110) | $407.08 |
| Out of Town Travel (Expense Reports - Meals) (E110EM) | $60.00 |
| Out-of-Town Travel (Direct Bill Firm – Airfare) (E110T) | $8,027.24 |
| Other Professionals (Accounts Payable) (E123A) | $1,816.89 |
| Other (Internal Bindery) (E124B1) | $1.25 |
| Scanning Services (Accuroute) (E130AR) | $28.10 |
| **Total** | **$19,291.86** |

Case 2:16-cv-05173-JSL-GJS Document 88-34 Filed 08/16/17 Page 350 of 445 Page ID
Case 1:04-cv-01731-SVW-RC Document 343-1 Filed 07/09/2008 Page 10 of 23
#:1763

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| NEW CENTURY TRS HOLDINGS, | : | **Case No. 07-10416(KJC)** |
| INC., a Delaware corporation, et al.,[1] | : | |
| | : | **Jointly Administered** |
| Debtors. | : | |
| | : | **Hearing Date: Only if Objection is Received** |
| | : | |
| | : | **Objection Deadline: July 28, 2008** |

## THIRTEENTH MONTHLY APPLICATION OF O'MELVENY & MYERS LLP FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES AS CO-COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD APRIL 1, 2008 THROUGH APRIL 30, 2008

Pursuant to Sections 330 and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Court's Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals dated April 25, 2007 [Docket No. 389] (the "Administrative Order"), O'Melveny & Myers LLP ("OMM") hereby files this Thirteenth Monthly Application for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors and Debtors in Possession for the Period from April 1, 2008 through and including April 30, 2008 (the "Application"). By this

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

Exhibit A
18

Application, OMM seeks a monthly allowance pursuant to the Administrative Order with respect to the sums of $771,117.60 (80% of $963,897.00) as compensation and $19,291.86 for reimbursement[2] of actual and necessary expenses for a total of $790,409.46 for the period April 1, 2008 through and including April 30, 2008 (the "Compensation Period"). In support of this Application, OMM respectfully represents as follows:

### Background

1.      On April 2, 2007 (the "Petition Date"), the Debtors, other than Access, filed the instant petitions for relief and the Debtors' bankruptcy cases are being jointly administered pursuant to an order of the Court. Access filed its chapter 11 petition on August 3, 2007 (the "Access Petition Date"). The Debtors are operating their business and managing their affairs as debtors and debtors in possession.

2.      The retention of OMM by the Debtors other than Access was approved effective as of the Petition Date by this Court's Order dated May 7, 2007 [Docket No. 567] (the "Retention Order"). The Retention Order authorized OMM to be compensated on an hourly basis and to be reimbursed for actual and necessary out-of-pocket expenses. Subsequently, on October 23, 2007, the scope of OMM's retention was expanded to include the representation of Access effective as of the Access Petition Date.

### Compensation Paid and its Source

3.      All services for which compensation is requested by OMM were performed for or on behalf of the Debtors.

4.      Except to the extent of the retainers paid to OMM as described in the applications seeking approval of OMM's employment by the Debtors during the period covered by this Application, OMM has received no payment and no promises for payment from any source for

---

[2]   In accordance with the procedures approved by the Court pursuant to the Administrative Order, upon the filing of a certificate of no objection with the Court, the Debtors are authorized to pay OMM an amount equal to the lesser of (i) 80% of the fees ($771,117.60) and 100% of the expenses ($19,291.86) requested in the Application and (ii) 80% of the fees and 100% of the expenses not subject to an objection.

services rendered or to be rendered in any capacity whatsoever in connection with the matters covered by this Application. There is no agreement or understanding between OMM and any other person other than the partners of OMM for the sharing of compensation to be received for services rendered in these cases.

## Fee Statements

5.      The fee statements for the Compensation Period are attached hereto as Exhibit A. The statements contain daily time logs describing the time spent by each attorney and paraprofessional for this period.[3] To the best of OMM's knowledge, this Application complies with Sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Guidelines adopted by the Office of the United States Trustee, Del. Bankr. L.R. 2016-2 and the Administrative Order.

## Actual and Necessary Expenses

6.      A summary of the actual and necessary expenses and daily logs of expenses incurred by OMM for the Compensation Period is attached hereto as Exhibit B. OMM has charged $1.00 per page for out-going facsimile transmissions and $.10 per page for photocopying expenses for the purposes of these bankruptcy cases, in accordance with Del. Bankr. L.R. 2016-2(e)(iii).[4] Actual long-distance carrier charges for outgoing facsimile transmissions are reflected in the long-distance telephone charges.

7.      Regarding providers of on-line legal research (e.g., LEXIS and WESTLAW), OMM charges all its clients the standard usage rates these providers charge, which, due to contractual flat fees, may not always equal OMM's actual cost. OMM is currently under contract to pay these providers a flat fee every month. For certain months the flat fee may be higher than actual usage. For certain other months the flat fee may be lower than actual usage.

---

[3] OMM's word processing and distribution handling expenses are not included in its overhead but instead are charged separately to clients. OMM generally charges its bankruptcy clients at the same rates as its non-bankruptcy clients but, consistent with applicable guidelines, is not seeking reimbursement from the Debtors' estates for these actual incurred expenses.

[4] OMM typically charges its clients $1.25 per page for out-going facsimile transmissions and $0.15 per page for photocopying expenses.

Charging its clients the on-line providers' standard usage rates allows OMM to cover adequately · the monthly flat fees it must pay to these types of providers.

       8.    OMM believes the foregoing rates are the market rates that the majority of law firms charge clients for such services. In addition, OMM believes that such charges are in accordance with the American Bar Association's ("ABA") guidelines, as set forth in the ABA's Statement of Principles, dated January 12, 1995, regarding billing for disbursements and other charges.

**Summary of Services Rendered**

       9.    The partners, counsel and associates who rendered professional services in this case during the Compensation Period are: Robert Rizzi, Ben Logan, David Krinsky, Gordon Krischer, Kathryn Sanders, Suzzanne Uhland, Alejandro Mayorkas, Shannon Lowry Nagle, Thomas Riordan, Gary Tell, C. Brophy Christensen, Victoria Newmark, J. Jorge DeNeve, Summer Conley, Christopher Campbell, Allan Johnson, Natausha Wilson, Justin Laubach, Arthur (Schan) Duff, Emily Culler, Laine Mervis, Andrew Parlen, Scott Sugino, Joshua Weisser, Jennifer Halvas, Mike Symons, Nima Amini, Abby Schwartz, Ana Acevedo, Danielle Oakley, Adrian Pollner, Michael Scheppele, Angela Wang, Melanie McLaughlin, Sue Derian, Ryan Austin, and Timothy Caballero.

      10.    The paraprofessionals of OMM who provided services to the attorneys in these cases are: Lynn Talab, Gregory Trotter, Timothy Sheehan, Michael Donovan, James McCarthy, Debra Fisher, Denise Lieu, Catherine Mirhady, Karen Nguyen, Ryan Lopez, Brian Osimiri, Elizabeth Ene, and Stella Kim. OMM by and through the above-named persons, has prepared and/or assisted in the preparation of various applications and orders submitted to the Court for consideration, advised the Debtors on a regular basis with respect to various matters in connection with these cases, and has performed professional services which are described and narrated in detail hereafter.

**Summary of Services by Project**

      11.    The services rendered by OMM during the Compensation Period can be

grouped into the categories set forth below.

A.    <u>Case Administration (071)</u>

Fees: $20,361.00          Total Hours: 27.2

This category includes all matters related to filing documents with the Court, service thereof, maintenance of calendars, communications with the U.S. Trustee, regular status calls including management and professionals, review of work in process reports, review of notices of appearances and maintaining services lists.

B.    <u>Non-Working Travel (072)</u>

Fees: $13,216.00          Total Hours: 37.1

This category includes all travel time not otherwise chargeable (and is billed at one-half the normal billing rate) in accordance with Del. Bankr. L.R. 2016-2(e)(iii).

C.    <u>Asset Analysis (073)</u>

Fees: $82.00          Total Hours: 0.1

This category includes all matter relating to the analysis of the Debtors assets.

D.    <u>Asset Disposition (074)</u>

Fees: $17,105.50          Total Hours: 34.4

This category includes all matters relating to the disposition of property of the estate. OMM provided significant services during these cases assisting the Debtors' efforts in pursuing major asset sales and during the Compensation Period continued to render services in connection with follow up matters related to these transactions. On May 7, 2007, the Court entered an order approving the sale of a pool of approximately 2,200 unencumbered mortgage loans to Ellington Management Group, L.L.C. on behalf of its Client Funds ("Ellington"). On May 23, 2007, the Court authorized the sale of the Debtors' servicing business (the "Carrington Sale") to Carrington Mortgage Services, LLC, an affiliate of Carrington Capital Management, LLC. On June 27, 2007, the Court approved an amendment to that sale agreement approving the sale of additional loans to Ellington. On July 3, 2007, the Court entered an order approving the sale of certain technology assets to EquiFirst Corporation. On September 14, 2007, the Court authorized

the sale of 235 mortgage loans (the "Disputed Loans"), the rights to which were disputed between

the Debtors and Deutsche Bank Structured Properties, Inc. Finally, on January 24, 2008, the Court

authorized the sale of 41 mortgage loans (the "Ohio LNFA")of the sale of such loans (subject to

overbid) to GRP Financial Services Corporation for approximately $1.4 million. Those sales are

now successfully closed.

During the Compensation Period, OMM's efforts included attending to post-closing

matters associated with the Carrington Sale. In that regard OMM spent time working with the

Debtors in connection with the assignment of certain licenses and contracts to Carrington. OMM

also spent time attending to post-closing matters regarding the Ohio LNFA sale. Additionally,

during the Compensation Period, OMM also spent substantial time advising the Debtors in

connection with and facilitating the sale of miscellaneous assets (particulary intellectual property

assets) pursuant to Court-approved procedures.

E.    Relief from Stay Proceedings (075)

    Fees: $7,690.50          Total Hours: 13.2

This category includes all matters related to and including all motions and

stipulations to modify the automatic stay and issues related to the effect of the automatic stay or

pending matters.

F.    Meetings/Communications with Creditors (076)

    Fees: $186.00          Total Hours: 0.6

OMM spent time during the Compensation Period receiving and responding to

numerous written and telephonic queries from creditors.

G.    Fee/Employment Objections (077)

    Fees: $115.7          Total Hours: 115.7

This category includes all matters related to (i) responding to objections to OMM's

employment and fee applications and (ii) objecting to employment and fee applications on behalf

of the Debtors. During the Compensation Period, OMM spent its time in this category responding

to the Fee Auditor's initial report regarding OMM's fees during the period April 2, 2007 through

July 31, 2007.

H.    <u>Assumption/Rejection of Leases and Contracts (080)</u>

    Fees: $53,073.00        Total Hours: 92.8

This category includes all matters related to contract and lease analysis and matters related to assumption, assignment or rejection of executory contracts and unexpired leases. During the Compensation Period, OMM analyzed its claims under contracts with third parties. Additionally, on behalf of the Debtors, OMM was successful in reaching an agreement with Accenture, pursuant to which Accenture agreed to pay the Debtors $1.9 million and to release $6.3 million of claims against the Debtors' estates. OMM drafted a motion seeking approval of this settlement agreement, which motion was granted by the Bankruptcy Court on April 21, 2008.

I.    <u>Claims Administration and Objections (081)</u>

    Fees: $41,715.00        Total Hours: 64.7

This category includes all matters related to and including claims administration matters and bar date matters, including claims objections and related contested matters. Among other tasks, OMM worked with the Debtors and their other professionals to analyze claims filed against the Debtors, strategize with respect to the claims objection process, and prepare omnibus objections to claims. Moreover, OMM spent time in this category negotiating with creditors holding claims to which the Debtors had previously objected. During the Compensation Period OMM also rendered services in connection with the Debtors' equipment financing arrangement with GMAC and the respective rights of the Debtors and GMAC. Additionally, OMM worked with the Debtors to resolve large claims filed by the state of Ohio and AT&T.

J.    <u>Plan & Disclosure Statement (082)</u>

    Fees: $514,465.00        Total Hours: $933.2

This category includes all matters related to the the joint chapter 11 plan of liquidation of the Debtors and the Committee (the "Plan"). Much of services rendered by OMM in this matter during the Compensation Period related to preparing for the April 24-25, 2008 hearing on the confirmation of the Plan (the "Confirmation Hearing"). Leading up to the Confirmation

Hearing, OMM coordinated the Debtors' document production to the Ad Hoc Committee of
Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or
Supplemental Executive Retirement/Savings Plan (the "Ad Hoc Committee"). OMM also
prepared Holly Etlin and Todd Brents for their depositions by the Ad Hoc Committee and
defended them at their depositions. Additionally, OMM worked with numerous creditors, the
Securities and Exchange Commission, and the Office of the United States Trustee to resolve both
formal and informal objections to the Plan, which efforts resulted in only two standing objections
to the Plan at the Confirmation Hearing and the filing of a second amended plan on April 23, 2008.
OMM also was primarily responsible for all briefing related to the Plan, which included an
extensive reply brief in response to the objections of the Ad Hoc Committee and the New York
State Teachers' Retirement System as lead plaintiff in a securities class action suit. Among other
tasks, OMM communicated with numerous creditors of the Debtors regarding the Plan, assisted
with the preparation of the Liquidating Trust Agreement and the Plan Administrator Agreement,
drafted a motion requesting an order approving modifications to the Plan, prepared a draft
Confirmation Order, drafted declarations of Holly Etlin and Todd Brents in support of the Plan,
negotiated voting stipulations, and attended to other matters regarding Plan voting. Subsequently,
on April 24 and 25, 2008, three OMM attorneys attended the Confirmation Hearing.

  K.  <u>General Litigation/Litigation Claims (083)</u>

    Fees: $32,370.50   Total Hours: 64.7

    This category includes all matters relating to pending state court litigation matters
and adversary proceedings for which no separate matter is listed.

  L.  <u>Reclamation Claims (086)</u>

    Fees: $ 520.00  Total Hours: 1.0

    This category includes the analyses of reclamation claims asserted in the Debtors'
cases. During the Compensation Period, OMM negotiated and drafted a supplemental stipulation
regarding the reclamation claim of KST Data, Inc.

M.  <u>Fee/Employment Applications (087)</u>

Fees: $36,609.00          Total Hours: 88.2

This category includes all matters related the retention and compensation of professionals in the Debtors' cases. During the Compensation, OMM prepared its monthly fee applications for February 2008 and March 2008. OMM also completed a supplemental declaration in support of its employment so as to remain in compliance with Rule 2014 of the Federal Rules of Bankruptcy Procedure, which task included an extensive supplemental conflicts check.

N.  <u>Employee Matters (Benefits, Pensions) (089)</u>

Fees: $2,925.00          Total Hours: 5.6

This category includes all matters related to employee wages, employee plans, benefits, other employee relations matters and retiree benefits. During the Compensation Period, OMM's time in this matter centered on addressing issues related to the Department of Labor's audit of the Debtors' 401(k) plan.

O.  <u>Corporate and Securities Matters (090)</u>

Fees: $17,015.00          Total Hours: 24.3

This category includes the drafting of board resolutions, the preparation and filing of reports required by the Securities and Exchange Commission, preparing materials for and attending board of directors meetings, and related research.

P.  <u>Tax Issues (091)</u>

Fees: $3,495.00          Total Hours: 36.0

This category includes all federal and state income, property, employment, excise and other tax matters, other than tax aspects of a chapter 11 plan. During the Compensation Period, OMM spent a substantial amount of time within this category analyzing the Debtors' tax liabilities and assisting the Debtors in connection with the ongoing IRS audit, including communicating with IRS counsel regarding the IRS' proof of claim and with the Committee regarding open audit issues.

Q. **Government Investigations (093)**

Fees: $52,603.50      Total Hours: 141.8

Continuing its work from prior to the Petition Date, OMM assisted the Debtors in addressing certain ongoing investigations being conducted by the U.S. Department of Justice and the Securities and Exchange Commission relating to prepetition criminal and regulatory investigations by such entities.

R. **Warehouse Lenders (094)**

Fees: $14,190.00      Total Hours: 16.5

This category includes all matters related to the Debtors' master repurchase agreements and master loan purchase agreements and to the Debtors' disputes with the counterparties to such agreements. OMM spent time during the Compensation Period analyzing and negotiating the deficiency claims of coutnerparties to master repurchase agreements

S. **Deferred Compensation Plan Litigation (095)**

Fees: $12,605.50      Total Hours: 21.1

This category includes all matters related to litigation concerning the Debtors' deferred compensation plan (the "Deferred Compensation Plan Litigation"). In particular, OMM continued its analysis of the documents governing the Debtors' deferred compensation plan and its fact investigation and legal analysis pertaining to the Deferred Compensation Plan Litigation. Additionally, OMM engaged in strategy discussions with the Committee.

T. **Access Lending (096)**

Fees: $26,801.00      Total Hours: 42.5

This category includes all matters related to the Access chapter 11 case. During the Compensation Period, OMM analyzed claims against Access Lending, worked to negotiate a settlement with Access Lending's largest creditor regarding its claim against Access Lending, and negotiating payment of amounts owed under the asset purchase agreement pursuant to which the assets of Access Lending were sold to Access Holdings. In addition, OMM spent substantial time

in this matter modifying Access Lending provisions of the Plan and drafting a motion related .

thereto.

    U.    <u>WARN Litigation (097)</u>

        Fees: $12,206.00        Total Hours: 21.4

        This category includes all matters related to the WARN Act lawsuit brought against

the Debtors, for which O'Melveny assumed responsibility at the end of June, 2007. During the

Compensation Period, OMM spent time in this category negotiating a settlement of the ligitation

with the plaintiffs and the Committee.

    V.    <u>Examiner Issues (098)</u>

        Fees: $353.00        Total Hours: 0.5

        This category includes all matters related to facilitating the Debtors' cooperation

with the investigation being conducted by the Court-appointed examiner.

<b><u>Valuation of Services</u></b>

        12.    Attorneys and paraprofessionals of OMM have expended a total of 1,785.3

hours in connection with this matter during the Compensation Period.

        13.    The nature of the work performed by these persons is fully set forth in

Exhibit A attached hereto. These are OMM's normal hourly rates for work of this character. The

reasonable value of the services rendered by OMM to the Debtors during the Compensation Period

is $963,897.00.

        14.    In accordance with the factors set forth in Section 330 of the Bankruptcy

Code, OMM respectfully submits that the amounts requested are fair and reasonable given (a) the

complexity of this case, (b) the time expended, (c) the nature and extent of the services rendered,

(d) the value of such services and (e) the costs of comparable services other than in a case under

this title. Moreover, OMM has reviewed the requirements of Del. Bankr. L.R. 2016-2 and believes

that this Application complies with that Rule.

Case 2:16-cv-05173-TJS-GJS Document 88-3 Filed 08/16/17 Page 361 of 445 Page ID
Case 1:04-cv-01731-SVW-RC Document 843-12 Filed 01/09/2009 Page 21 of 23
#:1774

WHEREFORE, OMM respectfully requests that the Court enter an order providing
that, for the Compensation Period, an allowance be made to OMM with respect to the sum of
$771,117.60 (80% of $963,897.00) as compensation for necessary professional services rendered,
and the sum of $19,291.86 for reimbursement of actual necessary costs and expenses, for a total of
$790,409.46, and that such sums be authorized for payment less any sums that have been
previously paid to OMM pursuant to the Administrative Order, and for such other and further
relief as the Court may deem just and proper.

Dated:  July 8, 2008
Wilmington, Delaware

Respectfully submitted,


/s/ Andrew M. Parlen_____
Suzzanne Uhland
Ben H. Logan
Andrew M. Parlen
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

Case 2:16-cv-05173-JHL-GJS Document 88-3 Filed 08/16/17 Page 362 of 445 Page ID
#:1775
Case 2:04-cv-07731-SVW-RC Document 843-2 Filed 01/09/2008 Page 22 of 23

## VERIFICATION

STATE OF CALIFORNIA)
COUNTY OF ORANGE   )

Suzzanne Uhland, after being duly sworn according to law, deposes and says:

a)  I am counsel with the applicant firm, O'Melveny & Myers LLP, co-counsel to the Debtors in the above-captioned matter.

b)  I have performed and am familiar with the work performed on behalf of the Debtors by O'Melveny & Myers LLP.

c)  I have reviewed the foregoing Application and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I have reviewed Del. Bankr. L.R. 2016-2 and submit that the Application substantially complies with such Rule.

_____
Suzzanne Uhland

SWORN AND SUBSCRIBED before me this ___th day of _____, 2008

_____
Notary Public

LA3:1148107.1

1

Exhibit A
30

## CALIFORNIA JURAT WITH AFFIANT STATEMENT

X See Attached Document (Notary to cross out lines 1–6 below)
See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____     _____
Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

State of California

County of __Orange__

Subscribed and sworn to (or affirmed) before me on this
__7th__ day of __July__, 20__08__ by
Date         Month                Year

(1) __Suzanne Uhland__,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

                                    (and

(2) _____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _____
Signature of Notary Public

MICHELE R. RABUDO
Commission # 1618933
Notary Public - California
Orange County
My Comm. Expires Dec 2, 2009

Place Notary Seal Above

——————— OPTIONAL ———————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document:_____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

Exhibit A
31

# DECLARATION OF JAMES GILLIAM

## DECLARATION OF JAMES W. GILLIAM

I, JAMES W. GILLIAM, declare:

1.     I am an attorney admitted to practice in the State of California. I make this declaration from facts of which I have personal knowledge; if I were called upon to testify to those facts, I could and would do so competently.

2.     I received my J.D. degree in 2003 from Loyola Law School and began working in the litigation department of Paul, Hastings, Janofsky & Walker LLP's ("Paul Hastings") Los Angeles office that same year. I left Paul Hastings in March 2010 to become the Deputy Executive Director at the ACLU of Southern California.

3.     I am submitting this declaration in support of Plaintiff's motion for attorneys' fees, to support the reasonableness of the hourly rates sought by Plaintiff's attorneys.

4.     During the six years I worked at Paul Hastings, I was the attorney responsible for allocating the budgets and then reviewing the Billing Summary Reports for all of our office's more than 400 pro bono matters. In performing that function, I learned the hourly rates that Paul Hastings charges for various of the firm's attorneys, based on their years of experience and expertise, including Paul Hastings' hourly billing rates for the year 2010.

5.     I understand that Plaintiff is seeking compensation for Mark Rosenbaum, a 1974 law school graduate at a rate of $775 per hour. Under the current billing rate schedule at Paul Hastings, an attorney with the skill and experience of Mr. Rosenbaum would be billed at a rate of $940 per hour. Based on my overall knowledge of the market for legal services, I believe this rate is well within the upper range of rates charged by Los Angeles firms for attorneys with that level of experience, background and specialized expertise. Accordingly, I believe that the $775 rate at which Mr. Rosenbaum is seeking compensation is

1

1  well within the range of rates within the market for a lawyer with his skill and

2  experience in Los Angeles.

3      6.    I understand that Plaintiff is seeking compensation for Hector

4  Villagra, a 1994 law school graduate, at a rate of $575.  Under the current billing

5  rate schedule at Paul Hastings, an attorney with the skill and experience of Mr.

6  Villagra would be billed at a rate of $725  per hour.  Based on my overall

7  knowledge of the market for legal services, I believe this rate is well within the

8  upper range of rates charged by Los Angeles firms for attorneys with that level of

9  experience, background and specialized expertise.  Accordingly, I believe that the

10  $575 rate at which Mr. Villagra is seeking compensation is well within the range

11  of rates within the market for a lawyer with his skill and experience in Los

12  Angeles.

13      7.    I understand that Plaintiff is seeking compensation for Peter

14  Eliasberg, a 1994 law school graduate at a rate of $575 per hour.  Under the

15  current billing rate schedule at Paul Hastings, an attorney with the skill and

16  experience of Mr. Eliasberg would be billed at a rate of $725 per hour.  Based on

17  my overall knowledge of the market for legal services, I believe this rate is well

18  within the upper range of rates charged by Los Angeles firms for attorneys with

19  that level of experience, background and specialized expertise.  Accordingly, I

20  believe that the $575 rate at which Mr. Eliasberg is seeking compensation is well

21  within the range of rates within the market for a lawyer with his skill and

22  experience in Los Angeles.

23      8.    I understand that the Plaintiff is seeking compensation for Ahilan

24  Arulanantham, a 1999 Yale Law School graduate, at a rate of $525 per hour.

25  Under the current billing rate schedule at Paul Hastings, an attorney with Mr.

26  Arulanantham's skill and experience would be billed at a rate of $670 per hour.

27  Based on my overall knowledge of the market for legal services, I believe this rate

28

2

DECLARATION OF JAMES W. GILLIAM
IN SUPPORT OF ATLF'S MOTION FOR AWARD OF ATTORNEYS' FEES

1    is well within the upper range of rates charged by Los Angeles firms for attorneys

2    with that level of experience, background, and specialized expertise. Accordingly,

3    I believe that the $525 rate at which Mr. Arulanantham is seeking compensation is

4    well within the range of rates within the market for a lawyer with his skill and

5    experience in Los Angeles.

6         9.    I understand that the Plaintiff is seeking compensation for Belinda

7    Escobosa Helzer, a 2000 law school graduate, at a rate of $500 per hour. Under

8    the current billing rate schedule at Paul Hastings, a lawyer with Ms. Escobosa

9    Helzer's skill and experience would be billed at a rate of $660 per hour. Based on

10   my overall knowledge of the market for legal services, I believe this rate is well

11   within the upper range of rates for lawyers with that level of experience in the Los

12   Angeles market. Accordingly, I believe that the $500 rate at which Ms. Escobosa

13   Helzer is seeking compensation is well within the range of rates within the market

14   for a lawyer with her skill and experience in Los Angeles.

15        10.   I understand that Plaintiff is seeking compensation for two paralegals,

16   Linda Dominic Ashe and Christian Lebano, both of whom have more than five

17   years experience as paralegals, at a rate of $175 per hour. Under the current

18   billing rate schedule at Paul Hastings, paralegals with Ms. Ashe and Mr. Lebano's

19   experience would be billed at a rate of $335 per hour, a rate that is well within the

20   upper range of rates for paralegals with that level of experience in the Los Angeles

21   market. Accordingly, I believe the $175 rate at which the two paralegals are

22   seeking compensation is at the low end of the range of rates for paralegals with

23   their level of experience in the Los Angeles market.

24        11.   I understand that Plaintiff is seeking compensation for costs relating

25   to attorney travel (mileage). At Paul Hastings, that cost would be charged to a fee-

26   paying client.

27        I declare under penalty of perjury that the foregoing is true and correct.

28
                                          3

11.    I understand that Plaintiff is seeking compensation for costs relating to attorney travel (mileage).  At Paul Hastings, those costs would be charged to a fee-paying client.

I declare under penalty of perjury that the foregoing is true and correct. Executed November 17, 2010 in Los Angeles, California.

_JAMES W. GILLIAM_

JAMES W. GILLIAM

DECLARATION OF JAMES W. GILLIAM
IN SUPPORT OF ATLF'S MOTION FOR AWARD OF ATTORNEYS' FEES

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD SANCHEZ, individually and as successor-in-interest; GABRIEL SANCHEZ, individually and as successor-in-interest; MALACHI SANCHEZ, individually and as successor-in-interest; J.S., a minor by and through his guardian ad litem, YVONNE VARELA, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF SAN BERNARDINO; SERGEANT CASEY JILES; DEPUTY ANTEKEIER; and DOES 1-10, inclusive, <br><br> Defendants. | CASE NO. CV 10-09384 MMM (OPx) <br><br> ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS |

Plaintiffs Donald Sanchez, Gabriel Sanchez, Malachi Sanchez's, and Jacob Sanchez filed a motion for attorneys' fees and costs on November 14, 2013.[1] The defendant, San Bernardino Police Sergeant Casey Jiles, opposes the motion.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 9, 2010, plaintiffs sued Jiles, the County of San Bernardino ("the County"), Deputy Andrew Antekeier, and various fictitious defendants.[3] The complaint alleged eleven causes of action based on Jiles' February 10, 2010 shooting of plaintiffs' father, Don Richard, and Don Richard's subsequent death.[4] Seven of these claims were asserted under 42 U.S.C. §§ 1983 and 1985, and alleged unreasonable detention and arrest, excessive force, denial of medical care, violation of substantive due process, conspiracy to violate civil rights, conspiracy to cover up violations of Don Richard's civil rights, and municipal and supervisory liability under *Monell*. The complaint also alleged state law claims for false arrest and false imprisonment, battery, negligence, and violation of the Bane Civil Rights Act, California Civil Code § 51.7.

On June 6, 2011, after plaintiffs filed a notice of non-opposition, the court granted defendants' motion to dismiss, dismissing their *Monell* claim against Jiles and Antekeier and all of the state law claims.[5] On February 24, 2012, the court dismissed Antekeier pursuant to the

---

[1]Second Motion for Attorneys' Fees ("Motion"), Docket No. 259 (Nov. 14, 2013). Because the decedent, Donald Richard Sanchez, Sr. and several of the plaintiffs share the same last name, for clarity, the court refers to the decedent in this order, as it has in prior orders, as "Don Richard."

[2]Opposition to Motion for Attorneys' Fees ("Opposition"), Docket No. 270 (Jan. 31, 2014).

[3]Yvonne Varela sued as guardian ad litem for plaintiff Jacob Sanchez, who was a minor when the action was filed.

[4]Complaint, Docket No. 3 (Dec. 9, 2010).

[5]Order Granting Defendants' Motion to Dismiss, Docket No. 13 (June 6, 2011).

parties' stipulation.[6]  On February 29, 2012, also pursuant to stipulation, the court dismissed plaintiffs' claims for unreasonable detention and arrest, denial of medical care, conspiracy to violate civil rights, conspiracy to cover up violations of Don Richard's civil rights, and municipal and supervisory liability under *Monell*.[7]  As a result of the dismissal of the *Monell* claim, the parties then stipulated to dismiss the County, which the court did.[8]

Following the entry of these orders, Jiles was the sole remaining defendant.  The remaining claims were plaintiffs' claim that Jiles used excessive force in violation of the Fourth Amendment when he shot Don Richard, and that Jiles violated plaintiffs' substantive due process rights by interfering with their familial relationship with their father.  These two claims were tried to a jury between June 26 and June 29, 2012.  On July 3, 2012, the jury returned a verdict in favor of Jiles on plaintiffs' due process claim but could not reach a unanimous verdict on plaintiffs' excessive force claim.[9]  The court directed the parties to participate in a settlement conference before Magistrate Judge Jay C. Gandhi,[10] which they did on November 1, 2012.[11]  The case did not settle.[12]  As a result, the excessive force claim was retried between January 8 and January 14,

---

[6]Order Granting Stipulation to Dismiss Individual Defendant Deputy Antekeier, Docket No. 33 (Feb. 24, 2012).

[7]Order Granting Stipulated Dismissal with Prejudice of the First, Third, Fifth, Sixth, and Seventh Claims, and Plaintiffs' Claim Defendants Deprived, or Conspired to Deprive, Plaintiffs' Decedent's Rights to Equal Protection and Immunities Because of His Hispanic Race, Docket No. 34 (Feb. 29, 2012).  See also Pre-Trial Conference Order, Docket No. 96 (Apr. 30, 2011).

[8]Order Granting Joint Stipulation to Dismiss County of San Bernardino, Docket No. 162 (June 28, 2012).

[9]Jury Verdict from First Trial ("First Verdict"), Docket No. 175 (July 3, 2012).

[10]Order Regarding Settlement Conference, Docket No. 181 (Aug. 2, 2012).

[11]Minutes of Settlement Conference, Docket No. 189 (Nov. 1, 2012).

[12]Second Order Regarding Settlement Conference, Docket No. 190 (Nov. 8, 2012).

2013.    The second jury returned a unanimous verdict in favor of plaintiffs and awarded $200,000.00 in damages.[13]

On January 29, 2013, Jiles filed a motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, arguing that he was entitled to qualified immunity.[14]  On September 12, 2013, the court denied the motion,[15] and on October 30, 2013, it entered judgment in favor of plaintiffs.[16]  On November 13, 2013, plaintiffs filed a motion for attorneys' fees.[17]  The court struck the motion on November 14, 2013, because plaintiffs had set it for hearing on a date that was closed on the court's calendar.[18]  That same day, plaintiffs filed a new motion for attorneys' fees, setting the motion for hearing on February 24, 2014.

## II.  DISCUSSION

### A.    Whether the Court Should Deny the Motion on Procedural Grounds

Jiles argues first that the court should deny plaintiffs' motion on procedural grounds because it was untimely, because plaintiffs' attorney did not meet and confer with opposing counsel prior to filing the motion, because the motion does not include the time and date of the hearing on the first page, and because it does not state that counsel met and conferred before the motion was filed.

---

[13]Jury Verdict from Second Trial ("Second Verdict"), Docket No. 232 (Jan. 15, 2013).

[14]Renewed Motion for Judgment as a Matter of Law, Docket No 236 (Jan. 29, 2013).

[15]Order Denying Motion for Judgment as a Matter of Law ("JMOL Order"), Docket No. 253 (Sept. 12, 2013).

[16]Judgment on the Verdict for the Plaintiff ("Judgment"), Docket No. 254 (Oct. 30, 2013).

[17]Plaintiffs' First Motion for Attorneys' Fees, Docket No. 257 (Nov. 13, 2013).

[18]Order Striking Plaintiffs' First Motion for Attorneys' Fees, Docket No. 248 (Nov. 14, 2013).

### 1.     Whether Plaintiffs' Motion Is Untimely

The procedure for requesting attorneys' fees is set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure.  That Rule provides that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages. . . .  Unless a statute or a court order provides otherwise, the motion must[ ] be filed no later than 14 days after the entry of judgment."  FED.R.CIV.PROC. 54(d)(2); see also CA CD L.R. 54-10 ("Any motion or application for attorneys' fees shall be served and filed within fourteen (14) days after the entry of judgment or other final order, unless otherwise ordered by the Court").  "Although 'the 14-day period [set forth in Rule 54] is not jurisdictional, the failure to comply [with Rule 54] should be sufficient reason to deny the fee motion, absent some compelling showing of good cause.'"  *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 889-90 (9th Cir. 2000) (quoting 10 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 54.151[1] (3d ed. 2000) (second alteration original)).

Judgment was entered in this case on October 30, 2013.  Plaintiffs' motion for attorneys' fees should therefore have been filed on November 13, 2013.  Plaintiffs in fact filed a motion for attorneys' fees that day, but, as noted, the clerk struck the motion on November 14, 2013 because it was set for a date that was closed on the court's calendar.  The text entry striking the motion also noted that plaintiffs' motion had not included an indication on the first page of the date and time of the hearing as required by Local Rule 7-4.[19]  Plaintiffs refiled the motion that day.  Jiles argues that plaintiffs have not shown good cause for a late filing because plaintiffs' need to refile the motion was due to their failure to comply with the Local Rules and failure to have ascertained the court's closed motion days prior to setting the motion for hearing.[20]

---

[19]Local Rule 7-4 provides that "[o]n the first page of the notice of motion and every other document filed in connection with the motion, there shall be included, under the title of the document, the date and time of the motion hearing."  CA C.D. L.R. 7-4.

[20]Opposition at 4-5.

5

Plaintiffs' motion was not untimely under the Federal Rules of Civil Procedure, however. Rule 5(d)(4) states that "[t]he clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice." FED.R.CIV.PROC. 5(d)(4). See *Klemm v. Astrue*, 543 F.3d 1139, 1143 (9th Cir. 2008) (holding that the clerk was obligated to accept appellant's notice of appeal for filing, even though appellant failed to comply with local filing rules, citing FED.R.CIV.PROC. 5(d)(4)); *MD Propertyco, LLC v. Mad Dog Saloon AZ, L.L.C.*, No. CV–12–2516–PHX–LOA, 2012 WL 5984950, *3 (D. Ariz. Nov. 28, 2012) ("[T]he Clerk of Court is not authorized to strike a non-conforming pleading or filing," citing FED.R.CIV.PROC. 5(d)(4)); *Zepeda v. Walker*, 564 F.Supp.2d 1179, 1183 (C.D. Cal. 2008) ("[A] pleading may be deemed filed even if the pleading is not in compliance with filing rules," citing *Ordonez v. Johnson*, 254 F.3d 814, 816 (9th Cir. 2001) ("We have previously held that a complaint is filed when it is placed in the actual or constructive custody of the clerk [of the court], despite any subsequent rejection by [the clerk] of the pleading for non-compliance with a provision of the local rules" (internal quotation omitted; alterations original), and *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)). For that reason, although the motion may have failed to comply with the local rules or was otherwise deficient, it was not untimely. It was deemed filed when plaintiffs docketed it on November 13, 2013.

## 2. Whether Plaintiffs Failed to Comply with Local Rule 7-3

Local Rule 7-3 provides that "[i]n all cases . . . , counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution. The conference shall take place at least seven (7) days prior to the filing of the motion." CA CD L.R. 7-3. Plaintiffs report that they met and conferred with opposing counsel prior to filing the motion. Dale Galipo has submitted a declaration that states:

"Prior to filing the instant motion for attorney fees I had numerous discussions with Defense counsel Dana A. Fox regarding the pending attorney fees motion and the settlement of the case, but no resolution could be reached. Since no resolution

Case 2:16-cv-05041-TJH-GJS   Document 28-7   Filed 08/16/17   Page 375 of 445   Page ID
Case 2:10-cv-09584-MMM-GJS   Document 279-7   Filed 03/20/14   Page 7 of 53   Page ID #5791
#:1788

1     could reached prior to the final date to file the attorney fees motion I timely filed

2     Plaintiffs['] motion for attorney fees on November 13, 2013."[21]

3  Jiles has adduced no evidence contradicting this statement; he merely offers attorney argument that

4  plaintiffs failed to meet and confer.  This is insufficient to rebut Galipo's sworn statement that he

5  complied with the meet and confer requirement.  Accordingly, the court cannot find that failure

6  to conduct a prefiling conference warrants denial of the motion.

7        **3.**    **Whether the Court Should Deny Plaintiffs' Motion Due to Procedural**

8            **Errors**

9     Under Local Rule 83-7, the court can sanction a party as it deems appropriate for "[t]he

10  violation of or failure to conform to any of the[ ] Local Rules" if the court finds the failure was

11  "willful, grossly negligent, [ ] reckless . . . bad faith and/or a willful disobedience of a court

12  order."  CA CD L.R. 83-7.  Plaintiffs concede they did not comply with Local Rule 7-3 because

13  they failed to include a statement in the notice of motion that "[the] motion [was] made following

14  the conference of counsel pursuant to L.R. 7-3, which took place on (date)."   They also

15  acknowledge that they did not comply with Local Rule 7-4 because they failed to note on the first

16  page of the motion the date and time of the motion hearing.[22]  The court cannot conclude,

17  however, that plaintiffs' failure to adhere to these rules constitutes willfulness, recklessness or bad

18  faith.  While the omissions may have been the result of negligence, the court declines to impose

19  the harsh sanction of denying plaintiffs attorneys' fees because of two procedural mistakes.  See

20  *Brodie v. Board of Trustees of California State University*, No. CV 12-07690 DDP (AGRx), 2013

21  WL 4536242, *1 (C.D. Cal. Aug. 27, 2013) (considering the merits of a motion despite counsel's

22  failure to comply with Local Rule 7-3); *Williams-Ilunga v. Gonzalez*, No. CV 12–08592 DDP

23  (AJWx), 2013 WL 571795 at *4 (same); *Reed v. Sandstone Properties, L.P.*, No. CV 12–05021

24  MMM (VBKx), 2013 WL 1344912, *6 (C.D. Cal. Apr. 2, 2013) (electing to consider a motion

25

---

26     [21]Reply in Support of Motion for Attorneys' Fees ("Reply"), Docket No. 271 (Feb. 10,
2014), Exh. 1 (Reply Declaration of Dale K. Galipo in Support of Motion for Attorneys' Fees

27  ("Galipo Reply Decl."), ¶ 4).

28     [22]Reply at 3-4.

even though the prefiling conference was untimely); *Thomas v. U.S. Foods, Inc.*, No. 8:12–cv–1221–JST (JEMx), 2012 WL 5634847, *1 n. 1 (C.D. Cal. Nov. 14, 2012) (considering a motion despite the fact that the movant had not met and conferred with his opponent); *Wilson-Condon v. Allstate Indemnity Co.*, No. CV 11–05538 GAF (PJWx), 2011 WL 3439272, *1 (C.D. Cal. Aug. 4, 2011) (same).

**B.    Whether the Court Should Grant Jiles' *Ex Parte* Application for an Order Allowing Him to File Evidentiary Objections**

On February 14, 2014, Jiles filed an *ex parte* application seeking an order permitting him to file objections to the declarations that plaintiffs' counsel filed in support of their reply.[23] Concurrently with his application, Jiles proffered proposed objections to the declarations. Jiles contends that counsel submitted new evidence by (1) requesting that the court award additional attorneys' fees incurred in connection with preparation of the reply; (2) submitting a recent case that awarded attorneys' fees to counsel; (3) stating that Jiles made no meaningful offer to settle the case; (4) clarifying Navab's role at the second trial; (5) explaining the applicable time period covered by the Schlueters' request for fees in another case; and (6) expanding on Peter Schlueter's civil trial experience and his role in this case.

The court can refuse to consider evidence or argument offered for the first time in reply. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief"). The court can properly consider evidence and argument offered in reply that is responsive to points raised in the non-moving party's opposition, however. See *United States v. Taibi*, No. 10–CV–2250 JLS, 2012 WL 553143, *4 (S.D. Cal. Feb. 21, 2012) ("[B]ecause the[ ] documents respond directly to Defendant's allegations made in his opposition brief, the Court finds it may properly consider this rebuttal evidence even though it was offered for the first time in Plaintiff's reply brief," citing *EEOC v. Creative Networks, LLC and Res–Care, Inc.*, No. CV–05–3032–PHX–SMM, 2008 WL 5225807,

---

[23]*Ex Parte* Application for Order to File Evidentiary Objections ("Application"), Docket No. 272 (Feb. 14, 2014).

8

*2 (D. Ariz. Dec. 15, 2008) (reviewing the rule that a party may not provide "new" evidence in a reply and deprive the opposing party of an opportunity to respond to it, but denying a motion to strike because the challenged evidence was not "new," as it properly rebutted arguments first raised in opposition to the motion for summary judgment); *Aguirre v. Munk*, No. C 09–763 MHP, 2011 WL 2149087, *13 (N.D. Cal. June 1, 2011) ("There was no new evidence in defendants' reply. Any shift in focus between the motion and the reply was responsive to Aguirre's arguments and 'evidence' in opposition that were different from the allegations in the amended complaint"); *Bell v. Santa Ana City Jail*, No. SA CV 07-1218-ODW, 2010 WL 582543, *1 n. 3 (C.D. Cal. Feb. 16, 2010) ("The Court concurs with defendant that the evidence adduced in her Reply raises no new issues and consists solely of a response to the arguments that plaintiff first raised in his Opposition"); *QBAS Co., Ltd. v. C Walters Intercoastal Corp.*, No. SACV 10–406 AG, 2010 WL 7785995, *3-4 (C.D. Cal. Dec. 16, 2010) ("Defendants argue that new evidence submitted for the first time with a Reply brief should not considered. This issue arises frequently, and it's sometimes tricky to distinguish between impermissible 'new' evidence in a reply and evidence that is permissibly responsive to an argument made in the opposing party's opposition. In this case, the issue is not so tricky. Plaintiffs' evidence . . . submitted with their Reply is clearly permissible evidence responsive to Defendants' . . . arguments. Thus, the . . . objections are OVERRULED").

The court may also consider new evidence offered in reply if it gives the opposing party an opportunity to respond. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040-41 (9th Cir. 2003) (indicating that the court may consider new issues raised in reply if it gives the opposition an opportunity to respond); *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir. 2001) (stating that the "district court has discretion to consider [a new] issue even if it was raised in a reply brief"); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond").

Even assuming, therefore, that the reply declarations offer new evidence, the court can properly consider their contents so long as Jiles has had an opportunity to respond to them. Jiles' objections afford him such an opportunity, as they contain topic-by-topic objections to the declarations. The clerk is therefore directed to accept the objections for filing, and the court will consider *infra* both the declarations and the objections.

## C. Whether Plaintiffs Can Recover Attorneys' Fees

As noted, the procedure for requesting attorneys' fees is set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure. While the rule specifies that requests shall be made by motion "unless the substantive law governing the action provides for the recovery of . . . fees as an element of damages to be proved at trial," the rule does not itself authorize the awarding of fees. "Rather, [Rule 54(d)(2)] and the accompanying advisory committee comment recognize that there must be another source of authority for such an award . . . [in order to] give[ ] effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing such an award." *MRO Communications, Inc. v. AT&T*, 197 F.3d 1276, 1281 (9th Cir. 1999).

Under § 1988, the prevailing party in a § 1983 lawsuit can recover reasonable attorneys' fees. 42 U.S.C. § 1988(b). In *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), the Supreme Court considered the meaning of the term "prevailing party." It concluded that plaintiffs are considered the "prevailing party" if they "succeed on any significant issue in litigation which achieves some of the benefit of the parties sought in bringing suit." *Id.*; see *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603-04 (2001) ( "Our '[r]espect for [the] ordinary language [of § 1988] requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail,'" quoting *Hewitt v. Helms*, 482 U.S. 755, 760 (1987)).

In subsequent cases, the Supreme Court continued to clarify the definition of "prevailing party." In *Farrar v. Hobby*, 506 U.S. 103, 111 (1992), it held that, "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought,

or comparable relief through a consent decree or settlement. . . .  In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 111-12.

Jiles contends that plaintiffs are not prevailing parties.  He argues that he prevailed on many significant aspects of the case, citing the fact that the court granted his motion to dismiss, all of plaintiffs' state law claims and the *Monell* claims against Jiles and Antekeier, that plaintiffs voluntarily dismissed Antekeier and the County of San Bernardino as defendants, and that the first jury returned a verdict in favor of Jiles on plaintiffs' interference with familial relations claim.[24] Jiles is wrong, as it is clear that plaintiffs satisfy the "prevailing party" standard set forth in *Hensley* and *Farrar*.  One need only look to the jury verdict and judgment to reach this conclusion.  The jury in the second trial found that "Casey Jiles use[d] excessive force against Donald Sanchez, Sr." and awarded plaintiffs $200,000 in damages.[25]  The judgment reflected "judgment on the verdict *for the plaintiff(s)*," and "ordered and adjudged that the plaintiff(s) . . . recover of the defendant[ ] Sergeant Casey Jiles the sum of . . . $200,000."[26]  Because plaintiffs "obtain[ed] at least some relief on the merits of [their] claim[s]," they are the prevailing parties. See *Farrar*, 506 U.S. at 111.

The court also determines that plaintiffs are entitled to an award of reasonable attorneys' fees because Jiles has not shown that any special circumstances merit their outright denial.  In *Hensley*, the Supreme Court noted that it was within the district court's discretion whether to allow reasonable attorneys' fees to prevailing parties under § 1988.  461 U.S. at 426.  The court's discretion under § 1988, however, "is very narrow and . . . fee awards should be the rule rather than the exception." *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1126 (9th Cir. 2008) (internal quotation marks omitted).  This is because denying a prevailing party attorneys' fees

---

[24]Opposition at 7-8.

[25]Second Verdict at 1-2.

[26]Judgment at 1.

could contravene Congress' intent in passing § 1988, which was "'to attract competent counsel to prosecute civil rights cases.'"  Stated differently, denying fees could be a disincentive to counsel considering whether to undertake to represent civil rights plaintiffs. *Barnard v. Theobald*, 721 F.3d 1069, 1077 (9th Cir. 2013) (citing *Mendez*, 540 F.3d at 1126).

Consequently, only in special circumstances should a district court deny a prevailing party's fee request under § 1988 outright.  A district court "evaluate[s] whether special circumstances exist by asking whether '(1) allowing attorney's fees would further the purposes of § 1988 and (2) whether the balance of equities favors or disfavors the denial of fees.'" *Mendez*, 540 F.3d at 1126.  Only where any award of attorneys' fees would be unreasonable should the court decline to award fees altogether. *Thomas v. City of Tacoma*, 410 F.3d 644, 648 (9th Cir. 2005) (noting that "there are occasions when a prevailing party's reasonable fee is no fee at all"). In *Farrar*, the Supreme Court found such a special circumstance and affirmed the circuit court's decision to deny all attorneys' fees because, although the plaintiff had technically prevailed on his claims by proving a constitutional violation and being awarded nominal damages, allowing him to recover attorneys' fees when he had failed to prove that he suffered any actual damages was unreasonable. *Farrar*, 506 U.S. at 115. Justice O'Connor, who provided the necessary fifth vote, and wrote separately "only to explain more fully why, in [her] view, it [was] appropriate to deny fees in [that] case," noted that "chimerical accomplishments" such as "a purely technical or *de minimis* victory" were not the kind of legal change Congress intended to promote in enacting § 1988. *Id.* at 116, 118.

Jiles contends that special circumstances exist in this case because plaintiffs' requested fee award of $932,321.00 is not proportional to their recovery of $200,000.[27] *Farrar*, however, does not stand for the proposition that a district court should deny outright any fee request that it believes is disproportionate to a prevailing party's recovery.  Rather, as noted, *Farrar* indicates that in certain circumstances, it may be reasonable to decline to award fees if a plaintiff's recovery has been merely technical or *de minimis*: the focus is on the nature of the plaintiff's recovery, not

---

[27]Opposition at 8.

on whether the fees requested are disproportionate to that recovery.  See *Farrar*, 506 U.S. at 115 ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all"); *Mendez*, 540 F.3d at 1126 (holding that a denial of all attorneys' fees under *Farrar* is "appropriate only where 'the plaintiff's success is purely technical or *de minimis*,'" citing *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996)).

Because the focus is on the nature of plaintiff's recovery, and not a comparison of that recovery to requested fees, the Ninth Circuit has consistently rejected the argument that giving a prevailing plaintiff a windfall by allowing him or her to recover a large fee award when the recovery has been a much smaller – but not *de minimis* – amount of damages is a special circumstance that justifies denying all fees.  In *Thomas*, for example, the Ninth Circuit reversed a district court's decision not to award fees to a prevailing plaintiff.  410 F.3d at 648.  The case began with four plaintiffs alleging multiple causes of action against 27 defendants; in the end, only one plaintiff prevailed on one claim against one defendant.  *Id*. at 646-47.  The jury awarded the prevailing plaintiff $15,000 in compensatory damages and $20,000 in punitive damages.  *Id*. at 647.  Counsel requested $488,174.35 in fees.  *Thomas v. City of Tacoma (Thomas II)*, No. C01-5138 RBL, 2005 WL 2254005, *5 (W.D. Wash. Sept. 16, 2005).  The Ninth Circuit held that Thomas' $35,000 recovery was not *de minimis* and that the district court had therefore erred in refusing to award any fees under the special circumstances exception.  *Id*.  The court rejected the district court's determination that it was appropriate to deny fees under the special circumstances exception because allowing any fees would result in a windfall to plaintiff.  It stated:

> "[Section] 1988 is a product of balancing [Congress'] concern[ ] [with granting a windfall to plaintiffs against the need to attract competent counsel to prosecute civil rights cases] by only permitting reasonable fees.  To require Defendants to pay reasonable attorney's fees relevant to the prosecution of the successful claim does not create a windfall, but fulfills the Congressional purpose of § 1988(b)."
> *Thomas*, 410 F.3d at 648.

For these reasons, even if plaintiffs' requested fees are disproportionate to their recovery, a question the court considers *infra* in assessing the reasonableness of the fee request, the fact that plaintiffs recovered $200,000 in actual damages for pain and suffering – $165,000 more than the plaintiff in *Thomas* – makes their recovery substantive, rather than merely technical or *de minimis*. Jiles identifies no reason other than proportionality why the court should decline to award fees altogether. Accordingly, the court concludes that plaintiffs are entitled to recover reasonable attorneys' fees under § 1988.

### D. Whether the Court Should Award the Amount of Fees Requested by Plaintiffs

Plaintiffs request that the court award fees of $932,321.[28] The first step in determining a reasonable fee award under § 1988 is to calculate the "lodestar" amount. *Morales*, 96 F.3d at 364. This is done by multiplying the total number of hours reasonably expended on the matter by a reasonable hourly rate. See *Hiram C. v. Manteca Unified Sch. Dist.*, No. CV S 03-2568 WBS KJM, 2004 WL 4999156, *1 (E.D. Cal. Nov. 5, 2004) (citing *Noyes v. Grossmont Union High Sch.*, 331 F.Supp.2d 1233, 1248 (S.D. Cal. 2004), in turn citing *Hensley*, 461 U.S. at 433)*; Neisz v. Portland Public Sch. Dist.*, 684 F.Supp. 1530, 1534 (D. Or. 1988) (citing *Miller v. Los Angeles County Bd. of Educ.*, 827 F.2d 617, 621 (9th Cir. 1987)); see also, e.g., *I.B. v. N.Y. City Dep't of Educ.*, 336 F.3d 79, 80 (2d Cir. 2003) (per curiam); *Jason D.W. ex rel. Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 208 (5th Cir. 1998); *Phelan v. Bell*, 8 F.3d 369, 374 (6th Cir. 1993). The lodestar "presumptively provides an accurate measure of reasonable attorney's fees." See *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994); *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986).

### 1. Whether Counsel's Requested Rates Are Reasonable

"The hourly rate for successful civil rights attorneys is to be calculated by considering certain factors, including the novelty and difficulty of the issues, the skill required to try the case, whether or not the fee is contingent, the experience held by counsel, and fee awards in similar cases." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1114 (9th Cir. 2008). Prosecuting an

---

[28]Motion at 18.

14

excessive force case against a police officer that involves the use of deadly force requires skilled advocacy, especially where, as here, the outcome of the case is not obvious. Plaintiffs' counsel, moreover, litigated the case on a contingency fee basis.[29] These factors weigh in favor of finding that counsel's requested rates are reasonable.

To assist the court in calculating the lodestar, the plaintiffs must submit "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895-96 n. 11 (1984). The relevant community is that in which the district court sits. See *Schwartz v. Sec'y of Health and Human Serv.*, 73 F.3d 895, 906 (9th Cir. 1995). Declarations from local attorneys who practice in the same area of law regarding the prevailing market rate in the relevant community suffice to establish a reasonable hourly rate. See *Camacho*, 523 F.3d at 980 ("As we have noted, '[a]ffidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community, and rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate,'" citing *United Steelworkers of America v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990)); *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998) (stating that it is true "that declarations of the prevailing market rate in the relevant community are sufficient to establish a reasonable hourly rate"); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir. 1996) (noting that declarations from attorneys in the community can provide adequate proof of the reasonableness of counsel's rates). See also *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1215 (9th Cir. 2003) (discussing the affidavit of "an attorney practicing in the same region as Earthquake's attorneys," which opined that "Earthquake's attorney rates were reasonable and customary").

Courts can also use survey data to evaluate the reasonableness of attorneys' rates. See *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) ("The parties presented two surveys of hourly rates, one reporting fees received by seven Twin Cities class action firms and the other

---

[29]Motion, Exh. 2 (Declaration of Peter Schlueter in Support of Motion for Attorneys' Fees ("P. Schlueter Decl."), ¶ 6).

reporting fees received by sixty-two firms doing a variety of work around the state. The court set individual hourly rates at the median of the class action survey and near the upper limit of the statewide survey, also taking into account the number of years an attorney had been admitted to practice"); *American Petroleum Inst. v. United States EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("Petitioners have provided support for the reasonableness of their rates through affidavits and a survey of rates and we hold that these rates are reasonable"); *Martin v. University of South Alabama*, 911 F.2d 604, 607 (11th Cir. 1990) ("Based on the testimony and survey produced by plaintiffs the reasonable non-contingent hourly rate for civil rights lawyers in the relevant market (Alabama) was found to be $135 to $150 per hour for senior counsel and $105 to $115 per hour for junior counsel").

Plaintiffs request fees for work performed by attorneys Dale K. Galipo, Kaveh Navab, Adrienne Quarry, John C. Fattahi, Hilary Rau, Peter Schlueter, and Jon Schlueter. They ask that the court calculate the lodestar using the following rates: $800 for Galipo, $550 for both Peter and Jon Schlueter, $425 for Fattahi, $350 for Quarry, and $300 for Navab and Rau.[30] As support for this request, counsel proffer declarations that recite their own, and their co-counsel's, skills as civil rights attorneys. They cite rates courts have awarded for their services in prior civil rights cases. They also submit the declarations of several prominent civil rights attorneys practicing in Los Angeles – John Burton, Paul Hoffman, Thomas E. Beck, and Danilo Becerra – who state that Galipo's and Quarry's requested rates are reasonable.[31]

---

[30]See Motion, Exhs. 1 (Declaration of Dale K. Galipo in Support of Motion for Attorneys' Fees ("Galipo Decl."), ¶ 7), 2 (P. Schlueter Decl., ¶ 1), 3 (Declaration of Jon Schlueter in Support of Motion for Attorneys' Fees ("J. Schlueter Decl."), ¶ 2), 4 (Declaration of Kaveh Navab in Support of Motion for Attorneys' Fees ("Navab Decl."), ¶ 6), 5 (Declaration of John C. Fattahi in Support of Motion for Attorneys' Fees ("Fattahi Decl."), ¶ 4), 6 (Declaration of Adrienne Quarry in Support of Motion for Attorneys' Fees ("Quarry Decl."), ¶ 2), 7 (Declaration of Hilary L. Rau in Support of Motion for Attorneys' Fees ("Rau Decl."), ¶ 4).

[31]See Motion, Exhs. 8 (Declaration of John Burton in Support of Plaintiffs' Motion for Attorneys' Fees ("Burton Decl.")), 9 (Declaration of Paul L. Hoffman in Support of Plaintiffs' Motion for Attorneys' Fees ("Hoffman Decl.")), 10 (Declaration of Thomas E. Beck in Support of Plaintiffs' Motion for Attorneys' Fees ("Beck Decl.")), 11 (Declaration of Danilo Becerra in

Jiles objects to each of the requested rates, arguing, *inter alia*, that his attorneys billed no more than $180 per hour for their work on the case; he notes that three of his attorneys are

---

Support of Plaintiffs' Motion for Attorneys' Fees ("Becerra Decl.")), 12 (Second Declaration of Paul L. Hoffman in Support of Plaintiffs' Motion for Attorneys' Fees ("2nd Hoffman Decl.")). Counsel also rely on the results of a survey published in the Los Angeles Daily Journal. (Galipo Decl., Exh. B (Chart in Los Angeles Daily Journal: Average Law Firm Billing Rates).) Jiles objects to the court's consideration of the survey as inadmissible hearsay. (Opposition at 13.) "Surveys are admissible, if relevant, either as nonhearsay or through a hearsay exception." *Prudential Insurance Co. of America v. Gibraltar Financial Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982). Courts frequently find that survey evidence is admissible under the "catch-all" exception to the hearsay rule. See FED.R.EVID. 807 (stating that hearsay not specifically covered by another hearsay exception is not excluded where "(1) [it] has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice"); see also *Keith v. Volpe*, 618 F.Supp. 1132, 1161 (C.D. Cal. 1985) (admitting survey evidence of number of households to be displaced by freeway construction and the racial make-up of their occupants under Rule 803(24), the precursor to Rule 807). Plaintiffs do not respond to Jiles' objection; the court construes their silence as a concession that the survey is inadmissible, and excludes the survey for that reason. Jiles has also proffered a survey overview. This document does not focus on attorneys in Los Angeles or the Central District; it also does not report rates by area of practice, with the exception that it isolates the highest- and lowest-rate practice specialties (entertainment law and insurance defense, respectively). Jiles has not shown that he could not adduce evidence that is more probative of the billing rates of plaintiff's civil rights attorneys in the Central District than the survey overview. Consequently, the court concludes that it too is inadmissible. The court notes, moreover, that Jiles has inaccurately represented the findings of the survey overview, in that he asserts that it concludes billing rates went down from 2011 to 2012. (See Opposition at 13 n. 1 ("[A]s noted in the survey attached to the Hassenberg declaration filed concurrently herewith, due to the economic decline, law firm billing rates have *decreased* over the past few years"(emphasis original)).) In fact, the survey overview clearly states that "[t]he average equity partner billing rate *increased* by 3.4% to $514 in 2012 from $497 in 2011. . . . Associate billing rates (average for all class years and all firm sizes) *increased* 3% to $337 from the 2011 rate of $328." (Opposition, Exh. 1 (Declaration of Barry Hassenberg in Opposition to Motion for Attorneys' Fees ("Hassenberg Decl."), ¶ 3 (citing www.rbz.com/wp-content/uploads/2012/11/2012LawFirmSurvey-Roberts1.pdf).) Instead, it appears from the document that those conducting the survey concluded that overall attorney *compensation* went down because the number of hours billed fell. (See *id.* (noting that while billing rates for partners increased by 3.4%, the average billable hours worked decreased by 5.75%).) Therefore, even if the court were to consider Jiles' evidence, it would not support his position.

17

partners who have been practicing law in California since 1976, 1985, and 1991.[32]  It is reversible error, however, for the court to "rel[y] on the rates paid by [a] City to private attorneys for defending excessive force cases . . . [because such attorneys] are not in the same legal market as private plaintiff's attorneys who litigate civil rights cases.  In addition, attorneys hired by a government entity to defend excessive force cases are not acting as 'private' attorneys at all." *Trevino v. Gates*, 99 F.3d 911, 925 (9th Cir. 1996).  The court considers the balance of Jiles' objections to counsels' rates below.

### a.    Dale Galipo

Galipo is a 1984 graduate of UCLA Law School.  As support for his requested hourly rate of $800, Galipo states that he has extensive experience successfully prosecuting civil rights actions involving police misconduct resulting in serious injury or death.  Galipo has tried more than 200 civil cases to verdict, winning the majority, and has recovered "numerous seven figure verdicts" for his clients.[33]  Hoffman, the former Legal Director of the ACLU of Southern California and partner at the well-known civil rights law firm Schonbrun, DeSimone Seplow Harris & Hoffman, LLP, says of Galipo:

> "There is no other attorney in our community who has had the level of success in police misconduct litigation in terms of large verdicts than Mr. Galipo has.  From my communications with other civil rights attorneys in the last few years it is clear that Mr. Galipo is looked upon as the leading trial lawyer for the kinds of cases he tries.  There are few, if any, lawyers in Southern California with a better reputation in this area or with greater skill or experience in this very demanding area of civil rights practice.  I think Mr. Galipo would be the first lawyer almost any other civil rights lawyer would recommend to handle complicated deadly force police case."[34]

---

[32]Opposition at 2, Exh. 1 (Hassenberg Decl., ¶ 4).

[33]Galipo Decl., ¶ 9.

[34]Hoffman Decl., ¶¶ 4-5.

18

Hoffman states that $800 per hour "is an hourly rate at the high end of rates for civil rights lawyers but Mr. Galipo's track record on civil rights trials has placed him in this select company."[35] Burton, another civil rights attorney, who has more than 34 years of experience and specializes in police misconduct actions in Los Angeles states that, in his opinion, $800 per hour "is appropriate and necessary to attract attorneys of Mr. Galipo's quality to challenging and risky civil-rights cases."[36] Burton reports that he "recently resolved a fee petition with the County of Los Angeles based on a claimed rate of $725 per hour."[37] Beck, who was associate counsel in Rodney King's civil lawsuit and has prosecuted a number of other high-profile cases in the Los Angeles area, agrees that $800 per hour "is well within the range of reasonable market rates for attorneys with [Galipo's] skills, accomplishments, experience, and reputation," and that is "consistent with the rates that are currently being billed by equally talented and experienced defense attorneys in metropolitan Los Angeles."[38] Becerra, who has been practicing law for 39 years and who focuses on civil rights police misconduct cases, similarly agrees.[39]

Courts in the Central District have awarded Galipo rates ranging from $500 in 2006 to $800 in 2014. He was awarded $800 per hour last month in *R.S. v. City of Long Beach*, SACV 11-536 AG (RNBx) (C.D. Cal. Jan. 31, 2014);[40] $675 in March 2013 in *Contreras v. City of Los*

---

[35]*Id.*, ¶ 6.

[36]Burton Decl., ¶ 12.

[37]*Id.*, ¶ 10.

[38]Beck Decl., ¶ 4.

[39]Becerra Decl., ¶¶ 2, 4.

[40]Jiles argues in his *ex parte* application that the court should not consider the court's award of $800 per hour to Galipo in *R.S.* because Galipo did not submit the case in a timely fashion. Specifically, he asserts that "there is simply no reason why th[is] [information] could not have been included with Declarations filed concurrently with the moving papers." *R.S.*, however, was decided on January 31, 2014, the day Jiles filed opposition to plaintiffs' motion for attorneys' fees, and more than two months after plaintiffs filed their motion. It was therefore impossible to submit the evidence prior to that date. Filing notice of the case ten days after it was decided, on February 10, 2014, in support of plaintiffs' reply, was reasonable. Other than arguing that Galipo's citation

19

*Angeles*, No. 2:11–cv–1480–SVW–SH, 2013 WL 1296763 (C.D. Cal. Mar. 28, 2013); $700 per hour in September 2012 in *P.C. v. City of Los Angeles*, No. CV 07-6495 PLA (C.D. Cal. Sept. 14, 2012); $500 per hour in August 2007 in *Ingram v. City of San Bernardino*, No. EDCV 05-925-VAP (SGLx), 2007 WL 5030225 (C.D. Cal. Aug. 27, 2007); and $500 per hour in July 2006 in *Adams v. City of Rialto*, Nos. EDCV 04–155–VAP (SGLx), EDCV 04–1032 VAP, 2006 WL 7090890 (C.D. Cal. July 20, 2006).

Jiles contends that Galipo's requested rate is unreasonable, citing the fact that some courts have awarded him fees at lower rates.[41] Giles suggests that the court reduce Galipo's rate to $525, in line with a Northern District opinion awarding Galipo that amount in 2012.[42] As noted, however, it is the current prevailing rate for the district in which the case is litigated that determines the reasonableness of an attorney's hourly rate. Jiles does not explain why more recent Central District decisions finding significantly more than $525 per hour reasonable for Galipo are less accurate representations of the prevailing rate in this district than a 2012 Northern District case. The more recent Central District cases indicate an upward trend over the years in the rates courts have found reasonable for someone of Galipo's experience, at least in part because Galipo has acquired more experience with the passage of time. Jiles also does not address the supporting declarations plaintiffs have submitted. Given Jiles' failure to dispute the accuracy of the statements in the declarations, and his failure to proffer declarations showing that a lower rate is more reasonable, the court accepts plaintiffs' supporting declarations as persuasive evidence of the prevailing rate in Los Angeles for prominent civil rights attorneys who specialize in police misconduct cases. As noted, Hoffman believes a rate of $800 per hour is at the high end of the

---

of *R.S.* was untimely, Jiles offers no other reason why the court should not consider the decision; he merely reiterates that Galipo's request for $800 per hour is unreasonable. (Application, Exh. B ([Proposed] Objection to the Reply Declaration of Dale K. Galipo) at 2-3.) Accordingly, the court finds it appropriate to consider *R.S.* in determining a reasonable hourly rate for Galipo's time.

[41]Opposition at 12-14.

[42]*Id.* at 14.

range for such attorneys, while Burton states that he recently settled a fee petition with the County of Los Angeles in which he claimed a rate of $725 per hour. All of the attorneys who have submitted declarations agree that, in Los Angeles, $800 is reasonable for someone with Galipo's experience prosecuting civil rights claims involving the use of deadly force.[43]  On these facts, given that the most recent rates Galipo has been awarded in this district range from $625 to $800, and given its own evaluation of Galipo's experience and skill as a trial attorney and its knowledge of the prevailing market rate for plaintiff's civil rights lawyers, the court concludes that a reasonable rate for attorneys in Galipo's field with his experience is $800 per hour.

## b.   Adrienne Quarry

Quarry is a 2005 graduate of Notre Dame Law School.  She worked at Schonbrun DeSimone from 2005 to 2010, and then began to work with Galipo.  In a recent state court case, *Jochimsen v. County of Los Angeles*, Los Angeles Superior Court Case No. BC386266, she was awarded $325 per hour for work performed in 2008 and 2009.  Hoffman has submitted a second

---

[43]At the hearing, Jiles' attorney argued that the court should not consider the declarations, or give them particular weight, because they are self-serving.  The Ninth Circuit, however, has expressly approved the consideration of such declarations.  In *Camacho*, the court noted that "[a]ffidavits of the plaintiffs' attorney[s] *and other attorneys regarding prevailing fees in the community*, and rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate."  523 F.3d at 980 (emphasis added).  The court noted that the party opposing the fee application "has a burden of rebuttal that requires submission of *evidence* to the district court challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits."  *Id*. (emphasis added).  Jiles' argument that the declarations are self-serving, without more, is insufficient to rebut plaintiffs' showing that Galipo's rates are reasonable.  This includes the declarations of plaintiffs' attorneys he has submitted.  As Galipo noted at the hearing, Jiles did not submit evidence, such as an expert report opining that the reasonable market rate in the community for civil rights attorneys with Galipo's experience is lower than $800 an hour.  While other plaintiffs' attorneys may submit declarations for self-serving reasons, there is no evidence that this occurred here.  The court notes, moreover, that the declarations are submitted under penalty of perjury, a fact it presumes the declarants took into account before agreeing to provide their sworn statements here.  Based on its own knowledge of the prevailing market rates in the Central District, the court does not believe that a fee of $800 per hour for someone of Galipo's experience is excessive, such that it would indicate collusion between Galipo and the declarants supporting his request.  Consequently, the court will consider the declarations, which support its conclusion that $800 per hour is a reasonable rate for Galipo in this case.

declaration in support of Quarry's fee request, in which he states that he has known Quarry since she externed for him while still a law student in 2003, and that he had the opportunity to supervise her work for more than four years at Schonbrune DeSimone.[44] He believes that $350 per hour "is below the market rate for attorneys of comparable skill and experience in civil rights cases in this community."[45]

Jiles argues that Quarry's requested rate is unreasonable because no court has ever valued her services at $350 per hour. He does not dispute Hoffman's statements, however, including his opinion that $350 per hour is below the market rate for civil rights attorneys like Quarry who have nine years of experience. Nor does he proffer evidence rebutting it. The court notes, moreover, that the $325 per hour that Quarry received in *Jochimsen* was for work performed several years prior to her work on this case. Accordingly, the court concludes that Quarry's requested rate of $350 per hour is reasonable.

  **c.** **Peter Schlueter, Jon Schlueter, Kaveh Navab, John Fattahi, and Hilary Rau**

Peter Schlueter is a 1991 honors graduate of Western State University College of Law. After law school, he worked as a prosecutor for four years. Since 1999, he has focused on criminal defense and civil rights litigation.[46] Prior to law school, Peter Schlueter was a journalist and photojournalist. Jon Schlueter is a 1982 graduate of UCLA law school. After law school, he became a prosecutor and tried more than 60 criminal cases to a jury before leaving to start his own civil rights firm in 1999 with his brother, Peter Schlueter. Jon Schlueter has argued before the California Supreme Court, the Ninth Circuit Court of Appeals, and the Fourth Appellate District of the California Court of Appeal. As noted, both Peter and Jon Schlueter request that the court value their time at $550 per hour. In 2010, a court in the Central District awarded Peter

---

[44]2nd Hoffman Decl., ¶¶ 4-5.

[45]*Id.*, ¶ 3.

[46]P. Schlueter Decl., ¶¶ 1-5.

1   Schlueter $300 per hour and Jon Schlueter $350 per hour for work performed between 2005 to

2   2007.[47]  *McCown v. City of Fontana*, 711 F.Supp.2d 1067 (C.D. Cal. 2010).

3          Fattahi is a 2006 graduate of UCLA School of Law and former clerk to the Honorable

4   Virginia Phillips.  Following his clerkship, Fattahi accepted a position at Quinn Emanuel Urquhart

5   & Sullivan, LLP, where he worked as an associate until 2009.  At that point, he joined Galipo's

6   office, where he focused almost exclusively on plaintiffs' civil rights litigation.  Fattahi left

7   Galipo's office in 2011 to start a solo practice, where he focuses exclusively on police civil rights

8   litigation.  Fattahi requests that the court use an hourly rate of $425 in awarding fees for his time.

9   In *Contreras*, he was awarded fees using a rate of $350 per hour, see 2013 WL 1296763 at *3;

10  in *P.C.*, the court awarded him fees based on a rate of $320 per hour.

11         Navab is a 2010 graduate of the Vermont Law School.  During law school, he worked one

12  summer at the Law Offices of Carol A. Sobel.  After law school, he joined Otten & Joyce, LLP,

13  which he left in 2012 to accept a position in Galipo's office.  Rau is a 2010 graduate of UCLA

14  Law School.  During law school, Rau was the editor of the UCLA Journal of Environmental Law

15  and Policy.  She worked at Galipo's office until July 2012, when she left to accept a position at

16  The Feldman Law Firm, APC, where she has a plaintiffs' employment and civil rights practice.

17  Navab and Rau request that the court use an hourly rate of $300 to value their time.  In *Contreras*,

18  the court awarded Rau $285 per hour.  2013 WL 1296763 at *3.

19

20

21

---

22         [47]Jiles argues that the court should not consider the information that the *McCown* court
    awarded the Schlueters hourly rates based on work performed between 2005 to 2007 because it

23  is irrelevant and should have been submitted in plaintiffs' moving papers. (Application, Exh. E
    ([Proposed] Objection to the Reply Declaration of Peter Schlueter at 2-3).)  As noted, because the

24  court has given Jiles an opportunity to respond to the information, the fact that it was not included
    in Peter Schlueter's original declaration does not prevent the court from considering it.  The fact

25  that the amount awarded in *McCown* was for work performed in 2005-2007 is clearly relevant
    because it suggests that a reasonable rate for the two some years later would be higher because

26  they had more experience by the time they worked on this case.  Accordingly, the court believes
    it appropriate to consider the fact that the work for which the Schlueters received fees in *McGown*

27  was performed between 2005 to 2007.

28

Other than declarations by each of these attorneys concerning their experience and the reasonableness of each other's rates, plaintiffs have adduced no other admissible[48] evidence supporting the reasonableness of plaintiffs' fee request for these attorneys. They have therefore failed to satisfy their burden of showing that the requested rates are reasonable. When a fee applicant fails to establish the reasonableness of the requested rates, the court may exercise its discretion to determine reasonable hourly rates based on its experience and knowledge of prevailing rates in the community. See, e.g., *Plan Administrator v. Kienast*, No. 2:06-cv-1529, 2008 WL 1981637, *4 (W.D. Pa. May 2, 2008) ("If a party fails to meet its burden to demonstrate a prima facie case that the requested rates were the prevailing rates in the community, 'the district court must exercise its discretion in fixing a reasonable hourly rate,'" quoting *Washington v. Philadelphia Court of Common Pleas*, 89 F.3d 1031, 1036 (3d Cir. 1996)); *Moreno v. Empire City Subway Co.*, No. CV 05-7768 (LMM) (HBP), 2008 WL 793605, *7 (S.D.N.Y. Mar. 26, 2008) (where the fee applicant "has submitted no evidence of the prevailing market rate for attorneys of like skill litigating cases similar to plaintiff's . . . it is within [the court's] discretion to determine the reasonable hourly rate at which plaintiff[']s counsel should be compensated based on [the court's] familiarity with plaintiff's case and the prevailing rates in the [relevant community]"); *Shephard v. Dorsa*, No. CV 95-8748 ER (JGx), 1998 WL 1799018, *2 (C.D. Cal. July 2, 1998) (determining a reasonable hourly rate based on "(1) the Court's own experience in considering the prevailing market rates in Los Angeles, (2) other fee awards in the relevant market, and (3) ALTMAN WEIL, PENSA, SURVEY OF LAW FIRM ECONOMICS (1996)" in a case where the fee applicant failed to establish the reasonableness of the lawyer's hourly rate).

Based on its experience and understanding of prevailing market rates in Los Angeles for civil rights attorneys with experience comparable to the Schlueters, and its belief that the work the Schlueters performed in this case did not require the skill of attorneys with as much experience

---

[48]As noted, plaintiffs submitted a survey stating that the average associate billed $516 per hour in 2011, and $550 per hour in 2012. The court has sustained Jiles' objection to the survey, and will thus not consider it.

as they had,[49] the court concludes that $450 per hour is a reasonable rate for their time. It concludes that a reasonable rate for Fattahi is $400 per hour, and that Navab's and Rau's requested rate of $300 per hour is reasonable as well.[50]

### d. Conclusion Regarding Counsels' Requested Rates

For the reasons, the court finds the following rates reasonable and will use them in calculating fees in this case: Dale Galipo – $800 per hour; Peter and Jon Schlueter – $450 per hour; John C. Fattahi – $400; Adrienne Quarry – $350; and Kaveh Navab and Hilary Rau – $300.

### 2. Whether the Hours Billed Are Reasonable

A court may award attorneys' fees only for the number of hours it concludes were reasonably expended on the litigation. *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary"). "[T]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of th[e] hours worked. . . .'" *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992)); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F.Supp. 865, 870 (E.D. Cal. 1988) ("The cases do not indicate that every minute of an attorney's time must be documented; they do, however, require that there be adequate description of how the time was

---

[49]As discussed *infra*, the Schlueters were largely involved in the discovery aspects of the case; they took many of the depositions and searched for possible witnesses and evidence plaintiffs could introduce at trial. While these activities were important, they did not require attorneys with the level of skill and experience the Schlueters have. For that reason, the court concludes that $550 is too high to constitute a reasonable rate for their work in this case.

[50]Jiles' counsel argued at the hearing that Navab and Rau have too little experience to make a $300 per hour reasonable. The court disagrees. Market rate is based not just on experience but also on skill. In the court's experience, civil rights attorneys who are recent law graduates with prestigious backgrounds frequently bill at rates in the $300 per hour range.

spent, whether it be on research or some other aspect of the litigation. . .").    Although a fee applicant "is not required to record in great detail how each minute of [his] time was expended . . . [he must] list[ ] [the] hours and identify[ ] the general subject matter of [the] time expenditures." *Gucci Am., Inc. v. Pieta*, No. CV 04-9626 ABC (Mcx), 2006 WL 4725707, *2 (C.D. Cal. July 17, 2006) (quotation omitted).

In calculating the lodestar, courts typically exclude time spent on clerical or ministerial tasks because such tasks are properly considered part of an attorney's overhead and are reflected in his or her hourly rate.    See *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who performs them").    In determining whether the number of hours requested is reasonable, a court must be mindful "that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees.  The payoff is too uncertain, as to both the result and the amount of the fee.  It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning.  By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno*, 534 F.3d at 1112.

In support of their motion for fees, each attorney has submitted time records detailing the work they performed on the case.  Collectively, plaintiffs' counsel billed 1,500.65 hours working on this matter, or about 7.8 hours per week over the four years the case was pending.  The attorney breakdown of hours is as follows: Galipo – 649.6 hours; Peter Schlueter – 470.65 hours; Quarry – 270.8 hours; Jon Schlueter – 39.3 hours; and Fattahi – 16.2 hours.[51]  Jiles contends that having seven attorneys work on the matter and bill this number of hours was unreasonable.[52]  He asserts that the case did not involve a large number of filings, as there was a single motion to dismiss, which plaintiffs did not oppose; a discovery motion; a "standard" number of motions *in*

---

[51]Motion at 18.

[52]Opposition at 10.

*limine*; and a motion for judgment as a matter of law.[53]  Additionally, although the case was tried twice, Jiles contends that the trials were not particularly difficult because they involved first two and then a single cause of action.[54]

Jiles also argues that many of the hours billed are excessive and duplicative.  "The court may reduce the number of hours awarded because the lawyer performed unnecessarily duplicative work."  *Moreno*, 534 F.3d at 1112; see also *Campon v. City of Blue Springs, Missouri*, 289 F.3d 546, 553 (8th Cir. 2002) (reducing the number of hours and stating that, "[i]n our view, it should not take four experienced, highly paid attorneys 480 hours to prepare one summary judgment motion and to prepare for and conduct a four-day trial when all pretrial discovery had been completed").  Jiles cites several aspects of plaintiffs' billing in this regard.  He notes that three attorneys billed 41.9 hours for preparation of the attorneys' fees motion, despite the fact that it is "almost identical" to motions Galipo has filed in other cases.  He asserts this is evidence of duplicative billing.[55]  Jiles also argues that Navab claims to have spent a total of 37.6 hours on the fee motion in this case and a similar motion in *R.S.* during the same week: he asserts the hours were either unnecessary, given the similarity of the motions, or that Navab double-billed for time spent on each motion.[56]  He also takes issue with Peter Schlueter's time entries for 625 telephone calls, primarily to Galipo and Quarry.  He notes that most of the entries are for .1 hours – or 6 minutes – and Galipo and Quarry did not bill for the calls.  From these facts, he deduces that the calls were likely situations in which Schlueter called Galipo and left a voicemail.  He contends

---

[53]*Id.*

[54]*Id.*

[55]*Id.*

[56]*Id.* at 11.

this time should not be compensated.[57] Jiles asks generally that the court reduce Peter Schlueter's hours by 50% because of these phone calls and his vague billing entries.[58]

Next, Jiles focuses on hours billed for tasks related to trial. Galipo billed 134 hours on trial preparation for the first trial and 225.5 hours in preparation for the second trial. Jiles argues that this number of hours was unreasonable because there was only one claim at issue in the second trial and that claim had already been tried.[59] He also asserts that Galipo billed for 40 hours of preparation for the Rule 50(b) hearing, and that was unreasonable[60] Additionally, he notes that Galipo billed 31.5 hours for time spent at trial, while Navab billed 18 hours and Peter Schlueter billed 27.1 hours. Jiles contends that Navab's and Schlueter's time was unnecessary because only Galipo tried the case.[61]

Finally, Jiles contends that plaintiffs' counsel block billed and that their time entries are too vague to permit a thorough analysis of the reasonableness of the hours. For this reason, he asserts, the number of hours should be reduced.[62] The court considers these arguments *seriatim* below.

### a. Whether Counsel Engaged in Block Billing

The court has discretion to reduce the number of hours requested where attorneys' block billing makes it difficult easily to identify the hours reasonably expended. See *Neil v. Commissioner of Social Sec.*, 495 Fed. Appx. 845, 847 (9th Cir. Nov. 9, 2012) (Unpub. Disp.) (holding that it was not an abuse of discretion for the district court to reduce a fee request by ten

---

[57]*Id*. at 17.

[58]*Id*. at 18.

[59]*Id*. at 16.

[60]*Id*. at 17.

[61]*Id*.

[62]*Id*. at 15-16.

percent to account for block billing, and citing *Hensley*, 461 U.S. at 437, and *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)).

The court agrees with Jiles that Galipo block-billed hours he denoted "trial preparation." His time records indicate that "trial preparation includes[ ] review of Depositions, Reports, Disclosures, Pretrial Documents, Expert Reports, Preparation of outline for opening, direct and cross examination, and closing."[63] Absent a breakdown of how much time Galipo spent reviewing documents and how much time he spent preparing outlines of his opening statement, direct and cross examination, and closing argument, however, the court is unable to say that it was reasonable to spend 134 hours – or a little more than three forty-hour workweeks – preparing for the first trial, and 225.5 hours – or approximately five-and-a-half forty-hour workweeks – preparing for the second trial. For this reason, the court reduces Galipo's trial hours by 20% from 359.5 to 287.6 hours.

The court, however, does not agree with Jiles that Peter Schlueter, or any of the other attorneys, engaged in block billing. Much of Peter Schlueter's time is detailed in his time records. For example, his entry on April 23, 2010 states "Discussion re progress of investigation with T Thompson. Discussion of discovery needs and the finding of bullets. Discussion re posey."[64] Although there are perhaps an equal number of entries that state only "Review" or "Gen[eral] rev[iew] of file and progress," Schlueter does not seek compensation for many of these entries.[65] Although Navab described the work he did for 18 hours only as "trial," he submitted a declaration stating that the time was spent preparing and coordinating witnesses and organizing documentary evidence to be presented at trial.[66] This description is sufficiently detailed that the court can determine whether the time spent was reasonable. Other counsel have likewise submitted time

---

[63]Galipo Decl., Exh. A (Time Records) at 5.

[64]P. Schlueter Decl., Exh. A (Time Records).

[65]See e.g., *id.*, Exh. A (Time Records at 2/8/2011 and 2/15/2011).

[66]Reply, Exh. 3 (Reply Declaration of Kaveh Navab in Support of Motion for Attorneys' Fees ("Navab Reply Decl."), ¶ 4).

1    records that are adequate for purposes of determining whether the time spent was

2    reasonable. Accordingly, the court declines to reduce the balance of the hours on the basis that

3    time was block-billed.

4              **3.**    **Whether Counsel's Time Entries Show That They Performed Excessive,**

5                      **Duplicative, and/or Unnecessary Work**

6         While the court agrees with Jiles that having seven attorneys work on this case

7    simultaneously would be excessive, it is clear from counsels' time records that they were not all

8    working on the case at the same time. Where several counsel were working on the case at the

9    same time, moreover, they split their duties so that they did not perform overlapping work. This

10    manner of staffing reduces the likelihood that time entries are duplicative or reflect unnecessary

11    work. Galipo was lead trial counsel. Peter Schlueter acted as "the bridge between the clients"

12    and Galipo. Peter Schlueter was also primarily responsible for conducting an investigation; he

13    visited the shooting site, tracked down and questioned witnesses, and conducted depositions.[67]

14    Jon Schlueter assisted his brother with investigation and depositions.[68] Quarry was the primary

15    associate assigned to the case in Galipo's office from September 2010 to August 2012. She

16    coordinated discovery efforts and trial strategy with Peter Schlueter and Galipo, reviewed the

17    motion to dismiss and conducted much of plaintiffs' written discovery.[69] Rau worked on the case

18    from April 2011 to July 2012, primarily drafting opposition to motions *in limine* and assisting

19    Galipo with trial preparation.[70] Navab took over responsibility for the day-to-day management

20    of the case beginning in November 2013.[71] He was responsible for drafting the exhibit and

21

22

23         [67]Reply, Exh. 4 (Reply Declaration of Peter Schlueter in Support of Motion for Attorneys'

24    Fees ("P. Schlueter Reply Decl."), ¶¶ 6-7).

25         [68]J. Schlueter Decl., Exh. A (Time Records).

26         [69]Quarry Decl., Exh. B (Time Records).

27         [70]Rau Decl., Exh. A (Time Records).

28         [71]Galipo Decl., ¶ 18.

witness lists, the verdict form, and the motion for attorneys' fees.[72]  He also assisted with trial, preparing and coordinating witnesses and organizing documentary evidence for presentation at trial.[73]  Galipo brought Fattahi in to oppose Jiles' Rule 50 motion at the end of trial.[74]

While having different associates handle different portions of the case likely increased the amount of time the attorneys billed reviewing documents to familiarize themselves with the case, there was little Galipo could do to prevent such duplication, given that several of his associates joined and left his office during the course of this litigation.  In all likelihood, having certain work performed by associates billing at lower rates reduced total fees below what they would have been had Galipo or one of the Schlueters undertaken to propound or response to written discovery, or organize exhibits and coordinate with witnesses.  The court does believe, however, that there was some inefficiency created by the fact that Peter Schlueter served as a conduit for Galipo's communications with plaintiffs.  While the court understands the circumstances that led to this layered approach to communication, that does not mean that defendant should be required to pay higher fees as a result of it.

For example, the court believes that the number of calls Peter Schlueter made to Galipo's office was excessive.  Jiles contends that the court should infer from the length and number of the calls, as well as from the fact that they are not mentioned in Galipo's billing records, that Peter Schlueter billed for time he spent leaving voicemails for Galipo that took less than 6 minutes to record.[75]  Peter Schlueter counters that he can corroborate the calls with telephone bills, and that the calls reflect conversations, not messages.  He asserts they were necessary because counsel did not work in the same office; he also asserts that counsel had to communicate and strategize more frequently than might otherwise have been the case because evidence in defendant's possession

---

[72]Navab Decl., Exh. A (Time Records).

[73]*Id.*; Reply, Exh. 3 (Navab Reply Decl., ¶ 4).

[74]Fattahi Decl., ¶ 5.

[75]Opposition at 17.

31

went missing and plaintiffs had to track down most of the evidence they ultimately offered at trial.[76] The court simply cannot find that as many as seven telephone calls a day was reasonable even if the case required an abnormal amount of independent investigation. Peter Schlueter billed for 581 calls to Galipo's office between November 24, 2010 and June 26, 2013.[77] 510 of these calls lasted just six minutes. The court finds this amount of communication, which amounts to 71.9 hours, excessive, given that many, if not most, of these telephone calls were likely necessitated by the layered approach counsel took to communication with the clients. It therefore reduces the hours billed by Peter Schlueter for telephone calls to co-counsel by 80% to 14.38 hours.

As noted, Jiles next contends that the number of hours Galipo spent preparing for trial was excessive. The court has already reduced Galipo's trial preparation hours by 20%, to 287.6 hours, because he block-billed his time. Consequently, the court must examine whether it was reasonable for Galipo to spend 107 hours preparing for the first trial and 180.4 hours preparing for the second trial. The court concludes it was reasonable to spend 107 hours preparing for use of deadly force case. The evidence in the case was conflicting; eyewitnesses saw different things and it was undoubtedly necessary to compare the various versions of events witnesses recounted, look for patterns and inconsistencies, try to construct a coherent theory of what transpired, and determine how best to elicit testimony in a way that would be most helpful in proving that theory. The questions the jury resolved were fact-intensive – whether Don Richard's hand was in his pocket at the time Jiles shot him, whether Don Richard was facing Jiles or had turned away from him at the time Jiles fired the third and fourth shots, and the amount of pain and suffering Don Richard suffered before he died as a result of the gunshot wounds.[78] For these reasons, the court finds that 107 hours was a reasonable amount of time to expend preparing for trial, and declines to reduce it.

---

[76]P. Schlueter Reply Decl., ¶ 6.

[77]Schlueter Decl., Exh. A (Time Records).

[78]See JMOL Order at 3, 16.

As respects preparation for the second trial, Galipo states that he spent more time preparing for the second trial because he had to change his theory of the case in order to prevail. The court observed that during the second trial, Galipo focused less on whether Don Richard's hand was in his pocket before, during and after he was shot, and more on the fact that Jiles shot Don Richard four times, including twice when the jury found that Don Richard had turned away from him. Coupled with the fact that Galipo had to review all of the documents and evidence in the case as well as transcripts of the first trial, this added to the amount of time reasonably expended preparing for the second trial.[79] The Ninth Circuit has noted that "[w]hen a case goes on for many years, a lot of legal work product will grow stale. . . . A lawyer [ ] needs to get up to speed with the research previously performed. All this is duplication, of course, but it's *necessary* duplication; it is inherent in the process of litigating over time." *Moreno*, 534 F.3d at 1112 (emphasis original). As with legal research, attorneys litigating a case over the course of several years must refresh their recollection of the facts. It was reasonable for Galipo to spend additional hours reviewing the evidence and transcripts of the first trial in preparation for the second trial, and to spend additional time reformulating his theory of the case. For these reasons, the court does not agree with Jiles that Galipo's trial preparation hours should be reduced further.

Next, as respects the 27.1 hours Peter Schlueter recorded for attending the first trial and the 18 hours Navab recorded for attending the second trial, the court disagrees with Jiles that it was unreasonable for plaintiffs to be represented by two attorneys at trial. The record establishes that Peter Schlueter was intimately familiar with the evidence, the witnesses, and the clients. Counsel state that Peter Schlueter "spent time with the family during the first trial, and aided in the coordination of witnesses in both trials," although he did not bill for his presence at the second trial.[80] Navab helped Galipo prepare and coordinate witnesses, and organized documentary

---

[79]Reply at 9.

[80]*Id.* at 10.

33

1   evidence to be presented at the second trial.[81] This was substantive work and the hours Navab

2   billed are reasonable. See *Fleming v. Kemper National Services, Inc.*, 373 F.Supp.2d 1000, 1009

3   (N.D. Cal. 2005) ("[G]iven the importance of the [settlement] conference, it was necessary for

4   a senior attorney to attend, and it was also important that the more junior attorney who actually

5   drafted the settlement conference statement be available at the conference to answer questions

6   about the facts of the case and the supporting evidence. Although the senior attorney could have

7   drafted the statement himself, it would not have been cost-effective, as his billing rate is more than

8   twice as high as that of the more junior attorney who actually drafted the statement"). Indeed,

9   Jiles himself was represented by two attorneys throughout both trials. As for Peter Schlueter, it

10   was reasonable for him to attend the first trial to the extent he performed substantive work that

11   contributed to presentation of the case to the jury. As the court has noted earlier, while it

12   understands the circumstances that resulted in Peter Schleuter having primary contact with the

13   plaintiffs, it does not believe that this circumstance, which resulted in two attorneys doing work

14   that could have been done by one, necessitates that defendant pay both attorneys' full fee.

15   Comparing Peter Schlueter's time for the first trial with Navab's time for the second trial, and

16   recognizing that Schlueter assisted with the coordination of witnesses in addition to serving as

17   liaison to plaintiffs, the court reduces the number of hours he is entitled to recover for the first

18   trial by 9.1 hours, for a total of 18 hours.

19       Finally, the court believes that the 41.9 hours spent drafting the motion for attorneys' fees

20   was reasonable. Although Jiles contends the motion is almost identical to those Galipo has filed

21   in other cases, Jiles has not submitted the other motions for the court's review. Even if Galipo

22

23

24       [81]Navab Supp. Decl., ¶ 4. Jiles argues that the court should not consider this information
because it is "irrelevant, hyperbolic, and otherwise unsupported with evidence." (Application,

25   Exh. D ([Proposed] Objection to the Reply Declaration of Kaveh Navab at 2).) The information
is clearly relevant because it assists the court in determining whether 18 hours was a reasonable

26   number of hours to bill by describing the tasks Navab performed during those hours. Navab's
statement, moreover, is not hyperbolic, and there is no need for Navab to submit evidence in

27   addition to a declaration under penalty of perjury. The court accordingly deems it appropriate to

28   consider this information.

uses standard language in the motions to describe the principles governing awards of attorneys' fees, and even if the biographical information concerning the attorneys who worked on the file and the fees they have been awarded in other cases is in large measure duplicative across motions, drafting this motion necessitated coordination with eleven attorneys and the crafting of case-specific arguments. There is no evidence, moreover, that Navab billed excessively for his work on the motion or double-billed for drafting the same portions of this motion as another he worked on during the same week. This is pure speculation on Jiles' part.

The court has reviewed the detailed time records submitted by counsel in support of the motion for attorneys' fees in this case. The factual issues were difficult and, although the parties litigated only one motion to dismiss, there were 15 motions *in limine* and one *ex parte* application to exclude expert testimony, as well as several follow-up offers of proof and sur-replies allowed by the court at the hearing on the motions, twenty-four depositions, a wealth of evidence that plaintiffs apparently discovered only through lengthy independent investigation, and two trials. Under these circumstances, the court finds the balance of counsels' requested hours reasonable.

### a. Calculation of the Lodestar Figure

For the reasons stated, the court calculates counsels' reasonable lodestar at:

| Attorney | Rate | Hours | Total |
|---|---|---|---|
| Dale Galipo | $800.00 | 580.7 | $464,560.00 |
| Peter Schlueter | $450.00 | 404.03 | $181,813.50 |
| Jon Schlueter | $450.00 | 58.1 | $26,145.00 |
| John Fattahi | $400.00 | 16.2 | $9,480.00 |
| Adrienne Quarry | $350.00 | 270.8 | $94,780.00 |
| Kaveh Navab | $300.00 | 62.2 | $18,660.00 |
| Hilary Rau | $300.00 | 39.3 | $11,790.00 |
| **Total:** | | **1,451.15** | **$807,228.50**[82] |

---

[82]This number includes requested additional fees for preparation of the motion for attorneys' fees, reply, and attendance at the hearing, which the court calculated by multiplying the number of hours counsel reasonably spent on these tasks by the hourly rates the court has approved, *supra*. See *Clark*, 803 F.2d at 992 ("We, like every other court that has considered

### 4. Whether the Court Should Adjust the Award

"A 'strong presumption' exists that the lodestar figure represents a 'reasonable fee,' and therefore, it should only be enhanced or reduced in 'rare and exceptional cases.'" *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 n. 4 (9th Cir. 2000) (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)); accord *Clark*, 803 F.2d at 990-91; see also *Hiram C.*, 2004 WL 4999156 at *1 ("There is a strong presumption that the lodestar amount is reasonable," citing *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994)). Nevertheless, after calculating the "lodestar" amount, the court must determine whether it should be adjusted, considering the factors identified in *Kerr v. Screen Guild Extra, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975): (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. See *Hiram C.*, 2004 WL 4999156 at *1; see also *Jason D.W.*, 158 F.3d at 209.

---

the question, have held that the time spent in establishing entitlement to an amount of fees awardable under section 1988 is compensable). Galipo estimates he will spent three hours preparing for and attending the hearing on the motion (Galipo Supp. Decl., ¶ 10). Fattahi has billed an additional 7.5 hours drafting a reply to Jiles' opposition (Fatahi Supp. Decl., ¶ 5), and Navab spent an additional 8.1 hours on the reply as well (Navab Supp. Decl., ¶ 6). The court incorporated these hours into the lodestar, which had the effect of increasing the fee award by $7,830. Jiles objects to the court's consideration of these hours in his *ex parte* application. Beyond asserting that the information was not included in the plaintiffs' moving papers, however, he simply repeats his objection that counsels' fees are unreasonable and inadequately supported. (See Application, Exhs. B ([Proposed] Objection to the Reply Declaration of Dale K. Galipo at 3-4); C ([Proposed] Objection to the Reply Declaration of John C. Fattahi at 2-4); D ([Proposed] Objection to the Reply Declaration of Kaveh Navab at 3-4). The court has considered Jiles' objections, but finds the hours reported reasonable and adequately supported by declarations under penalty of perjury.

Many of these factors, however, are subsumed in the initial lodestar calculation, see *Hensley*, 461 U.S. at 434 n. 9, and should not be double-counted, see, e.g., *Fisher*, 214 F.3d at 1119; *Clark*, 803 F.2d at 990-91. Moreover, some factors deserve more weight than others. The Supreme Court has held that "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained." *Farrar*, 506 U.S. at 114 (quoting *Hensley*, 461 U.S. at 436); see also *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 790 (1989) (noting that "the degree of [the party's] success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee"). This factor is particularly important when the parties seeking fees is deemed to have "prevailed" on only some of their claims. See *Hensley*, 461 U.S. at 434. Stated differently, a reduced fee is appropriate if the relief, "however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* at 440.

Consistent with this precedent, the Ninth Circuit has recently observed that "*Hensley*'s test does not require apportionment 'mechanically' on the basis of success or failure on *enumerated issues*." *Crawford v. San Dieguito Union Sch. Dist.*, 202 Fed. Appx. 185, 186 (9th Cir. Sept. 15, 2006) (Unpub. Disp.) (emphasis added); see also *Hensley*, 461 U.S. at 435 n. 11 ("We agree with the District Court's rejection of a mathematical approach comparing the total number of issues in the case with those actually prevailed upon. Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors" (internal quotation marks and record citation omitted)); *Aguirre v. Los Angeles Unified Sch. Dist.*, 461 F.3d 1114, 1121, 1122 )(9th Cir. 2006) (Pregerson, J., concurring) ("[T]he district court is not required to calculate a fee award by looking solely to the number of successful claims. That is, nothing in *Hensley* suggests that Aguirre is entitled to only 14.8% or 4/27 of the fee requested because she prevailed on only four of twenty seven claims. This is true because some claims may seek dramatic or more substantial relief, while others seek minor relief; the fee award must be calculated with careful consideration of the degree of success the prevailing party obtained"); *Robinson v. City of Edmond*, 160 F.3d 1275, 1283 (10th Cir. 1998) ("[W]hen a plaintiff achieves the principal goal

of [his] lawsuit, lack of success on some of [his] interrelated claims may not be used as a basis for reducing the plaintiff's fee award").

Rather, courts must consider two issues in evaluating a party's degree of success. *Webb v. Sloan*, 330 F.3d 1158, 1169 (9th Cir. 2003). The first step is to determine whether the prevailing party lost on claims that were unrelated to the claims on which it succeeded, since fees should not be awarded for hours spent on claims that were entirely distinct, unrelated, and unsuccessful. *Id.* Plaintiffs did not lose on unrelated claims. Although the first jury found they had not proven that Jiles interfered with their due process right to a familial relationship with their father, this claim was inextricably intertwined with plaintiffs' claim that Jiles used excessive force resulting in their father's death. Plaintiffs' state law claims, which the court dismissed without analysis after plaintiffs filed a notice of non-opposition to defendants' motion to dismiss, were also inextricably intertwined with the excessive force claim. Finally, plaintiffs did not lose the balance of their federal claims or their claims against other defendants, as they voluntarily dismissed these claims during the course of litigation. Neither the court nor the jury had an opportunity to pass on the merits of those claims, and the court notes that plaintiffs dismiss claims or defendants for a host of strategic reasons, and not simply because they have concluded the claims are not viable. Even if plaintiffs had lost on these aspects of their case, moreover, the remaining §§ 1983 and 1985 claims arose from Jiles' shooting of Don Richard and were inextricably intertwined with the excessive force claim as well.

Next, the court must consider whether the prevailing party "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Id.* As the Supreme Court has held, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," which "encompass[es] all hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. "The amount of damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded under § 1988. It is, however, only one of many factors that a court should consider in calculating an award of attorney's fees. [The Supreme Court has] reject[ed] the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." *City of*

*Riverside v. Rivera*, 477 U.S. 561, 574 (1986). As the Ninth Circuit has noted, "*Rivera* tells us that there is no absolute requirement that attorneys' fees in civil rights cases be proportionate to the damages awarded. Although the damage amount may be relevant, the correct standard is one of compensation for time reasonably expended." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1143-44 (9th Cir. 1986).

Jiles argues that plaintiffs' requested fee of $953,750.60 is disproportionate to the $200,000 verdict in their favor.[83] The court, of course, has calculated a lower lodestar of $807,228.50, making the differential between the verdict and the fee amount smaller.[84] The $200,000 recovery, moreover, is not insignificant. The jury found that $200,000 was sufficient to compensate plaintiffs, as Don Richard's successors in interest, for his actual damages. The court believes this was an excellent result, most particularly because the damages were limited to Don Richard's pain and suffering prior to death. Although the jury did not award punitive damages, this is because it could not reach a unanimous conclusion as to whether Jiles' conduct was malicious, oppressive, or in reckless disregard for Don Richard's rights.

As noted, moreover, plaintiffs' measure of success is not based solely on the amount of their recovery. The jury's verdict validates plaintiffs' belief that Jiles' conduct was unconstitutional, provides Don Richard's family a measure of closure they would not otherwise have received, and provides guidance to Jiles and the San Bernardino Police Department about the limits of appropriate uses of deadly force, which benefits society at large. Finally, as the court has noted, the eyewitness accounts of what transpired were conflicting; the reaction of the first jury, which hung on the excessive force count, necessitated reconsideration of plaintiffs' theory of the case, and reassessment of the evidence in light of the change in theory. Under the circumstances, the court believes $200,000 was an excellent recovery. For all of these reasons, the court cannot accept Jiles' argument that fees should be reduced to $289,409.80 because they

[83]Opposition at 8.

[84]At the hearing, Jiles' lawyer reiterated his argument that the differential between fees of $800,000 or more and plaintiffs' recovery was too large.

39

are disproportionate to plaintiffs' recovery.[85]  See, e.g., *Rivera*, 477 U.S. at 576 (affirming a $245,000 fee award in a case where plaintiff recovered $33,000); *Jones v. County of Sacramento*, No. CIV S–09–1025 DAD, 2011 WL 3584332, *17 (E.D. Cal. Aug. 12, 2011) (awarding $273,622.50 in attorneys' fees in a § 1983 excessive force claim where plaintiffs recovered $31,000 in compensatory and no punitive damages, declining to reduce award on the basis that the fees were disproportionate to the recovery, and stating "[t]he court is entirely unpersuaded by defendants proposed proportionality ratio [that because plaintiff recovered only 2% of what he asked the jury to award, he should be entitled to only 2% of the requested lodestar], which is blatantly inconsistent with Congress' purpose in enacting § 1988"); *Wheeler v. Coss*, No. 3:06–cv–00717–RAM, 2010 WL 2628667, *9 (D. Nev. June 28, 2010) (awarding fees of $264,158.86 in a § 1983 unlawful arrest action where plaintiff obtained a $50,000 settlement, stating that the recovery represented an "excellent result[ ]," and noting that the case "conferred a meaningful public benefit" because it "sen[t] a message to the City of Reno and its police department about the need to undertake proper investigation before placing a person under arrest"); *Oberfelder v. City of Petaluma*, No. C–98–1470 MHP, 2002 WL 472308, *4 (N.D. Cal. Jan.29, 2002) (awarding $940,593 in fees where plaintiff recovered $100,000 at trial, declining to reduce award as disproportionate, and noting that "plaintiff received excellent results from counsel's work").  The court therefore awards counsel reasonable attorneys' fees of $807,228.50.

### E.    Whether the Court Should Award Counsel their Requested Costs

Plaintiffs also request $21,429.60 in costs.[86]  Rule 54(d)(1) provides that costs "should be allowed to the prevailing party."  FED.R.CIV.PROC. 54(d)(1).  Plaintiffs have submitted a detailed breakdown of their request for $14,104.60 in costs, together with photocopies of receipts and checks that support their application to the clerk to tax costs.[87]  Although plaintiffs apparently seek

---

[85]*Id.* at 18.  Although Jiles suggests this alternate amount, he does not explain how he arrived at this valuation.

[86]Motion at 20.

[87]Application to Clerk to Tax Costs, Docket No. 256 (Nov. 13, 2013).

to have the court award the amounts included in their taxable costs, their request for taxable costs will be heard by the Clerk's designee in accordance with Local Rule 54-2.2, not by the court in this motion. Accordingly, to the extent plaintiffs ask that the court award taxable costs of $14,104.60, the court denies the motion.

The remainder of the costs plaintiffs seek – $7,325.00 – non-taxable expert witness fees. Specifically, plaintiffs seek $6,500 that was paid to Roger Clark, their police practices expert, and $825 that was paid to Vina Spiehler, a forensic toxicologist.[88] Plaintiffs have not submitted declarations by counsel or other supporting evidence demonstrating that they expended these amounts, and the court declines to provide them time to do so because the expert witness fees are not recoverable.

"It is well established that attorney's fees under 42 U.S.C. § 1988 include reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920." *Trustees of Construction Industry and Laborers Health and Welfare Trust v. Redland Insurance Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006). Expert witness fees, however, are not recoverable as costs under § 1988. In *West Virginia University Hospital Inc. v. Casey*, 499 U.S. 83, 102 (1991), the Supreme Court concluded that 42 U.S.C. § 1988 does not authorize the shifting of expert fees in civil rights cases to the losing party. As a result, prevailing parties cannot recover more than the witness fees authorized by § 1920 for experts who testified; they can recover nothing for the services of experts in a non-testimonial capacity. *Gates*, 987 F.2d at 1407 (" In *Casey* the Court held that § 1988 does not convey authority to shift expert fees in civil rights litigation to the losing party and that when experts appear at trial they are eligible for the fee provided by 28 U.S.C. §§ 1920 and 1821, but that the prevailing party may not be awarded more than this amount for expert witnesses' trial testimony and is not entitled to anything for services rendered by experts in a nontestimonial capacity").

---

[88]Motion at 20.

41

After the Supreme Court's decision in *Casey*, Congress amended § 1988 to provide for the recovery of expert fees in cases brought to enforce a provision of 42 U.S.C. § 1981 or 1981a. See 42 U.S.C. § 1988(c) ("In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee"); *Landgraf v. USI Film Products*, 511 U.S. 244, 251 (1994) (noting, in the context of a § 1981 case, that Congress amended § 1988 to "respond[ ] to [*Casey*], by providing that an award of attorney's fees may include expert fees"). Congress did not amend § 1988 to allow courts to award expert fees in all cases covered by § 1988(b), however. The amendment was limited only to cases arising under §§ 1981 or 1981a. In other types of cases, *Casey* is binding, and precludes awarding plaintiffs the expert fees they seek. See *Jones*, 2011 WL 3584332 at *19 ("[A] plaintiff may not recover expert witness fees pursuant to § 1988"); *Mitchell Engineering v. City and County of San Francisco*, No. C 08–04022 SI, 2011 WL 1431511, *8 (N.D. Cal. Apr. 14, 2011) ("The City points out, and . . . counsel concede, that plaintiff may not recover expert fees pursuant to Section 1988"); *Ruff v. County of Kings*, 700 F.Supp.2d 1225, 1243 (E.D. Cal. 2010) (noting that the Supreme Court has held that § 1988 does not allow for the recovery of expert witness fees and that subsequent Congressional action did not change this for purposes of § 1983 litigation); *Agster v. Maricopa County*, 486 F.Supp.2d 1005, 1019 (D. Ariz. 2007) (because Congress did not amend § 1988 to permit reimbursement of expert fees in § 1983 cases, the *Casey* decision controls in such cases). As it appears that the entirety of the non-taxable costs plaintiffs seek to have the court award are expert witness fees, the court denies plaintiffs' request to award costs.

## III.  CONCLUSION

For the reasons stated, the court awards counsel reasonable attorneys' fees in the amount of $807,228.50. It denies counsels' request for costs. Counsels' request for taxable costs will

Case 2:16-cv-05117-TJH-GJS Document 88-7 Filed 08/16/17 Page 411 of 445 Page ID
Case 2:16-cv-09581-MWF-GJS Document 278-7 Filed 03/10/14 Page 43 of 49 Page ID #:3027
#:1824

1  be heard by the Clerk's designee.  The court declines to award expert witness fees as non-taxable

2  costs.

3

4  DATED: March 10, 2014



   MARGARET M. MORROW
   UNITED STATES DISTRICT JUDGE

# PRIORITY SEND

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES -- GENERAL

Case No.  EDCV 12-00700 VAP (OPx)　　　　　　　Date:  August 27, 2014

Title:　　WILLIAM F. HOWARD -*v*- COUNTY OF RIVERSIDE ET AL
===============================================================
PRESENT:　　　HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE

|  |  |
|---|---|
| Marva Dillard | None Present |
| Courtroom Deputy | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS:

ATTORNEYS PRESENT FOR DEFENDANTS:

　　None　　　　　　　　　　　　　None

PROCEEDINGS:　　　MINUTE ORDER GRANTING IN PART DEFENDANT'S MOTION TO STAY JUDGMENT PENDING APPEAL AND GRANTING MOTION FOR ATTORNEY'S FEES (IN CHAMBERS)


　　On July 3, 2014, following a jury trial, the Court entered a Judgment in favor of Plaintiff William Howard and against Defendants Deputy Armando Munoz and the County of Riverside.  Before the Court is Defendants' Motion to Stay Enforcement of Judgment Pending Appeal (Doc. No. 174) and Plaintiff's Motion for Attorney's Fees and Costs (Doc. No. 169).  These matters came before the Court for a hearing on August 25, 2014.  After considering the papers filed in support of, and in opposition to, the Motions, and the arguments advanced by counsel at the hearings, the Court GRANTS the Motion for Attorney's Fees and GRANTS IN PART the Motion to Stay Judgment Pending Appeal without Bond.

# I. BACKGROUND

On April 7, 2011, William H. Howard ("Plaintiff") was shot in the face by County of Riverside Sheriff Deputy Armando Munoz.  Plaintiff brought an action against Deputy Munoz and the County of Riverside, alleging that Deputy Munoz used excessive and unreasonable force in violation of federal and state law and seeking damages for pain, suffering, and past and future medical costs.  The issues of liability and damages were tried to a jury on June 3, 2014.  On June 11, 2014, the jury returned a special verdict in favor of Plaintiff on his federal and state law claims and awarded him a total of $7,810,000.00 in damages.  ("Verdict") (Doc. No. 154.)  Plaintiff elected the damages awarded to him on his federal claim, and a judgment in the sum of $6,410,000.00 was entered in his favor on July 3, 2014.  ("Judgment") (Doc. No. 168.)  Defendants have appealed the Judgment to the Ninth Circuit Court of Appeals.  (Notice of Appeal) (Doc. No. 176.)

On July 17, 2014, Plaintiff filed a Motion for Attorney's Fees and Costs pursuant to 42 U.S.C. section 1988.  ("Atty's Fees Mot.") (Doc. No. 169.)  On July 28, 2014, Defendants filed an Opposition ("Atty's Fees Opp'n") (Doc. No. 181) and evidence in support of their Opposition (Doc. No. 180).  On August 11, 2014, Plaintiff filed his Reply and the Supplemental Declarations of Carol Sobel ("Supp. Sobel Decl.") (Doc. No. 188); Vicki Sarmiento ("Supp. Sarmiento Decl.") (Doc. No. 189); and Dale Galipo (Supp. Galipo Decl.") (Doc. No. 190).

On July 24, 2014, Defendants filed a Motion to Stay the Enforcement of Judgment Pending Appeal ("Stay Motion") (Doc. No. 174).  Plaintiff filed an Opposition on August 4, 2014 ("Stay Opp'n") (Doc. No. 183), and Defendants filed their Reply on August 7, 2014 ("Stay Reply") (Doc. No. 186).

# II. LEGAL STANDARD
## A. Staying Enforcement of Judgment Pending Appeal

Pursuant to Federal Rule of Civil Procedure 62(d), "[i]f an appeal is taken, the appellant may obtain a stay by supersedeas bond. . . . "  Fed. R. Civ. P. 62(d).  The bond "may be given upon or after filing the notice of appeal or after obtaining the order allowing the appeal.  The stay takes effect when the court approves the bond."  Id.  Filing the bond results in a stay as a matter of right.  Id.  A supersedeas bond "suspends a judgment creditor's power to levy execution, [usually] pending appeal,"

Black's Law Dictionary 1479 (8th ed. 2004), while also ensuring the judgment creditor will be able to collect the judgment plus interest should the court of appeals affirm the judgment, Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1505 n.1 (9th Cir. 1987). "District courts have inherent discretionary authority in setting supersedeas bonds. . . . The purpose of a supersedeas bond is to secure the appellees from a loss resulting from the stay of execution and a full supersedeas bond should therefore be required." Rachel, 831 F.2d at 1505 n.1 (citing Miami Int'l Realty Co. v. Paynter, 807 F.2d 871, 873 (10th Cir. 1986)).

## B.   Attorney's Fees Under 42 U.S.C. § 1988

Fees in section 1983 cases are governed by 42 U.S.C. section 1988, which provides:

> In any action or proceeding to enforce a provision of section[] . . . 1983 . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . .

42 U.S.C. § 1988(b). "The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quotation marks omitted). The analysis of attorney's fees is twofold. The Court first must determine whether or not the party seeking fees is the prevailing party. Fischer v. SJB-P.D., Inc., 214 F.3d 1115 (9th Cir. 2000); Chabner v. United of Omaha Life Ins. Co., 1999 WL 33227443 (N.D. Cal. 1999). A plaintiff is the prevailing party when the "resolution of the dispute . . . changes the legal relationship between itself and the defendant." Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792 (1989). In other words, "'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" Farrar v. Hobby, 506 U.S. 103, 109 (1992) (quoting Hensley, 461 U.S. at 433).

## III.  DISCUSSION

## A.   Stay Enforcement of Judgment Pending Appeal

Defendants seek to stay enforcement of the Judgment pending appeal without posting a supersedeas bond. Plaintiff opposes Defendants' Motion to stay the judgment without a bond, and contends that the bond should be set at 125 percent of the damages award, or $8,012,500.00.

## 1. Waiver of Bond

While filing a supersedeas bond allows a party to obtain a stay as a matter of right, "[t]he court also has discretion to stay execution of judgment pending appeal without requiring a bond," where the court finds that the appellee's interests are adequately protected. Acacia Research Corp. v. Nat'l Union Fire Ins. Co., 2008 WL 4381649, at *2 (C.D. Cal. Sept. 9, 2008) (citing Am. Color Graphics, Inc. v. Travelers Prop. Cas. Ins. Co., 2007 WL 1520952, at *1 (N.D. Cal. May 23, 2007)); see Townsend v. Holman Consulting Corp., 881 F.2d 788, 796 (9th Cir. 1989) ("[T]he district court has broad discretionary power to waive the bond requirement if it sees fit."), vacated on reh'g on other grounds, 929 F.2d 1358 (9th Cir. 1990) (en banc); Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n, 636 F.2d 755, 759-61 (D.C. Cir. 1980) (Rule 62 "in no way necessarily implies that filing a bond is the only way to obtain a stay.").

The court may waive the bond requirement on several grounds: "(1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial position that the requirement to post a bond would place other creditors of the defendant in an insecure position." United States v. Boyce, 148 F. Supp. 2d 1069, 1096 (S.D. Cal. 2001) (citing Dillon v. City of Chicago, 866 F.2d 902, 904-05 (7th Cir. 1988) (internal citations and quotations omitted)).

Defendants argue that, although the Judgment was entered jointly and severally against Deputy Munoz and the County of Riverside, the County of Riverside is responsible for the entire amount of the Judgment pursuant to California Government Code section 825. Cal. Gov't Code § 825. The County argues that it has sufficient assets to pay the Judgment if it is affirmed on appeal, and requiring a

bond would be a waste of money.

The County bears the burden of "objectively demonstrat[ing]" the reasons for departing from the usual requirement of a full superseadeas bond. Cotton ex rel. McClure v. City of Eureka, Cal., 860 F. Supp. 2d 999, 1028 (N.D. Cal. 2012). In support of its assertion that the County has sufficient resources to satisfy the Judgment, the County submits the declaration of the County of Riverside's Chief Executive Officer, Jay Orr. Orr states that County is not in any danger of filing for bankruptcy and the annual budget for 2014-2015 fiscal year is $4.8 billion dollars. (Orr Decl. ¶¶ 1-2.) In addition, Jeff Ashworth, the County's Senior Liability Claims Adjustor, submitted a declaration detailing the payment process if the Judgment is affirmed. (Ashworth Decl. ¶ 6.) Ashworth states that if the Judgment is affirmed, he will submit a check request to the Auditor/Controller's office for payment of the amount of the Judgment, and then the Auditor/Controller will issue a check and return it to him. Plaintiff will then be required to provide a signed W-9 statement to comply with IRS regulations. (Id. ¶ 6.) In total, Ashworth estimates the process usually takes less than 30 days. (Id.)

As Plaintiff correctly asserts, the County has provided information about the County's assets without explaining its liabilities.[1] The County has not identified which section of the budget the Judgment will be paid from, or provided any assurance that the amount necessary to pay the judgment is available or kept as part of a specific fund. Ashworth states that the process of satisfying the judgment is accomplished by simply requesting a check from the auditor/comptroller, but neither Orr nor Ashworth give any information about which fund within the budget will pay the judgment, or how much money is available in that specific fund.

"Courts are generally reluctant to waive the bond requirement for

---

[1]For example, the "Riverside County Budget Summary" attached to the Defendants' Reply states, in reference to the 2013-2014 fiscal year that, "of the $4.7 billion total, the Board of Supervisors has direct control over revenue totaling $590 million. The remainder of the budget is encumbered by state spending mandates and other commitments, such as bond payments." (Ex. 3 to Opp'n at 3.)

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

governmental entities unless funds are readily available and an effective procedure is in place for paying the judgment." <u>Wilmer v. Bd. of Cnty. Comm'rs of Leavenworth Cnty., Kan.</u>, 844 F. Supp. 1414, 1419 (D. Kan. 1993). Courts have waived the bond requirement for governmental entities when the entity has specifically allocated and identified funds that will be available to pay a judgment. <u>See</u> <u>Lightfoot v. Walker</u>, 797 F.2d 505, 507 (7th Cir. 1986) (noting the Rule 62(e), which entitles the federal government to stay execution pending appeal without bond, is appropriate because all judgments against the United States are paid out of a specific "Judgments Fund"); <u>Contract Design Grp., Inc. v. Wayne State Univ.</u>, 2014 WL 2892513, at *2 (E.D. Mich. June 25, 2014) (no bond required when University received funding from the state of Michigan legislature and identified $183.5 million in unrestricted net assets that could satisfy the judgment of $550,000); <u>Johnson v. City of Memphis</u>, 2013 WL 2404042, at *1 (W.D. Tenn. May 31, 2013) (no bond necessary because City of Memphis maintains a "General Fund for, <u>inter alia</u>, the purpose of satisfying money judgments"); <u>McCaughey v. City of Blue Ash</u>, 2009 WL 4280266, at *1-2 (S.D. Ohio Nov. 25, 2009) (no bond necessary where city represented it had already set aside funds to pay $526,430.42 judgment). Courts have not permitted waiver when funds are not reserved specifically for the payment of the judgment. <u>See</u> Order Re: Motion for Stay of Execution of Judgment and Waive of Posting Supersedeas Bond, <u>Contreras v. City of Los Angeles</u>, Case No. 2:11-cv-1480-SVW-SH (May 20, 2013, C.D. Cal.) ("Contreras") (City of Los Angeles not entitled to bond waiver when it merely identified the amount available in reserve fund without reporting deficits or providing assurance the sufficient funds were set aside for the judgment).

Furthermore, the amount of the judgment in this case, $6,410,000.00, is much larger than the judgments in cases where courts have found that simply identifying the government entity's resources was a sufficient guarantee the judgment would be paid. <u>Fialka-Feldman v. Oakland Univ. Bd. of Trs.</u>, 2010 U.S. Dist. LEXIS 92581 (E.D. Mich. Sept. 7, 2010) (Oakland University received funding from state and had sufficient resources to pay $101,676.00 judgment); <u>Reese v. Mich. Dep't of Corr.</u>, 2011 U.S. Dist. LEXIS 21545 (E.D. Mich. Mar. 3, 2011) (state of Michigan's ability to pay $50,000.00 judgment "beyond dispute.").

In Reply, the County submits the Declaration of James Sessions, the County

of Riverside's Risk Manager, who states that the majority of the judgment will be covered through "CSAC-Excess Insurance Authority," which is an insurance pool and group purchase program that currently insures most of the counties, cities, schools, and districts in the State of California.  (Sessions Decl. ¶ 3.)  The County is self-insured for the first million dollars of defense costs and the payment of any judgment against it.  Sessions states that CSAC purchased excess insurance for this action from Ironshore Insurance Company, which will be responsible for the amount of judgment in excess of one million dollars.  (Sessions Decl. ¶ 4.)  As Vice-President of the CSAC Executive Committee, Sessions states that he can attest that CSAC is financial stable.  (Sessions Decl. ¶ 3.)  In addition, Sessions submits A.M. Best's A:14 rating of Ironshore.  (Sessions Decl. ¶ 4.)

In Cotton, the City of Eureka submitted declarations from representatives of its insurance company stating that were no coverage issues in regard to the Judgment and thus the insurance would provide sufficient funds to pay the judgment.  The United States District Court for the Northern District of California found these declarations were not sufficient proof of the City's ability to pay any judgment because the insurance representatives did not state their respective funds would "unconditionally satisfy the judgment."  860 F. Supp. 2d at 1028.

Here, the Risk Manager for the County of Riverside stated that Ironshore will cover the costs of any judgment.  The County has not provided any declarations from Ironshore, or any other evidence, such as the policy limits, that supports Sessions' assertion that there is insurance coverage and that coverage would "unconditionally satisfy the judgment."  See Cotton, 860 F. Supp. 2d at 1028; Cf. Barachkov v. Davis, 2013 WL 2149104, at *9 (E.D. Mich. May 16, 2013) (Affidavit from insurance company admitting liability and promising to pay judgment on appeal sufficient to waive bond).[2]  The County has not met its burden of demonstrating that

_____

[2]At the hearing the County indicated it was willing to provide a declaration from Ironshore regarding its liability and willingness to pay the amount the amount of the
(continued...)

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

waiver of the supersedeas bond requirement is appropriate.

## 2.    Amount of the Bond

Plaintiff seeks a bond in the sum of 125 percent of the trial judgment, which amounts to $8,012,500.00.  Plaintiff seeks this amount in order to account for interest on the judgment and attorney's fees and costs.  Defendants argue that, if a bond is required, it should be calculated based on an interest rate of .11 percent per year for two years, which is the average amount of time the Ninth Circuit takes to resolve an appeal.  Under Defendant's calculation the bond would be set at $6,424,102.00.

The purpose of a supersedeas bond is to secure the appellees from a loss resulting from the stay of execution.  <u>Rachel</u>, 831 F.2d at 1505 n.1.  Rule 62(d) is silent as to the amount appropriate for a supersedeas bond pending appeal and the Court has discretionary authority to set the amount of the bond.  "Although practices vary among judges, a bond of 1.25 to 1.5 times the judgment is typically required." <u>Cotton</u>, 860 F. Supp. 2d at 1029 (quoting Christopher A. Goelz & Meredith J. Watts, California Practice Guide: Ninth Circuit Civil Appellate Practice ¶ 1:168 (2011)).

Defendant has cited no case law in support of its calculation of the amount of the supersedeas bond.  Plaintiff has cited to one recent civil rights cases in the

------------------------

[2](...continued)
judgment in excess of $1,000,000.00 if it is affirmed on appeal.  First, the Court notes that the issue of insurance was improperly raised for the first time on Reply. Second, the Court it is not required to consider new evidence submitted after the hearing, especially when that evidence could have been obtained at the time the motion was filed.  It is clear under existing case law, including the cases cited by the Defendants in their Motion, that the declarations submitted in support of their Motion were insufficient to justify waiver of a supersedeas bond.  Defendants initial failure to include the appropriate declarations in support of their Motion is not a reason to afford Defendants a second opportunity to submit sufficient evidence.

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

Central District of California where the court set the supersedeas bond at 125 percent of the amount of the total judgment.  See Contreras at 7.  In Contreras, the City of Los Angeles was required to post bond of $8,283,612.88, which was 125 percent of the $6,626,890.30 judgment, in order to stay execution of the judgment. Id.  Similarly, in Cotton, the court ordered the City of Eureka to post a bond of $5,718,750.00, which was 125 percent of the judgment entered in a civil rights action.  Accordingly, the Court finds that a bond in the amount of 125 percent of the judgment, which is $8,012,500.00, is appropriate.

## B.    Attorney's Fees Under 42 U.S.C. § 1988

Plaintiff was the prevailing party at trial.  The jury found that Deputy Munoz used excessive and unreasonable force against Plaintiff and awarded Plaintiff $7,810,000.00 in damages.  After electing damages for his federal excessive force claim, a Judgment was entered in Plaintiff's favor for $6,410,000.00.  Defendants agree Plaintiff is entitled to reasonable attorney's fees, but objects to the costs, hourly rate, and number of hours requested.

"In determining a reasonable attorney's fee, the district court's first step is to calculate a 'lodestar' by multiplying the number of hours it finds the prevailing party expended on the litigation by a reasonable hourly rate." McGrath v. County of Nevada, 67 F.3d 248, 252 (9th Cir. 1995) (citing Hensley, 461 U.S. at 433).  The Court then decides whether to increase or decrease the lodestar amount by evaluating the factors enunciated in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975), cert. denied, 425 U.S. 951 (1976).  The Kerr factors are:  time and labor required; the novelty and difficulty of the questions involved; the skill needed to perform the legal service properly; the preclusion of other employment by the attorney due to acceptance of the case; the customary fee, whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of the attorney; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases.  Id.

Case 2:16-cv-05017-TJH-GJS Document 188-7 Filed 08/16/17 Page 421 of 445 Page ID
Case 5:12-cv-00700-VAP-OP JS Document 199 Filed 09/29/14 Page 10 of 16 Page ID #:1966
#:1834

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

Plaintiff's counsel Vicki Sarmiento seeks $320,040.00 in fees based on an hourly rate of $600 per hour and a total of 533.4 hours; Dale Galipo seeks $419,120.00 in fees based on an hourly rate of $800 per hour and a total of 523.9 hours. Defendants object that (1) the hourly rates requested are too high; (2) fees should not be awarded for duplicative work, generic "trial preparation", or hours that did not contribute to the verdict; and (3) the hours claimed are excessive.

### 1. Reasonable Hourly Rate

"The hourly rate for successful civil rights attorneys is to be calculated by considering certain factors, including the novelty and difficulty of the issues, the skill required to try the case, whether or not the fee is contingent, the experience held by counsel and fee awards in similar cases." Moreno v. City of Sacramento, 534 F.3d 1106, 1114 (9th Cir. 2008). In addition, the court is guided by "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." Trevino v. Gates, 99 F.3d 911, 925 (9th Cir. 1996).

In support of their requested hourly rates, Ms. Sarmiento and Mr. Galipo submit declarations detailing their skills as civil rights attorneys and past fee awards they have received.[3] They also submit numerous declarations from accomplished civil rights attorneys in the Los Angeles area - Paul Hoffman, John Burton, Jorge Gonzalez, and Carol Sobel - who attest that the rates requested by Sarmiento and Galipo are reasonable.[4]

In Opposition, Defendants argue that the hourly rates requested are too high.

––––––––––––––––––––

[3]Declaration of Plaintiff's attorney Vicki I. Sarmiento ("Sarmiento Decl.") (Doc. No. 170) and Declaration of Plaintiff's attorney Dale Galipo ("Galipo Decl.") (Doc. No. 171).

[4]Declarations of Carol Sobel ("Sobel Decl.") (Doc. No. 170-2); Jorge Gonzalez ("Gonzalez Decl.") (Doc. No. 170-3); Paul Hoffman ("Hoffman Decl.") (Doc. No. 171-1); and John Burton ("Burton Decl.") (Doc. No. 171-2).

Case 2:16-cv-05017-TPL-GJS   Document 188-7   Filed 09/16/17   Page 422 of 445   Page ID
Case 5:12-cv-00700-VAP-OPJS   Document 198-7   Filed 08/27/14   Page 11 of 26   Page ID
#:1835

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

In support of their Opposition they submit the declarations of several attorneys who
practice in the Inland Empire, including the attorneys hired to defend the County in
this action.  All of these attorneys bill at hourly rates that are lower than the rates
requested by Plaintiff and range from $165.00 per hour to $400.00 per hour.[5]  As
Plaintiff correctly points out in Reply, except for Andrew Roth, all of the declarations
were submitted by attorneys who do not practice in the area of civil rights litigation.
The Roth Declaration submitted is a copy of a Declaration submitted in support of
Roth's 2011 motion for attorney's fees in an employment action, in which he
requested an hourly rate of $400.00 per hour.  (Roth Decl. ¶ 5.)  Thus, although the
Court has considered the rates charged by Mr. Roth, the Court notes that the
declaration submitted does not relate to fees charged for work in a civil rights action.

        In regard to the rates charged by defense counsel, the Ninth Circuit has stated
that "private attorneys hired by a government entity to defend excessive force cases
are not in the same legal market as private plaintiff's attorneys who litigate civil rights
cases."  Trevino, 99 F.3d at 925.  Accordingly, the Court may not consider the
compensation of the defense attorneys in this case when determining the
reasonable hourly rates for Plaintiff's counsel.


        Mr. Galipo is an extremely accomplished and successful civil rights attorney.
He has managed his own law firm since 1991, and has tried in excess of two
hundred civil cases through verdict.  (Galipo Decl. ¶¶ 8, 9.)  Mr. Galipo specializes in
police misconduct civil rights litigation and been counsel on numerous civil rights
cases that resulted in multi-million dollar plaintiff's verdicts.  (Id. ¶ 10.)  In support of
Mr. Galipo's fee request, Paul Hoffman, a partner at Schonbrun DeSimone Seplow
Harris & Hoffman LLP, states that "there is no other attorney in our community who
has had the level of success in police misconduct litigation in terms of large verdicts
that Mr. Galipo has."  (Hoffman Decl. ¶ 4.)  In 2006 and 2007 this Court awarded Mr.
Galipo an hourly rate of $500.00 per hour for his work on two different civil rights

_____

        [5]Declarations of Andrew Roth ("Roth Decl."); Dennis Stout ("Stout Decl.");
Mark Gunn ("Gunn Decl."); Jeffrey Raynes ("Raynes Decl."); and Jeremy Hanson
("Hanson Decl.")(Doc. No. 180).

Case 2:16-cv-05017-TJH-GJS Document 198-7 Filed 08/16/17 Page 423 of 445 Page ID
Case 5:12-cv-00700-VAP-OP Document 158-1 Filed 09/29/14 Page 12 of 36 Page ID #:1968
#:1836

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

cases.[6]  Since 2007 the hourly rates awarded to Mr. Galipo by courts in the Central
District have ranged from $675.00 to $800.00.[7]  Notably, Mr. Galipo was awarded an
hourly rate of $800.00 per hour in two recent civil rights cases in the Central District.
See R.S. v. City of Long Beach, SACV11-536 AG (RNBx) (C.D. Cal. Jan. 31, 2014);
Sanchez et al v. County of San Bernardino, CV10-9384 MMM (OPx) (C.D. Cal.
March 10, 2014).  Considering the rate prevailing in the community for similar work
performed by attorneys of comparable skill, experience, and reputation, the Court
finds a reasonable hourly rate for Mr. Galipo is $800.00 per hour.

Ms. Sarmiento is also an accomplished civil rights attorney.  She has been in
private practice since 1991 and specializes in major personal injury and civil rights
police misconduct cases.  (Sarmiento Decl. ¶ 5.)  Several local civil rights attorneys
submitted declarations attesting to Ms. Sarmiento's skill and experience.  Ms.
Sarmiento was recently awarded an hourly rate of $500.00 per hour in a civil rights
case in Los Angeles Superior Court.  (Id. ¶ 8.)  Considering the rate prevailing in the
community for similar work performed by attorneys of comparable skill, experience,
and reputation, the Court finds a reasonable hourly rate for Ms. Sarmiento is $550
per hour.

## 2.  Reasonable Hours

The Court has reviewed each and every billing entry in Plaintiff's fee request.
The Court has reduced the fees requested by Plaintiff for tasks (1) on which
excessive time was spent, (2) unnecessary, excessive, or duplicative entries, (3)

---

[6]Ingram v. City of San Bernardino, No. EDCV
05-925-VAP (SGLx), 2007 WL 5030225 (C.D. Cal. Aug. 27, 2007) (hourly rate of
$500 for Galipo); Adams v. City of Rialto, Nos. EDCV 04–155–VAP (SGLx), EDCV
04–1032 VAP, 2006 WL 7090890 (C.D. Cal. July 20, 2006) (same).

[7]Contreras v. City of Angeles, No. 2:11–cv–1480–SVW–SH, 2013 WL
1296763 (C.D. Cal. Mar. 28, 2013) ($675 per hour); P.C. v. City of Los Angeles, No.
CV 07-6495 PLA (C.D. Cal. Sept. 14, 2012) ($700 per hour).

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

time charged for clerical or secretarial tasks. The Court notes that Plaintiff's counsel voluntarily eliminated time spent on administrative or semi-clerical tasks, inter-office communication, some communication between co-counsel, and miscellaneous discovery matters, and thus the Court's reductions are minimal. (Atty's Fee Mot. at 12.) In addition, Plaintiff does not seek fees for any paralegal assistance and does not seek a multiplier, and has withdrawn his request for witness costs on Reply.

Defendants argue that Plaintiff should not receive compensation for hours related to claims on behalf of Plaintiff's father and son that were dismissed and claims against Sergeant Wedertz that were dismissed shortly before trial. The Court agrees that the hours related to the potential claims by Plaintiff's father and son are not sufficiently related to the ultimate litigation in which Plaintiff prevailed to justify an award of fees, and has reduced the hours requested accordingly. The time spent related to the claims against Sergeant Wedertz, including the motion for summary judgment, were in furtherance of the litigation in which Plaintiff prevailed and contributed to Plaintiff's success at trial. Accordingly, a reduction of those hours is not warranted.

Defendants also argue that counsels' hours should be reduced to account for round numbers, and that it is "impossible that all tasks just happened to take whole hours or half hours to complete." (Atty's Fees Opp'n at 12.) The Court has reviewed the billing records of Plaintiff's counsel and notes there are numerous records that are not in whole or half-hour increments. It appears that Plaintiff's counsel do indeed bill in tenth of hour increments, and therefore a reduction on this basis is not justified.

Defendants further argue that there is "huge duplication" in the billing records, including entries for both Ms. Sarmiento and Mr. Galipo to analyze all the reports, statements, and trial documents. (Atty's Fees Opp'n at 13.) In their supplemental declarations, Plaintiff's counsel explain that Ms. Sarmiento took the lead in drafting all the pleadings, motions, and pretrial documents, propounding and responding to written discovery, and consulting with experts. (Sarmiento Supp. Decl. ¶ 2.) Mr.

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

Galipo was lead trial counsel, but reviewed pretrial documents and motions in order to offer his input and familiarize himself with the case.  (Galipo Supp. Decl. ¶ 5; Sarmiento Supp. Decl. ¶ 2.)  Aside from Deputy Munoz, Ms. Sarmiento voluntarily eliminated hours she spent attending depositions taken by Mr. Galipo.  (Sarmiento Supp. Decl. ¶ 3.)  Accordingly, any duplication of efforts in this regard were reasonable and necessary and a reduction of hours on this basis is not justified.

Finally, Defendants object to Mr. Galipo's entries for generic "trial preparation," which add up to a total of 241.5 hours, or almost half of the total hours he listed for this case.  Mr. Galipo's billing sheet describes "trial preparation" as including:

Outlining examination for all witnesses while reviewing reports, statements, photos, medical records, expert reports, officer's depositions, expert report and deposition testimony, preparing Voir Dire, Opening Statement, Closing Argument, Direct Examination, Cross Examination, and Rebuttal Arguments.  Trial Preparation also includes reviewing Pre-Trial Documents, Exhibits, Jury Instructions, Witness Lists, Motions in Limine, and Verdict Form, etc.

(Ex. A to Galipo Decl. at 5.)  Mr. Galipo's billing records do not specifically describe the particular tasks within his definition of "trial preparation" that are associated with each individual billing entry.

Plaintiff's counsel bears the burden of establishing entitlement to an attorney's fee award and  "documenting the appropriate hours expended and hourly rates."  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  The Court maintains discretion to reduce the number of hours requested where an attorney's block billing makes it difficult to identify whether the hours were reasonably expended.  See Welch v. Metro. Life Ins. Co., 480 F.3d 942, 948 (9th Cir. 2007) ("We do not quarrel with the district court's authority to reduce hours that are billed in block format.  The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked."); R.S., et al,

MINUTES FORM 11                                    Initials of Deputy Clerk __md_____
CIVIL -- GEN                        Page 14

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

SACV11-536 AG (RNBx) at 28 (reducing Galipo's "trial preparation" hours by 20 percent based on block billing).

The trial court, due to its familiarity with the case, is in the best position to evaluate the reasonableness of the hours requested. <u>Moreno</u>, 534 F.3d 1106, 1116 (9th Cir. 2008). The time Mr. Galipo spent preparing for trial was reflected in the organized manner of counsel's trial presentation and his familiarity with the facts and complex legal issues of the case. In addition, the Court notes that throughout the trial Defendants were represented by three senior attorneys, who also had the assistance of a paralegal. Meanwhile Mr. Galipo and Ms. Sarmiento handled Plaintiff's case entirely on their own. Accordingly, the time spent on trial preparation was not excessive. In light of the lack of specificity in Mr. Galipo's billing for "trial preparation", the Court reduces the hours he spent dedicated to "trial preparation" by 5 percent, or 12.08 hours.

In addition, Plaintiff is entitled to attorney's fees for the time spent establishing his right to attorney's fees. <u>Clark v. City of Los Angeles</u>, 803 F.2d 987, 992 (9th Cir. 1986). Ms. Sarmiento submitted billing records documenting the time spent preparing this Motion and requests an award for an additional 18.5 hours. This is a reasonable amount of time to spend in relation to the Attorney's Fees Motion, and the Court has added these hours to its calculation.

In conclusion, the "presumptively reasonable" lodestar amounts for Plaintiff's counsel are as follows. See <u>Jordan</u>, 815 F.2d at 1262. The Court sees no reason to depart from the lodestar amount.

| Attorney | Hourly Rate | Hours | Lodestar |
|----------|-------------|-------|----------|

Case 2:16-cv-05017-TJH-GJS Document 88-7 Filed 03/16/17 Page 427 of 445 Page ID
Case 5:12-cv-00700-VAP-OP Document 198 Filed 08/27/14 Page 16 of 16 Page ID #:1972
#:1840

EDCV 12-00700 VAP (OPx)
WILLIAM F. HOWARD v. COUNTY OF RIVERSIDE ET AL
MINUTE ORDER of August 27, 2014

| Galipo | $800.00 | 498.4[8] | $398,720.00 |
|---|---|---|---|
| Sarmiento | $550.00 | 499.4[9] | $274,670.00 |
| **Total** | | 997.82 | $673,390.00 |

Plaintiff is also entitled to his reasonable out of pocket expenses of $12,796.14.[10]  The total award of attorney's fees and costs is $686,186.14.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Defendants' Motion to Stay the Judgment Pending Appeal, and orders Defendant County of Riverside post a bond of $8,012,500.00.  The Court GRANTS Plaintiff's Motion for Attorney's Fees and Costs, and awards fees in the amount of $673,390.00 and costs in the amount of $12,796.14.

**IT IS SO ORDERED.**

---

[8]521.9 - 12.08 (5% block billing reduction) - 11.4 (father/son claim) = 498.4.

[9]525.4 - 44.4 (father/son claim) + 18.5 (attorney's fee motion) = 499.5.

[10]As noted earlier, Plaintiff withdrew his request for expert witness fees of $45,670.18 in his Reply.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK WILLITS, JUDY GRIFFIN, BRENT PILGREEN, and COMMUNITIES ACTIVELY LIVING INDEPENDENT & FREE ("CALIF"), on behalf of themselves and all others similarly situated, | Case No.: CV 10-5782 CBM (RZx) |
| | **ORDER GRANTING MOTION FOR ATTORNEYS' FEES AND COSTS** |
| Plaintiffs, | |
| vs. | |
| CITY OF LOS ANGELES, a public entity, | |
| Defendant. | |

The matter before the Court is Plaintiffs' unopposed Motion For Attorneys' Fees and Costs brought pursuant to Fed. Rule of Civ. Proc. 23(h) (the "Motion"). (Dkt. No. 380.)

## I.    PROCEDURAL AND FACTUAL OVERVIEW

On August 4, 2010, Plaintiffs Mark Willits, Judy Griffin, Brent Pilgreen, and Communities Actively Living Independent and Free ("CALIF") (collectively, "Named Plaintiffs") filed a class action lawsuit on behalf of persons with mobility disabilities against the City of Los Angeles (the "City") and various individual defendants based on the alleged inaccessibility of the City's sidewalks and other

1

"pedestrian rights of way." The Complaint asserted two federal claims under the American with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act" or "Section 504"), and four state law claims.

**A.      State Court Actions**

In December 2006, Saundra Carter and nine other individuals filed a class action complaint in state court against the City alleging disability discrimination in connection with the City's sidewalks. (Los Angeles Superior Court Case No. BC363305.) In December 2007, Nicole Fahmie commenced a class action against the City in state court based on, among other things, lack of ramps or cutouts on the City's curbs. (Los Angeles Superior Court Case No. BC381773.) *Carter* and *Fahmie* (collectively, "*Carter/Fahmie*") were consolidated on January 27, 2011 under Case No. BC363305.[1]

Victor Pineda, Anatoli Ilyashov, and CALIF commenced a state court class action against the City and various individual defendants in December 2008 on behalf of persons with mobility disabilities who have been denied access to pedestrian rights of way in the City. (Los Angeles Superior Court Case No. BC403327, hereinafter "*Pineda*".)

**B.      Procedural History**

On December 10, 2010, the Court denied defendants' motion to stay proceedings pending *Pineda*, but dismissed the state law claims without prejudice "to be pursued in state court."[2] (Dkt. No. 57.) The Named Plaintiffs commenced a state court action against the City following this Court's dismissal of their state

---

[1] A settlement was reached in 2011 in *Carter/Fahmie*. Although the Named Plaintiffs objected to the *Carter/Fahmie* class action settlement, the settlement was approved by the Superior Court in 2012. The Named Plaintiffs appealed the Superior Court's approval of the *Carter/Fahmie* settlement, and the California Court of Appeal reversed the Superior Court order certifying the settlement class and approving the settlement based on due process grounds. *Carter v. City of Los Angeles*, 224 Cal. App. 4th 808 (Cal. Ct. App. 2014).

[2] The Court also dismissed the individual defendants on that date. (Dkt. No. 57.)

law claims.  (Case No. BC457403, hereinafter "*Griffin*").[3]

The Court granted Plaintiffs' motion for class certification for injunctive and declaratory relief only on January 3, 2011, and appointed Schneider Wallace Cottrell Konecky Wotkyns LLP ("SWCKW"), Disability Rights Legal Center ("DRLC"), Goldstein, Borgen, Dardarian & Ho ("GBDH"), and the Legal Aid Society – Employment Law Center ("LAS-ELC") as Class Counsel.  (Dkt. Nos. 59, 177.)

Defendants filed a motion for judgment on the pleadings based on the purported res judicata effect of the State Court Actions, which was denied as premature by this Court on August 10, 2012.   (Dkt. No. 150.)

The Court granted preliminary and final approval of the parties' class action settlement agreement in this case (the "Settlement Agreement").

Plaintiffs' instant Motion seeks $13,300,000 in attorneys' fees and $1,700,000 in costs expended in connection with this litigation and the State Court Actions.[4]

## II.   STATEMENT OF THE LAW

Federal Rule of Civil Procedure Rule 23(h) provides that "[i]n a certified class action, the court may award attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).

In "civil rights and other injunctive relief class actions, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement or any percentage thereof."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  In determining the amount of a reasonable fee, the Court first determines "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."   *Jankey*, 537 F.3d at 1132 (citing *Hensley*

---

[3] *Carter/Fahmie*, *Pineda*, and *Griffin* shall be collectively referred to herein as the "State Court Actions."

[4] Currently pending before the Clerk is Plaintiffs' application to tax costs.  (Dkt. No. 377.)

1  *v. Eckerhart,* 461 U.S. 424, 433-34 (1983)).  "The hours expended and the rate

2  should be supported by adequate documentation and other evidence."  *Hanlon*,

3  150 F.3d at 1029.  The Court then "exclude[s] from th[e] initial fee calculation

4  hours that were not reasonably expended," such as hours that are "excessive,

5  redundant, or otherwise unnecessary."  *Jankey*, 537 F.3d at 1132 (citing *Hensley v.*

6  *Eckerhart,* 461 U.S. 424, 433-34 (1983)).  The Court, however, must provide a

7  "comprehensible" explanation for any fee reductions.  *T.B. ex rel. Brenneise v.*

8  *San Diego Unified Sch. Dist.*, 806 F.3d 451, 486 (9th Cir. 2015), *cert. denied sub*

9  *nom. San Diego Unified Sch. Dist. v. T.B.*, 136 S. Ct. 1679 (2016).

10  ### III.    DISCUSSION

11  **A.    Prevailing Party**

12  The Court finds Plaintiffs are entitled to reasonable fees and costs as a

13  prevailing party under the ADA and Section 504.  *See* 42 U.S.C. § 12205; 29

14  U.S.C. § 794a(b); *Jankey v. Poop Deck*, 537 F.3d 1122, 1130 (9th Cir. 2008); *La*

15  *Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083,

16  1089 (9th Cir. 2010).[5]

17  **B.    Lodestar**

18  **a.    Hourly Rates**

19  The Court finds, based on the evidence submitted, that the following hourly

20  rates are reasonable:[6]

21

22  _____

[5] The Court declined to exercise supplemental jurisdiction over Plaintiffs' state
23  law claims and dismissed those claims without prejudice.  Accordingly, Plaintiffs
are not entitled to fees and costs as a prevailing party under state law, and are not
24  entitled to a state-law multiplier of the lodestar.  *See Chaudhry v. City of Los
Angeles*, 751 F.3d 1096, 1112 (9th Cir.), *cert. denied sub nom. City of Los
25  Angeles, Cal. v. Chaudhry*, 135 S. Ct. 295 (2014); *Mangold v. Cal. Pub. Utilities
Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995); *City of San Jose v. San Jose Police
26  Officers' Ass'n*, 2013 WL 4806453, at *3 (N.D. Cal. Sept. 9, 2013); *Yates v.
Union Square*, 2008 WL 346418, at *4 (N.D. Cal. Feb. 7, 2008).

27  [6] *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *United Steelworkers of Am.
v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990); *Camacho v. Bridgeport
28  Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008).

| Name | Title | Hourly Rate |
|---|---|---|
| Guy Wallace | Attorney | $750 |
| Mark Johnson | Attorney | $700 |
| Andrew Lee | Attorney | $525 |
| Jennifer Uhrowczik | Attorney | $450 |
| Kiran Prasad | Attorney | $450 |
| Michelle Nguyen | Attorney | $300 |
| Katharine White | Attorney | $300 |
| Amanda Riley | Attorney | $300 |
| Chris Springer | Paralegal/Law Clerk | $235 |
| Charles Greenlee | Paralegal/Law Clerk | $200 |
| Scott Gordon | Paralegal/Law Clerk | $200 |
| Sam Marks | Paralegal/Law Clerk | $200 |
| David A. Borgen | Attorney | $795 |
| Linda Dardarian | Attorney | $775 |
| Andrew Lee | Attorney | $550 |
| Jason Tarricone | Attorney | $525 |
| Katrina Eiland | Attorney | $400 |
| Nancy Hanna | Attorney | $375 |
| Raymond Wendell | Attorney | $325 |
| Scott G. Grimes | Paralegal/Law Clerk | $250 |
| Elizabeth Kramer | Paralegal/Law Clerk | $250 |
| Damon Valdez | Paralegal/Law Clerk | $225 |
| Wendy E. Whitt | Paralegal/Law Clerk | $225 |
| Charlotte Nguyen | Paralegal/Law Clerk | $195 |
| Stuart Kirkpatrick | Paralegal/Law Clerk | $195 |
| Jinny Kim | Attorney | $644 |
| Rachael Langston | Attorney | $473 |
| Alexis Alvarez | Attorney | $385 |
| Mary Broughton | Paralegal/Law Clerk | $165 |

| Michael Hsueh | Paralegal/Law Clerk | $110 |
|---|---|---|
| Shawna Parks | Attorney | $695 |
| Ronald Elsberry | Attorney | $680 |
| Surisa E. Rivers | Attorney | $550 |
| Trevor Finneman | Attorney | $375 |
| Law Clerk | Law Clerk | $230 |
| Shawna L Parks | Attorney | $695 |
| José R. Allen, Esq. | Attorney | $1,115.60 |

### b. Hours Worked

Based on the evidence submitted, the Court finds the following hours were reasonably expended:

| Willits | | |
|---|---|---|
| Name | Hourly Rate | Hours | Lodestar |
| Guy Wallace | $750 | 2,902.5 | $2,176,875.00 |
| Mark Johnson | $700 | 1,922.4 | $1,345,680 |
| Andrew Lee | $525 | 1,034.7 | $543,217.50 |
| Jennifer Uhrowczik | $450 | 331.4 | $149,130.00 |
| Kiran Prasad | $450 | 272.2 | $122,490.00 |
| Michelle Nguyen | $300 | 101.3 | $30,390.00 |
| Katharine White | $300 | 76.0 | $22,800.00 |
| Amanda Riley | $300 | 217.7 | $65,310.00 |
| Chris Springer | $235 | 277.5 | $65,212.50 |
| Charles Greenlee | $200 | 534.1 | $106,820.00 |

| | | | |
|---|---|---|---|
| Scott Gordon | $200 | 100.1 | $20,020.00 |
| Sam Marks | $200 | 1,026.7 | $205,340.00 |
| David A. Borgen | $795 | 113.8 | $90,471.00 |
| Linda Dardarian | $775 | 1,276.1 | $988,977.50 |
| Andrew Lee | $550 | 576.3 | $316,965.00 |
| Jason Tarricone | $525 | 278.0 | $145,950.00 |
| Katrina Eiland | $400 | 207.3 | $82,920.00 |
| Nancy Hanna | $375 | 44.4 | $16,650.00 |
| Raymond Wendell | $325 | 133.7 | $43,452.50 |
| Scott G. Grimes | $250 | 372.2 | $93,050.00 |
| Elizabeth Kramer | $250 | 63.3 | $15,825.00 |
| Damon Valdez | $225 | 946.4 | $212,940.00 |
| Wendy E. Whitt | $225 | 329.3 | $74,092.50 |
| Charlotte Nguyen | $195 | 100.3 | $19,588.50 |
| Stuart Kirkpatrick | $195 | 178.5 | $34,807.50 |
| Jinny Kim | $644 | 859.4 | $553,453.60 |
| Rachael Langston | $473 | 180.2 | $85,234.60 |
| Alexis Alvarez | $385 | 28.6 | $11,011.00 |

| Name | Hourly Rate | Hours | Lodestar |
|---|---|---|---|
| Mary Broughton | $165 | 567.9 | $93,703.50 |
| Michael Hsueh | $110 | 77.4 | $8,514.00 |
| Shawna Parks (DRLC)[7] | $695 | 101.9 | $70,820.50 |
| Ronald Elsberry | $680 | 63.7 | $43,316.00 |
| Surisa E. Rivers | $550 | 810.6 | $445,830.00 |
| Trevor Finneman | $375 | 112.9 | $42,337.50 |
| Unnamed Law Clerk | $230 | 149.3 | $34,339.00 |
| Shawna L Parks | $695 | 15.2 | $10,564.00 |
| José R. Allen, Esq. | $1,115.60 | 560.2 | $624,962.12 |
| **TOTAL** | | | **$9,013,060.32** |

| *Carter/Fahmie* | | | |
|---|---|---|---|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 499.7 | $374,775.00 |
| Mark Johnson | $700 | 141.2 | $98,840.00 |
| Andrew Lee | $525 | 1.7 | $892.50 |
| Charles Greenlee | $200 | 11.6 | $2,320.00 |

---

[7] Shawna Parks was the Legal Director / Director of Litigation at DRLC until her departure in 2012. The fees sought for Park's time spent during her employment with DRLC is designated under "Shawna Parks (DRLC)," and the fees sought for Park's time spent in connection with her own law practice is designated under "Shawna L Parks."

| Sam Marks | $200 | 4.4 | $880.00 |
|---|---|---|---|
| **TOTAL** | | | **$477,707.50** |

| *Pineda* | | | |
|---|---|---|---|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 188.2 | $141,150.00 |
| Mark Johnson | $700 | 142.9 | $100,030.00 |
| Andrew Lee | $525 | 67.4 | $35,385.00 |
| Kiran Prasad | $450 | 13.5 | $6,075.00 |
| Shawna Parks (DRLC) | $695 | 121.6 | $84,512.00 |
| Sage Reeves | $625 | 236.9 | $148,062.50 |
| Surisa E. Rivers | $550 | 67.2 | $36,960.00 |
| Debra J. Patkin | $450 | 410.2 | $184,587.75 |
| Unnamed Law Clerk | $230 | 108.5 | $24,955.00 |
| **TOTAL** | | | **$761,717.25** |

| *Griffin* | | | |
|---|---|---|---|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 0.8 | $600.00 |
| Mark Johnson | $700 | 6.5 | $4,550.00 |
| Shawna Parks (DRLC) | $695 | 2.0 | $1,390.00 |
| Surisa E. | $550 | 18.6 | $10,230.00 |

| Rivers | | | |
|--------|--------|-----|----------|
| Trevor Finneman | $375 | 1.4 | $490.00 |
| **TOTAL** | | | **$17,260.00** |

The Court also finds, based on the evidence submitted, that the above-listed hours expended by non-appointed class counsel Shawna Parks and Jose Allen, and hours expended in connection with the State Court Actions, benefitted the class in this case. *See* F.R.C.P. 23(h) 2003 Advisory Committee Notes; *Wininger v. SI Mgmt. L.P.,* 301 F.3d 1115, 1121 (9th Cir. 2002).

Accordingly, the Court awards $10,269,745.07 in reasonable attorneys' fees to Plaintiffs' counsel.

**C.    Costs**

Plaintiffs seek $1,631,511.98 in costs as follows:  (1) SWCKW:  $1,079,353.37; (2) GBDH:  $231,937.31; (3) LAS-ELC:  $276,257.48; (4) DRLC:  $43,918.94; and (5) Parks:  $44.88.

**(1)    SWCKW**

Plaintiffs seek a total of $1,079,353.37 in costs expended by SWCKW as follows:[8]

| CATEGORY | AMOUNT REQUESTED |
|----------|------------------|
| Copying/Scanning (external) | $94,122.20 |
| Copying (internal) | $86,565.00 |
| Document Management | $393,837.20 |
| Experts | $324,429.95 |
| Filing/Service Fees | $23,702.74 |
| Legal Research | $34,395.54 |

---

[8] The amount of costs sought on behalf of SWCKW is based on the amounts set forth in the declarations of Eugenia Gueorguieva.

10

| Mediation | $58,929.50 |
| Messenger | $1,853.90 |
| Overnight Mail | $2,169.79 |
| Telephonic Court Appearance | $473.00 |
| Travel and Transportation | $52,953.09 |
| Depositions (video services) | $4,472.50 |
| Postage | $509.96 |
| System Access Fees | $939.00 |
| **TOTAL** | **$1,079,353.37** |

Copying (internal). SWCKW seeks $86,565.00 in internal copying costs. The evidence demonstrates SWCKW made 290,629 internal copies for this action and 11,222 in connection with the State Court Actions, at a cost of $0.20 per page, totaling $60,370.20. Accordingly, the Court awards $60,370.20 in costs expended by SWCKW for internal copying.

Travel and Transportation. SWCKW seeks $52,953.09 in travel and transportation costs. SWCKW submits evidence verifying $51,791.49 in travel and transportation costs were expended by SWCKW. SWCKW declares that it cannot locate receipts confirming $9 and $409.80 in travel expenses purportedly expended on December 15, 2012 and January 11, 2013, respectively, and therefore do not seek reimbursement for those costs. SWCKW fails to submit evidence that $742.80 was actually expended for airfare on March 16, 2012.[9] Accordingly, the Court decreases travel and transportation costs by $1,161.60, and awards

---

[9] SWCKW submits evidence that the $742.80 travel cost sought "is consistent with airfares charged by Southwest Airlines for other events that took place in Los Angeles during the above-captioned litigation," but fails to submit evidence of the actual cost for the March 16, 2012 airfare requested. *See Vectren Commc'ns Servs. v. City of Alameda*, 2014 WL 3612754, at *7 (N.D. Cal. July 22, 2014); *Butler v. Homeservices Lending LLC*, 2014 WL 5460447, at *9 (S.D. Cal. Oct. 27, 2014).

$51,791.49 for travel and transportation costs expended by SWCKW.

Other Categories.  The evidence submitted demonstrates that the amount of the costs sought for the remaining categories were reasonably expended by SWCKW.  Accordingly, the Court awards the following amounts for costs reasonably expended by SWCKW:  (1) Copying/Scanning (external):  $94,122.20; (2) Document Management:  $393,837.20; (3) Experts:  $324,429.95; (4) Filing/Service Fees:  $23,702.74; (5) Legal Research:  $34,395.54; (6) Mediation: $58,929.50; (7) Messenger:  $1,853.90; (8) Overnight Mail:  $2,169.79; (9) Telephonic Court Appearance:  $473.00; (10) Depositions (video services): $4,472.50; (11) Postage:  $509.96; and (12) System Access Fees:  $939.00.

The Court therefore awards $1,051,996.97 in costs reasonably expended by SWCKW.[10]

**(2)    GBDH**

Plaintiffs seek $231,937.31 in costs expended by GBDH in this action as follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| Court Reporters/Transcripts | $10,267.05 |
| Special masters/Mediators/Arbitrators | $7,816.12 |
| Copying Costs - In-house | $10,664.80 |
| Depositions | $3,100.00 |
| Experts | $157,804.65 |
| Overnight Mail | $180.06 |
| Copying and Scanning - outside agency | $1,023.12 |

---

[10] Plaintiffs seek costs expended by SWCKW in this action and in connection with the State Court Actions.  The Court finds, based on the evidence submitted, that costs which were reasonably expended by SWCKW in connection with the State Court Actions benefitted the class in this litigation.

| Filing/Service Fees | $7,360.90 |
| Class Notice: | $990.00 |
| Postage/USPS | $64.04 |
| Legal Research | $19,812.27 |
| Telephone/Conference Calls | $45.33 |
| Travel and Transportation | $10,362.35 |
| Travel – Lodging | $2,446.62 |
| **TOTAL** | **$231,937.31** |

<u>Taxable Costs</u>.  Plaintiffs seek $18,083.17 in taxable costs expended by GBDH (i.e., $10,267.05 (court reporters/transcripts), and $7,816.12 (Special masters/Mediators/Arbitrators).  Accordingly, the Court decreases GBDH's costs by $18,083.17.[11]  *See* Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54; Local Rule 54.

<u>Other Categories</u>.  The evidence submitted demonstrates that the amount of costs sought for the remaining categories were reasonably expended by GBDH in this action.  Accordingly, the Court awards the following amounts for costs reasonably expended by GBDH in this action:  (1) Copying Costs - In-house: $10,664.80; (2) Depositions:  $3,100.00; (3) Expert Fees:  $157,804.65; (4) Overnight Mail:  $180.06; (5) Copying and Scanning - outside agency:  $1,023.12; (6) Filing Service Fees: $7,360.90; (7) Class Notice: $990.00; (8) Postage USPS: $64.04; (9) Legal Research:  $19,812.27; (10) Telephone/Conference Calls: $45.33; (11) Travel and Transportation:  $10,362.35; and (12) Travel – Lodging: $2,446.62.

The Court therefore awards $213,854.14 in costs reasonably expended by GBDH.

---

[11] To the extent not already including in Plaintiff's pending application to the Clerk to tax costs (Dkt. No. 377), Plaintiffs are directed to apply for all taxable costs with the Clerk pursuant to Rule 54.

**(3)** **LAS-ELC**

Plaintiffs seek $276,257.48 in costs expended by LAS-ELC in this action as follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| clerk's fees | $230.00 |
| depositions | $539.70 |
| reproducing exhibits to deposition | $9.99 |
| Special Master | $27,697.87 |
| copying (in house) | $6,721.40 |
| copying/scanning (outside) | $28,189.65 |
| document management and hosting | $16,290.04 |
| Experts | $167,325.98 |
| legal research | $245.10 |
| mediation | $21,462.98 |
| messenger | $134.29 |
| overnight mail | $69.37 |
| travel and transportation | $5,418.33 |
| long distance phone charges | $119.78 |
| photo reproduction | $20.92 |
| temporary staffing | $872.08 |
| investigator fees | $910.00 |
| **TOTAL** | **$276,257.48** |

Taxable Costs.  Plaintiffs seek $28,477.56 in taxable costs expended by LAS-ELC (i.e., $230 (clerk's fees), $539.70 (depositions), $9.99 (reproducing exhibits to deposition), and $27,697.87 (Special Master fees)).  Accordingly, the Court decreases LAS-ELC's costs by $28,477.56.  *See* Fed. R. Civ. P. 23(h); Fed.

R. Civ. P. 54; Local Rule 54.

Long Distance Phone Charges.  Plaintiffs originally requested $119.78 in long distance phone charges purportedly expended by LAS-ELC.  LAS-ELC, however, declares that it was unable to locate evidence supporting any of the long distance phone charges, and therefore will not be seeking reimbursement of those costs.  Accordingly, the Court does not award LAS-ELC any amount for long distance phone charges.

Other Categories.  The evidence submitted demonstrates that the amount of costs sought for the remaining categories were reasonably expended by LAS-ELC in this action.  Accordingly, the Court awards the following amounts for costs reasonably expended by LAS-ELC:  (1) copying (in house):  $6,721.40; (2) copying/scanning (outside):  $28,189.65; (3) document management and hosting: $16,290.04; (4) expert fees:  $167,325.98; (5) legal research:  $245.10; (6) mediation fees:  $21,462.98; (7) messenger:  $134.29; (8) overnight mail:  $69.37; (9) travel and transportation:  $5,418.33; (10) photo reproduction charges:  $20.92; (11) temporary staffing:  $872.08; and (12) investigator fees:  $910.00.

The Court therefore awards $247,660.14 in costs reasonably expended by LAS-ELC.

**(4) DRLC**

Plaintiffs seek $40,908.94 in costs expended by DRLC as follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| Clerks' fees | $1,891.45 |
| Depositions | $10,135.95 |
| Interpreter's and Translator Fees | $2,067.50 |
| Fees for Service of Process | $1,028.00 |
| Reporter's Transcripts | $789.00 |

| Reproduction of Documents - Chambers Copies | $1,736.40 |
| Other Costs - Photographs | $6,075.00 |
| Copying and Scanning - outside agency | $4,050.09 |
| Copying Costs - In-house | $833.98 |
| Filing/Service Fees | $87.40 |
| Experts | $10,821.12 |
| Messenger | $99.00 |
| Overnight Mail | $261.13 |
| Travel and Transportation | $2,891.86 |
| Postage | $45.76 |
| System Access Fees | $580.30 |
| Translation of Documents | $145.00 |
| Official Court Reporter | $380.00 |
| **TOTAL** | **$43,918.94** |

<u>Taxable Costs</u>.  Plaintiffs seek $23,723.30 in taxable costs expended by DRLC (i.e., $1,891.45 (clerks fees), $10,135.95 (Depositions), $2,067.50 (Interpreter's and Translator Fees), $1,028.00 (Fees for Service of Process), $789.00 (Reporter's Transcripts), $1,736.40 (Reproduction of Documents - Chambers Copies), and $6,075.00 (Other Costs - Photographs)).  Accordingly, the Court decreases DRLC's costs by $23,723.30.  *See* Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54; Local Rule 54.

<u>Other Categories</u>.  The evidence submitted demonstrates that the entire amount of costs sought for the remaining categories were reasonably expended by DRLC in this action.  Accordingly, the Court awards the following amounts for costs reasonably expended by DRLC:  (1) Copying and Scanning - outside agency: $4,050.09; (2) Copying Costs - In-house: $833.98; (3) Filing/Service Fees:  $87.40; (4) Expert Fees: $10,821.12; (5) Messenger: $99.00; (6) Overnight

Mail: $261.13; (7) Travel and Transportation: $2,891.86; (8) Postage: $45.76; (9) System Access Fee: $580.30; (10) Translation of Documents: $145.00; and (11) Official Court Reporter: $380.00.[12]

The Court therefore awards $20,195.64 in costs reasonably expended by DRLC.

**(5)** **Parks**

Plaintiffs seek $44.88 in costs expended by Parks. The evidence submitted demonstrates the $44.88 in costs were reasonably expended and benefitted the class. The Court therefore awards $44.88 in costs reasonably expended Parks.

## IV. CONCLUSION

Accordingly, the Court **GRANTS** the Motion, and awards $10,269,745.07 in attorneys' fees and $1,533,751.77 in costs to Plaintiffs.

**IT IS SO ORDERED.**

DATED: August 25, 2016.

_____
Honorable Consuelo B. Marshall
United States District Judge

CC:FISCAL

_____

[12] Plaintiffs seek costs expended by DRLC in this action and in connection with the State Court Actions. The Court finds, based on the evidence submitted, that costs which were reasonably expended by DRLC in connection with the State Court Actions benefitted the class in this litigation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28